# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMICA CENTER FOR IMMIGRANT
RIGHTS,
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036;

AMERICAN GATEWAYS,
314 East Highland Mall Boulevard, #501
Austin, TX 78752;

ESTRELLA DEL PASO,
2400A E. Yandell Drive
El Paso, TX 79903;

FLORENCE IMMIGRANT AND REFUGEE
RIGHTS PROJECT,
PO Box 654
Florence, AZ 85132;

IMMIGRATION SERVICES AND LEGAL
ADVOCACY,
3801 Canal Street, Suite 210
New Orleans, LA 70119;

NATIONAL IMMIGRANT JUSTICE
CENTER,
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604;

NORTHWEST IMMIGRANT RIGHTS
PROJECT,
615 Second Avenue, Suite 400
Seattle, WA 98104;

PENNSYLVANIA IMMIGRATION
RESOURCE CENTER,
PO Box 20339
112 Pleasant Acres Road, Suite I
York, PA 17402;

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK,

Case No. 1:25-cv-00298

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

7301 Federal Boulevard, Suite 300,
Westminster, CO 80030

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF
JUSTICE,
950 Pennsylvania Avenue, NW
Washington, DC 20530;

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW
Washington, DC 20528;

JAMES R. McHENRY III, in his official
capacity as Acting Attorney General of the
United States,
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530;

SIRCE E. OWEN, in her official capacity as
Acting Director of the Executive Office for
Immigration Review,
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528,

*Defendants.*

## INTRODUCTION

Plaintiffs challenge Defendants' arbitrary and unconstitutional attempt to terminate longstanding, congressionally-funded legal orientation and legal representation programs that make the U.S. immigration system more efficient, have saved U.S. taxpayers nearly $18 million annually, and provide thousands of noncitizens, including many in detention, with their only source of information regarding their rights and obligations in removal proceedings.  Since 2003, the Legal Orientation Program ("LOP"), Family Group Legal Orientation Program ("FGLOP"), Immigration Court Helpdesk ("ICH"), and Counsel for Children Initiative ("CCI") (collectively, "the Programs") have provided critical information and support for people in removal proceedings around the country.  Plaintiffs, which receive congressionally-authorized funding to operate the Programs, rely on this funding to continue their critical operations.  By cutting off access to these congressionally-appropriated funds, Defendants force Plaintiffs to cut programs and likely staff, and prevent them from providing essential access to legal information for unrepresented noncitizens.

In 2023, LOP served at least 35 detention facilities and more than 40,000 individuals.  *See* White House Legal Aid Interagency Roundtable, *Access to Justice in Federal Administrative Proceedings: Nonlawyer Assistance and other Strategies* 30 (2023), https://perma.cc/Z7CM-2UNY [hereinafter, "Access to Justice Report"].  ICH expanded to 24 immigration courts and served over 12,000 individuals.  *Id.*  FGLOP served more than 12,000 families, and CCI provided representation to more than 200 children across the country.  *Id.*

The U.S. Government consistently has recognized the effectiveness of the Programs, particularly LOP.  For example, in April 2017, Booz Allen Hamilton—an outside consultant retained by the U.S. Department of Justice ("DOJ") and Executive Office for Immigration Review

("EOIR")—issued a report at the government's request on the results of a year-long case study of the work and function of EOIR.  U.S. Dep't of Just. Exec. Off. for Immigr. Rev., Legal Case Study: Summary Report (Apr. 6, 2017), https://tinyurl.com/bddahzpv [hereinafter, "Booz Allen Hamilton Study"].  The report recommends, among other things, that EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications."  *Id.* at 24-25.

Recognizing LOP and ICH's benefits, Congress consistently has appropriated funding to continue and expand them.  Most recently, on March 9, 2024, Congress reauthorized $28 million to support the continuation of LOP and ICH.  Pub. L. 118-42, 138 Stat. 133 (2024), *available at* https://www.congress.gov/118/plaws/publ42/PLAW-118publ42.pdf.  The statute stated that "$28,000,000 shall be available for services and activities provided by the Legal Orientation Program."  *Id.* (emphasis added).  And the Senate Appropriations Committee warned EOIR against taking the very actions Defendants have now taken, explicitly directing DOJ to "continue all LOP services and activities . . . without interruption, *including during any review of the program*," and "utilize all appropriated funds solely for legitimate program purposes."  S. Rep. No. 118-62, at 84 (2023) (emphasis added).

Despite the evidence of LOP's efficacy and near-universal support for the Programs—and Congress's clear mandate to continue their funding and services—DOJ/EOIR issued a stop work order for the Programs on January 22, 2025, purportedly to "audit" the Programs under President Trump's "Protecting the American People Against Invasion" executive order.  Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025).  Although the executive order specified there should be a "review" of relevant Programs, and an audit only "if appropriate" after that review, the stop work order came less than 48 hours after its issuance.  No meaningful "review" could have occurred

2

during that time, particularly considering the strong evidence of LOP's efficiencies and the breadth of the Programs.  Defendants provided no justification for the stop, no indication of the stop's duration, and no indication of whether the stop is (or could be) permanent.  This arbitrary and capricious decision, without justification and in violation of federal law, causes Plaintiffs immediate and irreparable harm and violates their constitutional rights, warranting injunctive relief requested here.

Without the congressionally-authorized funding, Plaintiffs cannot continue their critical missions to assist noncitizens by informing them of their legal rights and responsibilities during immigration proceedings.  Already, Plaintiffs have been ejected from immigration courts and detention facilities during previously-scheduled visits to speak with noncitizens, educate them on their rights, and intake potential new clients—curtailing Plaintiffs' First Amendment Rights. Despite modifying materials to fit the executive order and provide unfunded services, some Plaintiffs still have been denied access and blocked from continuing their work.  The congressional funding each Plaintiff receives is a significant portion of their overall operating funds, and the arbitrary cutoff very likely will force Plaintiffs to start terminating or reassigning staff. Defendants' challenged action threatens Plaintiffs' missions, censors their speech, and deprives noncitizens of valuable information.  And, because the Programs are proven to increase judicial efficiency, terminating the Programs undoubtedly will increase the already staggering immigration court backlog, estimated at 3.6 million at the end of FY 2024.  Holly Straut-Eppsteiner, Cong. Rsch. Serv., IN12463, Immigration Courts: Decline in New Cases at the End of FY2024 (Nov. 26, 2024), http://bit.ly/4jBqmoW.

The Administrative Procedure Act ("APA") requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that

is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B). *First*, the arbitrary and capricious standard requires agency action to be both reasonable and reasonably explained. Defendants' termination of the Programs is neither. Defendants' decision, with no reasoned explanation provided, fails to consider the devastating impact this indefinite halt will have on the Programs' providers, the *pro se* noncitizens in removal proceedings who benefit from their services, and the immigration court system. Had they appropriately considered this impact, Defendants could not reasonably have decided to terminate funding and halt the Programs for purposes of conducting an efficiency review, especially in light of Congressional action appropriating funding with clear instructions to continue the programs.

*Second*, Defendants' acts are contrary to the constitution and to Plaintiffs' constitutionally guaranteed rights. Defendants' termination of the Programs is contrary to congressional appropriations and allocations of funds towards the Programs, which the executive branch does not have authority to stop. Similarly, Defendants' acts terminating the Program are contrary to the constitutional right of free speech guaranteed by the First Amendment. By preventing Plaintiffs from accessing immigration courts and detention facilities and sharing information about the legal process and legal rights to individuals who are detained, Defendants are preventing Plaintiffs from sharing their viewpoint in limited public forums.

This Court should expedite consideration of this motion under 28 U.S.C. § 1657(a) and grant immediate provisional relief enjoining Defendants' illegal action, which is creating ongoing and irreparable harm to Plaintiffs, and preserve the status quo pending a final judgment in this proceeding.

## BACKGROUND

**A.      Congress Funded LOP to Promote Efficiency in the Immigration System.**

Nonprofit organizations, including the Florence Immigrant and Refugee Rights Project (the "Florence Project"), developed legal orientation programs and "Know Your Rights" presentations decades ago, long before Congress instructed EOIR to launch LOP.  In June 1992, a General Accounting Office ("GAO," now the "Government Accountability Office") report on Immigration and Naturalization Service ("INS") detention policies and practices observed the Florence Project's "successful results."  U.S. Gen. Accounting Office, GAO/GGD-92-85, *Immigration Control: Immigration Policies Affect INS Detention Efforts* 51 (1992), https://perma.cc/DXU8-ELQL.  As the GAO explained, INS officials observed that the program improved court efficiency and saved "a significant amount of time" at deportation hearings by "eliminat[ing] the need to have immigration judges describe the various types of relief available to each alien during the hearings." *Id*.  In 1994, citing the Florence Project as a "good model," the Senate passed a bipartisan resolution directing the Attorney General to consider implementing a pilot program at INS processing centers for the purpose of "increasing efficiency and cost savings" by "assuring orientation and representation" for individuals who are detained.  S. Res. 284, 103d Cong. (1994), https://perma.cc/QKU7-U5JT.

In 1998, EOIR conducted a 90-day pilot program at three sites, with services provided by three different organizations.  Anna Hinken, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Evaluation of the Rights Presentation* (1999), https://perma.cc/TR85-DJNB.  Nearly 3,000 noncitizens who were detained attended the presentations. *Id.* at 3.  EOIR conducted an extensive review of the pilot program's efficacy and found that the pilot program produced substantial efficiencies, including (1) increasing the number of noncitizens requesting removal during their initial hearings; (2) reducing the time from initial hearing to completion for unrepresented

noncitizens; (3) increasing *pro bono* representation rates; and (4) reducing anxiety among noncitizens who are detained, which helped INS manage the detention facilities more easily. *Id.* at 7–10.

