## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMICA CENTER FOR IMMIGRANT
RIGHTS,
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036;

AMERICAN GATEWAYS,
314 East Highland Mall Boulevard, #501
Austin, TX 78752;

ESTRELLA DEL PASO,
2400A E. Yandell Drive
El Paso, TX 79903;

FLORENCE IMMIGRANT AND REFUGEE
RIGHTS PROJECT,
PO Box 654
Florence, AZ 85132;

IMMIGRATION SERVICES AND LEGAL
ADVOCACY,
3801 Canal Street, Suite 210
New Orleans, LA 70119;

NATIONAL IMMIGRANT JUSTICE
CENTER,
111 W. Jackson Boulevard, Suite 800
Chicago, IL 60604;

NORTHWEST IMMIGRANT RIGHTS
PROJECT,
615 Second Avenue, Suite 400
Seattle, WA 98104;

PENNSYLVANIA IMMIGRATION
RESOURCE CENTER,
PO Box 20339
112 Pleasant Acres Road, Suite I
York, PA 17402;

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK,

Case No. 1:25-cv-00298

**DECLARATION OF KELLY ROJAS
IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

7301 Federal Boulevard, Suite 300
Westminster, CO 80030,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF
JUSTICE,
950 Pennsylvania Avenue, NW
Washington, DC 20530;

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW
Washington, DC 20528;

JAMES R. McHENRY III, in his official
capacity as Acting Attorney General of the
United States,
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530;

SIRCE E. OWEN, in her official capacity as
Acting Director of the Executive Office for
Immigration Review,
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528,

*Defendants.*

**DECLARATION OF KELLY ROJAS**
**CO-DIRECTOR FOR THE DETAINED ADULT PROGRAM AT AMICA CENTER FOR**
**IMMIGRANT RIGHTS (FORMERLY THE CAPITAL AREA IMMIGRANTS' RIGHTS**
**(CAIR) COALITION)**

*I, Kelly Rojas, make the following statements on behalf of Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Kelly Rojas, and I am the Co-Director overseeing the Detained Adult Program ("DAP") at Amica Center for Immigrant Rights (formerly the Capital Area Immigrants' Rights (CAIR) Coalition) ("Amica Center"). Amica Center is a Washington, DC-based nonprofit, legal services organization. Amica Center is the primary organization dedicated to providing legal services to indigent immigrant men, women, and children who are detained by the Immigration Customs Enforcement ("ICE") agency under the Department of Homeland Security ("DHS") throughout Virginia.

2. Amica Center strives to ensure equal justice for all immigrant men, women, and children at risk of detention and deportation in the DC metropolitan area and beyond.

3. Amica Center is comprised of three main programs: the Detained Adult Program ("DAP"), the Detained Children's program, and the Immigration Impact Lab. DAP helps detained noncitizens understand the Immigration Court and deportation process so they can make better-informed decisions about their cases, including whether or not to pursue immigration relief, and more effectively participate in their proceedings. We also help people connect with pro bono attorneys if they are unable to pay an attorney to represent them. Our goal is to help families stay together and out of harm's way.

4. In order to carry out this mission, DAP has four main work components: (1) providing educational and pro se services in the form of "know your rights" presentations, conducting individual intakes and one-one-one legal orientations, and conducting pro se workshops with all unrepresented detained noncitizens in the custody of ICE at facilities located in Virginia; (2) connecting unrepresented detained noncitizens who cannot afford a lawyer with pro bono attorneys from our various pro bono firm partners, for cases at both the trial and appellate court levels; (3) representing detained clients found legally incompetent while appearing pro se before an immigration judge as part of the National Qualified Representative Program ("NQRP"); and (4) operating an in-house universal representational pilot program of staff attorneys to directly represent clients who are residents of various localities.

