IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, <br> 1025 Connecticut Avenue NW, Suite 701 <br> Washington, DC 20036; <br><br> AMERICAN GATEWAYS, <br> 314 East Highland Mall Boulevard, #501 <br> Austin, TX 78752; <br><br> ESTRELLA DEL PASO, <br> 2400A E. Yandell Drive <br> El Paso, TX 79903; <br><br> FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT, <br> PO Box 654 <br> Florence, AZ 85132; <br><br> IMMIGRATION SERVICES AND LEGAL ADVOCACY, <br> 3801 Canal Street, Suite 210 <br> New Orleans, LA 70119; <br><br> NATIONAL IMMIGRANT JUSTICE CENTER, <br> 111 W. Jackson Boulevard, Suite 800 <br> Chicago, IL 60604; <br><br> NORTHWEST IMMIGRANT RIGHTS PROJECT, <br> 615 Second Avenue, Suite 400 <br> Seattle, WA 98104; <br><br> PENNSYLVANIA IMMIGRATION RESOURCE CENTER, <br> PO Box 20339 <br> 112 Pleasant Acres Road, Suite I <br> York, PA 17402; <br><br> ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK, | Case No. 1:25-cv-00298 <br><br> **DECLARATION OF LAURA ST. JOHN IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

7301 Federal Boulevard, Suite 300
Westminster, CO 80030,

                *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
JUSTICE,
950 Pennsylvania Avenue, NW
Washington, DC 20530;

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW
Washington, DC 20528;

JAMES R. McHENRY III, in his official
capacity as Acting Attorney General of the
United States,
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530;

SIRCE E. OWEN, in her official capacity as
Acting Director of the Executive Office for
Immigration Review,
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528,

                *Defendants*.

# DECLARATION OF LAURA ST. JOHN FOR THE
# FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

I, Laura St. John, make the following statement on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Laura St. John. I am a licensed attorney and a member in good standing in both the California and Arizona bars. I am currently employed as Legal Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project in March 2011 and have served in my current role since 2015. Before I assumed my current position, I previously served as Managing Attorney of the Adult Program and as a staff attorney with the Florence Project's Adult Program serving adults detained in ICE custody in Arizona. During my time at the Florence Project, I have personally provided free legal services, both direct representation and pro se orientation services, to hundreds of individuals in custody in the various ICE detention facilities in Arizona. Additionally, as Managing Attorney and Legal Director I have supervised attorneys, legal assistants, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in ICE custody in Arizona.

## Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained in Immigration and Customs Enforcement ("ICE") custody in rural detention centers in Eloy and Florence, Arizona. With no public defender structure in immigration removal proceedings, the vast majority of people who are detained in ICE custody and facing removal are forced to go unrepresented in immigration court due to poverty or lack of access. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free legal services to people in immigration detention in Eloy and Florence, Arizona. Through our attorneys, accredited representative, legal assistants, and network of pro bono attorneys, the Florence Project provides free legal education and free representation to thousands of people who are detained in ICE custody and face removal in Arizona.

## Florence Project's Services Under the Legal Orientation Program

4. The Legal Orientation Program ("LOP") is modeled after the Florence Project's years of innovative work serving detained adults in ICE detention centers in Florence and Eloy, Arizona. Florence Project staff created the original model upon which the LOP was based

in response to the gap in representation created by the absence of a public defender system in immigration removal proceedings and the concern that individuals' statutory and due process rights were being violated as a result of this gap.

5. Since 1989, the Florence Project has established relationships with the courts, immigration officials, and detention facility officers to support programs that provide detained immigrants information and access to justice. Throughout the early 1990's, the Florence Project pioneered a service model that encouraged people in detention to play an active role in their own cases. Through the "rights presentation" model, the Florence Project strove to ensure that all detained individuals had access to accurate and accessible legal information and sought to empower individuals to make informed decisions about how to proceed with their immigration court cases. We also worked to address common questions and dispel common misconceptions about the immigration court system in our presentations in an effort to decrease people's anxiety, confusion, and discomfort about the legal process they were going through.

