**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-298-RDM |

<u>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.    EOIR's Legal Access Programs ................................................................................ 3

II.   The Program Contracts ............................................................................................. 5

III.  The January 22, 2025 Stop Work Order and Rescission.......................................... 8

IV.   Procedural History .................................................................................................. 10

LEGAL STANDARD ........................................................................................................11

ARGUMENT ................................................................................................................... 12

I.    Plaintiffs Are Not Likely to Succeed on the Merits of Any of Their Claims.................... 13

      A.    Plaintiffs' Appropriations Clause Claim Lacks Merit........................................... 13

      B.    Plaintiffs' First Amendment Claim Also Lacks Merit .......................................... 16

      C.    Plaintiffs' Arbitrary-and-Capricious Claim Fails for Several Reasons ................. 19

            1.    This Court lacks subject-matter jurisdiction over what amounts, in
                  essence, to a contract claim against the federal government ................... 20

            2.    Plaintiffs lack prudential standing to enforce the Acacia Contract........... 29

            3.    An alternative adequate remedy is available to Plaintiffs......................... 30

            4.    Plaintiffs do not challenge final agency action ......................................... 32

            5.    Plaintiffs' arbitrary-and-capricious claim fails on its own terms.............. 33

II.   The Remaining Preliminary Injunction Factors Weigh Against Plaintiffs...................... 38

      A.    Plaintiffs Fail to Show They Will Suffer Imminent Irreparable Harm ................. 38

      B.    The Public Interest Does Not Clearly Weigh in Plaintiffs' Favor........................ 41

III.  Any Relief Should Be Limited ................................................................................ 42

IV.   The Court Should Stay Any Preliminary Injunction It Grants and Require
      Plaintiffs to Submit a Bond as Security ................................................................. 44

CONCLUSION................................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ......................................................................... 39

*Albrecht v. Comm. on Emp. Benefits*,
  357 F.3d 62 (D.C. Cir. 2004) ........................................................................... *passim*

*Amgen Inc. v. Hargan*,
  285 F. Supp. 3d 397 (D.D.C. 2017) ......................................................................... 7

*Anna Jacques Hosp. v. Burwell*,
  797 F.3d 1155 (D.C. Cir. 2015) ............................................................................ 34

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ........................................................................ *passim*

*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................................. 32

*Bird v. Barr*,
  No. 19-cv-1581, 2020 WL 4219784 (D.D.C. July 23, 2020) ................................. 43

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ....................................................................................... 21, 30

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) .............................................................. 20, 38, 41

*Cardinal Health, Inc. v. Holder*,
  846 F. Supp. 2d 203 (D.D.C. 2012) ....................................................................... 39

*Cemex Inc. v. U.S. Dep't of the Interior*,
  560 F. Supp. 3d 268 (D.D.C. 2021) ....................................................................... 35

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ....................................................................................... 13, 14

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .................................................................... 38, 40, 41

*City of Houston v. Dep't of Hous. & Urb. Dev.*,
  24 F.3d 1421 (D.C. Cir. 1994) .............................................................................. 14

*City of New Haven v. United States*,
  809 F.2d 900 (D.C. Cir. 1987) .............................................................................. 16

*Columbia Gulf Transmission v. FERC,*
 106 F.4th 1220 (D.C. Cir. 2024) ........................................................... 34

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
 473 U.S. 788 (1985) ................................................................................ 19

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
 38 F.4th 1099 (D.C. Cir. 2022) ........................................................ *passim*

*Dalton v. Specter,*
 511 U.S. 462 (1994) ................................................................................ 36

*Davenport v. Wash. Educ. Ass'n,*
 551 U.S. 177 (2007) ................................................................................ 18

*Deutsche Bank Nat'l Tr. Co. v. FDIC,*
 717 F.3d 189 (D.C. Cir. 2013) ........................................................ 29, 30

*DSE, Inc. v. United States,*
 169 F.3d 21 (D.C. Cir. 1999) .......................................................... 44, 45

*Erickson Air Crane Co. of Wash., Inc. v. United States,*
 731 F.2d 810 (Fed. Cir. 1984) ................................................................ 31

*FCC v. Prometheus Radio Project,*
 592 U.S. 414 (2021) ................................................................................ 34

*FERC v. Elec. Power Supply Ass'n,*
 577 U.S. 260 (2016) ................................................................................ 36

*FiberLight, LLC v. Nat'l R.R. Passenger Corp.,*
 81 F. Supp. 3d 93 (D.D.C. 2015) ........................................................... 29

*Franklin v. Massachusetts,*
 505 U.S. 788 (1992) ................................................................ 13, 36, 43

*Friends of Animals v. U.S. Bureau of Land Mgmt.,*
 548 F. Supp. 3d 39 (D.D.C. 2021) ......................................................... 13

*Garcia v. Vilsack,*
 563 F.3d 519 (D.C. Cir. 2009) ............................................................... 31

*Gen. Land Off. of Tex. v. Biden,*
 722 F. Supp. 3d 710 (S.D. Tex. 2024) ................................................... 16

*Gill v. Whitford,*
 585 U.S. 48 (2018) .................................................................................. 44

*Godwin v. Sec'y of Hous. & Urb. Dev.*,
  356 F.3d 310 (D.C. Cir. 2004) ........................................................................... 31

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ........................................................................... 21

*Hodge v. Talkin*,
  799 F.3d 1145 (D.C. Cir. 2015) ........................................................................... 19

*Holistic Candlers & Consumers Ass'n v. FDA*,
  664 F.3d 940 (D.C. Cir. 2012) ........................................................................... 33

*Husky Mktg. & Supply Co. v. FERC*,
  105 F.4th 418 (D.C. Cir. 2024) ........................................................................... 33

*In re James R. Jones, House of Representatives*,
  B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ............................................. 16

*Int'l Tech. Corp. v. Winter*,
  523 F.3d 1341 (Fed. Cir. 2008) ........................................................................... 31

*ITServe All., Inc. v. Cuccinelli*,
  502 F. Supp. 3d 278 (D.D.C. 2020) ........................................................................... 31

*John Doe Co. v. CFPB*,
  849 F.3d 1129 (D.C. Cir. 2017) ........................................................................... 38, 39

*Khadr v. United States*,
  529 F.3d 1112 (D.C. Cir. 2008) ........................................................................... 20

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil.*,
  *Recs.*, 56 F.3d 279 (D.C. Cir. 1995) ........................................................... 22, 23, 26, 27

*Kowalski v. Turner*,
  543 U.S. 125 (2004) ........................................................................... 44

*Legal Services Corp. v. Velazquez*,
  531 U.S. 533 (2001) ........................................................................... 17

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ........................................................................... 15

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ........................................................................... 42

*Me. Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ........................................................................... 14

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ................................................................ 22, 23, 24, 29

*Motorola, Inc. v. Perry*,
   917 F. Supp. 43 (D.D.C. 1996) ................................................................ 25

*Mott Thoroughbred Stables, Inc. v. Rodriguez*,
   87 F. Supp. 3d 237 (D.D.C. 2015) .......................................................... 11

*Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*,
   631 F. Supp. 2d 17 (D.D.C. 2009) .......................................................... 43

*Nat'l Parks Conservation Ass'n v. Semonite*,
   282 F. Supp. 3d 284 (D.D.C. 2017) ........................................................ 40

*Navab-Sfavi v. Broad. Bd. of Governors*,
   650 F. Supp. 2d 40 (D.D.C. 2009) .......................................................... 24, 27

*Navajo Nation v. Azar*,
   292 F. Supp. 3d 508 (D.D.C. 2018) ...................................................... 38, 39, 40, 41

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
   435 F.3d 326 (D.C. Cir. 2006) .............................................................. 42, 43

*Nken v. Holder*,
   556 U.S. 418 ...................................................................................... 44

*Noem v. Haaland*,
   41 F.4th 1013 (8th Cir. 2022) ................................................................ 34

*NTCH, Inc. v. FCC*,
   950 F.3d 871 (D.C. Cir. 2020) .............................................................. 37

*Off. of Pers. Mgmt. v. Richmond*,
   496 U.S. 414 (1990) ............................................................................ 14, 15

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) .......................................................... *passim*

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) ............................................................................ 17

*Power Mobility Coal. v. Leavitt*,
   404 F. Supp. 2d 190 (D.D.C. 2005) ........................................................ 41

*Pub. Citizen v. Stockman*,
   528 F. Supp. 824 (D.D.C. 1981) ............................................................ 16

*Pulphus v. Ayers,*
    249 F. Supp. 3d 238 (D.D.C. 2017)................................................................ 17, 19

*Rancho Vista del Mar v. United States,*
    640 F. Supp. 3d 112 (D.D.C. 2022)..................................................................... 35

*Regan v. Taxation With Representation of Wash.,*
    461 U.S. 540 (1983)........................................................................................... 18

*Rust v. Sullivan,*
    500 U.S. 173 (1991)........................................................................................... 18

*Salazar v. Ramah Navajo Chapter,*
    567 U.S. 182 (2012)........................................................................................... 15

*Sampson v. Murray,*
    415 U.S. 61 (1974)............................................................................................. 39

*Seed v. EPA,*
    100 F.4th 257 (D.C. Cir. 2024)........................................................................... 29

*Shaffer v. Veneman,*
    325 F.3d 370 (D.C. Cir. 2003)................................................................. 21, 22, 25

*Sharp v. Weinberger,*
    798 F.2d 1521 (D.C. Cir. 1986).................................................................... 22, 23

*Sherley v. Sibelius,*
    689 F.3d 776 (D.C. Cir. 2012).................................................................... 34, 37

*Sissel v. Wormuth,*
    77 F.4th 941 (D.C. Cir. 2023)............................................................................. 34

*Soundboard Ass'n v. FTC,*
    888 F.3d 1261 (D.C. Cir. 2018)................................................................... 32, 33

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985)........................................................ 24, 25, 26, 28

*Steffan v. Perry,*
    41 F.3d 677 (D.C. Cir. 1994).............................................................................. 29

*Strait Shipbrokers Pte. Ltd. v. Blinken,*
    560 F. Supp. 3d 81 (D.D.C. 2021)...................................................................... 30

*Sw. Airlines Co. v. U.S. Dep't of Transp.,*
    832 F.3d 270 (D.C. Cir. 2016)..................................................................... 32, 33

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006) .................................................................... 23

*Toxco Inc. v. Chu*,
    724 F. Supp. 2d 16 (D.D.C. 2010) .............................................................. 31

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) ........................................................ 22, 23, 26

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) .............................................................. 20, 32

*Trump v. Thompson*,
    20 F.4th 10 (D.C. Cir. 2021) ...................................................................... 12

*Twin Metals Minn. LLC v. United States*,
    No. 22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023) ...................... 25

*United Aeronautical Corp. v. U.S. Air Force*,
    80 F.4th 1017 (9th Cir. 2023) .................................................................... 28

*Voyageur Outward Bound Sch. v. United States*,
    444 F. Supp. 3d 182 (D.D.C. 2020), *vacated and dismissed as moot*,
    No. 20-5097, 2022 WL 829754 (D.C. Cir. Mar. 17, 2022) ....................... 35

*Walker v. Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015) ................................................................................... 17

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................... 29

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................. 11, 38

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .................................................................. 41

*Wright v. Foreign Serv. Grievance Bd.*,
    503 F. Supp. 2d 163 (D.D.C. 2007) ..................................................... 23, 28

*Yee v. Jewell*,
    228 F. Supp. 3d 48 (D.D.C. 2017) ....................................................... 20, 21

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009) ................................................................................... 18

**STATUTES**

2 U.S.C. § 684 ................................................................................................. 15

5 U.S.C. § 702 .......................................................................................... 21, 28, 29

5 U.S.C. § 704 .......................................................................................... 12, 30, 32

5 U.S.C. § 706 .............................................................................................. 20, 33

28 U.S.C. § 1331 ............................................................................................... 20

28 U.S.C. § 1491 .......................................................................................... 21, 28

31 U.S.C. § 3726 ............................................................................................... 24

41 U.S.C. §§ 7101-09 ........................................................................................ 28

41 U.S.C. § 7103 ............................................................................................... 24

41 U.S.C. § 7104 ............................................................................................... 28

41 U.S.C. § 7105 ............................................................................................... 28

Consolidated Appropriations Act, 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2022) ................................................... 5

Consolidated Appropriations Act, 2024,
  Pub. L. No. 118-42, 138 Stat. 25 ..................................................... 5, 14, 15, 24

American Relief Act, 2025,
  Pub. L. No. 118-158, 138 Stat. 1722 (2024) ................................................... 5

**RULES**

Fed. R. App. P. 8 ............................................................................................... 44

Fed. R. Civ. P. 65 .............................................................................................. 44

Fed. R. Civ. P. 66 .............................................................................................. 44

**REGULATIONS**

48 C.F.R. §§ 1.000-53.300 ................................................................................... 6

48 C.F.R. § 1.101 ................................................................................................. 6

48 C.F.R. § 52.233-1 ......................................................................................... 28

48 C.F.R. § 52.242-15 ................................................................................. *passim*

Exec. Order No. 14159,
  90 Fed. Reg. 8443 (Jan. 20, 2025) .......................................................... *passim*

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 9......................................................................................................... 13

**OTHER AUTHORITIES**

Gov't Accountability Off., *Principles of Federal Appropriations Law*, § 2-50 (4th ed. 2016),
    https://www.gao.gov/assets/2019-11/675709.pdf ..................................................... 16

**INTRODUCTION**

The Executive Office for Immigration Review ("EOIR"), the agency within the United States Department of Justice ("DOJ") that is primarily responsible for adjudicating immigration cases and overseeing the nation's immigration courts, administers a number of legal access programs that provide legal information and resources to individuals placed in immigration proceedings.  The programs are funded through targeted congressional appropriations, but their design, implementation, and administration are otherwise left to EOIR.  EOIR contracts out the day-to-day operations of the programs to a prime contractor, who in turn subcontracts with various legal services organizations to deliver program services at immigration detention facilities and immigration courts throughout the country.  And all of the program requirements—everything from the funding available for each program, the specific services offered, the information to be delivered as part of those services, how and when providers are to be paid for delivering services, the particular government facilities at which services are to be provided, and the terms under which the programs can be extended, paused, or terminated altogether—are set forth in DOJ's contract with the prime contractor and the annual task orders through which program services are ordered and funded.

