# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>　　　　　　　　Defendants. | Case No. 1:25-cv-00298-RDM |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

The propriety and need for of broad and practical injunctive relief in this case is clear. Defendants' opposition brief demonstrates their determination to unilaterally cut funding from congressionally mandated programs, in violation of the law, and fails to refute Plaintiffs' arguments on the merits.

Defendants remain committed to defunding the Programs, and the limited injunctive relief for which their opposition brief advocates would enable them to do so.  For example, Defendants say Plaintiffs face no irreparable harm because Defendants rescinded the January 22, 2025, stop work order (the "Stop Work Order") to comply with the temporary restraining order (now a preliminary injunction) in *New York v. Trump.*  But the Stop Work Order pre-dated the Office of Management and Budget ("OMB") memorandum at issue in that case, and Plaintiffs have no assurance that Defendants' current position (that the *New York* preliminary injunction applies to the Programs at issue as defined in Plaintiffs' motion) will not change as soon as the threat of a preliminary injunction in this case disappears.  Defendants argue any injunction should only apply to the rescinded Stop Work Order, asking this Court to ignore entirely the February 5, 2025 memorandum from the Defendant Attorney General directing Defendants to act again to terminate funding for programs providing services to noncitizens, including the Programs.  If, as that memo shows, Defendants' real plan is to stop work—despite other public pronouncements to the contrary—an injunction should issue to prevent subversion of Congress's clear commands and to prevent Defendants from illegally withholding funding from these vital programs.  Defendants' request for a $32 million injunction bond further demonstrates Defendants' unconstitutional goal to cut congressionally appropriated funding without judicial review of their actions by pricing Plaintiffs out of court.  That request should be denied.

Plaintiffs' request for preliminary relief rests on the strength of the facts and clear legal authority. This Court should exercise its power to craft equitable relief to protect Plaintiffs and stop Defendants' actions that violate the law.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR APPROPRIATIONS CLAUSE CLAIM

Defendants mischaracterize their Stop Work Order as merely a "*temporary pause*" despite taking action to eliminate the Programs outright through unilateral Executive action—and directly contrary to congressional mandate. As outlined in Plaintiffs' motion, the Stop Work Order was not the first time the Executive Branch has attempted to illegally terminate the Programs. Dkt. 2-1 at 11–15. And, contrary to Defendants' assertions that the Stop Work Order was intended to be time-limited, the Stop Work Order itself contained no such durational limit nor did it reference FAR 52.242-15.[1] AR 161. Defendants' refusal to spend the full amount of funds appropriated by Congress for the purposes designated by Congress, even for a limited time, violates the Appropriations Clause.

The Executive Branch has no authority to block funding appropriated by Congress. *See Nat'l Council of Nonprofits v. Off. of Mgmt. and Budget*, --- F.Supp.3d ---, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025) (citing *U.S. Dep't of the Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)) (noting that the Appropriations Clause gives Congress "exclusive power"

---

[1] Perhaps recognizing this, Defendants argue there is some unspoken, default limitation in its Stop Work Order. Dkt. 35 at 12. But given the conduct at issue, there is no basis to assume the Stop Work Order was time limited. Only *after* Acacia emailed asking Defendants whether the Stop Work Order was issued under FAR 52.242-15 did Defendants indicate FAR 52.242-15 applied. AR 164. That post-hoc rationalization is insufficient.

over federal spending).  The Executive Branch cannot withhold or delay disbursement of appropriated funds, even if it "has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program."  *See In re Aiken Cnty*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (plurality opinion).  The Appropriations Clause is "particularly important as a restraint on Executive Branch officers."  *U.S. Dep't of the Navy*, 665 F.3d at 1347.  Defendants cannot circumvent the plenary authority of Congress under the Appropriations Clause by styling their Stop Work Order a "temporary pause" on funding for the Programs.  *See New York v. Trump*, --- F.Supp.3d ---, 2025 WL 715621, at *15 (D.R.I. Mar. 6, 2025) (issuing preliminary injunction because "though some funding has begun to flow again," the "chaos and uncertainty that the Defendants' arbitrary decision to [stop disbursing appropriated funds]" caused harm to plaintiffs and threatened the purpose of the funding).  Defendants' refusal under the Stop Work Order to disburse funds Congress appropriated for the Programs was illegal; any future attempt by the Executive Branch to unilaterally stop or pause disbursement of appropriated funding to Plaintiffs and other providers of the Programs will also be illegal.

To skirt around the APA, Defendants characterize the *Stop* Work Order as merely a "temporary pause".  Dkt. 35 at 12.  But even a temporary pause violates the Congress's appropriation.  Further, as Defendants note, Plaintiffs are not privy to Defendants' contract with Acacia that purportedly authorizes a 90-day pause.  Putting aside the legality of such a pause, the Stop Work Order did not contain any such time limit, and Plaintiffs' activities were directly impacted through prohibiting access to facilities where they ordinarily conduct the Programs and funding stops.  Although Defendants rescinded this unlimited Stop Work Order, the Defendant Attorney General's February 5, 2025 memorandum indicates that Defendants intend to "determine which . . . agreements to terminate," and that the Department of Justice "shall not enter into any

new contract . . . to provide Federal funding to non-governmental organizations that support or provide services, either directly or indirectly . . . to removable or illegal aliens." Dkt. 30-1 at 3–4. Courts have already ruled that "temporary" funding freezes are final actions under the APA justifying relief, because the directives implementing them are commands, rather than suggestions, "mark[ing] the consummation of each agency's decisionmaking process." *New York v. Trump*, 2025 WL 715621 at *8; *see also Clean Air Council v. Pruitt*, 862 F.3d 1, 5–6 (D.C. Cir. 2017) (imposing a 90-day stay of compliance with a rule is "tantamount to amending or revoking a rule."). In short, Defendants cannot justify their unlawful decision to end the Programs by calling it a "pause," and Plaintiffs' request for injunctive relief against such an action must be granted.

