**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*, | |
| Plaintiffs, | Case No. 1:25-cv-00298-RDM |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, | |
| Defendants. | |

## INTRODUCTION

Plaintiffs challenge Defendants' arbitrary and unconstitutional attempt to terminate longstanding, congressionally funded legal orientation and legal representation programs that make the U.S. immigration system more efficient, have saved U.S. taxpayers nearly $18 million annually, and provide thousands of noncitizens, including many in detention, with their only source of information regarding their rights and obligations in removal proceedings. The Legal Orientation Program ("LOP"), Family Group Legal Orientation Program ("FGLOP"), Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), Immigration Court Helpdesk ("ICH"), and Counsel for Children Initiative ("CCI") (collectively, "the Programs") have provided critical information and support for people in removal proceedings around the country. Plaintiffs receive funding Congress requires to be used to operate the Programs and rely on this mandated funding to continue their critical operations.

Defendants have tried three times in the last three months to illegally terminate the Programs—not because the Programs are inefficient or ineffective, but because Defendants disagree with Plaintiffs' missions and viewpoints. Despite Congress's commands, Defendants do not want to "provide Federal funding to non-governmental organizations that support or provide services . . . to removable or illegal aliens." Dkt. 30-1 at 3-4 (quoting Defendants).

- First, Defendants issued a Stop Work Order on January 22, 2025—which they rescinded after Plaintiffs sued.

- Second, on April 3, 2025, Acacia Center for Justice ("Acacia") received a notice bearing the Department of Justice's ("DOJ") seal purporting to cancel the Programs. *See* Rojas Supp. Decl. Ex. 1. Defendants' counsel acknowledged this cancellation would violate the Court's March 17, 2025 order requiring Defendants to provide

Plaintiffs three business days' notice before terminating the Programs, and scrambled to rescind the offending cancellation, saying it "ha[d] no legal effect. *Id.* Ex. 2.

- Most recently, on April 10, 2025, Defendants sent Acacia a notice terminating funding for the Programs as of 12:01 a.m. on April 16, 2025, "for the convenience of the government" (the "Termination Notice").

By cutting off access to congressionally appropriated funds, Defendants force Plaintiffs to cut programs and staff, prevent them from providing essential legal information to unrepresented noncitizens, and imperil Plaintiffs' core mission-based activities and speech.

In 2023, LOP served at least 35 detention facilities and more than 40,000 individuals. *See* White House Legal Aid Interagency Roundtable, *Access to Justice in Federal Administrative Proceedings: Nonlawyer Assistance and other Strategies* 30 (2023), https://perma.cc/Z7CM-2UNY [hereinafter, "Access to Justice Report"]. ICH expanded to 24 immigration courts and served over 12,000 individuals. *Id.* LOPC served nearly 51,000 custodians, FGLOP served more than 12,000 families, and CCI provided representation to more than 200 children. *Id.*

The government has consistently recognized the effectiveness of the Programs, particularly LOP. For example, in April 2017, Booz Allen Hamilton—an outside consultant retained by the DOJ and the Executive Office for Immigration Review ("EOIR")—issued a report at the government's request on the results of a year-long case study of the work and function of EOIR. U.S. Dep't of Just. Exec. Off. for Immigr. Rev., Legal Case Study: Summary Report (Apr. 6, 2017), https://tinyurl.com/bddahzpv [hereinafter, "Booz Allen Hamilton Study"]. The report recommends, among other things, that EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications." *Id.* at 24–25.

Recognizing LOP, LOPC, and ICH's benefits, Congress has regularly appropriated funding to continue and expand them. Most recently, on March 9, 2024, Congress reauthorized $28 million that Defendants "shall" spend to provide LOP, LOPC, and ICH. Pub. L. 118-42, 138 Stat. 133 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025) (continuing funding through September 30, 2025). And the Senate Appropriations Committee warned EOIR against taking the very actions Defendants have now taken, explicitly directing DOJ to "continue all LOP services and activities . . . without interruption, *including during any review of the program*," and "utilize all appropriated funds solely for legitimate program purposes." S. Rep. No. 118-62, at 84 (2023) (emphasis added).

Despite evidence of the efficacy and broad support for the Programs, Congress's mandate to continue their funding and services, and the public outcry following the January 22, 2025 Stop Work Order, Defendants will stop funding the Programs on April 16, 2025. Defendants' April 10, 2025 Termination Notice provides no justification apart from "convenience" for terminating these Programs for which Congress has mandated funds. While "convenience" may justify termination of a contract, it gives the government no cover for violating federal law. Defendants' arbitrary and capricious decision, without any apparent consideration or justification and in violation of federal law, causes Plaintiffs immediate and irreparable harm and violates their constitutional rights, warranting immediate injunctive relief.

Without the congressionally mandated funding, Plaintiffs will not be able to continue their critical missions to assist noncitizens by informing them of their legal rights and responsibilities in immigration proceedings. During the initial Stop Work Order period, Plaintiffs were ejected from immigration courts and detention facilities during previously-scheduled visits to speak with noncitizens, educate them on their rights, and intake potential new clients—curtailing Plaintiffs'

First Amendment Rights. Despite modifying materials to fit the executive order and provide unfunded services, some Plaintiffs were denied access and blocked from continuing their work. The congressional funding each Plaintiff receives is a significant portion of their overall operating funds, and the arbitrary cutoff will force Plaintiffs to start terminating or reassigning staff (who were already threatened with termination or reassignment during the Stop Work Order and the resulting months of uncertainty). Defendants' most recent challenged action threatens Plaintiffs' missions, censors their speech, and deprives noncitizens of valuable information. And, because the Programs are proven to increase judicial efficiency, terminating them will increase the already staggering immigration court backlog, estimated at 3.6 million at the end of FY 2024. Holly Straut-Eppsteiner, Cong. Rsch. Serv., IN12463, Immigration Courts: Decline in New Cases at the End of FY2024 (Nov. 26, 2024), http://bit.ly/4jBqmoW; *see also* Dkt. 46 at 10 (amici former immigration judges explaining that cancelling the Programs will increase the backlog).

The Administrative Procedure Act ("APA") requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B). *First*, the arbitrary and capricious standard requires agency action to be both reasonable and reasonably explained. Defendants' termination of the Programs is neither. Defendants' decision, with no reasoned explanation provided, fails to consider the devastating impact this termination will have on the Programs' providers, the *pro se* noncitizens in removal proceedings who benefit from their services, and the immigration court system. Had they appropriately considered this impact, Defendants could not reasonably have decided to terminate funding and halt the Programs for any reason (let alone the "efficiency" reasons Defendants previously asserted, or the

4

"convenience" reason cited in Defendants' termination notice), especially in light of congressional action appropriating funding with clear instructions to continue the Programs.

*Second*, Defendants' acts are contrary to the Constitution and to applicable statutes. Defendants' termination of the Programs contravenes congressional appropriations and allocations of funds towards the Programs, which the Executive does not have authority to stop. Similarly, Defendants' acts terminating the Programs contravene the First Amendment's right of free speech. Defendants are terminating the Programs because they disagree with Plaintiffs' viewpoints and missions—Defendants want to cut funding for all "organizations that support or provide services . . . to removable or illegal aliens." Dkt. 30-1 at 4. By preventing Plaintiffs from accessing immigration courts and detention facilities and sharing information about the legal process and legal rights to noncitizens who are detained, Defendants prevent Plaintiffs from sharing their viewpoint in limited public forums.

This Court should expedite consideration of this motion under 28 U.S.C. § 1657(a) and issue a temporary restraining order enjoining Defendants' illegal termination to prevent irreparable harm to Plaintiffs and to preserve the status quo pending a final judgment in this proceeding.

## BACKGROUND

### A.    Congress Funded LOP to Promote Efficiency in the Immigration System.

Nonprofit organizations, including the Florence Immigrant and Refugee Rights Project (the "Florence Project"), developed legal orientation programs and "Know Your Rights" presentations decades ago, long before Congress instructed EOIR to launch LOP. In June 1992, a General Accounting Office report on Immigration and Naturalization Service ("INS") detention policies and practices observed the Florence Project's "successful results." U.S. Gen. Accounting Office, GAO/GGD-92-85, *Immigration Control: Immigration Policies Affect INS Detention Efforts* 51 (1992), https://perma.cc/DXU8-ELQL. The report found the program improved court efficiency

and saved "a significant amount of time" by "eliminat[ing] the need to have immigration judges describe the various types of relief available to each alien during the hearings." *Id*. In 1994, citing the Florence Project as a "good model," the Senate passed a bipartisan resolution directing the Attorney General to consider implementing a pilot program at INS processing centers for the purpose of "increasing efficiency and cost savings" by "assuring orientation and representation" for individuals who are detained. S. Res. 284, 103d Cong. (1994), https://perma.cc/QKU7-U5JT.

In 1998, EOIR conducted a 90-day pilot program at three sites, with services provided by three different organizations. Anna Hinken, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Evaluation of the Rights Presentation* (1999), https://perma.cc/TR85-DJNB. Nearly 3,000 noncitizens who were detained attended the presentations. *Id.* at 3. EOIR conducted an extensive review of the pilot program's efficacy and found that it produced substantial efficiencies, including (1) increasing the number of noncitizens requesting removal during their initial hearings; (2) reducing the time from initial hearing to completion for unrepresented noncitizens; (3) increasing *pro bono* representation rates; and (4) reducing anxiety among noncitizens who are detained, which helped INS manage the detention facilities more easily. *Id.* at 7–10.

