# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*,<br><br>                Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>                Defendants. | Case No. 1:25-cv-00298-RDM<br><br>**BRIEF IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR A TEMPORARY RESTRAINING ORDER** |

**TABLE OF CONTENTS**

I. THE SUPREME COURT'S ORDER IN *DEPARTMENT OF EDUCATION V. CALIFORNIA* IS FACTUALLY AND LEGALLY INAPPLICABLE TO PLAINTIFFS' RENEWED MOTION FOR TRO. 1

    A. *Department of Education* arises in a distinct procedural posture that does not apply to Plaintiffs' Renewed Motion for TRO. ........................................................ 1

    B. *Department of Education* is factually inapplicable. ............................................. 2

    C. *Department of Education* does not change the existing landscape of controlling precedent applying the Tucker Act, which affirms that this Court has jurisdiction over Plaintiffs' claims. ............................................................................ 4

II. PLAINTIFFS CAN NEITHER BRING CLAIMS NOR SEEK RELIEF IN THE COURT OF FEDERAL CLAIMS. ................................................................................................................................ 7

III. PLAINTIFFS WILL SUFFER IMMEDIATE AND SEVERE IRREPARABLE HARM WITHOUT A TRO. .... ................................................................................................................................ 9

CONCLUSION ........................................................................................................ 13

**TABLE OF AUTHORITIES**
Cases

*Bowen v. Massachusetts*,
  487 U.S. 879 ............................................................................................................ 4, 5, 8

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ............................................................................... 4, 5, 6

*Dellinger v. Bessent*,
  2025 WL 559669 (D.C. Cir. Feb. 15, 2025) .................................................................. 2

*Department of Education v. California*,
  604 U.S. __, 2025 WL 1008354 (Apr. 4, 2025) ..................................................... 1, 2, 3, 4, 6

*E.R. Mitchell Constr. Co. v. Danzig*,
  175 F.3d 1369 (Fed. Cir. 1999) ...................................................................................... 7

*Eastport S.S. Corp. v. U.S.*,
  372 F.2d 1002 (Ct. Cl. 1967), *overruled on other grounds by Malone v. U.S.*,
  849 F.2d 1441 (Fed. Cir. 1988) ...................................................................................... 8

*Elrod v. Burns*,
  427 U.S. 347 (1976) ....................................................................................................... 9

*Erickson Air Crane Co. of Wash., Inc. v. United States*,
  731 F.2d 810 (Fed. Cir. 1984) ........................................................................................ 7

*J.G.G. v. Trump*,
  2025 WL 914682 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) ..................... 1

*Jibril v. Mayorkas*,
  20 F.4th 804 (D.C. Cir. 2021) ........................................................................................ 9

*Maine v. U.S. Dep't of Agric.*,
  2025 WL 1088946 (D. Me. Apr. 11, 2025) ................................................................ 2, 5

*Me. Cmty. Health Options v. U.S.*,
  590 U.S. 296 (2020) .................................................................................................. 6, 9

*Me. v. Dep't of State v. Aids Vaccine Advocacy Coal.*,
  145 S. Ct. 753 (2025) ..................................................................................................... 6

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) .................................................................................... 5, 6

*Nat'l Treas. Employees Union v. King*,
  961 F.2d 240 (D.C. Cir. 1992) ....................................................................................... 9

*New York v. Trump*,
  2025 WL 1098966 (D.R.I. Apr. 14, 2025) ................................................................. 4, 7

*New York v. Trump*,
  2025 WL 715621 (D.R.I. Mar. 6, 2025) ............................................................................... 12

*Roman Catholic Diocese v. Cuomo*,
  592 U.S. 14 (2020) ................................................................................................................ 9

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ...................................................................................... 5, 6, 8

*United States Conference of Catholic Bishops v. Department of State*,
  2025 WL 763738 (D.D.C. Mar. 11, 2025) ............................................................................ 5

*United States v. Johnson Controls, Inc.*,
  713 F.2d 1541 (Fed. Cir. 1983) ............................................................................................. 7

