**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| AMICA CENTER FOR IMMIGRANT ) | |
| RIGHTS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 1:25-cv-298-RDM |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ———————————————— ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

BACKGROUND ......................................................................................................................2

   I.      The Programs and the Acacia Contract...........................................................2

   II.     The April 10, 2025 Termination Decision.........................................................5

   III.    Procedural History..............................................................................................6

LEGAL STANDARD ...............................................................................................................7

ARGUMENT.............................................................................................................................8

   I.      Plaintiffs Are Not Likely to Succeed on the Merits ........................................8

      A.      The Court Lacks Jurisdiction to Compel the Government to Pay Money Under a
Contract ................................................................................................................8

      B.      Plaintiffs Have Other Adequate Remedies Available to Them .................................13

      C.      Program Funding Decisions Are Committed to Agency Discretion By Law ............16

      D.      Plaintiffs' Constitutional Theories Do Not Warrant Emergency Relief ...................18

          1.     Plaintiffs fail to state a viable Appropriations Clause claim ....................................18

          2.     Plaintiffs' First Amendment claim lacks merit .......................................................20

      E.        Plaintiffs' Last-Minute TVPRA Claim Fails…………………………………….21

   II.     The Remaining Preliminary Relief Factors Weigh Against Plaintiffs .........................23

      A.      Plaintiffs Fail to Show They Will Suffer Imminent Irreparable Harm......................23

      B.      The Public Interest Does Not Clearly Weigh in Plaintiffs' Favor ............................25

   III.    Any Relief Should Be Limited In Scope ................................................................26

   IV.    The Court Should Require Plaintiffs to Submit a Bond as Security ..........................27

CONCLUSION.........................................................................................................................27

**INTRODUCTION**

The Executive Office for Immigration Review ("EOIR") funds and administers a number of legal access programs that provide legal information and resources to individuals placed in immigration proceedings. Four such programs ("the Programs") are at issue in this case. Congressional appropriations fund these Programs, but those appropriations otherwise grant broad discretion to EOIR to determine how and to whom Program funds are obligated and spent. All Program requirements—including the terms under which the Programs can be extended, paused, or terminated altogether—are currently set forth in a contract between the United States Department of Justice ("DOJ") and the prime contractor that manages the Programs' day-to-day operations, as well as the annual task orders through which Program services are ordered and delivered.

On January 31, 2025, the plaintiffs in this case—nine nonprofit organizations that deliver Program services as subcontractors to that prime contractor—filed this lawsuit and sought preliminary relief from a January 22, 2025 stop work order issued by EOIR that temporarily paused funding for the Programs. That order was later rescinded, which restored Program funding in turn. This Court accordingly took Plaintiffs' motion for preliminary relief under advisement. On April 10, 2025, DOJ's Justice Management Division ("JMD") issued a notice of termination indicating that the operative task orders for the four Programs at issue in this case will be terminated for the convenience of the government on April 16, 2025. Plaintiffs subsequently notified the Court of their intent to renew their motion for preliminary relief, and they filed that renewed motion on the afternoon of April 14, 2025. *See* Dkt. 53; Dkt. 53-1 ("Renewed Motion").

In their Renewed Motion, Plaintiffs seek emergency relief from the April 10, 2025 termination decision ("Termination Decision"), which Defendants made pursuant to the express terms of the contract governing the Programs. Yet while the specific agency action that Plaintiffs now challenge has changed, the arguments they advance in support of their request for preliminary relief have not. And those arguments once again fail to demonstrate that Plaintiffs are entitled to such relief. *See* Dkt. 35 at 12-42 ("PI Opposition"). Indeed, a recent Supreme Court decision in

a near-identical case confirms as much. *See Dep't of Educ. v. California*, 604 U.S. --, 2025 WL 1008354 (Apr. 4, 2025) (per curiam). That decision makes clear that Plaintiffs are not likely to succeed on the merits of their claims because this Court lacks jurisdiction under the Administrative Procedure Act ("APA") "to order" the federal government to "pay[] . . . money" under a contract, *id.* at *1—a critical (and likely dispositive) legal proposition that Plaintiffs' Renewed Motion completely ignores.

Instead, suits like this one involving what amount, in essence, to contract claims against the federal government for monetary relief belong in the Court of Federal Claims. *Id.* APA review is unavailable in any event because Plaintiffs have "other adequate remed[ies]" available to them, 5 U.S.C. § 704, and Defendants' discretionary decisions regarding the allotment of appropriated funds constitutes unreviewable agency action, *see id.* § 701(a)(2). Even if the Court were to entertain the merits of the APA claims that Plaintiffs cast in constitutional terms, Plaintiffs fail to state a viable Appropriations Clause or First Amendment claim. And the remaining preliminary injunction factors—including the fact that the federal government "is unlikely to recover" Program funds "once they are disbursed," *Dep't of Educ.*, 2025 WL 1008354, at *1—weigh heavily against granting Plaintiffs' Renewed Motion.

## BACKGROUND

### I.    The Programs and the Acacia Contract

EOIR is an agency within DOJ responsible for conducting immigration court proceedings and immigration-related appellate reviews and administrative hearings. *See* AR 12-13.[1] EOIR funds and administers several legal access programs that, among other things, provide individuals in removal proceedings with information about immigration court processes and procedures, inform people about their rights and options for relief, and facilitate access to legal representation. *See* AR 18-20, 67-68. Four such programs are at issue in this case—the Legal Orientation Program ("LOP"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program

---

[1] Citations to the Administrative Record previously filed in this case, *see* Dkt. 44, will be styled "AR [page number]."

("FGLOP"), and the Counsel for Children Initiative ("CCI").  *See* AR 18, 67, 87-94 (describing LOP); AR 19, 67, 116-22 (describing ICH); AR 67-68, 132-38 (describing FGLOP); AR 68, 149-53 (describing CCI).[2]

The scope and requirements for each of the Programs are not prescribed in any federal statutes or regulations.  Rather, for the past several years, the Programs have been funded annually through congressional appropriations, and their implementation and administration have been left to EOIR.  In March 2024, Congress appropriated $844,000,000 to EOIR for fiscal year ("FY") 2024 "[f]or expenses necessary for the administration of immigration-related activities." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 133.  That same appropriations statute further provided that "not less than $28,000,000" of that total appropriated amount "shall be available for services and activities provided by the Legal Orientation Program." *Id.*  The funds earmarked for the "Legal Orientation Program" only concern LOP and ICH (as well as LOPC, the program Plaintiffs address for the first time here).  *See* S. Rep. No. 118-62, at 84-85 (2023) (indicating that the "Legal Orientation Program," as used in the 2024 Consolidated Appropriations Act, encompasses LOP, ICH, and LOPC).  By contrast, neither FGLOP nor CCI is required by any specific appropriation; both are instead funded through EOIR's general lump-sum appropriations.  Since September 2024, EOIR and the Programs have been funded through continuing appropriations that maintain funding at FY 2024 levels.  *See* American Relief Act,

