## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS,<br>1025 Connecticut Avenue NW, Suite 701<br>Washington, DC 20036;<br><br>AMERICAN BAR ASSOCIATION,<br>321 N. Clark St.<br>Chicago, IL 60654;<br><br>AMERICAN GATEWAYS,<br>314 East Highland Mall Boulevard, #501<br>Austin, TX 78752;<br><br>CHARLOTTE CENTER FOR LEGAL ADVOCACY,<br>5535 Albemarle Road<br>Charlotte, NC 28212;<br><br>ESTRELLA DEL PASO,<br>2400A E. Yandell Drive<br>El Paso, TX 79903;<br><br>FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT,<br>PO Box 86299<br>Tucson, AZ 85754;<br><br>IMMIGRATION CENTER FOR WOMEN AND CHILDREN,<br>634 South Spring St. Ste. 727<br>Los Angeles, CA 90014;<br><br>IMMIGRATION SERVICES AND LEGAL ADVOCACY,<br>3801 Canal Street, Suite 210<br>New Orleans, LA 70119;<br><br>NATIONAL IMMIGRANT JUSTICE CENTER,<br>111 W. Jackson Boulevard, Suite 800<br>Chicago, IL 60604; | Case No. 1:25-cv-00298<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

NORTHWEST IMMIGRANT RIGHTS
PROJECT,
615 Second Avenue, Suite 400
Seattle, WA 98104;

PENNSYLVANIA IMMIGRATION
RESOURCE CENTER,
PO Box 20339
112 Pleasant Acres Road, Suite I
York, PA 17402;

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK,
7301 Federal Boulevard, Suite 300
Westminster, CO 80030,

                    *Plaintiffs,*

*v.*

UNITED STATES DEPARTMENT OF
JUSTICE,
950 Pennsylvania Avenue, NW
Washington, DC 20530;

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW,
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

DEPARTMENT OF HOMELAND
SECURITY,
245 Murray Lane SW
Washington, DC 20528;

PAM BONDI, in her official capacity as
Attorney General of the United States,
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530;

SIRCE E. OWEN, in her official capacity as
Acting Director of the Executive Office for
Immigration Review,
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 1902

Falls Church, VA 22041;

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528,

*Defendants.*

## INTRODUCTION

1.      For more than two decades—and under four different Presidents—Congress has

funded the Department of Justice ("DOJ") Executive Office for Immigration Review ("EOIR") to

run programs that give unrepresented noncitizens facing deportation critical access to basic legal

information.  Most recently, Congress appropriated $28 million explicitly for a Legal Orientation

Program ("LOP"), Legal Orientation Program for Custodians of Unaccompanied Children

("LOPC"), and Immigration Court Helpdesk ("ICH") in the 2024 Consolidated Appropriations

Act.  Additionally, EOIR provides funding to support a Family Group Legal Orientation Program

("FGLOP") and the Counsel for Children Initiative ("CCI").  The contract EOIR signed to

outsource management of these programs acknowledges that it is *required* to provide the

programs.

2.      These five programs (the "Programs") promote immigration court efficiency,

reduce expense in immigration administrative adjudications, and (in the case of LOP, LOPC,

FGLOP, and ICH) provide safeguards for unrepresented noncitizens in an overburdened

immigration system by informing them about their responsibilities and rights when appearing in

immigration court, protect unaccompanied children from concerns including abuse and human

trafficking (LOPC), or provide direct representation to children in removal proceedings (CCI).

3.      Within the U.S. immigration system, where noncitizens do not have a right to appointed counsel and most noncitizens complete proceedings without counsel, the Programs are the only source of expert information about the immigration legal system many individuals ever receive.  The information the Programs provide is the most basic level of the due process to which noncitizens in removal proceedings are entitled.

4.      Due process and access to legal resources in removal proceedings is particularly urgent today, as detentions and deportations are increasing exponentially.  U.S. Immigrations and Customs Enforcement ("ICE") increasingly relies on expedited removal proceedings to move noncitizens through the immigration legal system.  Many newly detained noncitizens have little time to understand and act on their legal rights, and in expedited removal proceedings, they face deportation without seeing an immigration judge.  With increased detentions, rapid deportation processes, and new detention centers, legal access to these detention centers to ensure these activities are being carried out following applicable laws has never been more important.  The Programs at issue here are essential:  they provide basic due process to noncitizens and they ensure lawyers are regularly inside detention centers to observe or be told about potential legal violations.

5.      The legal and humanitarian case for the Programs is clear—and they are also cost-effective and efficient.  Studies and reviews of the Programs have repeatedly found that the Programs, among other things, promote judicial efficiency, save taxpayers money, and provide accurate, useful information to both detained and non-detained unrepresented noncitizens.  Defendants have repeatedly studied LOP and confirmed that it saves taxpayers millions and millions of dollars each year.  The Programs' efficiency benefits are especially important now, as immigration courts face a backlog of 3.6 million cases—the largest backlog in immigration court history.

6.      Defendants have now tried three times in the last three months to illegally end the Programs—not because the Programs are inefficient or ineffective, but because Defendants disagree with Plaintiffs' missions and viewpoints.  Despite Congress's commands, Defendants do not want to "provide Federal funding to non-governmental organizations that support or provide services . . . to removable or illegal aliens," as explained in Defendant Attorney General's February 5, 2025 Memorandum (the "AG Memo").

7.      **First**, On January 20, 2025, President Trump issued an Executive Order titled "Protecting the American People Against Invasion," which directs the Attorney General and Secretary of Homeland Security to "[i]mmediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws."  Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025).  The Executive Order further instructs the Attorney General and Secretary of Homeland Security to "[p]ause distribution of all further funds pursuant to such agreements pending the results of the review" and to "[t]erminate . . . agreements determined to be in violation of law or to be sources of waste, fraud, or abuse."  *Id.*

8.      Defendant EOIR issued a stop work order for the Programs (except LOPC) just two days later, on January 22, 2025 (the "Stop Work Order"), purportedly to "audit" the Programs under the "Protecting the American People Against Invasion" Executive Order.  The Stop Work Order stopped funding for the Programs and instructed Plaintiffs to stop all Program activities.  Defendants rescinded the Stop Work Order on February 2, 2025—two days after Plaintiffs filed their complaint in this case.

9.    On February 5, 2025, Defendant Attorney General Bondi issued a memorandum (the "AG Memo") directing Defendants DOJ and EOIR to pause funding to the Programs, among other activities, and review them for purported "waste, fraud, or abuse"—and to terminate existing contracts found to be wasteful, fraudulent, or abusive.  Defendants have cited this memorandum as a potential justification for terminating the Programs, and have confirmed that they are "compiling and reviewing certain information from recipients of Department of Justice funding in accordance with . . . the February 5, 2025 memorandum issued by the Attorney General."  The memo also expresses an overall policy goal for all future contracting, instructing Defendants to "not enter into any new contract . . . to provide Federal funding to non-governmental organizations that support or provide services, either directly or indirectly (e.g., through sub-contracting or other arrangements), to removable or illegal aliens."

10.    On March 17, 2025, this Court—following a hearing on Plaintiffs' initial request for injunctive relief—ordered Defendants to provide Plaintiffs three business days' notice before taking any action to terminate the Programs.

11.    **Second**, on April 3, 2025, Defendant DOJ issued a strangely formatted letter bearing the DOJ seal and the name of a DOJ contracting officer, saying DOJ "has determined the services are no longer needed" and purporting to cancel the Programs.  Bizarrely, the meta-data of the letter showed the document was titled "Application for VOA journalist credential."  Whatever the provenance of the letter, Defendants' counsel acknowledged this notice violated the Court's March 17 order and scrambled to rescind the cancellation, saying it "ha[d] no legal effect."

12.    **Third**, and now operatively, on April 10, 2025, Defendants gave notice that they were terminating funding for the Programs (this time including LOPC) as of 12:01 a.m. on April 16, 2025, "for the convenience of the government" (the "Termination Notice").  That termination

has now gone into effect, and Defendants have stopped funding the Programs with no apparent plans to continue the Programs despite Congress's mandate to fund and run them.

13.    The Termination Notice and earlier attempts to end the Programs ignore the Programs' clear track-record of saving immigration courts time and money and disregard the Congressional mandate to fund and enable LOP, LOPC, and ICH.  They are a hasty and pretextual attack on the immigration system and on noncitizens to deprive them of information they need to secure the due process guaranteed to them under the Constitution and the Immigration and Nationality Act.

14.    In April 2018, then-Attorney General Sessions similarly abruptly stopped funding LOP and ICH (FGLOP and CCI did not exist at the time), purportedly to "audit" the programs. *See* Maria Sacchetti, *Justice Dep't to halt legal-advice program for immigrants in detention*, WASH. POST (Apr. 10, 2018), https://wapo.st/2H4kczb.  James McHenry, Director of EOIR at the time, testified to Congress that he disregarded previous studies that found LOP saved money. *Strengthening and Reforming America's Immigration Court System Before the Subcomm. on Border Security and Immigration of the S. Comm. on the Judiciary*, 115th Cong. (2018) (video testimony of James McHenry), at 1:03–1:04, https://bit.ly/2JEJrWx.  McHenry claimed LOP had not been evaluated in six years (ignoring an outside review commissioned by the government and conducted only one year earlier), *id.* at 1:02, and told Congress the program was "redundan[t]" because immigration judges also ensure noncitizens in hearings understand certain legal basics, *id.* at 1:03–1:04. This testimony ignored the many statements by immigration judges, expressing their support for LOP because it saves them time in immigration proceedings.

15.    One week after the announced termination in 2018, members of the House and Senate Judiciary Committees communicated their "profound objection" to the Attorney General's

decision and voiced support for LOP and ICH. Bicameral Judiciary Letter to Attorney General Sessions (Apr. 17, 2018), https://web.archive.org/web/20221111041740 /https://www.leahy.senate.gov/imo/media/doc/4.17.18%20Bicameral%20Judiciary%20Letter%2 0to%20DOJ.pdf. These officials wrote that Defendant DOJ was "systematically deconstructing basic due process protections for immigrants" and noted that such measures raise "constitutional concerns." *Id.* The Judiciary Committee members also expressed disbelief at DOJ's supposed justifications for its actions, noting that, "[i]n 2016 alone, LOP attorneys and paralegals assisted more than 60,000 detained individuals." *Id.* at 2. The congressional officials added that, based on EOIR's own 2012 study, "LOP *saved* the government nearly $18 million over a three year period." *Id*. (emphasis in original).[1]  They emphasized that Defendants' actions violated "clear and unambiguous Congressional intent," as expressed in the most recent spending bill. *Id.*

16.    A coalition of LOP and ICH providers—including many of the Plaintiffs in this action—prepared to challenge the stop and to seek injunctive relief to keep LOP and ICH funding.

17.    After McHenry's testimony and Congress's repudiations, and after receiving notice of litigation from LOP and ICH providers that was to be filed the next day, then-Attorney General Sessions announced that LOP and ICH could continue during the supposed "audit."

18.    Since the failed 2018 attempt to end LOP and ICH, Congress's yearly appropriations of funds for the Programs have come with explicit endorsements of the Programs. For example, just a year later, the Senate Appropriations Committee explained in its recommendations for the 2020 LOP funding that "[t]he Committee supports LOP . . . . LOP benefits taxpayers by increasing the efficiency of immigration proceedings and reducing costs

---

[1] Though the Judiciary Committee members characterized the savings as being $18 million over three years, LOP actually saved nearly $18 million per year. *See infra* ¶ 69.

related to immigration detention." S. Rep. No. 116-127, at 86 (2019). The Senate Appropriations Committee recently delivered the same endorsement on July 25, 2024, in its recommendations for 2025 LOP appropriations. S. Rep. No. 118-198, at 92 (2024).

19. In these same reports, Congress has reminded EOIR it cannot try to stop LOP and ICH like it did in 2018. In the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, *including during any review of the program*." *Id.* (emphasis added). And in 2022, the House Appropriations Committee's report recommending LOP and ICH appropriations for 2023 warned, "The Committee reminds EOIR that funding for this program is mandated by law, and *any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee*." H. Rep. No. 117-395, at 65 (2022).

20. Despite Congress annually renewing and increasing appropriations for LOP, LOPC, and ICH—and explicitly warning DOJ and EOIR not to stop funding them during any "audit"—Defendants have sought to subvert Congress's clear mandate by terminating the Programs.

21. Plaintiffs, nonprofit organizations that receive funding from Defendants to administer LOP, LOPC, FGLOP, CCI, and/or ICH, seek to enjoin Defendants from illegally and arbitrarily ending these Programs in violation of the Appropriations Clause, the First Amendment, the TVPRA, and APA.

