**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| AMICA CENTER FOR IMMIGRANT ) | |
| RIGHTS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 1:25-cv-298-RDM |
| v. ) | |
| ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ———————————————— ) | |

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.  The Programs and the Acacia Contract ......................................................................2

II.  The April 10, 2025 Termination Decision ...................................................................3

III.  Procedural History.......................................................................................................4

LEGAL STANDARD ...........................................................................................................5

ARGUMENT ........................................................................................................................6

I.  The Court Lacks Jurisdiction Under the APA to Compel the Government to Pay Money Under a Contract ...............................................................................................6

II.  Program Funding Decisions Are Committed to Agency Discretion By Law ..................14

III.  Plaintiffs' Appropriations Clause, First Amendment, and TVPRA Claims Should Be Dismissed .................................................................................................................16

    A.  Plaintiffs Fail to State a Viable Appropriations Clause Claim ...................................16
    B.  Plaintiffs' TVPRA Claim Fails ................................................................................20
    C.  Plaintiffs Fail to State a Plausible First Amendment Claim.......................................22

CONCLUSION....................................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Coal.v. Dep't of State*,
-- F. Supp. 3d --, 2025 WL 752378 ................................................................19, 20

*Albrecht v. Comm. on Emp. Benefits*,
357 F.3d 62 (D.C. Cir. 2004) ..................................................................*passim*

*Al-Gharawy v. U.S. Dep't of Homeland Sec.*,
617 F. Supp. 3d 1 (D.D.C. 2022) ..................................................................3

*Alphapointe v. Dep't of Veterans Affairs*,
745 F. Supp. 3d 1 (D.D.C. 2020) ..................................................................7

*Am. Oversight v. U.S. Dep't of Veterans*,
*Affs.*, 498 F. Supp. 3d 145 (D.D.C. 2020) ................................................5, 6

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*,
897 F.3d 314 (D.C. Cir. 2018) ..................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................5

*Ateba v. Leavitt*,
-- F.4th --, 2025 WL 1036451 (D.C. Cir. Apr. 8, 2025) ............................24, 25

*California v. U.S. Dep't of Educ.*,
-- F. Supp. 3d --, 2025 WL 760825 (D. Mass. Mar. 10, 2025) ....................11

*City of New Haven v. United States*,
634 F. Supp. 1449 (D.D.C. 1986) ..............................................................19

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) ..................................................................*passim*

*Davenport v. Wash. Educ. Ass'n*,
551 U.S. 177 (2007) ..................................................................................23

*Dep't of Educ. v. California*,
145 S. Ct. 966 (2025) ..................................................................................*passim*

*Diaz v. Neighbors Consejo*,
77 F. Supp. 3d 227 (D.D.C) ..........................................................................5

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ..................................................................................18, 19

*Fed'n For Am. Immigration Reform, Inc. v. Reno*,
93 F.3d 897 (D.C. Cir. 1996) ..................................................................21

*Franklin-Mason v. Mabus*,
742 F.3d 1051 (D.C. Cir. 2014) ..................................................................6

*Great-West Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) ........................................................................................................ 6, 11

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ...................................................................................................... 19, 20

*Hazardous Waste Treatment Council v. Thomas,*
    885 F.2d 918 (D.C. Cir. 1989) .............................................................................................. 21

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .............................................................................................................. 15

*Hettinga v. United States,*
    677 F.3d 471 (D.C. Cir. 2012) ................................................................................................ 5

*Hodge v. Talkin,*
    799 F.3d 1145 (D.C. Cir. 2015) ...................................................................................... 24, 25

*Hometown Connections v. Noem,*
    No. 8:25-cv-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) .............................................. 12

*Ingersoll-Rand Co. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985) .................................................................................... 7, 10, 18

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan,*
    746 F.2d 855 (D.C. Cir. 1984) .............................................................................................. 15

*Janay v. Blinken,*
    743 F. Supp. 3d 96 (D.D.C. 2024) ........................................................................................ 20

*Keepseagle v. Vilsack,*
    815 F.3d 28 (D.C. Cir. 2016) ................................................................................................. 5

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.,*
    56 F.3d 279 (D.C. Cir. 1995) ............................................................................................ 8, 13

*Kimberlin v. U.S. Dep't of Justice,*
    318 F.3d 228 (D.C. Cir. 2003) .............................................................................................. 24

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ............................................................................................................... 6

*Lance v. Coffman,*
    549 U.S. 437 (2007) ...................................................................................................... 18, 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...................................................................................................... 21, 22

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ...................................................................................................... 14, 15

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) .............................................................................................................. 22

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ........................................................................................................ 6, 21

iii

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ................................................................. 7, 8, 13

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ................................................................. 15, 16

*Navab-Sfavi v. Broad. Bd. of Governors*,
  650 F. Supp. 2d 40 (D.D.C. 2009) ........................................................... 9, 17

*Off. of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990) ...................................................................................... 17

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) .............................................................. *passim*

*Pulphus v. Ayers*,
  249 F. Supp. 3d 238 (D.D.C. 2017) .............................................................. 24

*Regan v. Taxation With Representation of Wash.*,
  461 U.S. 540 (1983) ................................................................................ 23, 24

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ................................................................................ 23, 24

*Seed v. EPA*,
  100 F.4th 257 (D.C. Cir. 2024) ..................................................................... 13

*Shaffer v. Veneman*,
  325 F.3d 370 (D.C. Cir. 2003) ........................................................................ 7

*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986) .................................................................... 10

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) .............................................................. *passim*

*TigerSwan, Inc. v. United States*,
  110 Fed. Cl. 336 (2024) .................................................................................. 9

*Tootle v. Sec'y of Navy*,
  446 F.3d 167 (D.C. Cir. 2006) ........................................................................ 9

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ........................................................................ 7

*Twin Metals Minn. LLC v. United States*,
  No. 22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023) ....................... 10

*Twin Rivers Paper Co. LLC v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019) ...................................................................... 21

*U.S. Conference of Catholic Bishops v. U.S. Dep't of State*,
  -- F. Supp. 3d --, 2025 WL 763738 (D.D.C. Mar. 11, 2025) .................. *passim*

*United States v. Nassif*,
  97 F.4th 968 (D.C. Cir. 2024) ....................................................................... 25

*Wright v. Foreign Serv. Grievance Bd.*,
    503 F. Supp. 2d 163 (D.D.C. 2007) ........................................................................13

*Ysursa v. Pocatello Educ. Ass'n*,
    555 U.S. 353 (2009) ....................................................................................................23

**Statutes**

5 U.S.C. § 702 ....................................................................................................................7

5 U.S.C. § 701(a)(2) ............................................................................................... 2, 14, 16

5 U.S.C. § 706(2)(A) ........................................................................................................17

8 U.S.C. § 1232(c)(4) .................................................................................................5, 20

8 U.S.C. § 1232(g) ...........................................................................................................20

28 U.S.C. § 1491(a)(1) .......................................................................................................7