On March 11, 2003, citing the nearly twenty percent reduction in detention time observed in the pilot program, EOIR introduced LOP at 6 sites, funded by a $1 million congressional appropriation. U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *New Legal Orientation Program Underway to Aid Detained Aliens* (Mar. 11, 2003), https://perma.cc/U5CC-7HG5. LOP now provides four main services: (1) group orientations, which provide a general overview of removal proceedings and forms of relief; (2) individual orientations, in which unrepresented individuals can briefly discuss their cases with LOP providers; (3) self-help workshops providing guidance and self-help materials both to those who have potential avenues for relief and to those who are willing to voluntary depart the country; and (4) referrals to pro bono legal services, when available. *Legal Orientation Program*, U.S. Dep't of Just. (Nov. 5, 2015), https://web.archive.org/web/20160920163113/https://www.justice.gov/eoir/legal-orientation-program. These services are provided at a variety of detention facilities around the country.

## B.    Following Regular Studies Showing LOP's Effectiveness, EOIR Continuously has Expanded the Program.

For more than two decades, LOP has been evaluated repeatedly, with unambiguously positive results. In 2008, the Vera Institute of Justice ("Vera"), which contracted with EOIR to manage LOP from 2005 until 2022 (at which time Acacia Center for Justice ("Acacia") took over contracting), evaluated the program. Nina Siulc *et al.*, *Legal Orientation Program: Evaluation and Performance and Outcome Measurement Report, Phase II*, THE VERA INSTITUTE OF JUSTICE (2008), https://perma.cc/ZEN3-648L. Vera found that, on average, LOP participants completed removal proceedings nearly two weeks faster than nonparticipants, were less likely to fail to appear

for immigration court hearings (if released), and were better prepared to proceed *pro se*. *Id.* at iv–v. Vera also found that immigration judges felt that LOP helped the immigration courts run more smoothly, and that detention facility staff found that it contributed to a safer environment in the facilities. *Id.* at 66–67. Vera continued to study the program in 2009 and found that more LOP cases than non-LOP cases concluded at the first Master Calendar Hearing; of the cases that continued beyond that initial hearing, the median case processing time of LOP cases was 11 days less than the median case processing time for non-LOP cases. Zhifen Cheng & Neil Weiner, Vera Inst. of Just., *Legal Orientation Program (LOP): Evaluation, Performance and Outcome Measurement Report, Phase III* at 3 (2009), https://bit.ly/2K8ctOz.

In 2012, at Congress's instruction, EOIR developed a more in-depth estimate of the cost savings associated with LOP; the study identified $17.8 million per year in net savings. U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Cost Savings Analysis – The EOIR Legal Orientation Program* 2–3 (updated Apr. 4, 2012), https://perma.cc/5CjC-REZH. This estimate was based on an average reduction of detention time of six days per person; EOIR also found that the program reduced immigration court processing times by an average of twelve days. *Id.* Based on its consistently successful performance, Congress has appropriated funds for EOIR to expand LOP several times, including:

- Ten new LOP sites opened in October 2006, noting that LOP participants "make wiser decisions and [their] cases are more likely to be completed faster—resulting in fewer court hearings and less time spent in detention." News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *EOIR Adds 10 New Legal Orientation Program Sites – Initiates Sites for Children* (Oct. 13, 2006), https://perma.cc/NWV9-LM5H.

- Twelve new LOP sites opened in October 2008, explaining that LOP participants "[c]omplete their immigration proceedings 13 days faster than other detained aliens," are more successful, "[a]re better prepared to represent themselves *pro se*," and are less likely to fail to appear for immigration court. News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *EOIR Adds 12 New Legal Orientation Program Sites* (Oct. 15, 2008), https://perma.cc/7PJC-AJRV.

- Seven new LOP sites opened in 2014, declaring that "[t]he Legal Orientation Program is critical to the efficiency of our immigration court proceedings." News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *EOIR Expands Legal Orientation Program Sites* (Oct. 22, 2014), https://perma.cc/V89T-M9BC (quoting EOIR Director Juan P. Osuna).

- Three new LOP sites opened in 2016, again touting that LOP "improve[s] judicial efficiency." News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Executive Office for Immigration Review Expands Legal Orientation Program Sites* (Nov. 9, 2016), https://perma.cc/RD99-F5C5.

In addition to expanding LOP, EOIR—based on congressional instruction—also has built on LOP's success by creating other legal access programs, including ICH, FGLOP, and CCI. For Fiscal Year 2016, Congress provided EOIR with funding to create ICHs "at the immigration courts with the greatest pending caseload." Fact Sheet, U.S. Dep't of Just. Exec. Off. of Immigr. Rev., *EOIR's Office of Legal Access Programs* 4 (2016), https://perma.cc/8P3W-9NWM. Similar to LOP's work with individuals who are detained, ICH "orient[s] non-detained individuals appearing before the immigration court on the removal hearing process, and provide[s] information to non-detained individuals to inform them about possible remedies and legal resources." *Id.*

In 2021, EOIR added FGLOP and CCI. EOIR expanded LOP to create FGLOP as a specific version of the program to serve families in removal proceedings on expedited dockets or in the Family Expedited Removal Management program (a program created in 2023 to place family units in expedited removal proceedings). Acacia Ctr. for Just., *Family Group Legal Orientation Program*, https://acaciajustice.org/what-we-do/family-group-legal-orientation-program (last visited Jan. 29, 2025). In 2023, FGLOP educated more than 12,000 noncitizen families in nine immigration courts and via its national information line. *See* Access to Justice Report at 30. Rocky Mountain Immigrant Advocacy Network ("RMIAN") runs FGLOP in Colorado.

ICH is a court-based legal education program for people in immigration proceedings who are not in detention. The program provides information about court practices and procedures,

available legal options, and other relevant topics.  ICH acts as a safeguard for immigrants in removal proceedings, ensuring a modicum of due process in a high-stakes and complex legal system.  The program also is a crucial gateway for connecting people with pro bono attorneys, to the limited extent available.  National Immigrant Justice Center ("NIJC") runs ICH in Chicago, RMIAN runs ICH in Denver, Immigration Services and Legal Advocacy ("ISLA") runs ICH in New Orleans, and Estrelle del Paso ("Estrella") runs ICH in El Paso.

CCI provides full-scope, free legal representation for children who are in removal proceedings without a parent, who would otherwise be forced to appear in court alone.  Acacia Ctr.r for Just., *Counsel for Children Initiative*, https://acaciajustice.org/what-we-do/counsel-for-children-initiative (last visited Jan. 29, 2025).  CCI operates in 14 cities and provided representation for 200 children in 2023.  *See* Access to Justice Report at 30.  NIJC runs CCI in Chicago, American Gateways runs CCI in Austin, Texas, and ISLA runs CCI in New Orleans.

### C.    Recognizing the Benefits of the Programs, Congress Appropriated Funds to Continue the Programs, most recently on March 9, 2024.

The benefits of the Programs are widely recognized.  In an April 2017 report based on a year-long study of EOIR's performance, the government's outside consultant Booz Allen Hamilton recommended that DOJ and EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications."  Booz Allen Hamilton Study at 24–25.

In May 2017, the EOIR program director overseeing LOP and ICH affirmed that LOP has had positive effects on the immigration court process: individuals who are detained make more timely and better-informed decisions and are more likely to obtain representation; non-profit organizations reach a wider audience of people with minimal resources; and, cases are more likely to be completed faster, resulting in fewer court hearings and less time spent in detention.  Decl. of

Steven Lang ¶ 65 *NWIRP v. Sessions*, No. 17 Civ. 00716 (W.D. Wash. 2017), ECF No. 50, https://bit.ly/2Hwn6wa.

In November 2017, then-ICE Assistant Director for Custody Management informed ICE field officers that "[e]xperience has shown that LOP attendees are positioned to make better informed decisions, are more likely to obtain legal representation, and complete their cases faster than detainees who have not received the LOP," and instructed field officers to facilitate the programs by ensuring adequate meeting space, sharing information with the program staff, and facilitating attendance by noncitizens who are detained.  Memorandum from Tae Johnson, ICE Assistant Director for Custody Management, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program* (Nov. 30, 2017), https://tinyurl.com/4c6tzc4w; *see also* Maria Sacchetti, *ICE Praised Legal-Aid Program for Immigrants That Justice Dept. Plans to Suspend*, WASH. POST, Apr. 17, 2018, https://wapo.st/2qGf1uT.

On March 9, 2024, as it has done every year since 2003, Congress appropriated funds for LOP.  Pub. L. 118-42, 138 Stat. 133 (2024).[1]  The text of the statute reads:

> For expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000, of which $4,000,000 shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the ''Immigration Examinations Fee'' account, and of which not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program: Provided, That not to exceed $50,000,000 of the total amount made available under this heading shall remain available until September 30, 2028, for build-out and modifications of courtroom space.

Congress's appropriation is a mandate, not a suggestion.  The text of the bill reads specifically that "$28,000,000 <u>shall</u> be available for services and activities provided by the Legal

---

[1] Funding for FY 2024 has ended, but on December 20, 2024, Congress passed a Continuing Resolution which continued funding at 2024 levels.  *See* H. Rep. No. 118-10545 (2025).