5. To address the first programmatic focus area, Amica Center has been operating a Legal Orientation Program ("LOP") in Virginia since FY 2009 providing services to several

facilities housing noncitizens in that state and expanded in FY 2016 to cover three facilities housing noncitizens in Maryland. Amica Center provided LOP services across Maryland until 2021, when Maryland passed the Dignity Not Detention Act, which ended ICE detention in locally operated Maryland jails. Amica Center continues to provide LOP services at both ICE over-72 hour detention facilities in Virginia: Farmville Detention Center ("Farmville") in Farmville, Virginia, and Caroline Detention Facility in Bowling Green, Virginia ("Caroline"). The combined detention bedspace in both of these facilities is 1,072 people. Farmville has beds to house 736 people and Caroline can house 336 people; although the detained population at Farmville declined significantly in past years due to COVID-19 pandemic-related litigation, ICE is now steadily increasing the number of people held there to get back up to maximum capacity. This program covers the complete immigrant population detained by ICE whose cases are heard in the Annandale Immigration Court, which is the sole Virginia immigration court with a detained docket.

6.  With LOP funding, Amica Center has hired nine staff members dedicated to providing LOP services. Specifically, Amica Center employs a managing attorney, a senior attorney, a DOJ accredited representative, four paralegals, and one data entry specialist. Because we have been able to hire full time staff in reliance on LOP funding, we have been able to engage and supervise one additional non-LOP funded paralegal fellow to assist with pro se assistance work at the jails and currently two semester-long undergraduate interns. Staff under LOP regularly travel to each detention center to provide legal education presentations and individual orientations to detained noncitizens who do not have counsel. Amica Center staff visit both Farmville and Caroline once a month, typically for 2–4 days per visit, depending on the number of people detained. Amica Center further operates a free detention hotline that connects individuals in detention to attorneys and paralegals on our staff.

7.  LOP staff also work with our volunteer manager to recruit, train and supervise hundreds of volunteers each year who accompany and assist staff during detention center visits, translate documents for pro se individuals to include in their filings in court, and transfer calls to staff on the detention hotline. Our volunteers are a critical part of Amica Center's mission and the LOP team's delivery of legal services to individuals detained in Virginia. It would be impossible to reach all detained individuals during these visits without volunteers present to fulfill their tasks of (i) completing intake forms for staff review, (ii) delivering know your rights packets on specific legal topics to individuals as directed by our staff, and (iii) reading and translating written messages with tailored legal information to individuals for whom we previouslyconducted intakes. We bring 2-5 volunteers with us on a typical detention center visit. In 2024, a total of 140 volunteers joined us on these visits. Some volunteers have worked with us for many years, bringing their experience to bear in the work they do on the visits. Others later become highly skilled interns, staff and pro bono attorneys with our organization. All volunteers on detention center visits receive

training and are supervised by our staff. They also submit the same National Crime Information Center background checks for clearance by the DOJ and participate in an onboarding process with the prime contractor, the Acacia Center for Justice, like our LOP staff.

8. In our experience, LOP has been a shared endeavor between the Department of Justice and legal service providers, like Amica Center, to bridge the significant gap in basic immigration information available to detained noncitizens. In our experience, there is significant variation between detention facilities in: (1) the availability and accessibility of a law library, current immigration applications and basic treatises and statutory text; (2) free copies and mailing to indigent clients; (3) access to case law search engines and access to current country condition reports, which are critical to an asylum application; and (4) other information that is necessary to put on an immigration case. This is because each facility is subject to different detention standards, which facilities on the ground may or may not be in full compliance with at a given time. Compounding these difficulties is wide variance in literacy levels, and potential disabilities and languages spoken by people in detention, impacting the person's ability to access in-facility systems and prepare their cases from detention. In our experience, the Department of Homeland Security has historically cooperated in addressing legal orientation services and documents, when facilitated through LOP.