6. As the basis for the LOP model, the Florence Project was one of three organizations elected for a 1998 pilot program that preceded the LOP and was also one of the first LOPs to begin operating when the national program was initiated in 2003. The Florence Project has been operating a LOP in Arizona since the inception of the federal program. The Florence Project, in keeping with its mission, has always striven to provide *pro se* education and support services through the LOP to the entire immigrant population detained by ICE whose cases are heard in both the Florence and Eloy Immigration Courts – Arizona's two detained Immigration Court dockets.

7. As it pertains to adults detained in ICE custody, in order to carry out its mission of providing free legal and social services to detained adults facing removal proceedings, the Florence Project's Adult Legal Program is divided into three teams, each of which has a distinct primary area of focus, but each of which also work in synergy with the other components of the Florence Project's detained Adult Legal Program to provide high-quality, free legal education and representation to adults detained in ICE custody in Florence and Eloy, Arizona.

8. The first component of the Florence Project's Adult Legal Program that forms the foundation from which Florence Project's adult legal services scaffolds up is based on the our *pro se* model of services, which involves providing high-quality legal education, information, and *pro se* support to the thousands of people who are detained in immigration custody without counsel in Arizona every year.  The Florence Project provides *pro se* services through a combination of delivery methods including group rights orientations, group pro se workshops, individual orientations, and written pro se packets explaining forms of immigration relief. Today – prior to the stop-work order - much of the Florence Project's *pro se* education and informational services are provided under the umbrella of the LOP with the ongoing goal of protecting the most fundamental due process rights of people who are detained by enabling people to effectively and efficiently represent themselves in their removal proceedings and other related matters before the immigration agencies. The team that is primarily tasked with these types of

*pro se* education and support services is known at the Florence Project as our Detention Action & Response Team ("DART").

9. The second major component of the Florence Project's Adult Legal Program as it pertains to detained adults is our Pro Bono Team, who receive pro bono case referrals from DART and then connect unrepresented noncitizens with pro bono counsel from law firms or pro bono private immigration practitioners. Each year, our pro bono team places dozens of cases with volunteer attorneys before the immigration court, BIA, and the Ninth Circuit Court of Appeals and provides mentorship and technical support on those cases. Aspects of pro bono screening and mentorship in cases before the agency also are funded and conducted, in part, through the LOP.

10. Finally, the Florence Project's in-house Direct Representation Team is the final major component of the Florence Project's legal services for detained adults. Florence Project staff in the Direct Representation Team accept pro bono case referrals from DART and also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings under the National Qualified Representative Program and pursuant to the permanent injunction in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 8115q23a1 `3 at *1 (C.D. Cal. Apr. 23, 2023). Thus, in addition to our *pro se* services provided through the LOP and our external pro bono placements, attorneys in our Adult Program provide in-house pro bono direct representation to hundreds of clients each year, representing individuals in a broad variety of matters before the Immigration Court, Board of Immigration Appeals, United States Citizenship and Immigration Services ("USCIS"), and the Ninth Circuit Court of Appeals. Florence Project's direct representation is conducted entirely separate and apart from the LOP.

11. In addition to our direct legal services, the Florence Project is nationally known for developing written *pro se* materials that are designed specifically to explain complex legal concepts to people with no legal knowledge and often limited education. We work with experts in explaining complex concepts in "plain language" and aim to have them understandable to people with approximately a sixth grade reading level. Florence Project *pro se* guides are distributed in detention centers throughout the country. While the Florence Project uses our *pro se* guides and materials extensively when providing LOP services, and while all of our *pro se* guides and related materials have been vetted and approved for use under the LOP, the creation and updating of these materials is not funded under the LOP.

12. Currently – until January 22, 2025 when the Florence Project received notice of a stop-work order under of all services under the LOP – the Florence Project provided LOP services at all three current ICE detention facilities located in the State of Arizona – the Eloy Detention Center, the Florence Detention Center, and the Central Arizona Florence Correctional Complex. Combined, these three facilities have a currently contracted capacity to detain approximately 2,000 people in ICE custody on any given day. All three of these facilities are located in rural communities in Central Arizona, approximately one hour away from the nearest major metropolitan areas.