On January 20, 2025, President Trump, as part of an executive order that aims to "ensure[] that the Federal Government protects the American people by faithfully executing the immigration laws of the United States," directed the Attorney General to "[i]mmediately review" all government contracts that provide federal funding "to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens" in order to ensure that such contracts "conform to applicable law"; are "free of waste, fraud, and abuse"; and "do not promote or facilitate violations of our immigration laws."  Exec. Order No. 14159, §§ 1, 19(a), 90 Fed. Reg. 8443 (Jan. 20, 2025).  The executive order further directed that there be a "[p]ause" in the distribution of "all further funds" under those same contracts "pending the results of the review."  *Id.* § 19.  On January 22, 2025, EOIR accordingly ordered that further disbursements of funding for four of its legal access programs be immediately paused, and EOIR issued that stop

work order to its prime contractor pursuant to the express terms of the contract governing the programs.

The plaintiffs in this case—nine nonprofit organizations that receive funding from EOIR as legal access program subcontractors—filed this lawsuit to challenge the January 22, 2025 stop work order, and they also seek a preliminary injunction, despite the fact that the stop work order was rescinded two days after Plaintiffs brought suit.  Plaintiffs do not claim that the stop work order was in any way inconsistent with or in breach of the contract under which it was issued.  Nor could they, given that the contract—which Plaintiffs are not even parties to—expressly authorized EOIR to order "at any time" that program providers "stop all, or any part, of the work called for by th[e] contract for a period of 90 days."  48 C.F.R. § 52.242-15(a).  Plaintiffs instead seek to evade these contractual provisions and challenge the stop work order under the Administrative Procedure Act ("APA"), arguing that the order was arbitrary and capricious and also violated the Appropriations Clause and the First Amendment.

Plaintiffs fall well short of meeting the high bar for obtaining the extraordinary relief they request.  All of their claims fail on the merits.  EOIR has already obligated all of the funds that Congress appropriated for the agency's legal access programs, and neither the governing appropriations statute nor the Appropriations Clause requires more.  It is well settled that the federal government's decision not to subsidize certain speech does not run afoul of the First Amendment.  And Plaintiffs' arbitrary-and-capricious claim can be rejected on multiple fronts. That claim is essentially a contract-based claim against the federal government over which this Court lacks subject-matter jurisdiction.  The claim also fails on its own terms: an agency does not act arbitrarily and capriciously when it exercises its contractual rights consistent with contractual terms.  Nor is it unreasonable for an agency to order a temporary pause on funding, pursuant to an express presidential directive, to evaluate whether that funding is being put to its best use and is consistent with federal immigration laws.  The remaining preliminary injunction factors likewise do not favor Plaintiffs, and those factors certainly cannot overcome Plaintiffs' complete failure to

show a likelihood of success on the merits. Plaintiffs' motion for a preliminary injunction should accordingly be denied.

## BACKGROUND

### I.    EOIR's Legal Access Programs

EOIR is an agency within DOJ responsible for conducting immigration court proceedings and immigration-related appellate reviews and administrative hearings. *See* AR 12-13.[1]    EOIR funds and administers several legal access programs that, among other things, provide individuals in removal proceedings with information about immigration court processes and procedures, educate people about their rights and options for relief, and facilitate access to legal representation. *See* AR 18-20, 67-68. Four such programs are at issue in this case.

Launched in 2003, the Legal Orientation Program ("LOP") provides legal information and services to individuals who are in the custody of the Department of Homeland Security ("DHS"). LOP services are delivered in person at Immigration and Customs Enforcement ("ICE") detention facilities, and such services include group orientations that provide general information about immigration proceedings and forms of relief; individual orientations, during which unrepresented individuals can discuss their cases with LOP providers; and "pro se workshops," which provide participants with more detailed information about relevant immigration laws and procedures. AR 18, 67, 87-94. LOP providers also give referrals to pro bono legal services where available. AR 67, 92-94. LOP services are currently provided at thirty-five detention facilities nationwide. AR 108.

The Immigration Court Helpdesk program ("ICH") was established in 2016 to provide legal information and services to non-detained individuals placed in immigration proceedings, with a focus on immigration courts with the largest backlog of cases. AR 19, 67. ICH services are typically provided in person in immigration court facilities and, similar to LOP, include group information sessions that provide an overview of immigration proceedings and forms of relief, as

---

[1] Citations to the Administrative Record in this case, *see* Dkt. 29, will be styled "AR [page number]."

well as individual information sessions, during which unrepresented individuals can ask questions about immigration law and procedures and discuss their cases. AR 19, 67, 116-22.[2] ICH providers also offer small-group "self-help workshops," provide friend of the court services, and give referrals to pro bono legal services. AR 119-20. ICH services are currently offered at twenty-three immigration courts throughout the country. AR 125.

The Family Group Legal Orientation Program ("FGLOP") was created in 2021 to serve non-detained families in certain immigration courts who have cases scheduled on dedicated family group dockets. AR 67-68, 132. FGLOP services are typically provided in person in immigration court facilities and include multi-family group orientations, single-family orientations, and self-help workshops, all of which are designed to inform families about immigration law and procedures and help them navigate the immigration court process. AR 132-38. FGLOP providers also offer friend of the court services and referrals to pro bono legal services. AR 136-37. FGLOP currently operates in nine immigration courts nationwide. AR 141.

Finally, the Counsel for Children Initiative ("CCI") was started in 2021 and provides children who entered the United States without a parent or legal guardian with legal representation in immigration proceedings. AR 68. Eligible children are assigned a "CCI Representative," who is tasked with representing his or her client in any applicable removal, custody-redetermination, asylum, or appellate proceedings. AR 149-53. CCI's caseload is currently limited to 200 cases. AR 158.

The scope and requirements for each of these four programs—LOP, ICH, FGLOP, and CCI ("the Programs")—are not prescribed in any federal statutes or regulations. Rather, for the past several years the Programs have been funded annually through targeted congressional appropriations, and their implementation and administration have been left to EOIR. In March 2024, for example, Congress appropriated $844,000,000 to EOIR for fiscal year ("FY") 2024

---

[2] LOP and ICH providers who offer individual orientations and information sessions may respond to specific questions regarding immigration law and procedure and may offer legal advice based on an individual's unique circumstances, but they do not serve as legal representatives in any capacity and must notify participants accordingly. AR 91, 119.

"[f]or expenses necessary for the administration of immigration-related activities" and mandated that "not less than $28,000,000" of that amount "shall be available for services and activities provided by the Legal Orientation Program." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 133; *see also, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4522 (2022) (appropriating $860,000,000 to EOIR, "of which not less than $29,000,000 shall be available for services and activities provided by the Legal Orientation Program"). Since September 2024, EOIR and the Programs have been funded through continuing appropriations that maintain funding at FY 2024 levels. *See* American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722, 1723 (2024).

## II.    The Program Contracts

EOIR has a contract with Acacia Center for Justice, a Washington, D.C.-based nonprofit organization, to manage the Programs. *See* AR 7. Acacia is not a party in this matter. Acacia in turn subcontracts with various legal services organizations throughout the country, including Plaintiffs, to deliver Program services on the ground at covered detention facilities and immigration courts. *See* AR 15 (requiring "Program Operation Plan[s]" for "each program carried out by a subcontractor at a local program site"); *see also, e.g.*, Dkt. 2-2 at 3 (¶¶ 1-4) (declaring that Plaintiff Immigration Services and Legal Advocacy provides ICH and CCI services in the New Orleans Immigration Court); Dkt. 2-3 at 3-4 (¶¶ 1-5) (declaring that Plaintiff American Gateways provides LOP, ICH, and CCI services at detention facilities and immigration courts throughout central Texas); Dkt. 2-4 at 3-4 (¶¶ 2-4) (declaring that Plaintiff Rocky Mountain Immigrant Advocacy Network provides ICH and FGLOP services in the Denver Immigration Court).

All LOP, ICH, FGLOP, and CCI services are delivered pursuant to the prime contract between Acacia and DOJ ("the Acacia Contract" or "the Contract"). AR 7-82.[3] The Contract sets

---

[3] The Contract is formally between Acacia and the Procurement Services Staff within the Justice Management Division ("JMD"), the DOJ component that serves as the Department's management and operations arm. AR 7. A JMD "Contracting Officer" "has the overall responsibility for the administration of" the Contract and "alone, without delegation, is authorized to take actions on behalf of [the federal government] to amend, modify or deviate from the contract terms, conditions,

forth as a general matter that Acacia "shall provide all management, administration, staffing, planning, scheduling, etc., for all items and services required by the [C]ontract and individual task orders." AR 13. And the Contract's terms address everything from pricing tables for services delivered, "Program Operation Plan[s]," and invoice requirements to information systems security, background check processes for providers, and the observance of federal holidays. AR 10-11, 15-16, 24, 29-30, 34, 36-43. The Contract also incorporates by reference several clauses from the Federal Acquisition Regulation ("FAR"), 48 C.F.R. §§ 1.000-53.300, which address a wide range of matters such as "Preventing Personal Conflicts of Interest," "Restrictions on Certain Foreign Purchases," and "Equal Opportunity for Veterans." AR 22, 25, 50-53.[4] As relevant here, the Contract includes a "Stop-Work Order" clause that provides that "[t]he Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part, of the work called for by this contract for a period of 90 days after the order is delivered to the Contractor, and for any further period to which the parties may agree." 48 C.F.R. § 52.242-15(a) ("FAR 52.242-15"); *see* AR 25.

Under the Contract, Program services are "initiated" through the issuance of yearly program-specific "task orders" to Acacia. *See* AR 18; *see also, e.g.*, AR 83-110 (LOP task order for FY 2025); AR 111-26 (ICH task order for FY 2025); AR 127-43 (FGLOP task order for FY 2025); AR 144-59 (CCI task order for FY 2025).[5] These task orders set the total amount of funding available for each Program for the corresponding fiscal year. *See, e.g.*, AR 83 (allocating roughly

---

requirements, specifications, details and/or delivery schedules." AR 26. A "Contracting Officer's Representative" from EOIR, however, is responsible for, among other things, "coordinat[ing] contractor/government activities" and "the technical aspects of" the Contract; "[a]rrang[ing] for . . . the use of government resources (personnel, space, documents, etc.)"; and "inspect[ing] items/services furnished" under the Contract. AR 26-27.

[4] The FAR "codifi[es] . . . uniform policies and procedures" used by executive agencies when acquiring supplies and services. 48 C.F.R. § 1.101.

[5] In government contracting parlance, a contract like the one at issue here, in which "requirements" are "fulfilled on an indefinite-delivery, indefinite-quantity . . . task order basis," is often referred to as an "IDIQ." AR 10.

$22.5 million to LOP for FY 2025).  The task orders also describe in more detail the services that Acacia is required to deliver under each Program, *see, e.g.*, AR 90-93 (requiring LOP providers to offer group orientations, individual orientations, and pro se workshops and to develop a "Pro Bono Referral Plan"); the deliverables Acacia is required to provide to EOIR, *see, e.g.*, AR 96 (requiring Acacia to submit monthly data reports and quarterly progress reports regarding LOP); the facilities covered under each program, *see, e.g.*, AR 108, 125 (listing the detention facilities and immigration courts at which LOP services and ICH services are provided, respectively); and other program-specific requirements, *see, e.g.*, AR 90 ("All materials produced under this [LOP] Task Order for provision to individuals must be approved by [EOIR] prior to use or release, except related to legal strategy.").  Once executed, the task orders constitute an obligation of EOIR funds.  Accordingly, under the FY 2025 task orders, EOIR has incurred more than $32 million in obligations related to the Programs—*i.e.*, roughly $22.5 million for LOP, more than $2 million for ICH, more than $4.9 million for FGLOP, and more than $2.6 million to CCI.  AR 83, 111, 127, 144.