In any event, even a "temporary pause" for operational review (the type Defendants purport to have initiated) violates the Appropriations Clause. The Senate Appropriations Committee, in a report incorporated as a command in the Department of Justice Appropriations Act of 2024, gave Defendants an unambiguous order not to pause funding for the Programs: "The Committee directs the Department to continue all LOP services and activities, including that of the ICH, without interruption, *including during any review of the program*." S. Rep. No. 118-62, at 84 (2023) (emphasis added); *see* Consolidated Appropriations Act, 2024, Pub. L. 118-42, § 4, 138 Stat. 25, 26 (2024) (incorporating Senate Explanatory Statement); 118 Cong. Rec. S1398 (daily ed. Mar. 5, 2024) (Senate Explanatory Statement stating agencies "should comply with" Senate Report 118-62 and "shall follow the directions set forth in this act"). Even if Defendants had validly relied on FAR 52.242-15 *before* making their decision, it could not defend their actions here. *See Texas v. E.P.A.*, 726 F.3d 180, 196 (D.C. Cir. 2013) ("'[A] valid statute always prevails over a conflicting regulation,' and a regulation can never 'trump the plain meaning of a statute.'" (alterations in original) (citations omitted)). And that result makes sense—and is required—in light of

4

Congress's power to mandate use and purpose of funding, and the Executive Branch's duty to obey Congress's appropriations mandates. *See Aiken Cnty.*, 725 F.3d at 262 n.3 ("the Appropriations Clause acts as a separate limit on the [Executive Branch]'s power" over spending). Were the Executive Branch able to cite purported contract rights to terminate appropriated funding without congressional approval, appropriations legislation would be meaningless and easily overridden. This is especially so here, where Plaintiffs are not privy to the contract, and do not (and could not) bring contract claims to protect their rights. Absurd consequences would follow if the Court permitted Defendants to waive away Plaintiffs' appropriations claim by alleging the Stop Work Order was only "temporary." Defendants' past actions demonstrate this would only lead to further "temporary" pauses of indefinite length and scope, sowing confusion and rendering any practical administration of the Programs unworkable.

The Stop Work Order and the February 5, 2025 memo aim at ending the congressionally mandated Programs. EOIR's implementation of the "Protecting the American People Against Invasion" executive order (the "Executive Order") and the issuance of the Stop Work Order are not the first instances of executive action aimed at getting rid of the Programs. On April 11, 2018—only eighteen days after Congress appropriated funding for the LOP program—executive action abruptly halted the Programs. Compl. ¶ 94. When providers threatened to bring suit to enjoin such action, the Programs were reinstated (the very next day). Compl. ¶ 100. This time, two weeks after rescission of the 2025 Stop Work Order (and 3 days after Plaintiffs' suit), the Defendant Attorney General issued the February 5, 2025 memo, demonstrating Defendants' intent to end the congressionally authorized Programs.[2] Dkt. 35 at 10.

---

[2] Despite citing the memo and therefore conceding the memo is properly before this Court, Defendants erroneously assert this memo is not properly before the Court because it was not

Here, as in *National Council of Nonprofits*, Defendants' actions "run roughshod over a 'bulwark of the Constitution' by interfering with Congress's appropriation of federal funds." 2025 WL 368852, at *12 (citation omitted). When confronted with Executive overreach into Congress's spending power, courts have "stood firm" to reject such advances. *See, e.g., AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, ---- F.Supp.3d. ---, 2025 WL 752378, at *1 (D.D.C. Mar. 10, 2025). This Court should do the same, and find Plaintiffs are likely to succeed on the merits of their Appropriations Clause claim.

### B.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR ARBITRARY AND CAPRICIOUS APA CLAIM.

Defendants fail to meaningfully address the merits of Plaintiffs' claim that their actions are arbitrary and capricious under the APA, instead advancing specious arguments about claims they would rather litigate. Defendants misconstrue Plaintiffs' APA arbitrary-and-capricious claims as stemming from contracts, not Defendants' attempt to end the congressionally mandated Programs. Defendants spend most of their time wishing that Plaintiffs brought Tucker Act claims—claims Plaintiffs clearly did not and could not plead—rather than the claims actually and properly before the Court. In the process, Defendants wholly fail to address the merits of Plaintiff's arbitrary-and-capricious claim, because they have no legitimate reason for interrupting or ending the Programs.

As a preliminary matter, Plaintiffs challenge Defendants' *implementation* of the Executive Order by EOIR. *See* Dkt. 35 at 36. Agencies implementing Executive Orders *are* subject to the APA, even when "comply[ing] with a presidential directive." *Id.*: *see Pub. Citizen v. U. S Trade*

---

challenged in Plaintiffs' Complaint. Dkt. 35 at 10–11, nn. 8–9. But the memo was released five days *after* Plaintiffs filed their Complaint and Plaintiffs could not be expected to predict its release. Defendants offer no other basis for ignoring the memo. The memo shows Defendants' pattern of conduct specifically relevant to the claims asserted here and evidences their continuing action to disregard the law and to deny funding to the Programs.

*Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) ("*Franklin* [*v. Massachusetts*'s denial of judicial review of presidential action] is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties."), *cert. denied* 114 S. Ct. 685 (1994); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996); *see also* Dkt. 2-1 at 22; *Pacito v. Trump*, --- F.Supp.3d ---, 2025 WL 655075, at *14-*15 (W.D. Wash. Feb. 28, 2025) ("Agency Defendants cannot evade APA review merely by claiming they are implementing executive orders").  Even if this were a valid defense, Defendants have offered no evidence that they were actually completing an audit of the Programs under the Executive Order.  Instead, the Administrative Record reflects that they immediately issued a Stop Work Order without creating any plans for an audit or any other review.

Defendants try to manufacture jurisdictional defects by focusing on the Tucker Act, but they cannot choose which claims Plaintiffs brought.  Plaintiffs are not seeking a contract remedy for "particular categories or past injuries or labors for which various federal statutes provide compensation," implicating the Tucker Act.  *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 904–05, n.39 (1988)); *see* Dkt. 35 at 21 n.11 (noting *Bowen* does not apply for "contractual obligation[s] to pay money past due."). Rather, Plaintiffs seek injunctive relief to *prevent* the government unlawfully ending the Programs, which are specifically mandated and funded by Congress.  *See* Compl. ¶¶ 16–17; Dkt. 2-1 at 27–28.  By canceling the Programs' funding and interrupting Plaintiffs' Program activities, Defendants are unconstitutionally ending programs they have no authority to end.  This is not a contract issue and cannot not be treated as such without foreclosing *any* plaintiff from challenging such unconstitutional, illegal acts.  *See, e.g.*, *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38

F.4th 1099, 1107 (D.C. Cir. 2022) (rejecting the "broad notion that any case requiring some reference to or incorporation of a contract" cannot be heard in district courts) (cleaned up).

The Tucker Act does not apply to Plaintiffs' request to enjoin the government from terminating the Programs because doing so is arbitrary and capricious under the APA.  Instead, "[t]he Tucker Act yields when the obligation-creating statute provides its own detailed remedies, *or* when the [APA] provides an avenue for relief." *Me. Cmty.*, 590 U.S. at 323–24 (emphasis added); *see also Pacito*, 2025 WL 655075 at *17 (rejecting argument Tucker Act bars APA review.  Because Plaintiffs seek "declaratory and injunctive relief" and specific remedies that "attempt to give the plaintiff the very thing to which he was entitled," rather than "money in compensation for . . . losses," the Tucker Act's jurisdictional requirements do not apply.  *Bowen*, 487 U.S. at 893, 895; *see also Crowley*, 38 F.4th at 1111 (seeking declaratory and injunctive relief are not "specific to actions that sound in contract"); *James v. Caldera*, 159 F.3d 573, 579 (Fed. Cir. 1998) (discussing *Bowen*); *Katz v. Cisneros*, 16 F.3d 1204, 1208 (Fed. Cir. 1994) (suit seeking payments from HUD to which plaintiff alleged it was entitled did not "seek money as compensation for a loss suffered" and was properly brought in district court).  As "Claims Court[s do] not have the general equitable powers of a district court to grant prospective relief," a district court is the proper avenue to litigate an APA claim.  *Bowen*, 487 U.S. at 905–07.

The recent decision in *United States Conference of Catholic Bishops v. Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025), does support a different result.  There, the court— wrongly focusing exclusively on the nature of the relief requested by plaintiffs—incorrectly found that plaintiffs pursued "essentially a contract action" that belonged in the Court of Federal Claims under the Tucker Act.  *Id*. at *5, *7.  Here, Plaintiffs do not seek contractual relief from this Court—nor could they, as Plaintiffs do not contract with the government.  *See, e.g.*, *United States*

*v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed. Cir. 1983).  Instead, Plaintiffs request this Court enjoin the government from ending the Programs unlawfully and violating Plaintiffs' First Amendment rights.   *Conference*'s application of *Crowley* further undermines Defendants' position, because in *Crowley* "the plaintiff had no contractual relationship with [the government] itself, so any remedy afforded against [the government] could neither be construed as damages nor specific performance."  *Conference*, 2025 WL 763738, at *6 (citing *Crowley*, 38 F.4th at 1110). So, too, here:  Plaintiffs are not, as noted, in contract with the government, and instead seek the "prospective relief" that the plaintiffs in *Crowley* requested.  *Conference*, 2025 WL 763738 at *6.[3]

Further, Plaintiffs, subcontractors who implement a congressionally created program, cannot "recover directly from the United States for amounts owed to [them]," and as such do not have cognizable standing in the Court of Federal Claims.  *Johnson Controls*, 713 F.2d at 1550; *see also Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("It is a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act."); *Globex Corp. v. United States*, 54 Fed .Cl. 343, 347 (2002) (similar).  Nor can Defendants twist this litigation into a lawsuit "on Acacia's behalf."  Dkt. 35 at 30.  Plaintiffs do not seek to enforce Acacia's contract with Defendants; instead, Plaintiffs seek to ensure that federal funding for, and activities related to, the Programs remain uninterrupted.   Acacia cannot disburse funds Defendants have unlawfully

---

[3] To the extent *Conference* can be construed as anything besides holding *direct* monetary claims should go to the Court of Federal Claims under the Tucker Act, such an interpretation contradicts well-established precedent.  For example, in *Yee v. Jewell*, this Court noted that, since *Bowen*, the D.C. Circuit has "consistently held" that a claim must be brought under the Tucker Act only if the Claim "turns *entirely* on the terms of a contract."  228 F. Supp. 3d 48, 56 (D.D.C. 2017) (Moss, J.) (emphasis in original) (citing *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 69 (D.C. Cir. 2004)); *see also Me. Cmty*, 590 U.S. at 323–24 (distinguishing remedies for past labors with those for prospective relief).

withheld, or instruct any interruption in Program activities, so a suit against Acacia offers Plaintiffs no remedy.  No matter how hard Defendants contort Plaintiffs' claims, their arguments against subject matter jurisdiction fail.