On March 11, 2003, citing the nearly twenty percent reduction in detention time observed in the pilot program, EOIR introduced LOP at 6 sites, funded by a $1 million congressional appropriation. U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *New Legal Orientation Program Underway to Aid Detained Aliens* (Mar. 11, 2003), https://perma.cc/U5CC-7HG5. LOP now provides four main services: (1) group orientations, which provide a general overview of removal proceedings and forms of relief; (2) individual orientations, in which unrepresented individuals can briefly discuss their cases with LOP providers; (3) self-help workshops providing guidance and self-help materials both to those who have potential avenues for relief and to those who are

willing to voluntary depart the country; and (4) referrals to pro bono legal services, when available. *Legal Orientation Program*, U.S. Dep't of Just. (Nov. 5, 2015), https://web.archive.org/web/20160920163113/https://www.justice.gov/eoir/legal-orientation-program.  These services are provided at a variety of detention facilities around the country.

### B.    EOIR Has Repeatedly Expanded the Programs.

For more than two decades, LOP has been evaluated repeatedly, with unambiguously positive results.  In 2008, the Vera Institute of Justice ("Vera"), which contracted with EOIR to manage LOP from 2005 until 2022 (at which time Acacia Center for Justice ("Acacia") took over contracting), evaluated the program.  Nina Siulc *et al.*, *Legal Orientation Program: Evaluation and Performance and Outcome Measurement Report, Phase II*, THE VERA INSTITUTE OF JUSTICE (2008), https://perma.cc/ZEN3-648L.  Vera found that, on average, LOP participants completed removal proceedings nearly two weeks faster than nonparticipants, were less likely to fail to appear for immigration court hearings (if released), and were better prepared to proceed *pro se*.  *Id.* at iv–v.  Vera also found that immigration judges felt LOP helped their courts run more smoothly, and detention facility staff found it contributed to a safer environment in the facilities.  *Id.* at 66–67. Vera continued to study the program in 2009 and found more LOP cases than non-LOP cases concluded at the first Master Calendar Hearing; of the cases that continued beyond an initial hearing, median case processing time of LOP cases was 11 days less than for non-LOP cases. Zhifen Cheng & Neil Weiner, Vera Inst. of Just., *Legal Orientation Program (LOP): Evaluation, Performance and Outcome Measurement Report, Phase III* at 3 (2009), https://bit.ly/2K8ctOz.

In 2012, at Congress's instruction, EOIR conducted a study and found LOP resulted in $17.8 million per year in net savings.  U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Cost Savings Analysis – The EOIR Legal Orientation Program* 2–3 (updated Apr. 4, 2012), https://perma.cc/5CjC-REZH.  This estimate was based on an average reduction of detention time

of six days per person; EOIR also found that the program reduced immigration court processing times by an average of twelve days.  *Id.*  Based on its consistently successful performance, Congress has appropriated funds for EOIR to expand LOP several times, including:

- Ten new LOP sites opened in October 2006, noting that LOP participants "make wiser decisions and [their] cases are more likely to be completed faster—resulting in fewer court hearings and less time spent in detention."  News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *EOIR Adds 10 New Legal Orientation Program Sites – Initiates Sites for Children* (Oct. 13, 2006), https://perma.cc/NWV9-LM5H.

- Twelve new LOP sites opened in October 2008, explaining that LOP participants "[c]omplete their immigration proceedings 13 days faster than other detained aliens," are more successful, "[a]re better prepared to represent themselves *pro se*," and are less likely to fail to appear for immigration court.  News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *EOIR Adds 12 New Legal Orientation Program Sites* (Oct. 15, 2008), https://perma.cc/7PJC-AJRV.

- Seven new LOP sites opened in 2014, declaring that "[t]he Legal Orientation Program is critical to the efficiency of our immigration court proceedings."  News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *EOIR Expands Legal Orientation Program Sites* (Oct. 22, 2014), https://perma.cc/V89T-M9BC (quoting EOIR Director Juan P. Osuna).

- Three new LOP sites opened in 2016, again touting that LOP "improve[s] judicial efficiency."  News Release, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Executive Office for Immigration Review Expands Legal Orientation Program Sites* (Nov. 9, 2016), https://perma.cc/RD99-F5C5.

In addition to expanding LOP, EOIR—based on congressional instruction—has built on LOP's success by creating other legal access programs, including ICH, FGLOP, LOPC, and CCI.

In 2010, EOIR launched LOPC to provide legal orientations to adult "custodians" caring for unaccompanied noncitizen children, separated from their parents or other caregivers.  EOIR, *Legal Orientation Program for Custodians of Unaccompanied Children*, (June 19, 2024) http://bit.ly/4lphwLX.  Congress requires the government to run LOPC to protect unaccompanied children from mistreatment, exploitation, and trafficking—and to make sure unaccompanied children appear at their immigration court dates.  In the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA"), Congress commanded that the Secretary

of Health and Human Services (who has legal custody of unaccompanied children) "shall" work with EOIR to "ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by" EOIR.  8 U.S.C. § 1232(c)(4).  Declarant American Bar Association administers LOPC programming nationwide.  *See* Korolev Supp. Decl. ¶ 3.

For FY 2016, Congress provided EOIR with funding to create ICHs "at the immigration courts with the greatest pending caseload."  Fact Sheet, U.S. Dep't of Just. Exec. Off. of Immigr. Rev., *EOIR's Office of Legal Access Programs* 4 (2016), https://perma.cc/8P3W-9NWM.  Similar to LOP's work with individuals who are detained, ICH "orient[s] non-detained individuals appearing before the immigration court on the removal hearing process, and provide[s] information to non-detained individuals to inform them about possible remedies and legal resources."  *Id.*

ICH is a court-based legal education program for people in immigration proceedings who are not in detention.  The program provides information about court practices and procedures, available legal options, and other relevant topics.  ICH acts as a safeguard for immigrants in removal proceedings, ensuring a modicum of due process in a high-stakes and complex legal system.  The program also is a crucial gateway for connecting people with pro bono attorneys, to the limited extent available.  National Immigrant Justice Center ("NIJC") runs ICH in Chicago, RMIAN runs ICH in Denver, Immigration Services and Legal Advocacy ("ISLA") runs ICH in New Orleans, and Estrelle del Paso ("Estrella") runs ICH in El Paso.

In 2021, EOIR added FGLOP and CCI.  EOIR expanded LOP to create FGLOP as a version of LOP to serve families in removal proceedings on expedited dockets or in the Family Expedited Removal Management program (a program created in 2023 to place family units in expedited removal proceedings).  Acacia Ctr. for Just., *Family Group Legal Orientation Program*, https://acaciajustice.org/what-we-do/family-group-legal-orientation-program (last visited Jan. 29,

2025).  In 2023, FGLOP educated more than 12,000 noncitizen families in nine immigration courts and via its national information line.  *See* Access to Justice Report at 30.  Rocky Mountain Immigrant Advocacy Network ("RMIAN") runs FGLOP in Colorado.

CCI provides full-scope, free legal representation for children who are in removal proceedings without a parent, who would otherwise be forced to appear in court alone.  Acacia Ctr. for Just., *Counsel for Children Initiative*, https://acaciajustice.org/what-we-do/counsel-for-children-initiative (last visited Jan. 29, 2025).  CCI operates in 14 cities and provided representation for 200 children in 2023.  *See* Access to Justice Report at 30.  NIJC runs CCI in Chicago, American Gateways runs CCI in Austin, Texas, and ISLA runs CCI in New Orleans.

### C.    Recognizing the Benefits of the Programs, Congress Appropriated Funds to Continue the Programs, Most Recently on March 9, 2024.

The benefits of the Programs are widely recognized.  In an April 2017 report based on a year-long study of EOIR's performance, the government's outside consultant Booz Allen Hamilton recommended that DOJ and EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications."  Booz Allen Hamilton Study at 24–25.

In May 2017, the EOIR official overseeing LOP and ICH affirmed that LOP has positive effects on the immigration court process: individuals in detention make more timely and better-informed decisions and are more likely to obtain representation; non-profit organizations reach more people with minimal resources; and cases are more likely to be completed faster, resulting in fewer court hearings and less time spent in detention.  Decl. of Steven Lang ¶ 65, *NWIRP v. Sessions*, No. 17 Civ. 00716 (W.D. Wash. 2017), ECF No. 50, https://bit.ly/2Hwn6wa.

In November 2017, then-ICE Assistant Director for Custody Management informed ICE field officers that "[e]xperience has shown that LOP attendees are positioned to make better

informed decisions, are more likely to obtain legal representation, and complete their cases faster than detainees who have not received the LOP," and instructed field officers to facilitate the programs by ensuring adequate meeting space, sharing information with the program staff, and facilitating attendance by noncitizens who are detained.  Memorandum from Tae Johnson, ICE Assistant Director for Custody Management, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program* (Nov. 30, 2017), https://tinyurl.com/4c6tzc4w; *see also* Maria Sacchetti, *ICE Praised Legal-Aid Program for Immigrants That Justice Dept. Plans to Suspend*, WASH. POST, Apr. 17, 2018, https://wapo.st/2qGf1uT.

On March 9, 2024, as it has done every year since 2003, Congress appropriated funds for LOP.  Pub. L. 118-42, 138 Stat. 133 (2024).[1]  The text of the statute reads:

> For expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000, of which $4,000,000 shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the ''Immigration Examinations Fee'' account, and of which not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program: Provided, That not to exceed $50,000,000 of the total amount made available under this heading shall remain available until September 30, 2028, for build-out and modifications of courtroom space.