*Winter v. FloorPro, Inc.*,
  570 F.3d 1367 (Fed. Cir. 2009) ............................................................................................. 7

**Statutes**

Administrative Procedure Act ...................................................................................... 2, 6, 7, 9

Plaintiffs filed a Renewed Motion for a Temporary Restraining Order ("Renewed Motion") on April 14, 2025, Dkt. 53, and incorporate by reference that Renewed Motion as well as Plaintiffs' original Motion and Reply in Support of Preliminary Injunction, Dkts. 2 and 43. This Court also held a scheduling conference on April 14, 2025, and requested briefing on the following issues in advance of a hearing on Plaintiffs' Renewed Motion to be held April 15, 2025.

I. **The Supreme Court's Order in *Department of Education v. California* is Factually and Legally Inapplicable to Plaintiffs' Renewed Motion for TRO.**

*Department of Education v. California*, 604 U.S. __, 2025 WL 1008354 (Apr. 4, 2025), is both factually and legally inapplicable to this case and to Plaintiffs' motion. The order is bound to the specific posture of an emergency request to stay the District Court's order, is based on distinct facts specific to that case, and legally neither changes nor impacts pre-existing Tucker Act jurisprudence, apart from affirming a case on which Plaintiffs primarily rely.

  A. ***Department of Education* arises in a distinct procedural posture that does not apply to Plaintiffs' Renewed Motion for TRO.**

TROs are normally not appealable. *See Dep't of Educ.*, 2025 WL 1008354, at *1. In *Department of Education*, the government appealed a temporary restraining order after the District Court extended it beyond fourteen days, and the government moved to stay the order. In this posture, the Supreme Court framed the motion before it as an "application . . . seeking a stay pending appeal." *Id.* at *2. The Supreme Court held the extended temporary restraining order "carrie[d] many of the hallmarks of a preliminary injunction," and was thus appealable. *Id.* at *1.

Here, this Court has not issued any temporary relief that could be appealed or stayed. Should this Court properly grant Plaintiffs' request for temporary injunctive relief (as it should, *see* Dkt. 53-1), Plaintiffs expect that such temporary relief will be followed by full preliminary injunction briefing, without the emergency timing considerations present in a request for a TRO, which should not be appealable here. *See, e.g.*, *J.G.G. v. Trump*, 2025 WL 914682, at *3 (D.C.

1

Cir. Mar. 26, 2025) (TROs' "limited temporal duration means the juice [of an appeal] is often not worth the squeeze") (Henderson, J., concurring); *Dellinger v. Bessent*, 2025 WL 559669, at *5 (D.C. Cir. Feb. 15, 2025) (TROs are generally unappealable because review "before the district court has finished its work and issued a ruling on the preliminary injunction" would "disrupt, if not render obsolete, the proceedings in the district court"); *see also Maine v. U.S. Dep't of Agric.*, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (recognizing the Supreme Court's emergency docket has less precedential value because opinions are issued without full briefing or hearing).

## B. *Department of Education* is factually inapplicable.

*Department of Education* also is inapplicable because the facts the Supreme Court described and relied on are not present here. The Supreme Court held the government was likely to prevail on the merits of the Administrative Procedure Act ("APA") claims in question because the plaintiffs *sued for payment* on grant contracts *those plaintiffs* had with the government. The Court explained this meant the requested relief was "to enforce a contractual obligation to pay money" on the grant contracts, implicating jurisdictional concerns under the Tucker Act. *Dep't of Educ.* 2025 WL 1008354, at * 1 (citation omitted). The TRO that defendants appealed "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue." *Id*.

Here, by contrast, Plaintiffs have no contract with the government. Rather than suing to enforce contractual obligations, Plaintiffs are suing on rights created by specific appropriations statutes, the Constitution, and the APA. Accordingly, Plaintiffs seek only injunctive relief requiring Defendants to meet their constitutional and statutory obligations, *not* payment of money

2

or any relief sounding in contract. The Supreme Court's holding in *Department of Education* does not impact this Court's jurisdiction to hear Plaintiffs' claims. *See, supra*, at 1-2.