---

[2] In their Renewed Motion, Plaintiffs address for the first time in this case a separate EOIR legal access program—the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC")—that is nowhere discussed in their Complaint or PI Motion.  *See* Renewed Motion at 2-4, 9-10, 12-13.  And they assert for the first time a separate APA claim (or at least a wholly separate legal theory) concerning a statute—the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")—that is likewise mentioned nowhere in their Complaint or PI Motion.  *See id.* at 27 (claiming that the termination of LOP and LOPC violates the TVPRA); *see also id.* at 24 (claiming for the first time that terminating LOPC also violates the Appropriations Clause).  Under basic principles of fairness and subject-matter jurisdiction, however, a district court "lacks jurisdiction" over a motion for preliminary relief when it "raises issues different from those presented in the complaint."  *Sai v. Transp. Sec. Admin.*, 54 F. Supp. 3d 5, 9 (D.D.C. 2014) (quoting *Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002)).  Accordingly, Plaintiffs simply cannot seek relief—and especially emergency injunctive relief—based on claims that they raise for the first time here.

3

2025, Pub. L. No. 118-158, 138 Stat. 1722, 1723 (2024) (extending FY 2024 funding levels to March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9, 12 (2025) (extending FY 2024 funding levels to September 30, 2025).

EOIR has a contract with non-party Acacia Center for Justice, a Washington, D.C.-based nonprofit organization, to manage the Programs.  *See* AR 7.  Acacia in turn subcontracts with various legal services organizations throughout the country, including Plaintiffs, to deliver Program services on the ground at covered detention facilities and immigration courts.  All LOP, ICH, FGLOP, and CCI services are delivered pursuant to the prime contract between DOJ and Acacia ("the Acacia Contract" or "the Contract").[3]  AR 7-82.  The Acacia Contract's terms address an array of requirements and issues related to the provision of and payment for Program services. The Contract also incorporates by reference several clauses from the Federal Acquisition Regulation ("FAR"), which similarly address a wide range of matters concerning the policies, procedures, and standards applicable to federal government contracts.  *See* AR 22, 25, 50-53.  As relevant here, the Acacia Contract incorporates two FAR provisions that permit DOJ to "terminate the [C]ontract for the convenience of the Government."  AR 47; *see* AR 53.  More specifically, those provisions provide that "[t]he Government may terminate performance of work under th[e] [C]ontract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest."  48 C.F.R. § 52.249-2(a); *see id.* § 52.249-6(a)(1).

Under the Contract, Program services are "initiated" through the issuance of yearly program-specific "task orders" to Acacia.  *See* AR 18; *see also, e.g.*, AR 83-110 (combined LOP and LOPC task order for services to be provided between September 1, 2024, and August 31, 2025).  These tasks orders set the total amount of funding available for each Program for a specified period of performance.  *See, e.g.*, AR 112, 116 (allocating roughly $8.7 million to ICH for services to be delivered between September 1, 2024, and August 31, 2025).  The task orders also describe in more detail the services that Acacia is required to deliver under each Program, the facilities

---

[3] LOPC services are likewise delivered pursuant to the Acacia Contract.  *See* AR 18-19.

covered under each Program, and other program-specific requirements.  Before the end of FY 2024, EOIR issued task orders to Acacia that allocated more than $29 million in FY 2024 appropriated funds to the four Programs at issue in this case.  *See* AR 110, 126, 142, 145.  Those allocated FY 2024 funds are currently being used to cover Program services delivered through the end of July or August 2025 (depending on the specific task order).[4]

## II.    The April 10, 2025 Termination Decision

Shortly after taking office on January 20, 2025, President Donald Trump signed an executive order titled "Protecting the American People Against Invasion."  Exec. Order No. 14159; *see* AR 1-6.  That Executive Order, in relevant part, directed the Attorney General to "[p]ause distribution of further funds pursuant to" government contracts that "provid[e] Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens" pending a review of those contracts for, among other things, "waste, fraud, and abuse" and compliance with "applicable law."  Exec. Order No. 14159, § 19(a)-(b).  In response to that presidential directive, the JMD Contracting Officer for the Acacia Contract issued a stop work order on January 22, 2025 ("Stop Work Order"), which suspended the delivery of Program services.  *See* AR 161; *see also* 48 C.F.R. § 52.242-15(a) (authorizing the Contracting Officer to "require the Contractor to stop all, or any part, of the work called for by" the Acacia Contract "for a period of 90 days").  That Stop Work Order was later rescinded on February 2, 2025, in response to a temporary restraining order from a federal district court in a separate case. *See* AR 167; *see also* AR 169 (explaining that the Stop Work Order was rescinded "[o]ut of an abundance of caution" in light of that district court order).  Services under the Programs resumed on February 3, 2025, and have been ongoing since.

On April 3, 2025, a letter titled "Notice of Termination of Convenience" was sent to Acacia, which purported "to notify" the organization that "contracts" tied to certain "procurement instrument[s]"—including the operative task orders for the four Programs at issue here—were

---

[4] No funds appropriated for FY 2025 have been obligated to the Programs at this point, as the Programs are still being funded under task orders that obligated FY 2024 funds.

"hereby terminated for convenience effective" that same day.  Dkt. 53-3 at 2.  That April 3, 2025 letter was sent in error.  The following day, the Contacting Officer for the Acacia Contract sent a separate letter to Acacia instructing the latter to "[p]lease disregard" the April 3, 2025 letter "in its entirety, which has no legal effect."  Dkt. 53-4 at 2.  That rescission letter also stated that "[t]he contracts and tasks orders referenced in the [rescinded] April 3, 2025 communication remain in place, and w[ould] remain in place, until further notice."  *Id.*  No pause in Program funding occurred as a result of the April 3, 2025 letter.

On April 10, 2025, the same Contracting Officer sent a letter to Acacia stating that, "[i]n accordance with FAR 52.249-2 and FAR 52.249-6," the operative task orders for LOP, ICH, FGLOP, and CCI "are terminated for the convenience of the government, effective at 12:01 a.m. on April 16, 2025."  Dkt. 53-6 at 2.[5]  That notice of termination complied with the Court's March 17, 2025 Minute Order requiring Defendants to "provide Plaintiffs with at least three business days' notice before suspending or terminating any funding . . . for any of the [P]rograms at issue."