22. In addition to improperly terminating funding for these Programs, Defendants' decision is restricting, or eliminating, Plaintiffs' access to unrepresented noncitizens in detention facing civil confinement—just as, during the Stop Work Order period, Plaintiffs were denied entry and access to various detention facilities and immigration courts across the country. This access

is necessary to carry out Plaintiffs' respective missions to provide educational programs, information, counseling, referrals, and other services to unrepresented noncitizens, even absent the allocation of federal funds. Defendants' actions are hindering and/or preventing Plaintiffs from accomplishing their missions of informing noncitizens in detention of their legal rights.

23.    Because access to detention centers is limited and many detention facilities are prohibitively far from population centers, Program providers often are the only attorney many noncitizens in detention ever see. In most cases, Plaintiffs are the only organizations providing legal workshops and education to noncitizens in detention in the facilities they serve. And Program providers often are the only outsiders to witness noncitizens in detention or observe the conditions of their detention. By denying Program providers access, Defendants ensure that no legal service providers' eyes are watching what the government does inside.

24.    Defendants' actions have also violated Plaintiffs' First Amendment rights to freedom of speech in the limited public forums of immigration courthouses and detention centers where Plaintiffs have been allowed access, to hang posters, to provide legal educational materials to be kept in facility law libraries, and to advise noncitizens of their legal rights for the past 21 years.

25.    Defendants' actions further violate Plaintiffs' First Amendment rights by denying them funding to which they are entitled because Defendants seek to prevent them from speaking to noncitizens regarding their rights and responsibilities during the immigration process and to prevent them from achieving their missions. The AG Memo admitted Defendants are engaging in viewpoint-based discrimination, with the goal of not "provid[ing] Federal funding to non-governmental organizations that support or provide services . . . to removable or illegal aliens."

26.     Defendants' actions, including denying Plaintiffs access to detention facilities, also violate the National Detention Standards ("Detention Standards"), which specifically provide for legal access to noncitizens in detention.

27.     Plaintiffs respectfully ask this Court to grant declaratory and injunctive relief, enjoining Defendants nationwide from terminating the Programs by withholding the funding Congress appropriated to maintain LOP, LOPC, FGLOP, CCI, and ICH in their current form, commanding Defendants to allow Plaintiffs the access to immigration courts and detention facilities they have historically received, and commanding Defendants to cease removing posters and other educational material distributed by Plaintiffs and to replace (or allow Plaintiffs to replace) and posters or materials already removed.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as they arise under federal law, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the Appropriations Clause, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), and the First Amendment of the U.S. Constitution.

29.     The APA waives the U.S. government's sovereign immunity where, as here, federal agencies have acted in a manner that is arbitrary and capricious, an abuse of discretion, or otherwise in violation of the law.  5 U.S.C. § 706(2)(A).

30.     The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

31.     The Court has authority to grant injunctive relief under 5 U.S.C. §§ 702 and 706, and Rule 65 of the Federal Rules of Civil Procedure.

32.     Venue properly lies in the District of Columbia because a substantial part of the events giving rise to this action occurred in the District.  *See* 28 U.S.C. § 1391(e)(1)(B).  Defendants DOJ and Department of Homeland Security ("DHS") are headquartered in Washington, D.C., and Attorney General Bondi and Secretary Noem maintain principal offices in Washington, D.C.  On information and belief, Defendants' decisions regarding LOP, LOPC, FGLOP, CCI, and ICH programming have been made in the District of Columbia.

## PARTIES

**A.    Plaintiffs**

33.     Plaintiffs are nonprofit organizations that have received funding from Defendants to operate LOPs, LOPCs, FGLOPs, and ICHs to educate both detained and non-detained *pro se* noncitizens in removal proceedings about their rights and obligations in the immigration process, and to represent children in removal proceedings through CCI.

34.     Plaintiff American Gateways is a nonprofit organization in Austin, Texas.  American Gateways serves noncitizens in detention through LOP in the South Texas Processing Center, the Karnes County Immigration Processing Center, and the T. Don Hutto Detention Center, which had a total average daily population of 2,480 in the 2023 fiscal year.  It also runs ICH in San Antonio Immigration Court and provides representation to children through CCI.

35.     Plaintiff American Bar Association ("ABA") maintains a Fund for Justice and Education through which the ABA funds its public service and educational programs.  Through support from this fund, the ABA operates three LOPs:  the Immigration Justice Project ("IJP") in San Diego, California, the South Texas Pro Bono Asylum Representation Project ("ProBAR") in Harlingen, Texas, and the national Detention and Legal Orientation Program Information Line ("Information Line").  The IJP services the Otay Mesa Detention Facility, which had a daily population of 981 in fiscal year 2023, and provides CCI and ICH services for the San Diego

Immigration Court.  ProBAR serves the Port Isabel Detention Center and El Valle Detention Center, which had a combined average daily population of 1,457 in fiscal year 2023.  ProBAR also operates ICH at the Harlingen Immigration Court.  In 2019, the ABA also formally incorporated LOP into its national Detention Information Line, which serves all ICE detention facilities nationwide that do not have a local LOP.  ProBAR also provides in-person LOPC services to custodians of unaccompanied children who are released to custodians in the Rio Grande Valley and unaccompanied children whose cases are docketed before the Harlingen Immigration Court, as well as virtual and telephonic LOPC for custodians throughout the country.  ProBAR has provided LOPC services since 2010, including in many areas where they are the sole available LOPC provider, and provided nearly 500 LOPC orientations in just the first quarter of 2025.  The ABA, along with three other organizations, first administered a pilot program in 1998, preceding LOP, and was among the first organizations to receive LOP funding when EOIR initiated the national program in 2003.

36.     Plaintiff Amica Center for Immigrant Rights ("Amica Center"), formerly Capital Area Immigrants' Rights ("CAIR") Coalition, is a nonprofit organization and LOP provider in Washington, D.C.  It serves noncitizens in detention through LOP in the Caroline Detention Facility and ICA Farmville, both located in Virginia.  In fiscal year 2023, the average daily population in these facilities totaled 287.

37.     Plaintiff Charlotte Center for Legal Advocacy ("CCLA") is a nonprofit organization and LOPC provider in Charlotte, North Carolina. CCLA represents children who have suffered abuse, neglect, abandonment or other forms of harm.  In 2024, CCLA provided legal orientations, legal screenings, pro se workshops, and friend of the court services to 1,187 children from North Carolina, South Carolina, and Virginia through the LOPC program.

38.    Plaintiff Estrella del Paso ("Estrella") is a nonprofit organization and LOP and ICH provider in Texas.  It serves the El Paso Processing Center and the Otero County Processing Center in Chaparral, New Mexico.  Estrella also has dedicated programs to assist religious workers and survivors of crime and human trafficking.  In December 2024, the combined detention population on average in those facilities was 1,533.  Estrella provides ICH for the El Paso Immigration Court.

39.    Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") is a nonprofit organization that administers LOP in the Central Arizona Florence Correctional Complex (formerly two separate facilities:  the Central Arizona Detention Center and the Florence Correctional Center), the Florence Detention Center (Florence, Arizona), and the Eloy Contract Detention Facility (Eloy, Arizona).  In fiscal year 2023, the average daily population in these facilities totaled 1,764.  Florence Project, along with three other organizations, first administered a pilot legal orientation program in 1998, preceding LOP, and was among the first organizations to receive LOP funding when Congress initiated the national program in 2003.

40.    Plaintiff Immigration Center for Women and Children ("ICWC") is a nonprofit organization that administers LOPC, ICH, and FGLOP for the immigration court in San Francisco, California.  ICWC has been administering LOPC since 2011—providing a critical link among the immigration court, youth released from the custody of Office of refugee and Resettlement, and the sponsors to whom the youth are released.  In 2024, ICWC's team provided unique legal services to over 1,600 individuals through LOPC, over 550 individuals through ICH, and over 250 individuals through FGLOP.

41.    Plaintiff Immigration Services & Legal Advocacy ("ISLA") is a nonprofit organization that administers ICH and CCI in New Orleans Immigration Court.  ISLA also

provides pro bono direct representation in all nine detention centers in Louisiana and one detention center in Mississippi.

42.     Plaintiff National Immigrant Justice Center ("NIJC") is a nonprofit organization with its headquarters in Chicago, Illinois.  NIJC operates ICH and CCI at the Chicago Immigration Court, which has a backlog of over 200,000 cases.  In 2024, NIJC's ICH team provided over 3,500 unique legal services to more than 2,000 different individuals or families.

43.     Plaintiff Northwest Immigrant Rights Project ("NWIRP") is a nonprofit organization located in Washington State.  It operates LOP in the Northwest ICE Processing Center in Tacoma, Washington, which currently houses between 800 and 1,000 noncitizens on any given day.

44.     Plaintiff Pennsylvania Immigration Resource Center ("PIRC") is a nonprofit organization operating LOP in the Moshannon Valley Processing Center and the Clinton County Correctional Facility.  In fiscal year 2023, these facilities had a total average daily population of 1,002.

45.     Plaintiff Rocky Mountain Immigrant Advocacy Network ("RMIAN") is a nonprofit organization and LOP, FGLOP, and ICH provider in Colorado.  It serves noncitizens in detention at the Aurora Contract Detention Facility ("Aurora Facility"), which as of January 10, 2025, had a population of 1,111.  In fiscal year 2023, RMIAN provided 206 group orientation presentations at the Aurora facility and 928 individual intakes with funding provided through LOP.  RMIAN also serves non-detained noncitizens with pending cases before the Denver Immigration Court through FGLOP and ICH.  RMIAN provided 320 group "Know-Your-Rights" presentations to 5,132 people and 455 individual intakes in fiscal year 2023.  Colorado has the lowest rate of legal representation for noncitizens in removal proceedings, with only 15% having access to counsel.

Jennifer Brown, *There are 7,116 immigration cases per judge in Colorado, leading to calls for major expansion*, COLORADO SUN (Oct. 30, 2024), https://perma.cc/REC5-8UNB.  The services that RMIAN provides through LOP, FGLOP, and ICH are a critical stopgap in this underserved community.

46.    Defendants' actions impede Plaintiffs' respective missions to provide information, counseling, referrals, representation, and other services to noncitizens.  Defendants' decision to terminate funding for the Programs creates a substantial burden on the limited resources available to Plaintiffs to carry out their missions.  If Plaintiffs are to continue serving noncitizens and fulfilling their organizational missions, they will need to spend considerable time and money to overcome the barriers to access created by Defendants' actions.  Some will need to divert resources from other critical programming, while others will be forced to lay off employees.  And others will be forced to cease programming altogether, as funds run dry.

**B.    Defendants**

47.    Defendant DOJ is the department of the federal government that receives appropriations from Congress to administer the Programs to educate noncitizens in removal proceedings about their rights and legal alternatives.  DOJ most recently received this appropriation on March 8, 2024, in the 2024 Consolidated Appropriations Act.  *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, § 200, 138 Stat. 25, 133 (2024) (funding continued through September 30, 2025 by Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025)).  DOJ contracting officers authorize the release of the Congressional appropriations for the Programs.

48.    Defendant EOIR is the office of DOJ that administers the Programs and collects data regarding the Programs' objectives.

49.     Defendant DHS is the department of the federal government that houses ICE, including ICE's division of Enforcement and Removal Operations ("ERO"), and oversees immigration detention.  ICE and ERO are responsible for ensuring Plaintiffs' access to detention centers for educational presentations.

50.     Defendant Pam Bondi, the Attorney General of the United States, is sued in her official capacity.  She is responsible for the administration of funds appropriated to DOJ and EOIR and for the stop work order that stopped the Programs.

51.     Defendant Sirce E. Owen, the Acting Director of EOIR, is sued in her official capacity.  She is responsible for the administration of funds appropriated to EOIR and for the stop work order that stopped the Programs.

52.     Defendant Kristi Noem, Secretary of Homeland Security, is sued in her official capacity.  She is responsible for oversight of Plaintiffs' access to detention centers for purposes of legal education.

## STATEMENT OF FACTS

**A.     The Programs Are Federally Funded Programs Designed to Improve Efficiency and Access to Information in the U.S. Immigration System**

53.     Each year, DHS detains tens of thousands of individuals in facilities across the country pending removal proceedings.  The daily population in detention centers consistently exceeds 37,000 noncitizens.  *See* U.S. Immigration and Customs Enforcement, *Fiscal Year 2024 ICE Annual Report* 25 (Dec. 19, 2024), https://perma.cc/2T59-XMA2.  In Fiscal Year 2024, ICE made 113,431 arrests and removed 271,484 noncitizens, such that hundreds of thousands of noncitizens cycled through detention centers across the country.  *Id.* at 16, 30.  Plaintiffs have seen the number of noncitizens in the detention centers they serve increase dramatically as immigration

enforcement agencies are instructed to detain more noncitizens and place them in removal proceedings—making the services Plaintiffs provide through the Programs even more important.