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 .....................2

**Rules**

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 1, 5, 14

Fed. R. Civ. P. 12(b)(6) .......................................................................................5, 22, 26

Fed. R. Civ. P. 12(h)(3) .....................................................................................................5

Fed. R. Civ. P. 15(a)(3) ......................................................................................................1

**Regulations**

Exec. Order No. 14159 .......................................................................................................3

48 C.F.R. § 52.242-15(a) ..............................................................................................3, 4

48 C.F.R. § 52.249-2(a) .....................................................................................................3

**INTRODUCTION**

This case is about a contract. Defendant Executive Office for Immigration Review ("EOIR") administers several legal access programs that provide information and resources to individuals involved in immigration court proceedings, and the requirements for those programs—everything from the programs' implementation to how and by whom services are to be delivered—are left to EOIR's discretion. EOIR previously elected to contract out the day-to-day management of the programs to a prime contractor, who in turn subcontracted with various legal services organizations to deliver program services throughout the country. That arrangement ended on April 10, 2025, however, when the operative task orders for the programs were terminated for the convenience of the government pursuant to the express terms of the governing program contract ("Termination Decision").

The plaintiffs in this case—twelve nonprofit organizations that delivered program services as subcontractors to the prime contractor—sought a temporary restraining order ("TRO") in the wake of the April 10, 2025 Termination Decision, which this Court denied. The parties are now briefing *for the third time* the jurisdictional and threshold legal arguments that should decide this case. Yet while Plaintiffs may be reluctant to commit to resolving those issues dispositively, *see* Dkt. 61 at 2, this case should no longer proceed indefinitely in a preliminary posture because Plaintiffs' claims should be dismissed for lack of jurisdiction and failure to state a claim.[1] *See* Fed. R. Civ. P. 12(b)(1), (6).

As Defendants have argued since this case's inception, Plaintiffs' claims are, in essence, contract-based claims for monetary relief against the federal government over which this Court lacks subject-matter jurisdiction. Indeed, a recent Supreme Court order in a near-identical case confirms that federal district courts lack jurisdiction under the Administrative Procedure Act

---

[1] Defendants' deadline to respond to Plaintiffs' First Amended Complaint, Dkt. 62, is currently May 14, 2025, *see* Dkt. 49; Fed. R. Civ. P. 15(a)(3), and Defendants submit this motion to dismiss in light of that deadline. Additionally, in accordance with Local Rule 7(n)(1), Defendants are filing the Administrative Record for the Termination Decision "simultaneously with the filing of [this] dispositive motion."

("APA") "to order" the federal government to "pay[] . . . money" under a contract—the very relief that Plaintiffs demand here. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). APA review is unavailable in any event because Defendants' discretionary decisions regarding the allotment of appropriated funds constitutes unreviewable agency action. 5 U.S.C. § 701(a)(2). And Plaintiffs' allegations otherwise fail to state a plausible claim for relief. Plaintiffs' First Amended Complaint, Dkt. 62 ("Am. Compl."), should accordingly be dismissed in its entirety.

## BACKGROUND

### I.    The Programs and the Acacia Contract

This case concerns five legal access programs ('the Programs') administered by EOIR—the Legal Orientation Program ("LOP"), the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program ("FGLOP"), and the Counsel for Children Initiative ("CCI"). Am. Compl. at 3 (¶ 1). The scope and requirements for each of these Programs are not prescribed in any federal statutes or regulations. Rather, for the past several years, the Programs have been funded annually through congressional appropriations, and their implementation and administration have been left to EOIR. *See id.* 26-27 (¶¶ 80-81). In March 2024, Congress appropriated $844 million to EOIR for "expenses necessary for the administration of immigration-related activities," and that same appropriations statute provided that "not less than" $28 million of that total appropriated amount "shall be made available for services and activities provided by the Legal Orientation Program." *Id.* at 41 (¶ 116) (quoting the Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 133). The funds earmarked for the "Legal Orientation Program" only concern LOP, LOPC, and ICH. *Id.* at 3 (¶ 1). By contrast, neither FGLOP nor CCI is required by a specific appropriation; both programs are instead "discretionarily funded" through EOIR's general lump-sum appropriations. *Id.* at 31 (¶ 88). Since September 2024, EOIR and the Programs have been funded through continuing appropriations that maintain funding at fiscal year ("FY") 2024 levels. *Id.* at 27 (¶ 81).

2

EOIR contracted with non-party Acacia Center for Justice, a Washington, D.C.-based nonprofit organization, to manage the Programs.  *Id.* at 20 (¶ 62).  Acacia in turn subcontracted with various legal services organizations, including Plaintiffs, to deliver Program services on the ground at covered detention facilities and immigration courts.  *Id.* at 20 (¶ 63), 34 (¶ 94).  All LOP, LOPC, ICH, FGLOP, and CCI services were delivered pursuant to the prime contract between DOJ and Acacia ("the Acacia Contract" or "the Contract").  *Id.* at 34 (¶¶ 94-95); *see* AR 7-82; *see also Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F. Supp. 3d 1, 8 (D.D.C. 2022) (explaining that at the motion to dismiss stage, a court can consider "any documents attached to or incorporated into the complaint").  As relevant here, the Acacia Contract incorporated two provisions from the Federal Acquisition Regulation ("FAR") that permitted DOJ to "terminate the [C]ontract for the convenience of the Government."  AR 47; *see* AR 53.  More specifically, those provisions provided that "[t]he Government may terminate performance of work under th[e] [C]ontract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest."  48 C.F.R. § 52.249-2(a); *see id.* § 52.249-6(a)(1).

## II.    The April 10, 2025 Termination Decision

Shortly after taking office on January 20, 2025, President Donald Trump signed an executive order titled "Protecting the American People Against Invasion."  Exec. Order No. 14159; *see* Am. Compl. at 5 (¶ 7).  That Executive Order, in relevant part, directed the Attorney General to "[p]ause distribution of further funds pursuant to" government contracts that "provid[e] Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens" pending a review of those contracts for, among other things, "waste, fraud, and abuse" and compliance with "applicable law."  Exec. Order No. 14159, § 19(a)-(b).  In response to that presidential directive, the DOJ Contracting Officer for the Acacia Contract issued a stop work order on January 22, 2025 ("Stop Work Order"), which suspended the delivery of LOP, ICH, FGLOP, and CCI services.  *See* Am. Compl. at 5 (¶ 8); *see also* 48 C.F.R. § 52.242-15(a) (authorizing the Contracting Officer to "require the Contractor to stop all, or any part, of the work called for by" the Acacia Contract "for a period of 90 days").  That Stop Work

Order was later rescinded on February 2, 2025, and services under the Programs resumed the following day.  Am. Compl. at 5 (¶ 8), 42-44 (¶¶ 120-130).

On April 3, 2025, a letter that was sent to Acacia purported to terminate the operative task orders for the five Programs at issue in this case, effective that same day.  *Id.*. at 6 (¶ 11).  That letter was sent in error.  The following day, the Contracting Officer for the Acacia Contract sent a separate letter to Acacia that rescinded the April 3, 2025 letter and clarified that the latter communication "ha[d] no legal effect."  *Id.*  No pause in Program funding occurred as a result of the April 3, 2025 letter.