Orientation Program." *Id.* (emphasis added). Congress has also repeatedly warned EOIR not to try to stop the program, as it previously attempted to do (before reversing course) in 2018. In the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program." S. Rep. No. 118-198, at 92 (2024). And in 2022, the House Appropriations Committee's report recommending LOP appropriations for 2023 "remind[ed] EOIR that funding for this program is mandated by law, and any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee." H. Rep. No. 117-395, at 65 (2022). Congress's warnings reflect the mandatory nature of its appropriation, and underscore the illegality of Defendants' actions.

### D. The 2018 Attempt to Revoke Funding for LOP and ICH Provoked Significant Backlash, Demonstrating the Importance of and Broad Support for the Programs.

The last time Defendants (or their 2018 counterparts) attempted to unilaterally halt LOP, in 2018, an unnamed government official reportedly (and inaccurately) said that DOJ wanted to "conduct efficiency reviews which have not taken place in six years." *See* Maria Sacchetti, *Justice Dep't to Halt Legal-Advice Program for Immigrants in Detention*, Wash. Post (Apr. 10, 2018), https://wapo.st/2H4kczb. The unnamed official said that the program was halted "to examine the cost-effectiveness of the federally funded programs and whether they duplicate efforts within the court system." *Id.* This unnamed official did not, however, acknowledge the multiple efficiency reviews and unqualified support for LOP and its cost-effectiveness over the years.

Defendant James McHenry, formerly the director of EOIR and now the Acting Attorney General of the United States, provided testimony to Congress in 2018 that revealed the unconvincing and pretextual nature of Defendants' potential justifications. First, he ignored and rejected numerous studies demonstrating LOP's and ICH's efficacy, falsely claiming that LOP had

not been reviewed since 2012. *Strengthening and Reforming America's Immigration Court System*: *Hearings Before the Subcomm. on Border Security and Immigration of the S. Comm. on the Judiciary*, 115th Cong. (Apr. 18, 2018), at 1:02 [hereinafter Hearings] (video testimony of EOIR Dir. James R. McHenry III), https://bit.ly/2JEJrWx.  This testimony blatantly ignored Booz Allen Hamilton's report recommending the *expansion* of LOP.  Booz Allen Hamilton Study at 23. Second, McHenry mischaracterized previous studies of LOP as occurring "under some unorthodox circumstances," revealing doubt of his own agency's findings and indicating that Defendants have decided to discredit contrary (and consistent) efficacy findings in an attempt to terminate LOP and ICH.[2]  Hearings at 1:03–1:04.

Unsurprisingly, given that Congress had mandated continued funding for LOP and ICH in 2018, House and Senate members moved quickly to condemn Defendants' decision.  A week after the first attempted termination was announced in 2018, members of the House and Senate Judiciary Committees jointly communicated their "profound objection" to the Administration's actions, which are "systematically deconstructing basic due process protections for immigrants." Bicameral Judiciary Letter to General Sessions (Apr. 17, 2018), https://web.archive.org/web/20221111041740/https://www.leahy.senate.gov/imo/media/doc/4.17 .18%20Bicameral%20Judiciary%20Letter%20to%20DOJ.pdf.   The committee members expressed skepticism of Defendants' claim that a pause was needed to assess the cost-effectiveness of the programs, noting that the Department of Justice's own 2012 study concluded that LOP *saved*

---

[2]  Although McHenry, in the face of congressional backlash at the time, described Defendants' actions as a "suspension" of LOP and suggested that the programs would be reinstated *if*, at some unspecified future time, they were found to be effective, his testimony contradicted DOJ's announcement regarding the program's termination.   Regardless of how McHenry currently frames or previously framed the decision, Defendants' cessation of funding has the effect of immediately terminating the programs.  Accordingly, as shown in Section I.A of the argument, Defendants' actions constitute final agency action.

the government nearly $18 million annually.  *Id.* at 2.  The committee members wrote that the "decision to pause the LOP contradicts clear and unambiguous Congressional intent," *id.* at 2, as the March 23, 2018, omnibus spending bill included explicit instructions to the Department to provide funds to "sustai[n] the current legal orientation program," *id.* at 3, and even noted the need to *expand* the program in remote areas.  *See id.* at 3 (quoting H.R. Rep. No. 115-231, at 30 (2019) and citing S. Rep. No. 115-139 at 65 (2018)) (alteration in original).  They concluded, in no uncertain terms, that Defendants were "ignoring the will of Congress."  *Id.* at 3.

The next day, twenty-two Senators wrote to express their "strong opposition" to Defendants' decision to terminate LOP and ICH.  Senate Letter to Attorney General Sessions, (Apr. 18, 2018), https://perma.cc/2FLW-FB6B.  The Senators explained that, although they "support efforts to engage in oversight," they "do not agree that a review of the programs requires [the Department of Justice] to bring LOP, nor the ICH to a standstill."  *Id.*  Noting EOIR's own findings that the program was effective, the Senators wrote that, "[g]iven this Administration's goal of reducing the immigration court backlogs, it does not follow that the Department [of Justice] would suspend a program which has been shown to do just that."  *Id.*  The Senators insisted that Defendants "cannot be serious" in contending that DOJ must study the program because LOP and ICH were duplicative of the explanations that immigration judges provide in removal proceedings. *Id.* at 2.

The following day, 105 members of the House jointly expressed their "strong opposition" to the termination.  House Letter to Attorney General Sessions (Apr. 19, 2018), https://perma.cc/PU9P-4JLB.  Given the "body of evidence" supporting the programs' effectiveness, the House members were "shocked" to hear of Defendants' plans to terminate them. *Id.*  Like the Senators, the House members noted that, although they support regular oversight, it

"does not justify the termination of these programs during that process," as previous reviews were conducted effectively without interrupting operations. *Id.* The House members emphasized that Defendants' actions "directly contradict the express direction of Congress." *Id.* at 2.

### E.    Two Days into a new Administration, and without Justification, Defendants Terminated LOP and related Programs.

On January 20, 2025, the date of his inauguration, President Trump signed an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025). Section 19 of the order directs the Attorney General and Secretary of Homeland Security to "[i]mmediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws." *Id.* The order further instructs the Attorney General and Secretary of Homeland Security, in violation of congressional mandate, to "[p]ause distribution of all further funds pursuant to such agreements pending the results of the review" and to "[t]erminate . . . agreements determined to be in violation of law or to be sources of waste, fraud, or abuse." *Id.*

Less than 48 hours later, DOJ/EOIR issued a stop work order as to the Programs, and halted funding. *See, e.g.*, Rojas Decl. ¶ 11; St. John ¶ 21; Koop Decl. ¶ 3. The stop work order reportedly said, "[t]his email is to send you notification to stop work immediately Pursuant to the Executive Order." Laura Romero, *DOJ orders federally funded legal service providers to stop providing support at immigration courts*, ABC NEWS (Jan. 23, 2025), https://perma.cc/R455-JMGN. Putting aside, for now, the many illegalities related to the executive order, there is no basis to conclude executive order's mandated "review" of relevant Programs could have meaningfully occurred

during these few hours.  The stop work order for the Programs vaguely suggested the stop work order was to allow for an "audit" of the Programs but came without any explanation as to the stop's duration, or its permanence.  *See, e.g.*, Rojas Decl. ¶ 11; Yang Decl. ¶ 10.

Defendants offered virtually no explanation for their decision to stop funding the Programs, beyond a vague desire to conduct an audit.  But any such audit appears pretextual and the result preordained:  on January 28, 2025, EOIR removed its prior practice manuals and guidance pages, replacing them with a new "EOIR Policy Manual."  That new manual inaccurately asserts that the "EOIR has previously determined that the general LOP constitutes a wasteful program."  U.S. Dep't of Just., EOIR Policy Manual 557 (January 2025), https://www.justice.gov/eoir/media/1386531/dl?inline= [hereinafter "EOIR Policy Manual"].

### F.  Defendants' Action will Cause Severe and Irremediable Harm to Plaintiffs, Noncitizens, and the U.S. Immigration System.

Terminating funding for the Programs will have immediate, devastating, and irreparable effects.  Even if EOIR reinstates these programs at some unknown future time (an unlikely supposition), LOP already will have been dealt a fatal blow, at the expense of Plaintiffs, unrepresented noncitizens in removal proceedings, immigration judges, and taxpayers.  Program providers across the nation receive approximately $9 million dollars annually.  For Plaintiffs, this funding represents substantial portions of their organizations' overall operating budget, and funds many full-time staff dedicated to the Programs.  *See* Yang Decl. ¶ 13 (LOP and ICH account for 27% of American Gateways' budget and impact over 32% of staff); Brock Decl. ¶ 10 (LOP, ICH, and FGLOP account for about 25% of RMIAN's total revenue for 2025); Rojas Decl. ¶ 25 (LOP accounts for 20% of the Amica Center for Immigrant Rights ("Amica Center")'s Detained Adult Program budget); Lopez Decl. ¶ 14 (13 staff at Estrella are exclusively funded through LOP and ICH); St. John Decl. ¶ 38 (20 staff at the Florence Project are dedicated primarily to LOP).  As

nonprofit organizations, Plaintiffs cannot continue this critical work at the core of their mission if Defendants withdraw the previously appropriated, allocated, and approved funding. Plaintiffs will be forced to terminate or reassign staff. *See* Brunsink Decl. ¶ 12; Rojas Decl. ¶¶ 25–29. They will lose (and have already lost) access to noncitizens detained at immigration detention facilities across the country as well as noncitizens who are not detained, and in many cases have already lost access to courthouses and detention centers entirely. *See, e.g.*, Rojas Decl. ¶ 12; Yang Decl. ¶ 11; Gutierrez Decl. ¶¶ 11–12. They are being forced to renegotiate their relationships with detention centers and immigration courts. Rojas Decl. ¶ 20. All the while, thousands of *pro se* noncitizens will face removal proceedings without access to vital information about how to present themselves and their cases in those proceedings.