9. In our experience, Immigration Judges, ICE and facility staff rely on our provision of LOP services to assist people in understanding how to represent themselves and navigate the system. Throughout the years, there have been many instances where ICE or facility staff have contacted our legal assistants or attorneys for assistance with detained individuals, including rare language speakers, who need assistance understanding and meeting court requirements or who have special needs relating to their legal cases that staff need our assistance to address with the individual. I have frequently observed instances in open court where detained noncitizens ask questions the judge is not able to address or describe evidence in support of their cases, and judges have referred them to Amica Center for assistance obtaining volunteer translation services and determining if they can be matched to a pro bono attorney as part of our LOP services. Immigration Judges also regularly acknowledge Amica Center's LOP services in helping detained noncitizens collect evidence, submit completed applications, and know which forms of immigration relief— if any—are available to them. In recent months for example, immigration judges have thanked LOP staff for explaining appeal rights to pro se individuals and working to identify and assist individuals with disabilities, individuals who are illiterate, speakers of rare languages, and young adults just reached the age of majority through the court process. We have further frequently witnessed individuals in detention, who upon realizing that their potential claims are tenuous or that they are not bond eligible, decide not to seek relief and accept a removal order or request voluntary departure. Through our volunteer translations,

3

educational presentations, individualized orientations, and educational materials, LOP is a key part of Amica Center's ability to educate and teach pro se detained noncitizens about their options and responsibilities in removal proceedings.

10. Individual participants in LOP have also been referred to Amica Center's separately-funded representation programs, where noncitizens can be placed with in-house pro bono representation, or with pro bono representation with external law firms, who are able to represent clients with mentorship from our LOP staff. This is especially helpful where a noncitizen's case involves an untested area of law or a legal argument that is hard to teach to pro se parties. For example, Mr. Temu, a Tanzanian man with bipolar disorder who had been harmed as a result of his mental condition, was served through LOP and then placed with pro bono counsel, ultimately winning his case before the Fourth Circuit. *See Temu v. Holder*, 740 F.3d 887 (4th Cir. 2014) (finding that "individuals with bipolar disorder who exhibit erratic behavior" was a protected particular social group for asylum). In another example, LOP encountered Mr. Ilunga, a Congolese man fleeing political persecution, and was able to connect him with pro bono counsel. Pro bono counsel won remand from the Fourth Circuit when Mr. Ilunga was not provided reliable interpretation at his hearing and the inaccurate interpretation had resulted in an erroneous adverse credibility finding and the agency had impermissibly ignored record evidence of previous political persecution. *See Ilunga v. Holder*, 777 F.3d 199 (4th Cir. 2015). Amica Center also connected Mr. Santos Garcia to pro bono counsel, who won Mr. Santos Garcia withholding and protection under the Convention Against Torture and then won remand from the Fourth Circuit after the Board of Immigration Appeals reversed Mr. Santos Garcia's grant of relief on three separate occasions. *See Santos Garcia v. Garland*, 73 F.4th 219 (4th Cir. 2023).

11. Without warning, on January 22, 2025, the Department of Justice issued a national contract stop work order, citing to Section 19 of the January 20, 2025 Executive Order titled "Protecting the American People Against Invasion." The national contract stop work order, which took effect immediately, extended to the following LOP programs: the general LOP program for detained adults, the Immigration Court Helpdesk ("ICH"), the Counsel for Children Initiative ("CCI"), and Family Group Legal Orientation Program ("FGLOP"). As part of the stop work order, Amica Center was informed that we would receive payment for LOP services provided up to January 21, 2025 and potentially for part of the day on January 22, 2025, but not after. We did not receive further information regarding the duration of the stop work order or any accompanying audits as referenced in the Executive Order. LOP managing attorney Ana Dionne-Lanier and I spoke with staff at Washington ICE Enforcement and Removal Operations immediately after we received notice of the stop work order and communicated that Amica Center desired to continue providing LOP services, including group presentations and in-person intakes, without pause and without receiving renumeration during the stop work order, including at a detention facility visit already planned for the next day.