13. The Florence Project currently employs 20 staff who are dedicated primarily either to directly providing *pro se* legal education services under the LOP or to providing managerial or other administrative support to the LOP. Specifically, Florence Project employs 3 managing attorneys and 1 managing legal assistant who directly oversee staff providing LOP services, help manage data compliance, and conduct *pro se* services themselves; 1 managing attorney who supervises our pro bono team and provides direct pro bono mentorship herself; 5 staff attorneys and 1 law grad who directly provide legal education and *pro se* support under the LOP; 1 pro bono mentor who screens, places, and provides technical support to pro bono attorneys; 1 pro bono legal assistant who helps screen and place pro bono referrals; 5 legal assistants who provide pro se workshops and individual orientations under attorney supervision; and 2 legal administrative assistants who support the team with LOP related data entry and billing requirements. Due to staff turn-over, internal transitions, and promotions, the Florence Project also has several open positions that are contemplated under the Florence Project's LOP Program Operation Plan that we have yet to backfill. While these 20 individuals make up the core LOP service providers, portions of the Adult Program Manager and Associate Adult Program Manager positions are also dedicated in part to administration of the LOP and as such a small portion of their work is also covered under the LOP subcontract. In order to maintain staff flexibility to nimbly respond to on the ground needs and maintain capacity in each staff member's work plan for professional development and assignments that fall outside of the scope of normal LOP services, none of the Florence Project's DART staff are funded entirely under the LOP, but most staff who are dedicated to these types of services have 42% to 85% of their time dedicated to LOP specific work. The total Full Time Employees ("FTE") under the Florence Project's LOP Program Operation Plan is 16.76 FTEs.

14. Staff on the DART team who work under the LOP routinely travel to each of the three detention centers we serve to conduct in person legal services, including group orientations or Know Your Right presentations, pro se workshops, and individualized orientations and consultations with people who are detained and do not have legal counsel. Florence Project staff provide weekly large group general orientations at all three Arizona detention centers. At the Eloy Detention Center, the largest of the three Arizona detention centers, Florence Project staff typically have general orientations two times a week on Tuesdays and Thursdays in order to accommodate both the number of participants and the varying populations because Eloy houses both men and women who cannot be brought together for group presentations under facility rules. Meanwhile, at the Florence Detention Center and the Central Arizona Florence Correctional Complex, Florence Project staff provide one large general orientation each week at each facility, typically on Wednesdays. At all three detention centers, Florence Project staff follow the large group orientation with a same day pro se workshop specifically diving into the details of how to make a request for release from custody either through bond or parole. The Florence Project creates lists for general orientation participants largely using information sharing made possible by the LOP. Specifically, the Florence Project uses as combination of the "Cognos report" (an EOIR generated report sharing initial master calendar hearing docket information), facility housing rosters showing (again shared

specifically as a result of the LOP), as well as referrals and requests from detained individuals to create our participant lists for the general orientations, with a goal of providing as many people as possible their general orientation ideally two weeks before their first court hearing.

15. In addition to group general orientations and pro se workshops, Florence Project staff also conduct individual orientations, which can include both initial consultations as well as follow up *pro se* service visits. Individual orientations and follow-up visits occur on most days of the week in all three facilities. Initial individual orientations typically occur on the same day of the larger group orientations, following the general presentation. Given the size of the population we serve, follow up pro se service visits can occur any day of the work week and staff are routinely in all three of the detention centers. Follow up services typically include further legal orientation and education, or technical support, for example: translating court documents or helping individuals with low literacy or significant language barriers fill out their applications for relief.

16. In addition to our in-person services, the Florence Project also maintains a hotline for detained individuals which is currently operating once a week, on Thursdays, from 1 p.m. to 4 p.m. In recent years, all three detention facilities also have created additional methods for remote legal visits and communication, including telephone calls, virtual attorney visit televideo visitation systems, and the introduction of tablets in the housing units which enable detained individuals to send messages electronically to LOP providers. While our office tends to favor in-person services where possible, particularly when working with *pro se* respondents who remain in control of their own documents and filings such that remote assistance often poses unique operational challenges, Florence Project staff working on the LOP also use these remote communication mechanisms to support LOP work as appropriate.