The Acacia Contract and related task orders contemplate that Acacia will work with subcontractors to provide Program services.  *See, e.g.*, AR 14 ("The Government reserves the right to review the qualifications of all staff (*to include subcontractor staff*) selected to work on any given task order before assignment." (emphasis added)); AR 95 ("Receipt by [Acacia] of the *Subcontractor's* charges shall, for purposes of this [LOP] Task Order, be deemed an expense incurred by [Acacia] . . . ." (emphasis added)).  And various subcontractors, including Plaintiffs, deliver Program services at covered facilities throughout the country.  *See, e.g.*, Dkt. 2-2 at 3 (¶¶ 1-4); Dkt. 2-3 at 3-4 (¶¶ 1-5); Dkt. 2-4 at 3-4 (¶¶ 2-4); Dkt. 2-5 at 3-4 (¶¶ 1-5).  Defendants, however, are not parties to any of the subcontracts between Acacia and Plaintiffs.[6]

---

[6] Because the subcontracts between Acacia and Plaintiffs were not before EOIR at the time it issued the January 22, 2025 Stop Work Order, those subcontracts are not included in the administrative record that Defendants produced to Plaintiffs, *see* Dkt. 29.  *See Amgen Inc. v. Hargan*, 285 F. Supp. 3d 397, 404 (D.D.C. 2017) (Moss, J.) (describing the proper scope of the administrative record subject to judicial review in an APA case).

### III.    The January 22, 2025 Stop Work Order and Rescission

Shortly after taking office on January 20, 2025, President Donald Trump signed an executive order titled "Protecting the American People Against Invasion" ("the Executive Order"), the stated purpose of which is to "ensure[] that the Federal Government protects the American people by faithfully executing the immigration laws of the United States."  Exec. Order No. 14159, § 1; *see* AR 1-6.  The Executive Order provides in relevant part that

> The Attorney General and the Secretary of Homeland Security shall:
>
> (a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;"

Exec. Order No. 14159, § 19(a).  The Order separately directs the Attorney General and DHS Secretary to "[p]ause distribution of further funds pursuant to such agreements pending the results of the review."  *Id.* § 19(b).

On January 22, 2025, the Contracting Officer for the Acacia Contract sent Acacia's General Counsel the following email:



| Subject: | Stop Work on Legal Access Program Contract Work |
| Date: | Wednesday, January 22, 2025 1:14:40 PM |

Greetings,

This email is to send you notification to stop work immediately pursuant to the Executive Order linked below on the following task orders and acknowledge receipt with a quick reply:

- Legal Orientation Program (LOP)
- Immigration Court Helpdesk (ICH)
- Family Group Legal Orientation Program (FGLOP)
- Counsel for Children Initiative (CCI)

Protecting The American People Against Invasion – The White House

AR 161.  This January 22, 2025 "stop work" order ("Stop Work Order") suspended the delivery of Program services.  *See, e.g.*, Dkt. 2-2 at 4 (¶ 9); Dkt. 2-3 at 5 (¶ 11); Dkt. 2-5 at 7 (¶¶ 12-13).  Two

days later, the Contracting Officer confirmed in a response to an email from Acacia that the Stop

Work Order required Acacia to stop all work under the Contract and the corresponding FY 2025

Program task orders.  AR 163.  The Contracting Officer also confirmed that the Stop Work Order

was "issued pursuant to FAR 52.242-15, Stop-Work Order."  AR 164; *see* 48 C.F.R. § 52.242-15(a)

("The order shall be specifically identified as a stop-work order issued under this clause.").

      The Stop Work Order was later rescinded on February 2, 2025.  AR 167.  That rescission

decision was conveyed to Acacia via the following email from the Contracting Officer:

| | |
|---|---|
| **Subject:** | Stop Work on Legal Access Program Contract Work |
| **Date:** | Sunday, February 2, 2025 4:12:50 PM |
| **Attachments:** | RI Temporary Restraining Order Notice 01-31-2025.pdf |

Leah,

Please comply with the attached notice and immediately resume funding of all programs that
received a stop-work order. The stop-work order has been rescinded for the following orders:

- IDIQ 15JPSS22D00000013, Legal Orientation Program (LOP)
  15JPSS23F00000154/P00003
- IDIQ 15JPSS22D00000013, Immigration Court Helpdesk (ICH)
  15JPSS22F00000701/P00008
- IDIQ 15JPSS22D00000013, Family Group Legal Orientation Program (FGLOP)
  15JPSS22F00000699/P00006
- IDIQ 15JPSS22D00000013, Counsel for Children Initiative (CCI)
  15JPSS22F00000700/P00005

Should you have any questions or concerns, please feel free to contact our office.

AR 167.  Attached to the email was a "Notice of Court Order" explaining that a temporary

restraining order issued by a federal district court in Rhode Island mandated that "[f]ederal

agencies cannot pause, freeze, impede, block, cancel, or terminate any awards or obligations on

the basis of [OMB Memorandum M-25-13], or on the basis of the President's recently issued

Executive Orders."  AR 168.[7]  The attached Notice further explained that "[o]ut of an abundance

---

[7] The temporary restraining order ("TRO") cited in the "Notice of Court Order" was issued on
January 31, 2025, by the district court in *New York v. Trump*, 1:25-cv-39-JJM-PAS (D.R.I.), a case
involving APA and constitutional challenges to a January 27, 2025 Office of Management and
Budget ("OMB") memorandum that allegedly paused various forms of federal financial assistance.
*See* AR 171-82.  That OMB memorandum was issued five days after the January 22, 2025 Stop

of caution, all federal agencies (even those not named as defendants in the case) should comply with" the terms of the Rhode Island court's order.  AR 169.  Services under the Programs resumed on February 3, 2025, and currently remain ongoing.[8]

## IV.    Procedural History

Plaintiffs, a group of nonprofit organizations that deliver Program services as subcontractors of Acacia, filed this lawsuit against DOJ, EOIR, and DHS on January 31, 2025, two days before the January 22, 2025 Stop Work Order was rescinded.  *See* Dkt. 1 ("Compl.").  In their Complaint, Plaintiffs challenge what they call "Defendants' termination of funding for the Programs" under the Administrative Procedure Act ("APA").  Compl. at 43-48 (¶¶ 132-57).  They allege that the January 22, 2025 Stop Work Order was arbitrary and capricious (Count 1); that "Defendants' termination of LOP and ICH" violated the Appropriations Clause (Count 2); and that "Defendants' decision to terminate the Programs" violated the First Amendment (Count 3).  *Id.* at 43, 46-47 (¶¶ 136, 146, 152).  And they seek declaratory and injunctive relief, including an order enjoining Defendants "nationwide" from "ceasing to continue" the Programs and from "refusing

_____

Work Order, has since been rescinded, and is nowhere mentioned in Plaintiffs' Complaint.  The TRO issued by the Rhode Island district court remains in effect.  The parties in *New York v. Trump* have since completed briefing on the plaintiffs' motion for a preliminary injunction, which the Rhode Island court took under advisement on February 21, 2025, following a motion hearing.

[8] On February 5, 2025—a full two weeks after the January 22, 2025 Stop Work Order was issued and five days after Plaintiffs filed their Complaint—Attorney General Pamela Bondi issued a memorandum titled "Sanctuary Jurisdiction Directives" that, among other things, directs all DOJ components to (1) "immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens" and, "to the extent consistent with applicable statutes, regulations, court orders, and terms," (2) "[p]ause any further distribution of funds for 60 days after complying with any notice and procedural requirements." Dkt. 30-1 at 3.  The memorandum further directs DOJ components to gather from "non-governmental organization(s) receiving funding from the Department" certain information regarding the "disbursed funds" those organizations receive and provides that, "[u]pon completion of" that information-gathering "process," the Associate Attorney General "shall determine which (if any) agreements to terminate and whether to resume funding of any remaining agreements, consistent with applicable statutes, regulations, and terms."  *Id.*  The February 5, 2025 memorandum is not mentioned in Plaintiffs' Complaint, let alone challenged, and is thus not presently before the Court.

to expend the appropriated funds as necessary to continue the Programs." *Id.* at 49.  In conjunction with their Complaint, Plaintiffs also filed a Motion for Temporary Restraining Order and Preliminary Injunction ("PI Motion"), in which they not only seek preliminary relief from Defendants' alleged "cut-off of [Program] funds," but also a preliminary injunction enjoining Defendants from, among other things, "implementing or enforcing Executive Order No. 14159 . . . and any order, memo, instruction, or directive purportedly issued under that Executive Order" that (1) "pauses, stops, impedes, blocks, cancels, or terminates" funding for the Programs or (2) "denies" Plaintiffs "access to Defendants' facilities for the purpose of providing [Program] services."  Dkt. 2 at 3-4; *see also* Dkt. 2-1 ("PI Brief" or "PI Br.").

The Court held a status conference on February 3, 2025, during which Plaintiffs agreed that because the Stop Work Order had been rescinded the previous day, there was no longer a need for urgent litigation regarding a temporary restraining order.  *See* Dkt. 16 at 3 ("After the joint status conference on February 3, 2025, the parties communicated to confirm that Plaintiffs have resumed access to ICE detention facilities and their Program-related activities.").  Pursuant to the Court's February 3, 2025 Minute Order, the parties filed a Joint Status Report on February 10, 2025, in which they jointly proposed a briefing schedule for Plaintiffs' PI Motion, Dkt. 16 at 4, which the Court adopted.  In accordance with that schedule, Defendants produced the Administrative Record in this matter to Plaintiffs on February 21, 2025.  *See* Dkt. 29.[9]

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see Mott Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 243 (D.D.C. 2015) ("The power to issue a preliminary

---

[9] On February 24, 2025, Plaintiffs filed a motion to supplement the preliminary injunction record, *see* Dkt. 30, with (1) the February 5, 2025 Attorney General memorandum, Dkt. 30-1, and (2) declarations from several non-party Program providers, Dkt. 30-2 to 30-15.  The former document, as explained above, is not challenged in Plaintiffs' Complaint and is thus not presently before the Court.  And the latter documents from non-parties have little to no bearing on whether Plaintiffs have met their burden of establishing that *they*, as the ones actually bringing suit, are entitled to the extraordinary preliminary relief they seek.

injunction . . . should be sparingly exercised." (citation omitted)). To secure one, the moving party must "make a 'clear showing that four factors, taken together, warrant [such] relief'": (1) "likely success on the merits"; (2) "likely irreparable harm in the absence of preliminary relief"; (3) "a balance of the equities in its favor"; and (4) "accord with the public interest." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018) (citation omitted). "The likelihood of success and irreparability of harm 'are the most critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted). And the third and fourth factors "merge when the government is the opposing party." *Id.*

## ARGUMENT

It is helpful to clarify at the outset the precise scope of the PI Motion that is presently before the Court. In their Complaint, Plaintiffs challenge the January 22, 2025 Stop Work Order specifically, claiming that it was arbitrary and capricious and also violated the Appropriations Clause and First Amendment. *See* Compl. at 43 (¶ 136), 46 (¶ 146), 47 (¶ 152). Plaintiffs accordingly sought preliminary relief from that Order when they filed this lawsuit. *See* Dkt. 2 at 4. The Stop Work Order has since been rescinded, however, AR 167, meaning that the only relief the Court can now afford Plaintiffs, it seems, is preliminary relief from an identical stop work order that EOIR might issue pursuant to the Acacia Contract at some point in the future.

Plaintiffs repeatedly mischaracterize the January 22, 2025 Stop Work Order as tantamount to a "decision to terminate" or "cancel[]" the Programs. PI Br. at 28-29, 31-35; *see* Compl. at 43 (¶ 135). But the Order, in both its language and effect, only amounted to a *temporary pause* in Program funding. *See* AR 164 ("This stop work order is issued pursuant to FAR 52.242-15, Stop-Work Order."); 48 C.F.R. § 52.242-15(a) (providing that stop work orders are, by default, limited to "a period of 90 days"). Plaintiffs consequently cannot try to transform their claims against the Stop Work Order into a broader challenge against a hypothetical decision to "terminate" or "cancel" Program funding that has not occurred. *See* 5 U.S.C. § 704 (providing that only "final agency action" is "subject to judicial review" under the APA). Plaintiffs also reference Executive Order No. 14159 throughout their PI Brief and ostensibly seek to preliminarily enjoin its

implementation. *See* PI Br. at 16 ("Putting aside, for now, the many illegalities related to the executive order . . . ."); Dkt. 2 at 3 (requesting a preliminary injunction that enjoins Defendants "from implementing or enforcing Executive Order No. 14159").  But the President is not a named defendant, and Executive Order No. 14159, as a presidential action, does not—indeed, cannot— fall within the ambit of Plaintiffs' APA claims.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (holding that the President is not subject to "the provisions of the APA").