While attempting to transform the APA claim into a Tucker Act claim, Defendants fail to meaningfully address Plaintiffs' argument that their actions are arbitrary and capricious in violation of the APA.  Instead, Defendants produced an Administrative Record remarkable for its meagerness, and for its failure to provide any plausible support for Defendants' termination of the program or "set forth [Defendants'] reasons for decision."  *Tourus Records, Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (cleaned up).  The sparse Record shows Defendants did not consider *any* relevant factors or articulate a rational connection for the elimination of the Programs, as the APA requires, and exposes their claims of an audit as mere pretense.  *See Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 301 (D.C. Cir. 1981).  The Administrative Record provides *no* further clarity of the grounds for the administrative action, which Defendants must "clearly disclose[] and adequately sustain[]."  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *see also* Dkt. 2-1 at 28–30.  To the extent Defendants offer a purported justification based on allegations of "waste," relying on the January 28, 2025, EOIR Policy Manual, Dkt. 2-1 at 32–33, that rationale is both too late and not in the Record before the Court.  Even if such inefficiencies existed and could be considered as extra-record evidence, that Defendants considered them *after* the agency action took place shows that Defendants placed no reliance on them as a basis to interrupt and/or terminate the Programs.  Indeed, a reversal of an existing policy like this would require "a more detailed justification than what would suffice for a new policy created on a blank slate."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Here, Defendants provided nothing, and Plaintiffs are likely to succeed on their APA claim.

### C.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT CLAIM

Plaintiffs are likely to succeed on their First Amendment claim because Defendants' attempts to both cut off funding for the Programs and prevent Plaintiffs from speaking to noncitizens in immigration courts and detention facilities directly restricts private speech. Defendants make cursory arguments that the speech at issue constitutes government speech, that the government is not required to fund certain speech, and that it may reasonably restrict access to immigration courts and detention facilities to those Programs receiving government funding. Dkt. 35 at 16–19. But these miss Plaintiffs' central point: Plaintiffs engage in private speech that Congress has expressly chosen to fund and which is critical to the fair and efficient functioning of the courts. Dkt. 2-1 at 5. Under the First Amendment, Defendants may not arbitrarily withdraw funding because they have targeted speech for suppression; such attempts are *per se* unreasonable and thus violate Plaintiffs' First Amendment rights. *Cf. Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (First Amendment forbids restrictions that are "effort[s] to suppress expression merely because public officials oppose the speaker's view").

Plaintiffs' speech does not constitute government speech. As Plaintiffs explained in their motion, courts consider at least three factors to determine whether speech constitutes government speech: "(1) the history of the speech at issue; (2) a reasonable observer's perception of the speaker; and (3) control and final authority over the content of the message." Dkt. 2-1 at 35 (quoting *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d 395, 411 (D.D.C. 2016)). Defendants address only the third factor. Dkt. 35 at 16–17. The Supreme Court has cautioned against such a rigid approach to determining whether speech constitutes government speech, noting that "a government seal of approval" does not automatically transform private speech into government speech. *Matal v. Tam*, 582 U.S. 218, 235 (2017). Defendants' argument boils down to just that:

11

because EOIR approves materials shared through the Programs, Defendants claim that it automatically becomes government speech. But the Supreme Court clearly instructs that this is not a sufficient condition for finding that speech is government speech. *Id.* at 235.

Here, the LOP and ICH Programs began as private projects to further the organizational missions of certain Plaintiffs. *See* St. John Decl. ¶¶ 4–6; Koop Decl. ¶ 2. While Plaintiffs work *with* the government to disseminate their speech, they stand in stark contrast to the government's representatives in the immigration proceedings (e.g., the DHS attorneys who represent Immigration and Customs Enforcement and the Article II immigration judges who oversee proceedings). And, although EOIR approves materials, Plaintiffs' speech may, at times, stand at odds with the government's position in immigration proceedings. The speech at issue is Plaintiffs' private speech subject to the protections of the First Amendment.

Further, while the government is not *required* to fund certain speech or to allow certain speakers access to limited or non-public fora, the First Amendment still applies. The Supreme Court has "repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (a contrary holding "would allow the government to 'produce a result which (it) could not command directly'" (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

Plaintiffs agree that the government may impose restrictions "to define the limits and purposes" of a program "designed to facilitate private speech, not to promote a governmental message," *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542–43 (2001). But not all restrictions or conditions are permissible under the First Amendment: "the relevant distinction . . . is between conditions that define the limits of the government spending program—those that specify the

activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013).[4]  Here, Defendants' attempts to interrupt and terminate the Programs clearly fall outside the "limits of the government spending program" because Congress has not authorized Defendants to cease funding the Programs on *any* basis, let alone because Defendants unilaterally decide the private speech disseminated in the Programs is no longer worth funding.