Congress's appropriation is a mandate, not a suggestion.  The text of the bill reads specifically that "$28,000,000 <u>shall</u> be available for services and activities provided by the Legal Orientation Program."  *Id*. (emphasis added).  Congress directed that a portion of this funding is for LOPC: "LOP funding is also provided for LOP for Custodians [LOPC]"—and acknowledged

---

[1] Funding for FY 2024 has ended, but Congress has continued funding (including for the Programs) at 2024 levels through at least September 30, 2025.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025).

that LOPC is funded "pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 [the "TVPRA"]."  S. Rep. No. 118-62, at 85 (2023).

Congress has also repeatedly warned EOIR not to try to stop the program, as it previously attempted to do (before reversing course) in 2018.  In the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program."  S. Rep. No. 118-198, at 92 (2024).  And in 2022, the House Appropriations Committee's report recommending LOP appropriations for 2023 "remind[ed] EOIR that funding for this program is mandated by law, and any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee."  H. Rep. No. 117-395, at 65 (2022).  Congress's direction to spend the appropriated funds to provide the designated Programs underscores the illegality of Defendants' actions.

**D.    The 2018 Attempt to Revoke Funding for LOP and ICH Provoked Significant Backlash, Demonstrating the Importance of and Broad Support for the Programs.**

The last time Defendants (or their 2018 counterparts) attempted to unilaterally halt LOP, in 2018, an unnamed government official reportedly (and inaccurately) said that DOJ wanted to "conduct efficiency reviews which have not taken place in six years."  *See* Maria Sacchetti, *Justice Dep't to Halt Legal-Advice Program for Immigrants in Detention*, Wash. Post (Apr. 10, 2018), https://wapo.st/2H4kczb.  The unnamed official said that the program was halted "to examine the cost-effectiveness of the federally funded programs and whether they duplicate efforts within the court system."  *Id*.  This unnamed official did not, however, acknowledge the multiple efficiency reviews and unqualified support for LOP and its cost-effectiveness over the years.

James McHenry, formerly the director of EOIR and the Acting Attorney General of the United States at the time of filing (now, Director of the DOJ Office of Immigration Litigation),

provided testimony to Congress in 2018 that revealed the unconvincing and pretextual nature of Defendants' potential justifications. First, he ignored and rejected numerous studies demonstrating LOP's and ICH's efficacy, falsely claiming that LOP had not been reviewed since 2012. *Strengthening and Reforming America's Immigration Court System*: *Hearings Before the Subcomm. on Border Security and Immigration of the S. Comm. on the Judiciary*, 115th Cong. (Apr. 18, 2018), at 1:02 [hereinafter Hearings] (video testimony of EOIR Dir. James R. McHenry III), https://bit.ly/2JEJrWx. This testimony ignored Booz Allen Hamilton's report recommending the *expansion* of LOP. Booz Allen Hamilton Study at 23. Second, McHenry mischaracterized previous studies of LOP as occurring "under some unorthodox circumstances," purporting to doubt his own agency's findings and indicating that Defendants have decided to ignore contrary (and consistent) efficacy findings in an attempt to terminate LOP and ICH. Hearings at 1:03–1:04.

Unsurprisingly, as Congress mandated continued funding for LOP and ICH in 2018, Congress moved quickly to condemn Defendants' decision. A week after the first attempted termination was announced in 2018, members of the House and Senate Judiciary Committees jointly communicated their "profound objection" to the Administration's actions, which are "systematically deconstructing basic due process protections for immigrants." Bicameral Judiciary Letter to General Sessions (Apr. 17, 2018), https://web.archive.org/web/20221111041740/https://www.leahy.senate.gov/imo/media/doc/4.17 .18%20Bicameral%20Judiciary%20Letter%20to%20DOJ.pdf. The committee members expressed skepticism of Defendants' claim that a pause was needed to assess the cost-effectiveness of the programs, noting that the Department of Justice's own 2012 study concluded that LOP *saved* the government nearly $18 million annually. *Id.* at 2. The committee members wrote that the "decision to pause the LOP contradicts clear and unambiguous Congressional intent," *id.* at 2, as

13

the March 23, 2018, omnibus spending bill included explicit instructions to the Department to provide funds to "sustai[n] the current legal orientation program," *id.* at 3, and even noted the need to *expand* the program in remote areas. *See id.* at 3 (quoting H.R. Rep. No. 115-231, at 30 (2019) and citing S. Rep. No. 115-139 at 65 (2018)) (alteration in original). They concluded, in no uncertain terms, that Defendants were "ignoring the will of Congress." *Id.* at 3.

The next day, twenty-two Senators wrote to express their "strong opposition" to Defendants' decision to terminate LOP and ICH. Senate Letter to Attorney General Sessions, (Apr. 18, 2018), https://perma.cc/2FLW-FB6B. The Senators explained that, although they "support efforts to engage in oversight," they "do not agree that a review of the programs requires [the Department of Justice] to bring LOP, nor the ICH to a standstill." *Id.* Noting EOIR's own findings that the program was effective, the Senators wrote that, "[g]iven this Administration's goal of reducing the immigration court backlogs, it does not follow that the Department [of Justice] would suspend a program which has been shown to do just that." *Id.* The Senators insisted that Defendants "cannot be serious" in contending DOJ must study the program because LOP and ICH were duplicative of the explanations immigration judges provide in removal proceedings. *Id.* at 2.

The following day, 105 members of the House jointly expressed their "strong opposition" to the termination. House Letter to Attorney General Sessions (Apr. 19, 2018), https://perma.cc/PU9P-4JLB. Given the "body of evidence" supporting the programs' effectiveness, the House members were "shocked" to hear of Defendants' plans to terminate them. *Id.* Like the Senators, the House members noted that, although they support regular oversight, it "does not justify the termination of these programs during that process," as previous reviews were conducted effectively without interrupting operations. *Id.* The House members emphasized that Defendants' actions "directly contradict the express direction of Congress." *Id.* at 2.

E.    **Defendants Have Attempted Three Times to Illegally Terminate the Programs in the Last Three Months.**

On January 22, 2025, DOJ/EOIR issued a Stop Work Order for the Programs (minus LOPC), halting funding. *See, e.g.*, Dkt. 2-5 ¶ 11; Dkt. 2-6 ¶ 21; Dkt. 2-7 ¶ 3. The Stop Work Order offered virtually no explanation, just a vague reference to the January 20, 2025 "Protecting the American People from Invasion" Executive Order, presumably indicating an unspecified desire to audit the Programs under that Executive Order. Plaintiffs have obtained through a Freedom of Information Act request internal emails showing that Defendants considered and explicitly decided not to include LOPC in the Stop Work Order. *See* Rojas Supp. Decl. Ex. 3.

After the Stop Work Order, EOIR began to generate pretextual "evidence" that might support negative findings from such an audit: on January 28, 2025, EOIR removed its prior practice manuals and guidance pages, replacing them with a new "EOIR Policy Manual." That new manual inaccurately asserts that the "EOIR has previously determined that the general LOP constitutes a wasteful program." U.S. Dep't of Just., EOIR Policy Manual 557 (January 2025), https://www.justice.gov/eoir/media/1386531/dl?inline= [hereinafter "EOIR Policy Manual"].

Plaintiffs filed this case on January 31, 2025, and Defendants rescinded the Stop Work Order two days later. *See* AR 167. On February 5, 2025, Attorney General Pam Bondi issued a memorandum directing DOJ and EOIR to pause funding the Programs, among other activities, and review them for purported "waste, fraud, or abuse." Dkt. 30-1 at 3. Defendants cite that memorandum as potential justification for terminating the Programs. *See, e.g.*, Dkt. 35 at 20 n.8.

On March 17, 2025, this Court held a hearing on Plaintiffs' initial motion for a temporary restraining order and preliminary injunction. Following the hearing, the Court did not rule on Plaintiffs' motion but ordered Defendants to file a status report to update the Court as to the status of any review of the Programs and ordered that "Defendants shall provide Plaintiffs with at least

15

three business days' notice before suspending or terminating any funding or issuing any further stop-work orders for any of the programs at issue." *See* March 17, 2025 Minute Entry.

On March 19, 2025, Defendants filed a status report stating vaguely that EOIR was "compiling and reviewing certain information from recipients of Department of Justice funding in accordance with . . . the February 5, 2025 memorandum issued by the Attorney General," but not confirming whether EOIR was, in fact, "auditing" the Programs. Dkt. 45 at 4.

Despite the Court's order requiring three days' notice before termination, on April 4, 2025, Plaintiffs received—through Acacia, the prime contractor for the Programs—a strangely formatted notice on DOJ letterhead signed by a DOJ "Contracting Officer," which purported to "terminate[]" the contracts under which Defendants run the Programs because DOJ had "determined that the services are no longer needed." Rojas Supp. Decl. Ex. 1. In addition to the Programs now terminated by the Termination Notice, the April 4 notice terminated the National Qualified Representative Program and the Legal Access Services for Reunified Families program. *Id.* Plaintiffs' counsel immediately contacted counsel for Defendants to demand an explanation for their apparent violation of the Court's March 17 order. Counsel for Defendants shortly reverted with a copy of a second April 4 letter to Acacia explaining that the earlier notice should be "disregard[ed]" and had "no legal effect." *Id.* Ex. 2.