*Department of Education* also held that the plaintiffs in that case—states that receive specific grant funding—failed to demonstrate irreparable harm sufficient to prevent staying the temporary restraining order in that case, because the state represented "that they have the financial wherewithal to keep their programs running" without the grants, such that "any ensuing irreparable harm would be of their own making" if they declined to keep the programs running. 2025 WL 1008354 at *1. Accordingly, it was appropriate in *Department of Education* to proceed to the merits of the claims without the need for temporary injunctive relief.

The opposite is true here, particularly given the temporary and immediate relief sought by Plaintiffs. Without immediate injunctive relief, Plaintiffs will suffer harms that cannot be remediated or redressed, even if Defendants later resume funding the Legal Orientation Program ("LOP"), Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), Family Group Legal Orientation Program ("FGLOP"), Immigration Court Helpdesk ("ICH"), and Counsel for Children Initiative ("CCI") (collectively, the "Programs") at some unknown date. Once the termination takes effect, Plaintiffs' access to detention facilities will likely be instantly cut off, as occurred during the January 2025 Stop Work Order ("SWO"), violating Plaintiffs' constitutionally protected First Amendment speech rights within those facilities (an urgent consideration the court did not have to grapple with in *Department of Education*) and obstructing Plaintiffs' missions. Noncitizens in detention will immediately lose what is, for many, their only access to resources on their legal rights in the immigration court system. As Plaintiffs have described at length in dozens of declarations and reams of briefing, Plaintiffs are nonprofits with slim operating margins who depend on Congress's mandate to operate the Programs, and who will

3

be unable to keep providing the Programs to noncitizens without the congressionally mandated funding Defendants seek to unlawfully withhold. This is a far cry from states with billion-dollar budgets and flexibility to shift significant funding from unaffected programs while their lawsuit was pending. *See, e.g.*, Rojas Second Supp. Decl. ¶ 8; Dkts. 2-2 – 2-11, 53-2 – 53-17.

Given these factual distinctions, *Department of Education*'s remaining "irreparable harm" reasoning is clearly inapplicable here. Because the states could self-fund the programming at issue there, the Supreme Court found that "any ensuing irreparable harm" without an injunction would be of the states' "own making" from choosing not to self-fund. 2025 WL 1008354, at *1. Here, in contrast, Plaintiffs cannot self-fund: without the congressionally mandated funding around which they developed their organizations and missions, they will be forced to stop providing services, lay off staff, and potentially to shut down their organizations entirely. *See, e.g.*, Rojas Second Supp. Decl. ¶ 8. Unlike in *Department of Education*, Plaintiffs' claims are existential; absent relief from this Court, Plaintiffs will be left with increasingly limited resources, soon forcing them to abandon critical aspects of their missions or even cease to exist entirely.

**C.**     ***Department of Education* does not change the existing landscape of controlling precedent applying the Tucker Act, which affirms that this Court has jurisdiction over Plaintiffs' claims.**

The Supreme Court's order in *Department of Education* follows existing caselaw, which affirms that the Tucker Act does not apply when plaintiffs seek "declaratory and injunctive relief" under their statutory and constitutional rights instead of "money in compensation for . . . losses." *Bowen v. Massachusetts*, 487 U.S. 879, 893, 895; *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1111 (D.C. Cir. 2022) (declaratory and injunctive relief are not "specific to actions that sound in contract"). Although the Supreme Court discussed jurisdictional issues under the Tucker Act, *Department of Education* does not purport to overrule existing Tucker Act caselaw, and does not alter longstanding Tucker Act precedent. *See New York v. Trump*, 2025 WL

4

1098966 (D.R.I. Apr. 14, 2025) (*Bowen* remains the "guiding compass" for Tucker Act claims after *Department of Education*); *Maine*, 2025 WL 1088946, at *19 n.8.