## III.    Procedural History

Plaintiffs filed this lawsuit on January 31, 2025, and sought preliminary relief from the January 22, 2025 Stop Work Order.  *See* Dkt. 1 ("Compl."); Dkt. 2; Dkt. 2-1 ("PI Motion").  In their Complaint, Plaintiffs challenge what they call "Defendants' termination of funding for the Programs" under the APA and allege that the January 22, 2025 Stop Work Order was arbitrary and capricious (Count 1); that "Defendants' termination of LOP and ICH" violates the Appropriations Clause (Count 2); and that "Defendants' decision to terminate the Programs" violates the First Amendment (Count 3).  Compl. at 43-48 (¶¶ 132-57).  The Court held a hearing on Plaintiffs' PI Motion on March 17, 2025, and subsequently took the Motion under advisement.  *See* March 17, 2025 Minute Order.  Plaintiffs' PI Motion remains pending.

---

[5] Funding for LOP and LOPC is provided through the same task order.  *See* AR 97-107. Terminating the operative LOP task order at issue in this case will thus have the effect of terminating funding for LOPC as well.

Shortly after Defendants gave Plaintiffs notice of the April 10, 2025 Termination Decision, Plaintiffs notified the Court of their "intent" for their PI Motion "to be re-urged and re-heard." Dkt. 51 at 1. Plaintiffs subsequently filed their Renewed Motion on the afternoon of April 14, 2025. Dkt. 53; Dkt. 53-1.[6]

## LEGAL STANDARD

A temporary restraining order ("TRO") "is an extraordinary remedy and should be granted sparingly." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 (D.D.C. 2020). A motion for a TRO "is analyzed using the same 'factors applicable to preliminary injunctive relief,' and 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Univ. of Cal. Student Ass'n v. Carter*, -- F. Supp. 3d --, 2025 WL 542586, at *4 (D.D.C. Feb. 17, 2025) (Moss, J.) (citation omitted). A party seeking a TRO thus "must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in its favor; and (4) the issuance of [a TRO] is in the public interest." *Id.* (quoting *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1324 (D.C. Cir. 2024)). "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (citation omitted). And the requirement that a movant establish a likelihood of success on the merits includes the burden of "demonstrat[ing] a likelihood of success in establishing" a court's "jurisdiction." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020).

---

[6] Shortly after Plaintiffs filed their Renewed Motion, the Court entered a Minute Order stating that, "[t]o the extent there are additional documents related to Defendants' new decision to terminate funding or that are otherwise part of the administrative record, Defendants shall file those documents on the docket as a supplement to the administrative record on or before April 15, 2025, at 10:00 a.m." In the limited time Defendants had to respond to this Order, however, they were not made aware of any "additional documents related to" the April 10, 2025 Termination Decision beyond the April 10, 2025 notice of termination that JMD sent to Acacia. *See* Dkt. 53-6.

**ARGUMENT**

**I.    Plaintiffs Are Not Likely to Succeed on the Merits**

At the preliminary relief stage, "a plaintiff's likelihood of success on the merits is a key issue and often the dispositive one." *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 548 F. Supp. 3d 39, 55 (D.D.C. 2021) (Moss, J.) (cleaned up). "[T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (citation omitted); *see Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021) ("A plaintiff who fails to show a substantial likelihood of jurisdiction is 'not entitled to any relief, let alone the extraordinary remedy of a preliminary injunction.'"). Here, Plaintiffs' APA claims fail on both jurisdictional and substantive grounds.

**A.    The Court Lacks Jurisdiction to Compel the Government to Pay Money Under a Contract**

Plaintiffs' Renewed Motion should be denied at the threshold because, as the Supreme Court recently confirmed, this Court lacks jurisdiction under the APA "to enforce contractual obligation[s] to pay money" against the federal government. *Dep't of Educ.*, 2025 WL 1008354, at *1 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). That jurisdictional principle applies with equal force to any such obligations created by the Acacia Contract or Program task orders at issue in this case. And Plaintiffs did not even attempt to contend otherwise in their Renewed Motion—indeed, they did not even cite *Department of Education*, let alone grapple with the obvious consequences that decision has here.

A party seeking preliminary relief "must first demonstrate a likelihood of success in establishing jurisdiction." *Make the Road N.Y.*, 962 F.3d at 623; *see also Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) ("Before delving into the merits, we pause to assure ourselves of our jurisdiction, as is our duty."). For a plaintiff "bring[ing] a claim against the United States," carrying that jurisdictional burden requires "identify[ing] an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see Perry*

*Capital*, 864 F.3d at 619 (noting that sovereign immunity is "jurisdictional in nature"). Plaintiffs here assert claims under the APA, *see* Compl. at 43-48 (¶¶ 132-57), which "provide[s] a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702). "But even for claims that are not for money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting 5 U.S.C. § 702). This "important carveout" to the APA's sovereign immunity waiver "prevents plaintiffs from exploiting" that waiver "to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). And here, Plaintiffs' attempt to use the APA to compel the federal government to continue to provide Program funding pursuant to the terms of the Acacia Contract, related subcontracts, and Program task orders is "impliedly forbid[den]," 5 U.S.C. § 702, by the Tucker Act.

The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has accordingly "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under . . . the APA." *Perry Capital*, 864 F.3d at 618-19 (citing *Albrecht*, 357 F.3d at 67-68); *see Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA." (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)); *Crowley*, 38 F.4th at 1106. Thus, regardless of how a claim is styled, a district court lacks jurisdiction over that claim if it "is in 'its essence' contractual." *Perry Capital*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see Albrecht*, 357 F.3d at 67 ("[T]he district court lacks jurisdiction if [the plaintiff's] claim is essentially a contract action.").

And that jurisdictional barrier matters.  It ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law," *Alphapointe v. Dep't of Veterans Affairs*, 745 F. Supp. 3d 1, 11 (D.D.C. 2020), and it respects Congress's deliberate choice to limit the remedies available for such claims, *see Megapulse*, 672 F.2d at 971 (recognizing that a plaintiff "cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract").  *See also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes.").

Determining whether a claim "is 'at its essence' contractual"—and therefore falls beyond the ambit of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968)).  As Defendants explained in their earlier PI Opposition, Plaintiffs' claims here amount to the very sort of contractual claims for monetary relief against the federal government over which this Court lacks jurisdiction.  PI Opposition at 30-39.  Instead, Plaintiffs' claims—which are premised on a contract with the government, challenge the government's exercise of an express contractual right, and seek to compel the government to continue paying money pursuant to that contract—belong, under the Tucker Act, in the Court of Federal Claims.