54.    Although most detained individuals are noncitizens, U.S. citizens are regularly detained in immigration detention centers and some are even deported—even though they are, by definition, not deportable.    *See* U.S. Government Accountability Office, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations* (July 20, 2021), https://perma.cc/F4FA-9JCC.    This problem is even more urgent today, as the Administration has stated it may try to deport U.S. citizens who commit certain crimes, despite legal commentators emphasizing that such a plan is "pretty obviously illegal and unconstitutional." Lawrence Hurley, "'Obviously illegal': Experts pan Trump's plan to deport 'homegrown criminals,'" NBC NEWS (Apr. 14, 2025), https://www.nbcnews.com/politics/donald-trump/trump-floats-legally-questionable-proposal-deport-us-citizens-rcna201183.

55.    Individuals facing removal proceedings before EOIR have both a constitutional and statutory right to a "full and fair hearing," which includes a "reasonable opportunity . . . to present evidence." 8 U.S.C § 1229a(b)(4); *Rusu v. INS*, 296 F.3d 316, 321–22 (4th Cir. 2002).    They also enjoy a right to counsel of their choosing, although, with limited exceptions, not at government expense. 8 U.S.C. § 1229a(b)(4)(A).

56.    The vast majority of detained individuals must represent themselves in removal proceedings.    In the 2022 fiscal year, 79% of noncitizens in detention in deportation proceedings did not have access to counsel.    *See* American Civil Liberties Union, *No Fighting Chance, ICE's Denial of Access to Counsel in U.S. Immigration Detention Centers*, 10 (June 9, 2022), https://perma.cc/FQ64-WNTY.

57.    Congress began funding LOP in 2003, "to improve judicial efficiency and assist all parties in adult detained removal proceedings." *Legal Orientation Program*, U.S. DEP'T OF JUSTICE (Aug. 2016), https://web.archive.org/web/20160920163113/https://www.justice.gov/ eoir/legal-orientation-program.[2]

58.    In 2010, EOIR launched LOPC to provide legal orientations to adult "custodians" caring for unaccompanied noncitizen children, separated from their parents or other caregivers. EOIR, *Legal Orientation Program for Custodians of Unaccompanied Children*, (June 19, 2024) http://bit.ly/4lphwLX.  Congress requires DOJ and EOIR to run LOPC to protect unaccompanied children from mistreatment, exploitation, and trafficking—and to make sure unaccompanied children appear at their immigration court dates.  Unaccompanied children are among the most vulnerable noncitizens in the country, and include babies and toddlers who cannot speak or advocate for themselves.  The LOPC program is a crucial source of basic legal education for the custodians tasked with caring for unaccompanied children.  As the government has also cancelled funding for most legal services for unaccompanied children, LOPC may be the only chance unaccompanied children have to benefit from any understanding of their legal rights and responsibilities.

59.    In 2016, building on the success of LOP and LOPC, EOIR announced the creation of ICH, a program intended to provide education to non-detained immigrants appearing *pro se* in immigration court.  *See* U.S. Department of Justice, *Executive Office for Immigration Review, Fact Sheet: EOIR's Office of Legal Access Programs* (Aug. 2016), https://perma.cc/48AX-7L2B.  ICH provides information in Immigration Courthouses for non-

---

[2] As of January 29, 2025, this page was no longer publicly accessible on DOJ's website.  The link provides access to the version available as of September 20, 2016 through the Wayback Machine.

detained noncitizens in removal proceedings.  The program provides information about Immigration Court practices and procedures, noncitizens' legal options, and other helpful topics. ICH is a safeguard for these noncitizens, ensuring they receive a modicum of due process in their high-stakes and complicated immigration proceedings.  ICH also connects noncitizens with pro bono attorneys when possible.

60.    As LOP, LOPC, and ICH continued to provide efficiencies, EOIR announced the creation of CCI in 2021, to provide legal representation to children and to help "identify children who have been victims of human trafficking or abuse."  *See EOIR Announces "Access EOIR" Initiative*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW (Sept. 28, 2021), https://perma.cc/6SU8-SNQ9.

61.    EOIR started the FGLOP concurrently with its launch of dedicated dockets for families in removal proceedings in 2021, building on LOP's success to "help families understand the immigration system and refer families to pro bono legal service providers for possible representation."  *See DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings*, U.S. DEP'T OF JUSTICE (May 28, 2021), https://perma.cc/5JBJ-VPS7.

62.    EOIR implements the Programs by contracting with the Acacia Center for Justice ("Acacia").

63.    Acacia does not directly administer any of the Programs to noncitizens, and instead subcontracts with nonprofit organizations, including Plaintiffs, whose staff provide specialized skills and experience in delivering the Programs across the country.

64.    Because so many noncitizens navigate their removal cases without the assistance of a lawyer, do not speak English, are held in detention facilities in legal deserts, and lack any legal education, the Programs serve a vital information-providing role.  Plaintiffs fill a critical gap in

the immigration adjudication system by providing crucial, albeit limited, education to noncitizens in removal proceedings. This work is vital to Plaintiffs' respective organizational missions: to educate noncitizens regarding their legal alternatives, rights, and obligations in immigration proceedings, assisting them to make more informed decisions as they face a judge and a DHS prosecuting attorney.

65.    Although LOP, LOPC, FGLOP, and ICH providers do not use federal funding to provide legal representation to noncitizens, they provide individuals with critical information about the immigration court process and the types of legal remedies that exist in removal proceedings. *See Legal Orientation Program*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW (June 19, 2024), https://web.archive.org/web/20250123113005 /https://www.justice.gov/eoir/legal-orientation-program.[3]    In many cases, this is the only information unrepresented noncitizens receive during their removal proceedings.

**B.    After Regular Evaluations Demonstrating Their Success in Creating Efficiencies and Reducing Costs, EOIR Has Expanded the Programs**

66.    For decades, even before DOJ and EOIR began administering LOP in 2003, legal orientation programs and/or "Know Your Rights" presentations existed to provide noncitizens in detention with basic information about their due process rights. The benefits of these programs—both in informing noncitizens of their rights and in creating efficiencies in the immigration court system—are well documented.

67.    For example, since 1989, Plaintiff Florence Project has provided legal orientation services to individuals in immigration custody in Arizona.

---

[3] As of January 29, 2025, this page was no longer publicly accessible on DOJ's website. The link provides access to the version available as of January 23, 2025 through the Wayback Machine.

68.    The effectiveness of the Florence Project's model inspired the development of EOIR-funded pilot programs that preceded the creation of LOP.  In June 1992, a report by the Government Accounting Office (now the Government Accountability Office) evaluated the Florence Project's programming.  The report noted that INS officials observed "successful results," including improved case processing times by reducing the amount of time officials had to spend explaining immigration remedies to detained individuals.  *See* U.S. Gov't Accountability Off., GAO/GGD-92-85, *Immigration Control:  Immigration Policies Affect INS Detention Efforts* 50–51 (Jun. 25, 1992), https://perma.cc/DXU8-ELQL.  The report also noted that the Florence Project attorneys created other efficiencies by ensuring that less complex cases were handled first, leaving more time for more complex cases.  *Id.* at 51.

69.    In 1994, the Senate passed a bipartisan resolution requesting the Attorney General implement a legal orientation pilot program carried out by nonprofits to increase efficiency and save costs in immigration proceedings, highlighting the Florence Project as a "good model." S. Res. 284 103d Cong. (1994), https://perma.cc/QKU7-U5JT.

70.    In 1998, EOIR collaborated with nonprofit organizations, including Plaintiff Florence Project, to implement 90-day pilot programs in three locations:  Port Isabel, Texas; Florence, Arizona; and San Pedro, California.  Nearly 3,000 individuals participated in the pilot program. U.S. Dep't of Justice, Exec. Office for Immigration Review, *Evaluation of the Rights Presentation* 3-4 (1998), https://perma.cc/TR85-DJNB.

71.    EOIR's evaluation of the pilot program revealed numerous benefits and efficiencies, including an increase in the number of cases completed at initial hearings, an increase in pro bono representation rates, the identification of individuals with legitimate claims for relief from removal, and a reduction in anxiety among detained individuals.  *Id.* at 6–10.  Data

demonstrated that individuals who participated in the pilot programs completed their cases approximately 4.2 days faster than individuals who did not participate. *Id.* at 12. At the time of this study, the average daily detention cost was $65.61; based on this data, EOIR estimated that the government could save $8 million in detention costs annually if LOP were implemented nationwide. *Id.*

72.    In 2003, Congress instructed EOIR to create LOP, with the stated aim of creating efficiencies in immigration courts. *New Legal Orientation Program Underway To Aid Detained Aliens*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW (Mar. 11, 2003), https://perma.cc/U5CC-7HG5. EOIR initially established LOP sites at six different facilities.

73.    Since LOP's launch in 2003, EOIR, at Congress's instruction, has periodically evaluated, and consistently expanded, the program. Over many years under different administrations, EOIR has repeatedly determined that the program effectively (1) decreases the average length of cases and duration immigrants are detained at the government's expense, and (2) provides noncitizens with a basic orientation to removal proceedings and their legal options (or lack thereof), promoting both productivity and due process in immigration proceedings by ensuring that unrepresented individuals have a greater opportunity to understand their rights and responsibilities.

74.    Based on LOP's efficiencies and successes and in accordance with Congress's direction, LOP grew from 6 facilities in 2003 to 35 facilities by 2024.

a.    In October 2006, EOIR expanded LOP to six additional adult detention facilities. *EOIR Adds 10 New Legal Orientation Program Sites – Initiates Sites for Children*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW (Oct. 13, 2006), https://perma.cc/NWV9-LM5H ("As a result [of LOP] . . . detained

individuals make wiser decisions and cases are more likely to be completed faster—resulting in fewer court hearings and less time spent in detention.").

b.    In October 2008, in response to a favorable evaluation of existing programs, EOIR announced 12 new LOP sites. *EOIR Adds 12 New Legal Orientation Program Sites*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW (Oct. 15, 2008), https://perma.cc/7PJC-AJRV (noting that LOP participants "[c]omplete their immigration proceedings 13 days faster than other detained aliens," are more successful, "[a]re better prepared to represent themselves *pro se*," and are less likely to fail to appear for immigration court). By that time, LOP already had served more than 130,000 detained individuals since its inception in 2003. *Id.*

c.    In 2014, EOIR again expanded LOP, resulting in the first LOP in the Midwest, awarded to Plaintiff NIJC to serve detention centers in Illinois and Wisconsin. *EOIR Expands Legal Orientation Program Sites*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW (Oct. 22, 2014), https://perma.cc/V89T-M9BC.

d.    In 2016, EOIR expanded LOP to three more sites, one in Georgia and two in Texas. *See Executive Office for Immigration Review Expands Legal Orientation Program Sites*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW (Nov. 9, 2016), https://perma.cc/RD99-F5C5 (noting that LOP aids judicial efficiency).

e.    Most recently, in 2024, EOIR and ICE collaborated to (1) expand the "Tablet LOP" initiative to 26 detention facilities, allowing noncitizens in detention to access LOP services on tablets; (2) simultaneously broadcast LOP group orientations in 9 detention facilities; and (3) expand LOP materials to more than

24

30 languages, including audio and video recordings.  U.S. Dep't of Homeland

Sec., U.S. Immigration and Customs Enforcement, *Access to Due Process: Fiscal*

*Year 2023 Report to Congress* 6 (Feb. 20, 2024), https://perma.cc/FUJ4-YXHM.

75.     EOIR based each of these expansions on LOP's clearly demonstrated efficiency.

In May 2008, the Vera Institute for Justice, then EOIR's LOP administrator, evaluated the program

based on activities through September 2007.  At the time of this evaluation, LOPs had served more

than 100,000 noncitizens in detention.  Nina Siulc et al., *Legal Orientation Program:  Evaluation*

*and Performance and Outcome Measurement Report, Phase II*, Vera Institute of Justice

(2008), https://perma.cc/ZEN3-648L.  Vera's evaluation found that, on average, LOP participants

moved through the immigration court process 13 days faster than non-participants.  *Id.* at iv, 48.

The report noted other positive effects, including explanations by immigration judges of increased

efficiencies in proceedings.  *Id.* at 65–66.