On April 10, 2025, the same Contracting Officer sent a letter to Acacia stating that the operative task orders for LOP, LOPC, ICH, FGLOP, and CCI were being terminated "for the convenience of the government," effective at 12:01 a.m. on April 16, 2025.  *Id.* at 6 (¶ 12).  That termination has since gone into effect.  *Id.*

## III.   Procedural History

Plaintiffs filed this lawsuit on January 31, 2025, and sought preliminary relief from the January 22, 2025 Stop Work Order.  *See* Dkt. 1; Dkt. 2; Dkt. 2-1 ("PI Motion").  The Court held a hearing on Plaintiffs' PI Motion on March 17, 2025, and subsequently took the Motion under advisement.  *See* March 17, 2025 Minute Order.

Shortly after Defendants gave notice of the April 10, 2025 Termination Decision, Plaintiffs notified the Court of their "intent" for their PI Motion "to be re-urged and re-heard."  Dkt. 51 at 1.  Plaintiffs subsequently filed a Renewed Motion for a Temporary Restraining Order, Dkt. 53; Dkt. 53-1 ("Renewed Motion"), which Defendants opposed, Dkt. 60.  The Court held a hearing on Plaintiffs' Renewed Motion on April 15, 2025, and at the conclusion of the hearing, denied the Motion from the bench.  *See* April 15, 2025 Minute Order.  The Court then set a hearing on Plaintiffs' pending challenge to Defendants' Termination Decision for May 14, 2025.

On April 18, 2025, Plaintiffs filed an Amended Complaint, in which they challenge the April 10, 2025 Termination Decision under the APA and on constitutional grounds.  Dkt. 62.  Plaintiffs specifically allege that the Termination Decision was arbitrary and capricious (Count 1);

that the termination of the LOP, LOPC, and ICH task orders violated the Appropriations Clause (Count 2); that the termination of the LOP and LOPC task orders violated the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232(c)(4) (Count 3); that the Termination Decision violates Plaintiffs' First Amendment rights (Count 4); and that the Termination Decision violates the separation of powers and was ultra vires (Counts 5 and 6).  Am. Compl. at 54-62 (¶¶ 158-98).

## LEGAL STANDARD

Federal courts "are courts of limited jurisdiction," and "[i]t is axiomatic that a court must have jurisdiction before it can hear any argument on the merits."  *Keepseagle v. Vilsack*, 815 F.3d 28, 32, 36 (D.C. Cir. 2016) (citation omitted).  Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  A "facial" challenge to a court's jurisdiction, like the one Defendants bring here, "contests the legal sufficiency of the jurisdictional allegations contained in the complaint."  *Am. Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145, 152 (D.D.C. 2020).  The court must accept such factual allegations as true and "construe 'the complaint in the light most favorable to the non-moving party.'"  *Id.* (citation omitted).  And if those allegations fail to establish that the court has jurisdiction, "dismissal is required as a matter of law."  *Diaz v. Neighbors Consejo*, 77 F. Supp. 3d 227, 229 (D.D.C); *see* Fed. R. Civ. P. 12(h)(3).

To withstand a motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  "[N]or must [a] court accept legal conclusions cast as factual allegations."  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).  Rather, a court must disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth" and determine whether the remaining "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief."  *Iqbal*, 556 U.S. at 679.

## ARGUMENT

I.    **The Court Lacks Jurisdiction Under the APA to Compel the Government to Pay Money Under a Contract**

Plaintiffs' APA claims should be dismissed at the threshold because, as the Supreme Court recently confirmed, this Court lacks jurisdiction under the APA "to enforce contractual obligation[s] to pay money" against the federal government. *Dep't of Educ.*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). And that jurisdictional principle applies with equal force to any such obligations created by the Acacia Contract or Program task orders at issue in this case.

At the motion-to-dismiss stage, "[t]he plaintiff bears the burden of establishing" a court's "jurisdiction." *Am. Oversight*, 498 F. Supp. 3d at 152 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) ("Before delving into the merits, we pause to assure ourselves of our jurisdiction, as is our duty."). For a plaintiff "bring[ing] a claim against the United States," carrying that jurisdictional burden requires "identify[ing] an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see Perry Capital*, 864 F.3d at 619 (noting that sovereign immunity is "jurisdictional in nature"). Plaintiffs here assert claims under the APA, *see* Am. Compl. at 54-61 (¶¶ 158-89), which "provide[s] a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702). "But even for claims that are not for money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting 5 U.S.C. § 702). This "important carveout" to the APA's sovereign immunity waiver "prevents plaintiffs from exploiting" that waiver "to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). And here,

6

Plaintiffs' attempt to use the APA to compel the federal government to continue to provide Program funding pursuant to the terms of the Acacia Contract, related subcontracts, and Program task orders is "impliedly forbid[den]," 5 U.S.C. § 702, by the Tucker Act.

The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has accordingly "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under . . . the APA." *Perry Capital*, 864 F.3d at 618-19 (citing *Albrecht*, 357 F.3d at 67-68); *see Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA." (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)); *Crowley*, 38 F.4th at 1106. Thus, regardless of how a claim is styled, a district court lacks jurisdiction over that claim if it "is in 'its essence' contractual." *Perry Capital*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see Albrecht*, 357 F.3d at 67 ("[T]he district court lacks jurisdiction if [the plaintiff's] claim is essentially a contract action."). And that jurisdictional barrier matters. It ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law," *Alphapointe v. Dep't of Veterans Affairs*, 745 F. Supp. 3d 1, 11 (D.D.C. 2020), and it respects Congress's deliberate choice to limit the remedies available for such claims, *see Megapulse*, 672 F.2d at 971 (recognizing that a plaintiff "cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract"). *See also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes.").

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38

F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). In examining the "source of the rights" prong, the D.C. Circuit has "rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 1107). But the court has also warned that plaintiffs cannot avoid the Tucker Act and its jurisdictional consequences by artfully crafting a complaint to disguise what is essentially a contract claim as a claim for equitable relief under a separate legal authority. *See id.*; *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see also Megapulse*, 672 F.2d at 969-70 ("This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."). A court must therefore consider, among other factors, whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Crowley*, 38 F.4th at 1107 (citation omitted).