Defendants' termination already has forced Plaintiffs to reevaluate their operations. Given the small size of most LOP providers, some organizations may be forced to close their doors or forced to charge fees for their services. *See* Brunsink Decl. ¶ 12; Lopez Decl. ¶ 14. Even those nonprofits large enough to survive Defendants' arbitrary and capricious action will face serious consequences, including being forced to reassign or terminate staff, many of whom have specialized expertise in providing services tailored to the Programs, and whose experience is irreplaceable. For example, while American Gateways has, in the short term, shifted its LOP and ICH staff to other programs, it expects it will have to lay off staff members if the stop continues for much longer. Yang Decl. ¶ 13. Similarly, the Amica Center has already had to divert funding for one of its LOP employees to another program and predicts it will have to make other diversions going forward, leading to potential layoffs if funding is not restored in the short-term. Rojas Decl. ¶ 26. NWIRP predicts that the stop will significantly limit its ability to provide detention defense. Gutierrez Decl. ¶ 15. Without federal funding, NIJC's ability to provide continued services to

unrepresented people in the immigration court is "at imminent risk."  Koop Decl. ¶ 12.  RMIAN is working to find alternative funding sources for its LOP, FGLOP, and ICH programs, taking time from its mission, but much of its other funding cannot be used to provide certain programming typically conducted through those programs.  Brock Decl. ¶ 10; Sherman Decl. ¶ 14.  RMIAN fears that these limitations will cause it to lose staff due to low morale and mission drift.  Sherman Decl. ¶ 18.

Moreover, given the extreme complexity of immigration removal proceedings, *see Padilla v. Kentucky*, 559 U.S. 356, 369 (2010), and the absence of appointed counsel for noncitizens facing removal, the dismantling of these programs will severely frustrate Plaintiffs' respective missions to support noncitizens in removal proceedings.  An increased number of noncitizens will be forced to navigate the immigration system without *ever* having spoken to a lawyer about the immigration process, their obligations, or the legal remedies available to them.  Access to legal resources in removal proceedings is a particularly urgent issue today, as deportations have increased significantly.  *See, e.g.*, *ICE Enforcement and Removal Operations Statistics*, ICE, https://www.ice.gov/spotlight/statistics (last visited Jan. 31, 2025).  Recent actions by ICE—including imposing daily arrest quotas and opening a new detention facility for 30,000 noncitizens in Guantánamo Bay—only underscore the urgent need for the Programs, which serve a critically important role in providing legal access and due process.  Tarini Parti, *Trump Orders Use of Guantanamo Bay to House Migrants*, Wall St. J. (Jan. 26, 2025), https://www.wsj.com/politics/national-security/migrants-guantanamo-bay-executive-order-ea6a2e72; Danielle Wallace, *Trump Officials Give ICE Goal on Number of Arrests Per Day: Report*, Fox News (Jan. 27, 2025), https://www.foxnews.com/politics/trump-officials-give-ice-goal-number-arrests-per-day-report.  With these increased detentions, rapid deportation processes,

and new detention centers, providing legal advice at detention centers to ensures these activities are being carried out following applicable laws is more important now than ever.  The Programs inform noncitizens about basic due process and ensure lawyers are regularly inside detention centers to observe or learn about potential legal violations.

Beyond the obvious negative implications for noncitizens in removal proceedings and the nonprofit organizations that serve them, the dismantling of these programs will result in a less efficient and costlier immigration system, to the detriment of noncitizens, courts, and taxpayers alike, at a time when efficiencies in the immigration system are particularly crucial.  Given an average daily cost in detention of $164.65, and LOP's average cost of at most $200 per person ($8 million in funding and more than 40,000 people served), even a reduction of 1.5 days of detention per detainee saves taxpayer money on top of providing due process protections in removal proceedings.  Thus, terminating the Programs causes the very inefficiencies Defendants purportedly want to eliminate from the immigration system.

The harms caused by Defendants' actions *cannot* be redressed after-the-fact by restarting the programs or providing monetary relief.  Halting the Programs, even if they are eventually reinstated, has started and will continue to cripple the nonprofit organizations that provide Program services, effectively killing the programs.  Plaintiffs have already been denied access to detention centers and immigration courts where they typically perform their services, depriving numerous *pro se* noncitizens of the valuable information they share, and depriving Plaintiffs of the ability to share information and communicate with detainees.  For example, the day the stop work order was issued, an NIJC ICH attorney was at the Chicago immigration court providing services to unrepresented individuals.  The attorney was promptly instructed to terminate her work and return to NIJC's office.  Koop Decl. ¶ 4.  The stop work order has limited RMIAN's access to docket

information, preventing RMIAN from reliably ensuring that juveniles and families on the expedited docket have access to information regarding their rights and responsibilities in removal proceedings.  Brock Decl. ¶ 9.  For plaintiffs who administer CCI, although the stop work order prevents organizations from receiving funding for their services, attorneys continue to be ethically obligated to represent their juvenile clients.  Page Decl. ¶ 8.  But CCI providers, like NJIC, are being denied access to immigration courts and detention facilities—at one facility, a security told an immigrant that they could not access NJIC services "because there was 'no more pro bono.'"  Koop Decl. ¶ 11.  These access restrictions limit CCI providers' ability to speak to their clients and provide competent representation.

In addition to imposing these new roadblocks to performing needed services, Defendants' actions prevent Plaintiffs from communicating and sharing information related to their missions. The Amica Center has been unable to conduct its regular "know your rights" ("KYR") trainings at detention facilities and courthouses in Virginia, despite requesting the ability to do so without LOP.  Rojas Decl. ¶ 18–19.  Similarly, NWIRP has received pushback from a detention facility about continuing to meet individually with detainees and does not know whether it can continue to enter the detention facility to conduct KYR presentations or meet with individuals.  Gutierrez Decl. ¶ 12.  Pennsylvania Immigration Resource Center ("PIRC") was forced to cancel several planned trips to continue KYR services and has not received a response as to whether similar presentations will be allowed going forward.  Brunsink Decl. ¶ 10.  ICE informed RMIAN that they would no longer be allowed to perform group KYR and consultation services.  Sherman Decl. ¶ 14.  As time goes on, Plaintiffs (and other nonprofit providers) will be forced to reassign or terminate staff, divert funding from equally important initiatives, or even shut their doors.  Loss

of these staff may include those with significant subject-matter expertise in relation to LOP; loss of that experience and expertise is irreparable and ongoing harm.  Rojas Decl. ¶¶ 28–29.

Further, the immigration system will suffer the strain of losing these educational programs as the efficiency benefits from the Programs are lost, increasing the time to manage an already staggering backlog of around 3.6 million cases.  And the system will lose critical institutional knowledge, further impairing its operations for years to come.  Immediate preliminary injunctive relief is necessary to maintain the status quo from before the stop work order to ensure Plaintiffs do not suffer further irreparable harm.

## STANDARD OF REVIEW

Motions for temporary restraining orders are governed by the same standards as motions for preliminary injunctions.  *See Morgan Stanley DW Inc. v. Rothe,* 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction.").  A preliminary injunction is warranted where the plaintiffs establish: (1) their likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Where the government is the defendant, the last two factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Courts consider the same factors in determining whether a temporary restraining order should be issued.  *Rothe*, 150 F. Supp. 2d at 72.

**ARGUMENT**

**I.      Plaintiffs are Likely to Succeed on the Merits**

Agency action cannot stand if it is arbitrary, capricious, or contrary to law, if it is done without appropriate process, or if it is contrary to the constitution.  Defendants' abrupt termination[3] of the Programs is all of those, and therefore Plaintiffs are likely to succeed on the merits.

**A.      Defendants' Termination of the Programs Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  Persons or organizations, like Plaintiffs here, who are "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  The APA makes clear that "agency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id*.; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law."  5 U.S.C. §§ 701(a), 704. Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*.  Under the APA, "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2).  An agency action is final where two conditions

---

[3]  *See* Rojas Decl. ¶ 10; St. John Decl. ¶ 21; Yang Decl. ¶ 10; Brock Decl. ¶ 10; Lopez Decl. ¶ 10; Gutierrez Decl. ¶ 10; Sherman Decl. ¶ 13; Koop Decl. ¶¶ 3–4; Brunsink Decl. ¶ 9.

are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006).