4

12. The following day—January 23, 2025—LOP staff from Amica Center was in the middle of a regularly-scheduled visit at Caroline, offering "know your rights" presentations and intake services when facility staff abruptly ordered them to leave the facility. I was later informed by the Washington ICE Field Office that this action to remove LOP staff was pursuant to a national directive and that non-profit organizations would no longer be allowed to access ICE detention facilities to provide LOP services. Caroline facility staff informed us that they believed they may need to remove posters regarding LOP services, as well as instructions detailing how to contact Amica Center through our detention hotline and packets of legal information we placed in the facility through LOP.

13. That same day, Amica LOP staff were also informed via email by the facility operations team that they had lost access to Farmville Detention Center due to LOP's suspension and Farmville staff also removed LOP posters, legal information packets, and hotline information. LOP staff were informed by the few individuals still able to connect to us through our hotline that staff at both facilities were informing them that Amica Center would no longer be permitted into the facility and not to contact Amica Center staff, who were unable to help them now.

14. Later that day, in response to my questions on access to facilities and whether we could continue our in-person visit to Caroline the following day without LOP renumeration and as a legal service provider apart from LOP, as we had without interruption in different instances in the past, Washington ICE Office of Principal Legal Advisor ("OPLA") Chief Counsel, stated that Amica Center could submit a request pursuant to ICE's 2011 Performance-Based National Detention Standards ("PBNDS") but that such request would not be reviewed by the following day, January 24, 2025, after the date of our scheduled LOP visit.

15. On January 27, 2025, we emailed the Assistant Chief Immigration Judge of the Annandale Immigration Court (ACIJ) to update the court regarding these developments and to reiterate our continued support for the noncitizens detained in Virginia. However, on January 28, 2025, we received a reply that the ACIJ was cancelling our pre-scheduled stakeholder meeting on February 6, 2025, due to the LOP "stop work order." I responded the same day to reiterate that we wish to keep the meeting or reschedule as soon as possible to discuss our continued services, including pro bono placement efforts, as the only legal service provider focused on services to individuals on the court's detained docket. I have not yet received any response.

16. On January 28, 2025, we emailed the Washington ERO Field Office Director, requesting approval to post an updated poster in the detention facilities that removed all reference to LOP. This modified poster solely contained instructions for calling the Amica Center hotline. We also clarified that these instructions were important for clients to connect to their pro bono attorneys, in addition to allowing pro se people to contact us for information.

We requested that ICE approve the poster and send copies to both Caroline and Farmville for posting. Later that day, the Field Office Director replied and did not approve our poster, only affirming that all facilities display the generic immigration court list of pro bono attorneys. However, that list only includes the general hotline number with which detained noncitizens have to pay per minute of the call. That list does not include step-by-step instructions or the code for free call access to the Amica Center hotline. As of the filing of this declaration, we have heard reports through the hotline that some of our hotline calling instructions may remain posted at Caroline, but it is our understanding that our hotline information was removed from Farmville. The only remaining specific Amica Center poster may be a poster required by recently settled litigation involving release for individuals granted withholding or protection under the Convention Against Torture, informing individuals of their rights under the settlement.

17. We have also received reports that all our materials that had any reference to LOP—including "know your rights" materials in the law libraries at the facilities—have been removed from the facilities. We asked Washington ICE if the facilities would be able to redact the words "LOP" or "Legal Orientation Program" from the materials – these are mentioned only in passing in the materials – so the substantive content would remain available, but that request was not followed. There was also a large poster at Farmville that contained no reference to the LOP program but detailed in Spanish and English how to contact our organization via the detention hotline and that we are a nonprofit organization offering in-person and remote support to pro se individuals and connections to pro bono attorneys; we have even received reports that this poster was removed.