17. LOP education and *pro se* legal services are a critical safety net for the people who are detained in ICE custody in Arizona. The remote location of the detention centers, combined with a relatively sparse legal community able and willing to take detained removal cases in Arizona, and the frequent indigency of individuals who are detained and unable to work, means that the majority of people detained in Arizona go through their legal process entirely alone, without a lawyer. As noted above, the Florence Project is the only non-profit organization that provides free legal services to people who are detained by ICE in Arizona. The LOP helps those people understand the process, their rights, and their obligations in the legal proceedings as well as teaching them about the possible defenses to deportation, which helps people better prepare their claims and present them efficiently to the immigration court.

18. Additionally, the majority of individuals detained in the ICE detention centers in Arizona have limited English proficiency ("LEP"). This poses unique challenges for *pro se* respondents who do not speak English because, while court hearings themselves are interpreted, all documents filed with the EOIR must be in English and often *pro se* individuals require help understanding documents filed in their cases and/or assistance translating documents or evidence they are trying to submit. The Florence Project's LOP

staff are all bilingual in English and Spanish and routinely provide support deciphering court documents and applications for *pro se* respondent who have limited English proficiency. Moreover, while a large majority of LEP individuals in ICE custody in Arizona speak Spanish, in 2023 FIRRP served individuals from 83 countries who spoke 45 languages. LOP staff often play a critical role in identifying individuals who speak neither Spanish nor English and helping conduct orientations with such individuals using interpretation services, also provided in connection with the LOP. In this way, LOP services provide a truly basic level of protection – helping people understand their legal process – while also helping improve court efficiency by decreasing confusion and delays caused by language barriers.

19. Florence Project staff routinely encounter people through the LOP who have any number of characteristics that might make them particularly vulnerable and at risk in detention of due process violations. For example, many of Florence Project's *pro se* clients have limited education and have either low or no literacy, even in their best language. Indeed, this is the reason that the Florence Project works with plain language experts and aims to develop written pro se materials that explain concepts at about a sixth grade education level. Florence Project staff also routinely work with individuals under the LOP who have experienced serious trauma; LGBTQ individuals; and individuals with significant disabilities including mental health conditions as well as physical conditions like blindness or deafness. For such individuals, the LOP is a critical safety net since, without the LOP, the vast majority of these particularly vulnerable individuals would be left without any information and most likely would face significant barriers to adequately and efficiently preparing their cases without counsel.

20. The Florence Project has long enjoyed a cooperative stakeholder relationship with both the Florence and Eloy Immigration Courts. Beginning from the initial call to action by an Immigration Judge that led to the creation of the Florence Project, Immigration Judges in Arizona have consistently engaged with and welcomed the Florence Project's legal education services. This cooperation has included everything from willingness to provide Florence Project staff space in the physical courtrooms to conduct orientations when necessary, to smaller acts of appreciation, including donating used paperclips, binder clips, and other small office supplies that otherwise would have been discarded from court filings to the Florence Project to reuse. Judges in Eloy and Florence have long relied on the Florence Project as a resource to which they may refer respondents who are confused or unclear about the next step in their immigration court process. In both EOIR and ICE stakeholder meetings, government partners routinely express thanks and emphasize the value of the services the Florence Project provides.

## Issuance and Immediate Impact of LOP Stop-Work Order

21. On January 22, 2025, the Department of Justice suddenly issued a stop-work order on the LOP, as well as several other legal service contracts under the EOIR budget.[1] Upon

---

[1] Beside the LOP, the other impacted programs include the Immigration Court Helpdesk (ICH), the Counsel for Children Initiative (CCI), and the Family Group Legal Orientation Program (FGLOP).

information and belief, this action was taken pursuant to Section 19 of the January 20, 2025, Executive Order titled "Protecting the American People Against Invasion." Florence Project learned about the stop-work order through an email notification from the government prime contractor on the LOP program, the Acacia Center for Justice at approximately 1:30 p.m. Arizona time. The national contract stop-work order, which took effect immediately, stated that the impacted programs were being paused while they undergo an audit. That said, the practical effect of this alleged pause for the Florence Project is that we have lost, for an indeterminate period of time and perhaps permanently, a significant revenue stream that supports staff salaries for critical work that is central to our mission.