The precise question before the Court is therefore narrow: Have Plaintiffs clearly shown that they are likely to succeed on the merits of their claims that the January 22, 2025 Stop Work Order was unlawful and that they are entitled to prospective preliminary injunctive relief prohibiting a future stop work order?  They have not, for several reasons.  Plaintiffs, for one, are not likely to succeed on the merits of any of their claims.  Their Appropriations Clause and First Amendment claims both fail as a matter of law.  Their remaining arbitrary-and-capricious claim amounts, in essence, to a contract claim against the federal government for monetary relief, which this Court lacks subject-matter jurisdiction to hear.  That claim also fails for other threshold reasons and on its own terms.  And the remaining preliminary injunction factors weigh against granting Plaintiffs' PI Motion.

## I.    Plaintiffs Are Not Likely to Succeed on the Merits of Any of Their Claims

At the preliminary injunction stage, "a plaintiff's likelihood of success on the merits is a key issue and often the dispositive one."  *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 548 F. Supp. 3d 39, 55 (D.D.C. 2021) (Moss, J.) (cleaned up).  All three of Plaintiffs' claims lack merit.

### A.    Plaintiffs' Appropriations Clause Claim Lacks Merit

Plaintiffs' claim that the January 22, 2025 Stop Work Order violated the Appropriations Clause can be readily dismissed.  The Appropriations Clause of the Constitution provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.  The Clause's meaning is "straightforward": "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."  *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (citation omitted).  "[I]n other words," the

Appropriations Clause generally concerns whether a certain "payment of money from the Treasury" is "authorized by a statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). There is no dispute here that the federal funds that Plaintiffs receive from EOIR to provide Program services are "appropriated by an act of Congress." *CFPB*, 601 U.S. at 425. Indeed, in the 2024 Consolidated Appropriations Act, Congress expressly appropriated "not less than" $28 million "for services and activities provided by the Legal Orientation Program." 138 Stat. at 133. Plaintiffs' Appropriations Clause claim instead hinges on their assertion that a "[t]ermination or indefinite suspension of" the Programs would constitute a "withhold[ing]" of congressionally appropriated funds and would thus "violate[] the mandate set forth" in the 2024 Consolidated Appropriations Act. PI Br. at 27. But that argument fails on both the facts and the law.

As a factual matter, the Stop Work Order in no way amounted to a "termination" or "indefinite suspension" of the Programs, as Plaintiffs claim. Rather, by its own terms, the Order effectuated a *temporary pause* in the disbursement of Program funds for a finite period of time. *See* 48 C.F.R. § 52.242-15(a) ("The Contracting Officer may, at any time, . . . require the Contractor to stop all, or any part, of the work called for by this contract *for a period of 90 days* . . . . (emphasis added)). Nor, as a legal matter, did that temporary pause in Program funding constitute a "withhold[ing]" of congressionally appropriated funds "from allotment and obligation." PI Br. at 27. To the contrary, the Stop Work Order was issued pursuant to the terms of the Acacia Contract. *See* AR 25 (incorporating by reference 48 C.F.R. § 52.242-15). And that Contract, in combination with the FY 2025 task orders, obligated roughly $32 million to the Programs for FY 2025—an amount that exceeds the $28 million appropriations "floor" set by the 2024 Consolidated Appropriations Act. *See* AR 83, 111, 127, 144. The federal government is thus contractually obligated to pay that full amount with appropriated funds. As the Supreme Court has explained, an "obligation" is a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received," and "[t]he Government may incur" such an obligation "by contract," as EOIR did through the Acacia Contract and related task orders. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 307-08 (2020) (citation omitted); *see City of*

*Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426-27 (D.C. Cir. 1994) (noting that "[f]unds appropriated for an agency's use can become unavailable" if the funds have "been awarded to . . . recipients" via a contract). The Stop Work Order merely paused the disbursement of Program funds; it did not modify or otherwise invalidate the government's obligation to pay those funds. *Cf. Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 191 (2012) ("[Contractors] may trust that the Government will honor its contractual promises."). Plaintiffs cite no authority for the remarkable proposition that an agency violates the Appropriations Clause when it simply pauses work under a contract in accordance with the FAR. To the contrary, the fact that all of the funds appropriated by Congress for the "Legal Orientation Program," 138 Stat. at 133, have been obligated for that very purpose is sufficient on its own to resolve Plaintiffs' Appropriations Clause claim in Defendants' favor.

Plaintiffs at times seem to equate language drawn from congressional committee reports and explanatory statements as evidence of a "mandate[]" to continue Program funding "without interruption." PI Br. at 28. But whatever that language might reveal about legislative intent, "indicia in committee reports and other legislative history as to how funds should or are expected to be spent do not establish any" binding "legal requirements" on agencies receiving appropriated funds. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (citation omitted). The Appropriations Clause likewise has nothing to say about whether EOIR's issuance of the Stop Work Order was consistent with the terms of the Acacia Contract. Nor does this case present a situation where EOIR is alleged to have exceeded the limitations imposed by Congress on EOIR's appropriations authority, such as by spending more money than Congress appropriated, or by spending money for a different purpose than Congress authorized. The Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Richmond*, 496 U.S. at 424. As explained above, Defendants have in no way contravened that requirement.

As a final note, Plaintiffs briefly invoke the Impoundment Control Act, 2 U.S.C. § 684, in their PI Brief. *See* PI Br. at 29. Notably, their Complaint does not mention the Act, let alone plead a claim under it. Nor is the Act implicated by *temporary pauses* in funding like the Stop Work

Order.[10]   Regardless, the Impoundment Control Act was designed to enforce *Congress's* power over the purse in relation to the Executive.   *See City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987) (explaining that the Act "was passed at a time when Congress was united in its furor over presidential impoundments and intent on reasserting its control over the budgetary process").   Thus, the statute is generally not enforceable by private parties through an APA suit, *see Gen. Land Off. of Tex. v. Biden*, 722 F. Supp. 3d 710, 734-35 (S.D. Tex. 2024); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981), and it does not help Plaintiffs here.

### B.    Plaintiffs' First Amendment Claim Also Lacks Merit

Plaintiffs separately contend that "Defendants' actions" (presumably the Stop Work Order) "constrain Plaintiffs' speech" in violation of the First Amendment by (1) limiting Plaintiffs' access to the immigration courts and detention facilities where Program services are typically provided, and (2) "denying" Plaintiffs "access to congressionally authorized funds" in order to allegedly "suppress" certain information.   PI Br. at 36.   But this claim, too, is meritless.

As an initial matter, much of the "speech" provided in conjunction with Program-related services must be reviewed and approved by EOIR before being disseminated, which Plaintiffs themselves acknowledge.   *See* PI Br. at 38 (noting that "the government may exercise some oversight as to the written materials used in [Program] presentations").   The Acacia Contract, for instance, provides that Acacia "shall develop appropriate written and/or recorded legal orientation materials in accordance with Government guidance" and that such materials "must be approved by the Government prior to distribution and use."   AR 17.   The Program-specific task orders similarly require that "all materials produced . . . for provision to individuals" in connection with

---

[10] *See In re James R. Jones, House of Representatives*, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981) (noting that an agency "taking the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated" does not constitute a "deferral" under the Act); *see also* Gov't Accountability Off., *Principles of Federal Appropriations Law*, § 2-50 (4th ed. 2016), https://www.gao.gov/assets/2019-11/675709.pdf ("The expiration of budget authority or delays in obligating it resulting from ineffective or unwise program administration are not regarded as impoundments unless accompanied by or derived from an intention to withhold the budget authority.").

the Programs "be approved by [EOIR] prior to use or release, except related to legal strategy," and that Acacia "maintain . . . a file-share or other electronic repository . . . to allow subcontractors to access all EOIR-approved . . . materials."  AR 89-90; *see* AR 90 ("[Acacia] will not continue to use or distribute materials after notice from [EOIR] that they are invalid for use and distribution."); *id.* (requiring Acacia to "maintain a curated library . . . of EOIR-approved LOP written and/or recorded materials on the internet"); *see also* AR 118 (requiring that all ICH "materials" be "approved by [EOIR] prior to use or release, except related to legal strategy"); AR 134 (requiring the same of FGLOP materials).  Any EOIR-approved materials thus qualify as the sort of "government speech" that the First Amendment simply "does not regulate."  *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *see Walker v. Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").  Plaintiffs accordingly "have no First Amendment rights at stake" whenever EOIR elects to no longer promote or fund certain types of its own speech. *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017).

Moreover, to the extent the Stop Work Order impacted any of Plaintiffs' speech, any such impact was entirely consistent with the First Amendment.  Notwithstanding Plaintiffs' assertions to the contrary, the Order in no way "censor[ed]" Plaintiffs.  PI Br. at 39.  After the Order was issued, Plaintiffs were still free to advise individuals about immigration court proceedings, to provide such individuals with Plaintiffs' own informational materials, and to speak about any issue, including immigration, as they saw fit.  Plaintiffs rely heavily on *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 543 (2001), to argue that the Order "silence[d]" their speech "regarding litigants' rights."  PI Br. at 38.  But *Velazquez* is readily distinguishable.  In that case, the Supreme Court found a certain speech restriction unconstitutional in large part because that restriction prohibited lawyers receiving funds from a legal access program from raising certain legal arguments in court, which, in the Court's view, "distort[ed] the legal system" and "threaten[ed] severe impairment of the judicial function."  531 U.S. at 544, 546; *see id.* at 536-37 (noting that the speech restriction at issue "prohibit[ed] legal representation funded by" the program "if the representation involve[d]

17

an effort to amend or otherwise challenge existing welfare law"). Here, in contrast, the Stop Work Order had no bearing whatsoever on the content of the legal advice offered by Program providers, and the Order certainly did not bar such providers from addressing certain issues entirely.

The Stop Work Order, at most, merely paused federal funding for Plaintiffs' speech (and temporarily so). Yet it is well settled that the federal government "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *see Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007) ("[I]t is well established that the government can make content-based distinctions when it subsidizes speech."). And it is equally well settled that the government does not run afoul of the First Amendment simply by electing not to fund certain activities, including ones that facilitate speech on issues of public importance. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (confirming that the government is "not required" by the First Amendment "to assist others in funding the expression of particular ideas, including political ones"); *cf. Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right . . . ."). Put simply, then, Defendants do not violate Plaintiffs' First Amendment rights merely "by declining to" further "subsidize" Plaintiffs' alleged "First Amendment activities" with Program funding. *Regan*, 461 U.S. at 548; *see also Ysursa*, 555 U.S. at 355 (explaining that the First Amendment "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression").

In light of these principles, the Court can reject Plaintiffs' First Amendment claim without needing to address Plaintiffs' invocation of the forum doctrine. *See* PI Br. at 34-35. But even assuming that doctrine applies here, Plaintiffs' arguments fall short. Whether classified as nonpublic or limited public fora, the immigration courts and detention facilities covered by the Programs are, as Plaintiffs admit, government-controlled properties in which the government "has wide latitude" to restrict speech on certain subject matters, *Archdiocese of Wash.*, 897 F.3d at 324,

so long as such restrictions are "reasonable" and "viewpoint-neutral," *Hodge v. Talkin*, 799 F.3d 1145, 1170 (D.C. Cir. 2015). *See* PI Br. at 36. Given that Defendants have "no constitutional obligation" to open up such sensitive facilities to expressive activities, *Archdiocese*, 897 F.3d at 324, it is certainly reasonable for them to limit access to only those organizations that are currently receiving Program funding and are thus, by extension, providing "speech" that has largely been pre-approved by EOIR as consistent with the Programs' objectives. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (noting that "a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created"). And Plaintiffs offer no evidence whatsoever that the Stop Work Order revoked access to Program facilities from providers that expressed a certain viewpoint on immigration proceedings but not from providers espousing a different viewpoint. *See Hodge*, 799 F.3d at 1170 (finding no viewpoint discrimination where a regulation "ban[ned] demonstrations and displays in the [Supreme Court] plaza regardless of whether they support or oppose (or even concern) the Court"); *Pulphus*, 249 F. Supp. 3d at 247 (observing that the government could not permissibly "prohibit [art]works that are 'anti-police' while allowing works that are 'pro-police'"). Indeed, the Stop Work Order "operate[d]" on all Program-related speech "without regard" to the speaker's specific "viewpoint." *Hodge*, 799 F.3d at 1162. Thus, even taking Plaintiffs' forum-doctrine arguments at face value, Plaintiffs are still not likely to succeed on the merits of their First Amendment claim.