Contrary to Defendants' position, *Velazquez* is precisely on point.  Plaintiffs disseminate private speech providing noncitizens "accurate and accessible legal information" that "empower[s] individuals to make informed decisions about how to proceed with their immigration court cases." St. John. Decl. ¶ 5; *see also* Dkt. 41-1 at 10, 12.  This may include information "about the possible defenses to deportation."  St. John Decl.¶ 17.  Defendants have wrongly suggested that providing such information "promote[s] or facilitate[s] violations of our immigration laws."  Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025); Dkt. 30-1 at 3.  As in *Velazquez*, Defendants have thus sought to limit the ability of Plaintiffs to disseminate legal information that could allow parties in immigration proceedings to raise arguments contrary to the government's position (that a particular individual is removable) without imposing similar limitations on speakers representing the government.  531 U.S. at 546 (statute violated the First Amendment in part because it attempted "to exclude from litigation those arguments and theories Congress finds unacceptable but which by their nature are within the province of the courts to consider").  The First Amendment does not

---

[4] The subsidized speech cases cited by Defendants are plainly inapposite because they concern *Congress*'s right to choose not to subsidize certain speech when it sets forth the confines of a program. Dkt. 35 at 28.  But those cases do not stand for the proposition that the Executive Branch may unilaterally and arbitrarily refuse to fund private speech Congress has already determined should be funded through a government program (as Defendants seek to do here).

allow such arbitrary and viewpoint-discriminatory restrictions on speech, even when the government decided to subsidize certain private speech.

Defendants' answer to Plaintiffs' concerns that the Stop Work Order (and future attempts to eliminate the Programs) is an unreasonable and viewpoint-discriminatory restriction on access to limited public and nonpublic fora is hopelessly circular.[5]  According to Defendants, the Executive Branch may arbitrarily refuse to provide congressionally appropriated funds and then reasonably restrict access to immigration courts and detention facilities to those Programs for which the Executive Branch has not revoked funding.  Dkt. 35 at 28–29.  But Defendants may not validate one unconstitutional action by bootstrapping it to another.  *Lederman v. United States*, 291 F.3d 36, 43 (D.C. Cir. 2002) ("[U]nconstitutional restrictions certainly cannot, by their mere existence, bootstrap *subsequent* restrictions into validity.").

As shown here and in Plaintiffs' Motion, Plaintiffs are likely to succeed on the merits of their First Amendment claim.

## II.    PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF

### A.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

While Plaintiffs suffer ongoing irreparable harm, Defendants offer alternative suggestions for relief that are inadequate and irrelevant.  "District courts have broad discretion to evaluate the

---

[5] Defendants also assert, without factual support, that during the Stop Work Order, Plaintiffs were still able to advise individuals about immigration court proceedings and that their actions had no bearing on the legal advice offered by Plaintiffs. Dkt. 35 at 17.  But this is contradicted by the factual record:  many Plaintiffs were prevented from accessing detention facilities and immigration helpdesks, including being ejected mid-visit such that their speech was completely cut off, *see, e.g.*, Yang Decl. ¶ 11; Rojas Decl. ¶¶ 13–17; others had their access extremely restricted such that they could no longer perform their ordinary programs, *see, e.g.*, Sherman Decl. ¶¶ 14–16; and others were forced to spend significant time revising their materials in order to regain access to immigration courts and detention facilities, *see, e.g.*, St. John Decl. ¶ 37; Rojas Decl. ¶ 20.

14

irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Wagner v. Taylor*, 836 F.2d 566, 575–76 (D.C. Cir. 1987). When a defendant's actions "have 'perceptibly impaired' [an organizational plaintiff's] programs, 'there can be no question that the organization has suffered injury in fact'." *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). If the defendant's actions make the organization's activities more difficult and "directly conflict with the organization's mission," a preliminary injunction is appropriate. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

An injunction to stop Defendants illegally ending the Programs and refusing to spend appropriated funding is necessary to protect Plaintiffs from severe and irreparable harm. *See* Dkt. 2-1 at 40–41; Dkts. 2-1–2-11. Denying Plaintiffs access to immigration courts and detention facilities would have the immediate and irreparable effect of preventing Plaintiffs from speaking— as the irreparable harms Plaintiffs already suffered during the stop work period demonstrate. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). The First Amendment harms from the Stop Work Order are permanent: "'there can be no do over and no redress.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 247 (4th Cir. 2014). If Defendants are again allowed to frustrate Plaintiffs' mission to support noncitizens in immigration proceedings and silence Plaintiffs' voices, those harms will be repeated and expanded.

In addition to First Amendment harms from denial of access and other actions to end the Programs, Plaintiffs face significant harm from loss of Program funding. *See* Dkt. 2-1 at 40–41; *see also, e.g.,* Dkts. 2-8 ¶ 14, 2-9 ¶ 18, 2-6 ¶ 39, 2-11 ¶ 15, 2-4 ¶ 10, 2-5 ¶ 29, 2-7 ¶ 13, 2-10 ¶ 12,

2-3 ¶ 13.   In the last two months, courts across the country have repeatedly rejected the governments' argument that there is no irreparable harm for supposed "economic harm" from a stoppage of funding (Dkt. 35 at 49).  *See, e.g.*, *New York v. Trump*, 2025 WL 715621 at *13 ("It is so obvious that it almost need not be stated that when money is obligated and therefore expected . . . and is not paid as promised, harm follows");  *Pacito*, 2025 WL 655075 at *23 (rejecting "the tepid suggestion that [loss of funding for non-profit organizations] amount[s] to mere economic inconvenience").  And courts have affirmed the exact harms Plaintiffs face—"staff reductions, loss of institutional knowledge, damaged community partnerships, and declining service quality"—are irreparable.  *See id.*; *New York v. Trump*, 2025 WL 715621 at *13, *15 (identifying as irreparable harms "considering layoffs," "reductions in service," and "uncertainty" over funding that disrupts an organization's "ability to budget, plan . . . and carry out its mission"); *see also* Dkt. 2-1 at 40–41, Dkts. 2-1–2-11 (describing harms Plaintiffs have and will suffer from funding losses).