Most recently, on April 10, 2025, Defendants sent Plaintiffs a Termination Notice, which terminated, "for the convenience of the government," the contracts through which Defendants fund and run the Programs (including LOPC, which was not part of the Stop Work Order). Dkt. 51-1. Defendants offered no other explanation for this termination. The same day, Plaintiffs notified the Court that Plaintiffs would file this renewed motion. *See* Dkt. 51.

**F.    Defendants' Action will Cause Severe and Irreparable Harm to Plaintiffs, Noncitizens, and the U.S. Immigration System.**

Terminating funding for the Programs will have immediate, devastating, and irreparable effects—graver even than the harms Plaintiffs suffered when the Programs were stopped in January. *See, e.g.,* Rojas Supp. Decl. ¶¶ 6–9. Even if EOIR reinstates these Programs in the future (an unlikely and unsupported supposition), the Programs already will have been dealt a fatal blow, at the expense of Plaintiffs, noncitizens in removal proceedings, immigration judges, and taxpayers.

Program providers across the nation receive approximately $9 million dollars annually. For Plaintiffs, this funding represents substantial portions of their organizations' overall operating budget, and funds many full-time staff dedicated to the Programs. *See* Dkt. 2-3 ¶ 13 (LOP and ICH account for 27% of American Gateways' budget and impact over 32% of staff); Dkt. 2-4 ¶ 10 (LOP, ICH, and FGLOP account for about 25% of RMIAN's total revenue for 2025); Dkt. 2-5 ¶ 25 (LOP accounts for 20% of the Amica Center for Immigrant Rights ("Amica Center")'s Detained Adult Program budget); Lopez Supp. Decl. ¶ 5 (12 staff at Estrella are exclusively funded through LOP and ICH); Dkt. 2-6 ¶ 38 (20 Florence Project staff are dedicated primarily to LOP). As nonprofit organizations, Plaintiffs cannot continue this critical work at the core of their mission if Defendants withdraw the previously appropriated, allocated, and approved funding. Plaintiffs will be forced to terminate or reassign staff. *See* Dkt. 2-10 ¶ 12; Dkt. 2-5 ¶¶ 25–29. They will lose access to noncitizens detained at immigration detention facilities across the country as well as noncitizens who are not detained, just as they did after the first stop work order. *See, e.g.*, Dkt. 2-5 ¶ 12; Dkt. 2-3 ¶ 11; Dkt. 2-11 ¶¶ 11–12. They will be forced to renegotiate their relationships with detention centers and immigration courts. Dkt. 2-5 ¶ 20. All the while, thousands of *pro se* noncitizens will face removal proceedings without access to vital information about how to present themselves and their cases in those proceedings.

17

Defendants' actions have already forced Plaintiffs to reevaluate their operations. Given the small size of most Plaintiffs, some may be forced to close their doors or to charge fees for their services. *See* Dkt. 2-10 ¶ 12; Dkt. 2-8 ¶ 14. Even Plaintiffs large enough to possibly survive Defendants' arbitrary and capricious action face serious consequences, including being forced to reassign or terminate staff, many of whom have specialized expertise in providing services tailored to the Programs, and whose experience is irreplaceable. For example, during the Stop Work Order, American Gateways had to shift its LOP and ICH staff to other programs, it anticipates it will need to lay off several staff members, "leaving a large gap in services" and "a massive staffing loss" for the organization. Dkt. 2-3 ¶ 13; Yang Supp. Decl. ¶ 6. Similarly, the Amica Center had to divert funding for one of its LOP employees to another program and predicts it will have to make other diversions going forward, leading to potential layoffs if funding is not restored. Dkt. 2-5 ¶ 26; *see also* Rojas Supp. Decl. ¶ 9. At Estrella, "it will be necessary to furlough all 12 staff members currently funded by" LOP and ICH, and prolonged closure of the Programs may require the organization to terminate staff. Lopez Supp. Decl. ¶¶ 5 7. The Florence Project, meanwhile, is now preparing for "likely layoffs" and "is increasingly likely to have to consider staff reductions," which "will necessarily result in an accompanying reduction of services." St. John Supp. Decl. ¶¶ 7–8. NWIRP predicts the stop will significantly limit its ability to provide detention defense. Dkt. 2-11 ¶ 15. Without federal funding, NIJC's ability to provide continued services to unrepresented people in the immigration court is "at imminent risk." Dkt. 2-7 ¶ 12. NIJC already "was forced to temporarily shift staff members" away from ICH, and is "at imminent risk" of discontinuing legal services to unrepresented individuals in Chicago Immigration Court. Koop Supp. Decl. ¶ 4. RMIAN is looking for alternative funding sources, taking critical time from its

18

mission.  Dkt. 2-4 ¶ 10; Dkt. 2-9 ¶ 18; *see also* Sherman Supp. Decl. ¶ 10.  RMIAN fears that restricted funding will cause it to lose staff due to low morale and mission drift.  Dkt. 2-9 ¶ 18.

Moreover, given the extreme complexity of immigration removal proceedings, *see Padilla v. Kentucky*, 559 U.S. 356, 369 (2010), and the absence of appointed counsel for noncitizens facing removal, the dismantling of these programs will severely frustrate Plaintiffs' respective missions to support noncitizens in removal proceedings.  An increased number of noncitizens will be forced to navigate the immigration system without *ever* having spoken to a lawyer about the immigration process, their obligations, or the legal remedies available to them.

Access to legal resources in removal proceedings is a particularly urgent issue today, as deportations have increased significantly and at breakneck speed.  For example, the Amica Center's LOP team recently provided services to a Venezuelan parent who is afraid they will be subject to summary expulsion under the Alien Enemies Act when they saw "Tren de Aragua" displayed on a screen when ICE interviewed them, despite having no criminal history or involvement with that gang.  Rojas Supp. Decl. ¶ 7.  ICE has begun arresting and even deporting individuals subject to court orders under the Convention Against Torture that preclude removing these individuals to their home countries.  *See id.*  With these increased detentions, rapid deportation processes, and new detention centers, providing legal advice at detention centers to ensures these activities are being carried out following applicable laws is more important now than ever.  The Programs inform noncitizens about basic due process and ensure lawyers are regularly inside detention centers to observe or learn about potential legal violations.

Beyond the obvious negative implications for noncitizens in removal proceedings and the nonprofit organizations that serve them, the dismantling of these programs will result in a less efficient and costlier immigration system, to the detriment of noncitizens, courts, and taxpayers

alike, at a time when efficiencies in the immigration system are particularly crucial. Given an average daily cost in detention of $164.65, and LOP's average cost of at most $200 per person ($8 million in funding and more than 40,000 people served), even a reduction of 1.5 days of detention per detainee saves taxpayer money on top of providing due process protections in removal proceedings. Thus, terminating the Programs causes the very inefficiencies Defendants purportedly want to eliminate from the immigration system. *See generally* Dkt. 46 (amici former immigration judges explaining the efficiency benefits of the Programs).

The harms caused by Defendants' actions *cannot* be redressed after-the-fact by restarting the Programs or providing monetary relief. Halting funding for the Programs, even if they are eventually reinstated, will cripple the nonprofit organizations that provide Program services, effectively killing the Programs. Plaintiffs will be denied access to detention centers and immigration courts where they perform their services, depriving *pro se* noncitizens of the valuable information they share, and depriving Plaintiffs of the ability to share information and communicate with detainees. Indeed, Plaintiffs already lost this vital access under the January Stop Work Order: the day the Stop Work Order was issued, an NIJC ICH attorney was at the Chicago immigration court providing services to unrepresented individuals. The attorney was instructed to terminate her work and return to NIJC's office. Dkt. 2-7 ¶ 4. The Stop Work Order limited RMIAN's access to docket information, preventing RMIAN from ensuring that juveniles and families on the expedited docket have access to information regarding their rights and responsibilities in removal proceedings. Dkt. 2-4 ¶ 9. For plaintiffs who administer CCI, although the Termination Notice prevents organizations from receiving funding for their services, attorneys continue to be ethically obligated to represent their juvenile clients. Dkt. 2-2 ¶ 8. But CCI providers, like NIJC, were denied access to immigration courts and detention facilities under the

Stop Work Order—at one facility, a security officer told an immigrant that they could not access NIJC services "because there was 'no more pro bono.'"  Dkt. 2-7 ¶ 11.  These access restrictions limit CCI providers' ability to speak to their clients and provide competent representation.

In addition to imposing roadblocks to performing needed services, Defendants' actions will prevent Plaintiffs from communicating and sharing information related to their missions.  During the Stop Work Order, the Amica Center was unable to conduct its regular "know your rights" ("KYR") trainings at detention facilities and courthouses in Virginia, despite requesting the ability to do so without LOP.  Dkt. 2-5 ¶ 18–19.  Similarly, NWIRP received pushback from a detention facility about continuing to meet individually with detainees and does not know whether it will be able to enter the detention facility after April 16 to conduct KYR presentations or meet with individuals.  Dkt. 2-11 ¶ 12.  Pennsylvania Immigration Resource Center ("PIRC") was forced to cancel several planned trips to continue KYR services and does not know if it will be able to continue KYR services after April 16.  Dkt. 2-10 ¶ 10.  RMIAN does not known if they will be allowed to continue group KYR and consultation services.  Dkt. 2-9 ¶ 14.  Under the Termination Notice, Plaintiffs (and other nonprofit providers) will be forced to reassign or terminate staff, divert funding from equally important initiatives, or even shut their doors.  Loss of these staff may include those with significant subject-matter expertise in relation to LOP; loss of that experience and expertise is irreparable and ongoing harm.  Dkt. 2-5 ¶¶ 28–29.