The Supreme Court's order follows existing caselaw, which affirms that when plaintiffs seek "declaratory and injunctive relief" under their statutory and constitutional rights instead of "money in compensation for . . . losses," the Tucker Act does not apply. *Bowen*, 487 U.S. at 893, 895; *see also Crowley*, 38 F.4th at 1111 (declaratory and injunctive relief are not "specific to actions that sound in contract"). Accordingly, *Department of Education* does not change this Court's jurisdictional analysis; only if Plaintiffs' claims *both* (1) are founded upon contract-based rights, *and* (2) seek a contract-based remedy would the Court lose jurisdiction over the claims. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Neither of those conditions are met here.[1]

As to (1), the rights underlying Plaintiffs claims, whether those claims must be brought in the Court of Federal Claims "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992). The D.C. Circuit examines three factors, all of which support Plaintiffs here: (1) their asserted rights arise from statute or the Constitution; (2) their rights exist prior to and apart from rights created under the contract; and (3) they do not seek to enforce any duty imposed upon the government by contract (indeed, they do not even *have* a contract with the government). *Crowley,* 38 F.4th at 1107. Moreover, Plaintiffs' requested relief

---

[1] As Plaintiffs explained in their reply brief, *United States Conference of Catholic Bishops v. Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025), does not support a different result here. Dkt. 43 at 9–10. Unlike the plaintiff there, Plaintiffs do not contract directly with the government. That case is presently on appeal.

5

is not contract-based and does not require paying any past-due obligations, so Plaintiffs' claims do not even fall within the scope of the Tucker Act. *See, e.g.*, *Crowley*, 38 F.4th at 1107 (rejecting the "broad notion that any case requiring some reference to or incorporation of a contract" cannot be heard in district courts (cleaned up)).

And as to (2), the Tucker Act "yields when the obligation creating statute provides its own detailed remedies, or when the [APA] provides an avenue for relief." *Me. Cmty. Health Options v. U.S.*, 590 U.S. 296, 323–24 (2020). Where a plaintiff "does not claim a breach of contract," "seeks no monetary damages against the United States," and does not seek specific performance, there is no contract claim, and even the fact "that a court may have to rule on a contract issue" does not "automatically transform the action" or deprive the court of jurisdiction it otherwise has. *Megapulse*, 672 F.2d at 968–70. *Department of Education* approvingly cites *Bowen* as good law, acknowledging that, just because a claim may result in relief entailing disbursement of funds, that does not bar district court jurisdiction. 2025 WL 1008354 at * 1. In fact, even if Plaintiffs sought specific performance or other relief under the contract between Acacia Center for Justice and the government (and here, Plaintiffs do not), that would not rob the Court of jurisdiction: "a federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract." *Transohio*, 967 F.2d at 610.

The controlling precedent Plaintiffs have consistently relied on in their briefing before this Court remains good law, and nothing about the Tucker Act analysis before the Court is changed from when the parties briefed this question a month ago. *See* Dkt. 43 at 8-11 (Plaintiffs' Reply in Support of their Motion for a Preliminary Injunction, citing *Bowen* and Tucker Act cases that are undisturbed by the Supreme Court's order); *see also Me. v. Dep't of State v. Aids Vaccine*

6

*Advocacy Coal.*, 145 S. Ct. 753 (2025) (declining to stay a case involving the cancellation of appropriated funds).

II.     **Plaintiffs Can Neither Bring Claims Nor Seek Relief in the Court of Federal Claims.**

Controlling precedent, discussed above, limits the reach of the Tucker Act at least in part because the powers of the Court of Federal Claims are limited.  If plaintiffs could not seek relief in the district courts, the Tucker Act would leave many plaintiffs with no ability to seek redress for harms suffered by government actions.  Such a reading of the Tucker Act would unreasonably insulate numerous agency actions that are properly subject to review under the APA.  *Cf. New York*, 2025 WL 1098966 ("This matter is a claim about process, not damages.").