Plaintiffs' APA claims, for one, are effectively based on an alleged right to Program funding that is free from "abrupt termination[s]," Compl. at 43 (¶ 135), and the only legal "source . . . upon which" Plaintiffs could even plausibly "base[]" that asserted right, *see Crowley*, 38 F.4th at 1108, is the Acacia Contract, related subcontracts, and Program tasks orders.  Plaintiffs have no colorable claim to Program funding whatsoever absent those contracts.  And deciding whether EOIR lawfully terminated Program funding pursuant to the termination-for-convenience clauses in the Acacia Contract "turns *entirely* on the terms of" that Contract and principles of federal contracting law.  *Albrecht*, 357 F.3d at 69; *see also, e.g.*, *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 344-45 (2024) (describing the legal standard for assessing whether the government's termination

of a contract for convenience was improper). Plaintiffs' asserted right to continuous Program funding "in no sense . . . exist[s] independently of" the Acacia Contract and related subcontracts. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding that the plaintiff's claim against the federal government amounted to "a contract dispute" over which a district court lacked jurisdiction under the APA); *see Ingersoll-Rand Co.*, 780 F.2d at 78 (explaining that "it [was] possible to conceive of" a government contractor's challenge to a termination decision "as entirely contained within the terms of the contract").

The relief Plaintiffs seek, moreover, only bolsters the conclusion that their APA claims are essentially contractual in nature. *See Crowley*, 38 F.4th at 1110 ("We turn next to 'the type of relief sought.'"). In their Complaint, Plaintiffs ask the Court to "[e]njoin Defendants . . . from refusing to expend" federal funds "as necessary to continue the Programs . . . , including funding to any persons previously authorized by DOJ to receive funding for the Programs." Compl. at 49. Plaintiffs seek, in other words, "an order compelling the government to pay [them] money," *Spectrum*, 764 F.2d at 894, pursuant to the only legal instruments that would arguably entitle them to any Program funding at all—*i.e.*, the Acacia Contract and related subcontracts and task orders. Such relief is indistinguishable from "the classic contractual remedy of specific performance," *id.*, confirming in turn that Plaintiffs' claims "sound in contract," *Perry Capital*, 864 F.3d at 619. *See id.* (observing that "specific performance is an explicitly contractual remedy"); *see also Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or *specific performance* in contract cases . . . . (emphasis added)).

Any lingering doubts as to whether this Court has jurisdiction to hear Plaintiffs' contract-based claims have since been dispelled by the Supreme Court's recent decision in *Department of Education v. California*, 604 U.S. --, 2025 WL 1008354 (Apr. 4, 2025) (per curiam). In *Department of Education*, a district court had issued a TRO "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue," *id.* at *1, after that court

concluded, in relevant part, that the plaintiff grant recipients were likely to succeed on their claim that the government's termination decision was arbitrary and capricious under the APA. *See California v. U.S. Dep't of Educ.*, -- F. Supp. 3d --, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025). The Supreme Court stayed the district court's TRO, however, after determining, among other things, that "the Government [was] likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ.*, 2025 WL 1008354, at *1. More specifically, the Supreme Court explained that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court [had] ordered." *Id.* (quoting *Great-West Life*, 543 U.S. at 212). "Instead," according to the Supreme Court, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.*

*Department of Education* further underscores that this Court lacks jurisdiction over Plaintiffs' contract-based claims. Like the *Department of Education* plaintiffs, Plaintiffs here seek emergency preliminary injunctive relief from the termination of certain federal funding made pursuant to the terms of a government contract. Like the *Department of Education* plaintiffs, Plaintiffs challenge that contract-termination decision under the APA, including on the ground that the termination is arbitrary and capricious. Compl. at 43-45 (¶¶ 133-41). And like the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the APA" to compel Defendants "to pay money" pursuant to a contract, including the Acacia Contract and related subcontracts and task orders. *Dep't of Educ.*, 2025 WL 1008354, at *1. This Court should accordingly deny Plaintiffs' Renewed Motion for lack of jurisdiction, just as other courts have done recently in similar cases involving government grants or contracts, consistent with the Supreme Court's reasoning in *Department of Education*. *See U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, -- F. Supp. 3d --, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (denying a TRO motion after concluding that the court lacked the authority to "order the Government to pay money due on a contract"); *Solutions in Hometown Connections v. Noem*, No. 8:25-cv-885 (D. Md. Apr. 8, 2025), ECF No. 46 (denying the plaintiffs' TRO motion challenging the termination

of certain U.S. Citizenship and Immigration Services grants in light of the Supreme Court's *Department of Education* decision and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); *see also* Order, *Am. Ass'n of Colleges For Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *Department of Education* decision).

At bottom, when Plaintiffs' claims here are "[s]tripped" of their APA embellishments and "equitable flair," their "requested relief seeks one thing": they "want[] the Government to keep paying up" under the Acacia Contract and related subcontracts and task orders. *U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *5. But because this Court lacks jurisdiction "to enforce" Defendants' "contractual obligation[s] to pay money," *Dep't of Educ.*, 2025 WL 1008354, at *1, or to otherwise resolve claims against the federal government that are "essentially" contractual, *Albrecht*, 357 F.3d at 68, Plaintiffs' Renewed Motion should be denied.

## B.    Plaintiffs Have Other Adequate Remedies Available to Them

Even if the Court were to conclude that it has subject-matter jurisdiction over Plaintiffs' APA claims, those claims nonetheless fail because Plaintiffs have "other adequate remed[ies]" available to them to vindicate their asserted right to continuous Program funding under the Acacia Contract and related subcontracts. 5 U.S.C. § 704. APA review is limited to "final agency action for which there is no other adequate remedy in a court." *Id.*; *see Perry Capital*, 864 F.3d at 621 (recognizing that § 704's "finality requirement and adequate remedy bar . . . determine whether" there is a "cause of action under the APA, not whether there is federal subject matter jurisdiction"). The APA's "adequate remedy" bar "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

Here, Plaintiffs challenge Defendants' decision to terminate the operative Program task orders under the Acacia Contract's termination-for-convenience clauses. But Plaintiffs fail to clearly show why they lack an adequate remedy for such a contract-based claim in the Court of

13

Federal Claims, which routinely adjudicates similar challenges to the lawfulness of such contract termination decisions. *See TigerSwan, Inc.*, 110 Fed. Cl. at 347 ("[The plaintiff] has alleged sufficient facts to demonstrate a potential breach of contract for improper termination for convenience . . . ."); *Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134-35 (2016) ("[The plaintiff] has not shown or alleged that [the defendant] committed bad faith or abused its discretion in terminating the contract for convenience."); *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 370 (2013) ("The termination for convenience . . . was within the contracting officer's discretion and, therefore . . . was not a breach of contract."); *see also Ingersoll-Rand*, 780 F.2d at 78, 80 (concluding that claims based on the government's termination of a contract for convenience "should be resolved in the Claims Court").