76.     In 2010, EOIR's then-director Thomas Snow lauded LOP as "an effective public-

private partnership."  *Recent Initiatives for EOIR's Legal Orientation and Pro Bono Program*,

U.S. Dep't of Justice Executive Office of Immigration Review (Oct. 4, 2010),

https://perma.cc/6T6X-ZCJG.

77.     The 2011 Conference Report of the Committee on Appropriations praised EOIR's

"highly successful LOP," noting the program's dual benefits to individual noncitizens, who receive

better information, and to taxpayers, who enjoy reduced costs.  H.R. Rep. No. 112-284, at 233

(2011) (Conf. Rep.), https://perma.cc/J82Z-BGMB. The report directed the continuation of the

program and asked EOIR to provide data regarding the duration and cost of detention to enable

further estimates of costs savings associated with LOP.  *Id.*

78.     In 2012, EOIR provided the requested data, which showed that (1) despite a dramatic increase in the number of noncitizens served by the programs, LOP participants moved through immigration court an average of 12 days faster than non-participants and spent six fewer days in detention, and (2) on average, this efficiency saved $677 in detention costs per person because participants spent an average of six fewer days in detention. *EOIR, Costs Saving Analysis – The EOIR Legal Orientation Program*, U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE OF IMMIGRATION REVIEW 2–3 (Apr. 4, 2012), https://perma.cc/5CjC-REZH.  EOIR concluded that LOP resulted in net savings of $17.8 million dollars per year. *Id.* at 3.

79.     A more recent report by DHS calculates the average cost of detention to the government at $132.90 per day, further highlighting the direct impact of LOP's reduction of individuals' time in detention.  U.S. Dep't of Homeland Security, U.S. Immigration Customs Enforcement, *Fiscal Year 2019 Congressional Justification*, (2018), https://perma.cc/MWA3-D56Q.

80.     Based on LOP, LOPC, and ICH's proven track-record of effectiveness and efficiency, Congress has continuously funded them.  At the beginning of 2019, Congress appropriated $11.4 million for the programs. *See* Consolidated Appropriations Act, 2019, Pub. L. 116-6, § 200, 133 Stat. 13, 102 (2019).  In mid-2019, in response to a "humanitarian crisis" on the U.S./Mexico border, Congress appropriated an additional $10 million for the programs. *See* Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019, Pub. L. 116-26, § 300, 133 Stat. 1018, 1018 (2019).  For 2020, Congress increased funding, appropriating $18 million for the programs. *See* Consolidated Appropriations Act, 2020, Pub. L. 116-93 § 200, 133 Stat. 2317, 2396 (2019).  For 2021, Congress again increased funding, appropriating $22.5 million for the programs. *See* Consolidated

Appropriations Act, 2021, Pub. L. 116-260, § 200, 134 Stat. 1182, 1246 (2020).  In 2022, Congress continued to increase funding, appropriating $24 million for the wo programs.  *See* Consolidated Appropriations Act, 2022, Pub. L. 117-103, § 200, 136 Stat. 49, 113 (2022).  In 2023, Congress yet again increased funding, appropriating $29 million for the programs.  *See* Consolidated Appropriations Act, 2023, Pub. L. 117-328, § 200, 136 Stat. 4459, 4522 (2023).

81.    Most recently, Congress appropriated $28 million explicitly for the LOP  programs in March of 2024.  *See* Consolidated Appropriations Act, 2024, Pub. L. 118-42, § 200, 138 Stat. 25, 133 (2024).  Congress's appropriation is a mandate, not a suggestion.  The text of the bill instructs that "$28,000,000 *shall* be available for services and activities provided by the Legal Orientation Program."  *Id*. (emphasis added).  Congress directed that $5 million of this funding was intended for the operation of ICH.  S. Rep. No. 118-62, at 85 (2023).  Congress further directed that "LOP funding is also provided for LOP for Custodians [LOPC]"—and acknowledged that LOPC is funded "pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 [the "TVPRA"]."  *Id*.  Funding for FY 2024 has ended, but Congress has continued funding (including for the Programs) at 2024 levels through at least September 30, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025).

82.    The House and Senate Appropriation Committees have, with their recommendations for these appropriations, stated their complete support for LOP, LOPC, and ICH. *See, e.g.*, S. Rep. No. 118-198, at 92 (2024) ("The Committee supports LOP"); S. Rep. No. 116-127, at 86 (2019) (same);  H. Rep. No. 116-101, at 47 (2019) ("The Committee supports access to LOP and ICHs");  H. Rep. No. 116-455, at 63 (2020) (same);  H. Rep. No. 117-97, at 66 (2021) (same);  H. Rep. No. 117-395, at 65 (2022) (same).  The Committees have  repeatedly explained that LOP and ICH are effective and efficient: "LOP benefits taxpayers by increasing the efficiency

of immigration proceedings and reducing costs related to immigration detention." S. Rep. No. 116-127, at 86 (2019); *see also* S. Rep. No. 118-198, at 92 (2024) (same); H. Rep. No. 116-101, at 47 (2019) ("LOP improves the efficiency of court proceedings, reduces court costs, and helps ensure fairness and due process"); H. Rep. No. 116-455, at 63 (2020) (same); H. Rep. No. 117-97, at 66 (2021) (same); H. Rep. No. 117-395, at 65 (2022) (same).

83.    Congress has repeatedly warned DOJ and EOIR not to try to stop LOP and ICH like they did in 2018. In the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, *including during any review of the program*." S. Rep. No. 118-198, at 92 (2024) (emphasis added). And in 2022, the House Appropriations Committee's report recommending LOP appropriations for 2023 "remind[ed] EOIR that funding for this program is mandated by law, and *any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee*." H. Rep. No. 117-395, at 65 (2022) (emphasis added).

84.    Today, EOIR, through this congressional appropriation, provides funding to 18 nonprofit agencies, including Plaintiffs, to implement LOP in detention facilities in 12 different states. Acacia Center for Justice, *Legal Orientation Program*, https://acaciajustice.org/what-we-do/legal-orientation-program-lop/ (last accessed Jan. 31, 2025). In 2023, EOIR's LOP served more than 40,000 detained persons. *See* White House Legal Aid Interagency Roundtable, *Access to Justice in Federal Administrative Proceedings: Nonlawyer Assistance and Other Strategies* 30 (2023), https://perma.cc/Z7CM-2UNY [hereinafter, "Access to Justice Report"].

85.    To enable this valuable programming, Plaintiffs work with the relevant immigration courts, ICE, and detention centers to coordinate an efficient means of accessing

detained individuals and administering LOP. For example, facilities generally make specific space available for the presentations and inform detained individuals about LOP. LOP providers often are permitted to use approved technology to provide PowerPoint presentations or other visual aids to deliver information about the legal rights of noncitizens in detention. Some LOP providers also receive court dockets or lists of new arrivals to the detention centers from Defendant EOIR, helping ensure that newly arrived noncitizens are able to participate in the programming and assist LOP in promoting court efficiency. This synergy benefits Plaintiffs, the detention centers, the overtaxed immigration courts, taxpayers, and the individual noncitizens. Plaintiff ABA runs LOP at the Otay Mesa Detention Facility (through IJP), the Port Isabel Detention Center and El Valle Detention Facility (through ProBAR), and the national Detention Information Line in all ICE detention facilities without a local LOP; Plaintiff American Gateways runs LOP at the South Texas Processing Center, the Karnes County Immigration Processing Center, and the T. Don Hutto Detention Center; Plaintiff Amica Center runs LOP at the Caroline and Farmville Detention Centers; Plaintiff Florence Project runs LOP at the Eloy Detention Center, Florence Detention Center, and Central Arizona Florence Correctional Complex; Plaintiff RMIAN runs LOP at the Aurora Contract Detention Facility; Plaintiff NWIRP runs LOP at the Northwest ICE Processing Center; Plaintiff PIRC runs LOP at the Moshannon Valley Processing Center and Clinton County Correctional Facility; and Plaintiff Estrella runs LOP at the Otero Processing Center and El Paso Processing Center.

86.     In 2010, EOIR expanded LOP to create the new LOPC to provide legal orientations to adult "custodians" caring for unaccompanied noncitizen children, separated from their parents or other caregivers. EOIR, *Legal Orientation Program for Custodians of Unaccompanied Children*, (June 19, 2024) http://bit.ly/4lphwLX. Congress requires the government to run LOPC

to protect unaccompanied children from mistreatment, exploitation, and trafficking—and to make sure unaccompanied children appear at their immigration court dates.  In the TVPRA, Congress commanded that the Secretary of Health and Human Services (who has legal custody of unaccompanied children) "shall" work with EOIR to "ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by" EOIR. 8 U.S.C. § 1232(c)(4).  Defendant EOIR's official policy manual acknowledges the "purpose" of LOPC is to "inform the children's custodians of their responsibilities . . . and to protect the children" "in fulfillment of the duties provided for in the [TVPRA]."  EOIR, *EOIR Policy Manual – Part V-Miscellaneous – 4.3-Legal Orientation Program for Custodians of Unaccompanied Alien Children*, (last accessed Apr. 14, 2025), https://www.justice.gov/eoir/eoir-policy-manual/miscellaneous/chapter4-3.  "EOIR works with the Department of Health and Human Services, Office of Refugee Resettlement, to carry out this program nationally." *Id.*  Plaintiff ABA provides LOPC services nationwide; Plaintiff CCLA provides LOPC services in North Carolina; and Plaintiff ICWC administers LOPC services for Northern California.  ICE has identified their Charlotte location as one of the leading offices for human trafficking-related arrests.

87. Building on LOP's and LOPC's success, and at Congress's direction, EOIR initiated other legal access programs, including ICH.  For Fiscal Year 2016, Congress provided EOIR with funding to create ICHs "at the immigration courts with the greatest pending caseload." U.S. Department of Justice, *Executive Office for Immigration Review, Fact Sheet: EOIR's Office of Legal Access Programs* (2016), https://perma.cc/8P3W-9NWM.  ICH's goals are to "orient non-detained individuals appearing before the immigration court on the removal hearing process, and provide information to non-detained individuals to inform them about possible remedies and legal resources." *Id.*  ICH operates in 23 immigration courts in 18 cities across the country and served

12,000 noncitizens in 2023. *See* Access to Justice Report at 30. Each ICH provides "in person information sessions, self-help assistance to individuals without counsel, and information on available pro bono resources to unrepresented individuals." *Id.* Plaintiff ABA runs ICH at the San Diego Immigration Court (through IJP) and the Harlingen Immigration Court (through ProBAR), Plaintiff American Gateways runs ICH in San Antonio, Plaintiff NIJC runs the ICH in Chicago, Plaintiff RMIAN runs ICH in Denver, Plaintiff ISLA runs ICH in New Orleans, Plaintiff ICWC runs ICH in San Francisco, and Plaintiff Estrella runs ICH in El Paso. ICH programming, which is very similar to LOP, differs in that ICH serves non-detained individuals.

88.    In 2021, EOIR added FGLOP and CCI as discretionarily funded programs. EOIR expanded LOP to create FGLOP as a specific version of the program to serve families in removal proceedings on expedited dockets or in the Family Expedited Removal Management program. *Family Group Legal Orientation Program*, ACACIA CENTER FOR JUSTICE, https://acaciajustice.org/what-we-do/family-group-legal-orientation-program/ (last visited Jan. 29, 2025). In 2023, FGLOP educated more than 12,000 noncitizen families before nine immigration courts and via its national information line. *See* Access to Justice Report at 30. Plaintiff RMIAN runs FGLOP at the Denver Immigration Court and Plaintiff ICWC runs FGLOP in San Francisco Immigration Court.

89.    CCI provides full-scope, free legal representation for children who are in removal proceedings, who would otherwise be forced to appear in court alone. *Counsel for Children Initiative*, ACACIA CENTER FOR JUSTICE, https://acaciajustice.org/what-we-do/counsel-for-children-initiative/ (last visited Jan. 29, 2025). CCI operates in 14 cities and provided representation for 200 children in 2023. *See* Access to Justice Report at 30. Plaintiff ABA runs CCI in the San Diego Immigration Court

(through IJP), Plaintiff NIJC runs CCI in Chicago, Plaintiff American Gateways runs CCI in San Antonio, and Plaintiff ISLA runs CCI in New Orleans.

90.    Immigration judges and immigration enforcement officials alike regularly praise the Programs and the work Plaintiffs do through them.