The second prong "considers 'the type of relief sought.'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). Money damages and specific performance are "explicitly contractual remed[ies]," for instance. *Perry Capital*, 864 F.3d at 619. The D.C. Circuit has recently explained, moreover, that "the crux of" this relief-focused inquiry "boils down to" whether the plaintiff, "in whole or in part, . . . explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (quoting *Kidwell*, 56 F.3d at 284). Although a plaintiff does not necessarily seek monetary relief "merely because . . . success on the merits may obligate the United States to pay the complainant," as with the "source of the rights" prong, a plaintiff cannot avoid the Tucker Act's jurisdictional consequences by "converting" through creative pleading what is essentially a claim for money damages into one "requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284. In assessing the type of relief a plaintiff seeks, a court must accordingly "look to the complaint's substance, not merely its form." *Id.* And a plaintiff's request for injunctive or declaratory relief is truly non-monetary only if that requested

relief "has 'considerable value' independent of any future potential for monetary relief." *Id.*
*Compare Tootle v. Sec'y of Navy*, 446 F.3d 167, 175-76 (D.C. Cir. 2006) (concluding that a
plaintiff's request for injunctive relief was not a disguised claim for monetary relief because the
injunctive relief sought had "non-negligible value" compared to any potential monetary recovery
the plaintiff might have received), *with Spectrum Leasing Corp. v. United States*, 764 F.2d 891,
894 (D.C. Cir. 1985) (concluding that a plaintiff's claim was "one 'founded upon' a contract for
purposes of the Tucker Act" in part because the plaintiff's request for an order "compelling the
government to pay money owed . . . under an executory contract" was equivalent to the "classic
contractual remedy of specific performance").

Applying the two-pronged test described in *Crowley* here confirms that Plaintiffs' APA
claims amount to the very sort of contractual claims for monetary relief against the federal
government over which this Court lacks jurisdiction. Instead, those claims—which are premised
on a contract with the government, challenge the government's exercise of an express contractual
right, and seek to compel the government to continue paying money pursuant to that contract—
belong, under the Tucker Act, in the Court of Federal Claims.

Plaintiffs' APA claims, for one, are effectively based on an alleged right to Program funding
that is free from "abrupt termination[s]," Am. Compl. at 54 (¶ 160), and the only legal
"source . . . upon which" Plaintiffs could even plausibly "base[]" that asserted right, *see Crowley*,
38 F.4th at 1108, is the Acacia Contract, related subcontracts, and Program task orders. Plaintiffs
have no colorable claim to Program funding whatsoever absent those contracts. *See Navab-Sfavi
v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009) ("[T]he APA itself does not
'confer a substantive right to be free from arbitrary agency action,' nor does it create any other
substantive right that might be violated."). And deciding whether EOIR lawfully terminated
Program funding pursuant to the termination-for-convenience clauses in the Acacia Contract "turns
*entirely* on the terms of" that Contract and principles of federal contracting law. *Albrecht*, 357 F.3d
at 69; *see also, e.g.*, *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 344-45 (2024) (describing
the legal standard for assessing whether the government's termination of a contract for

convenience was improper). In short, Plaintiffs' asserted right to continuous Program funding "in no sense . . . exist[s] independently of" the Acacia Contract and related subcontracts and task orders. *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding that the plaintiff's claim against the federal government amounted to "a contract dispute" over which a district court lacked jurisdiction under the APA); *see Ingersoll-Rand Co.*, 780 F.2d at 78 (explaining that "it [was] possible to conceive of" a government contractor's challenge to a termination decision "as entirely contained within the terms of the contract"); *Twin Metals Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at *7 (D.D.C. Sept. 6, 2023) (finding a lack of subject-matter jurisdiction because the plaintiff "point[ed] to no other source of its asserted rights" beyond the lease agreements at issue).

The relief Plaintiffs seek, moreover, only bolsters the conclusion that their APA claims are essentially contractual in nature. *See Crowley*, 38 F.4th at 1110 ("We turn next to 'the type of relief sought.'"). In their Amended Complaint, Plaintiffs ask the Court to "[e]njoin Defendants . . . from refusing to expend" federal funds "as necessary to continue the Programs . . . , including funding to any persons previously authorized by DOJ to receive funding for the Programs." Am. Compl. at 63 (¶ 8). Plaintiffs seek, in other words, "an order compelling the government to pay [them] money," *Spectrum*, 764 F.2d at 894, pursuant to the only legal instruments that would arguably entitle them to any Program funding at all—*i.e.*, the Acacia Contract and related subcontracts and task orders. Such relief is indistinguishable from "the classic contractual remedy of specific performance," *id.*, confirming in turn that Plaintiffs' claims "sound in contract," *Perry Capital*, 864 F.3d at 619. *See id.* (observing that "specific performance is an explicitly contractual remedy"); *see also Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or *specific performance* in contract cases . . . . (emphasis added)).

Any lingering doubts as to whether this Court has jurisdiction to hear Plaintiffs' contract-based claims have since been dispelled by the Supreme Court's recent order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam). In *Department of Education*, a district

10

court had issued a TRO "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue," *id.* at 968, after that court concluded, in relevant part, that the plaintiff grant recipients were likely to succeed on their claim that the government's termination decision was arbitrary and capricious under the APA. *See California v. U.S. Dep't of Educ.*, -- F. Supp. 3d --, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025). The Supreme Court stayed the district court's TRO, however, after determining, among other things, that "the Government [was] likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ.*, 145 S. Ct. at 968. More specifically, the Supreme Court explained that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court [had] ordered." *Id.* (quoting *Great-West Life*, 543 U.S. at 212). "Instead," according to the Supreme Court, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.*

*Department of Education* further underscores that this Court lacks jurisdiction over Plaintiffs' contract-based claims. Like the *Department of Education* plaintiffs, Plaintiffs here seek relief from the termination of a government contract under which they received federal funding. Like the *Department of Education* plaintiffs, Plaintiffs challenge that contract-termination decision under the APA, including on the ground that the termination is arbitrary and capricious. Am. Compl. at 54-56 (¶¶ 158-67). And like the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the APA" to compel Defendants "to pay money" pursuant to a contract, including the Acacia Contract and related subcontracts and task orders. *Dep't of Educ.*, 145 S. Ct. at 968.

This Court should accordingly dismiss Plaintiffs' contract-based APA claims, which would be consistent with what other courts have done in similar cases involving government grants or contracts, in accordance with the Supreme Court's reasoning in *Department of Education*. *See U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, -- F. Supp. 3d --, 2025 WL 763738, at

*5 (D.D.C. Mar. 11, 2025) (denying a TRO motion after concluding that the court lacked the authority to "order the Government to pay money due on a contract"); *Solutions in Hometown Connections v. Noem*, No. 8:25-cv-885, 2025 WL 1103253, at *8-*10 (D. Md. Apr. 14, 2025) (denying the plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants in light of the Supreme Court's *Department of Education* order and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); Electronic Order, *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 3:25-cv-30041 (D. Mass Apr. 14, 2025), ECF No. 42 (dissolving a TRO after acknowledging that the *Department of Education* order is an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"); *see also* Order, *Am. Ass'n of Colleges For Teacher Educ. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *Department of Education* order).