DOJ/EOIR's stop work order is a final agency action. The D.C. Circuit's opinion in *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017) (per curiam) is instructive. In that case, the EPA granted a petition for reconsideration of a final rule and issued a 90-day stay of the compliance date for the rule. *Id.* at 5. Less than two weeks later, EPA published a notice of proposed rulemaking announcing its intention to extend the stay for two years and to "look broadly at the entire" rule during "the reconsideration proceeding." *Id.* The D.C. Circuit found that, although granting reconsideration of the rule was not a final action, imposing the stay was. *Id.* at 6. As the Court explained, "this court has held that such orders are tantamount to amending or revoking a rule." *Id.* There was "no indication" that the agency intended to reconsider *the stay*, and thus the stay represented a final decision and thus marked "the consummation of [the agency's] decisionmaking process." *Id.* At the same time, the stay affected parties' rights or obligations, as it affected the compliance obligations for regulated entities and the penalties that would have applied for non-compliance. *Id.* at 7.

Here, as in *Clean Air Council*, there is no indication that the agency intends to reconsider its decision to halt the programs. To the contrary—as discussed in footnote 2, supra—when pressed during testimony before the Senate Judiciary Committee about the first "temporary" stop in 2018, Defendant McHenry confirmed the agency's intention to stop funding. Hearings at 1:02. In 2018, Defendants never provided a timeline for conducting the efficiency study that supposedly

precipitated the decision and gave no explanation for why the programs needed to stop to be studied. This time around, Defendants have clearly demonstrated that any concerns with "waste" are pretextual: less than a week after the stop work order, Defendants issued a new EOIR Policy Manual already prejudging that LOP, at least, is "wasteful" without so much as a pretense of an audit. EOIR Policy Manual 557. Defendant McHenry's previous and self-serving assertions that a termination like this is "temporary" cannot be squared with his comments that EOIR would resume the program only "if" it were found to be efficient, while simultaneously judging the program to be redundant—a judgment that ignores all available data. *See* Background, Sections B, C. Defendants' actions are the culmination of years of efforts to undermine the Programs, regardless of the overwhelmingly positive reviews of their efficiency and efficacy; there is little doubt that Defendants do not intend to restart the Programs.

Even if Defendants' contentions that a stop work order like DOJ's/EOIR's could be temporary are believable, their action nonetheless is final because even a temporary termination of the program will have the effect of killing it. Plaintiffs will not be able to sustain the programming that they have offered, staff will be laid off or reassigned, organizations may close their doors, and institutional knowledge (both for the government and the affected nonprofits) will be permanently lost. Undeniably, by eliminating funding, the halt will have an immediate effect on parties' rights or obligations. *See, e.g.*, Brinsink Decl. ¶¶ 11–12; Koop Decl. ¶ 14; Sherman Decl. ¶ 18; Rojas Decl. ¶ 25.

Likewise, the agency's use of informal means of communicating its decision does not insulate it from review. *See, e.g.*, *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986) ("It is settled . . . that an agency may not avoid judicial review merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation.").

For example, this Court has recognized that an email that "is 'definitive' and has 'direct and immediate effect on the day-to-day business of the part[y] challenging the action'" is a final agency action. *Allergan, Inc. v. Burwell*, 2016 WL 1298960, at *6 (D.D.C. Mar. 31, 2016) (quoting *Ciba-Geigy*, 801 F.2d at 436). Here, the agency action is definitive because "there is 'no ambiguity' in the statement, nor any indication it is 'subject to further agency consideration or possible modification." *Allergan*, 2016 WL 1298960, at *6 (quoting *Ciba Geigy*, 801 F.2d at 436). And the "direct and immediate effect on the day-to-day business" of the Plaintiffs resulting from a catastrophic loss of funds is undeniable. *Id.*; *see also* Section II.A. The agency's decision to halt the programs is therefore a final agency action and reviewable by this Court.

No Other Adequate Remedy. Plaintiffs do not have any other adequate remedy for their claims. The Supreme Court narrowly interprets the "other adequate remedy" limitation, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("the generous review provisions of the APA must be given a hospitable interpretation such that only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review") (internal citations and quotations omitted)). Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). Here, no such special procedures have been established, so it is proper for Plaintiffs to seek relief from this Court.

No Statutory Bar to Review. Finally, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial

review" of the administrative actions Plaintiffs challenge. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

**B.      Termination of LOP and ICH Violates the Appropriations Clause.**

Canceling LOP and ICH flouts an express congressional mandate. Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(a)(2)(B). Termination or indefinite suspension of LOP and other Programs violates the mandate set forth in the Spending Bill and thus must be set aside under the APA. Pub. L. 118-42, 138 Stat. 133 (2024).

Congressional appropriations *require* the executive to fulfill congressional expenditures; the use of the word "shall" means that the expenditure is mandatory. *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381, 1381 n.19 (D.D.C 1973). The executive branch does not have the authority to withhold funds from allotment and obligation. *Train v. City of New York*, 420 U.S. 35 (1975). In *Train*, the Supreme Court affirmed the D.C. Circuit's finding that where a statute mandated a federal agency to spend *all* appropriated funds, the President could not direct that agency to allot less money than the congressionally appropriated amount. *Id*. at 35, 37, 41. Like the statute directing funding to the Environmental Protection Agency in *Train*, the text of the statute here is clear that Congress did not intend to give the executive branch "limitless power to withhold funds from allotment and obligation." *Id*. at 46; *see also New York v. Dep't of Just.*, 951 F.3d 84, 100–01 (2d Cir. 2020) (noting that DOJ is an agency that is subject to limits on executive discretion to spend congressionally appropriated money). Further, where funds have already been obligated through a definite commitment of those funds to a provider of services or goods, the government is legally obligated to provide those funds. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (control over obligated funds resides in Congress, and not the executive, and agents of the executive cannot obligate the Treasury for payment of funds contrary to congressional

intent).  After funds have been obligated, the intended recipient is legally entitled to receive those funds.  *See Nat'l Juv. L. Ctr., Inc. v. Regnery*, 738 F.2d 455, 462–65 (D.C. Cir. 1984) (where the government has promised to fund a private party, it is obligated to pay).

Congress allocated more than $840 million dollars "for the administration of immigration-related activities" of the EOIR.  Pub. L. 118-42, 138 Stat. 133 (2024).  In its language regarding LOP, Congress explicitly required that "$28,000,000 . . . *shall* be available" for the LOP, using the language of command.  *Id*.  In previous Spending Bills, Congress defined some of the "immigration-related activities" it intended to fund in (1) a Joint Explanatory Statement, which the 2018 Spending Bill incorporated, 164 Cong. Rec. H2084, H2090 (2018), https://bit.ly/2ES8xNV (2) a House Report, H.R. Rep. No. 115-231, at 30 (2018), https://bit.ly/2H7BhnT; and (3) a Senate Report, S. Rep. No. 115-139, at 65 (2018), https://bit.ly/2qAPq5K.  Since then, Congress has reminded EOIR it cannot try to stop the program like it did in 2018.  In the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program."  S. Rep. No. 118-198, at 92 (2024) (emphasis added).  And in 2022, the House Appropriations Committee's report recommending LOP appropriations for 2023 warned, "[t]he Committee reminds EOIR that funding for this program is mandated by law, and any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee."  H. Rep. No. 117-395, at 65 (2022).  The reports and the explanatory statement made clear that agencies are bound by the mandates contained therein, including that LOP and other Programs continue without interruption.  *See* Background, Section C.  EOIR's cancellation of the Programs in no way considered the fact that Congress expressly funded and mandated continuation of the Programs.

26

Here, Defendants have no authority under the Constitution to withhold the relevant funds from Plaintiffs, because those funds have been authorized by Congress and already allocated to Plaintiffs.  Because payments have been approved *at least* until June 2025, a "contractual obligation" has been created between the United States and the recipients of congressionally appropriated funds.  *See Train*, 420 U.S. at 39; *see also Maine v. Goldschmidt*, 494 F. Supp. 93, 95 (D. Me. 1980) (holding that the Federal-Aid Highway Act of 1956 mandates spending and precludes the Executive from deferring or reducing the obligational limit).  Defendants "must follow statutory mandates so long as there is appropriated money available" and cannot simply "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).  This Court should set aside the stop work order and enjoin any future attempts to withhold funds.  5 U.S.C. § 706(2)(B).

Even if an administration wanted "to spend less that the full amount appropriated by Congress" instead of withholding the full amount, as attempted here, procedural requirements must be followed, set forth in the Impoundment Control Act ("ICA"), 2 U.S.C. §§ 681 *et seq. See Aiken Cnty.*, 725 F.3d at 261 n.1   (citing 2 U.S.C. § 683) (requiring budget authority proposed for rescission to be made available for obligation until "Congress has completed action on a rescission bill[.]").  Even a temporary stop of budget authority requires compliance with the ICA.  2 U.S.C. § 684 (requiring proposed deferrals to be transmitted via a "special message" to Congress). Defendants did not follow such procedural requirements here.

### C.      Terminating the Programs is Arbitrary and Capricious.

Defendants' decision to terminate the Programs ignores the well-documented historical efficacy of the program and is the definition of arbitrary and capricious.  To ensure that agency actions are reasonable and lawful, the court must "exercise our independent judgment and apply all relevant interpretive tools to reach the best reading of the statute." *Env't Def. Fund v. United*

27

*States Env't Prot. Agency*, 124 F.4th 1, 11 (D.C. Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).  Agency actions that are not contrary to law must nevertheless be "reasonable and reasonably explained." *Id.*  After undertaking such review, a court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); *see also Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001) (noting that the "standard requires the agency to 'examine the relevant data and articulate a satisfactory explanation for its action'").

Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned analysis" for departure from preexisting policies.  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42–43 (1983).  In cases where the purported rationale for agency action is pretextual, it must be set aside without further inquiry. *See, e.g.*, *N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130–31 (D.C. Cir. 1984); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986).  Here, Defendants fail on all grounds, justifying immediate provisional relief (as well as ultimate relief on the merits).

### 1.    Defendants Failed to Adequately Explain the Basis for the Decision.

A "fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Tourus Recs.*, 259 F.3d at 737 (quotation marks omitted); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*) (it is a "simple but fundamental rule of administrative law" that "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency").

"[Courts] do not hear cases merely to rubber stamp agency actions.  To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'"  *Nat'l Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000) *citing A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995).  Meaningful judicial review cannot proceed unless "the grounds upon which the administrative agency acted [are] clearly disclosed and adequately sustained."  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) *(Chenery I)*.  Accordingly, an agency action must be set aside unless its basis is "set forth with such clarity as to be understandable."  *Chenery II*, 332 U.S. at 196.

Defendants' cancellation of the Programs fails even this most basic test, eviscerating the only access to information about deportation proceedings that is available to tens of thousands of individuals, with nothing more than a pretextual justification.  EOIR made no public statements regarding the reasons for the cancellations.  Instead, Plaintiffs and other providers learned of the news from the Acacia Center for Justice, who emailed them about a stop work order they had received from their Contracting Officer, and via email communications from individual facilities that abruptly revoked their access.  St. John Decl. ¶ 21; Lopez Decl. ¶ 10; Koop Decl. ¶ 4.  Neither Plaintiffs nor Acacia received any advance notice of the stop work order, which was effective immediately.  Brock Decl. ¶ 8; Brunsink Decl. ¶ 9; Gutierrez Decl. ¶ 10; Koop Decl. ¶ 3; Lopez Decl. ¶ 10; Rojas Decl. ¶ 11; Sherman Decl. ¶ 13; St. John Decl. ¶ 21; Yang Decl. ¶ 10.

Defendants, who have provided *no justification* whatsoever for their dramatic reversal of policy and practice, are far from satisfying the APA's requirement that an agency provide *a reasoned basis* for its actions.  *See Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." (emphasis in original) (internal citations omitted)).  In fact, EOIR's past public statements on LOP,

like that on October 22, 2014, concluded that Defendants carried out the program to "improve judicial efficiency in the immigration courts." *See* U.S. Dep't of Just., *Executive Office for Immigration Review Expands Legal Orientation Program Sites* (2014), https://perma.cc/V89T-M9BC. As such, because EOIR failed to provide any discernable rationale for its decision to terminate the programs, the cancellation must be set aside. *See Chenery II*, 332 U.S. at 196–97 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *see also Columbia Gas Transmission Corp. v. FERC*, 448 F.3d 382, 387 (D.C. Cir. 2006) (same).

### 2. Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made.

To survive review under the arbitrary and capricious standard, an agency must have "demonstrated a rational connection between the facts found and the choice made." *Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 301 (D.C. Cir. 1981) (quotations omitted). Courts "do not defer to the agency's conclusory or unsupported suppositions." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engs.*, 255 F. Supp. 3d 101, 121–22 (D.D.C. 2017). In canceling the Programs, Defendants failed to address any of the considerations appropriate to the decision. Far from articulating a rational connection between the facts found and the action taken, the decision blatantly ignores multiple instances of government analysis finding the programs to be effective and cost efficient.

For example, the government's April 2017 Booz Allen Hamilton Study explicitly recommends that EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications." Booz Allen Hamilton Study at 24–25. Further, a 2017 ICE memorandum issued

during the first Trump Administration noted that "LOP attendees are positioned to make better informed decisions, are more likely to obtain legal representation, and complete their cases faster than detained noncitizens who have not received the LOP." *See* Memorandum from ICE Assistant Director for Custody Management Tae Johnson, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program* (Nov. 30, 2017),  https://tinyurl.com/4c6tzc4w ; *see also* Nina Siulc, et al., *Legal Orientation Program: Evaluation and Performance and Outcome Measurement Report, Phase II*, THE VERA INSTITUTE OF JUSTICE (2008), https://perma.cc/ZEN3-648L (finding that LOP participants moved through the immigration court process at a faster pace than non-participants, resulting in processing times that were an average of thirteen days faster).  Instead, Defendants offer only a conclusory and inaccurate statement that EOIR previously concluded that LOP is a wasteful program without any support to back up this false claim.  EOIR Policy Manual at 557. Given repeated and consistent evaluations that the Programs make the immigration courts run more efficiently, providing significant savings to taxpayers, Defendants' decision to abruptly terminate the program, ostensibly while they review its efficacy, must be rejected as arbitrary and capricious.

Defendants also failed to assess in any way the impacts that cancellation of the Programs programming will have on the intended and actual beneficiaries of the program.  In a system where immigrants have no right to appointed counsel and nearly 90% of noncitizens who are detained complete deportation proceedings without counsel, the anticipated termination of the program removes the only access to relevant, legal information that many individuals ever receive. "Reasoned decisionmaking" requires that agencies "look at the costs as well as the benefits" of their actions.  *See State Farm*, 463 U.S. at 52, 54.  Defendants have given no indication that any

such analysis or consideration occurred here, which practically would have been impossible in the less than 48 hours before executive order and EOIR action.

The record reveals no policy rationale for the decision to cancel programming. Where, as here, "no findings and no analysis . . . justify the choice made," the APA "will not permit" a court to accept the agency's decision. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962). Because Defendants "should have considered those matters but did not," their "failure was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

### 3. Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy.

When the government reverses its own established policy, it has an even greater burden to justify its actions. The agency must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (citation omitted); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (an agency cannot depart from prior policy without "explaining its changed position"). Thus, reversing a pre-existing policy may require a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox*, 556 U.S. 502, 515 (2009).

Here, the cancellation reverses a two decades-old policy that was explicitly reaffirmed year after year by Congress, most recently when they renewed funding for LOP programming via the 2024 Omnibus Spending Bill. That bill appropriated funds "for the administration of immigration-related activities of the Executive Office for Immigration Review," with "$28,000,000 [that] shall be available for services and activities provided by the Legal Orientation Program." Pub. L. 118-42, 138 Stat. 133 (2024). Contrasting this clear intention to continue longstanding policy and

practice of funding LOPs and related Programs, DOJ has ended the programs without explanation under the guise of an alleged "audit" of their effectiveness. Even taking DOJ at its word that it is suspending the programs for an evaluation for "waste, fraud, and abuse" (which is belied by the recent studies finding them to be effective), terminating the programs merely to conduct such studies would be unprecedented.

In cancelling the programs for "further study," DOJ and EOIR dramatically depart from their own precedent. Their radical about-face comes without any adequate justification for the departure from earlier policy. An "audit, even if legitimately needed, should not serve as a justification for cancellation of a long-standing and successful program. Defendants lack any explanation for this abrupt change in policy, let alone the "reasoned" explanation that is required, *see Fox*, 556 U.S. at 515, and therefore their action is arbitrary and capricious.

### 4. To the Extent Any Reason Was Offered, That Reason Was Pretextual.

Unlike the 2018 attempt to cancel LOP and ICH, Defendants here make no effort to justify their decision in stopping funding for the Programs. The Executive Order upon which Defendants' actions were purportedly based requires Defendants to "review and, if appropriate, audit" funding agreements "supporting or providing services . . . to removable or illegal aliens, to ensure that such agreements . . . are free of waste, fraud, and abuse." The stop work order purports to pause funding pending an "audit." *See, e.g.*, St. John Decl. ¶ 21. But the EOIR Policy Manual makes clear that the purported audit is pretextual—Defendants already deemed the Programs wasteful without any support and unconstitutionally cut off access to their funding. EOIR Policy Manual at 557.

Even the purported focus on "waste" is plainly pretextual. The Executive Order is titled "Protecting the American People Against Invasion." Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025). That title proclaims the Executive Order concerns the Administration's jaundiced view of certain noncitizens. The failed attempt to remove funding from LOP and ICH in 2018

suggests instead that Defendants are targeting these programs for reasons unrelated to purportedly "wasteful" spending.

The termination in January 2025 offered no indication of a good-faith belief that an audit was necessary to effectuate congressional intent—instead, it suggests the real goal is to unconstitutionally eliminate funding for the Programs notwithstanding Congress's clear directions. The circumstances reveal that this action was merely the latest in a series of improper attempts to dismantle the current immigration system, to deport individuals without basic due process protections, to the detriment of noncitizens, due process, and the rule of law.

**D.    Termination of the Programs Violates Plaintiffs' First Amendment Rights.**

Under the APA, this Court may set aside agency action that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  Here, Defendants' actions constrain Plaintiffs' speech by (1) limiting their access to limited public forums where Plaintiffs have spoken to noncitizens for more than 20 years;[4] and (2) denying them access to congressionally authorized funds because the administration wants to suppress the information they have traditionally shared with noncitizens.

Under the First Amendment, when the government creates a limited public forum or when it chooses to fund private speech, it may impose speech restrictions that are "viewpoint neutral and 'reasonable in light of the purpose served by the forum.'"  *Tabak*, 109 F.4th at 633 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001)); *see also Legal Servs. Corp. v.*

---

[4]    Although courthouses and detention facilities often are considered nonpublic forums, the courthouses and detention facilities are limited public forums here because the government "create[d] a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects" by allowing Plaintiffs to conduct their training programs there for more than twenty years.  *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 632 (D.C. Cir. 2024).  But the court need not resolve this issue because the same test applies to nonpublic and limited public forums.