18. The abrupt pausing of the LOP program at Amica Center is already directly affecting and frustrating Amica Center's mission to assist all unrepresented detained noncitizens in the Washington, DC metropolitan region and specifically those with active proceedings before the Annandale Immigration Court, Arlington Asylum Office, or Washington ICE Field Office. First, Amica Center wishes to continue conducting "know your rights," individual orientations, and rendering pro se assistance with all unrepresented detained noncitizens in Virginia.

19. We communicated this intent to ICE and the court as soon as we received notice of the stop work order. We have been denied the ability to do so to date, despite a history of providing these services without interruption to individuals detained in the region even during periods of time when services were provided outside of LOP. We were not permitted to return to the Caroline facility on January 24, 2025 despite our request to do so outside of LOP.

20. We were instructed we may submit a new request to do in-person group presentations and individual counseling pursuant to the 2011 PBNDS, which requires submitting all dates for proposed visits, names and SSNs for presenters, scripts and materials for review and approval by ICE. This is despite the fact that our staff have already been cleared by the

DOJ and facilities to conduct these visits, the DOJ has already thoroughly vetted and approved our scripts and written materials, and ICE and the facilities have agreed to dates for facilities visits through the end of the spring. Our LOP staff completed the labor-intensive process of assembling all materials for reapproval for visits under the PBNDS and submitted our written request to the Washington ICE Enforcement and Removal Operations Acting Director on January 30, 2025. To date we have received no indication whether our request will be approved or not. Even if approved, we understand the provisions for visits under the PBNDS will not replace the level of legal access permitted under LOP to effectively deliver services. For example, the PBNDS generally restrict visits to four attorney, legal assistant or interpreter presenters, whereas given the large number of newly arrived individuals we meet for group presentations and intakes and time restrictions given facility schedules, we need to bring additional volunteers cleared by the DOJ with us on LOP visits to be able to offer services to everyone who requests them. Due to the events of the last week, all our other visits ICE and facilities had approved through the end of the spring are now considered canceled. As of the date of this declaration, we continue to be denied access to Caroline and Farmville without indication of if and when visits can resume.

21. This decision impedes our ability to carry out our mission and programming in several ways. Without being able to provide "know your rights" presentations and conduct intakes and receive information from the facility for the planning of these visits, it is very difficult to identify who is in the jails and who needs a pro bono attorney or pro se assistance. In our experience, rendering pro se assistance solely by mail or by phone is wholly insufficient given that mailed materials are occasionally arbitrarily rejected or delayed by the facilities or mail offices, many detained individuals cannot read in English or other languages we have written materials in, and phone calls are prohibitively expensive to the detained noncitizens. Further, detained noncitizens are frequently afraid to disclose or request certain information out of fear of who is overhearing their conversations, since the telephones are in spaces to which other detained individuals and staff also have access. This also calls into question the confidentiality available during consultations by phone, effectively breaking the attorney-client privilege, even in this limited setting. And given that facility staff have taken down posters with our detained hotline information, even if the hotline is still in operation, individuals in detention will not know the phone number or how to access information. We have also been told that individuals are being informed that Amica Center will no longer be able to assist them, further deterring outreach.

22. Second, this limited access frustrates our ability to offer legal services and pro bono representation to detained noncitizens, beyond those who have local friends or family who know how to reach out to Amica Center on behalf of their detained loved ones and can tell the detained person how to contact us. Very often the only way to meet with newly-arrived asylum seekers, third language speakers, cognitively impaired, or mentally ill detained

noncitizens who have no local contacts or who do not know how to help themselves, is by conducting "know your rights" presentations and intake. We work with many individuals whose special needs and even existence we are not able to identify without the ability to meet them in person inside the facilities.  For example, we regularly work with individuals with disabilities and individuals held in medical isolation, suicide watch, solitary confinement, and other types of segregation who are not effectively able to reach us unless we come to them in person. Without the ability to provide these basic services, it is unclear how we will be able to connect with these vulnerable populations of detained noncitizens to render pro se assistance or connect them with a lawyer.