22. On January 22, 2025 shortly after receiving the stop work notice, Florence Project leadership promptly notified all staff regarding receipt of the LOP stop-work order and provided additional specific instruction to staff who provided services under the LOP clarifying how they would need to change aspects of their work to follow that order.

23. However, because the Florence Project's mission is to provide free legal and social services to all detained adults facing removal in ICE custody, we also immediately began to discuss how we could potentially transition the critical services that had been conducted under the LOP to other legal access mechanisms, specifically legal access as envisioned in provisions allowing for non-federally funded legal group rights presentations under section 6.4 of the Performance-Based National Detention Standards ("PBNDS"). The PBNDS explicitly encourages the provision of "Legal Rights Group Presentations" in ICE detention facilities and states that "all facilities are required to cooperate fully with authorized persons seeking to make such presentations."[2] Under the 2011 PBNDS, "[d]etainees shall have access to group presentations on United States immigration law and procedures and all other relevant issues related to the immigration court, appeals, and removal process, including a detainee's legal rights," and "persons and organizations requesting to make such group presentations shall be able to obtain clear information about how to become authorized to provide legal rights group presentations, including regularly scheduled presentations." In other instances of past stop work orders on the LOP - due for example to government shutdowns over appropriations – ICE has allowed the Florence Project to seamlessly transition our services to legal rights group presentations under the PBNDS.

24. On January 22, 2025, the same day we learned of the LOP stop work order, Florence Project adult program leadership emailed Assistant Field Office Directors ("AFOD") Karin Kinghorn and Brian Ortega acknowledging the stop work order under the LOP and indicated that, although Florence Project could not continue services under the LOP, we

---

[2] See 2011 Operations Manual ICE Performance-Based National Detention Standards, available at: PBNDS 2011, Rev. 2016. See also 2008 Operations Manual ICE Performance-Based National Detention Standards, full table of contents available at: 2008 Operations Manual ICE Performance-Based National Detention Standards | ICE  and relevant section available at: legal_rights_group_presentations.doc. Upon information and belief, both the Eloy Detention Center and Florence Detention Center (also known as the Florence Service Processing Center) fall under the 2011 PBNDS. The Central Arizona Florence Correctional Complex (also known as the Florence Correctional Center) falls under the 2008 PBNDS. Both the 2008 and 2011 PBNDS reflect essentially identical language as to the language quoted herein.

had ability and interest to continue to provide presentations and workshops under the PBNDS and were seeking to confirm the viability of that option with ICE. We inquired specifically if this transition could feasibly allow for us to conduct a legal rights group presentation under the PBNDS as early as the following day in Eloy Detention Center.

25. On January 23, 2025, Florence Project received a response to our email from AFOD Kinghorn stating that the presentation in Eloy was cancelled due to guidance that LOP services cannot continue to be provided within Eloy. AFOD Kinghorn's message neither mentioned nor responded in any way to Florence Project's inquiry as to the possibility of providing legal rights group presentations under the PBNDS.

26. In light of the response from AFOD Kinghorn, the Florence Project cancelled our group rights presentation on January 23, 2025 and have not conducted any group presentations at any of the Arizona detention facilities since the stop work order to the present date. However, on January 23, 2025, Florence Project adult program leadership followed up with AFODs Kinghorn and Ortega, CCing Supervising Detention and Deportation ("SDDO") Officer Christopher Miller, seeking an opportunity to schedule a meeting to further discuss options for provision of legal services outside of the LOP context, including under the PBNDS. The Florence Project email also sought additional guidance from ICE regarding what information they would need from us to consider this alternative request.[3] SDDO Miller promptly responded the same day, restating that all LOP services are paused, but noting that "if a FIRRP attorney would like to speak with an alien, they would need to file a G-28[4] and follow standard procedures for meeting with a client."