### C.    Plaintiffs' Arbitrary-and-Capricious Claim Fails for Several Reasons

Once Plaintiffs' meritless constitutional claims are set aside, what remains is their claim that the January 22, 2025 Stop Work Order was arbitrary and capricious. Compl. at 43-45 (¶¶ 133-41). More specifically, Plaintiffs contend that EOIR, in issuing the Stop Work Order pursuant to the terms of the Acacia Contract, acted arbitrarily and capriciously because the agency purportedly gave no "discernible rationale for its decision to terminate the [P]rograms"; "failed to address any of the considerations appropriate to" such a decision; and otherwise offered pretextual

19

justifications for the Order.  PI Br. at 32, 35-36; *see* Compl. at 43 (¶ 135).  Plaintiffs essentially argue that the Stop Work Order was unlawful—*i.e.*, that it was *in breach* of the legal authority under which it was issued (the Acacia Contract).  And they demand that the Order (and future ones like it) be set aside and Program funding maintained without interruption—*i.e.*, that the Court grant *monetary relief* to Plaintiffs by ordering Defendants to *specifically perform* the Acacia Contract. *See* Compl. at 48-49 (prayer for relief).  Yet this Court lacks subject-matter jurisdiction over what amounts, in essence, to a contract claim against the federal government for monetary relief. Plaintiffs, at the very least, cannot seek relief under the APA here because they have other adequate remedies available to them and do not challenge final agency action.  And even taking Plaintiffs' arbitrary-and-capricious claim at face value, it fails on its own terms.

### 1.    This Court lacks subject-matter jurisdiction over what amounts, in essence, to a contract claim against the federal government

In suits like this one that are brought against the federal government, a district court's subject-matter jurisdiction "turns on at least 'two different jurisdictional questions'": (1) whether "Congress [has] provided an affirmative grant of subject-matter jurisdiction," and (2) whether "Congress [has] waived the United States's immunity to suit."  *Yee v. Jewell*, 228 F. Supp. 3d 48, 53 (D.D.C. 2017) (Moss, J.) (quoting *Trudeau v. FTC*, 456 F.3d 178, 183 (D.C. Cir. 2006)).  In their Complaint, Plaintiffs answer the first question by citing to 28 U.S.C. § 1331, the statute granting federal-question jurisdiction, and they answer the second by citing to the APA.  Compl. at 9 (¶¶ 23-24) (citing 5 U.S.C. § 706(2)(A)).  Regarding the latter question, however, Plaintiffs have not met their burden of clearly showing that their arbitrary-and-capricious claim falls within the APA's waiver of sovereign immunity, meaning that the Court lacks subject-matter jurisdiction to grant preliminary relief based on that claim.  *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008) ("As the party claiming subject matter jurisdiction, [the plaintiff] has the burden to demonstrate that it exists."); *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (Moss, J.) (explaining that a party that fails to show a "substantial likelihood" of satisfying "jurisdictional prerequisites" is "not entitled to a preliminary injunction").

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity," *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022), and sovereign immunity is "jurisdictional in nature," *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (citation omitted).  Plaintiffs are right that, "[v]ia the APA, Congress has provided a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'"  *Crowley*, 38 F.4th at 1105-06 (quoting 5 U.S.C. § 702). "But even for claims that are not for money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'"  *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting 5 U.S.C. § 702).  And here, Plaintiffs' "chief obstacle" under that "impliedly forbids" prong of the APA's sovereign immunity waiver is the Tucker Act, 28 U.S.C. § 1491.  *Yee*, 228 F. Supp. 3d at 55; *see Albrecht*, 357 F.3d at 67.[11]

The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under the [sovereign immunity] waiver in the APA."  *Perry Capital*, 864 F.3d at 618-19 (citing *Albrecht*, 357 F.3d at 67-68); *see Shaffer v.*

---

[11] In *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Supreme Court drew a distinction between a suit for "money damages," for which the APA does not waive sovereign immunity, *see* 5 U.S.C. § 702, and "an equitable action for specific relief," which can fall within the APA's sovereign immunity waiver even if that specific relief "may require one party to pay money to another."  487 U.S. at 893.  Plaintiffs here are essentially seeking "monetary relief under a contract," which the *Bowen* Court expressly identified as an example of the sort of "specific relief" that is different from "money damages."  *Id.* at 895.  Defendants accordingly do not contend at this stage that Plaintiffs' arbitrary-and-capricious claim is barred by § 702's "relief other than money damages" limitation, to the extent Plaintiffs seek specific performance of the Contract rather than compensatory damages for past losses.  *See id.* at 893-96.  *But see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002) ("*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due.").

*Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis*, the APA." (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)); *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or specific performance in contract cases, because . . . the Tucker Act . . . impliedly forbid[s] such relief."). Accordingly, regardless of how a claim is styled, a district court lacks jurisdiction if the claim "is in 'its essence' contractual." *Perry Capital*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see Albrecht*, 357 F.3d at 67 ("[T]he district court lacks jurisdiction if [plaintiff's claim] is essentially a contract action.").

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). In examining the "source of the rights" prong, the D.C. Circuit has "rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 1107). But the court has also warned that plaintiffs cannot avoid the Tucker Act and its jurisdictional consequences by artfully crafting a complaint to disguise what is essentially a contract claim as a claim for equitable relief under a separate legal authority. *See id.*; *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see also Megapulse*, 672 F.2d at 969-70 ("This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."). A court must therefore consider, among other factors, whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Crowley*, 38 F.4th at 1107 (citation omitted).

22

The second prong "considers 'the type of relief sought.'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). Money damages and specific performance are "explicitly contractual remed[ies]," for instance. *Perry Capital*, 864 F.3d at 619. The D.C. Circuit has recently explained, however, that "the crux of" this relief-focused inquiry "boils down to" whether the plaintiff, "in whole or in part, . . . explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (quoting *Kidwell*, 56 F.3d at 284).[12]  Although a plaintiff does not necessarily seek monetary relief "merely because . . . success on the merits may obligate the United States to pay the complainant," as with the "source of the rights" prong, a plaintiff cannot avoid the Tucker Act's jurisdictional consequences by "converting" through creative pleading what is essentially a claim for money damages into one "requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284. In assessing the type of relief a plaintiff seeks, a court must accordingly "look to the complaint's substance, not merely its form." *Id.* And a plaintiff's request for injunctive or declaratory relief is truly non-monetary only if that requested relief "has 'considerable value' independent of any future potential for monetary relief." *Id.* *Compare Tootle v. Sec'y of Navy*, 446 F.3d 167, 175-76 (D.C. Cir. 2006) (concluding that a

---

[12] The *Crowley* court read D.C. Circuit precedent to require a demand for monetary relief in order for a claim to be, "at its essence," contractual and thus beyond the ambit of the APA's waiver of sovereign immunity. *See* 38 F.4th at 1107 n.6 ("Both parties appear to recognize . . . that *Kidwell*'s test for monetary relief is included in *Megapulse*'s remedy prong."). Other D.C. Circuit cases appear to have read the Tucker Act to impliedly forbid injunctive relief for such contract-based claims as well, notwithstanding the fact that the Court of Federal Claims cannot grant such relief. *See Albrecht*, 357 F.3d at 68 ("We have held that the Tucker Act 'impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, *but also injunctive relief,* which the Claims Court may not." (emphasis added) (quoting *Transohio Sav. Bank*, 967 F.2d at 609)); *Sharp*, 798 F.2d at 1523 ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or specific performance in contract cases . . . ."); *see also Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 180 (D.D.C. 2007) ("Because the Tucker Act—which does not authorize equitable relief—was intended to provide 'the exclusive remedy for contract claims against the government,' this Circuit has interpreted the Tucker Act as 'impliedly forbidding' district courts from awarding equitable relief against the government on a contract claim brought under the APA."). This lack of doctrinal clarity should not pose a problem in this case, however, because, as explained below, Plaintiffs' demand for an injunction requiring Defendants to disburse Program funding to them effectively amounts to a demand for monetary relief, as ostensibly required by *Crowley*.

plaintiff's request for injunctive relief was not a disguised claim for monetary relief because the injunctive relief sought had "non-negligible value" compared to any potential monetary recovery the plaintiff might have received), *with Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding that a plaintiff's claim was "one 'founded upon' a contract for purposes of the Tucker Act" in part because the plaintiff's request for an order "compelling the government to pay money owed . . . under an executory contract" was equivalent to the "classic contractual remedy of specific performance").

Applying the two-prong test described in *Crowley* here confirms that Plaintiffs' arbitrary-and-capricious claim is essentially a contract claim for monetary relief against the federal government, meaning that the Court lacks subject-matter jurisdiction to resolve it. *See Albrecht*, 357 F.3d at 68 ("[T]he district court lacks jurisdiction if [the plaintiff's claim] is essentially a contract action."). Consider first "the source of the right upon which" Plaintiffs "base[]" their arbitrary-and-capricious claim. *Crowley*, 38 F.4th at 1108. Plaintiffs effectively assert that they have a right to Program funding that is free from "abrupt termination[s]" or "arbitrary and capricious" interruptions on Defendants' part. Compl. at 43-45 (¶¶ 133-41); *see* PI Br. at 34. Any suggestion by Plaintiffs that they are somehow entitled to such funding under appropriations laws clearly falls flat. *See, e.g.*, Dkt. 2-12 at 3 (requesting that the Court order Defendants to comply "with the mandate in the Department of Justice Appropriations Act, 2024 to fund [the Programs]"). Those laws only require EOIR to obligate a set amount of appropriated funds to the Programs, *see* 138 Stat. at 133, and in no way mandate that a portion of those funds be allocated to Plaintiffs specifically. The APA itself, moreover, "does not 'confer a substantive right to be free from arbitrary agency action,' nor does it create any other substantive right that might be violated." *Navab-Sfavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009) (citations omitted). And Plaintiffs otherwise fail to identify any other statutory or constitutional authority on which their alleged right to uninterrupted Program funding is purportedly grounded. *Cf. Crowley*, 38 F.4th at 1108-09 (involving alleged rights based on the Transportation Act, 31 U.S.C. § 3726(a), and the Contract Disputes Act, 41 U.S.C. § 7103(g)); *Megapulse*, 672 F.2d at 969 ("[Plaintiff's]

24

position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act.").

The only remaining source upon which Plaintiffs could even plausibly base their asserted right to Program funding, *see Crowley*, 38 F.4th at 1108, is the Acacia Contract and its related subcontracts. Indeed, Plaintiffs would have no colorable claim to Program funding whatsoever absent those contracts, and the manner in which such funding is currently disbursed, paused, or terminated is governed entirely by the terms of the Acacia Contract and attendant task orders. *See, e.g.*, AR 10-11 (pricing tables); AR 18 (task orders); AR 25 ("Stop-Work Order" clause); AR 29-30 (invoicing requirements); AR 53 (termination clauses). Consequently, "determining whether" EOIR "infringed" Plaintiffs' asserted right to Program funding by issuing the January 22, 2025 Stop Work Order "requires . . . an examination of" those Contract terms, and those terms alone. *Crowley*, 38 F.4th at 1109-10.

Plaintiffs, of course, completely ignore in both their Complaint and PI Brief the relationship between the Acacia Contract and their asserted right to Program funding. But whether deliberate or not, that silence does not change the fundamental fact that deciding whether Defendants' issuance of the Stop Work Order was impermissible and unreasonable here—the thrust of Plaintiffs' arbitrary-and-capricious claim—"turns *entirely* on the terms of a contract," *Albrecht*, 357 F.3d at 69, and is therefore "at its essence" a contract claim that cannot be heard in district court under the APA, *Crowley*, 38 F.4th at 1106. *See Shaffer*, 325 F.3d at 373 (finding a lack of subject-matter jurisdiction because the plaintiff's claims "involve[d] only straightforward contract issues" and did not require the district court to interpret any federal statutes); *Spectrum*, 764 F.2d at 894 (finding the same because the plaintiff's asserted right to payment "in no sense . . . exist[ed] independently of [its] contract" with the government); *Motorola, Inc. v. Perry*, 917 F. Supp. 43, 47 (D.D.C. 1996) (finding the same because it was "possible to conceive of [th]e dispute as entirely contained within the terms of the [plaintiff's] contract" with the government); *Twin Metals Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at *7 (D.D.C. Sept. 6, 2023) (finding

the same because the plaintiff "point[ed] to no other source of its asserted rights" beyond the lease agreements at issue).

The relief Plaintiffs seek only bolsters the conclusion that their arbitrary-and-capricious claim is essentially contractual in nature. *See Crowley*, 38 F.4th at 1110 ("We turn next to 'the type of relief sought.'"). Plaintiffs do not explicitly demand monetary relief in their Complaint or PI Motion. *See* Compl. at 48-49; Dkt. 2 at 3. *But see Kidwell*, 56 F.3d at 284 ("The plain language of a complaint, however, does not necessarily settle the question of Tucker Act jurisdiction."). Yet they do ask the Court to "[e]njoin Defendants . . . from refusing to expend . . . appropriated funds as necessary to continue the Programs . . . , including funding to any persons previously authorized by DOJ to receive funding for the Programs." Compl. at 49. Plaintiffs, in other words, seek "an order compelling the government to pay [them] money," *Spectrum*, 764 F.2d at 894, presumably pursuant to the only legal instruments that would entitle them to any Program funding at all—*i.e.*, the Acacia Contract and related subcontracts. Such relief is indistinguishable from "the classic contractual remedy of specific performance," *id.*, and, as a result, confirms that Plaintiffs' arbitrary-and-capricious claim "sound[s] in contract," *Perry Capital*, 864 F.3d at 619. *See id.* (observing that "specific performance is an explicitly contractual remedy"); *see also Albrecht*, 357 F.3d at 69 (concluding that the plaintiff's claim "sound[ed] in contract" in part because the terms of the contract at issue "w[ould] determine whether the relief sought—recovery of past contributions and termination of future payments—[was] available"); *Transohio Sav. Bank*, 967 F.2d at 613 (recognizing the D.C. Circuit's "very specific holdings that the APA does *not* waive sovereign immunity for contract claims seeking specific relief").