Courts have also rejected the government's position that the supposed "temporary" nature of the attempt to end the Programs mitigates any mission-based or economic harms.  Dkt. 35 at 50.  That the Stop Work Order was rescinded and funding has temporarily resumed does nothing to lessen the gravity of the imminent and irreparable harm Plaintiffs face without injunctive relief: resumption "does not erase the imminence or irreparability of what another pause would entail" because the resumption would "mean[] nothing if the spigot is shut off again."  *Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, --- F.Supp.3d ---, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) , 2025 WL 597959 at *18 (nonprofits suffered irreparable harm from government withholding appropriated funds); *see also New York v. Trump*, 2025 WL 715621 at *15 (issuing preliminary injunction because, "though some funding has begun to flow again," the "chaos and uncertainty that the Defendants' arbitrary decision to [stop disbursing appropriated funds]"

prevented plaintiffs "recruit[ing] and hir[ing]" and carrying out their "mission"). And of course, Defendants' voluntary cessation cannot moot this case, as the Defendant Attorney General's memorandum indicates a revived attempt to end the Programs is imminent. *See Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1180 (D.C. Cir. 2025) ("Voluntary cessation does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur") (quoting *West Virginia v. EPA*, 597 U.S. 697, 720 (2022)).

### B.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR AN INJUNCTION

The balance of equities and public interest favor an injunction because Plaintiffs will suffer significant and irreparable harms without an injunction, while an injunction will do Defendants no harm at all. Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *Newby*, 838 F.3d at 12 (quotation marks and citation omitted).

There is no harm to Defendants from an injunction forcing them to obey the law, because "the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)); *see also New York v. Trump*, 2025 WL 715621 at *16 (issuing preliminary injunction because "[a]n agency is not harmed by an order prohibiting it from violating the law"). On the contrary, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (quotations and citation omitted). Defendants also are not harmed by the status quo of running the appropriated Programs, because they receive significant value from the Programs. *See generally* Dkt. 41-1 (amicus brief of former immigration judges and former members of the Board of Immigration Appeals, explaining that "[e]ven a brief interruption in these programs will disrupt the efficient and fair functioning of the immigration courts"); *see, e.g.,* Compl. ¶¶ 79-81, 84-87.

Regardless, maintaining the Programs serves the important public interest in an immigration system that reaches an efficient and appropriate result in individual cases, obviating any harms to Defendants. *Id.*

Nor would Defendants be harmed by an injunction preventing them from withholding funds they admit have been appropriated by Congress and obligated to the Programs. Dkt. 35 at 12. They have no choice but to spend the funds on the Programs—they cannot spend the funds in any other way or refuse to spend them. *See In re Aiken County*, 725 F.3d at 261 n.1 (even when the Executive "has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program[,] . . . even the President does not have unilateral authority to refuse to spend the funds"). "Defendants are not harmed where the order requires them to disburse funds that Congress has appropriated to the [Programs] and that they have obligated." *New York v. Trump*, 2025 WL 715621 at *16 (finding balance of equities favored plaintiffs denied appropriated and obligated funding by the government).

Defendants' assertion that an injunction would harm "the Executive Branch's ability to lawfully direct and guide agencies' spending decisions," Dkt 35 at 52, is a red herring. Plaintiffs are suing because Defendants' actions violate Congress's appropriations power (among other reasons the actions are unlawful), not to dictate "policy" to the Executive. And regardless, the Executive Branch's direction here is not "lawful." Congress, as "the immediate representatives of the people," holds the "power over the purse" as a check against "all the overgrown prerogatives of the other branches of the government." *See* THE FEDERALIST No. 58 (James Madison). Defendants can invoke no right to override congressional appropriations statutes in this case. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("an agency literally has no power to act . . . unless and until Congress confers power upon it"); *City & Cnty. of San Francisco v. Trump*,

897 F.3d 1225, 1235 (9th Cir. 2018) ("[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

## III.    A NATIONWIDE INJUNCTION IS APPROPRIATE

The only equitable outcome on these facts is a nationwide injunction against any action to pause, stop, or otherwise end Defendants' compliance with the mandate in the Department of Justice Appropriations Act, 2024 to fund the four Programs at issue.

Because Defendants' actions to deny appropriated funding to Plaintiffs are unlawful, they are unlawful as applied to every organization providing vital legal services to noncitizens under the four funded Programs.  The D.C. Circuit has repeatedly affirmed the "broad discretion" district courts enjoy when crafting equitable relief includes the authority to issue nationwide injunctions. *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408–09 (D.C. Cir. 1998).  A nationwide injunction is particularly appropriate in APA cases like this one, which demonstrate the illegality of agency actions in their entirety and not just for the plaintiffs.  "[A] single plaintiff, so long as he is injured by the [agency action], may obtain 'programmatic' relief that affects the rights of parties not before the court." *Id.* at 1409 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting)).  District of Columbia courts regularly apply this binding precedent to reject arguments from agencies saying, as Defendants do here, that injunctive relief in APA cases should extend only to named plaintiffs.  *See, e.g., id.* (issuing relief without limitation); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Hum. Servs.*, 485 F. Supp. 3d 1, 62 (D.D.C. 2020) (same).  It would be nonsensical to issue injunctive relief that protects Plaintiffs while allowing Defendants to take the same unlawful actions against non-plaintiffs. There is no argument that non-plaintiff Program providers do not need, or oppose, the requested relief.  At the Court's instruction, Plaintiffs have submitted 15 additional declarations from non-

plaintiff legal service providers, explaining they support the preliminary injunction motion and will be helped by it. *See* Dkts. 30, 30-2-30-15; Dagen Decl. ¶ 4; *see generally* Duea Decl.; Rodriguez Decl.; Annand Decl.; Salas Decl..[6]