Further, the immigration system will suffer the strain of losing these educational programs as the efficiency benefits from the Programs are lost, increasing the time to manage an already staggering backlog of around 3.6 million cases.  And the system will lose critical institutional knowledge, further impairing its operations for years to come.  Immediate preliminary injunctive

relief is necessary to maintain the status quo from before the stop work order to ensure Plaintiffs do not suffer further irreparable harm.

## STANDARD OF REVIEW

Motions for temporary restraining orders are governed by the same standards as motions for preliminary injunctions. *See Morgan Stanley DW Inc. v. Rothe,* 150 F. Supp. 2d 67, 72 (D.D.C. 2001) ("The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."). A temporary restraining order is warranted where the plaintiffs establish: (1) likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Rothe*, 150 F. Supp. 2d at 72 (same factors govern temporary restraining orders). In suits against the government, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs are Likely to Succeed on the Merits

Agency action cannot stand if it is arbitrary, capricious, or contrary to law, if it is done without appropriate process, or if it is contrary to the constitution. Defendants' abrupt termination of the Programs is all of those, and therefore Plaintiffs are likely to succeed on the merits.

### A.    Defendants' Termination of the Programs Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). A plaintiff "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review

thereof." 5 U.S.C. § 702. The APA makes clear that "agency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id.*; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704. Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*. Under the APA, "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2). An agency action is final where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006).

The Termination Notice is a final agency action. It permanently terminates the contracts that controlled spending the congressionally appropriated funding for the Programs. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *10–11 (D.D.C. Feb. 3, 2025) (cutting off government funding is final agency action). Agency action that "is 'definitive' and has 'direct and immediate effect on the day-to-day business of the part[y] challenging the action'" is a final agency action. *Allergan, Inc. v. Burwell*, 2016 WL 1298960, at *6 (D.D.C. Mar. 31, 2016) (quoting *Ciba-Geigy*, 801 F.2d at 436). The Termination Notice is definitive because "there is 'no ambiguity' in the statement, nor any indication it is 'subject to further agency consideration or

23

possible modification." *Allergan*, 2016 WL 1298960, at *6 (quoting *Ciba Geigy*, 801 F.2d at 436). And the "direct and immediate effect on the day-to-day business" of the Plaintiffs resulting from a catastrophic loss of funds is undeniable. *Id.*; *see also* Section II.A. Defendants' decision to terminate the Programs is reviewable as a final agency action.

    *No Other Adequate Remedy*. Plaintiffs do not have any other adequate remedy for their claims. The Supreme Court narrowly interprets the "other adequate remedy" limitation, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also El Rio Santa Cruz Neighborhood Health Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) ("the generous review provisions of the APA must be given a hospitable interpretation such that only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review") (citations and quotations omitted)). Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). No such special procedures have been established, so it is proper for Plaintiffs to seek relief from this Court.

    *No Statutory Bar to Review*. Finally, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial review" of the administrative actions Plaintiffs challenge. *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

    **B.**    **Termination of LOP, LOPC, and ICH Violates the Appropriations Clause.**

    Canceling LOP, LOPC, and ICH flouts an express congressional mandate. Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Termination of the Programs violates

the mandate in the Spending Bill and the Appropriations Clause, and thus must be set aside under the APA. Pub. L. 118-42, 138 Stat. 133 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025) (extending funding through September 30, 2025); *see* 5 U.S.C. §§ 706(2)(A), (C).

Congressional appropriations *require* the executive to fulfill congressional expenditures; the use of the word "shall" means that the expenditure is mandatory. *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381, 1381 n.19 (D.D.C 1973). The executive branch does not have the authority to withhold funds from allotment and obligation. *Train v. City of New York*, 420 U.S. 35 (1975). In *Train*, the Supreme Court affirmed the D.C. Circuit's finding that where a statute mandated a federal agency to spend *all* appropriated funds, the President could not direct that agency to allot less money than the congressionally appropriated amount. *Id*. at 37, 41. Like the statute directing funding to the Environmental Protection Agency in *Train*, the text of the statute here is clear that Congress did not intend to give the executive branch "limitless power to withhold funds from allotment and obligation." *Id*. at 46; *see also New York v. Dep't of Just.*, 951 F.3d 84, 100–01 (2d Cir. 2020) (noting that DOJ is an agency that is subject to limits on executive discretion to spend congressionally appropriated money). Further, where funds have already been obligated through a definite commitment of those funds to a provider of services or goods, the government is legally obligated to provide those funds. *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (control over obligated funds resides in Congress, and not the executive, and agents of the executive cannot obligate the Treasury for payment of funds contrary to congressional intent). After funds have been obligated, the intended recipient is legally entitled to receive those funds. *See Nat'l Juv. L. Ctr., Inc. v. Regnery*, 738 F.2d 455, 462–65 (D.C. Cir. 1984) (where the government has promised to fund a private party, it is obligated to pay).

Congress allocated more than $840 million dollars "for the administration of immigration-related activities" of the EOIR. Pub. L. 118-42, 138 Stat. 133 (2024). In its language regarding LOP, Congress explicitly required that "$28,000,000 . . . *shall* be available" for the LOP, using the language of command. *Id*. In previous Spending Bills, Congress defined some of the "immigration-related activities" it intended to fund in (1) a Joint Explanatory Statement, which the 2018 Spending Bill incorporated, 164 Cong. Rec. H2084, H2090 (2018), https://bit.ly/2ES8xNV (2) a House Report, H.R. Rep. No. 115-231, at 30 (2018), https://bit.ly/2H7BhnT; and (3) a Senate Report, S. Rep. No. 115-139, at 65 (2018), https://bit.ly/2qAPq5K. Since then, Congress has reminded EOIR it cannot try to stop the program like it did in 2018. In the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program." S. Rep. No. 118-198, at 92 (2024) (emphasis added). And in 2022, the House Appropriations Committee's report recommending LOP appropriations for 2023 warned, "[t]he Committee reminds EOIR that funding for this program is mandated by law, and any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee." H. Rep. No. 117-395, at 65 (2022). Defendants' cancellation of the Programs in no way considered that Congress expressly funded and mandated continuation of the Programs.

Here, Defendants have no authority under the Constitution to withhold the relevant funds because those funds have been authorized by Congress and already allocated to Plaintiffs. *See Train*, 420 U.S. at 39; *see also Maine v. Goldschmidt*, 494 F. Supp. 93, 95, 100 (D. Me. 1980) (holding that the Federal-Aid Highway Act of 1956 mandates spending and precludes the Executive from deferring or reducing the obligational limit). Defendants "must follow statutory mandates so long as there is appropriated money available" and cannot simply "decline to follow

a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.).  This Court should set aside the Termination Notice and enjoin any future attempts to withhold funds.  5 U.S.C. § 706(2)(B).

Even if an administration wanted "to spend less that the full amount appropriated by Congress" instead of withholding the full amount, as attempted here, procedural requirements must be followed, set forth in the Impoundment Control Act ("ICA"), 2 U.S.C. §§ 681 *et seq. See Aiken Cnty.*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683) (requiring budget authority proposed for rescission to be made available for obligation until "Congress has completed action on a rescission bill[.]").  Defendants did not follow such procedural requirements here.

### C.    Terminating LOP and LOPC Also Violates the TVPRA.

Defendants' decision to terminate LOP and LOPC also violates Congress's command in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA"), that the Secretary of Health and Human Services (who has legal custody of unaccompanied children) "shall" work with EOIR to "ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by [EOIR]." 8 U.S.C. § 1232(c)(4).  This command in the TVPRA presupposes (and thus requires) EOIR must operate a legal orientation program for custodians, which it has done through LOPC. By cancelling both LOP and the more specific LOPC, Defendants violate the TVPRA and thus violate the APA.  5 U.S.C. § 706(2)(B).

### D.    Terminating the Programs is Arbitrary and Capricious.

Defendants' decision to terminate the Programs ignores the well-documented historical efficacy of the Programs and is the definition of arbitrary and capricious.  To ensure agency actions are reasonable and lawful, the court must "exercise our independent judgment and apply all relevant interpretive tools to reach the best reading of the statute." *Env't Def. Fund v. United States*

27

*Env't Prot. Agency*, 124 F.4th 1, 11 (D.C. Cir. 2024) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).  Agency actions not contrary to law must nevertheless be "reasonable and reasonably explained."  *Id.*  A court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A); *see also Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001) (the "standard requires the agency to 'examine the relevant data and articulate a satisfactory explanation for its action'").

Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned analysis" for departure from preexisting policies.  *Motor Vehicles Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42–43 (1983).  In cases where the purported rationale for agency action is pretextual, it must be set aside without further inquiry.  *See, e.g.*, *N.E. Coal. on Nuclear Pollution v. Nuclear Regul. Comm'n*, 727 F.2d 1127, 1130–31 (D.C. Cir. 1984); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986).  Here, Defendants fail on all grounds, justifying immediate provisional relief (as well as ultimate relief on the merits).

### 1.    Defendants Failed to Adequately Explain the Basis for the Decision.

A "fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Tourus Recs.*, 259 F.3d at 737 (quotation marks omitted); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency.").