Plaintiffs, as subcontractors to a government contract that effectuates congressional and statutory requirements, may not bring a claim for direct relief in the Court of Federal Claims because they do not contract directly with the government.  Subcontractors ordinarily cannot recover under a primary contract in the Court of Federal Claims.  *See United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550–51 (Fed. Cir. 1983); *Erickson Air Crane Co. of Wash., Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984) ("It is a hornbook rule that, under ordinary government prime contracts, subcontractors do not have standing to sue the government under the Tucker Act.").  Instead, Plaintiffs' only opportunity for recovery through the Court of Federal Claims is if Acacia consents to sponsor Plaintiffs' claims and allows Plaintiffs to bring their claims in Acacia's name.  *See Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1369 n.1 (Fed. Cir. 2009); *E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369, 1370 (Fed. Cir. 1999).  Here, nonprofit Plaintiff Program providers do not seek to recover on subcontractor rights or in Acacia's name—instead, they seek to assert their own rights under the Constitution and the APA.  They would be unable to do so in the Court of Federal Claims.

Even if Plaintiffs could bring suit in the Court of Federal Claims, they could not seek injunctive and declaratory relief there—either on an emergency basis or after judgment on the merits. The Court of Federal Claims can only award damages in cases involving review of agency actions. *See Bowen*, 487 U.S. at 905 n.40. It "does not have the general equitable powers of a district court to grant prospective relief," a limitation the Supreme Court cited in *Bowen* to find that claims for injunctive and declaratory relief fell outside of the Tucker Act and in the jurisdiction of District Courts. *Bowen*, 487 U.S. at 905. And the fact that the prospective relief Plaintiffs seek may result in "an order forcing the government to obey the terms of a contract" *does not* strip this Court of jurisdiction or require certain claims to be heard in the Court of Federal Claims. *Transohio*, 967 F.2d at 610. Controlling precedent rejects the argument that a claim "for damages . . . in the Claims Court" is an "'adequate substitute for prospective relief.'" *Id.* at 608. Thus, even if the Court of Federal Claims had jurisdiction, that court could not order Defendants to continue the Programs and could only award back damages, a remedy that falls significantly short of the relief sought by Plaintiffs.

Further, even setting aside these jurisdictional hurdles, the Court of Federal Claims likely still could not exercise jurisdiction over Plaintiffs' claims. The Court of Federal Claims only has jurisdiction over claims founded on statutes if the "legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. U.S.*, 372 F.2d 1002, 1009 (Ct. Cl. 1967), *overruled on other grounds by Malone v. U.S.*, 849 F.2d 1441, 1444–45 (Fed. Cir. 1988). In general, statutes that *do* give the Court of Federal Claims jurisdiction are ones that "attempt to compensate a particular class of persons for past injuries or labors." *Bowen*, 487 U.S. at 905 n.42. On the other hand, district courts—*not* the Court of Federal Claims—have jurisdiction "when the obligation-creating statute

8

provides its own detailed remedies, or when the [APA] provides an avenue for relief." *Me. Cmty. Health Options*, 590 U.S. at 323–24. Because Plaintiffs' claims arise under the APA, which provides its own "avenue for relief," and under the First Amendment, which permits redress in Article III courts like this one, the Court of Federal Claims does not have jurisdiction. *See, e.g.*, *Nat'l Treas. Employees Union v. King*, 961 F.2d 240, 243 (D.C. Cir. 1992) (in the context of administrative law, "federal district courts clearly retain subject matter jurisdiction both when . . . the constitutional injury [is] unremedied, and when an [alternative] proceeding cannot adequately redress the alleged constitutional violation.").