Plaintiffs might attempt to evade the jurisdictional consequences of their contract-based claims by contending that they are seeking the sort of injunctive relief—*i.e.*, an injunction barring Defendants "from refusing to expend" Program funds, Compl. at 49—that the Court of Federal Claims ordinarily cannot grant. *See, e.g.*, *Sergent's Mech. Sys., Inc. v. United States*, 157 Fed. Cl. 41, 46 (2021); *see also Albrecht*, 357 F.3d at 68. Plaintiffs, however, cannot "bypass Tucker Act jurisdiction" simply by "converting" through artful pleading what are essentially claims for monetary relief into ones "requesting injunctive relief or declaratory actions." *Kidwell v. Dep't of Army, Bd. of Correction for Military Records*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see Crowley*, 38 F.4th at 1107. And in any event, the injunctive relief Plaintiffs demand—which is essentially equivalent to specific performance of the Acacia Contract and operative Program task orders—is not available in this Court either, and thus cannot serve as a basis for avoiding the APA's "adequate remedy" bar. *See Megapulse*, 672 F.2d at 971 (noting the "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims"); *Spectrum*, 764 F.2d at 893 n.2 (citing legislative history indicating that Congress intended for the Tucker Act to "foreclose specific performance of government contracts" (citation omitted)).

That Plaintiffs are *subcontractors* rather than prime contractors in direct privity with the federal government does not necessarily mean Plaintiffs are categorically barred from bringing

suit in the Court of Federal Claims.  While it is generally true that "[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States," *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003), prime contractors "are permitted to sponsor claims brought by subcontractors against the government . . . . through, and with the consent and cooperation of, the prime, and in the prime's name.'"  *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1369 (Fed. Cir. 2009) (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 814 (Fed. Cir. 1984)); *see* 48 C.F.R. § 44.203(c).  Alternatively, a "pass-through claim allows a prime contractor to assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1347 (Fed. Cir. 2008).  Plaintiffs have made no effort to show why these alternative—and potentially "adequate," 5 U.S.C. § 704—procedural mechanisms are wholly unavailable to them.

Plaintiffs likewise fail to show why their contract-based claims cannot be adequately resolved via a contract action against Acacia, the actual counterparty to each of Plaintiffs' Program subcontracts.  "The availability of a private right of action" against a third party "may supply an alternative remedy precluding judicial review." *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 25 (D.D.C. 2010).  Here, Plaintiffs' alleged right to Program funding is derived from, and is thus governed by, their respective subcontracts with Acacia.  If Plaintiffs fail to receive Program funding to which they believe they are entitled under those subcontracts, the natural remedy available to them would thus seem to be a suit against Acacia for breach of contract.  *See Erickson Air Crane Co.*, 731 F.2d at 813 (Fed. Cir. 1984) ("Aggrieved subcontractors have the option of enforcing their subcontract rights against the prime contractor in appropriate proceedings . . . .").  Because that adequate alternative remedy is potentially available to them, Plaintiffs cannot simply disregard their contractual rights and obligations altogether and try to seek relief against the federal government via the APA instead.

**C.      Program Funding Decisions Are Committed to Agency Discretion By Law**

Plaintiffs' challenge to Defendants' termination of the Program task orders fails for a separate reason: such a decision concerning how to allocate and expend federal funding is "committed to agency discretion by law" and is thus not subject to arbitrary-and-capricious review under the APA.  5 U.S.C. § 701(a)(2).  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court underscored that the APA, by its own terms, "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'"  508 U.S. at 191 (quoting 5 U.S.C. § 701(a)(2)).  The *Lincoln* Court then held that an agency's "allocation of funds from a lump-sum appropriation" is one such "administrative decision traditionally regarded as committed to agency discretion," given that "the very point of a lump-sum appropriation," the Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192.  The Court accordingly concluded that the Indian Health Service's decision to discontinue a program that was (1) funded through the agency's yearly lump-sum appropriations from Congress (2) but not otherwise mandated or prescribed by statute was "committed to the [agency's] discretion" and thus "unreviewable" under the APA.  *Id.* at 193-94.

That same principle from *Lincoln* applies to at least two of the Programs at issue in this case—FGLOP and CCI.  Like all of EOIR's legal access programs, neither FGLOP nor CCI is prescribed by federal statute or regulation.  And as Plaintiffs themselves concede, neither program is funded through targeted appropriations, but rather through the lump-sum appropriations that EOIR receives from Congress "[f]or expenses necessary for the administration of immigration-related activities," Consolidated Appropriations Act, 2024, 138 Stat. at 133.  *See* S. Rep. No. 118-62, at 84-85 (2023) (explaining that the $28 million minimum earmarked for "the Legal Orientation Program" in the 2024 Consolidated Appropriations Act applies to funding for LOP, ICH, and a third legal access program not at issue here); Compl. at 3 (¶ 1), 35 (¶ 105).  As *Lincoln* made clear, EOIR's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the

16

agency's "'resources are best spent' on one program or another," and "whether a particular program 'best fits the agency's overall policies.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). For programs like FGLOP and CCI, then, which are funded entirely out of such lump-sum appropriations, any decisions regarding how much funding to allocate to either program, or whether to fund either program at all, are committed entirely to EOIR's discretion. *See Lincoln*, 508 U.S. at 193-94; *see also Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."). Defendants' "decision to discontinue" funding for those two programs is "accordingly unreviewable under § 701(a)(2)" of the APA. *Lincoln*, 508 U.S. at 193.