91.    The Programs are a vital help to immigration judges.  For example, many removal proceedings are docketed in El Paso Immigration Court, as El Paso is on the U.S./Mexico border and near where many noncitizens are first detained—but noncitizens frequently move to other areas after their initial detention.  The court has developed a dedicated docket for litigants to request a change of venue, and Plaintiff Estrella's ICH plays a vital role in this docket, guiding *pro se* litigants as they fill out change-of-venue forms.  Immigration judges in El Paso have expressed gratitude to Estrella's LOP and ICH teams, who often inform the court of necessary information about cases where the litigant appears to lack capacity to represent themselves or requires an interpreter.  Immigration judges frequently refer litigants to Plaintiff Amica Center for legal education, and regularly acknowledge Amica Center's LOP services in helping litigants—particularly those with disabilities, who are illiterate, who speak uncommon languages, or who have just reached adulthood—as helping them run their courtrooms efficiently.  Plaintiff RMIAN's ICH and FGLOP staff routinely assist individuals filling out required court forms, reducing the number of individuals requesting assistance from court staff, and court staff often send RMIAN staff to speak on the court staff's behalf to these individuals in need of assistance.  Immigration judges thank Plaintiff American Gateways for increasing efficiency in their dockets by reducing the need for multiple continuances.

92.    LOPC services help remind children on the court docket and their custodians of their upcoming court hearings.  This program is vital to ensure litigants not only know their rights

but also have the right tools to ensure they are procedurally ready to face an immigration judge.  It allows them to understand what to expect in court, what documents they may need, and how to navigate the early stages of the process.  The court system is complex enough for an adult, but insurmountable for a child facing this system without any help at all.  This support is especially critical while these children and their families search for and retain an attorney.  For many this will be the only connection to legal assistance or an attorney they have.  Plaintiff CCLA staffs a pro bono room every Tuesday and Wednesday in the Immigration Court in Charlotte where they play a vital role in ensuring unaccompanied minors on the docket receive the services they need, i.e. change of address, change of venue, legal orientations, and access to legal screenings if requested. Without the LOPC program, minors will no longer receive assistance to complete and properly submit forms that are pertinent to their immigration proceedings.  CCLA also provides children and their sponsors with community resources and important hotlines to ensure their safety and well-being.  The Immigration Court in Charlotte has frequently expressed appreciation for our services and will often send respondent children to our room for services and further orientation.

93.    The Programs also help ICE run its detention centers efficiently.  For example, Plaintiff Estrella has been told by ICE officials at the centers it serves that LOP's work helps noncitizens in detention understand local processes for communicating with ICE and securing release from detention, leading to smoother interactions.  Detention facility staff regularly contact Plaintiff Amica Center for assistance with detained individuals who need help understanding and meeting court requirements or have special needs related to their legal cases.  ICE officers credit American Gateways' LOP with reducing confusion for noncitizens, leading to fewer inquiries for the officers to handle.

**C.    Plaintiffs Operate the Programs Under a Contract Between EOIR and Acacia**

94.     To fulfill its Congressional mandate to facilitate and fund the Programs, EOIR contracts with Acacia.  Acacia, in turn, contracts with Plaintiffs and other organizations, who run the Programs.

95.     The EOIR contract with Acacia emphasizes the importance of continuity in the Programs and acknowledges that EOIR is *required* to provide the Programs.  The contract also requires EOIR to approve all written materials distributed by LOP providers.

**D.     Past Government Statements Acknowledge the Efficiency and Efficacy of LOP and ICH**

96.     When DOJ attempted to terminate LOP and ICH in 2018, government officials and third-party analysts immediately raised the effectiveness and efficiency of these legal access programs as reflected in then-recent studies and findings.  For example, in April 2017, an outside consultant to DOJ and EOIR—Booz Allen Hamilton—issued a report on the results of a year-long case study regarding EOIR's work and function.   U.S. Dep't of Justice, Exec. Office for Immigration Review, *Legal Case Study: Summary Report* (Apr. 6, 2017), https://www.aila.org/aila-files/B121BF3B-B38B-42FE-9C2C-7DE969355264/18042011.pdf? 1697590153.  Among its many recommendations for improving EOIR, the report recommends that EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications."  *Id* at 23–24.

97.     In May 2017, the EOIR program director overseeing LOP and ICH stated that the programs address "a critical and ongoing shortage of qualified legal representation for underserved populations in immigration cases," an aim he described as "vitally important."  Decl. of Steven Lang, Program Director, EOIR Office of Legal Access Programs ¶ 8, *NWIRP v. Sessions*, W.D. Wash. Case No. 2:17-cv-00716, ECF No. 50 (June 26, 2017), https://bit.ly/2Hwn6wa.  Director

Lang added that LOP "improve[s] judicial efficiency and assist[s] all parties in adult detained removal proceedings," and "has had positive effects on the immigration court process." *Id.* ¶¶ 60, 65.

98.    On November 30, 2017, ICE issued guidance regarding LOP to its field offices, emphasizing LOP's effectiveness and instructing officers to support LOP.  *See* Memorandum from Tae Johnson, ICE Assistant Director for Custody Management, to ICE Field Office Directors, *Updated Guidance:  ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program* (Nov. 30, 2017), https://www.aila.org/aila-files/E2187C7C-96F1-4309-B4E4-121A86F8F57B/18041845.pdf?1697589559 [hereinafter ICE LOP Memo]; *see also* Maria Sacchetti, *ICE praised legal-aid program for immigrants that Justice Dept. plans to suspend*, WASH. POST (Apr. 17, 2018), https://wapo.st/2qGf1uT.

99.    Specifically, then-ICE Assistant Director for Custody Management Tae Johnson recognized that the purpose of LOP was to "improve the efficiency of immigration court proceedings by increasing access to information and improving representation for individuals in proceedings."  ICE LOP Memo at 1.  He explained that LOP was for the benefit of "*all* parties," including ICE and the courts.  *Id.* (emphasis added).  To promote effective administration of LOP, then-Assistant Director Johnson encouraged ICE field offices to facilitate LOP participation by sharing information about it with detained noncitizens, allowing individuals to retain access to relevant legal documents, and allowing LOP providers access to technology and facilities.  *Id.* at 2–3.

**E.    In 2018, Congress Passed a Budget Maintaining Funding for LOP and ICH and Explicitly Finding that the Programs Were Valuable and Effective**

100.    On March 23, 2018, Congress passed an Omnibus Spending Bill ("Spending Bill"), which the president signed into law on the same day.  As part of the Spending Bill, Congress

appropriated funds "for the administration of immigration-related activities of the Executive Office for Immigration Review." Title II of Division B addresses spending levels for the Department of Justice. Consolidated Appropriations Act, 2018, Pub. L. 115-141, 132 Stat. 348, 410 (Mar. 23, 2018), https://bit.ly/2EFGb9J. Congress's decision to fund LOP and ICH (FGLOP and ICH were not yet started)—which enjoyed broad bipartisan support—was unsurprising, given their well-documented effectiveness and the relevant government entities' continual support for them.

101.    Included in the Spending Bill is Congress's Joint Explanatory Statement, an authoritative explanatory statement with "the same effect with respect to the allocation of funds and implementation of . . . this Act as if it were a joint explanatory statement of a committee of conference." *Id.* 132 Stat. 350. The Joint Explanatory Statement unambiguously required continuation of LOP and ICH, providing that EOIR "shall continue ongoing programs." 164 Cong. Rec. H2045, H2090 (2018), https://bit.ly/2ES8xNV. The Spending Bill's House and Senate reports, which are explicitly incorporated into the Joint Explanatory Statement at p. H 2090, supplemented this directive with detailed instructions regarding LOP and ICH. *Id.* at H2084 ("Report language included in House Report 115-231 . . . or Senate Report 115-139 . . . that is not changed by this explanatory statement or this Act is approved.").

102.    The House Committee Report accompanying the House version of the Spending Bill explicitly stated that the Committee's recommendation "sustains the current legal orientation program and related assistance, such as the information desk pilot," i.e., LOP, LOPC, and ICH. H.R. Doc. No. 115-231, at 30 (2017), https://bit.ly/2H7BhnT.

103.    Similarly, the endorsed language from the Senate version of the Spending Bill clarified that "[t]he Committee's recommendation maintains the fiscal year 2017 level of no less than $10,400,000 for LOP. This includes funding for LOP for Custodians [LOPC], including

efforts, pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 (Public Law 110-457), for custodians of unaccompanied, undocumented children . . ." S. Rep. No. 115-139, at 65 (2017), https://bit.ly/2qAPq5K.

104.    The Senate Committee recommended *expanding* LOP: "Recognizing that LOP currently serves detained individuals in a limited number of States, the Committee directs that attention be paid to geographic equity as LOP expands the reach of its services to additional detention centers.  The Committee notes the particular need for legal services at more remote immigration detention sites that are far from legal service providers in urban centers." *Id.*

105.    These directions are mandates, not suggestions.  As the Joint Explanatory Statement explains, "[e]ach department and agency funded in this Act *shall* follow the directions set forth in this Act and the accompanying explanatory statement, and *shall not* reallocate resources or reorganize activities except as provided herein."  164 Cong. Rec. at H2084 (emphasis added), https://bit.ly/2ES8xNV.

## F.    The Previous Attempt to Pretextually Eliminate LOP, Despite Evidence Supporting LOP and ICH's Efficacy and Effectiveness, Failed

106.    Despite Congress's unambiguous 2018 directive that Defendants continue LOP and ICH as existing programming—and despite consistent evidence of the programs' effectiveness—on April 11, 2018, DOJ abruptly decided to halt both programs, only eighteen days after Congress appropriated funds for them.

107.    DOJ claimed that it halted the program "to examine the cost-effectiveness of the federally funded programs and whether they duplicate efforts within the court system."  Maria Sacchetti, *Justice Dep't to halt legal-advice program for immigrants in detention,* WASH. POST (Apr. 10, 2018), https://wapo.st/2H4kczb.  That statement contradicted extensive and well-

documented analysis concluding that LOP and ICH were both efficient and effective, and ignored the long history of studies done while the programs remained ongoing.

108.    Then-Director of the Executive Office for Immigration Review McHenry similarly ignored and rejected recent studies demonstrating LOP's and ICH's efficacy.  During an April 18, 2018, Senate Judiciary Committee hearing titled "Strengthening and Reforming America's Immigration Court System," McHenry baselessly claimed that LOP had not been reviewed since 2012, ignoring Booz Allen Hamilton's April 2017 report evaluating the efficiency of EOIR more broadly and expressly recommending the *expansion* of LOP.  *Strengthening and Reforming America's Immigration Court System Before the Subcomm. on Border Security and Immigration of the S. Comm. on the Judiciary*, 115th Cong. (2018) (video testimony of James McHenry), at 1:02, https://bit.ly/2JEJrWx.

109.    One week after Defendants' announced termination, members of House and Senate Judiciary Committees communicated their "profound objection" to the termination.  Bicameral Judiciary Letter to Attorney General Sessions (Apr. 17, 2018) https://democrats-judiciary.house.gov/news/documentsingle.aspx?DocumentID=432.  These officials wrote that DOJ was "systematically deconstructing basic due process protections for immigrants" and noted that such measures raise "constitutional concerns."  *Id.*  The Judiciary Committee members also expressed disbelief at DOJ's supposed justifications for its actions, noting that, "[i]n 2016 alone, LOP attorneys and paralegals assisted more than 60,000 detained individuals."  *Id*.  The congressional officials added that, based on EOIR's own 2012 study, "LOP *saved* the government nearly $18 million over a three year period."  *Id* (emphasis in original).[4]  Finally, they emphasized

---

[4] Though the Judiciary Committee characterized the savings as being $18 million over three years, the program actually saved nearly $18 million per year. *See infra*, ¶ 59.

that Defendants' actions violated "clear and unambiguous Congressional intent," as expressed in the Spending Bill. *Id*.

110.    The next day, twenty-two members of the Senate voiced "strong opposition" to Defendants' decision to terminate LOP and ICH, expressing profound skepticism of Defendants' purported justifications for the decision.  The Senators stated that "[t]he decision belies the Department of Justice's ('DOJ') stated goal of reducing the backlogs in our immigration courts." Senate Letter to Attorney General Sessions (Apr. 18, 2018), https://perma.cc/2FLW-FB6B.  They explained that, although they support efforts to review LOP and ICH's efficiency, they "do not agree that a review of the programs requires [the Attorney General] to bring LOP, nor the ICH to a standstill."  *Id*.  Moreover, the Senators insisted that Defendants "cannot be serious" that DOJ must study the programs because LOP and ICH were purportedly duplicative of the explanations that immigration judges provide to individuals in removal proceedings.  *Id*. at 2.