Importantly, Plaintiffs cannot escape the conclusion that their APA claims are "at [their] essence" contractual, *see Crowley*, 38 F.4th at 1106, by pointing to their status as subcontractors. *See* Am. Compl. at 20 (¶ 63). Although Plaintiffs are not parties to the Contract between the federal government and Acacia, Plaintiffs' asserted right to Program funding is undoubtedly grounded in *a* contract—specifically, their respective subcontracts with Acacia, which are derived in turn from the primary Contract. And while Plaintiffs' APA claims here are not strictly based on a contract between Plaintiffs and the federal government, those claims nonetheless "turn[] *entirely* on" contracts terms—namely, the termination-for-convenience clauses found in the Acacia Contract. Consequently, Plaintiffs' claims can still be fairly characterized as the sort of claims "sound[ing] in contract" over which the Court lacks jurisdiction under the APA. *Perry Capital*, 864 F.3d at 619.

Additionally, a conclusion that claims sounding in contract would necessarily fall within the APA's waiver of sovereign immunity so long as they are brought by government subcontractors who are not in direct privity with the government would have perverse consequences. The Tucker

Act's "primary purpose" is "to ensure that a central judicial body adjudicates most claims against the United States Treasury," *Kidwell*, 56 F.3d at 284, and to that end, the statute "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims," *Crowley*, 38 F.4th at 1106 (citation omitted); *see also Spectrum*, 764 F.2d at 895 (observing that "Congress intended the jurisdiction and remedies of the Tucker Act to be exclusive in cases based on government contracts"). The D.C. Circuit has consistently respected this jurisdictional boundary by reading the Tucker Act to "'impliedly forbid[]' contract claims against the Government from being brought in district court" under the APA's waiver of sovereign immunity. *Perry Capital*, 864 F.3d at 619 (quoting 5 U.S.C. § 702). Yet concluding here that Plaintiffs' APA claims fall within that waiver merely because Plaintiffs are not in direct privity with the government would create an easily exploitable jurisdictional loophole, whereby claims for monetary relief that are grounded in a contract between the government and a prime contractor—claims that ordinarily should be brought in and resolved by the Court of Federal Claims, *see Crowley*, 38 F.4th at 1106; *Spectrum*, 764 F.2d at 895—could instead be reviewed by district courts under the APA so long as a *subcontractor* who benefits indirectly from the prime contract is the one bringing suit.

The Court's endorsement of such a novel jurisdictional strategy here would threaten to undermine the jurisdictional scheme that Congress devised under the Tucker Act. *Cf. Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 181 (D.D.C. 2007) ("To allow a plaintiff to utilize the [APA's] waiver of sovereign immunity . . . to obtain a district-court judgment that a government contract is void would 'create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims.'" (quoting *Megapulse*, 672 F.2d at 967)). Such an outcome would also upend the settled expectations and agreed-upon obligations reached by the federal government in its contracts by subjecting any consequential exercise of a contractual right to APA lawsuits brought by subcontractors in district court, whereas an identical contract-based claim brought by a prime contractor could only be brought in the Court of Federal Claims. The APA's waiver of sovereign immunity should not be read to permit such an absurd

result.  *See Seed v. EPA*, 100 F.4th 257, 265 (D.C. Cir. 2024) ("Courts, in turn, must strictly construe a waiver of sovereign immunity in terms of its scope, in favor of the sovereign." (cleaned up)).

At bottom, when Plaintiffs' claims here are "[s]tripped" of their APA embellishments and "equitable flair," their "requested relief seeks one thing": they "want[] the Government to keep paying up" under the Acacia Contract and related subcontracts and task orders.  *U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *5; *see* Am. Compl. at 63 (¶ 8).  But because this Court lacks jurisdiction "to enforce" Defendants' "contractual obligation[s] to pay money," *Dep't of Educ.*, 145 S. Ct. at 968, or to otherwise resolve claims against the federal government that are "essentially" contractual, *Albrecht*, 357 F.3d at 68, Plaintiffs' claims should be dismissed.  *See* Fed. R. Civ. P. 12(b)(1).

## II.    Program Funding Decisions Are Committed to Agency Discretion By Law

Even if the Court were to conclude that it has subject-matter jurisdiction over Plaintiffs' challenge to Defendants' termination of the Program task orders, that challenge fails for a separate reason: such a decision concerning how to allocate and expend federal funding is "committed to agency discretion by law" and is thus not subject to APA review.  5 U.S.C. § 701(a)(2).  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court underscored that the APA, by its own terms, "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'"  508 U.S. at 191 (quoting 5 U.S.C. § 701(a)(2)).  The *Lincoln* Court then held that an agency's "allocation of funds from a lump-sum appropriation" is one such "administrative decision traditionally regarded as committed to agency discretion," given that "the very point of a lump-sum appropriation," the Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192.  The Court accordingly concluded that the Indian Health Service's decision to discontinue a program that was (1) funded through the agency's yearly lump-sum appropriations from Congress (2) but not otherwise mandated or prescribed by statute was "committed to the [agency's] discretion" and thus "unreviewable" under the APA.  *Id.* at 193-94.

14

That same principle from *Lincoln* applies to at least two of the Programs at issue in this case—FGLOP and CCI.  Like all of EOIR's legal access programs, neither FGLOP nor CCI is prescribed by federal statute or regulation.  And as Plaintiffs themselves concede, neither program is funded through targeted appropriations, but rather through the lump-sum appropriations that EOIR receives from Congress "[f]or expenses necessary for the administration of immigration-related activities," Consolidated Appropriations Act, 2024, 138 Stat. at 133.  *See* S. Rep. No. 118-62, at 84-85 (2023) (explaining that the $28 million minimum earmarked for "the Legal Orientation Program" in the 2024 Consolidated Appropriations Act applies to funding for LOP, LOPC, and ICH); Am. Compl. at 3 (¶ 1); *id.* at 31 (¶ 88) (describing FGLOP and CCI as "discretionarily funded programs").  As *Lincoln* made clear, EOIR's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another," and "whether a particular program 'best fits the agency's overall policies.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  For programs like FGLOP and CCI, then, which are funded entirely out of such lump-sum appropriations, any decisions regarding how much funding to allocate to either program, or whether to fund either program at all, are committed entirely to EOIR's discretion.  *See Lincoln*, 508 U.S. at 193-94; *see also Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").  Defendants' "decision to discontinue" funding for those two programs is "accordingly unreviewable under § 701(a)(2)" of the APA.  *Lincoln*, 508 U.S. at 193.

The D.C. Circuit has extended *Lincoln*'s reasoning to agency decisions involving specific appropriations as well.  *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 750-52 (D.C. Cir. 2002).  LOP, LOPC, and ICH are funded through such targeted appropriations, and the corresponding appropriations statutes set a minimum amount of funding that must be collectively allocated to the three programs.  *See* Consolidated Appropriations Act, 2024, 138 Stat. at 133 (providing that "not

less than $28 million shall be available for services and activities provided by the Legal Orientation Program"). But those statutes otherwise say nothing about the means by which those funds should be disbursed, the precise timeline for such disbursements, or who should receive Program funding or deliver Program services (*e.g.*, a prime contractor versus the agency itself). That statutory silence thus indicates that Congress committed such programmatic decisions to EOIR's discretion, meaning in turn that any such decisions regarding *how* EOIR chooses to allocate the funds specifically appropriated for LOP, LOPC, and ICH—including by creating, modifying, or terminating contracts that govern the use of those funds—are likewise unreviewable under the APA. *See Milk Train*, 310 F.3d at 751 (explaining that an agency's implementation of a subsidy program for milk producers was unreviewable under § 701(a)(2) because the applicable appropriations statute "provide[d] no relevant 'statutory reference point' for the court" to assess the agency's "determination of the manner for providing assistance to dairy farmers").