*Velazquez*, 531 U.S. 533, 543–44 (2001) (comparing the standard for subsidized speech claims to limited public forum claims)).  Here, the stop work order is neither.

First, Plaintiffs' speech is private speech, not government speech.  Courts "must exercise great caution before" deciding speech constitutes government speech, and private speech does not transform into "government speech by simply affixing a governmental seal of approval."  *Matal v. Tam*, 582 U.S. 218, 235 (2017).  Like the speech at issue in *Velazquez*, 531 U.S. 533 (2001), the Programs were "designed to facilitate private speech, not to promote a governmental benefit."  *Id.* at 534.  Courts consider three factors in identifying government speech: "(1) the history of the speech at issue; (2) a reasonable observer's perception of the speaker; and (3) control and final authority over the content of the message."[5]  *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d 395, 411 (D.D.C. 2016).  The Programs were founded by nonprofit organizations to convey their own messages and fulfill their organizational mission.  *See, e.g.*, St. John Decl. ¶¶ 33–34, 37; Rojas Decl. ¶ 21–22.  Indeed, both LOP and ICH began as private projects to inform noncitizens of their rights before Congress authorized funding to support the Programs.  *See, e.g.*, St. John Decl. ¶¶ 4–6; Koop Decl. ¶ 2.  Plaintiffs also work with numerous volunteers who assist with carrying out their mission, such that censoring Plaintiffs also impacts numerous members of the public.  *See, e.g.*, Rojas Decl. ¶ 7.  Further, while Plaintiffs have a cooperative relationship with the immigration system, their role is clearly distinct from the government attorneys who represent DOJ in removal proceedings or the immigration judges who oversee the proceedings.  *See Velazquez*, 531 U.S. at 542.  While immigration judges are required to provide basic due process information to

_____

[5] Plaintiffs do not concede that the government exercises final control over the content of their speech.  But because the other two factors clearly show that Plaintiffs' speech is private, Plaintiffs have demonstrated they are likely to succeed on their First Amendment claim without reaching this factor.

noncitizens, the Programs perform a vital role in providing more comprehensive information.  *See, e.g.*, Rojas Decl. ¶ 9.  And, while the government may exercise some oversight as to the written materials used in these presentations, Plaintiffs' speech remains their own as they work with noncitizens to advise them of their rights and help them navigate the immigration system.  *See, e.g.*, Sherman Decl. ¶ 18 (noting the morale impact of preventing Plaintiffs from fulfilling their missions).

Second, as addressed above, the stop work order is plainly unreasonable because it exceeds the scope of executive power and denies Plaintiffs access to congressionally authorized funds.  "A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use."  *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1073 (D.C. Cir. 2012).  Here, there is no legitimate government interest in denying Plaintiffs funding or access to immigration courts or detention facilities.  And Defendants' actions are intended to silence speech disfavored by the administration because, although Plaintiffs' speech informs noncitizens broadly about their rights and responsibilities, the administration has falsely suggested such speech "promote[s] or facilitate[s] violations of our immigration laws."  Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025).  The government engages in viewpoint-discrimination when it "targets not subject matter, but particular views taken by speakers on a subject."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  The government may not leverage its power to subsidize speech or restrict speech in a limited public forum to silence speech regarding litigants' rights or to prevent them from defending themselves in court proceedings.  *Cf. Velazquez*, 531 U.S. at 547–48.  The Programs often provide the only limited legal advice available to noncitizens.  As in *Velazquez*, the Government may not hamstring this legal advice by preventing Plaintiffs from speaking to noncitizens or threatening their ability

to exist by withdrawing funding to which they are entitled and upon which they rely. *Id.* at 548–49 ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.").

The executive order vaguely and overbroadly prohibits funding for "non-governmental organizations or providing services . . . to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws." Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025). Although this language fails to clearly define which programs are prohibited, given the prior attempt to defund the Programs, it is clearly an attempt to cut off funding for the Programs and censor Plaintiffs' speech. Such an attempt violates Plaintiffs' First Amendment rights and, as in *Velazquez*, cuts off the opportunity for noncitizens "to receive vital information respecting constitutional and statutory rights bearing upon" their immigration proceedings. 531 U.S. at 546.

## II. Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief

### A. Plaintiffs Face Irreparable Harm

A preliminary injunction is appropriate where, as here, the moving party shows that it faces harm that is both (1) "certain and great, actual and not theoretical, and so imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm," and (2) "beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (internal quotations and citation omitted, alteration in original). Thus, Plaintiffs must show a "clear and present need for equitable relief" that is "beyond remediation." *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 179 (D.D.C. 2011) (internal quotations and citations omitted).

When a defendant's actions "have 'perceptibly impaired' [an organizational plaintiff's] programs, 'there can be no question that the organization has suffered injury in fact'." *Fair Emp.*

*Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  If the defendant's actions make the

organization's activities more difficult and "directly conflict with the organization's mission," then

the organizational plaintiff may be entitled to a preliminary injunction.  *Nat'l Treasury Emps.*

*Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).  "Monetary costs are of course an

injury."  *United States v. Texas*, 599 U.S. 670, 676 (2023).  Thus, "los[ing] out on federal funds . . .

is a sufficiently concrete and imminent injury to satisfy Article III . . . ."  *Dep't of Com. v. New*

*York*, 588 U.S. 752, 767 (2019).

Here, immediate injunctive relief is necessary to protect Plaintiffs from suffering severe

and irreparable harm.  Defendants' decision to abruptly halt funding for the Programs will directly

interfere with Plaintiffs' mission, impeding their ability to provide critical orientation services that

are at the heart of Plaintiffs' activities.  There is no question that ceasing funding for LOP and

other Programs—a decision that effectively terminates the programs—will cause imminent harm

that cannot be later remediated.  Because Defendants' actions are preventing Plaintiffs from

speaking by denying them access to immigration courts and detention facilities and cutting off

crucial funding sources, Plaintiffs will be irreparably harmed in the absence of an injunction.  *See*

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) ("The loss of First Amendment freedoms, for

even minimal periods of time, unquestionably constitutes irreparable injury.").

By defunding and terminating the program, Defendants will prevent Plaintiffs from

providing thousands of noncitizens the services Congress prescribed, frustrating their primary

mission of supporting noncitizens in immigration proceedings, and permanently silencing their

voices.  If this occurs, "'there can be no do over and no redress.'"  *Newby*, 838 F.3d at 9 (quoting

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).  Without

the funding Congress appropriated, Plaintiffs will be forced to reduce or eliminate services to *pro se* noncitizens. *See, e.g.*, Lopez Decl. ¶ 14. Some organizations may be forced to close their doors, *see, e.g.*, Brunsink Decl. ¶ 12, or layoff staff, *see, e.g.*, Yang Decl. ¶ 13. Others will be required to divert staff away from the Programs, causing them to lose disaffected staff and institutional knowledge. *See, e.g.*, Sherman Decl. ¶ 18; St. John Decl. ¶ 39; Gutierrez Decl. ¶ 15; Brock Decl. ¶ 10. Dismantling this program will eliminate significant institutional knowledge, impairing the immigration system's operations for years to come. *See, e.g.*, Rojas Decl. ¶ 29; Koop Decl. ¶ 13.

These harms cannot be remediated or redressed, even if Defendants later resume funding for the Programs at some future date. There is no time to delay injunctive relief. The harm to Plaintiffs is imminent, with funding already paused indefinitely. Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding. The Court cannot later turn back the clock; unless it grants this preliminary injunction now, it will be powerless in the future to redress the harms Plaintiffs suffer.

## B.    The Balance of Equities

Finally, in considering whether to grant a preliminary injunction, the Court should "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (ellipses in original) (citations omitted). Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *Newby*, 838 F.3d at 12 (quotation marks and citation omitted).

Here, there will be no harm to Defendants—or any other interested party—if this Court issues a preliminary injunction. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)).

On the contrary, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (quotations and citation omitted). Halting funding for the Programs contravenes Congress's express directive in the omnibus spending bill, which appropriates funds "for the administration of immigration-related activities of the Executive Office for Immigration Review," and the House's express admonishment that "any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee." H. Rep. No. 117-395, at 65 (2022). Enjoining Defendants from terminating funding already appropriated for the Programs merely prevents Defendants from defying the congressional mandate. Paying out the monies already earmarked for the Programs cannot harm Defendants in any meaningful way compared to the harms that Plaintiffs and their clients will suffer if an injunction does not issue.

Maintaining funding for the Programs furthers a critical public interest: promoting functioning of the immigration system that reaches an appropriate result in individual cases. The programs benefit noncitizens by informing them of their rights—helping more noncitizens obtain a just resolution to their immigration proceedings—and benefit taxpayers by promoting efficiency within the immigration system. In November 2017, Tae Johnson, the Assistant Director of ICE, instructed ICE personnel that LOP is for the benefit of "all parties," including ICE and the courts. Memorandum from ICE Assistant Director for Custody Management Tae Johnson, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program*, 1 (Nov. 30, 2017), https://tinyurl.com/4c6tzc4w . He explained that the program was created to "improve the efficiency of immigration court proceedings by increasing access to information and improving representation for individuals in proceedings." *Id.* Recognizing the program's significant benefits,

Assistant Director Johnson encouraged ICE agents to share information about it with noncitizens who were detained. *Id*. at 2. By appropriating money for these programs, Congress has agreed that providing funding for the Programs is in the public interest. *See, e.g.*, Bicameral Judiciary Letter to General Sessions (Apr. 17, 2018) ("urg[ing] DOJ to reject these ill-advised policy changes," and noting that DOJ's decision "undermine[s] the most basic notions of fairness in the American justice system, and thus the rule of law itself."). A preliminary injunction protecting that funding, therefore, likewise is in the public interest.