23. Third, Amica Center also fears that, even as it tries to maintain some presence in the detention centers in Virginia, the discontinuation of this contract could prompt local jurisdictions to cut off funding appropriated to fund direct representation of the county's residents and so further restrict our ability to connect detained noncitizens with attorneys who can represent them if we are no longer able to identify many of the individuals eligible for these non-federally funded representation programs. For example, Amica Center receives funding from Maryland to represent Maryland residents who are detained in ICE custody, many of whom are held in Virginia ICE facilities. Loss of access to Virginia ICE facilities to identify Maryland residents and connect them with legal resources and representation jeopardizes Amica Center's ability to retain and renew its funding from Maryland.

24. Fourth, we are concerned that the discontinuation of this contract will result in the end of much of the external pro bono representation for detained individuals in our region, a critical part of our mission to maximize legal representation for people in detention.  Our pro bono partners, which include large law firms, law school clinics at nearly all the law schools in the District of Columbia, Virginia and Maryland, and other nonprofit organizations, rely on LOP to (1) identify, screen and refer potential clients and cases, (2) offer expert mentorship through the life of the case and guidance on how to work with clients at a particular detention center, and (3) facilitate communication systems for exchanging documents such as retainers and calls with pro bono clients that have now been discontinued.

25. Fifth, LOP accounts for around 20% of DAP's budget. Amica Center is currently working on a contingency plan to respond to the government's sudden defunding of the LOP.  We are certain that this loss of funding will affect our ability to provide legal education services to pro se noncitizens in Virginia facilities, which account for the complete ICE detained population in our region and with cases in the Annandale Immigration Court.

26. Amica Center also expects that it will have to shift staff away from serving pro se individuals to other projects with different funding, leaving a dire gap in service and access to minimal information regarding rights for detained noncitizens. Already, we diverted

funding of one employee from supporting data management for our LOP work to supporting data management on our representational programs. If we are unable to bridge the funding gap left by the loss of LOP, we will be unlikely to be able to keep all our LOP staff given that our current funding is not sufficient to do so. We will also lose the ability to engage with, supervise and retain our skilled jail visit volunteers.

27. DAP's mission is to help detained noncitizens; being unable to access and serve them undermines this key goal and is already lowering the morale of staff across Amica Center. Many of our staff have years of experience serving detained noncitizens and/or are young, new attorneys and paralegals who joined the organization to develop their experience in the delivery of services to detained noncitizens, tasks that now they may not be able to carry out at all.

28. Amica Center has invested resources in the past several years to reduce employee turnover and as a result, we have experienced attorneys with more than four years of local detained experience, and junior attorneys and paralegals with more than two years of local detained immigration law experience. Our staff have mastered our administrative systems, which allow us to provide services to hundreds of newly-detained detained noncitizens a month, as well as how to issue-spot and explain complex immigration law subjects and legal analysis of relevant local criminal statutes that are crucial for explaining removability and eligibility for relief. This staff has further developed various facility and ICE stakeholder relationships and learned how to navigate the intricate processes of the local immigration detention facilities, which allow us to provide consistent seamless services and guide pro bono attorneys in how to represent detained noncitizens.

29. Losing our LOP staff will be a drain on our organizational brain trust in the delivery of pro se and pro bono detained legal services. The collective staff experience would be hard to recover over time and would hobble our ability to deliver pro se services to the detained noncitizen population in the Capital region even if the LOP was reinstated. This is because we would have to spend additional time training and teaching new staff, fellows, volunteers or interns who take the place of current staff.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 31st of January 2025, in Washington, D.C.

**Kelly Rojas**
Co-Director, Detained Adult Program

Amica Center for Immigrant Rights
1025 Connecticut Ave. NW, Suite 701
Washington, DC 20006
P: 202-888-3507
F: 202-331-3341
Kelly.rojas@amicacenter.org