27. On January 23, 2025, Florence Project also began receiving a number of panicked calls and reports from clients in all three detention facilities. Clients reported that officials had removed all of the posters and information about the Florence Project that had been posted in the housing units. These postings included information about the Florence Project, who we are, what free services we offer, and how to contact us. Importantly, these flyers also included plain language, clarified instructions on how to use the detention center pro bono telephone platform – the only truly free telephone call system in detention – to reach the Florence Project, which is a step that has proven necessary over the years due to the complexity and lack of clear instructions from ICE or the detention centers on how to navigate the pro bono platform.

28. Clients also reported that guards and housing unit counselors told them that Florence Project attorneys were no longer allowed to enter the facilities, no longer allowed to do legal visits, and in at least one case was told that Florence Project did not exist at all anymore. Clients reported that they saw other detained people crying in the detention

---

[3] See 2011 PBNDS, Section 6.4(II)(2), available at: PBNDS 2011, Rev. 2016 ("Persons and organizations requesting to make such group presentations shall be able to obtain clear information about how to become authorized to provide legal rights group presentations, including regularly scheduled presentations.")

[4] A G-28 is the Notice of Entry of Appearance form used for communicating with ICE. Upon information and belief, all three ICE detention facilities in Arizona do not require a G-28 to conduct in person visits if those visits are pre-representational.

facility when guards were telling people that Florence Project was no longer going to be allowed into the facilities.

29. From January 23, 2025 through January 28, 2025, Florence Project Adult Program leadership continued to follow up with ICE leadership in Arizona to seek authorization to conduct legal rights group presentations under the PBNDS, further clarifying that this would be entirely apart and separate from the LOP, providing citations to the relevant detention standards, and suggesting a proposed schedule for services. While Deputy Field Officer Director ("DFOD") Christopher McGregor offered to review written Know Your Rights materials, every request specifically to provide legal rights group presentations in the facilities was met with responses indicating that "right now there is no LOP" that ignored that our current requests were made under the PBNDS.

30. On January 28, 2025, Florence Project provided ICE with copies of the written materials, specifically a proposed script for a non-LOP rights presentation, that would accompany our proposed rights group presentation and, again, renewed our request for authorization to conduct group presentations under the PBNDS and not under the LOP. Later that day, AFOD Kinghorn responded, stating that "I have elevated your email request below to DFOD McGregor for clarification. ICE has paused any and all LOP presentations/group orientations within its facilities, and they cannot occur. Your proposal cited below for another form of presentation/group orientation at the facility is not approved."

31. On January 29, 2025, Florence Project adult program leadership responded to AFOD Kinghorn's email inquiring as to the reasons for the denial and further discussing materials that we hope ICE can review and approve, including new posters for the housing units. To date, we have not received any response from Arizona ICE to that email.

32. Additionally, to date, the Florence Project has not received any further instruction regarding the details of any allegedly pending audit from Acacia or from EOIR/DOJ. To date, the government has not provided the Florence Project any timeline indicating how long this alleged pause is likely to continue. To date, the Florence Project has not been provided a copy of the official stop-work order.

## Overarching Impact of LOP Stop-Work Order

33. This stop work order, particularly combined with ICE's simultaneous and apparently related decision to deny access for group rights presentations even under the PBNDS is devastating to Florence Project's mission of providing free legal services to all detained adults facing removal in Arizona. As noted above, the *pro se* rights-based model of services that has been conducted under the LOP since 2003 is part of Florence Projects very DNA, as we innovated this service delivery model going back to our founding in 1989. Elimination of access to the people who are detained in ICE custody for group rights presentations and education services, for the first time in over 35 years of our existence as a non-profit legal service provider, is deeply disruptive to our legal service

model and is sending ripple effects to our other teams serving detained adults, as both the pro bono team and direct representation team currently rely on referrals for pro bono placements from individuals who have passed through and received our group rights orientation. Even a short lapse in the Florence Project's ability to follow the model we established and which forms the foundation upon which our other detained programs are built is a major disruption to our services and forces contemplation of significant restructuring should this supposed pause extend for a prolonged period or result in eventual termination.