Plaintiffs also request ostensibly non-monetary forms of injunctive relief, including injunctions that would ensure their continued access to Program facilities and that would prohibit Defendants from "removing" Program-related "materials and posters" that Plaintiffs have "posted" in those facilities. Compl. at 49; *see* Dkt. 2 at 3. But Plaintiffs are permitted to enter secure ICE detention facilities only by virtue of the fact that the services they provide inside are funded, and thus sanctioned, by EOIR; Plaintiffs do not argue that they would otherwise have any sort of right

to access those same facilities absent their affiliation with the Programs. The non-monetary injunctive relief that Plaintiffs demand in their Complaint is thus inseparable from the monetary relief they principally seek here—namely, uninterrupted Program funding pursuant to the Acacia Contract and related subcontracts. *See Kidwell*, 56 F.3d at 284 (explaining that a request for declaratory and injunctive relief can avoid Tucker Act jurisdiction only if that relief "is not 'negligible in comparison' with" any "potential monetary recovery").

Plaintiffs cannot escape the conclusion that their arbitrary-and-capricious claim is "at its essence" contractual, *see Crowley*, 38 F.4th at 1106, by pointing to their status as subcontractors. Although Plaintiffs are not parties to the Contract between the federal government and Acacia, Plaintiffs' asserted right to Program funding is undoubtedly grounded in *a* contract—specifically, their respective subcontracts with Acacia, which are derived in turn from the primary Contract. And unlike *Crowley*, which involved both a plaintiff that was not in contractual privity with the government defendant *and* claims that were derived from other federal statutes, *id.* at 1108-09, Plaintiffs' arbitrary-and-capricious claim here, while not strictly based on a contract between Plaintiffs and the federal government, nonetheless "turns *entirely* on" contract terms—namely, those found in the Acacia Contract and Plaintiffs' subcontracts, *Albrecht*, 357 F.3d at 69. Put another way, there is no other source of substantive law from which Plaintiffs' right to Program funding could plausibly be derived. *See Navab-Sfavi*, 650 F. Supp. 2d at 71 (noting that the APA itself "does not 'confer a substantive right to be free from arbitrary agency action'"). Consequently, their arbitrary-and-capricious claim can still be fairly characterized as the sort of claim "sound[ing] in contract" over which the Court lacks jurisdiction under the APA. *Perry Capital*, 864 F.3d at 619.

Additionally, a conclusion that claims sounding in contract would necessarily fall within the APA's waiver of sovereign immunity so long as they are brought by government subcontractors who are not in direct privity with the government would have perverse consequences. The Tucker Act's "primary purpose" is "to ensure that a central judicial body adjudicates most claims against the United States Treasury," *Kidwell*, 56 F.3d at 284, and to that end, the statute "confer[s]

exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims," *Crowley*, 38 F.4th at 1106 (citation omitted); *see also Spectrum*, 764 F.2d at 895 (observing that "Congress intended the jurisdiction and remedies of the Tucker Act to be exclusive in cases based on government contracts"). The D.C. Circuit has consistently respected this jurisdictional boundary by reading the Tucker Act to "'impliedly forbid[]' contract claims against the Government from being brought in district court" under the APA's waiver of sovereign immunity. *Perry Capital*, 864 F.3d at 619 (quoting 5 U.S.C. § 702). Yet concluding here that Plaintiffs' arbitrary-and-capricious claim falls within that waiver merely because Plaintiffs are not in direct privity with the government would create an easily exploitable jurisdictional loophole, whereby claims for monetary relief that are grounded in a contract between the government and a prime contractor—claims that ordinarily should be brought in and resolved by the Court of Federal Claims, *see Crowley*, 38 F.4th at 1106; *Spectrum*, 764 F.2d at 895[13]—could instead be reviewed by district courts under the APA so long as a *subcontractor* who benefits indirectly from the prime contract is the one bringing suit.

Plaintiffs cite no authority to support this novel jurisdictional strategy. And a judicial endorsement of it would threaten to undermine the jurisdictional scheme that Congress devised under the Tucker Act. *Cf. Wright*, 503 F. Supp. 2d at 180-81 ("To allow a plaintiff to utilize the [APA's] waiver of sovereign immunity . . . to obtain a district-court judgment that a government contract is void would 'create such inroads into the restrictions of the Tucker Act that it would

---

[13] Regarding the Acacia Contract specifically, the Contract incorporates by reference 48 C.F.R. § 52.233-1, a FAR provision titled "Disputes." AR 53. That FAR provision states that "all disputes arising under or relating to th[e] [C]ontract shall be resolved under this clause." 48 C.F.R. § 52.233-1(b). And that clause goes on to describe the administrative remedy Acacia must exhaust when raising disputes relating to Contract, *id.* § 52.233-1(d)-(f), which mirrors the remedy prescribed by the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-09. Thus, if Acacia has a dispute regarding the Contract, it would first need to adhere to the procedures described in the Contract's "Disputes" clause and could then, under the CDA, appeal any final decision reached by the Contracting Office to either an agency board of contract appeals or the Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(2); 41 U.S.C. §§ 7104(a)-(b), 7105; *see United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022-28 (9th Cir. 2023) (describing the jurisdictional distinctions between the CDA and the Tucker Act).

ultimately result in the demise of the Court of Claims.'" (quoting *Megapulse*, 672 F.2d at 967)).

Such an outcome would also upend the settled expectations and agreed-upon obligations reached

by the federal government in its contracts by subjecting any consequential exercise of a contractual

right to APA lawsuits brought by subcontractors in district court, whereas an identical contract-

based claim brought by a prime contractor could only be brought in the Court of Federal Claims.

The APA's waiver of sovereign immunity should not be read to permit such an absurd result.  *See*

*Seed v. EPA*, 100 F.4th 257, 265 (D.C. Cir. 2024) ("Courts, in turn, must strictly construe a waiver

of sovereign immunity in terms of its scope, in favor of the sovereign." (cleaned up)).

At bottom, Plaintiffs' arbitrary-and-capricious claim is "essentially a contract action,"

*Albrecht*, 357 F.3d at 68—they assert a right to Program funding that is grounded solely in the

Acacia Contract and its related subcontracts, and they seek monetary relief from Defendants in the

form of Program funding.  Yet because the Tucker Act "impliedly forbids" this Court from granting

such relief, 5 U.S.C. § 702, the Court lacks subject-matter jurisdiction under the APA over

Plaintiffs' arbitrary-and-capricious claim.

### 2.    Plaintiffs lack prudential standing to enforce the Acacia Contract

Even if the Court were to find that sovereign immunity does not bar it from considering

Plaintiffs' arbitrary-and-capricious claim, it should nonetheless decline to consider that claim on

another jurisdictional ground: Plaintiffs, as subcontractors, lack prudential standing to enforce the

terms of the Acacia Contract.  Though different from Article III standing, prudential standing is a

threshold "jurisdictional concept" that "mandate[s] that a plaintiff's suit seek to vindicate his own

legal rights or interests, not those of some absent third party."  *Steffan v. Perry*, 41 F.3d 677, 697

(D.C. Cir. 1994) (en banc).  Prudential standing requirements "are designed 'to limit the role of

the courts in resolving public disputes' as a matter of policy."  *FiberLight, LLC v. Nat'l R.R.*

*Passenger Corp.*, 81 F. Supp. 3d 93, 105 (D.D.C. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490,

500 (1975)).  And one such requirement "is that a party cannot sue to enforce or challenge the

terms of a contract to which it is neither a party nor a third-party beneficiary."  *Id.*; *see Deutsche*

*Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 194 (D.C. Cir. 2013).

As explained above, Plaintiffs' arbitrary-and-capricious claim amounts, in essence, to a request that the Court (1) deem EOIR's issuance of the January 22, 2025 Stop Work Order unlawful and (2) order EOIR to disburse Program funding to Plaintiffs without interruption. Yet deciding whether EOIR had the authority to issue the Stop Work Order requires looking to the Acacia Contract, to which Plaintiffs are not parties. And the only party besides the federal government that has enforceable rights under the Contract is Acacia, who is not a party in this case. Plaintiffs thus appear to be challenging the permissibility of the Stop Work Order *on Acacia's behalf*, which they lack prudential standing to do. *See Deutsche Bank*, 717 F.3d at 194 ("Appellants lack prudential standing to enforce the terms of the Agreement because they were neither parties nor intended third-party beneficiaries of th[at] contract."). Plaintiffs' subcontractor status thus precludes them from asserting an arbitrary-and-capricious claim that is based on the terms of the Acacia Contract.

### 3.    An alternative adequate remedy is available to Plaintiffs

Even assuming the Court concludes that Plaintiffs' arbitrary-and-capricious claim does not fail on jurisdictional grounds, that would not necessarily mean that APA review is available. APA review is limited to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Because Plaintiffs potentially have alternative adequate remedies available to them to vindicate their asserted interest in receiving Program funding pursuant to the Acacia Contract and related subcontracts, they have failed to clearly show that they have a viable APA cause of action. *See Perry Capital*, 864 F.3d at 621 ("[W]e have several times recognized that the finality requirement and adequate remedy bar of § 704 determine whether this is a cause of action under the APA, not whether there is federal subject matter jurisdiction."); *see also Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 91 (D.D.C. 2021) ("Plaintiffs bear the burden of persuasion on all factors in consideration of a motion for a preliminary injunction.").

The APA's requirement that a plaintiff have "no other adequate remedy in court," 5 U.S.C. § 704, "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen*, 487 U.S. at 903. As explained

above, Plaintiffs' arbitrary-and-capricious claim amounts, in essence, to a contract claim against the federal government for monetary relief. Because such claims are routinely adjudicated in the Court of Federal Claims, *see Crowley*, 38 F.4th at 1106, Plaintiffs have thus failed to clearly show why bringing an action in that forum to obtain the monetary relief they seek—*i.e.*, Program funding, or a monetary award equivalent to that funding amount—would not provide them with an adequate remedy. *See ITServe All., Inc. v. Cuccinelli*, 502 F. Supp. 3d 278, 288 (D.D.C. 2020) (finding a lack of jurisdiction over a claim for declaratory and injunctive relief because the plaintiffs "ha[d] 'an adequate remedy'" in the Court of Federal Claims); *see also Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1347 (Fed. Cir. 2008) (describing "pass-through claims[s]" in which a prime contractor can "assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm"). The relief available to Plaintiffs in the Court of Federal Claims (monetary relief for breach of contract) may not be strictly identical to the relief they seek in this case (an injunction requiring Defendants to disburse Program funding to Plaintiffs, through Acacia, without interruption). But the D.C. Circuit has made clear that an "alternative remedy need not provide relief identical to relief under the APA" to be "adequate" for purposes of § 704, "so long as" that remedy "offers relief of the 'same genre.'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009).

Plaintiffs likewise fail to show why their contract-based claim cannot be adequately resolved via a contract action against Acacia, the actual counterparty to each of Plaintiffs' Program subcontracts. "The availability of a private right of action" against a third party "may supply an alternative adequate remedy precluding judicial review." *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 25 (D.D.C. 2010); *see Garcia*, 563 F.3d at 523. Here, Plaintiffs assert a right to Program funding, and that right is derived from, and is thus governed by, their respective subcontracts with Acacia. If Plaintiffs fail at any point to receive the Program funding to which they believe they are entitled under those subcontracts, the natural remedy available to them would accordingly seem to be a suit against Acacia for breach of contract. *See Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("Aggrieved subcontractors have the option of enforcing

31

their subcontract rights against the prime contractor in appropriate proceedings . . . .); *cf. Godwin v. Sec'y of Hous. & Urb. Dev.*, 356 F.3d 310, 312-13 (D.C. Cir. 2004) (per curiam) (concluding that APA review was not available because the plaintiff had an adequate alternative remedy through a private suit directly against the alleged wrongdoer).  Because that adequate alternative remedy is potentially available to them, Plaintiffs cannot simply disregard their contractual rights and obligations altogether and try to seek APA review of a Stop Work Order issued by a federal agency with which they share no direct contractual relationship.