There is likewise no reason to limit injunctive relief to activity related to the Stop Work Order and Executive Order. Courts are not limited to addressing past wrongs—injunctive relief is forward-looking, and the Court has "broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *Zenith Radio Corp. v. Hazeltine Rsch. Inc.*, 395 U.S. 100, 132 (1969). Defendants already outlined a plan to get around any such limitation: the Defendant Attorney General's February 5, 2025 memo directs Defendants DOJ and EOIR to immediately stop funding the Programs, among other activities. *See* Dkt. 35 at 20, n.8. Such action is just as unlawful as the January 22, 2025, Stop Work Order, but Defendants claim that, because Plaintiffs' Complaint and Motion do not challenge that memo (issued a week *after* Plaintiffs filed their Complaint and Motion), the Court is powerless to enjoin it. The late-issued memo is a clear attempt to justify another attempt to end the Programs, and it would "defeat the jurisdiction of the courts" were Plaintiffs only entitled to a limited injunction that would allow Defendants to terminate the Programs in a new way not specifically named in Plaintiffs' Complaint and Motion. *New York v. Trump*, --- F.Supp.3d ---, 2025 WL

---

[6] Plaintiffs moved to supplement the record with eleven declarations from non-plaintiff legal service providers. Dkt. 30. Consistent with that motion, Plaintiffs contacted all providers of the Programs, offering the chance to submit a declaration or to object. Plaintiffs attach additional responsive declarations here and, consistent with their motion to supplement, move this Court to supplement the record with these declarations. Further, while not all non-party providers chose to submit a declaration, no provider objected to the relief Plaintiffs seek. *See* Dagen Decl. ¶ 9.

357368, at *5 (D.R.I. Jan. 31, 2025) (issuing injunctive relief against future attempts to implement the same illegal funding stoppage by different means).

Defendants admit they only rescinded the Stop Work Order because they believe rescission was required by the *New York v. Trump* temporary restraining order (now a preliminary injunction). *See* Dkt. 35 at 19. And the OMB memo at issue in *New York v. Trump* was issued *after* the Stop Work Order—though the same Executive Order is at issue in both cases. If that injunction is overturned, or Defendants decide it no longer applies in this case, only an order from this Court would protect Plaintiffs from the same result that was unlawful under the first Stop Work Order. As courts have repeatedly concluded in analogous situations involving another court's injunction, an injunction here is necessary. *See, e.g., Nat'l Council of Nonprofits*, 2025 WL 597959, at *18 n.13 ("This court has no control over the District of Rhode Island's decisions and a TRO in that case does 'not block this court from entering a TRO of its own'"); *Whitman-Walker Clinic*, 485 F. Supp. 3d at 60 ("[C]ourts routinely grant follow-on injunctions against the Government, even in instances when an earlier nationwide injunction has already provided plaintiffs in the later action with their desired relief.").

And in light of the Defendant Attorney General's memorandum, justice and equity counsel in favor of a nationwide injunction not limited to the Stop Work Order (leaving the Programs vulnerable to other attempts at ending them that are imminent), but that protects the Programs more broadly. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) ("Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents").

## IV.    THERE SHOULD BE NO BOND OR STAY

The White House recently instructed government attorneys to "curb[] activist judges" and "deter[] . . . litigation" by seeking excessive, punitive bonds in cases like this.  "Fact Sheet: President Donald J. Trump Ensures the Enforcement of Federal Rule of Civil Procedure 65(c)," WHITEHOUSE.GOV (Mar. 6, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-ensures-the-enforcement-of-federal-rule-of-civil-procedure-65c/.  Following this directive, Defendants here demand Plaintiffs—non-profits with fragile finances—post a $32 million injunction bond.  *See* Dkt. 35 at 55.  This request is, by the government's own admission, an attempt to "deter" litigation and not tailored to the issues in this case—not a legitimate argument under Federal Rule of Civil Procedure ("Rule") 65(c).

Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond, including the discretion to require no bond at all."  *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (Sullivan, J.) (quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (cleaned up).  A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action."  *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review").  In this case, where Plaintiffs have suffered harms from Defendants' improper suspension of payments to Plaintiffs, "it would defy logic . . . to hold Plaintiffs hostage for the resulting harm."  *Nat'l Council of Nonprofits*, 2025 WL 597959 at *19 (issuing preliminary injunction without bond).

It would also be inappropriate for the Court to issue a stay pending appeal, as Defendants request.  Dt. 35 at 54.  Plaintiffs "(1) are entitled to a preliminary injunction; and (2) will be

irreparably harmed without," as described in detail above, so there is no basis to issue a stay under the factors governing issuance of a stay, which overlap with the preliminary injunction analysis. *New York v. Trump,* 2025 WL 715621 at *17 (issuing preliminary injunction against denial of appropriated funding and denying stay); *see also Nken v. Holder,* 556 U.S. 418, 433–34 (2009) (stay factors are (1) applicant's likelihood of success on the merits, (2) applicant's harm without a stay, (3) harm to other parties from a stay, and (4) the public interest). Defendants also have not followed the correct procedure to request a stay, which requires a motion. *See, e.g., PFLAG*, 2025 WL 685124, at *32 (denying request for stay of preliminary injunction made in opposition papers as procedurally improper under Rule of Civil Procedure 7); *see also* Fed. R. Civ. Proc. 7(b)(1) ("A request for a court order must be made by motion"). In any event, a stay pending appeal is "premature" at this stage—"[i]f Defendants, after reviewing [the Court's opinion], believe that a stay pending appeal is warranted, they may make a request consistent with Federal Rule of Appellate Procedure 8." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 n.14 (issuing preliminary injunction and denying stay).