"[Courts] do not hear cases merely to rubber stamp agency actions.  To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure

Act.'" *Nat'l Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000) (citing *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)). Meaningful judicial review cannot proceed unless "the grounds upon which the administrative agency acted [are] clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*). Accordingly, an agency action must be set aside unless its basis is "set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196.

Defendants' cancellation of the Programs fails even this most basic test. The cancellation eviscerates Programs that provide the only information about removal proceedings to tens of thousands of individuals. Defendants give no reason for their illegal action other than a bare citation to the government's "convenience" and contract-related regulations. Defendants' citation to FAR 52.249-2 and -6 in the Termination Notice cannot whitewash their violation of the constitution and statutes. *See Texas v. E.P.A.*, 726 F.3d 180, 195 (D.C. Cir. 2013) ("'[A] valid statute always prevails over a conflicting regulation,' and a regulation can never 'trump the plain meaning of a statute.'" (alterations in original) (citations omitted)). Thus, Defendants' reliance on these regulations must be ignored in light of Congress's power to mandate use and purpose of funding and the Executive Branch's duty to obey Congress's appropriations mandates. *See Aiken Cnty.*, 725 F.3d at 262 n.3 (noting that "the Appropriations Clause acts as a separate limit on the [Executive Branch]'s power" over spending). Were the Executive Branch able to cite purported contract rights to terminate appropriated funding without congressional approval, appropriations legislation would be meaningless and easily overridden. This is especially so here, where Plaintiffs are not parties to the relevant contract, and do not (and could not) bring contract claims to protect their rights. *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550 (Fed. Cir. 1983).

Defendants, who have provided *no justification* for their dramatic reversal of policy and practice, cannot satisfy the APA's requirement to provide *a reasoned basis* for their actions.  *See Amerijet Int'l v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." (emphasis in original) (citations omitted)). EOIR's past statements on LOP, like that on October 22, 2014, concluded that Defendants carried out the program to "improve judicial efficiency in the immigration courts."  *See* U.S. Dep't of Just., *Executive Office for Immigration Review Expands Legal Orientation Program Sites* (2014), https://perma.cc/V89T-M9BC.  Defendants' purported justifications have shifted over just the last few months, from citing the "Protecting the American People from Invasion" Executive Order for the Stop Work Order, to citing the Attorney General's memorandum in litigation (with no mention of either in connection with the Termination Notice).  Because EOIR provides no discernable rationale for its decision to terminate the Programs, the cancellation must be set aside.  *See Chenery II*, 332 U.S. at 196–97 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."); *see also Columbia Gas Transmission Corp. v. FERC*, 448 F.3d 382, 387 (D.C. Cir. 2006) (same).

        **2.**      **Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made.**

To survive review under the arbitrary and capricious standard, an agency must have "demonstrated a rational connection between the facts found and the choice made." *Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 301 (D.C. Cir. 1981) (quotations omitted).  Courts "do not defer to the agency's conclusory or unsupported suppositions." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*, 255 F. Supp. 3d 101, 121–22 (D.D.C. 2017).  In terminating the Programs, Defendants failed to address any of the considerations appropriate to the decision.  Far from

articulating a rational connection between the facts found and the action taken, the decision ignores multiple instances of government analysis finding the programs to be effective and cost efficient.

For example, the government's April 2017 study recommended EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications."  Booz Allen Hamilton Study at 24–25.  Further, a 2017 ICE memorandum issued during the first Trump Administration noted "LOP attendees are positioned to make better informed decisions, are more likely to obtain legal representation, and complete their cases faster than detained noncitizens who have not received the LOP."  *See* Memorandum from ICE Assistant Director for Custody Management Tae Johnson, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program* (Nov. 30, 2017), https://tinyurl.com/4c6tzc4w ; *see also* Nina Siulc, et al., *Legal Orientation Program: Evaluation and Performance and Outcome Measurement Report, Phase II*, THE VERA INSTITUTE OF JUSTICE (2008), https://perma.cc/ZEN3-648L (finding LOP participants moved through the immigration court process an average of 13 days faster than non-participants).  Instead, Defendants offer only a conclusory, unsupported—and inaccurate—statement that EOIR previously concluded LOP is a wasteful program.  *See* EOIR Policy Manual at 557.  Given repeated findings that the Programs make the immigration courts run more efficiently, providing significant savings to taxpayers, Defendants' decision to terminate the Programs is arbitrary and capricious.

Defendants also failed to assess in any way the impacts that cancellation of the Programs programming will have on the intended and actual beneficiaries of the Programs.  In a system where immigrants have no right to appointed counsel and nearly 90% of noncitizens in detention complete deportation proceedings without counsel, the terminating the Programs removes the only

access to relevant, legal information many individuals ever receive.  "Reasoned decisionmaking" requires that agencies "look at the costs as well as the benefits" of their actions.  *See State Farm*, 463 U.S. at 52, 54.  There is no evidence of such analysis or consideration.  *See, e.g.*, Dkt. 45 at 4 (providing no update as to any audit or review of the Programs).

The record reveals no policy rationale for the decision to cancel programming.  Where, as here, "no findings and no analysis . . . justify the choice made," the APA "will not permit" a court to accept the agency's decision.  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962).  Because Defendants "should have considered those matters but did not," their "failure was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

### 3.    Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy.

When the government reverses its own established policy, it has an even greater burden to justify its actions.  The agency must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (citation omitted); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (an agency cannot depart from prior policy without "explaining its changed position").  Thus, reversing a pre-existing policy may require a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox*, 556 U.S. 502, 515 (2009).

This termination reverses a decades-old policy explicitly reaffirmed year after year by Congress, most recently when it renewed funding in 2024 and continued that funding in March 2025.  The 2024 bill appropriated funds "for the administration of immigration-related activities of the Executive Office for Immigration Review," with "$28,000,000 [that] shall be available for

services and activities provided by the Legal Orientation Program." Pub. L. 118-42, 138 Stat. 133 (2024). Contrasting this clear intention to continue longstanding policy and practice of funding the Programs, DOJ ended the Programs without explanation. Even the Attorney General's February 5, 2025 memo directing Defendants to identify and terminate contracts resulting in "waste, fraud, or abuse," is at best pretextual, as described further below. The idea that the Programs are "waste, fraud, or abuse" is belied by the long history of congressional and other statements of support and findings of the Programs' many efficiency-creating effects.

In cancelling the Programs, Defendants dramatically depart from their own precedent, without justification. Defendants lack any explanation for this abrupt change in policy, let alone the "reasoned" explanation that is required, *see Fox*, 556 U.S. at 515, and therefore their action is arbitrary and capricious.

### 4. To the Extent Any Reason Was Offered, That Reason Was Pretextual.

Unlike the 2018 attempt to cancel LOP and ICH, Defendants here make no effort to justify their decision in stopping funding for the Programs. Should Defendants rely on the February 5, 2025 Attorney General memo commanding termination of contracts that result in "waste, fraud, or abuse," Dkt. 30-1 at 3, that reliance is belied by past attempts to terminate the Programs that revealed any concerns with waste, fraud, and abuse were pretextual. For example, the Executive Order upon which Defendants' January 22, 2025 Stop Work Order was purportedly based requires Defendants to "review and, if appropriate, audit" funding agreements "supporting or providing services . . . to removable or illegal aliens, to ensure that such agreements . . . are free of waste, fraud, and abuse." The stop work order purported to pause funding pending an "audit." *See, e.g.*, Dkt. 2-6 ¶ 21. But the EOIR Policy Manual made clear that the purported audit was pretextual—Defendants already deemed the Programs wasteful without any support and unconstitutionally cut off access to their funding. EOIR Policy Manual at 557. And at the March 17, 2025, hearing on

33

Plaintiffs' motion for a preliminary injunction, Defendants were unable to cite a single action taken to conduct any "audit." *See also* Dkt. 45 at 4 (failing to provide any update on any such "audit").

Even the purported focus on "waste" is plainly pretextual. That the Stop Work Order *did not* pause funding for LOPC for the "audit" Defendants were purportedly doing—but the Termination Notice has now terminated funding for LOPC—only highlights this arbitrary and capricious (and pretextual) decision-making. *Compare* AR 161 to Dkt. 51-1; *see also* Rojas Supp. Decl. Ex. 3 (internal emails showing DOJ considered stopping work on LOPC in January and chose not to). Defendants' true reasoning is revealed in the Attorney General's memo, which instructs Defendants to "not enter into any new contract . . . to provide Federal funding to non-governmental organizations that support or provide services, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable or illegal aliens." Dkt. 30-1 at 3–4. That is Defendants' aim here: to cut off *all* contracts to provide services to non-citizens, regardless of whether those contracts are actually wasteful, fraudulent, or abusive. The review was simply a mechanism to generate a pretextual reason to cancel existing contracts. That this is the third attempt by Defendants in three months to terminate the Programs further evidences their determination to terminate the Programs—not to carry out true efficiency reviews.

The Termination Notice offered no rationale for cancelling congressionally appropriated funding—instead, it suggests the real goal is to unconstitutionally eliminate funding for the Programs notwithstanding Congress's clear directions. The circumstances reveal this action was the latest in a series of attempts to dismantle the immigration system, to remove individuals without basic due process protections, to the detriment of noncitizens, due process, and the rule of law.