### III. Plaintiffs Will Suffer Immediate and Severe Irreparable Harm Without a TRO.

If the Court does not grant Plaintiffs' requested temporary injunctive relief, Plaintiffs will suffer immediate and severe irreparable harm, both because their First Amendment rights will be curtailed and because their core business activities will be irreparably interrupted, impairing critical aspects of their missions. As demonstrated across dozens of declarations from attorneys and organizations, the harms Plaintiffs face if Defendants' termination takes effect at the stroke of midnight tomorrow night *are not speculative*—they already occurred following the SWO, and will occur again if this Court does not enjoin the impending termination. *See Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) ("Although a plaintiff seeking prospective declaratory and injunctive relief 'may not rest on past injury' alone, '"[p]ast wrongs" may serve as 'evidence bearing on whether there is a real and immediate threat of repeated injury.'" (citations omitted)).

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (*citing Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). Defendants have made clear in this litigation that when funding is cut, they will cut off access to immigration courts and detention facilities, suppressing Plaintiffs' speech. *See* Dkt. 35 at 29 "([I]t is certainly reasonable for [Defendants] to

9

limit access to only those organizations that are currently receiving Program funding."). As described in Kelly Rojas's initial declaration, Dkt. 2-5 and the one filed concurrently herewith, a national directive from ICE instructed facilities to restrict access to Plaintiffs and other providers upon Program termination following the January 2025 stop work order. *See* Rojas Second Supp. Decl. ¶ 5. Accordingly, Plaintiffs' First Amendment rights will be immediately and irreparably harmed as they are prevented from speaking to individuals in removal proceedings if Defendants are permitted to terminate funding.

This Court need not speculate about whether this irreparable harm will occur. Plaintiffs already suffered irreparable harm in the days between the issuance of the SWO and its subsequent recission. Specifically, on January 23, 2025—the day after the SWO—LOP Staff from Amica Center were offering intake services and "know your rights" presentations at the Caroline detention facility "when facility staff abruptly ordered them to leave the facility," citing the SWO. Amica Decl. (Dkt. 2-5) ¶ 12. Amica Center was also warned that they may need to remove materials containing information for detainees to contact Amica Center and access LOP services, and several Plaintiffs' informational materials were taken down. *Id.* ¶¶ 17, 21; *see also* Gutierrez Decl. (Dkt. 2-11) ¶ 11; Yang Decl. (Dkt. 2-3) ¶ 11. The same day, Amica Center staff were denied access to the Farmville detention facility, and Amica Center's "LOP posters, legal information packets, and hotline information" were removed. Amica Decl. (Dkt. 2-5) ¶ 13. Each of these limitations restricted Plaintiffs' ability to communicate with individuals in removal proceedings, accruing First Amendment harm for every moment the SWO was in place.

Similarly, upon issuance of the SWO, detention facility guards and housing unit counselors told clients of the Florence Project that "Florence Project attorneys were no longer allowed to enter the facilities, no longer allowed to do legal visits, and in at least one case was told that Florence

10

Project did not exist at all anymore." St. John Decl. (Dkt. 2-6) ¶ 28. Moreover, the Florence Projects' efforts even under non-federally funded programs were significantly curtailed, as ICE officials understood the SWO to extend far past the limits of the SWO itself. *See id.* at ¶ 23. For example, the Florence Project inquired about the possibility of conducting legal presentations at the Eloy Detention Center under the Performance-Based National Detention Standards ("PBNDS")—a non-LOP program—on the same day as the SWO, and were denied. *Id.* at ¶ 24. Despite ongoing attempts to provide these presentations for another week, ICE eventually informed the Florence Project that their request was "not approved" without explanation. St. John Supp. Decl. (Dkt. 53-16) ¶ 10. Though directly contrary to the PBNDS, the Florence Project has had to advocate with ICE for the ability to give these presentations that they have "historically done for decades." *Id.*

The Florence Project's experience is not unique; the impact of the termination and uncertainty created within the system is severe and reaches far beyond the scope of specifically terminated services, curtailing Plaintiffs' ability to access immigration courts and detention facilities and exercise their First Amendment right to communicate with individuals in removal proceedings. *See also* Sherman Decl. (Dkt. 2-9) at ¶¶ 10, 13; (Yang Decl. (Dkt. 2-3) at ¶ 10). Other Plaintiffs were prohibited from meeting clients altogether during the SWO. Gutierrez Decl. (Dkt. 2-11) at ¶ 10. And some Plaintiffs did not immediately regain access after the SWO was rescinded. RMIAN Supp. (Dkt. 53-9) ¶ 4.