The D.C. Circuit has extended *Lincoln*'s reasoning to agency decisions involving specific appropriations as well. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 750-52 (D.C. Cir. 2002). LOP and ICH are both funded through such targeted appropriations, and the corresponding appropriations statutes set a minimum amount of funding that must be collectively allocated to LOP, ICH, and LOPC. *See* Consolidated Appropriations Act, 2024, 138 Stat. at 133 (providing that "not less than $28 million shall be available for services and activities provided by the Legal Orientation Program"). But those statutes otherwise say nothing about the means by which those funds should be disbursed, the precise timeline for such disbursements, or who should receive Program funding or deliver Program services (*e.g.*, a prime contractor versus the agency itself). That statutory silence thus indicates that Congress committed such programmatic decisions to EOIR's discretion, meaning in turn that any such decisions regarding *how* EOIR chooses to allocate the funds specifically appropriated for LOP and ICH—including by creating, modifying, or terminating contracts that govern the use of those funds—are likewise unreviewable under the APA's arbitrary-and-capricious standard. *See Milk Train*, 310 F.3d at 751 (explaining that an agency's implementation of a subsidy program for milk producers was unreviewable under § 701(a)(2) because the applicable appropriations statute "provide[d] no relevant 'statutory

17

reference point' for the court" to assess the agency's "determination of the manner for providing assistance to dairy farmers").

###### D.    Plaintiffs' Constitutional Theories Do Not Warrant Emergency Relief

As explained above, the Court lacks jurisdiction over Plaintiffs' APA claims, and APA review is unavailable in any event because Plaintiffs have "other adequate remed[ies]" available to them, 5 U.S.C. § 704, and the contract-termination decisions at issue here are "committed to agency discretion by law," *id.* § 701(a)(2). But even if the Court were to disagree on these points and conclude that it can review the two constitutional theories Plaintiffs invoke in their Renewed Motion—namely, that Defendants' Termination Decision violates the Appropriations Clause and the First Amendment—neither theory warrants the extraordinary relief Plaintiffs seek.

###### 1.    Plaintiffs fail to state a viable Appropriations Clause claim

Plaintiffs invoke the Appropriations Clause as one of the bases for their claim that Defendants' Termination Decision was unlawful. *See* Renewed Motion at 25-28. But the Appropriations Clause simply provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "In other words," the Clause generally concerns whether a certain "payment of money from the Treasury" is "authorized by statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). And there is no dispute here that the federal funds that Plaintiffs receive from EOIR to provide Program services are appropriated by an act of Congress. *See* Consolidated Appropriations Act, 2024, 138 Stat. at 133; *see also* PI Opposition at 13-16.

The thrust of Plaintiffs' Appropriations Clause claim instead appears to be that Defendants' Termination Decision effectively amounts to an allegedly unlawful withholding of funds appropriated by Congress for the "Legal Orientation Program." *See* Renewed Motion at 24-25. Such a claim cannot apply, of course, to FGLOP or CCI, which are not funded through the appropriations earmarked for the "Legal Orientation Program. *See* Compl. at 3 (¶ 1). Nor does Defendants' termination of the operative task orders at issue here *ipso facto* constitute a "withholding" of those funds. Again, the appropriations statute Plaintiffs rely on provides that

18

EOIR must make available a specific minimum amount of funds for "the Legal Orientation Program," but the precise contours of that "Program"—including the means and timing of fund disbursement—are left to EOIR's discretion.

Moreover, even assuming for the sake of argument that the termination of the LOP and ICH task orders constitutes such a withholding, as Plaintiffs claim, Congress has provided a specific statutory mechanism through which such an alleged withholding can be challenged in court—the Impoundment Control Act of 1974 ("ICA"). The ICA prescribes the circumstances under which the President can propose to Congress that certain appropriated funds be permanently rescinded. *See* 2 U.S.C. § 683(a) (requiring the President to propose such a rescission via a "special message" to Congress); *id.* § 683(b) (requiring that funds "proposed to be rescinded . . . be made available for obligation" if Congress does not adopt the President's rescission proposal). And the ICA further provides that compliance with the statute's requirements shall be enforced exclusively by the Comptroller General via civil suit in the United States District Court for the District of Columbia. *Id.* § 687.

Plaintiffs make no mention of the ICA in their Complaint. *See Adair v. England*, 193 F. Supp. 2d 196, 200 (D.D.C. 2002) (explaining that a court "has no jurisdiction over" a motion for preliminary injunction that "raises issues different from those presented in the complaint"). *But see* Renewed Motion at 28 (citing the ICA). But even if they had, Plaintiffs could not challenge the lawfulness of Defendants' Termination Decision under that statute. The ICA was designed to enforce *Congress's* power over the purse in relation to the Executive. *See City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987) (explaining that the ICA "was passed at a time when Congress was united in its furor over presidential impoundments and intent on *reasserting its control* over the budgetary process" (emphasis added)); *Dabney v. Reagan*, 542 F. Supp. 756, 760 (S.D.N.Y. 1982) ("The [ICA] was enacted by Congress . . . in an effort to resolve disagreement between the Executive and Legislative branches over which has ultimate control of government program and fiscal spending policies."). Consequently, the ICA is not generally enforceable through a private cause of action. *See Gen. Land Off. v. Biden*, 722 F. Supp. 3d 710, 735 (S.D.

19

Tex. 2024) ("[The ICA] makes clear that it is the Comptroller General—and only the Comptroller General—that may prosecute an alleged ICA violation."); *see also Pub. Citizen v. Stockman*, 528 F. Supp. 824, 827-30 (D.D.C. 1981); *Rocky Ford Hous. Authority v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977); *Rogers v. United States*, 14 Cl. Ct. 39, 50 (1987). And Plaintiffs cannot circumvent that deliberate legislative choice via an APA suit. *See Gen. Land Off.*, 722 F. Supp. 3d at 734-35; *Pub. Citizen*, 528 F. Supp. at 830 n.1; *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."). *But see AIDS Vaccine Coal. v. U.S. Dep't of State*, -- F. Supp. 3d --, 2025 WL 752378, at *14-*18, *23 (D.D.C. Mar. 10, 2025) (concluding that the plaintiffs were likely to prevail on their constitutional claim concerning the withholding of foreign aid funds, but holding that the court could not grant an injunction that "would specifically order [the government] to continue to contract with [the plaintiffs]" and that the "appropriate remedy" was to instead "order Defendants 'to make available for obligation the full amount of funds Congress appropriated' under the relevant laws").