111.    The following day, 105 members of the House jointly expressed their "strong opposition to the recent announcement that the Department of Justice is terminating the Legal Orientation Program (LOP) and the Immigration Help Desk program (ICH)." House Letter to Attorney General Sessions (Apr. 19, 2018), https://perma.cc/PU9P-4JLB.  Like their colleagues in the Judiciary Committee, these House members highlighted that Defendants' actions "directly contradict the express direction of Congress."  *Id*.

112.    Around this time, providers of the Programs, including some of the Plaintiffs, gave the Government notice that they intended to file suit to enjoin DOJ's action.  The next day, DOJ reversed course and indicated it would continue funding LOP and ICH.

113.    On September 5, 2018, McHenry's EOIR released a report from a review that ostensibly began in 2017 purporting to show that LOP was inefficient.  Executive Office for

Immigration Review, *LOP Cohort Analysis* (Sept. 5, 2018), https://perma.cc/9WH6-KB5U.  On September 14, 2018, the Vera Institute of Justice (at that time, the non-profit contracted by EOIR to run LOP) released its own study demonstrating that EOIR's study had been set up to achieve misleading results.  Vera Institute of Justice, *LOP Case Time Analysis for Performance Indicators* (Sept. 14, 2018), https://perma.cc/F7TG-9BDL.  EOIR distorted statistics by refusing to consider pending cases in their analysis and failed to control for factors other than LOP—such as case location and what immigration charges are involved—that have significant effects on how cases are processed.  *Id.*  EOIR also did not explain how it reached a different result than, for example, a study just a year earlier by consultants from Booz Allen Hamilton that made positive findings, or any of the other multiple reviews and positive findings.  U.S. Dep't of Justice, Exec. Office for Immigration Review, *Legal Case Study: Summary Report* (Apr. 6, 2017), https://www.aila.org/aila-files/B121BF3B-B38B-42FE-9C2C-7DE969355264/18042011.pdf? 1697590153.  By setting up a flawed study, the McHenry EOIR produced the only report to ever find LOP has anything but a positive effect on costs and immigration court efficiency.  Even with these findings, however, the report *did not* conclude that LOP is "waste[ful]."

114.    Tellingly, neither McHenry nor anyone else has cited EOIR's flimsy report to try again to end LOP.

## G.    In 2024, Congress Reauthorized Funding for LOP, LOPC, and ICH without Controversy

115.    With the exception of McHenry's 2018 report, every review and discussion of LOP has been uniformly positive.  Congress has funded LOP every year without fail and has encouraged EOIR to expand it.  The Programs have uncontroversially and consistently been funded by Congress and supported by EOIR, DOJ, and DHS (with the single 2018 exception, noted above).

116.    On March 9, 2024, Congress reauthorized funding for LOP, LOPC, and ICH to the tune of $28 million.  Consolidated Appropriations Act, Pub. L. 118-42, 138 Stat. 133 (Mar. 9, 2024), available at https://www.congress.gov/118/plaws/publ42/PLAW-118publ42.pdf.  Title II, "Department of Justice," gives EOIR $844,000,000 for "expenses necessary for the administration of immigration-related activities."  *Id.*  Of this total EOIR funding, $28,000,000 "*shall* be available for services and activities provided by the Legal Orientation Program."  *Id.* (emphasis added).  The full text of the statute reads:

> For expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000, of which $4,000,000 shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the "Immigration Examinations Fee" account, and of which not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program: Provided, That not to exceed $50,000,000 of the total amount made available under this heading shall remain available until September 30, 2028, for build-out and modifications of courtroom space.

117.    *Id*. The Senate Appropriations Committee stated that it "supports LOP" and "emphasize[d] that LOP benefits taxpayers by increasing the efficiency of immigration proceedings and reducing costs related to immigration detention."  S. Rep. No. 118-62, at 84 (2023), available at https://www.congress.gov/congressional-report/118th-congress/senate-report/62/1?outputFormat=pdf.  The Committee also directed that of the $28,000,000 funding for LOP, $5 million should be used "for the operation of the Immigration Help Desk."  *Id.* at 85. Congress also directed that "LOP funding is also provided for LOP for Custodians [LOPC]"—and acknowledged that LOPC is funded "pursuant to [the "TVPRA"]."  *Id*.  The Committee—as it has for years—warned EOIR against trying to suspend the Programs pending review:  "The Committee directs the Department to continue all LOP services and activities, including that of the ICH, without interruption, *including during any review of the program*," and "[t]he Committee directs the Department to utilize all appropriated funds solely for legitimate program purposes."  *Id.*

(emphasis added).  Finally, the Committee "recommend[ed]" that EOIR expand LOP access "for all detainees."  *Id.*

118.    This uncontroversial reauthorization followed in the footsteps of bipartisan reauthorizations beginning in the George W. Bush Administration.

119.    Congress has continued funding through September 30, 2025, at the levels set in the 2024 Consolidated Appropriations Act.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025).

## H.    Only Two Days After Inauguration, Defendants Shut Down the Programs.

120.    This funding continued to flow to the Programs until January 22, 2025.

121.    On January 20, 2025, President Trump signed an Executive Order titled "Protecting the American People Against Invasion."  Section 19 of the Executive Order directs the Attorney General and Secretary of Homeland Security to "[i]mmediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws."  The Executive Order further instructs the Attorney General and Secretary of Homeland Security to "[p]ause distribution of all further funds pursuant to such agreements pending the results of the review" and to "[t]erminate . . . agreements determined to be in violation of law or to be sources of waste, fraud, or abuse."

122.    Despite the Programs' clear Congressional mandate and track-record of saving immigration courts time and money, on January 22, 2025, DOJ and/or EOIR issued, via email, a Stop Work Order for LOP and the other Programs.  The contracting officer, a DOJ employee,

informed the primary LOP contractor for the Programs (Acacia) that no further work on the Programs should be performed because there was a stop work order in place immediately. Acacia, in turn, informed its subcontractors—including Plaintiffs—by email on January 22, 2025 to stop work pursuant to that agency directive.

123.    Although the Executive Order specified there was to be a "review" of relevant Programs and an audit only "if appropriate" after that review, the Stop Work Order came less than 48 hours later.

124.    EOIR issued the Stop Work Order for the Programs without any explanation as to the reasons for the stop, the duration of the stop, or whether the stop is intended to be temporary.

125.    Defendants' internal emails, obtained through a Freedom of Information Act request, show that Defendants explicitly considered whether LOPC funding should be cancelled in the Stop Work Order—and decided it would not be.

126.    Demonstrating the arbitrary and capricious manner of stopping the Programs, EOIR also abruptly changed its website and information to provide a pretextual justification. In a "Policy Manual" posted to EOIR's website on January 28, 2025—as EOIR is supposedly auditing the Programs—EOIR now says that "[t]he general LOP does not reduce an alien's detention time or length of proceedings, not does it increase representation rates for detained aliens."[5]  U.S. Dep't of Just. Exec. Off. of Immigr. Review, *EOIR Policy Manual*, https://www.justice.gov/eoir/media/1386531/dl?inline= (last visited Jan. 29, 2025).  EOIR cites no authority for this statement, which is refuted by every other study or review of the Programs—except the methodologically deficient 2018 study that (as explained above) was designed to reach these conclusions.

---

[5] Earlier policy documents described LOP without this language.

127.    EOIR's January 28, 2025 pretextual document goes on to falsely claim that "EOIR has previously determined that the general LOP constitutes a wasteful program." *Id.* Even the flawed 2018 report never concluded the program is "wasteful."

128.    EOIR's position that LOP is "wasteful" is entirely new as of January 28, 2025, and lacks any support or credibility. EOIR made this supposed finding within *eight* days of the change in administrations and the Executive Order being signed.

129.    Because the "Protecting the American People Against Invasion" Executive Order commands the Attorney General and Secretary of Homeland Security to "[t]erminate" contracts (like the one between EOIR and Acacia to administer the Programs) found to be "sources of waste," EOIR's pretextual and unsupportable conclusion operates to permanently terminate the Programs.

## I.    Days After Plaintiffs Filed This Lawsuit, Defendants "Rescinded" the Stop Work Order—But Continued Working to Terminate the Programs.

130.    On the afternoon of Sunday, February 2, 2025, two days after Plaintiffs filed this lawsuit, the DOJ contracting officer contacted Acacia and indicated that the Stop Work Order had been "rescinded" for the Programs, except for LOPC (which was not included in the Stop Work Order). The email asked Acacia to "immediately resume funding of all programs that received a stop-work order."

131.    Notwithstanding this purported rescission, three days later, on February 5, 2025, Defendant Attorney General Bondi issued the memorandum titled "Sanctuary Jurisdiction Directives." *See* Office of the Attorney General, Sanctuary Jurisdiction Directives (Feb. 5, 2025), https://www.justice.gov/ag/media/1388531/dl?inline. Among other directives, the AG Memo ordered DOJ departments to "immediately identify all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens." *See id.* at 2.

132.    The AG Memo furthered ordered DOJ to "[p]ause any further distribution of funds for 60 days after complying with any notice and procedural requirements." *Id.*  The memo expressed Defendants' policy choice to cease funding organizations with missions and services Defendants do not agree with, directing Defendants to "not enter into any new contract . . . to provide Federal funding to non-governmental organizations that support or provide services, either directly or indirectly (e.g., through sub-contracting or other arrangements), to removable or illegal aliens." *Id.* at 3–4.

133.    A month after the memo was issued, on April 4, 2025, Acacia received a strangely formatted notice on DOJ letterhead signed by a DOJ "Contracting Officer," which purported to "terminate[]" the contracts under which Defendants run the Programs because DOJ had "determined that the services are no longer needed."  In addition to the Programs now terminated by the Termination Notice, the April 4 notice also terminated the National Qualified Representative Program and the Legal Access Services for Reunified Families program.  This termination appeared to be in violation of this Court's order from March 17 requiring three days' notice before any termination.  Plaintiffs' counsel immediately contacted Defendants' counsel to seek an explanation for the apparent violation.  Defendants' counsel shortly reverted with a copy of a second April 4 letter to Acacia explaining that the earlier notice should be "disregard[ed]" and had "no legal effect."

134.    Then, just six days later, on April 10, 2025, Defendants sent Acacia a Termination Notice, which terminated, "for the convenience of the government," the contracts through which Defendants fund and run the Programs.  Defendants offered no other explanation for this termination, and to date have provided no more information about the future of the Programs.  The termination became effective on April 16.

**J.      Defendants' Actions Violate Their Own Policies, including the Performance-Based National Detention Standards.**

135.    Defendant DHS, which operates ICE, has adopted standards governing conditions in immigration detention.    These standards include the 2008 Performance-Based National Detention Standards, the 2011 Performance-Based National Detention Standards, and the 2019 National Detention Standards (collectively, the "Detention Standards').    By applying these standards, Defendants purport to ensure a base level of access for legal counsel at detention facilities—though this level of access often falls below constitutional requirements.    Through the Detention Standards, Defendants recognize their obligation to ensure basic access to counsel at detention facilities.    But adherence to the standards varies by day and detention facility.

136.    ICE has admitted that it "does not track . . . the number of facilities that do not meet ICE standards for attorney/client communications."    ICE, *Access to Due Process: Fiscal Year 2021 Report to Congress*, at 2 (Feb. 14, 2022), https://bit.ly/3F1TMek.    Detention centers frequently violate various Detention Standards, including those providing for confidential communication with counsel, guaranteeing ability to have calls longer than 20 minutes with counsel, forbidding screening of legal mail, and those guaranteeing certain details of attorney access.

137.    Most relevantly in this action, Standard 6.4 of the 2019 National Detention Standards guarantees "legal rights group presentations."    *See* ICE, *National Detention Standards: Standard 6.4* (revised 2019), https://www.ice.gov/doclib/detention-standards/2019/6_4.pdf (the "Presentation Standard").    This standard states as Defendants' policy that detention centers "*shall* permit authorized persons to make presentations to groups of detainees for the purpose of informing them of U.S. immigration law and procedures."    *Id.* (emphasis added).    The Presentation Standard provides that attorneys and legal representatives must "submit a written request" to make

46

a group legal rights presentation, and may make a presentation only with approval from ICE. *Id.* Presentations may be conducted daily, but in practice facility restrictions make this frequency impossible. Presenters must follow all standard visitor procedures, which can have the effect of severely limiting presentations, and presenters may only distribute written materials approved in advance by ICE. *Id.* Following a presentation, the detention facility "*shall*" allow presenters to meet with small groups of detainees to discuss their cases. *Id.* (emphasis added).