## III. Plaintiffs' Appropriations Clause, First Amendment, and TVPRA Claims Should Be Dismissed

As explained above, the Court lacks jurisdiction under the APA over Plaintiffs' contract-based claims for monetary relief, and APA review is unavailable in any event because the contract-termination decisions at issue here are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). But even if the Court were to disagree and conclude that it can review Plaintiffs' constitutional and statutory theories of injury—namely, that Defendants' Termination Decision violates the Appropriations Clause, the TVPRA, and the First Amendment, *see* Am. Compl. at 56-61 (¶¶ 168-89)—those theories still fail to state a justiciable and plausible claim for relief.

### A. Plaintiffs Fail to State a Viable Appropriations Clause Claim

Plaintiffs allege that "Defendants' termination" of the LOP, LOPC, and ICH programs "violates the Appropriations Clause." Am. Compl. at 57 (¶ 172). The Appropriations Clause, however, simply provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "In other words," the Clause generally concerns whether a certain "payment of money from the Treasury" is "authorized by

statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  And as Plaintiffs acknowledge in their Amended Complaint, the federal funds that EOIR provides for LOP, LOPC, and ICH services were appropriated by an act of Congress.  *See* Am. Compl. at 3 (¶1) (alleging that "Congress appropriated $28 million explicitly for" LOP, LOPC, and ICH "in the 2024 Consolidated Appropriations Act"); *see also id.* at 40-42 (¶¶ 115-19).

The thrust of Plaintiffs' Appropriations Clause claim instead appears to be that Defendants' Termination Decision effectively amounts to an allegedly unlawful withholding of funds appropriated for certain programs that Congress requires EOIR "to fund and run." *Id.* at 6-7 (¶ 12); *see id.* at 56-57 (¶¶ 170-71).  Yet even taking at face value Plaintiffs' suggestion that the termination of the Program task orders here is necessarily tantamount to an indefinite withholding of Program funding, *see, e.g.*, Am. Compl. at 55 (¶ 164) (alleging that Defendants have "terminate[d] the Programs"); *id.* at 56 (¶ 167) (same), Plaintiffs nonetheless fail to allege a viable unlawful-withholding claim.

Plaintiffs appear to allege that the Termination Decision reflects Defendants' "disregard" for the "Congressional mandate to fund and enable LOP, LOPC, and ICH," Am. Compl. at 7 (¶ 13), which, according to Plaintiffs, renders the Termination Decision "not in accordance with law" as a general matter, 5 U.S.C. § 706(2)(A), which in turn provides a basis for the Court to grant Plaintiffs' more specific request that Defendants be enjoined "from refusing to expend the appropriated funds as necessary to continue the Programs mandated by Congress, *including funding to any persons previously authorized by DOJ to receive funding for the Programs*," Am. Compl. at 63 (¶ 8) (emphasis added).  Plaintiffs, in other words, effectively ask the Court to reinstate the terminated Program task orders and "enforce" Defendants' "contractual obligation[s]" under those task orders "to pay [Plaintiffs] money" in the form of Program funding.  *Dep't of Educ.*, 145 S. Ct. at 968 (citation omitted).  But as explained above, that is the very sort of contract-based claim for monetary relief over which this Court lacks jurisdiction.  *See id.*  And Plaintiffs' invocation of separate appropriations statutes does not render their claims any less contractual in nature.  Those statutes simply provide that a minimum amount of appropriated funds "shall be

available for services and activities provided by the Legal Orientation Program," Consolidated Appropriations Act, 2024, 138 Stat. at 133, but in no way mandate that any portion of those funds be disbursed to Plaintiffs specifically. The appropriations statutes Plaintiffs cite thus "in no way create[] the substantive right to the remedy" Plaintiffs seek here—namely, a renewal of disbursements of Program funding to them under the Acacia Contract and related task orders. *Spectrum Leasing*, 764 F.2d at 894. That right is instead "created in the first instance by" the Acacia Contract and "in no sense . . . exist[s] independently of that [C]ontract." *Id.* Notwithstanding its label, then, Plaintiffs' unlawful-withholding claim is still, in essence, "founded upon a contract for purposes of the Tucker Act" and cannot be adjudicated by this Court. *Id.*; *see Ingersoll-Rand*, 780 F.2d at 78 ("That the [contract] termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action."); *see also U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *6 ("Like [the plaintiffs in *Spectrum Leasing* and *Ingersoll-Rand*], the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do.").

To the extent Plaintiffs instead attempt to claim that they are merely asking the Court to require Defendants to comply with certain appropriations statutes, they lack standing to assert such an "undifferentiated, generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). Indeed, the Supreme Court has long held that "[a] citizen may not sue" in federal court "based only on an 'asserted right to have the Government act in accordance with law.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citation omitted); *see Lance*, 549 U.S. at 439 ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree."). Any effort by Plaintiffs here to detach Defendants' alleged noncompliance with certain appropriations statutes from the contract-based remedy that Plaintiffs seek here—*i.e.*, a reinstatement of the Program task orders and renewed Program funding to Plaintiffs specifically—would effectively amount to Plaintiffs merely lodging "a general legal,

18

moral, ideological, or policy objection to a particular government action," which they lack standing to do. *All. for Hippocratic Med.*, 602 U.S. at 381.

Plaintiffs may counter that they have a "particularized stake" in a challenge to Defendants' alleged noncompliance with appropriations statutes concerning the "Legal Orientation Program" specifically, *Lance*, 549 U.S. at 442, given that Plaintiffs formerly served as Program providers and generally support the Programs' objectives. But even if Plaintiffs sufficiently allege that such noncompliance causes them an Article III injury, they fail to plausibly allege that such an injury "is 'likely' to be 'redressed by judicial relief'" here. *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023). As other D.C. district courts have recognized recently, this Court cannot "specifically order" the federal government "to continue to contract" with specific parties, as such relief would undermine the "Executive's discretion" that "both the Constitution and Congress's laws have traditionally afforded" with respect to "how to spend" appropriated funds "within the constraints set by Congress." *AIDS Vaccine Advoc. Coal. v. Dep't of State,* -- F. Supp. 3d. --, 2025 WL 752378, at *23 (D.D.C. Mar. 10, 2025); *see U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *7 ("The relief the Conference seeks in its preliminary injunction—reinstatement of contracts terminated by the Government—is beyond the power of this Court."). Rather, "the appropriate remedy" for an allegedly impermissible withholding of congressionally appropriated funds by the Executive Branch is "to order" the agency in question "to 'make available for obligation the full amount of funds Congress appropriated' under the relevant laws." *AIDS Vaccine Coal.*, 2025 WL 752378, at *23 (quoting *City of New Haven v. United States*, 634 F. Supp. 1449, 1460 (D.D.C. 1986)). Yet granting that limited remedy here would not result in the restoration of Program funding to Plaintiffs, given that the Program task orders have been terminated. The various funding-dependent injuries that Plaintiffs will allegedly suffer as a result of Defendants' Termination Decision—a substantial loss of funds for their operations, reduced access to detention facilities and immigration courts, and an attendant burden on Plaintiffs' "organizational missions," Am. Compl. at 47-53 (¶¶ 140-57)—would thus go wholly unredressed. That absence of a redressable injury fails to satisfy Article III's standing requirements, *Haaland*, 599 U.S. at 294,