If the Court does not issue a preliminary injunction, Plaintiffs and thousands of noncitizens moving through the immigration system (and in some cases, U.S. citizens) will face clear, immediate, and irreparable harms, as described above. U.S. taxpayers, who will bear the increase in overall systems costs resulting from the elimination of the Programs, likewise will suffer from Defendants' actions. Defendants themselves, meanwhile, do not face any injury from the issuance of a preliminary injunction to stop their illegal instruction, particularly where Congress mandated that the Programs to continue. Given these considerations, the balance of equities weighs heavily in favor of issuing a preliminary injunction here.

## III.    A Nationwide Injunction is Appropriate

District courts' authority to issue nationwide injunctions is well established; they "enjoy broad discretion in awarding injunctive relief." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). Accordingly, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020) (quoting *Nat'l Min. Ass'n*, 145 F.3d at 1408 (alteration in original)). The appropriate injunctive relief "often depend[s] as much on the equities of a given

case as the substance of the legal issues it presents."  *Trump v. Int'l. Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).

Here, "[n]ationwide relief . . . is necessary to provide complete relief to the plaintiffs for the 'violation[s] established'" and "ensures that complete relief remains available to the plaintiffs after . . . final adjudication."  *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49. Defendants' decision to terminate funding for the Programs directly contradicts Congress's express mandate and is contrary to law *in every case*—regardless of which organization provides the services—and will cause irreparable harm to Plaintiffs if allowed to proceed.  A nationwide injunction is the only way to effectively grant Plaintiffs, who operate the Programs in ten different states, the relief they seek: the preservation of critical, congressionally approved programs that increase efficiency of the immigration system nationwide.  Without a nationwide injunction, Defendants may seek to deny funding to other nonprofit organizations operating similar programs, blocking thousands of noncitizens' access to even the most basic information about the U.S. immigration system.  Plaintiffs, whose primary mission is to serve noncitizens in removal proceedings, will be forced to choose between expending additional resources to make up for the defunded providers and turning their backs on vulnerable clients.  Notably, Defendants—who, consistent with the omnibus spending bill, already have allocated funding for the Programs—will not face any harm from a nationwide injunction requiring them to continue funding the programs as planned.  Thus, the balance of equities weighs heavily in favor of a nationwide injunction.

Courts have recognized that "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."  *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017), *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017), and *reconsideration en banc denied*, 858 F.3d 1168 (9th Cir. 2017), and *cert.*

*denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017).  Moreover, a nationwide injunction also protects this Court from the risk of duplicative litigation, as "an injunction issued here only as to the plaintiff organizations and their members would cause all others affected by [the invalid rule] . . . to file separate actions for declaratory relief in this circuit."  *Nat'l Min. Ass'n*, 145 F.3d at 1409.  Plaintiffs are located throughout the country, and piecemeal injunctive relief would be impractical and difficult to administer.  *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021).  Accordingly, a nationwide injunction is appropriate in this case.

## IV.    Plaintiffs Seek Expeditious Resolution of their Claims

Under 28 U.S.C. § 1657(a), "each court of the United States . . . shall expedite the consideration of any action . . . if good cause therefor is shown."  Courts have held that "good cause" is shown where the effective relief hinges on appropriate timing.  *Virginians Against Corrupt Cong. v. Moran*, No. 92-2120, 1992 WL 321508, at *1 (D.D.C. Oct. 21, 1992) (granting prompt hearing where plaintiff needed relief against allegedly unlawful election mailings before Election Day); *see Indep. Inst. v. FEC*, 70 F. Supp. 3d 502, 503 n.1 (D.D.C. 2014) (expediting consideration "in light of the timing of the upcoming elections"), *rev'd on other grounds sub nom. Indep. Inst. v. FEC*, 816 F.3d 113 (D.C. Cir. 2016); *San Luis Obispo Mothers for Peace v. Hendrie*, 502 F. Supp. 408, 409 (D.D.C. 1980) (granting expedited consideration of Plaintiffs' claims, including APA claim, where plaintiffs sought to prevent allegedly disqualified commissioner from ruling on pending application).  Further, actions may also be expedited where one party's income stream is dependent on the outcome of the case.  *See, e.g.*, *AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates*, *P.C.*, No. 07 Civ. 1908, 2008 WL 4543422, at *3 (D. Colo. Oct. 10, 2008).

Here, funding for the Programs has already abruptly been rescinded.  Plaintiffs have been ordered to stop work, no longer receive their Programs' funding, and have been denied access to

the noncitizens housed in detention facilities nationwide. *See, e.g.*, Brock Decl. ¶¶ 11–12 (Colorado); St. John Decl. ¶¶ 21–32, 38–39 (Arizona); Koop Decl. ¶ 11 (Illinois); Yang Decl. ¶ 11 (Texas); Gutierrez Decl. ¶¶ 11–13 (Washington); Brunsink Decl. ¶¶ 9–11 (Pennsylvania); Rojas Decl. ¶¶ 12–20 (Virginia). Not only will Plaintiffs be irreparably injured, *see* Section II.A of the Argument, the thousands of individuals that Plaintiffs assist will also be harmed if the funding expires. With every passing day without funding for the Programs, more individuals will appear in immigration courts across the country without any knowledge "about immigration court procedures along with other basic legal information."[6] In addition to the noncitizens whose due process rights will be harmed, judicial efficacy in immigration courts across the country will decline.[7] Accordingly, there is sufficient "good cause" to expedite the consideration of this motion under 28 U.S.C. § 1657(a).

## CONCLUSION

Defendants' decision to terminate funding for the Programs is contrary to the Constitution, beyond the scope of executive power, pretextual, arbitrary, and capricious. Accordingly, their actions—which ignore and contradict extensive evidence documenting the Programs' success and efficiency—violate the APA. Because the decision immediately will cause Plaintiffs irreparable harm, this Court should grant immediate provisional relief enjoining Defendants' illegal action, including enjoining the attorney general and DOJ from refusing to make available funding for the

---

[6] Legal Orientation Program, U.S. DEP'T OF JUSTICE (Nov. 2015), https://web.archive.org/web/20160920163113/https://www.justice.gov/eoir/legal-orientation-program.

[7] *See id.* ("Experience has shown that the LOP has had positive effects on the immigration court process: detained individuals make wiser, more informed, decisions and are more likely to obtain representation; non-profit organizations reach a wider audience of people with minimal resources; and, cases are more likely to be completed faster, resulting in fewer court hearings and less time spent in detention.").

Programs, including funding to any persons previously authorized by DOJ to receive 2024–25 funding, and preserving the status quo pending a final judgment.

Respectfully submitted,

January 31, 2025

*/s/ Adina Appelbaum*                              */s/ Amer S. Ahmed*

AMICA CENTER FOR IMMIGRANT          GIBSON DUNN & CRUTCHER
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)      Amer S. Ahmed (D.C. Bar No. 500630)
Samantha Hsieh (V.A. Bar No. 90800)*        Richard W. Mark (D.C. Bar No. NY0378)
Amelia Dagen (D.C. Bar No. 9004838)         Raena Ferrer Calubaquib (C.A. Bar No.
Amica Center for Immigrant Rights           328794)*
1025 Connecticut Avenue NW, Suite 701       Apratim Vidyarthi (N.Y. Bar No. 6007041)*
Washington, DC 20036                        200 Park Avenue
(202) 331-3320                              New York, NY 10166-0193
adina@amicacenter.org                       (212) 351-4000
sam@amicacenter.org                         rmark@gibsondunn.com
amelia@amicacenter.org                      aahmed@gibsondunn.com
                                            rcalubaquib@gibsondunn.com
                                            avidyarthi@gibsondunn.com


                                            Naima L. Farrell (D.C. Bar No. 1023230)
                                            1700 M Street, N.W.
                                            Washington, D.C. 20036-4504
                                            (202) 955-8500
                                            nfarrell@gibsondunn.com


                                            Laura Sturges (C.O. Bar No. 36843)*
                                            Patricia M. Herold (D.C. Bar No. 1030148)
                                            Josiah J. Clarke (C.O. Bar No. 51302)*
                                            Caelin Moriarity Miltko (C.O. Bar No.
                                            56721)*
                                            1801 California Street, Suite 4200
                                            Denver, CO 80202-2642
                                            (303) 298-5700
                                            lsturges@gibsondunn.com
                                            pherold@gibsondunn.com
                                            jclarke@gibsondunn.com
                                            cmoriaritymiltko@gibsondunn.com


                                            Katie Marquart (D.C. Bar No. 1044618)
                                            Arthur M. Halliday (C.A. Bar No. 347620)*
                                            333 South Grand Avenue
                                            Los Angeles, CA 90071-3197

46

(213) 229-7000
kmarquart@gibsondunn.com
ahalliday@gibsondunn.com

Alexander M. Fischer (N.Y. Bar No. 6018485)*
811 Main Street, Suite 3000
Houston, TX 77002-6117
(346) 718-6600
afischer@gibsondunn.com

*_pro hac vice_ forthcoming

47