34. Additionally, FIRRP's vision that every person facing removal have access to counsel, understand their rights, and be treated fairly and humanely is also severely undermined by the elimination of the LOP. First, although the LOP program has never been a program that provided direct representation, for the majority of people in ICE custody in Arizona, conversations and orientations with Florence Project attorneys working under the LOP are likely their only access to counsel and opportunity to be screened for potential pro bono representation. This stop work order will all but guarantee that more people in ICE custody in Arizona will go through their removal proceedings without ever having spoken to an attorney and without even the basic information necessary to navigate their cases.

35. Second, by not only restricting the Florence Project's ability to provide group presentations in facilities, but also eliminating the means of obtaining information about who is new to the facilities and who has upcoming court hearings – information that was provided through the LOP – we are left with minimal and insufficient avenues to timely identify and reach individuals in detention who are in need of information and education about the immigration court process. While we can continue to try to reach people who contact us on an individual basis, that model is both inefficient and is certain to miss people who may not be aware of the Florence Project's free services. The fact that our clients have reported that ICE has removed all postings explaining who the Florence Project is, what services we offer, and how to contact us further amplifies the likelihood that many people in detention will not know that they can have a free legal orientation if they contact us and/or will not know how to even go about contacting us without guidance on how to use facility mail or the complex pro bono telephone platform. Thus, without the LOP, there will almost certainly be a significant number of people who will go through their immigration court proceedings without ever having had the opportunity to speak to an attorney or understand their rights and potential forms of defense against deportation.

36. Third, this stop work order, even if temporary, will irreparably harm the people that the Florence Project serves. Given the accelerated pace of detained removal proceedings and Immigration Judge reviews of expedited removal orders, even a brief lapse in services will likely result in some people being ordered removed, denied relief, or denied release on bond simply because they did not know or understand what was required of them. This is not pure speculation. Even under the current general orientation structure in which we try to see people a week or more before their first court date, Florence Project staff occasionally encounter individuals who, for one reason or another, did not come to their

initial group presentation and who are now trying to see us after being denied bond because they did not know that they needed to have specific documents regarding where and with whom they would live to establish that they were not a flight risk. Even worse than being denied bond, is being denied relief simply because an individual did not understand immigration law or their rights in immigration court. I recall one case very early in my career as a LOP staff attorney, where the LOP orientation I gave prevented a U.S. Citizen's wrongful removal. At the time, Florence Project gave our group general orientations in Florence to the individuals on the docket for their initial master calendar hearings just before they went into court. At the end of my presentation, in which I quickly touched on various forms of relief, including U.S. Citizenship, a young man approached me saying that he'd planned to just take his deportation order that morning, but wanted to talk to someone more about what I'd said about citizenship claims. I explained that if that was the case, he had the right to ask for more time to speak with an attorney. He did ask for more time and upon learning more about his family history, it became apparent that this young man was in fact a U.S. Citizen. With his permission, we notified ICE who agreed and released him from custody. Without having access to information about the various ways in which a parent can pass along U.S. Citizenship to even a child born abroad, this young man would have simply accepted a removal order and the U.S. Government would have wrongfully deported a U.S. Citizen. Without a consistent way to obtain information to see people well before their court hearings, this type of issue where a person is denied either relief or release, not because of the merits of their case, but because of their ignorance as to the legal requirements, will inevitably become more and more frequent.