### 4.    Plaintiffs do not challenge final agency action

Plaintiffs' arbitrary-and-capricious claim is not reviewable under the APA for a separate reason: Plaintiffs do not challenge "final agency action."  5 U.S.C. § 704.  In addition to the "adequate remedy" bar, § 704 "'limits causes of action under the APA' to 'final agency action.'" *Trudeau*, 456 F.3d at 188 (citation omitted); *see Perry Capital*, 864 F.3d at 620-21 (noting that "the requirement of final agency action in § 704 is not a condition of the waiver of [sovereign] immunity . . . , but instead limits the cause of action created by the APA").  To be "final," an agency action must satisfy "two independent conditions": (1) it must "mark[] the consummation of the agency's decisionmaking process," meaning it cannot be "of a merely tentative or interlocutory nature," and (2) it must be an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  The agency action that Plaintiffs challenge here—the January 22, 2025 Stop Work Order—"fails at the first prong."  *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016); *see id.* ("An order must satisfy both prongs of the *Bennett* test to be considered final.").

The Stop Work Order was issued pursuant to a term in the Acacia Contract that allows EOIR (through a Contracting Officer) to order that "all, or any part, of the work called for by th[e] [C]ontract be stopped for a period of 90 days."  48 C.F.R. § 52.242-15(a).  EOIR must then decide by the end of that ninety-day period whether to (1) "[c]ancel the stop-work order" and resume work under the Contract, or (2) "[t]erminate the work covered by" the stop work order in

accordance with the terms of the Acacia Contract. *Id.* A stop work order issued under 48 C.F.R. § 52.242-15 thus does not definitively determine whether work under a contract will continue or be terminated. Such an order instead merely marks the start of contractually prescribed time period during which such a final decision will be made and is therefore just an "interlocutory" step in the "decisionmaking process." *Soundboard*, 888 F.3d at 1267.

The January 22, 2025 Stop Work Order was no less "tentative" or "interlocutory" in nature. *Id.* Indeed, the Order was issued in response to Executive Order No. 14159, *see* AR 161, which ordered a "[p]ause" in the "distribution of all further funds pursuant to" certain government contracts "pending the results of [a] review" of those funds. Exec. Order No. 14159, § 19(b). And that funding review was to culminate in a final decision to either (1) "[t]erminate" the Acacia Contract, if it was "determined" that the Contract was "in violation of law" or a "source[] of waste, fraud, or abuse," or (2) resume Program funding under the Contract. *Id.* § 19(c). The Stop Work Order merely marked *the start* of that internal agency review and in no way "terminat[ed]" the Acacia Contract or the Programs itself, notwithstanding Plaintiffs' erroneous claims to the contrary. PI Br. at 6. Put another way, the Order was just an interim step in reaching the final decision regarding Program funding that was mandated by the Executive Order. Because the Stop Work Order thus "plainly d[id] not mark the consummation of . . . [that] decisionmaking" process—quite the opposite—it lacks the finality required for APA review. *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012); *see id.* (concluding that an FDA warning letter was not final agency action in part because the letter stated that the FDA "*w[ould] evaluate*" the information the plaintiff submitted to the agency before making a final decision); *Sw. Airlines*, 832 F.3d at 275 (concluding that a Department of Transportation letter was not final agency action because it was followed by the initiation of a proceeding that would ultimately "resolve . . . the very issues addressed in the challenged . . . letter").

### 5.    Plaintiffs' arbitrary-and-capricious claim fails on its own terms

Finally, even if the Court were to decide that it has subject-matter jurisdiction over Plaintiffs' arbitrary-and-capricious claim and that APA review is available, that claim still fails on

its own terms.  The APA's "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), "is deferential and narrow in scope."  *Husky Mktg. & Supply Co. v. FERC*, 105 F.4th 418, 421 (D.C. Cir. 2024); *see Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023) ("[O]rdinary arbitrary-and-capricious review is highly deferential and presumes the validity of agency action." (cleaned up)).  As a result, a court reviewing agency action under the arbitrary-and-capricious standard "may not substitute its own judgment for that of the agency."  *Columbia Gulf Transmission v. FERC*, 106 F.4th 1220, 1230 (D.C. Cir. 2024).  Instead, the court must "simply ensure[] that the agency has acted within a zone of reasonableness," and an agency decision must be upheld so long as it is "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Plaintiffs allege in their Complaint that the January 22, 2025 Stop Work Order was "arbitrary and capricious in multiple respects."  Compl. at 43 (¶ 136).  As an initial matter, the Order expressly noted that it was being issued in response to Executive Order No. 14159.  AR 161. Because a future stop work order issued pursuant to another authority, or premised on different circumstances, would not present the same legal issue as the one raised by Plaintiffs' arbitrary-and-capricious challenge here, their challenge is accordingly limited to the January 22, 2025 Stop Work Order specifically and, at most, future stop work orders identical to it—*i.e.*, temporary pauses in Program funding issued in response to Executive Order No. 14159 and pursuant to 48 C.F.R. § 52.242-15.  *See Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1171 (D.C. Cir. 2015) (explaining that an agency decision that altered an approach taken by the agency two years earlier did not mean the earlier decision was unreasonable because both decisions "were reasonable under their different circumstances"); *Noem v. Haaland*, 41 F.4th 1013, 1017 (8th Cir. 2022) ("In arbitrary-and-capricious review, even small factual differences can matter.").

Looking to the specifics of Plaintiffs' challenge, they do not question EOIR's conclusion that Executive Order No. 14159's directive to pause the distribution of funds pursuant to certain government contracts applied to the Acacia Contract and related subcontracts.  Nor can it be seriously suggested that EOIR could have disregarded that presidential directive if compliance was possible and legally permissible. *See Sherley v. Sibelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (noting

that "an agency under the direction of the executive branch . . . must implement the President's policy directives to the extent permitted by law"). Plaintiffs also do not contend—nor could they— that EOIR lacked the authority under the Acacia Contract to order that services and funding under the Programs be immediately stopped. That Contract expressly incorporates 48 C.F.R. § 52.242-15, which provides that EOIR (through a DOJ Contracting Office) may "*at any time* . . . require the [Program] Contractor to stop all, or any part, of the work called for by th[e] [C]ontract for a period of 90 days." *Id.* (emphasis added). And the only additional requirements imposed by that stop-work provision are that a stop work order (1) be in writing and (2) "specifically identif[y]" itself as an order being "issued under" § 52.242-15, *id.*; nowhere does that stop-work provision explicitly or impliedly require EOIR to consider certain factors before issuing a stop work order, to "provide . . . . [a] rationale" for such an order, or to justify an order once issued. *See* PI Br. at 30-34. Accordingly, the fact that EOIR (1) was subject to a presidential directive to "[i]mmediately" pause the "distribution of all further [Program] funds," Exec. Order No. 14159, § 19(a)-(b), and (2) had unambiguous authority under the terms of the Acacia Contract to implement that directive by issuing a stop work order for the Programs, *see* 48 C.F.R. § 52.242-15, should be enough on its own to reject Plaintiffs' claim that the January 22, 2025 Stop Work Order was somehow arbitrary and capricious. *See Cemex Inc. v. U.S. Dep't of the Interior*, 560 F. Supp. 3d 268, 277 (D.D.C. 2021) ("Whether the challenged agency action in this case was arbitrary and capricious turns on the meaning of contractual language and how to go about interpreting it."); *Rancho Vista del Mar v. United States*, 640 F. Supp. 3d 112, 122 (D.D.C. 2022) ("The agency responsible for [a decision to halt construction on a border wall near the plaintiff's property] followed an unambiguous statutory and executive command, and thus its actions cannot be considered arbitrary and capricious."); *see also Voyageur Outward Bound Sch. v. United States*, 444 F. Supp. 3d 182, 199 (D.D.C. 2020) (concluding that an arbitrary-and-capricious claim failed in part because the agency decision at issue involved interpreting lease terms, and the agency's interpretation of those terms was reasonable), *vacated and dismissed as moot*, No. 20-5097, 2022 WL 829754 (D.C. Cir. Mar. 17, 2022).

The thrust of Plaintiffs' claim appears to be that the Stop Work Order was arbitrary and capricious because it was neither "reasonable" nor "reasonably explained." *See* PI Br. at 6. Yet there is simply nothing unreasonable about an agency imposing a temporary and contractually permissible funding pause, pursuant to an express presidential directive, pending a review of that funding to ensure that it is compliant with applicable laws and the President's priorities. Additionally, requiring EOIR to have articulated a rationale for the Stop Work Order *beyond* the agency's need to comply with a presidential directive (to the extent permitted by law and the Acacia Contract) would effectively subject such directives to arbitrary and capricious review, contrary to the well-established principle that the President is not an agency under the APA. *See Franklin*, 505 U.S. at 800-01; *Dalton v. Specter*, 511 U.S. 462, 470 (1994). And demanding that EOIR thoroughly explain its issuance of the Stop Work Order to Plaintiffs' satisfaction would impose extra-contractual burdens on the agency's exercise of an express contractual right that is otherwise largely unconditional, *see* 48 C.F.R. § 52.242-15, thus undermining the contractual expectations reflected in the agreed-upon terms of the Acacia Contract.

Plaintiffs' more specific challenges to the reasonableness of the Stop Work Order all fail as well. They argue, for instance, that EOIR "failed to provide any discernable rationale" or "reasons for" the Order. PI Br. at 31-32. Not so. The Stop Work Order stated that it was issued "pursuant to" Executive Order No. 14159, AR 161, and the Executive Order clearly explained the purpose of the funding pause it directed be imposed—namely, to allow the Attorney General to "review" and potentially "audit" certain government contracts for "waste, fraud, and abuse" as well as compliance with "applicable law," Exec. Order No. 14159, § 19(a). Plaintiffs may disagree with the policy choice reflected in the Executive Order, or they may think that a temporary pause in Program funding was unnecessary. *See, e.g.*, PI Br. at 35 (claiming that pausing the programs "merely to conduct such studies would be unprecedented"). But the substance and wisdom of the Executive Order is not before the Court. *See Franklin*, 505 U.S. at 800-01. And the relevant question here, in any event, is whether a certain agency decision was *reasonable*, not whether that decision was "the best one possible or even whether it is better than the alternatives." *FERC v.*

36

*Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). There is no basis for substituting the policy judgments made in the Executive Order and effectuated by the Stop Work Order with Plaintiffs' preferences. *Cf. NTCH, Inc. v. FCC*, 950 F.3d 871, 881 (D.C. Cir. 2020) ("These sorts of 'judgments on the public interest are entitled to substantial judicial deference, and we see no reason to second-guess the Commission's decision . . . ." (citation omitted)).

Plaintiffs also argue that EOIR, in issuing the Stop Work Order, "failed to address any of the considerations appropriate to th[at] decision," including, they claim, the Programs' efficacy and the "impacts that cancellation of the Programs . . . will have on the [Programs'] intended and actual beneficiaries." PI Br. at 32–33. An agency action is potentially arbitrary and capricious if the agency failed to consider "*relevant* factors." *Sherley*, 689 F.3d at 785 (emphasis added). Yet Plaintiffs fail to explain why EOIR, after receiving a presidential directive to immediately pause Program funding, should have considered factors that, as Plaintiffs themselves suggest, ostensibly supported a course of action that was "diametrically opposed to" that directive. *Id.* at 784. Put another way, Plaintiffs seem to be arguing that EOIR should have thoroughly weighed the pros and cons of pausing Program funding, but the language of Executive Order No. 14159 makes clear that the funding pause it ordered left little room for agency discretion—it straightforwardly ordered a "[p]ause" in the "distribution of all further funds." Exec. Order No. 14159, § 19(b). The principal factor that EOIR thus needed to consider in implementing that mandated pause was whether it had the legal authority to do so. *See Sherley*, 689 F.3d at 784 ("[A]s an agency under the direction of the executive branch, it must implement the President's policy *directives to the extent permitted by law*."). It did. *See* 48 C.F.R. § 52.242-15. Any other factors that arguably weighed *against* a pause in Program funding were therefore not relevant to implementing the Executive Order, and EOIR did not act arbitrarily or capriciously by not considering them. *See Sherley*, 689 F.3d at 785 (concluding that an agency's decision to not respond to certain comments that opposed a directive in an Executive Order was not arbitrary and capricious because "[s]uch comments simply did not address any factor relevant to implementing the Executive Order").

In short, there is nothing remotely unreasonable about an agency's decision to temporarily pause certain federal funding in response to a clear presidential directive and in full compliance with the terms of a governing contract. Plaintiffs' claim that the January 22, 2025 Stop Work Order was arbitrary and capricious therefore fails.

## III.    The Remaining Preliminary Injunction Factors Weigh Against Plaintiffs

Plaintiffs' failure to show any likelihood of success on any of their claims should be sufficient on its own to deny their PI Motion. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction *must establish* that he is likely to succeed on the merits . . . ." (emphasis added)). Yet even if the Court were to consider the remaining preliminary injunction factors, those factors likewise weigh against granting preliminary relief here, and they certainly do not overcome Plaintiffs' complete failure to establish a likelihood of success on the merits.