## PARALLEL LITIGATION

Plaintiffs' motion succeeds on its own merits, and the Court should join courts around the country in enjoining Executive agency defendants interfering with congressionally appropriated funds and programs Congress has mandated. Many courts have issued injunctions against these unconstitutional and arbitrary and capricious actions in direct and unequivocal terms.

For example, "[r]ather than taking a deliberate, thoughtful approach," the agency defendants in *New York v. Trump*, 25-cv-39 (D.R.I. Mar. 6, 2025) (McConnell, J.), "abruptly froze billions of dollars of federal funding for an indefinite period." *See New York v. Trump*, 2025 WL 715621 at *12. The court explained further that "[i]t is difficult to perceive any rationality" in the agency action—"let alone thoughtful consideration of practical consequences—when these

funding pauses endanger [plaintiffs'] ability to provide vital services." *Id.* Although the defendants in that case purported to rescind the challenged action, the court found the rescission was issued "in name only" in response to the court's previous temporary restraining order, so the freeze "could continue without any judicially-imposed impediment." *Id.* at *6. The court granted the plaintiffs' motion for a preliminary injunction. *Id.* at *16-*17.

In this District, another court explained, "[t]he touchstone of [the arbitrary-and-capricious] inquiry is rationality, and Defendants' actions flunk that test." *Nat'l Council of Nonprofits*, 2025 WL 597959 at *14 (AliKhan, J.). As in *New York v. Trump* and this case, the agency defendants in *National Council of Nonprofits* froze funds Congress commanded them to expend, without explanation or justification. Just like in *New York v. Trump*, the court held that, "[r]ather than taking a measured approach . . . Defendants cut the fuel supply to a vast, complicated, nationwide machine—seemingly without any consideration for the consequences of that decision." *Id.* at *14. The agency defendants' conduct "was not—and could never be—rational, especially when the decision was made without grappling with its catastrophic effects or the logistical nightmare of its implementation." *Id.* The defendants "adopted a 'freeze first, ask questions later' approach that 'entirely failed to consider [multiple] important aspect[s] of the problem.'" *Id.* (citing *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The court granted the plaintiffs' motion for preliminary injunction because the defendants' actions were "irrational" and "imprudent," and they "precipitated a nationwide crisis." *Id.* at *15.

A court in the Western District of Washington recently enjoined another agency's funding freeze. "By withholding funding," the court concluded, "the Agency Defendants likely act contrary to law not only by abdicating their own obligations to fund and administer the program but also by prohibiting [nonprofit] partners from complying with their statutory obligations."

24

*Pacito*, 2025 WL 655075 at *18 (Whitehead, J.). The court also explained that the specific performance the plaintiffs sought—payment of the money they were statutorily owed—was not a claim for money damages within the meaning of the Tucker Act. *Id.* at *16-*17. As equitable relief, it fell firmly within the district court's purview. *Id.* at *17 (citing *Bowen*, 487 U.S. 879).

Next, yet another court in this District: "When an agency suddenly changes course, it must recognize 'longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *AIDS Vaccine Advoc. Coal*, 2025 WL 752378 at *10 (Ali, J.) (citing *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020)). The agency defendants' reasoning in *AIDS Vaccine*—that they wanted to "review" the frozen programs for "efficiency" and "consistency"—did not justify the defendants' "blanket suspension" of appropriated funds or their "disregarding the massive reliance interests" at stake. *Id.* Further, the court concluded, the agency defendants were attempting to "hollow out" arbitrary-and-capricious review. *Id.* at *10 n.9. The court rejected the defendants' argument that it could "merely infer from [their] silence" that they had appropriately exercised their agency discretion, and it rejected their invitation to "dramatically and impermissibly cabin judicial review under the APA." *Id.*

The defendants in *New York*, *National Council of Nonprofits*, *Pacito*, and *AIDS Vaccine* each made similar arguments to those advanced in Defendants' opposition brief. In each of these cases, a preliminary injunction has been granted. This Court should do the same.

## CONCLUSION

For the reasons set forth in Plaintiffs' submissions, the Court should grant Plaintiffs' motion and enter the requested preliminary injunctive relief.

Respectfully submitted,

Date: March 13, 2025

*/s/ Laura M. Sturges*
Laura M. Sturges (*admitted pro hac vice*)

GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202-2642
(303) 298-5700
lsturges@gibsondunn.com

Naima L. Farrell
1700 M. Street, N.W.
Washington, D.C. 20036-4504
Tel.: 202.955.8500
nfarrell@gibsondunn.com

*/s/ Adina Appelbaum*
Adina Appelbaum

AMICA CENTER FOR IMMIGRANT
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)
Samantha Hsieh (V.A. Bar No. 90800)
(*admitted pro hac vice*)
Amelia Dagen (D.C. Bar No. 9004838)
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
amelia@amicacenter.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2025, a true and correct copy of this document was filed and served with the Clerk of Court and served on all counsel of record, in accordance with Federal Rule of Civil Procedure 5(a).

Date: March 13, 2025

*/s/ Laura M. Sturges*
Laura M. Sturges (*admitted pro hac vice*)

GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO 80202-2642
(303) 298-5700
lsturges@gibsondunn.com

Naima L. Farrell
1700 M. Street, N.W.
Washington, D.C. 20036-4504
Tel.: 202.955.8500
nfarrell@gibsondunn.com

*/s/ Adina Appelbaum*
Adina Appelbaum

AMICA CENTER FOR IMMIGRANT RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)
Samantha Hsieh (V.A. Bar No. 90800)
(*admitted pro hac vice*)
Amelia Dagen (D.C. Bar No. 9004838)
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
amelia@amicacenter.org

*Attorneys for Plaintiffs*