### E.    Termination of the Programs Violates Plaintiffs' First Amendment Rights.

Under the APA, this Court may set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Here, Defendants' actions will

constrain Plaintiffs' speech by (1) limiting their access to limited public forums where Plaintiffs have spoken to noncitizens for more than 20 years;[2] and (2) denying them access to congressionally authorized funds because the administration wants to suppress the information they have traditionally shared with noncitizens.

Under the First Amendment, when the government creates a limited public forum or when it chooses to fund private speech, it may impose speech restrictions that are "viewpoint neutral and 'reasonable in light of the purpose served by the forum.'" *Tabak*, 109 F.4th at 633 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001)); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 543–44 (2001) (comparing the standard for subsidized speech claims to limited public forum claims)). The Termination Notice is neither.

First, Plaintiffs' speech is private speech, not government speech. Courts "must exercise great caution before" deciding speech constitutes government speech, and private speech does not transform into "government speech by simply affixing a governmental seal of approval." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Like the speech at issue in *Velazquez*, the Programs were "designed to facilitate private speech, not to promote a governmental message." 531 U.S. at 534. Courts consider three factors in identifying government speech: "(1) the history of the speech at issue; (2) a reasonable observer's perception of the speaker; and (3) control and final authority over the content of the message."[3] *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d 395, 411 (D.D.C.

---

[2] Although courthouses and detention facilities often are considered nonpublic forums, the courthouses and detention facilities are limited public forums here because the government "create[d] a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects" by allowing Plaintiffs to conduct Programs there for more than twenty years. *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 632 (D.C. Cir. 2024). The Court need not resolve this issue, as the same test applies to nonpublic and limited public forums.

[3] Plaintiffs do not concede the government exercises final control over the content of their speech. But because the other two factors clearly show Plaintiffs' speech is private, Plaintiffs demonstrate they are likely to succeed on their First Amendment claim without reaching this factor.

2016). The Programs were founded by nonprofit organizations to convey their own messages and fulfill their missions. *See, e.g.*, Dkt. 2-6 ¶¶ 33–34, 37; Dkt. 2-5 ¶ 21–22. LOP and ICH began as private projects to inform noncitizens of their rights before Congress authorized funding to support the Programs. *See, e.g.*, Dkt. 2-6 ¶¶ 4–6; Dkt. 2-7 ¶ 2. Plaintiffs also work with numerous volunteers who assist with carrying out their mission, such that censoring Plaintiffs also impacts numerous members of the public. *See, e.g.*, Dkt. 2-5 ¶ 7. Further, while Plaintiffs have a cooperative relationship with the immigration system, their role is clearly distinct from the government attorneys who represent DOJ in removal proceedings or the immigration judges who oversee the proceedings. *See Velazquez*, 531 U.S. at 542. While immigration judges are required to provide basic due process information to noncitizens, the Programs perform a vital role in providing more comprehensive information. *See, e.g.*, Dkt. 2-5 ¶ 9. And, while the government may exercise some oversight of written materials used in these presentations, Plaintiffs' speech remains their own as they work with noncitizens to advise them of their rights and help them navigate the immigration system. *Cf.* Dkt. 2-9 ¶ 18 (staff members joined RMIAN because they believed in its mission and that morale is negatively impacted by the inability to provide services).

Second, as addressed above, the Termination Notice is unreasonable because it exceeds the scope of executive power and denies Plaintiffs access to congressionally authorized funds. "A regulation is reasonable if it is consistent with the government's legitimate interest in maintaining the property for its dedicated use." *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1073 (D.C. Cir. 2012). Here, there is no legitimate government interest in denying Plaintiffs funding or access to immigration courts or detention facilities. And Defendants' actions are intended to silence speech disfavored by the administration because, although Plaintiffs' speech informs noncitizens broadly about their rights and responsibilities, the administration has falsely

36

suggested such speech "promote[s] or facilitate[s] violations of our immigration laws." Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025). The government engages in viewpoint-discrimination when it "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The government may not leverage its power to subsidize speech or restrict speech in a limited public forum to silence speech regarding litigants' rights or to prevent them from defending themselves in court proceedings. *Cf. Velazquez*, 531 U.S. at 547–48. The Programs often provide the only limited legal advice available to noncitizens. As in *Velazquez*, the Government may not hamstring this legal advice by preventing Plaintiffs from speaking to noncitizens or threatening their ability to exist by withdrawing funding to which they are entitled and upon which they rely. *Id.* at 548–49 ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.").

The Executive Order the Stop Work Order cited vaguely and overbroadly prohibits funding for "non-governmental organizations or providing services . . . to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws." Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025). And the February 5, 2025 Attorney General's memo presumably behind the Termination Notice specifically targets organizations because of their work and missions, commanding Defendants not to fund "organizations that support or provide services . . . to removable or illegal aliens." Dkt. 30-1 at 4. This language shows an intent to cut funding to censor Plaintiffs' speech. This viewpoint-based action violates Plaintiffs' First Amendment rights and, as in *Velazquez*, cuts off the opportunity for noncitizens "to receive vital information respecting constitutional and statutory rights bearing upon" their immigration proceedings. 531 U.S. at 546.

## II.    Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief

### A.    Plaintiffs Face Irreparable Harm

A temporary restraining order is appropriate where, as here, the moving party shows that it faces harm that is both (1) "certain and great, actual and not theoretical, and so imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm," and (2) "beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quotations and citation omitted, alteration in original). Thus, Plaintiffs must show a "clear and present need for equitable relief" that is "beyond remediation." *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys.*, 773 F. Supp. 2d 151, 179 (D.D.C. 2011) (quotations and citations omitted).

When a defendant's actions "have 'perceptibly impaired' [an organizational plaintiff's] programs, 'there can be no question that the organization has suffered injury in fact'." *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). If the defendant's actions make the organization's activities more difficult and "directly conflict with the organization's mission," then the organizational plaintiff may be entitled to a temporary restraining order. *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). "Monetary costs are of course an injury." *United States v. Texas*, 599 U.S. 670, 676 (2023). Thus, "los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III . . . ." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019).

Immediate injunctive relief is necessary to protect Plaintiffs from severe and irreparable harm. Defendants' decision to abruptly terminate funding for the Programs will directly interfere with Plaintiffs' missions, impeding their ability to provide critical orientation services that are at the heart of Plaintiffs' activities. There is no question ceasing funding for LOP and other

38

Programs—a decision that will effectively terminate the Programs—will cause imminent harm that cannot be later remediated. Because Defendants' actions will prevent Plaintiffs from speaking by foreseeably denying them access to immigration courts and detention facilities and cutting off crucial funding sources, Plaintiffs will be irreparably harmed without an injunction. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

By terminating the Programs, Defendants will prevent Plaintiffs from providing thousands of noncitizens the services Congress prescribed, frustrating Plaintiffs' missions of supporting noncitizens in immigration proceedings by ensuring they are not removed without basic knowledge of their rights, and silencing Plaintiffs' voices. If this occurs, "'there can be no do over and no redress.'" *Newby*, 838 F.3d at 9 (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)). Without the funding Congress appropriated, Plaintiffs will be forced to reduce or eliminate services to *pro se* noncitizens. *See, e.g.*, Dkt. 2-8 ¶ 14. Some organizations may be forced to close their doors, *see, e.g.*, Dkt. 2-5 ¶ 23, or layoff staff, *see, e.g.*, Dkt. 2-3 ¶ 13. Others will be required to divert staff away from the Programs, causing them to lose disaffected staff and institutional knowledge. *See, e.g.*, Dkt. 2-9 ¶ 18; Dkt. 2-6 ¶ 39; Dkt. 2-11 ¶ 15; Dkt. 2-4 ¶ 10. Dismantling the Programs will eliminate significant institutional knowledge, impairing the immigration system's operations for years to come. *See, e.g.*, Dkt. 2-5 ¶ 29; Dkt. 2-7 ¶ 13. Even if funding later resumes, organizations forced to lay off significant portions of their staff will be unable to maintain the infrastructure and institutional knowledge needed to restart their programs at a later date. *See* Brunsink Supp. Decl. ¶ 5.

These harms cannot be remediated or redressed, even if Defendants later resume funding for the Programs at some future date. There is no time to delay injunctive relief. The harm to

Plaintiffs is imminent, with funding set to be completely terminated on April 16, 2025. Plaintiffs and the noncitizens they serve will also experience irreparable harm far exceeding the mere loss of funding. The Court cannot later turn back the clock; unless it grants this temporary restraining order now, it will be powerless in the future to redress the harms Plaintiffs suffer.

### B.    The Balance of Equities

Finally, in considering whether to grant a temporary restraining order, the Court should "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief.'" *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (ellipsis in original) (citations omitted). Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor. *Newby*, 838 F.3d at 12 (quotation marks and citation omitted).

Here, there will be no harm to Defendants—or any other interested party—if this Court issues a temporary restraining order. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quoting *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017)). On the contrary, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (quotations and citation omitted). Halting funding for the Programs contravenes Congress's express directive in the omnibus spending bill, which appropriates funds "for the administration of immigration-related activities of the Executive Office for Immigration Review," and the House's express admonishment that "any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee." H. Rep. No. 117-395, at 65 (2022). Enjoining Defendants from terminating funding already appropriated for the Programs merely prevents Defendants from defying the congressional mandate. Paying out the monies

already earmarked for the Programs cannot harm Defendants in any meaningful way compared to the harms that Plaintiffs and the noncitizens they serve will suffer if an injunction does not issue.