This irreparable harm will immediately follow the termination of funding at 12:01 a.m. April 16, 2025. Amica Center rightly anticipates that "the termination of funding will be accompanied by the same termination of access to all detention facilities and immigration courts as [it] experienced under the [SWO]." Rojas Second Supp. Decl. ¶ 5. Plaintiffs regularly visit

11

detention centers and immigration courts, and the imminent loss of access (similar to the loss of access following the SWO) will severely impact Plaintiffs' ability to offer legal services. *See e.g.*, Rojas Decl. (Dkt. 2-5) ¶ 6 (noting that Amica Center visits the Farmville and Caroline detention centers two to four days a month); Lopez Decl. (Dkt. 2-8) ¶ 5 (noting visits to two Processing Centers three and five days a week, and immigration court every weekday); Koop Decl. (Dkt. 2-7) ¶ (noting visits to immigration court three days a week); Gutierrez Decl. (Dkt. 2-11) ¶ 5 (noting visits to detention facility four to five days a week); Brunsink Decl. (Dkt. 2-10) ¶ 5 (noting visits to processing center twice a month, with communications through remote visits, phone calls, and messaging with detainees daily); Sherman Decl. (Dkt. 2-4) ¶ 5 (noting visits to detention facility at least four days a week). Plaintiffs anticipate these issues will start as soon as the next morning after the Termination Notice goes into effect. *See* Rojas Second Supp. ¶¶ 5–6. Accordingly, only a TRO can protect Plaintiffs from this imminent and irreparable harm.

Further, as detailed in Plaintiffs' prior briefing, the termination of funding will have immediate and irreparable harms to Plaintiffs' ability to carry out their missions. Plaintiffs will need to immediately start considering how to reallocate their resources, including whether and when to lay off staff. *Id.* ¶¶ 7–8; *see also* Dkt. 2-1 at 40 – 41; Dkt. 43 at 15–18; Dkt. 53-1 at 39–41. As other courts have recognized, Defendants' arbitrary and capricious decisions to cut funding without warning causes organizational uncertainty that has already harmed Plaintiffs and will continue to paralyze their ability to function to pursue their missions. *See, e.g., New York v. Trump*, 2025 WL 715621, at *15 (D.R.I. Mar. 6, 2025) (issuing injunction because, "the "chaos and uncertainty that the Defendants' arbitrary decision to [stop disbursing appropriated funds]" prevented plaintiffs "recruit[ing] and hir[ing]" and carrying out their "mission").

## CONCLUSION

Because *Department of Education* does not change the Tucker Act analysis in any meaningful way and because Plaintiffs will be immediately and irreparably harmed by the Termination Notice, this Court should grant Plaintiffs' request for a temporary restraining order and proceed on merits briefing for a preliminary injunction.

Respectfully submitted,

April 15, 2025

s/ Adina Appelbaum

AMICA CENTER FOR IMMIGRANT RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)
Samantha Hsieh (V.A. Bar No. 90800)*
Amelia Dagen (D.C. Bar No. 9004838)
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
amelia@amicacenter.org

s/ Laura Sturges

GIBSON DUNN & CRUTCHER

Laura Sturges (C.O. Bar No. 36843)*
1900 Lawrence Street, Suite 3000
Denver, CO 80202-2211
(303) 298-5700
lsturges@gibsondunn.com

Amer S. Ahmed (D.C. Bar No. 500630)
Richard W. Mark (D.D.C. Bar No. NY0378)
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
rmark@gibsondunn.com
aahmed@gibsondunn.com

* admitted *pro hac vice*