## 2. Plaintiffs' First Amendment claim lacks merit

Plaintiffs separately contend that Defendants' Termination Decision violates the First Amendment. *See* Renewed Motion at 35-38. As explained in Defendants' PI Opposition, however, the First Amendment arguments Plaintiffs asserted with respect to the January 22, 2025 Stop Work Order lacked merit. PI Opposition at 26-29. And those same arguments lack merit as applied to Defendants' Termination Decision as well. It is well settled, for one, that Defendants do not violate Plaintiffs' First Amendment rights merely "by declining to" further "subsidize" Plaintiffs' alleged "First Amendment activities" with federal funds. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983); *see Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (confirming that the government is "not required" by the First Amendment "to assist others in funding the expression of particular ideas, including political ones"). Furthermore, to the extent Plaintiffs allege a First Amendment violation based on their inability to access certain detention

facilities without restriction, or to engage in certain expressive activity in government buildings to whatever extent they wish, such a claim fails given that (1) it is entirely reasonable for Defendants to limit the expressive activity that can take place in such sensitive government facilities, and (2) Plaintiffs offer no evidence whatsoever that access to those same facilities is granted or denied based viewpoint.  *See Hodge v. Talkin*, 799 F.3d 1145, 1170 (D.C. Cir. 2015) (explaining that restrictions on expressive activity in nonpublic fora are permissible so long as they are reasonable and viewpoint-neutral).

### E.    Plaintiffs' Last-Minute TVPRA Claim Fails

Finally, Plaintiffs assert for the first time in this case (and in a single paragraph) that "Defendants' decision to terminate LOP and LOPC also violates the [TVPRA]."  Renewed Motion at 28.  That last-minute claim fails on both procedural and substantive grounds.

The provision of the TVPRA that Plaintiffs cite provides that the "Secretary of Health and Human Services shall cooperate with [EOIR] to ensure that custodians" of certain "unaccompanied alien children," *see* 8 U.S.C. § 1232(g), receive legal orientation presentations provided through the Legal Orientation Program administer by [EOIR]," *id.* § 1232(c)(4).  Critically, though, Plaintiffs do not mention the TVPRA at all in their Complaint, let alone plead a claim under it, meaning in turn that the Court cannot rely on that statute as a basis for granting emergency injunctive relief.  *See Adair*, 193 F.3d Supp. 2d at 200.  Additionally, § 1232(c)(4) ostensibly imposes statutory obligations on the Secretary of Health and Human Services ("HHS"), who is not named as a defendant in this case.  That "*Declarant* American Bar Association"—which is not a party to this case—administers LOPC programming nationwide, Renewed Motion at 10 (emphasis added), also raises obvious concerns about prudential standing.  *See Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994) (en banc) (explaining that this "jurisdictional concept "mandate[s] that a plaintiff's suit seek to vindicate his own legal rights or interests, not those of some absent third party").

Another fatal threshold issue with Plaintiffs' TVPRA claim is that Plaintiffs fall outside the "zone of interests" protected by § 1232(c)(4).  The zone-of-interests requirement is a general

presumption about Congress's intended limits on the scope of the APA's cause of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *Patchak*, 567 U.S. at 224. The zone-of-interests test requires courts to assess whether the plaintiff's interests fall within the zone of interests "that Congress sought to protect or regulate under the statute in question." *Fed'n For Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996); *see Patchak*, 567 U.S. at 224 ("The interest [the plaintiff] asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." (cleaned up). That test thus forecloses suit where a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Patchak*, 567 U.S. at 399.

Furthermore, because § 1232(c)(4) does not regulate Plaintiffs here, their claims "necessarily rest[] on the idea that [their] members' interests are among those Congress sought to protect." *Reno*, 93 F.3d at 900; *see Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922-23 (D.C. Cir. 1989) (explaining the difference between "regulated interests" and "protected interests" for purposes of the zone-of-interests inquiry). The D.C. Circuit has explained that "[p]rotected interests are ones asserted either by intended beneficiaries of the statute at issue or by other suitable challengers—*i.e.*, parties whose interests coincide systemically, not fortuitously with those of intended beneficiaries." *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (cleaned up).

Here, nothing in the text of § 1232(c)(4) suggests that Congress intended to permit enforcement of that statute by subcontractors who assert indirect financial injuries associated with a contract termination. The statute does not regulate government subcontractors, nor does it protect their financial interests. Instead, § 1232(c)(4) protects, at most, the interests of "unaccompanied alien children" and their potential custodians by directing the HHS Secretary to "cooperate" with EOIR to ensure custodians receive certain legal orientation materials. The "interests protected by" the statute are therefore completely unrelated to the contract-based financial interests Plaintiffs seek to vindicate here, *see Lexmark*, 572 U.S. at 131, and Plaintiffs otherwise provide no evidence

suggesting that Congress intended to give government subcontractors a judicial cause of action to protect such financial interests based on alleged non-cooperation between EOIR and HHS.

In any event, Plaintiffs' TVPRA claim fails on the merits. Plaintiffs have not made the clear showing required for an emergency injunction that HHS has, in fact, failed to "cooperate" with EOIR as required by § 1232(c)(4). And terminating the operative Program tasks orders at issue here certainly does not foreclose that such cooperation could be achieved in other ways consistent with the statute.

## II.    The Remaining Preliminary Relief Factors Weigh Against Plaintiffs

Plaintiffs' failure to show any likelihood of success on their APA claims should be sufficient on its own to deny their Renewed Motion. *See, e.g.*, *Babamuradova v. Blinken*, 633 F. Supp. 3d 1, 19 (D.D.C. 2022) (denying a TRO solely because the plaintiffs "ha[d] not established a likelihood of success on any of their claims"). Yet even if the Court were to consider the remaining preliminary relief factors, those factors likewise weigh against granting relief here, and they certainly do not overcome Plaintiffs' failure to establish a likelihood of success on the merits.

### A.    Plaintiffs Fail to Show They Will Suffer Imminent Irreparable Harm

As Defendants explained in their PI Opposition, Plaintiffs failed to demonstrate that a temporary pause in Program funding would cause them the type of "sufficiently great, certain, or imminent" harm necessary to "warrant injunctive relief," *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 513 (D.D.C. 2018). *See* PI Opposition at 48-52. That remains true with respect to Defendants' Termination Decision as well.

As a baseline matter, a loss of Program funding, standing alone, constitutes the very sort of economic harm that is not considered irreparable for purposes of obtaining preliminary relief. *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1135 (D.C. Cir. 2017) (per curiam) ("[I]t is 'well settled that economic loss does not, in and of itself, constitute irreparable harm . . . .'" (citation omitted)); *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327 F.2d 327, 335 (D.D.C. 2012) ("The first hurdle Plaintiffs face is that the harms they identify are economic in nature and therefore not generally irreparable."). Plaintiffs attempt to identify a variety of non-

economic harms that will allegedly flow from the termination of Program funding, including the elimination of certain services they deliver, staff layoffs, and interference with their respective organizational missions.   But Plaintiffs fail to clearly show that those harms are "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Indeed, if Plaintiffs "ultimately prevail" on the merits of their claims, "they can recover any wrongfully withheld funds through suit in an appropriate forum."   *Dep't of Educ.*, 2025 WL 1008354, at *1.   Plaintiffs could then use those recovered funds to reinstate employees or to provide any services that went undelivered in the interim.   *See Chaplaincy*, 454 F.3d at 297-98 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm. (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)).   The Supreme Court concluded in its recent *Department of Education* decision that such a possibility for redress defeated the plaintiffs' assertions of irreparable harm in that case, *see* 2025 WL 1008354, and this Court should reach the same conclusion here.