138. During the Stop Work Order period in January 2025, Plaintiffs submitted various requests to conduct group presentations under the Presentation Standard. Some of these requests were denied, while others were not approved prior to the rescission of the Stop Work Order. While the restrictions on Presentation Standard presentations already make them an inadequate alternative to normal LOP and other Program work, evidence from this period further shows that the manner in which Defendants (and the detention centers they control) apply the Presentation Standard severely restricts Plaintiffs' ability to pursue their mission of providing legal orientations and services to noncitizens.

139. Following termination of the Programs on April 16, 2025, Plaintiffs are again encountering issues accessing detention facilities, in violation of the Detention Standards. Defendants' access restrictions significantly harm Plaintiffs' ability to pursue their missions of providing legal orientations and services to noncitizens.

**K. Terminating These Programs Frustrates Plaintiffs' Missions, Causes Plaintiffs Irreparable Harm, and Serves No Legitimate Purpose.**

140. Terminating funding for the Programs has devastating and irreparable effects, especially in the context of an exponential growth in ICE detentions and removals. Even if EOIR reinstates these Programs at some unknown future time (an unlikely supposition, given its new opinion that LOP is "wasteful" and the AG Memo's stated policy against funding organizations

with missions to serve noncitizens), the Programs, the non-profits that administer them, and the noncitizens that receive vital legal resources from them already will have been dealt a fatal blow. For Plaintiffs, the funding they receive to run the Programs represents a significant portion of each organization's overall operating budget. As nonprofit organizations, Plaintiffs cannot continue their critical, mission-serving work if Defendants withdraw the previously allocated funding that Congress has already authorized for spending. Plaintiffs had planned around receiving this funding; for example, Amica Center is in the middle of a "task order" period that runs from September 1, 2024 to June 31, 2025, during which it was due to receive nearly $1 million in funding. Without the funds Plaintiffs budgeted to receive (because they had been appropriated for the programs by Congress), Plaintiffs will be forced to terminate or reassign staff. All the while, Plaintiffs will be unable to achieve their organizational missions of assisting noncitizens by informing them of their legal rights during immigration proceedings.

141. Plaintiffs will lose (and in some cases already have lost) access to facilities and will be forced to renegotiate their relationships with detention centers and immigration courts. Plaintiffs know this will happen in part because it already is happening and in part because it happened during the Stop Work Order Period, when detention centers denied Plaintiffs access to lists of noncitizens in the detention centers they serve and reports on their upcoming court dates. Detention centers also, in some cases, refused Plaintiffs access to noncitizens to provide individual services (which are not funded by the government) or made it more difficult for Plaintiffs to provide these services. For example, staff at the Caroline Detention Facility stopped Plaintiff Amica Center's LOP staff in the middle of a presentation and ordered the Amica Center employees to leave the facility. When Amica Center staff attempted to return the next day to perform services outside of LOP, facility staff did not allow them to enter.

142.    Plaintiffs have lost access to necessary funding that allows them to share information with noncitizens and inform them about their rights and responsibilities in the immigration process.

143.    Plaintiffs are also informed and believe that ICE has issued a nation-wide directive, purportedly justified by the Termination Notice and the end of the Programs, instructing detention centers to remove all posters and information about the Programs and related resources for noncitizens in detention to learn about their legal rights.

144.    Because of Defendants' decision to end the Programs, Plaintiffs will lose (and in some cases have already lost) access to a limited public forum where they could disseminate information (such as posters or flyers) and have conversations with vulnerable noncitizens who know little about their legal rights.  Detention centers have removed posters put up by Plaintiffs that inform noncitizens of their rights and give them information about how to obtain legal representation.  Detention centers previously removed posters during the Stop Work Order period. For example, Plaintiff Amica Center had a poster at the Farmville Detention Center that explained Amica Center's work (including "know your rights" presentations), visitation times, and hotline information—without mentioning any of the Programs by name.  This poster was taken down after the Stop Work Order.  Plaintiffs are working to confirm whether their posters are still up today, including posters that must be posted according to the terms of various settlement agreements.

145.    All the while, thousands of noncitizens will face removal proceedings without access to vital information about how to present themselves and their cases in those proceedings. This is particularly concerning for noncitizens in detention, whose removal proceedings are accelerated.  For noncitizen children receiving representation through CCI, the harm is even more drastic: disruption to—and potential loss of—their representation in immigration court.  Even a

"temporary" stop to these programs is extremely harmful to individuals in custody, for whom removal proceedings move particularly quickly—even if the Programs are later reinstated, many will be ordered removed in the meantime.

146.    Defendants' announced termination already has forced Plaintiffs to reevaluate their operations.  As time goes on, Plaintiffs (and other nonprofit providers) are forced to reassign or terminate staff, divert funding from equally important initiatives, or even shut their doors.  Even those nonprofits large enough to survive Defendants' arbitrary and capricious action will face serious consequences, including being forced to reassign or terminate staff.  For example, Plaintiff NWIRP receives nearly a third of its budget in the form of dedicated funding from the federal government, and much of its other funding is similarly restricted to support specific work.  NWIRP cannot simply shift funding around to cover the gaps in its services from losing funding for the Programs.  Plaintiff Estrella received approximately $83,148 per month in LOP and ICH funding and is rapidly depleting its savings to keep the 13 dedicated employees who run these programs employed.  Plaintiff Amica Center relied on continued LOP funding to hire nine full-time staff members dedicated to providing LOP services, and now those positions are unfunded and in jeopardy.  For Plaintiff RMIAN, LOP, FGLOP, and ICH funding makes up 25% of its 2025 operating budget, and without that funding may have to lay off the 6 full-time equivalent staff members proving LOP services and the 8 staff members at least partially funded by FGLOP or ICH funding.  Plaintiff American Gateways receives 27% of its budget from LOP and ICH funding, and loss of that funding for any extended period of time will force them to lay off at least some of the 14 full-time equivalent staff it dedicates to those programs.  Plaintiff PIRC is very likely to have to lay off five or six staff members because of the funding cancellation.  Plaintiff CCLA receives over 17% of its budget for immigration-related work from LOPC, and has already

been forced to lay off a part-time employee and to immediately reassign two members of its staff to different departments for at least a portion of their time—and CCLA may be forced to conduct further layoffs as time goes on without funding.

147.    Loss of these staff may include those who have deep, significant, and subject-matter expertise in relation to LOP, and loss of that experience and expertise would be irreparable and ongoing harm.  This is especially true because in many remote areas where detention facilities are located, Plaintiffs' employees are the only individuals with the necessary expertise.  Even if the Programs eventually are reinstated, it will be impossible to recreate the institutional knowledge that will be lost, both within the government and within Plaintiff organizations.

148.    Termination of the Programs also will result in a loss or reduction of Plaintiffs' access to noncitizens in detention and at immigration courts.  Already, Plaintiffs are losing access to noncitizens in detention and immigration courts, because of the decision to terminate the programs.  Plaintiffs are working and will continue to work to regain limited access to detention facilities under the Detention Standards, as they tried under the Stop Work Order, spending significant time and resources to modify presentations and materials to remove references to LOP activities—but the Stop Work Order period shows these efforts are unlikely to be successful.

149.    Given the extreme complexity of immigration removal proceedings, *see Padilla v. Kentucky*, 559 U.S. 356, 369 (2010), and the absence of appointed counsel for noncitizens facing removal, the dismantling of these Programs will frustrate Plaintiffs' respective missions to support noncitizens.  An increased number of noncitizens will be forced to navigate the immigration system without *ever* having spoken to a lawyer about the immigration process, their obligations, or the legal remedies available to them.  Noncitizen children represented by lawyers through CCI

are experiencing disruption to their attorney-client relationship, and could lose representation altogether, as organizations are forced to cut staff.

150.    Beyond the adverse consequences resulting from noncitizens in removal proceedings losing access to information, Defendants' actions will result in a less efficient and costlier immigration system, to the detriment of noncitizens, courts, and U.S. taxpayers alike. Thus, terminating the Programs causes inefficiencies, and prevents noncitizens from receiving due process protections that they are legally required to receive.

151.    Terminating the Programs makes little fiscal sense.  Judge Dana Marks, a former San Francisco immigration judge and former spokeswoman for the National Association of Immigration Judges told the Washington Post that, "[f]rom our experience as immigration judges, the program is cost effective."  Maria Sacchetti, *ICE Praised Legal-Aid Program for Immigrants That Justice Dept. Plans to Suspend*, WASH. POST (Apr. 17, 2017), https://wapo.st/2qGf1uT.  The amicus brief of former immigration judges confirms this.

152.    Far from streamlining the immigration system, Defendants' actions will force immigration judges to spend *more* time explaining removal proceedings and ensuring that noncitizens understand what is happening in their cases.  Immigration courts, which already face record backlogs, will be forced to explain these considerations in greater detail to noncitizens on an individual basis, wasting valuable time and resources.  Immigration Courts are also likely to experience an increase in appeals and motions to reopen, as noncitizens ordered removed without a full understanding of their legal rights seek to challenge those removal orders.  Similarly, without accurate knowledge of the required showings for relief, some noncitizens who may have otherwise agreed to removal upon realizing that their claims were tenuous may instead choose to seek relief, adding to the immigration court backlog.  Plaintiffs Amica Center and RMIAN, for example, have

frequently witnessed individuals in detention realize that their potential claims were tenuous and decide not to seek relief—accepting a removal order or requesting voluntary departure.

153.    Terminating LOPC will also mean unaccompanied children and their custodians are not informed of their rights and responsibilities, including the duty to appear at scheduled immigration court hearings.  Terminating LOPC is likely to result in more missed hearings, and thus more duplicative scheduling and work for immigration courts.

154.    Further, in the case of CCI, Defendants' actions arbitrarily take away funding for existing legal representations with ongoing ethical duties, leaving CCI providers on the hook to provide continued legal services with no funding.

155.    Defendants have failed to provide *any* official explanation for their actions, which violates Congressional instruction and ignores unrefuted evidence about the Programs' efficacy.

156.    Defendants' decision to terminate the Programs is far from an isolated attempt to remove protections afforded to noncitizens navigating the immigration system.  Noncitizens are being arrested, detained, and deported rapidly—many in expedited proceedings.  Defendants now illogically have terminated Programs that, according to multiple studies, make proceedings demonstrably more efficient, while ensuring that immigration proceedings are conducted legally.

157.    Defendants' termination of funding for the Programs constitutes "final agency action" reviewable under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of [Defendants'] decisionmaking process," and because "rights or obligations have been determined" by Defendants' decision.  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted).  By halting funding for the Programs, Defendants are effectively shutting down the Programs and leading detention facilities and immigration courts to reduce or eliminate Plaintiffs' access to noncitizens—unquestionably altering the parties' legal rights and obligations.

### FIRST CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious, Abuse of Discretion, and Not in Accordance with Law

158.    Plaintiffs incorporate herein by reference paragraphs 1 through 157 as if fully rewritten herein.

159.    The Administrative Procedure Act ("APA") authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

160.    Defendants have given no reasoned justification for the abrupt termination of the Programs.  The only information provided is that termination of the underlying contract is for "convenience" of the government.

161.    The decision to end the Programs is arbitrary and capricious in multiple respects.

162.    Since Congress appropriated funding for LOP, LOPC, and ICH in 2024, no factual or legal developments have rendered the Programs ineffective or unnecessary.  Indeed, only *two days* passed between the change of administration and the Defendants' first attempt to end the Programs.  Defendants have provided no reasonable explanation for their actions, despite the practical consequences that will arise from its actions.  Even assuming the need to conduct a further evaluation of the Programs, any such evaluation could take place while the Programs are ongoing, as has occurred regularly in the past.  There is no need for a stop during the "audit," whether or not an executive order instructs there be one, and particularly where Congress has clearly instructed that funding and operation should continue pending any review.  It is arbitrary and capricious—indeed, it is nonsensical—to destroy the Programs before purporting to evaluate them.

163.    To the extent Defendants claim the "Protecting the American People Against Invasion" Executive Order commanded them to stop funding the Programs, that is not a defense— such a command itself is arbitrary and capricious.  It is also an incorrect reading of the Executive

Order, which instructs Defendants to only "[p]ause distribution of all *further* funds." Funding for LOP, LOPC, and ICH has already been appropriated by Congress and is thus not "further" at all—the Programs are *already* funded and Defendants have stopped *existing* funding.