19

and such a "defect[] of standing" requires the dismissal of Plaintiffs' unlawful-withholding claim under Rule 12(b)(1). *Janay v. Blinken*, 743 F. Supp. 3d 96, 103 (D.D.C. 2024).

### B.     Plaintiffs' TVPRA Claim Fails

Plaintiffs also allege that "Defendants' decision to terminate LOP and LOPC" violates the TVPRA, Am. Compl. at 57 (¶ 175), but that claim fails for the same reasons that Plaintiffs' Appropriations Clause claim does.  The provision of the TVPRA that Plaintiffs cite provides that the "Secretary of Health and Human Services shall cooperate with [EOIR] to ensure that custodians" of certain "unaccompanied alien children," *see* 8 U.S.C. § 1232(g), receive legal orientation presentations provided through the Legal Orientation Program administered by [EOIR]," *id.* § 1232(c)(4).  But like the appropriations statutes on which Plaintiffs' Appropriations Clause claim is based, the TVPRA provision that Plaintiffs cite here does not "create[] a substantive right" to the renewed Program funding that Plaintiffs seek.  *Spectrum Leasing*, 764 F.2d at 894.  Any such right to Program funding on Plaintiffs' part can, once again, only be plausibly derived from the Acacia Contract and related subcontracts and task orders, and Plaintiffs' invocation of the TVPRA does not change the fact that their claims are "founded upon a contract for purposes of the Tucker Act."  *Id.*

Furthermore, to the extent Plaintiffs seek relief from an abstract violation of the TVPRA, they lack standing to do so.  As with the appropriations-related violation that Plaintiffs allege, a violation of the TVPRA here could only be remedied by a court order requiring Defendants to keep the Legal Orientation Program in operation, *see* 8 U.S.C. § 1232(c)(4).  *See AIDS Vaccine Coal.*, 2025 WL 752378, at *23.  But such a remedy would by no means result in a reinstatement of the Acacia Contract and renewed Program funding to Plaintiffs.  *See U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *7 ("The relief the Conference seeks in its preliminary injunction— reinstatement of contracts terminated by the Government—is beyond the power of this Court.").  Consequently, even if Plaintiffs plausibly allege a violation of the TVPRA, remedying that violation would leave their various funding-dependent injuries unredressed.  *See Haaland*, 599 U.S. at 292.

20

Beyond these justiciability issues, another threshold flaw with Plaintiffs' TVPRA claim is that Plaintiffs fall outside the "zone of interests" protected by § 1232(c)(4). The zone-of-interests requirement is a general presumption about Congress's intended limits on the scope of the APA's cause of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *Patchak*, 567 U.S. at 224. The zone-of-interests test requires courts to assess whether the plaintiff's interests fall within the zone of interests "that Congress sought to protect or regulate under the statute in question." *Fed'n For Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996); *see Patchak*, 567 U.S. at 224 ("The interest [the plaintiff] asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." (cleaned up). That test thus forecloses suit where a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Patchak*, 567 U.S. at 399.

Furthermore, because § 1232(c)(4) does not regulate Plaintiffs here, their claims "necessarily rest[] on the idea that [their] members' interests are among those Congress sought to protect." *Reno*, 93 F.3d at 900; *see Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922-23 (D.C. Cir. 1989) (explaining the difference between "regulated interests" and "protected interests" for purposes of the zone-of-interests inquiry). The D.C. Circuit has explained that "[p]rotected interests are ones asserted either by intended beneficiaries of the statute at issue or by other suitable challengers—*i.e.*, parties whose interests coincide systemically, not fortuitously with those of intended beneficiaries." *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (cleaned up).

Here, nothing in the text of § 1232(c)(4) suggests that Congress intended to permit enforcement of that statute by subcontractors who assert indirect financial injuries associated with a contract termination. The statute does not regulate government subcontractors, nor does it protect their financial interests. Instead, § 1232(c)(4) protects, at most, the interests of "unaccompanied alien children" and their potential custodians by directing the HHS Secretary to "cooperate" with EOIR to ensure custodians receive certain legal orientation materials. The "interests protected by"

the statute are therefore completely unrelated to the contract-based financial interests Plaintiffs seek to vindicate here. *See Lexmark*, 572 U.S. at 131.

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), is instructive in this regard. In that case, the Supreme Court noted that an agency's failure "to comply with a statutory provision requiring 'on the record' hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings." 497 U.S. at 883. But the Court nonetheless made clear that the court reporter in that scenario would not fall within the zone of interests of the "on the record" statutory provision, and thus could not seek relief from a violation of that provision under the APA, because "the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters." *Id.* So too here. It cannot be plausibly inferred from Plaintiffs' allegations that Congress intended to give government subcontractors a judicial cause of action under the TVPRA to protect their financial interests based on alleged non-cooperation between EOIR and HHS.

### C.    Plaintiffs Fail to State a Plausible First Amendment Claim

Plaintiffs separately allege that Defendants' Termination Decision violates their First Amendment rights. *See* Am. Compl. at 58-61 (¶¶ 178-89). As a threshold matter, Plaintiffs nowhere allege that the Termination Decision operates as a restriction on the content of their speech. Instead, Plaintiffs' First Amendment claim appears to be based on two distinct theories of injury: (1) that the Termination Decision unlawfully "den[ies]" Plaintiffs "funding to which they are entitled because Defendants seek to prevent [Plaintiffs] from speaking to noncitizens regarding their rights and responsibilities during the immigration process," and (2) that the Decision impermissibly limits Plaintiffs' access to the immigration courts and detention facilities where Program services were previously provided. *Id.* at 10 (¶¶ 24-25), 59 (¶ 184). But neither theory states a plausible claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

Starting with Plaintiffs' funding-related theory of injury, Plaintiffs basically allege that the termination of the Program funding they formerly received under the Acacia Contract and related task orders amounts, on its own, to a First Amendment violation. Yet it is well settled that the

federal government "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *see Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007) ("[I]t is well established that the government can make content-based distinctions when it subsidizes speech."). And it is equally well settled that the government does not run afoul of the First Amendment simply by electing not to fund certain activities, including ones that facilitate speech on issues of public importance. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (confirming that the government is "not required" by the First Amendment "to assist others in funding the expression of particular ideas, including political ones"); *cf. Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right . . . ."). Put simply, then, Defendants do not violate Plaintiffs' First Amendment rights merely "by declining to" further "subsidize" Plaintiffs' alleged "First Amendment activities" with Program funding. *Regan*, 461 U.S. at 548; *see also Ysursa*, 555 U.S. at 355 (explaining that the First Amendment "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression").