37. While the Florence Project intends to attempt to continue to reach detained individuals to provide them with basic legal education and support, without access to the information - the dockets and rosters - previously available through LOP, staff will have to spend more time doing outreach to try to ensure widespread knowledge of referral and request systems. Florence Project's staff are already working on updating and modifying all of our postings and materials to scrub them of reference to the LOP in the hopes of getting updated materials approved for posting in ICE facilities. We also prepared and provided an updated non-LOP rights presentation script to ICE before we were denied access to conduct group presentations under the PBNDS. If we can successfully identify people who require legal education and assistance in a timely manner, which as noted above remains in serious question, Florence Project legal staff will also have to conduct all education services in individual visits, which is significantly less efficient. As an additional measure to help us try to reach as many detained people as possible as timely as possible, and in keeping with our mission, the Florence Project is planning to expand our hotline hours to include another day of services, which creates strains on our front desk staff who are not and never were funded by LOP, but who will have to answer additional calls coming into the hotline and route them to the appropriate LOP staff members, since the hotline must all come through the one phone number that is accessible on the ICE pro bono telephone platform. This all amounts to a significant shifting of resources to modify operations as necessary to account for the loss of information and access due to the LOP stop work order. These changes in workflow and

office procedures are necessary even if the stop work order is temporary in order to meet our mission in light of the stop work order.

38. There is also a serious financial impact to the Florence Project as a direct result of the stop work order. As noted above, 20 staff members have a significant portion – ranging from 42% to 85% - of their salaries that were paid for with LOP subcontract funds. The Florence Project must now pay for those salaries out of our general funds for as long as the stop work order persists – a situation that becomes more fiscally untenable the longer this stop work order goes on. While some work had been done on this Option Year contract, approximately two-thirds of our total contract value had not been realized at the time of the stop work order and, as an organization, we are now facing a significant budget shortfall over just over 1 million dollars on this contract as a result. Additionally, because these subcontracts operate for a set window of time and payments are based on actual billing for work conducted in that time frame, even if the stop work order is eventually lifted and the LOP reinstated sometime while this Option Year contract is still in effect, it may not be possible for Florence Project staff to provide services at the rate necessary to make up for the lost time under the stop work order, such that a portion of this contract could still be unrecoverable even if the stop work order is temporary.

39. Additionally, the uncertainty around the LOP funding and the possibility that this stop work order could well become either prolonged or permanent is cause for serious concern as to our overall staffing plans, staff morale, and the ability to keep qualified and trained staff with the organization. At the outset, the Florence Project's Program Operation Plan contemplates a number of additional positions being partially funded under the LOP subcontract. However, due to uncertainty around funding for these and all other LOP positions, Florence Project leadership is having to re-evaluate hiring plans and delay onboarding or hiring staff that had been contemplated for these open positions. This approach of scrutinizing and potentially delaying or freezing hiring for certain open positions extends well beyond only those positions that would have been partially funded under the LOP; rather it touches hiring for any positions, new or backfilled, that are in whole or in part funded through general funding, given that general funding is now being tapped to cover the lost salary that would have been covered under the LOP. This includes re-evaluating and perhaps delaying positions on all other adult teams, the advocacy team, and all of our support teams who do not provide direct client services. Thus, the morale ripple effects of this loss of LOP funding will be felt throughout the organization. Moreover, the uncertainty around the budget as well as delays in hiring to backfill positions can create a sense of overwhelm and stress among remaining staff, both on the directly impacted team as well as on other teams, which negatively impacts morale and people's sense of job security. While the Florence Project does not anticipate an immediate financial need to move any staff from the team providing LOP services to other legal teams, Florence Project leadership has already begun to have conversations about what would be required to make such transitions possible if they became necessary. This involves taking into consideration the impact and cost of various factors, such as retraining staff or losing some staff who do not want to do other types of work, as well as operational pre-work that would be required before any such transition could happen, such as potentially redesignating staff members' home offices based on new assignments

and union notification under the Florence Project's collective bargaining agreement. While staff transitions may not be imminent or necessary unless the stop work order goes on for more than five or six months, some of the managerial and administrative preparation to be able to act to transition staff if it should become necessary will have to begin sooner. Of course, if this stop work remains indefinite and prolonged or if the LOP is fully terminated, the Florence Project may have to also consider broader actions to re-size the adult program in light of available funding.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of January, 2025 in Flagstaff, Arizona.

_____
Laura St. John