### A.    Plaintiffs Fail to Show They Will Suffer Imminent Irreparable Harm

"[A] showing that irreparable injury is 'likely' is the *sine qua non* for obtaining a preliminary injunction." *Cal. Ass'n*, 344 F. Supp. 3d at 167 (citation omitted). The D.C. Circuit has "set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). An asserted injury "must be both certain and great," as well as "actual" rather than "theoretical." *Id.* (citation omitted); *see Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018) ("[A] mere possibility [of irreparable injury] is not enough."). Relatedly, the movant must show that "the injury complained of is of such *imminence*, that there is a clear and present need for equitable relief." *Chaplaincy*, 454 F.3d at 297 (clean up). The injury must also be "beyond remediation," *id.*, and "it is 'well settled that economic loss does not, in and of itself, constitute irreparable harm,'" *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017).

Plaintiffs' PI Brief is replete with largely conclusory assertions that the January 22, 2025 Stop Work Order caused them to suffer a range of "severe and irreparable harm[s]." PI Br. at 40. Crucially, though, the Stop Work Order has been rescinded and Program funding restored, *see* AR 167, meaning that Plaintiffs are not presently suffering any of the harms they allege. At best, then,

Plaintiffs are now seeking preliminary relief from the irreparable harms that will allegedly flow from an identical stop work order that EOIR might issue at some unknown time in the future. None of those speculative future injuries, however, is "sufficiently great, certain, or imminent to warrant injunctive relief." *Navajo Nation*, 292 F. Supp. 3d at 513.

In any event, a temporary loss of Program funding, standing alone, constitutes the very sort of economic harm that is not considered irreparable. *See John Doe Co.*, 849 F.3d at 1135; *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) ("The first hurdle Plaintiffs face is that the harms they identify are economic in nature and therefore not generally irreparable."). Indeed, if Plaintiffs were to prevail on the merits of their claims and obtain the injunctive relief they seek, that funding would eventually be disbursed to them, just at a later date. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Plaintiffs instead highlight certain alleged harms that would materialize while a funding pause is in place. Yet many of those harms can be dismissed with little consideration. For instance, any impact the Stop Work Order (or future identical orders) might have on Plaintiffs' "clients," *see* PI Br. at 41 ("Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding."), does not show that Plaintiffs *themselves* would suffer irreparable harm in the absence of preliminary relief. *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 213 (D.D.C. 2012) ("This argument fails because it shows irreparable harm not to [the plaintiff], but to third parties."). Plaintiffs also invoke an alleged loss of First Amendment rights. *See* PI Br. at 40. But as explained above, Plaintiffs have not suffered a First Amendment violation from which any constitutional injury (whether irreparable or not) could flow. *See Archdiocese*, 897 F.3d at 334 ("[T]he deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely.").

Plaintiffs claim that a future pause in Program funding "will directly interfere with" their organizational missions by "impeding their ability to provide critical orientation services" to

individuals in immigration proceedings.  PI Br. at 40.  That alleged interference is limited in scope—a temporary pause in Program funding would not prevent Plaintiffs from continuing to provide legal access services that are supported by other funding streams.  *See Chaplaincy*, 454 F.3d at 297 ("[T]he injury 'must be both certain and *great* . . . .'" (emphasis added)); *see also, e.g.*, Dkt. 2-5 at 10 (¶ 25) (noting that LOP accounts for only 20 percent of the budget for Plaintiff Amica Center's "Detained Adult Program"); Dkt. 2-7 at 5 (¶ 13) (noting that Plaintiff National Immigrant Justice Center "is seeking private funding from individual donors or foundations to maintain [its] work, in the absence of [Program] funding").  And any harm that a temporary pause in Program funding might have on Plaintiffs' organizational missions would not be "beyond remediation."  *Chaplaincy*, 454 F.3d at 297.  If the Court were to order that such a pause be lifted, Plaintiffs' ability to deliver Program services would be fully restored.  *See Nat'l Parks Conservation Ass'n v. Semonite*, 282 F. Supp. 3d 284, 290 (D.D.C. 2017) ("It is not adequate for the plaintiffs to allege mere harm to the organization; the harm must also be irreparable to warrant a preliminary injunction.").

Plaintiffs further allege that even a temporary pause in Program funding might require them to "eliminate services," "layoff staff," and potentially "close their doors."  PI Br. at 41.  As with the alleged harm to Plaintiffs' organizational missions, a loss of certain employees as a result of a temporary stop work order would likely be redressable if Plaintiffs were to prevail on the merits of their claims; once Program funding is restored, Plaintiffs would presumably be able to reinstate those employees or hire new ones.  Plaintiffs also fail to clearly show that the staff layoffs and loss of "institutional knowledge" they purportedly fear are sufficiently "certain[] or imminent to warrant injunctive relief" here.  *Navajo Nation*, 292 F. Supp. 3d at 513.  For instance, certain Plaintiffs admit that while the January 22, 2025 Stop Work Order was still in place, they were able to implement "contingency plan[s]," Dkt. 2-3 at 5-6 (¶ 13); Dkt. 2-5 at 10 (¶ 25), and "temporarily shift[]" their employees to programs that do not rely on Program funding, Dkt. 2-4 at 4 (¶ 10); Dkt. 2-10 at 5 (¶ 12), to avoid the prospect of layoffs, at least in the short term.  According to Plaintiffs themselves, then, the staffing-related harms they assert would "not arise immediately" if EOIR

were to issue another stop work order in the future. *Navajo Nation*, 292 F. Supp. 3d at 513 (finding no showing of irreparable harm where the "alleged harms" of having to lay off employees and close facilities would not "arise immediately" upon a loss of funding). That fact, combined with the speculative nature of any future funding pause, thus fails to "creat[e] a clear and present need for extraordinary equitable relief to prevent harm." *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

In sum, the "mere 'possibility' of irreparable harm" stemming from a future pause in Program funding that Plaintiffs allege here falls well short of warranting the extraordinary relief they seek. *Cal. Ass'n*, 344 F. Supp. 3d at 167; *see Chaplaincy*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction . . . ."). It should also be noted that granting Plaintiffs' PI Motion under the unique circumstances of this case would be particularly inapt. Plaintiffs claim that they would be irreparably harmed by any temporary pause in Program funding, notwithstanding the fact that the Acacia Contract expressly gives EOIR the right to temporarily "stop all, or any part, of the work called for by th[e] [C]ontract" "at any time." 48 C.F.R. § 52.242-15(a). Yet despite voluntarily entering into Program subcontracts that, through the Acacia Contract, allow for temporary stop work orders, Plaintiffs now seek to evade the consequences of that knowing choice by suggesting that the issuance of any such orders would cause irreparable harm worthy of preliminary injunctive relief. A ruling in Plaintiffs' favor here would suggest that preliminary relief is potentially available any time a party to a contract is adversely affected by a counterparty's exercise of a contractual right. Such efforts to undermine the benefits of contracting should not be rewarded.

### B.    The Public Interest Does Not Clearly Weigh in Plaintiffs' Favor

Lastly, the balance of equities and the public interest do not clearly weigh in favor of granting Plaintiffs the extraordinary remedy of a preliminary injunction. As explained above, Plaintiffs have failed to clearly show that they will face "great, certain, [and] imminent" harm absent such relief. *Navajo Nation*, 292 F. Supp. 3d at 513. Additionally, Plaintiffs' assertion that Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice," PI Br.

at 41 (citation omitted), is just a repackaged version of their unsuccessful merits arguments and cannot serve as an independent basis for relief.  *Cf. Archdiocese*, 897 F.3d at 335 ("[T]he strength of [the plaintiff's] showing on public interest rises and falls with the strength of its showing on likelihood of success on the merits.").  That Plaintiffs are attempting to skirt the consequences of a knowing and voluntary contractual arrangement only further tips the balance against granting preliminary relief; it is surely not in the public interest to allow a government subcontractor to cry foul via an APA suit whenever contractual terms prove to be unfavorable to them.

Meanwhile, contrary to Plaintiffs' claim that "there will be no harm to Defendants" if the Court were to issue a preliminary injunction, PI Br. at 41, such an injunction would effectively disable EOIR from implementing the President's priorities consistent with the agency's legal authority.  That injunction would also directly undermine EOIR's contractual rights, as well as the consistency and predictability that contract law is meant to bolster—a consequence that likely would not be limited to the Acacia Contract alone.  It is certainly not in the public interest to enjoin federal agencies from permissibly exercising their rights under government contracts, especially when disbursements from the public fisc are at issue.  Given the disruption that Plaintiffs' requested relief would have on government contracting and the Executive Branch's ability to lawfully direct and guide agencies' spending decisions more broadly, the balance of the equities weighs in favor of denying Plaintiffs' PI Motion.

## IV.    Any Relief Should Be Limited

For the reasons explained above, Plaintiffs are not entitled to any preliminary relief.  But in the event the Court concludes otherwise, it is well settled that injunctive relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  In light of these principles, any preliminary relief the Court grants should be limited in at least two respects.

First, the scope of any preliminary injunction should be limited to the specific agency action Plaintiffs challenge in their Complaint—namely, the January 22, 2025 Stop Work Order and, at most, future orders that are likewise issued in response to Executive Order No. 14159 and pursuant to the stop work order clause in the Acacia Contract, 48 C.F.R. § 52.242-15. Any broader relief would impermissibly enjoin unrelated agency conduct whose lawfulness is not before the Court. *See Neb. Dep't of Health & Hum. Servs.*, 435 F.3d at 330 (concluding that a district court abused its discretion by vacating agency policy announcements that the plaintiff did not directly challenge); *cf. Nat'l Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Hum. Servs.*, 631 F. Supp. 2d 17, 21 (D.D.C. 2009) (concluding that a preliminary injunction was "more burdensome than necessary" because it enjoined certain conduct that did not "cause the harms of which plaintiffs complain[ed]").

The relief Plaintiffs propose, *see* Dkt. 2 at 3, would extend well beyond the scope of the agency action they actually challenge here. For one, the Court has no authority under the APA to directly enjoin the "enforc[ement]" of Executive Order No. 14159, *id. See Franklin*, 505 U.S. at 800-01. Additionally, Plaintiffs ask the Court to enjoin Defendants from "remov[ing] from their websites and any other locations of publication" certain statements regarding the Programs, Dkt. 2 at 3, yet Plaintiffs provide no basis for restricting Defendants' speech in such a way. Plaintiffs also request injunctions concerning their access to and communications within facilities covered under the Programs. *See id.* (requesting that Defendants be enjoined from "preventing Plaintiffs from accessing Defendants' facilities for the purpose of providing [Program] services" and from "removing from" those facilities "posters, literature, or other written communications of Plaintiffs' pertaining to" the Programs). But there are no grounds for the Court to enjoin access- or communications-related issues that are wholly unrelated to the January 22, 2025 Stop Work Order. *See Bird v. Barr*, No. 19-cv-1581, 2020 WL 4219784, at *2 (D.D.C. July 23, 2020) (Jackson, J.) ("[T]his Court only possesses the power to afford preliminary injunctive relief that is *related* to the claims at issue in the litigation . . . ."). For instance, it is conceivable that access to certain ICE detention facilities may need to be temporarily restricted at certain times due to safety concerns,

43

which would have nothing to do with the Program-related stop work orders Plaintiffs challenge. Such issues are beyond the scope of Plaintiffs' claims here and should be resolved pursuant to the terms of the Contract and task orders governing the Programs. *See id.* (explaining that a preliminary injunction "is not a generic means by which a plaintiff can obtain auxiliary forms of relief that may be helpful to them while they litigate unrelated claims").

Second, any preliminary relief should be limited to Plaintiffs alone, and even then only to those Plaintiffs that have clearly shown that they face imminent irreparable harm in the absence of such relief. Plaintiffs demand a "nationwide injunction," PI Br. at 43-45, ostensibly in an effort to protect various Program providers that are not parties to this suit. Yet Plaintiffs do not even attempt to explain why they think they have standing to seek relief on behalf of providers who are presumably capable of protecting their own rights and interests. *See Kowalski v. Turner*, 543 U.S. 125, 129 (2004) (explaining that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). More fundamentally, enjoining Defendants from temporarily pausing the Program funding that is disbursed to Plaintiffs specifically would remedy the precise "inadequacy that produced" the injuries that Plaintiffs attempt to "establish[]" in their Compliant. *Gill v. Whitford*, 585 U.S. 48, 66 (2018).

## V.    The Court Should Stay Any Preliminary Injunction It Grants and Require Plaintiffs to Submit a Bond as Security

If the Court decides to grant preliminary injunctive relief, it should stay any such injunction pending any appeal authorized by the Solicitor General. *See* Fed. R. App. P. 8(a). For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions").

Finally, the Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant

gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 66(c). This Rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Should the Court issue an injunction at this preliminary stage requiring Defendants to continue to pay Acacia and its subcontractors millions of dollars under the Contract, Defendants request that Plaintiffs post a bond of $32 million, which is approximately equal to the amount of money EOIR has obligated to the Programs under the FY 2025 task orders. *See supra* at 7.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction should be denied.

DATED: March 5, 2025               Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ANDREW I. WARDEN
Assistant Director
Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
Indiana Bar No. 37147-49
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Counsel for Defendant*