Maintaining funding for the Programs furthers a critical public interest: promoting an immigration system that reaches an appropriate result in individual cases. The programs benefit noncitizens by informing them of their rights—helping more noncitizens obtain a just resolution to their immigration proceedings—and benefit taxpayers by promoting efficiency within the immigration system. In November 2017, Tae Johnson, Assistant Director of ICE, instructed ICE personnel that LOP is for the benefit of "all parties," including ICE and the courts. Memorandum from ICE Assistant Director for Custody Management Tae Johnson, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program*, 1 (Nov. 30, 2017), https://tinyurl.com/4c6tzc4w. He explained the program was created to "improve the efficiency of immigration court proceedings by increasing access to information and improving representation for individuals in proceedings." *Id.* Recognizing the program's significant benefits, Assistant Director Johnson encouraged ICE agents to share information about it with noncitizens in detention. *Id.* at 2. The Programs provide a particularly important public service now, as immigration laws and policies shift rapidly, it is increasingly challenging for noncitizens to navigate the immigration system alone, and the population in immigration detention increases significantly. *See* Brock Supp. Decl. ¶¶ 4–5; Rojas Supp. Decl. ¶ 7. By appropriating money for these programs, Congress has agreed funding the Programs is in the public interest. *See, e.g.*, Bicameral Judiciary Letter to General Sessions (Apr. 17, 2018) ("[U]rg[ing] DOJ to reject these ill-advised policy changes," and noting that DOJ's decision "undermine[s] the most basic notions of fairness in the American justice system, and thus the rule of law itself."). A temporary restraining order protecting that funding, therefore, likewise

41

is in the public interest. *See generally* Dkt. 41-1 (amicus brief of former immigration judges and former members of the Board of Immigration Appeals, explaining that "[e]ven a brief interruption in these programs will disrupt the efficient and fair functioning of the immigration courts").

If the Court does not issue a temporary restraining order, Plaintiffs and thousands of noncitizens moving through the immigration system (and in some cases, U.S. citizens) will face clear, immediate, and irreparable harms, as described above. U.S. taxpayers, who will bear the increase in overall systems costs resulting from the elimination of the Programs, likewise will suffer from Defendants' actions. Defendants themselves, meanwhile, do not face any injury from the issuance of a temporary restraining order to stop their illegal instruction, particularly where Congress mandated that the Programs to continue. Given these considerations, the balance of equities weighs heavily in favor of issuing a temporary restraining order here.

## III.    A Nationwide Injunction is Appropriate

District courts' authority to issue nationwide injunctions is well established; they "enjoy broad discretion in awarding injunctive relief." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). Accordingly, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020) (quoting *Nat'l Mining Ass'n*, 145 F.3d at 1409 (alteration in original)). The appropriate injunctive relief "often depend[s] as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).

Here, "[n]ationwide relief . . . is necessary to provide complete relief to the plaintiffs for the 'violation[s] established'" and "ensures that complete relief remains available to the plaintiffs after . . . final adjudication." *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49.

Defendants' decision to terminate funding for the Programs directly contradicts Congress's express mandate and is contrary to law *in every case*—regardless of which organization provides the services—and will cause irreparable harm to Plaintiffs if allowed to proceed. A nationwide injunction is the only way to effectively grant Plaintiffs, who operate the Programs in ten different states, the relief they seek: the preservation of critical, congressionally approved programs that increase efficiency of the immigration system nationwide. Without a nationwide injunction, Defendants may seek to deny funding to other nonprofit organizations operating similar programs, blocking thousands of noncitizens' access to even the most basic information about the U.S. immigration system. Plaintiffs, whose primary mission is to serve noncitizens in removal proceedings, will be forced to choose between expending additional resources to make up for the defunded providers and turning their backs on vulnerable noncitizens. Notably, Defendants—who, consistent with the omnibus spending bill, already have allocated funding for the Programs—will not face any harm from a nationwide injunction requiring them to continue funding the programs as planned. Thus, the balance of equities weighs heavily in favor of a nationwide injunction.

Courts have recognized that "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Washington v. Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017). Moreover, a nationwide injunction also protects this Court from the risk of duplicative litigation, as "an injunction issued here only as to the plaintiff organizations and their members would cause all others affected by [the invalid rule] . . . to file separate actions for declaratory relief in this circuit." *Nat'l Mining Ass'n*, 145 F.3d at 1409. Plaintiffs are located throughout the country, and piecemeal injunctive relief would be impractical

and difficult to administer. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021).

Accordingly, a nationwide injunction is appropriate in this case.[4]

IV.    **Plaintiffs Seek Expeditious Resolution of their Claims**

Under 28 U.S.C. § 1657(a), "each court of the United States . . . shall expedite the

consideration of any action . . . if good cause therefor is shown."  "[G]ood cause" is shown where

the effective relief hinges on appropriate timing. *Virginians Against Corrupt Cong. v. Moran*, No.

92-2120, 1992 WL 321508, at *1 (D.D.C. Oct. 21, 1992) (granting prompt hearing where plaintiff

needed relief against allegedly unlawful election mailings before Election Day); *see Indep. Inst. v.

FEC*, 70 F. Supp. 3d 502, 503 n.1 (D.D.C. 2014) (expediting consideration "in light of the timing

of the upcoming elections"), *rev'd on other grounds sub nom. Indep. Inst. v. FEC*, 816 F.3d 113

(D.C. Cir. 2016); *San Luis Obispo Mothers for Peace v. Hendrie*, 502 F. Supp. 408, 409 (D.D.C.

1980) (granting expedited consideration of Plaintiffs' claims, including an APA claim, where

plaintiffs sought to prevent allegedly disqualified commissioner from ruling on pending

application).  Further, actions may also be expedited where one party's income stream is dependent

on the outcome of the case. *See, e.g.*, *AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates, P.C.*,

No. 07 Civ. 1908, 2008 WL 4543422, at *3 (D. Colo. Oct. 10, 2008).

Funding for the Programs will terminate on April 16, 2025.  Plaintiffs will have to stop

providing the Programs to noncitizens, will lose funding, and will presumably be denied access to

detention facilities and immigration courts nationwide—as they were denied access during the

Stop Work Order. *See, e.g.*, Dkt. 2-4 ¶¶ 11–12 (Colorado); Dkt. 2-6 ¶¶ 21–32, 38–39 (Arizona);

Dkt. 2-7 ¶ 11 (Illinois); Dkt. 2-3 ¶ 11 (Texas); Dkt. 2-11 ¶¶ 11–13 (Washington); Dkt. 2-10 ¶¶ 9–

---

[4] Plaintiffs also have submitted, at the Court's request, declarations demonstrating that non-plaintiff legal service providers support injunctive relief and will be helped by it. *See* Dkts. 30, 30-2 – 30-15, 43-2 – 43-5.

11 (Pennsylvania); Dkt. 2-5 ¶¶ 12–20 (Virginia).  The thousands of noncitizens Plaintiffs assist will also be harmed if Defendants terminate funding.  Every day that passes without Program funding, more individuals will appear in immigration courts across the country without any knowledge "about immigration court procedures along with other helpful legal information."[5]  In addition to the noncitizens whose due process rights will be harmed, judicial efficacy in immigration courts across the country will decline.[6]  Accordingly, there is sufficient "good cause" to expedite the consideration of this motion under 28 U.S.C. § 1657(a).

## CONCLUSION

Defendants' decision to terminate funding for the Programs is contrary to the Constitution, express congressional appropriations, and the TVPRA, beyond the scope of executive power, pretextual, arbitrary, and capricious.  Accordingly, their actions—which ignore and contradict extensive evidence documenting the Programs' success and efficiency—violate the APA.  Because the decision immediately will cause Plaintiffs irreparable harm, this Court should grant immediate provisional relief enjoining Defendants' illegal action, including enjoining the attorney general and DOJ from refusing to make available funding for the Programs, including funding to any persons previously authorized by DOJ to receive 2024–25 funding, and preserving the status quo pending a final judgment.

---

[5] Legal Orientation Program, U.S. DEP'T OF JUSTICE (Nov. 2015), https://web.archive.org/web/20160920163113/https://www.justice.gov/eoir/legal-orientation-program.

[6] *See id.* ("Experience has shown that the LOP has had positive effects on the immigration court process: detained individuals make wiser, more informed, decisions and are more likely to obtain representation; non-profit organizations reach a wider audience of people with minimal resources; and, cases are more likely to be completed faster, resulting in fewer court hearings and less time spent in detention.").

Respectfully submitted,

April 14, 2025

s/ Adina Appelbaum                                    s/ Laura Sturges

AMICA CENTER FOR IMMIGRANT                    GIBSON DUNN & CRUTCHER
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)         Laura Sturges (C.O. Bar No. 36843)*
Samantha Hsieh (V.A. Bar No. 90800)*            1801 California Street, Suite 4200
Amelia Dagen (D.C. Bar No. 9004838)             Denver, CO 80202-2642
Amica Center for Immigrant Rights               (303) 298-5700
1025 Connecticut Avenue NW, Suite 701           lsturges@gibsondunn.com
Washington, DC 20036
(202) 331-3320                                  Amer S. Ahmed (D.C. Bar No. 500630)
adina@amicacenter.org                           Richard W. Mark (D.D.C. Bar No. NY0378)
sam@amicacenter.org                             200 Park Avenue
amelia@amicacenter.org                          New York, NY 10166-0193
                                                (212) 351-4000
                                                rmark@gibsondunn.com
                                                aahmed@gibsondunn.com

                                                * admitted *pro hac vice*

46