To the extent, moreover, that Plaintiffs attempt to argue that a First Amendment violation constitutes *per se* irreparable harm, the D.C. Circuit has made clear that "there is no *per se* rule that a violation of freedom of expression *automatically* constitutes irreparable harm." *Chaplaincy*, 454 F.3d at 301 (D.C. Cir. 2006); *see NTEU v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (noting that despite the plaintiffs' alleged violation of the First Amendment's speech clause, there was no irreparable harm).   Accordingly, any such argument made by Plaintiffs here would simply amount to bootstrapping the merits of their First Amendment claim to their irreparable harm allegations.   That is, with one (likelihood of success on the merits) comes the other (irreparable harm) based on a syllogism that is not supported by D.C. Circuit case law.   But as Defendants have explained at both the PI stage and here, Plaintiffs have not shown that they are likely to succeed on the merits of their First Amendment claim and thus cannot demonstrate irreparable harm on that basis.

It should also be noted that granting Plaintiffs' Renewed Motion under the unique circumstances of this case would be particularly inappropriate. Plaintiffs voluntarily entered into Program subcontracts that, through the Acacia Contract, permit the government to "terminate performance of work" related to the Programs "in whole, or, from time to time, in part" if it is determined that such a termination "is in the Government's interest." 48 C.F.R. § 52.249-2(a); *see id.* § 52.249-6(a)(1). Terminating a contract pursuant to such terms, which were expressly contemplated by the parties, is not irreparable harm. Yet Plaintiffs now seek to evade the consequences of that knowing choice by claiming that Defendants' exercise of their right to terminate for convenience will cause Plaintiffs irreparable harm worthy of preliminary injunctive relief. Granting Plaintiffs' Renewed Motion here would suggest that emergency preliminary relief is potentially available any time a party to a government contract is adversely affected by the government's exercise of an express contractual right. Plaintiffs cite no authority to support that remarkable proposition, and such efforts to undermine the benefits of contracting should not be rewarded.

### B.    The Public Interest Does Not Clearly Weigh in Plaintiffs' Favor

Lastly, the balance of equities and public interest do not weigh in Plaintiffs' favor for the same reasons described in Defendants' PI Opposition. *See* PI Opposition at 51-52. As explained above, Plaintiffs have failed to clearly show that they are likely to prevail on the merits of their claims or that they will suffer imminent irreparable harm. That Plaintiffs are attempting to skirt the consequences of a knowing and voluntary contractual arrangement only further tips the balance against them, given that it is surely not in the public interest to allow a government subcontractor to cry foul via an APA suit whenever contractual terms prove to be unfavorable.

As for Defendants, a TRO or preliminary injunction would directly undermine Defendants' contractual rights under the Acacia Contract, as well as the consistency and predictability that contract law is meant to foster. Such relief would also interfere with the Executive Branch's ability to lawfully direct and guide agencies' spending decisions and, more broadly, to protect the public fisc. Indeed, the Supreme Court underscored that a stay of the district court TRO at issue in the

recent *Department of Education* decision was warranted by the fact that the federal government was "unlikely to recover . . . grant funds once they are disbursed." 2025 WL 1008354, at *1. That concern is just as salient with respect to the Program funding that Defendants intend to terminate here. The federal government will likely be unable to recover any Program funds once they are disbursed, while Plaintiffs can seek to recover any wrongfully withheld funds in the appropriate forum.

## III.    Any Relief Should Be Limited In Scope

For the reasons explained above, Plaintiffs are not entitled to any preliminary relief. But in the event the Court concludes otherwise, it is well settled that injunctive relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). In light of these principles, any preliminary relief the Court grants should be limited in at least two respects.

First, the scope of any preliminary relief should be limited to the particular Programs that are implicated by the claims on which the Court determines Plaintiffs are likely to succeed. For instance, if the Court were to conclude that Plaintiffs are likely to succeed on their Appropriations Clause claim, any corresponding injunction should not encompass funding for FGLOP or CCI, which are not subject to the specific appropriations provision that, according to Plaintiffs, Defendants' Termination Decision purportedly violates. Second, any relief should be limited to Plaintiffs alone, and even then only to those Plaintiffs that have clearly shown that they face imminent irreparable harm in the absence of such relief. Plaintiffs, for instance, cannot seek relief on behalf of Program providers who are not parties to this suit. *See Kowalski v. Turner*, 543 U.S. 125, 129 (2004) (explaining that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). Additionally, enjoining Defendants from terminating the Program funding that is disbursed to Plaintiffs

specifically would remedy the precise "inadequacy that produced" the injuries that Plaintiffs attempt to "establish[]" in their Complaint.  *Gill v. Whitford*, 585 U.S. 48, 66 (2018).

The scope of injunctive relief that the Court can grant here is also limited by separation of powers principles.  As other D.C. district courts have recognized recently, the Court cannot "specifically order" the federal government "to continue to contract" with specific parties, as such relief would undermine the "Executive discretion" that "both the Constitution and Congress's laws have traditionally afforded" with respect to "how to spend" appropriated funds "within the constraints set by Congress." *AIDS Vaccine Coal.*, 2025 WL 752378, at *23.  "The relief" that that Plaintiffs seek here—namely, "reinstatement of contracts terminated by the Government"—is "beyond the power of this Court."  *U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *7.

## IV.    The Court Should Require Plaintiffs to Submit a Bond as Security

Finally, the Court should order security with any preliminary relief it grants.  Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 66(c).  This Rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond."  *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  Should the Court issue an injunction at this preliminary stage requiring Defendants to continue to pay Plaintiffs millions of dollars under the Acacia Contract and related subcontracts and task orders, Defendants request that Plaintiffs be ordered to post a bond that is roughly equivalent to the remaining balance on the operative Program task orders.  *See Dep't of Educ.*, 2025 WL 1008354, at *1 (noting when discussing the harm the government would face from the continued disbursement of terminated grant funds that "the District Court declined to impose bond")

## CONCLUSION

For the reasons set forth above, Plaintiffs' Renewed Motion should be denied.

DATED: April 15, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ANDREW I. WARDEN
Assistant Director
Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
Indiana Bar No. 37147-49
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Counsel for Defendant*