164.    To the extent Defendants cite their own February 5 memo, its purported focus on "waste" is plainly pretextual. That the Stop Work Order did not pause funding for LOPC for the "audit" Defendants were purportedly doing—but the Termination Notice has now terminated funding for LOPC—only highlights this arbitrary and capricious (and pretextual) decision-making. Defendants' true reasoning is revealed in the AG Memo, which instructs Defendants to "not enter into any new contract . . . to provide Federal funding to non-governmental organizations that support or provide services, either directly or indirectly (e.g., through sub-contracting or other arrangements), to removable or illegal aliens." That is Defendants' aim here: to cut off all contracts to provide services to non-citizens, regardless of whether those contracts are actually wasteful, fraudulent, or abusive. The review was simply a mechanism to generate a pretextual reason to cancel existing contracts. That this is the third attempt by Defendants in three months to terminate the Programs further evidences their determination to terminate the Programs—not to carry out legitimate efficiency reviews.

165.    Defendants' unlawful actions of issuing the Termination Order, terminating funding for the Programs, denying Plaintiffs access to detention centers and courthouse facilities, and removing posters and other materials from detention centers and courthouse facilities has caused and will continue to cause Plaintiffs significant and irreparable harms. An organization is harmed if the "actions taken by [the defendant] have perceptibly impaired the [organization's] programs." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotation marks and citation omitted). Here, the loss of funds will frustrate Plaintiffs' missions

and force them to reduce staff and/or shift programing to serve fewer noncitizens. To achieve their goals of educating noncitizens of their rights and responsibilities in removal proceedings, Plaintiffs will be forced to expend other money (to the extent that Plaintiffs have other sources of funding), diverting limited funds and staff from other critical programs.

166.    In addition, Defendants' unlawful action directly undermines Plaintiff organizations' respective missions to provide information, counseling, referrals, and other services to *pro se* noncitizens. Defendants have "entirely failed to consider an important aspect of the problem" by failing to consider the impact to Plaintiffs and their clients. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

167.    Because Defendants' termination of the Programs is arbitrary and capricious, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA.

## SECOND CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### Violation of the Appropriations Clause
### (LOP/LOPC/ICH Providers Only)

168.    Plaintiffs incorporate herein by reference paragraphs 1 through 157 as if fully rewritten herein.

169.    The APA authorizes this Court to set aside agency action that is "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(B)–(D).

170.    Congress has already appropriated and allocated funds to LOP, LOPC, and ICH, and President Biden signed Congress's bill into law in 2024. Those funds have already been obligated to Plaintiffs, through their contracts with Acacia, who contracts on behalf of the

government.  Under the Appropriations Clause, the Executive Branch is obligated to spend funds that have been appropriated by Congress.  U.S. Const. art. I, § 9, cl. 7.

171.    The Executive Branch and the President do not have the authority to withhold funds from allotment and obligation.  *See, e.g.*, *Train v. City of New York*, 420 U.S. 35, 37, 41, 46 (1975).  Similarly, where funds have already been obligated through a definite commitment of those funds to a provider of services or goods, the government is legally obligated to provide those funds.  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

172.    Because Defendants' termination of LOP, LOPC, and ICH violates the Appropriations Clause, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA.

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### Violation of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
### (LOPC Providers Only)

173.    Plaintiffs incorporate herein by reference paragraphs 1 through 157 as if fully rewritten herein.

174.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

175.    Defendants' decision to terminate LOP and LOPC also violates Congress's command in the TVPRA, that the Secretary of Health and Human Services (who has legal custody of unaccompanied children) "shall" work with EOIR to "ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by [EOIR]." 8 U.S.C. § 1232(c)(4).  This command in the TVPRA means that EOIR must operate a legal orientation program for custodians, which it has done through LOPC.  By cancelling both

LOP and the more specific LOPC, Defendants violate the TVPRA and thus violate the APA. 5 U.S.C. § 706(2)(B).

176.    Defendants' unlawful termination of LOPC directly harms LOPC providers by denying them funding and by undermining Plaintiff organizations' respective missions to provide information, counseling, referrals, and other services to *pro se* noncitizens, including unaccompanied children and their custodians.

177.    Because Defendants' termination of the Programs is unlawful, , Plaintiffs ask that the Court set aside Defendants' termination of LOPC as violative of the APA.

**FOURTH CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Violation of the First Amendment—As Applied**

178.    Plaintiffs incorporate herein by reference paragraphs 1 through 157 as if fully rewritten herein.

179.    The APA authorizes this Court to set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

180.    The First Amendment to the United States Constitution guarantees Plaintiffs the rights to free speech, to free assembly, and to petition the government. While courtrooms are typically nonpublic forums, other parts of the courthouse are limited public forums. *See Enoch v. Hamilton Cnty. Sheriff's Off.*, 2024 WL 3597026, at *5 (6th Cir. 2024). By granting Plaintiffs access to courthouses and immigration detention centers to hang posters, advise noncitizens of their legal rights, and speak for the past 21 years, the Government has confirmed that the courthouses and detention centers function as limited public forums. Plaintiffs exercise their First Amendment rights and express their viewpoints regarding the provision of information to noncitizens in immigration proceedings, when they screen, educate, consult with, advise, and otherwise assist noncitizens in need of legal services through the Programs, in courthouses,

detention centers, or other areas permitted by the Programs. Plaintiffs also exercise these rights when they inform noncitizens of their rights and obligations in immigration courts and proceedings. While the Government may impose reasonable limits on speech in limited public forums, it may not exercise viewpoint discrimination. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

181.    Plaintiffs' broader efforts on behalf of noncitizens' rights and ensuring access to equal justice also implicate their rights to free speech, to free assembly, and to petition the government.

182.    Furthermore, while the government need not provide funding for all speech, the government may not withhold funding if it infringes on the speaker's freedom of speech. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972), *overruled on other grounds by Rust v. Sullivan*, 500 U.S. 173 (1991). Thus, the government may not discriminate on the basis of viewpoint when it provides access to funding. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548-549 (2001).

183.    Defendants' decision to terminate the Programs violates the First Amendment by curtailing Plaintiffs' exercise of their First Amendment rights. Defendants' action is an overbroad and unduly burdensome restriction on Plaintiffs' rights to free speech, to free assembly, to access to a limited public forum, and to petition the government.

184.    Defendants are terminating the Programs because they disagree with Plaintiffs' viewpoints and missions: as the AG Memo explains, Defendants want to cut funding for all "organizations that support or provide services . . . to removable or illegal aliens." By preventing Plaintiffs from accessing immigration courts and detention facilities and sharing information about the legal process and legal rights to noncitizens who are detained, Defendants prevent Plaintiffs from sharing their viewpoint in limited public forums.

185.    Defendants' actions rescind Plaintiffs' access to these approved forums and attempt to silence their constitutionally protected speech by removing funding that Congress has allocated to support their speech.    Additionally, Defendants' actions prevent Plaintiffs from sharing information about legal rights and legal services to noncitizens in detention and potential clients who need the services of the Programs, both through written materials and word of mouth.  These actions are arbitrary and an interference with Plaintiffs' speech in a limited public forum.

186.    Defendants' actions also burden the constitutionally protected speech of third parties, including others similarly situated to Plaintiffs (among them, volunteers who historically have been allowed in detention centers to share legal information as part of LOP) and the noncitizens in detention and potential clients of Plaintiffs who need the services, and have a First Amendment right to receive information from Plaintiffs' Programs.

187.    Because Defendants' actions impose unreasonable limits on Congressionally appropriated funding and seek to silence Plaintiffs because the government disagrees with their speech, they violates the First Amendment.  *See Rosenberger*, 515 U.S. at 829.

188.    This violation causes ongoing and irreparable harm to Plaintiffs, who have no adequate remedy at law for Defendants' wrongful conduct.  Absent immediate injunctive relief, Plaintiffs will continue to suffer irreparable harm.

189.    Because Defendants' termination of the Programs violates the First Amendment, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA, restore funding to the Programs as allocated by Congress, and permit Plaintiffs access to the courts and other public forums that they were previously permitted to access in connection with the Programs, but that Defendants are currently preventing Plaintiffs from accessing.  Plaintiffs further ask the Court to enjoin Defendants from preventing Plaintiffs from distributing written materials and putting up

posters with information relevant to the Programs in these designated public forums, and to replace any posters and materials Defendants have removed (or to allow Plaintiffs to do so).

**FIFTH CLAIM FOR RELIEF**
**Violation of the Separation of Powers—Usurping the Legislative Function**

190.    Plaintiffs incorporate herein by reference paragraphs 1 through 157 as if fully rewritten herein.

191.    Article I, Section 1 of the United States Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."  U.S. Const. Art. I, § 1.  "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power among the legislature to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'"  *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting Federalist No. 70, at 475 (A. Hamilton)).  Attempts by the Executive to exercise legislative power are an affront to the carefully constructed balance created by the Framers.

192.    The Constitution vests the right to appropriate funds exclusively with Congress.  The Executive Branch has no discretion to withhold funds validly appropriated by Congress.  U.S. Const. Art. I, § 9, cl. 7; *see also Train v. New York*, 420 U.S. 35, 45–47 (1975).

193.    Defendants' attempts to terminate the Programs violate the separation of powers because Executive Branch refusal to disburse previously appropriated funds as direct by statute disregards the controlling acts of Congress.  Cancelling congressionally appropriated funding to the Programs and refusing to disburse funds appropriated by Congress, in defiance of a congressional enactment, violates the separation of powers.

194.    Further, any future attempts by Defendants to implement Executive Order No. 14159 or the AG Memo (or any other command that usurps the legislative powers of congress) by withholding congressionally appropriated funds will likewise violate the separation of powers.

195.    Because Defendants' attempts to terminate the Programs violate the separation of powers, Plaintiffs are entitled to declaratory and injunctive relief prohibiting Defendants from terminating the Programs or preventing Plaintiffs from receiving appropriated funds pursuant to the existing memos or any future action under Executive Order No. 14159.

### SIXTH CLAIM FOR RELIEF
### Ultra Vires

196.    Plaintiffs incorporate herein by reference paragraphs 1 through 157 as if fully rewritten herein.

197.    Defendants are acting ultra vires in seeking to terminate the Programs and by refusing to provide validly appropriated funds to the Programs.  Defendants have no statutory authority to terminate the Programs and any attempt to do so, including any future attempts to do so under Executive Order No. 14159 or the AG Memo, is ultra vires.  *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963).

198.    Because Defendants; attempts to terminate the Programs are ultra vires, Plaintiffs are entitled to declaratory and injunctive relief preventing Defendants from taking further ultra vires steps to terminate the Programs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.    Declare that Defendants' actions violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise in violation of the law."

2.    Declare that Defendants' actions violate the APA because they violate the Appropriations Clause.

3.    Declare that Defendants' actions violate the APA because they violate Plaintiffs' First Amendment Rights to advocate on behalf of noncitizens in removal proceedings.

4.    Declare that Defendants' actions violate the separation of powers because they exceed the appropriate authority of the Executive Branch and purport to exercise power granted exclusively to Congress.

5.    Declare that Defendants' actions seeking to terminate the Programs are ultra vires and void.

6.    Set aside Defendants' actions that violate the APA, including all attempts and orders to terminate the Programs.

7.    Enjoin Defendants nationwide from ceasing to continue LOP, LOPC, FGLOP, ICH and CCI programs, Programs that were mandated by Congress.

8.    Enjoin Defendants nationwide from refusing to expend the appropriated funds as necessary to continue the Programs as mandated by Congress, including funding to any persons previously authorized by DOJ to receive funding for the Programs.

9.    Enjoin Defendants nationwide from preventing Plaintiffs from accessing immigration courthouses, detention centers, and other public forums.

10.    Enjoin Defendants nationwide from removing materials and posters Plaintiffs have posted in immigration courthouses, detention centers, and other public forums.

11.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

12.     Award such other relief as this Court may deem just and proper.

Respectfully submitted,

April 18, 2025

s/ Adina Appelbaum                                        s/ Laura Sturges

AMICA CENTER FOR IMMIGRANT RIGHTS          GIBSON DUNN & CRUTCHER

Adina Appelbaum (D.C. Bar No. 1026331)          Laura Sturges (C.O. Bar No. 36843)*
Samantha Hsieh (V.A. Bar No. 90800)*            1900 Lawrence Street, Suite 3000
Amelia Dagen (D.C. Bar No. 9004838)             Denver, CO 80202-2211
Amica Center for Immigrant Rights               (303) 298-5700
1025 Connecticut Avenue NW, Suite 701           lsturges@gibsondunn.com
Washington, DC 20036
(202) 331-3320                                  Amer S. Ahmed (D.C. Bar No. 500630)
adina@amicacenter.org                           Richard W. Mark (D.D.C. Bar No. NY0378)
sam@amicacenter.org                             200 Park Avenue
amelia@amicacenter.org                          New York, NY 10166-0193
                                                (212) 351-4000
                                                rmark@gibsondunn.com
                                                aahmed@gibsondunn.com

                                                * admitted *pro hac vice*