Plaintiffs allege that the termination of Program funding was the product of "viewpoint-based discrimination," and they appear to base that allegation on a directive in a memorandum issued by the Attorney General providing that DOJ shall not "enter into any new contract . . . to provide Federal funding to non-governmental organizations that support or provide, either directly or indirectly (*e.g.*, through sub-contracting or other arrangements), to removable illegal aliens." Am. Compl. at 6 (¶ 9), 10 (¶ 25). Even assuming for purposes of a motion to dismiss that such a directive played a role in the Termination Decision Plaintiffs challenge, however, that directive simply provides an objective descriptor of the particular "activity" that the federal government no longer wishes to subsidize with federal funding. *Rust*, 500 U.S. at 193. And in making that choice, the federal government in no way "discriminated on the basis of viewpoint." *Id.* Indeed,

Defendants' decision not to subsidize the provision of services to "removable or illegal aliens" is just as permissible as a restriction on federal funding for "abortion-related activities," *Rust*, 500 U.S. at 178, or "lobbying," *Regan*, 461 U.S. at 546. *Cf. Kimberlin v. U.S. Dep't of Justice*, 318 F.3d 228, 232-33 (D.C. Cir. 2003) (finding that a Bureau of Prisons regulation prohibiting inmates "from possessing electric or electronic musical instruments" did not violate the First Amendment because "BOP ha[d] simply chosen not to subsidize inmates' use or possession of a class of instruments requiring the expenditure of funds for electricity and care").

As for Plaintiffs' access-related theory of injury, it is equally well settled that a plaintiff "does not have an automatic entitlement to engage in" expressive activity "wherever (and whenever) he would like." *Hodge v. Talkin*, 799 F.3d 1145, 1157 (D.C. Cir. 2015). And whether classified as nonpublic or limited public forums, the immigration courts and detention facilities where Plaintiffs want to "exercise their First Amendment rights and express their viewpoints regarding the provision of information to noncitizens in immigration proceedings," Am. Compl. at 58 (¶ 180), are government-owned properties in which the government "has wide latitude" to restrict certain expressive activity, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 324 (D.C. Cir. 2018), so long as such restrictions are "reasonable" and "viewpoint-neutral," *Hodge*, 799 F.3d at 1170. *See Ateba v. Leavitt*, -- F.4th --, 2025 WL 1036451, at *6 (D.C. Cir. Apr. 8, 2025) ("'Control over access to a nonpublic forum can be based' even 'on subject matter and speaker identity so long as' it meets the requirements of reasonableness and viewpoint neutrality"); *see also Pulphus v. Ayers*, 249 F. Supp. 3d 238, 246-47 (D.D.C. 2017) (explaining that speech restrictions in nonpublic and limited public forums are governed by the same standard).

Plaintiffs allege that, as a result of the Termination Decision, they "will lose . . . access to facilities" where they previously delivered Program services. Am. Compl. at 48 (¶ 141); *see id.* at 59 (¶ 184) (alleging that Plaintiffs are being "prevent[ed]" from "accessing immigration courts and detention facilities and sharing information about the legal process and legal rights to noncitizens who are detained"). Being denied access to a nonpublic forum like a detention facility, however, does not constitute a per se First Amendment violation, as Plaintiffs seem to allege, given that "the

government is not required to open" a nonpublic forum "for any speech at all." *Ateba*, 2025 WL 1036451, at *5. And notably, Plaintiffs do not allege specific instances where they were denied access to certain facilities entirely *because of the particular speech they wished to engage in*, as opposed to a non-speech-related reason such as space constraints or noncompliance with security protocols. Plaintiffs themselves acknowledge, moreover, that immigration detention facilities allow for visitations by members of the public, including legal representatives, subject to uniform "National Detention Standards," Compl. at 46 (¶ 135),[2] and Plaintiffs do not allege that any of the restrictions or protocols set forth in those Standards are unreasonable "in light of the government's interest in preserving" detention facilities "for 'the use to which [they are] lawfully dedicated.'" *United States v. Nassif*, 97 F.4th 968, 978 (D.C. Cir. 2024) (citation omitted); *Ateba*, 2025 WL 1036451, at *6 ("The Supreme Court gives the government substantial leeway to regulate access to a nonpublic forum and has upheld a range of restrictions that were justified in light of the forum's purpose.").

Plaintiffs suggest that the alleged restrictions on their access to detention facilities and immigration courts impermissibly "prevent[s] [them] from sharing their viewpoint in limited public forums." Compl. at 59 (¶ 184). But what matters in a First Amendment forum analysis is whether the speech restrictions in question "target[] specific viewpoints" for differential treatment. *Hodge*, 799 F.3d at 1150. And here, Plaintiffs fail to plausibly allege that access to detention facilities and immigration courts is denied to individuals who express a certain viewpoint on immigration-related matters but is granted to others who espouse a different viewpoint. *See id.* at 1170 (finding no viewpoint discrimination where a regulation "ban[ned] demonstrations and displays in the [Supreme Court] plaza regardless of whether they support or oppose (or even concern) the Court"); *Ateba*, 2025 WL 1036451, at *7 ("The [speech restriction in question] does not reference viewpoints in any way, and [the plaintiff] does not allege that either the White House

---

[2] *See* U.S. Immigration & Customs Enforcement, *National Detention Standards For Non-Dedicated Facilities* (Revised 2019), https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

or the Senate Daily Press Gallery denies press credentials based on the content of a correspondent's writing."). Indeed, nowhere do Plaintiffs' allegations counter the natural inference that they are subject to the same reasonable and viewpoint-neutral access restrictions that apply to every other member of the general public who visits a detention facility or immigration court.

In sum, whether grounded on the termination of Program funding or restrictions on access to certain government facilities, Plaintiffs' First Amendment claim fails as a matter of law on its own terms and should accordingly be dismissed. *See* Fed. R. Civ. P. 12(b)(6).

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion to dismiss.

DATED: April 24, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         ANDREW I. WARDEN
                                         Assistant Director
                                         Federal Programs Branch

                                         */s/ Zachary W. Sherwood*
                                         ZACHARY W. SHERWOOD
                                         Indiana Bar No. 37147-49
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street NW
                                         Washington, DC 20005
                                         Phone: (202) 616-8467
                                         Fax: (202) 616-8470
                                         Email: zachary.w.sherwood@usdoj.gov

                                         *Counsel for Defendant*