## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*,<br><br>                         Plaintiffs,<br><br>         v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>                         Defendants. | Case No. 1:25-cv-00298-RDM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF** |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 5

    A.   Congress Funded LOP to Promote Efficiency in the Immigration System. .................. 5

    B.   EOIR Built on LOP's Success by Repeatedly Expanding the Programs. ...................... 6

    C.   Recognizing the Programs' Benefits, Congress Consistently Has Appropriated Funds to Continue Them, Most Recently in March 2024. ............................................... 7

    D.   The Administrative Record Shows Defendants Never Provided a Reasoned Justification for Any of Their Three Attempts to Terminate the Programs. .................. 9

    E.   Defendants' Action Has Already Drastically Harmed Plaintiffs. ................................ 12

STANDARD OF REVIEW ............................................................................................. 13

ARGUMENT ................................................................................................................... 14

    I.   This Court Has Jurisdiction over Plaintiffs' Claims. .................................................. 14

        A.   Plaintiffs Have Article III Standing. .................................................................... 14

        B.   Plaintiffs Have Prudential Standing. .................................................................... 18

        C.   This Court—and Not the Court of Federal Claims—Has Jurisdiction. ............... 20

    II.   Defendants' Termination of the Programs Determines Plaintiffs' Legal Rights and Obligations and Is a Final Agency Action Reviewable Under the APA. .............. 24

    III.   Termination of LOP, LOPC, and ICH Violates the Appropriations Clause. ............... 26

    IV.   Terminating LOP and LOPC Also Violates the TVPRA. ............................................. 28

    V.   Terminating the Programs Is Arbitrary and Capricious. .............................................. 29

        A.   Defendants Failed to Adequately Explain the Basis for the Decision. ................. 30

        B.   Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made. ................. 32

        C.   Defendants Offer No Reasoned Explanation for Their Reversal of Policy. ......... 34

    VI.   Termination of the Programs Violates Plaintiffs' First Amendment Rights. ............... 35

    VII.   Defendants' Actions Are *Ultra Vires* and Should Be Set Aside. ................................. 39

    VIII.   Defendants' Actions Violate the Separation of Powers. .............................................. 40

    IX.   Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief .......................... 41

        A.   Plaintiffs Face Irreparable Harm. ........................................................................ 41

        B.   The Balance of Equities and Public Interest Favor an Injunction. ...................... 43

        C.   A Nationwide Injunction Is Appropriate ............................................................ 44

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*A.N.S.W.E.R. Coal. v. Jewell*,
  153 F. Supp. 3d 395 (D.D.C. 2016) ......................................................37

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
  789 F.2d 931 (D.C. Cir. 1986) ...........................................................16

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)...........................................................35, 38, 39

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  2025 WL 752378 (D.D.C. Mar. 10, 2025)..........................................16, 18, 40, 41

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ...........................................................27, 28

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
  946 F.3d 615 (D.C. Cir. 2020) ...........................................................14

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) .........................................................13

*Amneal Pharms. LLC v. Food & Drug Admin.*,
  285 F. Supp. 3d 328 (D.D.C. 2018) ...................................................13

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015).........................................................................39

*Bennett v. Spear*,
  520 U.S. 154 (1997).........................................................................25

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988).........................................................20, 21, 23, 24, 25

*Bowen v. Michigan Acad. of Fam. Physicians*,
  476 U.S. 667 (1986).........................................................................20, 25

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962).........................................................................34

*C.G.B. v. Wolf*,
  464 F. Supp. 3d 174 (D.D.C. 2020) ...................................................43

*Cablevision Sys. Corp. v. FCC*,
  649 F.3d 695 (D.C. Cir. 2011) ...........................................................13

*California v. U.S. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025)...............................................................21

*Climate United Fund v. Citibank, N.A.*,
  2025 WL 1131412 (D.D.C. Apr. 16, 2025) ...................................................................17, 18

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ...........................................................................................................40

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
  2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) ..................15, 18, 19, 21, 22, 23, 25, 29, 32, 45

*Ctr. for Biological Diversity v. Regan*,
  734 F. Supp. 3d 1 (D.D.C. 2024) .......................................................................................13

*Darby v. Cisneros*,
  509 U.S. 137 (1993) ...........................................................................................................25

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020) ..........................................................................................................32, 34

*Department of Education v. California*,
  145 S. Ct. 966 (2025) .........................................................................................................21

*Dist. of Columbia v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) .......................................................................................44

*Eastport S.S. Corp. v. U.S.*,
  372 F.2d 1002 (Ct. Cl. 1967) .............................................................................................22

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ..............................................................................................14, 42, 43

*Elrod v. Burns*,
  427 U.S. 347 (1976) ...........................................................................................................43

*Env't Def. Fund v. U.S. Env't Prot. Agency*,
  124 F.4th 1 (D.C. Cir. 2024) ..............................................................................................29

*FCC v. Fox*,
  556 U.S. 502 (2009) ......................................................................................................34, 35

*Fed. Express Corp. v. Dep't of Commerce*,
  39 F.4th 756 (D.C. Cir. 2022) ............................................................................................39

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...........................................................................................................24

*Globex Corp. v. United States*,
  54 Fed. Cl. 343 (2002) .......................................................................................................22

*HIAS, Inc. v. Trump*,
  985 F.3d 309 (4th Cir. 2021) .............................................................................................45

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
  613 F.3d 1112 (D.C. Cir. 2010) .........................................................................................34

iii

*Katz v. Cisneros,*
  16 F.3d 1204 (Fed. Cir. 1994) ................................................................................ 21

*Larson v. Domestic & Foreign Commerce Corp.,*
  337 U.S. 682 (1949) ............................................................................................... 39

*League of United Latin Am. Citizens v. Exec. Off. of the President,*
  2025 WL 1187730 (D.D.C. April 24, 2025) ........................................................... 16

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................ 41, 43

*Legal Servs. Corp. v. Velazquez,*
  531 U.S. 533 (2001) ........................................................................................ 37, 38

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ............................................................................................... 18

*Maine Cmty. Health Options v. U.S.,*
  590 U.S. 296 (2020) ............................................................................................... 23

*Maine v. Goldschmidt,*
  494 F. Supp. 93 (D. Me. 1980 ................................................................................ 27

*Maine v. U.S. Dep't of Agric.,*
  2025 WL 1088946 (D. Me. Apr. 11, 2025) ........................................................... 21

*Matal v. Tam,*
  582 U.S. 218 (2017) ............................................................................................... 37

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ............................................................................................... 19

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) ........................................................................ 23, 24

*Motor Vehicles Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................................... 30, 34

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr,*
  496 F. Supp. 3d 116 (D.D.C. 2020) ...................................................................... 18

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
  26 F.4th 960 (D.C. Cir. 2022) ............................................................................... 40

*Nat'l Council of Nonprofits v. OMB,*
  2025 WL 368852 (D.D.C. Feb. 3, 2025) .............................................................. 25

*Nat'l Juv. L. Ctr., Inc. v. Regnery,*
  738 F.2d 455 (D.C. Cir. 1984) ............................................................................... 26

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) ...................................................................... 44, 45

iv

*New York v. Trump,*
  2025 WL 1098966 (D.R.I. Apr. 14, 2025) ............................................................................21

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................................................................14

*Nw. Immigrant Rts. Project v. USCIS,*
  496 F. Supp. 3d 31 (D.D.C. 2020) ................................................................................16, 19

*O.A. v. Trump,*
  404 F. Supp. 3d 109 (D.D.C. 2019) ....................................................................................19

*Off. of Pers. Mgmt. v. Richmond,*
  496 U.S. 414 (1990) ............................................................................................................26

*Pan Arctic Corp. v. United States,*
  8 Cl. Ct. 546 (1985) ............................................................................................................22

*Pennsylvania v. Weinberger,*
  367 F. Supp. 1378 (D.D.C 1973) ........................................................................................26

*People for the Ethical Treatment of Animals v. Tabak,*
  109 F.4th 627 (D.C. Cir. 2024) ...........................................................................................36

*People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.,*
  797 F.3d 1087 (D.C. Cir. 2015) ..............................................................................14, 15, 16

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009) ............................................................................................................36

*Pub. Citizen, Inc. v. Trump,*
  361 F. Supp. 3d 60 (D.D.C. 2019) ......................................................................................17

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ............................................................................................................38

*Rust v. Sullivan,*
  500 U.S. 173 (1991) ......................................................................................................35, 36

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943) ..............................................................................................................30

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947) ............................................................................................................30

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.,*
  255 F. Supp. 3d 101 (D.D.C. 2017) ....................................................................................32

*Tex. Children's Hosp. v. Burwell,*
  76 F. Supp. 3d 224 (D.D.C. 2014) ......................................................................................43

*Texas v. E.P.A.,*
  726 F.3d 180 (D.C. Cir. 2013) ............................................................................................31

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015)...................................................................................45

*Tourus Recs., Inc. v. Drug Enf't Admin.,*
  259 F.3d 731 (D.C. Cir. 2001)..........................................................................29, 30

*Train v. City of New York,*
  420 U.S. 35 (1975)...........................................................................................26, 27

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision,*
  967 F.2d 598 (D.C. Cir. 1992).........................................................................23, 24

*W. Va. v. U.S. Env't Prot. Agency,*
  597 U.S. 697 (2022)..............................................................................................39

*Wawszkiewicz v. Dep't of Treasury,*
  670 F.2d 296 (D.C. Cir. 1981)..............................................................................32

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)..................................................................................................14

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952).........................................................................................40, 41

## Statutes

5 U.S.C. §§ 701 ........................................................................................................25

5 U.S.C. § 702 .....................................................................................................20. 25

5 U.S.C. § 704 .....................................................................................................20, 25

5 U.S.C. § 706 ...............................................................................3, 13, 14, 26, 28, 29, 35

8 U.S.C. § 1232 .................................................................................................6, 19, 28

Full-Year Continuing Appropriations and Extensions Act, 2025,
  Pub. L. No. 119-4, § 1101 (2025) .................................................................2, 8, 26

Impoundment Control Act, 2 U.S.C. §§ 681–688 ......................................................27

Pub. L. No. 118-42, 138 Stat. 133 (2024).........................................2, 8, 19, 26, 27, 41

William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
  ...................................................................................6, 8, 19, 26, 28, 29

## Other Authorities

164 Cong. Rec. H2084 (2018) ....................................................................................27

EOIR, *Legal Orientation Program for Custodians of Unaccompanied Children*
  (June 19, 2024)........................................................................................................6

Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025) ...............................................38

Executive Order 14222 ..................................................................................................11

H.R. Rep. No. 110-430 (2007).........................................................................................28

H.R. Rep. No. 115-231 (2018).........................................................................................27

H.R. Rep. No. 117-395 (2022)......................................................................................9, 27

Immigr. Rev., *EOIR's Office of Legal Access Programs* (2016)....................................7

Immigr. Rev., *Evaluation of the Rights Presentation* (1999) .........................................5

Immigr. Rev., *New Legal Orientation Program Underway to Aid Detained Aliens*
    (Mar. 11, 2003)...........................................................................................................5

*Immigration Control: Immigration Policies Affect INS Detention Efforts* (1992) ........5

*Counsel for Children Initiative*, https://acaciajustice.org/what-we-do/counsel-for-
    children-initiative.......................................................................................................7

*Family Group Legal Orientation Program*, https://acaciajustice.org/what-we-
    do/family-group-legal-orientation-program;.............................................................7

*Legal Orientation Program: Evaluation and Performance and Outcome
    Measurement Report, Phase II*, The Vera Institute of Justice (2008)....................33

*Legal Orientation Program*, U.S. Dep't of Just. (Nov. 5, 2015)....................................6

Maria Sacchetti, *ICE Praised Legal-Aid Program for Immigrants That Justice
    Dept. Plans to Suspend*, WASH. POST, Apr. 17, 2018 ...............................................8

Memorandum from ICE Assistant Director for Custody Management Tae Johnson, to
    ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S.
    Department of Justice Executive Office for Immigration Review Legal Orientation
    Program* (Nov. 30, 2017)......................................................................................8, 33

S. Rep. No. 115-139 (2018) .............................................................................................27

S. Rep. No. 118-62 (2023) .......................................................................................3, 8, 39

S. Rep. No. 118-198 (2024).........................................................................................9, 27

White House Legal Aid Interagency Roundtable, *Access to Justice in Federal
    Administrative Proceedings: Nonlawyer Assistance and other Strategies* (2023),..............2, 7

## INTRODUCTION

Defendants have sought to terminate longstanding, congressionally funded legal orientation and legal representation programs three times since January, despite clear evidence that these programs make the U.S. immigration system more efficient, have saved U.S. taxpayers nearly $18 million annually, and provide thousands of noncitizens with their only source of information regarding their rights and obligations in removal proceedings. Notwithstanding Defendants' characterization of their decision as a contract issue, the administrative record contains no evidence Defendants plan to continue the programs in any form. Instead, it shows Defendants have permanently terminated those programs. One would hope that, as legally required, a reasonable justification accompanied this drastic move. But the administrative record filed on April 24, 2025, contains *no reason* for the termination, despite those responsible for implementing the cancellation directive requesting one. The administrative record leaves no doubt that the April 10, 2025 termination was arbitrary and capricious, contrary to law, and unconstitutional. Because the termination is not supported by the administrative record or consistent with the Administrative Procedure Act ("APA"), this Court should grant summary judgment in Plaintiffs' favor and permanently enjoin the termination.

Defendants admit agency decisions must be reasonable and reasonably explained. Yet the administrative record is bereft of any reason or explanation for the challenged action. Initially, Defendants purported to "stop work" on these programs pending an audit. Defendants rescinded their stop work order after Plaintiffs filed this lawsuit, but insisted they were still reviewing the programs as purportedly required by a January Executive Order and a February memorandum from the Attorney General. Despite this Court's repeated requests to share updates regarding the purported audit, Defendants provided no information regarding any review. Instead, the administrative record reveals that no review or audit occurred or is planned. Nevertheless,

Defendants twice purported to terminate the programs for "convenience," with the first notice rescinded for failure to comply with this Court's order. The record offers *no reason* for terminating the programs in violation of a clear congressional mandate.

The Legal Orientation Program ("LOP"), Family Group Legal Orientation Program ("FGLOP"), Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), Immigration Court Helpdesk ("ICH"), and Counsel for Children Initiative ("CCI") (collectively, "the Programs") provide critical information and support for people in removal proceedings around the country. In 2023, LOP served 35 detention facilities and more than 40,000 individuals. *See* White House Legal Aid Interagency Roundtable, *Access to Justice in Federal Administrative Proceedings: Nonlawyer Assistance and other Strategies* 30 (2023), https://perma.cc/Z7CM-2UNY [hereinafter, "Access to Justice Report"]. ICH expanded to 24 immigration courts and served over 12,000 individuals. *Id.* LOPC served nearly 51,000 custodians, FGLOP served more than 12,000 families, and CCI provided representation to more than 200 children. *Id.*

The government has consistently recognized the effectiveness of the Programs, particularly LOP. *See* U.S. Dep't of Just. Exec. Off. for Immigr. Rev., Legal Case Study: Summary Report (Apr. 6, 2017), https://tinyurl.com/bddahzpv [hereinafter, "Booz Allen Hamilton Study"]. A report commissioned by the Executive Office for Immigration Review ("EOIR"), for example, recommends that EOIR consider expanding legal representation programs like LOP. *Id.* at 24–25. Recognizing the Programs' benefits, Congress has regularly appropriated funding to continue and expand them. Most recently, on March 9, 2024, Congress reauthorized $28 million that Defendants "shall" spend to provide LOP, LOPC, and ICH. Pub. L. No. 118-42, 138 Stat. 133 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101 (2025) (continuing funding through September 30, 2025). And the Senate

Appropriations Committee warned EOIR against taking the very actions taken here, explicitly directing DOJ to "continue all LOP services and activities . . . without interruption, *including during any review of the program*," and "utilize all appropriated funds solely for legitimate program purposes." S. Rep. No. 118-62, at 84 (2023) (emphasis added).

Despite ample evidence of the Programs' efficacy, broad support for the Programs, Congress's mandate to continue their funding and services, and legislative and public outcry following the January 22, 2025 Stop Work Order, Defendants terminated the contracts through which it ran the Programs on April 16, 2025. The record shows no evidence that Defendants plan to continue the Programs in any form—instead, Defendants have permanently ended them. The full administrative record establishes that there was no reasoned basis for that decision, proving the termination decision violated the APA as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A), (B).

*First*, the arbitrary and capricious standard requires agency action be both reasonable and reasonably explained. Defendants acknowledge as much, *see, e.g.*, Dkt. 35 at 35, 37, but provide no evidence of reasonableness, let alone a reasonable explanation. The administrative record shows that unexplained policy motives drove the decision to terminate the Programs, rather than a reasoned decision-making process. Moreover, the termination cannot be reasonable, as the administrative record does not even reference the extensive evidence of the Programs' benefits and efficiencies (let alone offer a reasoned basis for rejecting them). Defendant Owen admitted she did not know the reason for the terminations, and although one DOJ employee specifically requested "a memo in writing" justifying terminating the Programs, no such memo is in the record.

While the "convenience" referenced in Defendants' April 10, 2025 Termination Notice may justify termination of a federal contract, it gives Defendants no cover for violating federal law.

*Second*, Defendants' acts are contrary to the Constitution and to applicable statutes. Defendants admit they cannot simply disregard the congressional mandate and refuse to fund the programs. *See, e.g.*, Dkt. 35 at 34. Yet Defendants' termination of the Programs does just that, contravening mandatory congressional appropriations and allocations of funds the Executive does not have authority to stop. Similarly, Defendants' acts terminating the Programs violate the First Amendment's free-speech protections. To the extent the administrative record reveals *any* reason for terminating the Programs, it appears to be part of an effort to cut funding for all "organizations that support or provide services . . . to removable or illegal aliens." Dkt. 30-1 at 4. In other words, Defendants terminated the Programs because they disagree with Plaintiffs' viewpoints and missions, which center on providing services to noncitizens. By preventing Plaintiffs from accessing immigration courts and detention facilities and sharing information about the legal process and legal rights to noncitizens, Defendants prevent Plaintiffs from sharing their viewpoint in limited public forums.

Defendants' arbitrary and capricious termination of the Programs is unconstitutional and causes Plaintiffs immediate and irreparable harm, including by forcing them to cut programs and staff and preventing them from carrying out their core mission-based activities. This Court should grant summary judgment in favor of Plaintiffs, vacate the termination of the Programs, and grant a permanent injunction requiring Defendants to continue the Programs as required by applicable statutes. Because Plaintiffs are currently experiencing irreparable harm from Defendants' termination of the Programs, this Court also should grant preliminary injunctive relief to prevent this harm while its decision on Plaintiffs' summary judgment motion is pending.

4

## BACKGROUND

**A.    Congress Funded LOP to Promote Efficiency in the Immigration System.**

Private nonprofit organizations, including Plaintiff the Florence Immigrant and Refugee Rights Project ("FIRRP"), developed legal orientation programs and "Know Your Rights" presentations decades ago, long before Congress instructed EOIR to launch LOP.  Dkt. 62 ¶¶ 66–68.  After a 1992 General Accounting Office report found FIRRP's program saved "a significant amount of time" by "eliminat[ing] the need to have immigration judges describe the various types of relief available to each alien during the hearings," the Senate passed a bipartisan resolution directing the Attorney General to consider implementing a pilot program for the purpose of "increasing efficiency and cost savings."   U.S. Gen. Accounting Office, GAO/GGD-92-85, *Immigration Control: Immigration Policies Affect INS Detention Efforts* 51 (1992), https://perma.cc/DXU8-ELQL; S. Res. 284, 103d Cong. (1994), https://perma.cc/QKU7-U5JT.

In 1998, EOIR conducted a 90-day pilot program at three sites, with services provided to nearly 3,000 noncitizens by three different organizations, including plaintiffs the American Bar Association ("ABA") and FIRRP.  Anna Hinken, U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Evaluation of the Rights Presentation* (1999), https://perma.cc/TR85-DJNB.  EOIR conducted an extensive review of the pilot program's efficacy and found substantial efficiencies.  *Id.* at 7–10.  On March 11, 2003, citing the nearly 20% reduction in detention time observed in the pilot program, EOIR introduced LOP at six sites, funded by a $1 million congressional appropriation.  U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *New Legal Orientation Program Underway to Aid Detained Aliens* (Mar. 11, 2003), https://perma.cc/U5CC-7HG5.  For more than two decades, LOP's repeated evaluations showed unambiguously positive results, and Congress increased LOP appropriations, enabling LOP to expand in scope.  *See* Nina Siulc *et al.*, *Legal Orientation Program: Evaluation and Performance and Outcome Measurement Report, Phase II*, The Vera

Institute of Justice (2008), https://perma.cc/ZEN3-648L (detailing efficiencies of LOP); U.S. Dep't of Just. Exec. Off. for Immigr. Rev., *Cost Savings Analysis – The EOIR Legal Orientation Program* at 2–3, https://perma.cc/5CjC-REZH (finding LOP resulted in $17.8 million in net savings yearly); Dkt. 2 at 7–8 (detailing expansions in congressional appropriations).

Before its recent termination, LOP provided four services at detention facilities: (1) group orientations giving an overview of removal proceedings and forms of relief; (2) individual orientations for unrepresented individuals to discuss their cases with LOP providers; (3) self-help workshops providing guidance and materials both to those with potential avenues for relief and to those willing to voluntarily depart the country; and (4) referrals to pro bono legal services, when available. *Legal Orientation Program*, U.S. Dep't of Just. (Nov. 5, 2015), https://web.archive.org/web/20160920163113/https://www.justice.gov/eoir/legal-orientation-program.

## B.    EOIR Built on LOP's Success by Repeatedly Expanding the Programs.

In addition to expanding LOP, EOIR—acting on congressional instruction—has built on LOP's success by creating other legal access programs, including ICH, FGLOP, LOPC, and CCI. EOIR launched LOPC in 2010 to provide legal orientations to adult "custodians" caring for unaccompanied noncitizen children, separated from their parents or other caregivers. EOIR, *Legal Orientation Program for Custodians of Unaccompanied Children*, (June 19, 2024) http://bit.ly/4lphwLX. This effectuates Congress's command in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA") that the Secretary of Health and Human Services (who has legal custody of unaccompanied children) "shall" work with EOIR to "ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by" EOIR. 8 U.S.C. § 1232(c)(4).

In 2016, Congress provided EOIR with funding to create ICHs, court-based legal education programs for individuals in immigration proceedings who are not in detention, "at the immigration

courts with the greatest pending caseload." Fact Sheet, U.S. Dep't of Just. Exec. Off. of Immigr. Rev., *EOIR's Office of Legal Access Programs* 4 (2016), https://perma.cc/8P3W-9NWM. ICH provides information about court practices and procedures, available legal options, and other relevant topics, acting as a safeguard and ensuring a modicum of due process for noncitizens navigating a complex, high-stakes legal system. ICH also is a crucial tool to connect noncitizens in removal proceedings with pro bono attorneys, to the limited extent available.

In 2021, EOIR added FGLOP, a version of LOP serving families in expedited removal proceedings, and CCI, a program providing free legal representation to children in removal proceedings without a parent or who otherwise would be forced to appear in court alone. Acacia Ctr. for Just., *Family Group Legal Orientation Program*, https://acaciajustice.org/what-we-do/family-group-legal-orientation-program; Acacia Ctr. for Just., *Counsel for Children Initiative*, https://acaciajustice.org/what-we-do/counsel-for-children-initiative. In 2023, FGLOP educated more than 12,000 noncitizen families in nine immigration courts and via its national information line. *See* Access to Justice Report at 30. Acacia Ctr. for Just., *Counsel for Children Initiative*, https://acaciajustice.org/what-we-do/counsel-for-children-initiative. CCI operates in 14 cities and provided representation for 200 children in 2023. *See* Access to Justice Report at 30.

**C.    Recognizing the Programs' Benefits, Congress Consistently Has Appropriated Funds to Continue Them, Most Recently in March 2024.**

The benefits of the Programs are widely recognized. In an April 2017 report based on a year-long study, the government's outside consultant, Booz Allen Hamilton, recommended DOJ and EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications." Booz Allen Hamilton Study at 24–25. In November 2017, the ICE Assistant Director for Custody Management informed ICE field officers that "[e]xperience has shown that LOP attendees are

positioned to make better informed decisions, are more likely to obtain legal representation, and complete their cases faster than detainees who have not received the LOP," and instructed field officers to facilitate the programs by ensuring adequate meeting space, sharing information with the program staff, and facilitating attendance by noncitizens who are detained.  Memorandum from Tae Johnson, ICE Assistant Director for Custody Management, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program* (Nov. 30, 2017), https://tinyurl.com/4c6tzc4w; *see also* Maria Sacchetti, *ICE Praised Legal-Aid Program for Immigrants That Justice Dept. Plans to Suspend*, WASH. POST, Apr. 17, 2018, https://wapo.st/2qGf1uT.

On March 9, 2024, as it has done every year since 2003, Congress appropriated funds that "shall" be available for LOP programs:

> For expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000, of which $4,000,000 shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the ''Immigration Examinations Fee'' account, and of which not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program: Provided, That not to exceed $50,000,000 of the total amount made available under this heading shall remain available until September 30, 2028, for build-out and modifications of courtroom space.

Pub. L. No. 118-42, 138 Stat. 133 (2024) (emphasis added).[1]  Congress directed that a portion of this funding is for ICH, and a portion is for LOPC:  "LOP funding is also provided for LOP for Custodians [LOPC]"—and acknowledged that LOPC is funded "pursuant to [the TVPRA]." S. Rep. No. 118-62, at 85 (2023).

---

[1] Funding for FY 2024 has ended, but Congress has continued funding (including for the Programs) at 2024 levels through at least September 30, 2025.  *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101 (2025).

Congress has also repeatedly warned EOIR not to stop the Programs, as EOIR previously attempted in 2018 (before reversing course). *See* Dkt. 62 ¶ 14. In the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program." S. Rep. No. 118-198, at 92 (2024). Likewise, in 2022, the House Appropriations Committee "remind[ed] EOIR that funding for [the LOP] program is mandated by law, and any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee." H.R. Rep. No. 117-395, at 65 (2022).

### D. The Administrative Record Shows Defendants Never Provided a Reasoned Justification for Any of Their Three Attempts to Terminate the Programs.

The Court instructed Defendants to include in the administrative record (1) information about how the Programs would continue if, as Defendants argued, they had not terminated the Programs, (2) whether Defendants have provided any guidance about Plaintiffs' ability to access detention facilities and immigration courts, and (3) "what, if any, rationale exists" for Defendants' actions. 4/15/25 Hearing Tr. at 69:5–70:8. The 205-page administrative record does not include any of this information. 11 pages are the text of contracting regulations. 153 pages are technical and contract documents. The remaining 41 pages (AR 1–41) are the *only* materials relating to decisionmakers exercising discretion over the Programs. This thin record is notable for what it lacks: any evidence of considered, reasoned policy determination—including consideration of statutory mandates for the Programs—any articulated reason for terminating the Programs, or any evidence of the Programs continuing in any other form.[2]

---

[2] Defendants filed the administrative record in this action. *See* Dkt. 65. All cites to the administrative record use "AR" and the administrative record page numbers.

###### 1.    January 22, 2025: "Stop Work."

On January 22, 2025, DOJ/EOIR issued a Stop Work Order, halting funding for all Programs other than LOPC. Dkt. 44-3 at 23. The Stop Work Order offered only a vague reference to the January 20, 2025 "Protecting the American People from Invasion" Executive Order, presumably indicating an unspecified desire to audit the Programs under that Executive Order. Internal emails, not produced as part of the administrative record, showed Defendants explicitly decided *not* to include LOPC in the Stop Work Order. *See* Amica Decl. Ex. 3.

Plaintiffs filed this case on January 31, 2025, and Defendants rescinded the Stop Work Order two days later. *See* Dkt. 44-3 at 8. On February 5, 2025, Attorney General Pam Bondi issued a memorandum directing DOJ and EOIR to pause funding the Programs and review them for purported "waste, fraud, or abuse." Dkt. 30-1 at 3. Although Defendants previously cited that memorandum as a potential justification for terminating the Programs, *see, e.g.*, Dkt. 35 at 20 n.8, the administrative record includes a post-decision declaration created for this litigation claiming that this memorandum is *not* the basis for their decision. AR at 39–41.

###### 2.    April 4, 2025:  DOJ Sends a Termination Notice By Accident, and Reverses Itself.

On March 19, 2025, Defendants filed a status report stating that EOIR was "compiling and reviewing certain information from recipients of Department of Justice funding in accordance with . . . the February 5, 2025 memorandum issued by the Attorney General," without confirming whether EOIR was, in fact, "auditing" the Programs. Dkt. 45 at 4. Just two weeks later, despite the Court's order requiring three days' notice before any termination, on April 4, 2025, Plaintiffs received—through the prime contractor, Acacia Center for Justice ("Acacia")—a DOJ notice terminating the contracts under which Defendants run the Programs because DOJ "determined that the services are no longer needed." AR 7. The only reason offered for this termination is a

reference to freezing contracts not identified as "mission essential" under Executive Order 14222, Implementing the President's Department of Government Efficiency ("DOGE") Cost Efficiency Initiative. AR 1. Recognizing the April 4, 2025 termination violated this Court's order requiring three days' notice, Defendants rescinded the termination. AR 13.

The administrative record shows that a DOGE operative, Tarak Makecha, rushed the termination because he wanted to "report completion to WH." AR 4. Otherwise, the administrative record reveals no reason or explanation for terminating the Programs. All that appears in the administrative record is an executive fiat. On April 3, 2025, Defendant Sirce Owen, Acting Director of EOIR, admitted she did not know the reason for the termination. AR 8. Instead, she stated that "DOGE contacted JMD [Justice Management Division] this afternoon and instructed them to terminate the contract" and that "whoever [DOGE] spoke to . . . [knew] the basis for the termination." *Id.* But no such basis is offered in the record.

### 3.    April 16, 2025:  Termination for Convenience.

After the April 4 termination was rescinded, DOGE operative Makecha again pressed for terminating the Programs, describing the three-days' notice issue as an "easy fix." AR 7. A new termination notice, this time with a three-business day notice period, was rushed out on April 10. The April 10 termination notice (the "Termination Notice") terminated the contract through which Defendants fund and run the Programs "for the convenience of the government," effective April 16, 2025. AR 30. Other than invoking a procedural term in the contract, no justification was provided. In fact, Defendants admitted the "notice of termination is the relevant document here for the basis on which these contracts are being terminated"—i.e., there is no other explanatory document. 4/15/25 Hearing Tr. at 38:21–23. On April 10, a JMD employee told EOIR, "We need to know why does EOIR want these task orders terminated? Please provide a memo in writing ASAP." AR 27. But the administrative record shows that no such memo was ever provided, nor

11

was any other justification given for ending the task orders. Similarly, nothing in the record evidences any plan to continue the Programs in another form—instead, ending the task orders was equated to terminating the Programs, as EOIR told JMD to issue notices directing Acacia "to terminate FGLOP, ICH, CCI, and LOP/LOPC." AR 18. This notice went into effect on April 16; since then, the Programs have ceased operation and, as far as Plaintiffs are aware, have not been continued in any form. Amer. Gateways Decl. ¶ 17.

**E.    Defendants' Action Has Already Drastically Harmed Plaintiffs.**

Terminating the Programs has already resulted in devastating and ongoing harm on a scale far greater than when the Programs were stopped in January. *See, e.g.,* ProBAR Decl. ¶¶ 19–22. Over the last few weeks, Estrella del Paso, American Gateways, and ProBAR were forced to furlough or lay off large portions of their staff in direct response to the loss of funding. Estrella Decl. ¶ 18; Amer. Gateways Decl. ¶ 15; ProBAR Decl. ¶ 20. Terminating the programs has also frustrated Plaintiffs' missions to support noncitizens in removal proceedings, as more noncitizens will have to navigate the immigration system without ever having spoken to a lawyer about the immigration process, their obligations, or the legal remedies available to them.

In addition to blocking performance of required services, Defendants' actions have prevented Plaintiffs from communicating information related to their missions. For instance:

- The ABA has not been allowed to provide ICH group orientations at the Harlingen Immigrant Court after the court administrator denied its request "based on recent changes in the contracts." ProBAR Decl. ¶ 22.

- The South Texas Detention Complex is no longer allowing its library to contain materials that are not written in English. Amer. Gateways Decl. ¶ 17.

- RMIAN has not been allowed to conduct group presentations to detained individuals and

instead has been able to arrange only individual consultations, resulting in a 90% reduction in the scope of the organization's outreach. RMIAN Sherman Decl. ¶¶ 28–30.

- Estrella was told they could not use EOIR space at immigration courthouses to conduct KYR presentations or individual orientations. Estrella Decl. Ex. 1.

- Several non-Plaintiff organizations who provide similar services have likewise faced access limitations since the termination. *See, e.g.*, MIRC Decl. ¶ 8; FLS Decl. ¶¶ 5–7.

These harms all directly follow from Defendants' unlawful actions—and will continue unless and until those actions are enjoined.

## STANDARD OF REVIEW

For APA claims, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 30 (D.D.C. 2024). In such cases, the district court "sits as an appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did," *Amneal Pharms. LLC v. Food & Drug Admin.*, 285 F. Supp. 3d 328, 339 (D.D.C. 2018).

Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011). The APA also

prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(B)–(D).

A preliminary injunction is warranted where plaintiffs establish: (1) a likelihood of success on the merits; (2) irreparable harm; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts look to the same factors in assessing whether a permanent injunction is warranted. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In suits against the government, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    This Court Has Jurisdiction over Plaintiffs' Claims.

#### A.    Plaintiffs Have Article III Standing.

Organizational plaintiffs have standing to sue in their own right when they have suffered an "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *People for the Ethical Treatment of Animals v. U.S. Dept. of Agric.* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015). Plaintiffs here have suffered multiple injuries in fact, their injuries are fairly traceable to Defendants' conduct, and their requested relief would likely redress their harms.

***Injury.*** "To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020). In the D.C. Circuit, this means showing the agency's action injured the organization's interest and the organization used its resources to counteract that harm. *PETA*,

797 F.3d at 1094. Here, Plaintiffs have suffered at least two injuries that give rise to Article III standing: direct interference with their core business activities and loss of funding.

*First*, Defendants' actions are directly interfering with Plaintiffs' core business operations. Plaintiffs' access to noncitizens detained at immigration detention facilities and at immigration courts across the country has been curtailed and frustrated. NWIRP Decl. ¶¶ 23–24; ICWC Decl. ¶ 8; RMIAN Sherman Decl. ¶¶ 28–30; *supra* at 12–13. Estrella has been told it cannot access spaces in immigration courthouses. Estrella Decl., Ex. 1; *see also* MIRC Decl ¶ 8. Other Plaintiffs are being forced to renegotiate their relationships with detention centers and immigration courts (RMIAN Sherman Decl. ¶¶ 29–30), and are no longer receiving critical information from detention facilities enabling them to serve their populations. FIRRP Decl. ¶¶ 34–37; CCLA Decl. ¶ 6; PIRC Decl. ¶ 17; NWIRP Decl. ¶ 22; ICWC Decl. ¶ 7. This inhibits Plaintiffs' abilities to provide legal services, through the Programs or otherwise. PIRC Decl. ¶ 19; NWIRP Decl. ¶ 24.

Most importantly, the termination means Plaintiffs are unable to provide noncitizens with critical information regarding their rights and responsibilities in immigration proceedings, a core aspect of their missions. Estrella Decl. ¶ 17; *see also Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1233674, at *4 (N.D. Cal. Apr. 29, 2025) (by cancelling all funding, "the Government 'perceptibly impair[s]' Plaintiffs' ability to fulfill their shared organizational mission."). For example, Estrella has not been able to conduct any legal orientations since this Court denied Plaintiffs' renewed motion for a temporary restraining order. Estrella Decl. ¶ 17. Plaintiffs are forced to conduct their missions in a "less efficient and effective" way, increasing the cost of providing services and dramatically reducing the number of noncitizens Plaintiffs can serve. *PETA*, 797 F.3d at 1091. These are exactly "the type[s] of 'substantial,

tangible costs' that are cognizable for purposes of organizational standing." *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 48 (D.D.C. 2020).

In sum, Defendants' actions "deny [Plaintiffs] access to information and avenues . . . they wish to use in their routine information-dispensing, counseling, and referral activities." *Action All. of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986). These harms impede Plaintiffs' "core business activities"—their programs providing legal information to noncitizens. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730, at *22–23 (D.D.C. April 24, 2025) (finding organizational standing where executive order relating to proof of citizenship implicated voter-registration nonprofits' core mission); *see also, e.g.*, RMIAN Sherman Decl. ¶ 30.

*Second*, Defendants have terminated all funding for the Programs through which Plaintiffs fund and run their legal orientation activities—a loss of millions of dollars, which represents substantial portions of Plaintiff organizations' overall budget. Financial injuries like these are the "gold standard or 'prototypical form of injury in fact.'" *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *6 (D.D.C. Mar. 10, 2025). These injuries are forcing Plaintiffs to reassign, furlough, or terminate staff, shift funding between programs, and expend resources looking for other sources of funding. Some of the smaller Plaintiffs may be forced to close their doors entirely or to charge fees for their services (which itself requires them to compromise their missions). All of this will leave a large gap in the services Plaintiffs are able to provide to noncitizens. Estrella Decl. ¶¶ 17–19; PIRC Decl. ¶ 20; FIRRP Decl. ¶¶ 39– 43; ICWC Decl. ¶ 9.

*Traceability.* Plaintiffs' injuries are "fairly traceable" to Defendants' actions here. *PETA*, 797 F.3d at 1093. Cases involving a "blanket directive to suspend congressionally appropriated" funds provide a "textbook" example of the kind of "causation" needed to establish standing. *AIDS*

*Vaccine Advoc.*, 2025 WL 752378, at *7. Plaintiffs' lack of information about, and lack of access to, noncitizens in detention facilities and in immigration court is a direct consequence of Defendants' termination of the Programs. FIRRP Decl. ¶ 37; CCLA Decl. ¶ 6; PIRC Decl. ¶ 17; NWIRP Decl. ¶ 22; ICWC Decl. ¶ 7.

 ***Redressability.*** To satisfy the redressability prong, a plaintiff need not demonstrate "victory in court will without doubt cure the identified injury," but "only that it is likely to do so." *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 82 (D.D.C. 2019): *see also* 4/15/25 Hearing Tr. at 64:20–23 (The Court: "And I don't think that for purposes of Article III standing, it has to be a certainty that a decision by the Court would result in their funding being restored, but a likelihood would be sufficient."). A "plaintiff need not negate speculative and hypothetical possibilities in order to demonstrate the likely effectiveness of judicial relief." *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *7 (D.D.C. Apr. 16, 2025) (cleaned up).

 Defendants actions have critically harmed Plaintiffs' core business activities and organizational missions. Halting funding for the Programs is crippling the nonprofit organizations that provide Program services, preventing thousands upon thousands of noncitizens from receiving legal services for which Congress has appropriated funding. The requested injunctive relief will redress these harms by restarting the Programs, ensuring that Plaintiffs' missions to provide noncitizens with this critical legal information are fulfilled.

 Reinstatement of the legally required funding for the Programs also significantly increases the likelihood that Plaintiffs will obtain some relief. Defendants' administrative record shows no plan to provide the Programs through other providers, despite Defendants' representation to the contrary to this Court (4/15/25 Hearing Tr. at 34:4–6), nor is there any record that there *are* any other qualified providers. As the Court correctly recognized at the April 15, 2025 hearing, "in

17

some of the[] areas [in which Plaintiffs operate], they are the only organizations that actually provide these services. And so if the program goes forward through private entities, [Plaintiffs] may be the only ones that are available to do it." *Id.* 64:23–65:2; *see, e.g.*, FIRRP Decl. ¶ 18; NWIRP Decl. ¶ 6; PIRC Decl. ¶ 4; RMIAN Sherman Decl. ¶ 8. It is thus highly likely that an order granting the requested injunction will result in Plaintiffs' own funding being reinstated. And even if Defendants choose to fund the Programs through contracts with other providers, this still provides Plaintiffs relief by furthering their organizational goals and allowing them to divert resources to other initiatives. *See Cmty. Legal Servs.*, 2025 WL 1233674, at *5 ("[I]f the Government . . . ensure[s] direct representation through others, the harm Plaintiffs suffer in the form of providing representation without payment or diverting resources would be alleviated."); *AIDS Vaccine Advoc.*, 2025 WL 752378, at *7 (finding redressability where order would "directly affect[] Plaintiffs' . . . ability to fulfill their organizational missions").

Further, Plaintiffs' requested injunction prohibiting Defendants "from preventing Plaintiffs from accessing Defendants' facilities" and "from removing . . . Plaintiffs' posters, literature, or other written communications" will directly redress Plaintiffs' access and other First Amendment harms. *See* Proposed Order. This, too, will ensure the noncitizens Plaintiffs serve continue to have access to legal information. And Plaintiffs' request for "declaratory relief would provide [them] ammunition for any future legal attack" on Defendants' actions hampering their access to facilities crucial to their organizational missions. *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 131 (D.D.C. 2020).

## B.    Plaintiffs Have Prudential Standing.

Prudential standing exists so long as a "plaintiff's complaint fall[s] within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). In APA cases, agency action is "presumptively reviewable" unless a

plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Plaintiffs have prudential standing because their APA claims are in the zone of interests protected by the congressional appropriations and the TVPRA. Plaintiffs' interests in sustaining their core activities and organizational missions—including their commitment to ensuring noncitizens are not left to navigate the immigration system alone and uninformed, *e.g.*, NIJC Decl. ¶ 1; NWIRP Decl. ¶¶ 2–3—are more than "marginally related to" the TVPRA and appropriations at issue here. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225. In fact, these statutes "contemplate[] an important role for organizations like Plaintiffs." *Nw. Immigrant Rts. Project*, 496 F. Supp. 3d at 52. The relevant congressional appropriation provides that "not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program," Consolidated Appropriations Act, Pub. L. No. 118-42, 138 Stat. 133 (Mar. 9, 2024), and the TVPRA directs the Secretary of Health and Human Services to work with EOIR to conduct an LOPC program, 8 U.S.C. § 1232(c)(4).

Courts have held that organizational plaintiffs "easily meet" the test for prudential standing under similar circumstances. For instance, in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), this Court determined that nonprofits providing legal services to refugees had prudential standing for an APA challenge because various provisions of federal immigration law expressly envision engagement from nonprofits. *Id.* at 144–45. Likewise, the court in *Community Legal Services* determined that nonprofits providing legal services to unaccompanied children had prudential standing because "their interests are congruent with the TVPRA's and Foundational Rule's beneficiaries." 2025 WL 1233674, at *5. The same analysis applies here.

### C.    This Court—and Not the Court of Federal Claims—Has Jurisdiction.

Courts apply a "strong presumption that Congress intends judicial review of administrative action" of the challenged administrative actions. *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986). A court has jurisdiction to review agency action under the APA if (1) the plaintiff is "seeking relief other than money damages" and (2) "there is no other adequate remedy" available elsewhere. *Bowen v. Massachusetts*, 487 U.S. 879, 893, 901 (1988); 5 U.S.C. §§ 702, 704. Plaintiffs meet both factors here because their claims for injunctive and declaratory relief are statutory and regulatory—not contractual—and the "the doubtful and limited relief available in the Claims Court under the Tucker Act is not an adequate substitute for review" by this Court. *Bowen*, 487 U.S. at 901.

### 1.    Plaintiffs seek equitable relief, not money damages.

Plaintiffs' amended complaint asks the Court to "declare" violations of law, "set aside" Defendants' unlawful actions, and "enjoin" further unlawful actions. Am. Compl., Prayer for Relief. Nowhere do Plaintiffs request "monetary compensation for an injury." *Bowen*, 487 U.S. at 893. Plaintiffs challenge the lawfulness of Defendants' decision to terminate the Programs, not whether Defendants' actions breach any contract. As Defendants concede, their argument that the Court lacks APA jurisdiction depends on rejecting Plaintiffs' "premise that the Programs have been terminated." 4/15/25 Hearing Tr. at 34:4–6. But Defendants admit their actions "suspended the delivery of Program services," Dkt. 35 at 18, and while counsel speculated that the Programs were not actually terminated, 4/15/25 Hearing Tr. at 34:4–6, the administrative record reveals no plan to restart or continue the Programs. Further, "[e]ven if Plaintiffs brought a claim for breach of the contract . . . under a theory of third-party liability, they likely would not be able to litigate in the Federal Court of Claims—given the absence of privity between the Government and

20

subcontractors like Plaintiffs, there is no express or implied contract that would implicate the Tucker Act." *Cmty. Legal Servs.*, 2025 WL 1233674, at *6 n.3.

The mere fact that Plaintiffs' remedies "may require [Defendants'] to pay money to" Plaintiffs after resuming congressionally mandated appropriations is "not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. In fact, numerous federal courts have upheld jurisdiction under the APA even when a case could result in an order directing a federal agency to disperse funds. *See, e.g.*, *Katz v. Cisneros*, 16 F.3d 1204, 1208 (Fed. Cir. 1994) (suit seeking payments from HUD to which plaintiff alleged it was entitled did not "seek money as compensation for a loss suffered" and was properly brought in district court); *New York v. Trump*, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025) (same for claims relating to freeze of FEMA funds); *Maine v. U.S. Dep't of Agric.*, 2025 WL 1088946, at *1 (D. Me. Apr. 11, 2025) (same for claims relating to freeze of department of Agriculture funds).

The Supreme Court's *per curiam* order in *Department of Education v. California*, 145 S. Ct. 966 (2025) did not change this well-settled rule. There, the Supreme Court reaffirmed *Bowen*'s holding and explained that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* at 968 (quoting *Bowen*, 487 U.S. at 910). Applying well-settled law, the Court determined that, under the specific facts of that case, the relief awarded amounted to an order "to enforce a contractual obligation to pay money." 145 S. Ct. at 968. That was so because the claims involved disputes over "the terms and conditions of each individual grant award" issued to plaintiffs by the defendant. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025). Here, by contrast, the Court need not consider the terms of any contract to review Plaintiffs' claims; instead, Plaintiffs are challenging Defendants' wholesale unlawful termination of the Programs. *See New*

*York*, 2025 WL 1098966, at *2 (finding *Department of Education* inapposite in the context of "a broad, categorical freeze on obligated funds"). Because Plaintiffs "do not seek payout . . . *Department of Education* has no bearing here." *Cmty. Legal Servs.*, 2025 WL 1233674, at *7.

### 2. The Court of Federal Claims does not provide an adequate alternative forum for Plaintiffs' claims.

Defendants suggest this Court does not have jurisdiction under the APA because the Court of Federal Claims provides an alternative forum in which to hear Plaintiffs' claims. Dkt. 64-1 at 6–14. The Court should reject that argument for at least three reasons.

*First*, Plaintiffs' claims fall outside the jurisdiction of the Court of Federal Claims, which has jurisdiction only over claims by parties that directly contract with the government. *Globex Corp. v. United States*, 54 Fed. Cl. 343, 347 (2002). Given this, "[i]t is a fundamental tenet of Claims Court jurisprudence that a subcontractor may not sue the government absent privity of contract." *Pan Arctic Corp. v. United States*, 8 Cl. Ct. 546, 547 (1985). "Even if Plaintiffs brought a claim for breach of the contract . . . under a theory of third-party liability, they likely would not be able to litigate in the Federal Court of Claims" in light of "the absence of privity between the Government and subcontractors like Plaintiffs." *Cmty. Legal Servs.*, 2025 WL 1233674, at *6 n.3. Defendants admit Plaintiffs (who were subcontractors) could sue in Court of Federal Claims only if they were "sponsor[ed]" by Acacia—and, as the Court explained, no case "would ever suggest that APA jurisdiction turns on being able to show . . . I could get someone else to sponsor me and then I would have a remedy." 4/15/25 Hearing Tr. at 31:7–24.

Moreover, the Court of Federal Claims has jurisdiction over claims founded on statutes only if the "legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. U.S.*, 372 F.2d 1002, 1009 (Ct. Cl. 1967), *overruled on other grounds by Malone v. U.S.*, 849 F.2d 1441,

1444–45 (Fed. Cir. 1988). Statutes that give the Court of Federal Claims jurisdiction generally are ones that "attempt to compensate a particular class of persons for past injuries or labors." *Bowen*, 487 U.S. at 905 n.42. By contrast, district courts—not the Court of Federal Claims—have jurisdiction "when the obligation-creating statute provides its own detailed remedies, or when the [APA] provides an avenue for relief." *Maine Cmty. Health Options v. U.S.*, 590 U.S. 296, 323–24 (2020). Because Plaintiffs' claims arise under the APA, which provides its own "avenue for relief," the Court of Federal Claims does not have jurisdiction.

*Second*, the Tucker Act neither deprives this Court of jurisdiction nor creates jurisdiction in the Court of Federal Claims. The Tucker Act forces truly contractual claims to the Court of Federal Claims *only if both of the following are true*: (1) the claims are founded on contract-based rights, and (2) the claims seek a contract-based remedy. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Neither condition is satisfied here. Plaintiffs' claims are not premised on their contracts with Acacia or Acacia's contract with the government. Instead, their claims arise from statutory and constitutional rights that existed prior to and apart from rights created under any contract—indeed, Plaintiffs do not even have a contract with the government. The "contract underlying the [termination] was between [the government] and Acacia Center" and Plaintiffs "were not parties to that contract and assert no rights related to that contract." *Cmty. Legal Servs.*, 2025 WL 1233674, at *6; *see Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (Tucker Act jurisdiction "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are *founded only on a contract*, or whether they *stem from a statute or the Constitution*") (emphasis added)). Defendants have conceded this limitation, recognizing that "a Plaintiff does not necessarily seek monetary relief merely because . . . success on the merits may obligate the United

States to pay the complainant." Dkt. 35 at 5. Defendants also recognize that "the D.C. Circuit has 'rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id.* at 32; *see also Megapulse*, 672 F.2d at 968 (explaining that "the mere fact that a court may have to rule on a contract issue does not . . . automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have"). Plaintiffs here do not seek a contract-based remedy; they ask for only declaratory and injunctive relief.

*Third*, the Court of Federal Claims cannot provide Plaintiffs the relief they seek because that court "does not have the general equitable powers of a district court to grant prospective relief," *Bowen*, 487 U.S. at 905, and a claim "for damages . . . in the Claims Court" is not an "adequate substitute for prospective relief," *Transohio*, 967 F.2d at 608. By canceling the Programs' funding and interrupting Plaintiffs' Program activities, Defendants are unconstitutionally ending the Programs. Post-hoc monetary relief—the only relief the Court of Federal Claims could provide—cannot redress the harms caused by Defendants' actions because ending the Programs irreparably harms Plaintiffs' missions by preventing noncitizens from receiving the Program support Congress has funded. The administrative record discloses no plan to continue these Programs in any form—further demonstrating that Defendants' actions go beyond simple termination of a contract. This is not a contract issue and cannot be treated as such without foreclosing *any* plaintiff from challenging unconstitutional, illegal acts.

## II. Defendants' Termination of the Programs Determines Plaintiffs' Legal Rights and Obligations and Is a Final Agency Action Reviewable Under the APA.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). A plaintiff "suffering legal wrong because of agency action, or adversely affected or

aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704. Plaintiffs satisfy each of these criteria here.

*First*, the Termination Notice is a final agency action. An agency action is final where it (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Termination Notice meets these criteria because it permanently terminates the contracts that controlled spending of all congressionally appropriated funding for the Programs. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *10–11 (D.D.C. Feb. 3, 2025) (cutting off government funding is final agency action).

*Second*, Plaintiffs have no other adequate remedy for their claims. The Supreme Court narrowly interprets the "other adequate remedy" limitation. *Bowen*, 487 U.S. at 903. "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). No such special procedures have been established, so relief from this Court is proper.

*Third*, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial review" of the challenged administrative actions. *Bowen*, 476 U.S. at 670–71. Nor was the agency's action committed to its discretion, because Congress mandated appropriations for these Programs and instructed that services be provided without gaps. *See Community Legal Servs.*, 2025 WL 1233674, at *8–9

(appropriations requiring legal representation for unaccompanied children and the TVPRA provide meaningful standards against which to judge the agencies' discretion).

## III.    Termination of LOP, LOPC, and ICH Violates the Appropriations Clause.

Under the APA, a court "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B). Termination of these Programs violates the mandate in the Spending Bill and the Appropriations Clause. Pub. L. No. 118-42, 138 Stat. 133 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(2), 1106 (2025) (extending funding through September 30, 2025); 5 U.S.C. §§ 706(2)(A), (C).  Defendants admit this:  when the Court asked, "Would you agree though that, in fact, the Justice Department is required by law to expend the funds on the LOP?," Defendants' counsel responded, "I would agree with that under the terms of the appropriation statute."  4/15/25 Hearing Tr. at 52:4–8.  Yet Defendants are not spending the appropriated funds on any Program services.  That violates the APA.

Congressional appropriations *require* the executive to fulfill congressional expenditures; the word "shall" makes the expenditure mandatory.  *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1381, 1381 n.19 (D.D.C 1973).  The executive branch has no authority to withhold funds from allotment and obligation. *Train v. City of New York*, 420 U.S. 35, 46 (1975).  Instead, where funds have already been obligated through a definite commitment of those funds to a provider of services or goods, the government must provide those funds.  *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) (agents of the executive cannot "obligate the Treasury for the payment of funds" contrary to congressional intent).  After funds have been obligated, the intended recipient is legally entitled to receive those funds.  *See Nat'l Juv. L. Ctr., Inc. v. Regnery*, 738 F.2d 455, 462–65 (D.C. Cir. 1984) (where the government has promised to fund a private party, it is obligated to pay).  Here, Defendants effectively concede that terminating a contract withholds

26

congressionally obligated funds, Dkt. 35 at 14, and that without the task orders the Termination Notice cancelled, the appropriated funding is not even obligated, Dkt. 45 at 3.

Congress allocated more than $840 million dollars "for the administration of immigration-related activities" of EOIR.   Pub. L. No. 118-42, 138 Stat. 133 (2024).   Congress explicitly required that "$28,000,000 . . . *shall* be available" for LOP, LOPC, and ICH . *Id.* And in previous Spending Bills, Congress defined some of the "immigration-related activities" it intended to fund in (1) a Joint Explanatory Statement, which the 2018 Spending Bill incorporated, 164 Cong. Rec. H2084, H2090 (2018), https://bit.ly/2ES8xNV (2) a House Report, H.R. Rep. No. 115-231, at 30 (2018), https://bit.ly/2H7BhnT; and (3) a Senate Report, S. Rep. No. 115-139, at 65 (2018), https://bit.ly/2qAPq5K. Since then, Congress has reminded EOIR it cannot try to stop the program like it did in 2018.  In 2022, the House Appropriations Committee warned "EOIR that funding for this program is mandated by law, and any diversion from the funds' intended purpose must be formally communicated and convincingly justified to the Committee." H.R. Rep. No. 117-395, at 65 (2022).  And in 2024, the Senate Appropriations Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program." S. Rep. No. 118-198, at 92 (2024).  Defendants' cancellation of the Programs in no way considered that Congress expressly funded and mandated continuation of the Programs, let alone any "convincingly justified" basis for the termination.[3]

Defendants have no authority under the Constitution to withhold the relevant funds because Congress authorized those funds and obligated the funds to be spent on the Programs. *See Train*, 420 U.S. at 45–46; *see also Maine v. Goldschmidt*, 494 F. Supp. 93, 95, 100 (D. Me. 1980) (holding

---

[3] Even if Defendants wanted "to spend less than the full amount appropriated by Congress," they would still have to follow the procedural requirements set out in the Impoundment Control Act, 2 U.S.C. §§ 681–688, which they did not do here. *See Aiken Cnty.*, 725 F.3d at 261 n.1.

that the Federal-Aid Highway Act of 1956 mandates spending and precludes the Executive from deferring or reducing the obligational limit). Defendants "must follow statutory mandates so long as there is appropriated money available" and cannot simply "decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). This Court should vacate the termination of the Programs and enjoin any future attempts to withhold funds. 5 U.S.C. § 706(2)(B).

## IV.    Terminating LOP and LOPC Also Violates the TVPRA.

Defendants' termination of LOP and LOPC also violates Congress's command in the TVPRA—which mandates that the Secretary of Health and Human Services "shall" work with EOIR to "ensure that custodians receive legal orientation presentations provided through the Legal Orientation Program administered by [EOIR]," 8 U.S.C. § 1232(c)(4)—and thus violates the APA, 5 U.S.C. § 706(2)(B). These orientations are part of the TVPRA's purpose of "[p]reventing the trafficking of unaccompanied [noncitizen] children found in the United States by ensuring that they are not repatriated into the hands of traffickers or abusive families, and are well cared for." H.R. Rep. No. 110-430 at 35 (2007). This statutory command requires EOIR to operate a legal orientation program for custodians, which it has done through LOPC. The Office of Refugee Resettlement's own Policy Manual recognizes that custodians "should attend a presentation provided by [LOPC]" and providing that "attendance at an LOPC presentation" is a factor in considering whether to approve a custodian. https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2

The administrative record shows Defendants recognize EOIR has "statutory obligations" under the TVPRA that they have to meet by either running LOPC or running a "federalized program" to provide orientations for custodians. AR at 15. Yet the administrative record shows

no plan to run LOPC or any "federalized program." And Defendants ignored their own staff's recommendation to wind down LOPC over 30 days to allow for a "federalized program." *Id.*

Defendants do not have discretion to *not* provide the orientation that the TVPRA mandates. *See Community Legal Servs.*, 2025 WL 1233674, at *9 ("The Government violates the TVPRA by withholding funding for direct legal representation entirely, with no supplemental plan to ensure unaccompanied children have legal counsel 'to the greatest extent practicable.'"). Notably, Defendants do not contest that Plaintiffs correctly describe what the TVPRA requires. *See* Dkt. 64-1 at 26–28. Instead, they argue only that Plaintiffs cannot bring an APA claim for violation of the TVPRA. *Id.* That attempt to evade judicial review of an uncontested TVPRA violation fails, as Plaintiffs have standing and are well within the lenient "zone of interest" analysis to bring a claim for violation of the TVPRA. *See supra* § I.B.

## V.    Terminating the Programs Is Arbitrary and Capricious.

To ensure agency actions are reasonable and lawful, courts "exercise . . . independent judgment and apply all relevant interpretive tools to reach the best reading of the statute." *Env't Def. Fund v. U.S. Env't Prot. Agency*, 124 F.4th 1, 11 (D.C. Cir. 2024). Agency actions not contrary to law must nevertheless be "reasonable and reasonably explained." *Id.* This "standard requires the agency to 'examine the relevant data and articulate a satisfactory explanation for its action.'" *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). And a court "shall" set aside agency action if it is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

Defendants have the burden of proof under the APA: their termination of the Programs must be set aside as arbitrary and capricious unless they produce an administrative record that (1) explains the basis of their decision, (2) considers all relevant factors and articulates a "rational connection between the facts found and the choice made," and (3) offers a "reasoned analysis" for

departure from preexisting policies. *Motor Vehicles Mfrs. Ass'n, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42–43 (1983). Defendants' decision here fails on all three grounds.

### A.    Defendants Failed to Adequately Explain the Basis for the Decision.

A "fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Tourus Recs.*, 259 F.3d at 737. Meaningful judicial review cannot proceed unless "the grounds upon which the administrative agency acted [are] clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*). An agency action should be set aside unless its basis is "set forth with such clarity as to be understandable." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*). Or, as Defendants put it, the APA requires their actions be "reasonable and reasonably explained" under the administrative record. Dkt 35 at 34.

Defendants' cancellation of the Programs fails even this most basic test. As the Court observed, "I would be really surprised if there wasn't an email to the . . . acting director of EOIR, saying, yes, you know, here is why we are going to terminate this and this is why we want to terminate it." 4/15/25 Hearing Tr. at 37:4–7. Yet that is exactly what is missing here. Plaintiffs invite the Court to turn every page of the administrative record. That will reveal Defendants acting to terminate the contracts under the assumption that *someone* might provide the required justification—but none was ever provided. On April 3, 2025, Defendant EOIR Acting Director Owen wrote that "DOGE contacted JMD this afternoon and instructed them to terminate the contract. I was not privy to this conversation, but whoever they spoke to at JMD knows the basis for the termination." Dkt. 65-2 at 8. But JMD did not know either. On April 10, 2025, hours before the termination notice was sent, a JMD employee asked for the justification: "We need to know why does EOIR want these task orders terminated? Please provide a memo in writing

ASAP." AR at 21. The administrative record does not contain any such memo or any statement of any reason at all—not even the last-minute rationalization JMD asked for.

What the administrative record does show is that Defendants terminated the programs quickly and without explanation so they could "report completion" to an unnamed figure at the "W[hite] H[ouse]." On April 3, 2025, DOGE staffer Josh Gruenbaum sent Tarak Makecha a list of the contracts at issue in this case, with no explanation. AR at 5. Makecha, a DOGE staffer tasked to DOJ, forwarded the list to JMD (again, with no explanation) telling them to "execute this termination today" and to let him know when it was done "so I can report completion to WH"— presumably referring to the White House. Dkt. 4. This exchange led to DOGE searching through JMD for someone to send the April 4, 2025 termination letter that Defendants later scrambled to retract after recognizing it violated this Court's order requiring three business days' notice before terminating the Programs. AR at 3, 13. After this first termination was retracted, Makecha again directed JMD to terminate the contracts, this time giving notice to Plaintiffs—and, again, providing no reason for the termination. AR at 14.

The only purported rationale Defendants offer is "convenience" and the contract-related regulations cited in the termination notice itself. AR at 30. But regulations cannot override Congress's appropriation mandates. *See Texas v. E.P.A.*, 726 F.3d 180, 195 (D.C. Cir. 2013) ("'[A] valid statute always prevails over a conflicting regulation,' and a regulation can never 'trump the plain meaning of a statute.'"). Were the Executive able to invoke purported contract rights to terminate congressionally appropriated programs, it would render appropriations legislation meaningless. That is especially so here, where Plaintiffs are not parties to the relevant contract and cannot bring contract claims to protect their rights. *Supra* § I.C.

Without *any* justification in the record for Defendants' complete reversal of policy and practice, Defendants do not satisfy the APA's requirement to provide a reasoned basis for their actions. Tellingly, Defendants' purported justifications have shifted over the course of this case, from citing the "Protecting the American People from Invasion" Executive Order for the Stop Work Order (Dkt. 35 at 36), to citing the Attorney General's memorandum in litigation and telling the Court they were "compiling and reviewing certain information . . . in accordance with" the memo (Dkt. 45 at 4), to now disavowing that memo and claiming they actually never reviewed the Programs under the memo, contradicting their earlier filing (AR at 41), and producing an administrative record that shows there simply was no reason to terminate the Programs other than a demand from DOGE. Defendants' new disavowal of the Attorney General's memorandum and their other attempts at a "post-hoc rationalization via attorney argument" are not, and do not reflect, reasoned decision-making. *Cmty. Legal Servs.*, 2025 WL 1233674, at *11; *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) ("[J]udicial review of agency action is limited to the grounds that the agency took when it invoked the action."). Because Defendants have provided no rationale for their decision to terminate the Programs, the Court should set aside the termination. *See Chenery II*, 332 U.S. at 196–97 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").

## B. Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made.

To survive review under the arbitrary and capricious standard, the administrative record must show the agency "demonstrated 'a rational connection between the facts found and the choice made.'" *Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 301 (D.C. Cir. 1981). Courts "do not defer to the agency's conclusory or unsupported suppositions." *Standing Rock Sioux Tribe v. U.S.*

*Army Corps of Eng'rs.*, 255 F. Supp. 3d 101, 121–22 (D.D.C. 2017).  As Defendants concede, they must consider "relevant factors" under the APA.  Dkt. 35 at 37.  But there is no evidence they did so; in fact, the record shows no *attempt* to do so.   Defendants' termination ignores even the bare advice of Defendants' own policy office.  *See* AR at 15.

Defendants' predecessors have repeatedly studied and commended the Programs.  For example, the government's April 2017 study recommended that EOIR "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications."  Booz Allen Hamilton Study at 24–25.  Further, a 2017 ICE memorandum noted "LOP attendees are positioned to make better informed decisions, are more likely to obtain legal representation, and complete their cases faster than detained noncitizens who have not received the LOP."   *See* Memorandum from ICE Assistant Director for Custody Management Tae Johnson, to ICE Field Office Directors, *Updated Guidance: ERO Support of the U.S. Department of Justice Executive Office for Immigration Review Legal Orientation Program* (Nov. 30, 2017),  https://tinyurl.com/4c6tzc4w; *see also* Nina Siulc, et al., *Legal Orientation Program: Evaluation and Performance and Outcome Measurement Report, Phase II*, The Vera Institute of Justice (2008), https://perma.cc/ZEN3-648L (finding the average LOP participant moved through the immigration court 13 days faster than non-participants).  The administrative record does not engage with these or any other study about the Programs.  Given the repeated findings that the Programs make immigration courts run more efficiently and provide significant savings to taxpayers, Defendants' decision to terminate the Programs without distinguishing those findings or citing any contrary evidence is arbitrary and capricious.

Defendants also failed to assess in any way the impacts of terminating the Programs on the intended and actual beneficiaries of the Programs.  In a system where immigrants have no right to

appointed counsel and nearly 90% of noncitizens in detention complete deportation proceedings without counsel, terminating the Programs removes the only access to relevant, legal information many individuals ever receive. Defendants also did not engage with the reliance interests of Plaintiffs, who staffed and built organizational capacity around the expectation of continued Program funding. Nor did Defendants grapple with the implications of ending representation for children under CCI, where attorneys are prevented by ethics and immigration court rules from withdrawing from cases that Defendants are no longer funding. Defendants' own policy office even flagged that there should be a wind-down period for CCI to address this very concern, but the Termination Notice ended CCI immediately. AR at 15. The APA requires that agencies "look at the costs as well as the benefits" of their actions. *See State Farm*, 463 U.S. at 52, 54. The administrative record reveals no such analysis or consideration occurred. *See* AR 1–41; Dkt. 45 at 4 (no update as to any audit or review of the Programs).

The record reveals there was no rationale for the decision to cancel programming. Where, as here, "no findings and no analysis . . . justify the choice made," the APA "will not permit" a court to accept the agency's decision. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962). Because Defendants "should have considered those matters but did not," their "failure was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec.*, 591 U.S. at 33.

## C.    Defendants Offer No Reasoned Explanation for Their Reversal of Policy.

When the government reverses its own established policy, it has an even greater burden to justify its actions. The agency must "acknowledge and provide an adequate explanation for its departure from established precedent," and must give due consideration to "serious reliance interests." *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010). Thus, reversing a pre-existing policy calls for a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox*, 556 U.S. 502, 515 (2009).

Defendants' termination decision reverses a decades-old policy explicitly reaffirmed year after year by Congress—most recently when it renewed funding in 2024 and continued that funding in March 2025.  In contrast to Congress's clear intention to continue longstanding policy and practice of funding the Programs, DOJ ended the Programs without explanation.  In terminating the Programs, Defendants dramatically depart from their own precedent, moving so quickly they produced no justification because they were being "rushed to act" by DOGE.  AR at 4.  Defendants lack *any* explanation for this abrupt change in policy, let alone a "reasoned" explanation, and their action is arbitrary and capricious.  *Fox*, 556 U.S. at 515.

To recap what the administrative record shows:  Defendants terminated Programs with no reasoning after receiving DOGE's say-so.  Defendants repeatedly asked for the official "reason" for the termination and never received an answer—not even a pretextual one.  Nonetheless, Defendants proceeded to terminate the Programs with no factual support or analysis to justify that decision.  It is hard to imagine a clearer case of arbitrary and capricious agency action.

## VI.     Termination of the Programs Violates Plaintiffs' First Amendment Rights.

This Court may set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).  Defendants' actions violate the First Amendment by (1) limiting Plaintiffs' access to limited public forums where they have spoken to noncitizens for more than 20 years; and (2) denying them access to congressionally authorized funds because Defendants want to suppress the information they have traditionally shared with noncitizens.

Defendants have withdrawn funding that has already been appropriated by Congress.  Although a legislature is not required to create programs that subsidize all viewpoints equally, *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), once Congress has chosen to encourage activity related to one viewpoint, the government may not directly interfere with that activity in violation of the First Amendment, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013).

Congress has chosen to fund the Programs, and Plaintiffs are "insisting that public funds be spent for the purposes for which they were authorized," *Rust*, 500 U.S. at 196, in a manner that is "not inconsistent with Congressional intent," *id.* at 188.

Similarly, when the government creates a limited public forum or chooses to fund private speech, it may impose speech restrictions only if they are "viewpoint neutral and 'reasonable in light of the purpose served by the forum.'" *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 633 (D.C. Cir. 2024). Here, the courthouses and detention facilities where Plaintiffs implement the Programs are limited public forums, because Congress made all such government property where the Programs are implemented available for "use by [Plaintiffs]" for more than 20 years. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009).

The termination of the Programs imposes neither viewpoint-neutral nor reasonable restrictions on speech. Compounding Defendants' decision to terminate Programs that provide information to individuals in removal proceedings, they have made it difficult for Plaintiffs to access immigration courthouses and detention facilities in an effort to prevent that information from being shared at all. Plaintiffs' posters in these facilities not only provide information about the Programs, but also generally inform noncitizens about how to contact Plaintiffs for potential representation. Estrella and ProBAR can no longer access spaces at immigration courthouses. ProBAR Decl. ¶22; Estrella Decl. Ex. 1; *see also* MIRC Decl. ¶ 8; FLS Decl. ¶¶ 5–7. NWIRP's posters containing the organization's contact information were taken down from inside the housing pods of the facility NWIRP operates from. NWIRP Decl. ¶ 11. Similarly, PIRC's information posters were removed from a different detention facility, drastically impeding PIRC's ability ever to come into contact with detained individuals. PIRC Decl. ¶¶ 17–19; FLS Decl. ¶¶ 5–7 Non-plaintiff organizations have faced similar access limitations. *Supra* at 13. Meanwhile, the

Department of Homeland Security is putting up new, official posters inside immigration courts with messages such as "Message to Illegal Aliens: A Warning to Self- Deport." RMIAN Bachman Decl. ¶ 13. Such viewpoint-based restrictions and allowances violate the First Amendment.

*First*, Plaintiffs' speech is private speech, not government speech. Courts "must exercise great caution" in assessing what constitutes government speech, and private speech does not transform into "government speech by simply affixing a governmental seal of approval." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Here, the Programs were "designed to facilitate private speech"—i.e., provision of information to those in immigration court—"not to promote a governmental message." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). They thus facilitate Plaintiffs' private speech rather than any message attributable to the U.S. government.

Courts consider three factors in identifying government speech: "(1) the history of the speech at issue; (2) a reasonable observer's perception of the speaker; and (3) control and final authority over the content of the message." *A.N.S.W.E.R. Coal. v. Jewell*, 153 F. Supp. 3d 395, 411 (D.D.C. 2016). Defendants have not offered evidence to show sufficient "control" or "final authority" over Plaintiffs' speech. *Id.* Nor do the other factors support a finding of government speech. The Programs were founded by nonprofits to convey their own messages and fulfill their missions. *See, e.g.*, Estrella Decl. ¶ 3; CCLA Decl. ¶ 2. LOP and ICH began as private projects to inform noncitizens of their rights before Congress authorized funding to support the Programs. *See, e.g.*, FIRRP Decl. ¶¶ 5–7; ProBAR Decl. ¶ 5. And while Plaintiffs cooperate with other stakeholders in the immigration system, their role is distinct from the government attorneys who represent DHS or immigration judges. *See Velazquez*, 531 U.S. at 542.

*Second*, the termination of the Programs is not viewpoint-neutral. Defendants attempt to silence speech that informs noncitizens broadly about their rights and responsibilities based on

Defendants' apparent belief that such speech "promote[s] or facilitate[s] violations of our immigration laws." Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025); *see also* Dkt. 30-1 at 4. This language shows an intent to cut funding to censor Plaintiffs' speech on a nationwide basis. The government engages in viewpoint discrimination when it "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The government may not leverage its power to subsidize or restrict speech in a limited public forum to silence speech regarding litigants' rights or to prevent them from defending themselves in court proceedings. *Cf. Velazquez*, 531 U.S. at 547–48. Yet here, Defendants apparently want to steer noncitizens away from using available procedures to examine legal and factual bases for removal and instead to "self-deport." Defendants' actions squelch Plaintiffs' speech to non-citizens concerning their other rights and options. The Programs often provide the only legal advice available to noncitizens. As in *Velazquez*, the Government may not hamstring this legal advice by preventing Plaintiffs from speaking to noncitizens or threatening their ability to exist by withdrawing funding upon which they rely. 531 U.S. at 548–49 ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest."). Cutting off access to information to ensure individuals in removal proceedings are unable to access legal services plainly runs contrary to the First Amendment. *See* 4/15/25 Hearing Tr. at 46:1–10.

 *Third*, terminating the Programs is not reasonable. Funding conditions violate the First Amendment when they "leverage[] the federal funding to regulate [a party's] speech outside the scope of the program." *Agency for Int'l Dev.*, 570 U.S. at 216. This is precisely what Defendants do here: they contend that, once they cut off funding to Plaintiffs, they can "reasonably" cut off access to these facilities. *See* Dkt. 35 at 28–29. Not so. Plaintiffs have accessed these facilities

for decades to provide these orientations; cutting off access prevents noncitizens from receiving any legal advice whatsoever. *See, e.g.*, ProBAR Decl. ¶ 12. Leveraging a cut-off in funding to limit Plaintiffs' access to those facilities and censor their speech therein violates the First Amendment. *See Agency for Int'l Dev.*, 570 U.S. at 216.

## VII.    Defendants' Actions Are *Ultra Vires* and Should Be Set Aside.

This Court has the authority to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Indeed, the Supreme Court has long allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). Such relief is appropriate here. Defendants' termination of the Programs is "blatantly lawless" and a "clear departure . . . from [their] statutory mandate[s]." *Fed. Express Corp. v. Dep't of Commerce*, 39 F.4th 756, 764 (D.C. Cir. 2022). There is no law that permits Defendants to slash congressionally mandated programs at will. Their action is *ultra vires* and so should be permanently enjoined.

As explained above, Defendants have tried to terminate the Programs three times. *See supra* at 9–12. Defendants characterized the termination slightly differently each time, but each attempt aimed at the same target: the summary cancellation of Programs Congress has mandated and funded every year for more than two decades.

Defendants have no such power. No statute or other law authorizes the unilateral termination of congressionally appropriated and mandated programs by an executive agency or its principals. If Congress had intended to grant Defendants the power to make choices of such "vast economic and political significance," it would have "sp[oken] clearly." *W. Va. v. U.S. Env't Prot. Agency*, 597 U.S. 697, 716 (2022). Here, it did not; in fact, Congress repeatedly directed Defendants to continue funding the Programs. S. Rep. No. 118-62 at 84. Defendants ask the Court

to let them cancel congressionally mandated programs at will, "for convenience" or perhaps when they "determine[] that [the programs are] no longer needed." AR 7, 30. But the Programs are federal law, and Defendants' purported cancellations "are the functional equivalent of partial repeals of Acts of Congress." *Clinton v. City of New York*, 524 U.S. 417, 444 (1998).

Further, Defendants scarcely attempt any justification for the termination of the Programs. In fact, an internal DOJ request to "provide a memo in writing ASAP" explaining why EOIR wanted the programs cancelled went unanswered. AR 27. This lack of contemporaneous justification was unlawful, because "an agency acts *ultra vires* when its decision is not supported by 'a contemporaneous justification by the agency itself, but only a post hoc explanation [by] counsel." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 975 (D.C. Cir. 2022). In any event, as this Court explained, Defendants' counsel's post hoc justification of terminating the contracts for "convenience" amounts to little more than "gobbledygook." 4/15/25 Hearing Tr. at 35:8–17. Defendants acted far beyond their power without contemporaneous (or even post hoc) explanation. Their actions were *ultra vires* and should be enjoined.

## VIII. Defendants' Actions Violate the Separation of Powers.

"It is well established that, whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch that makes the law, and this includes Congress' core spending power." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (cleaned up). When the Executive takes action that is "incompatible with the express or implied will of Congress, [its] power is at its lowest ebb" and it must "rely upon [its] own constitutional powers" to justify the action. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

Here, Defendants have unlawfully encroached on a power explicitly granted to Congress by refusing to distribute congressionally mandated appropriations. Congress directed that

Defendants "shall" spend to provide LOP, LOPC, and ICH.  Pub. L. No. 118-42, 138 Stat. 133 (2024).  Given this express congressional command, the Executive *must* provide that funding. Defendants' attempt to withhold these funds is "incompatible with the express or implied will of Congress" and violates the separation of powers.  *Youngstown,* 343 U.S. at 637.

The *Aids Vaccine Advocacy Coalition* case is instructive.  There, an executive order paused all aid funding through the United States Agency for International Development, notwithstanding Congress's appropriation of funds that it ordered "remain available until September 30, 2025." 2025 WL 752378, at *2–3.  Recipients of that aid challenged the implementation of the Executive Order on the basis that the Executive was acting "in violation of the separation of powers, including Congress's . . . exclusive power over spending, and the expression of those powers through statutes that constrain the Executive's authority." *Id.* at *14.  The court granted a preliminary injunction, noting "Congress's appropriations laws set the amount that is to be spent.  That is, the appropriations laws reflect an exercise of Congress's own, core constitutional power to determine *whether and how much* money is spent."  *Id.* at *17.  The same holds true here, and this Court should bar Defendants' *ultra vires* actions.

## IX.    Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief

Plaintiffs move for summary judgment on all claims and permanent injunctive relief, along with their other requested relief.  In the alternative—or until the Court issues a decision on Plaintiffs' motion for summary judgment—Plaintiffs also seek a preliminary injunction.

### A.    Plaintiffs Face Irreparable Harm.

A preliminary injunction is appropriate where the moving party shows that it faces harm that is both (1) "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm," and (2) "beyond remediation." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (cleaned up).  A party

41

seeking a permanent injunction must similarly show "irreparable harm." *See eBay*, 547 U.S. at 391. That standard is satisfied here.

Defendants' decision to terminate funding for the Programs has directly interfered with Plaintiffs' funding and ability to provide critical orientation services that are at the heart of Plaintiffs' activities. Program providers across the nation receive approximately $9 million dollars annually—which represents substantial portions of Plaintiffs' overall operating budgets and funds many full-time staff dedicated to the Programs. *See* Amer. Gateways Decl. ¶ 13 (LOP and ICH account for 27% of American Gateways' budget and impact over 32% of staff); Amica Decl. ¶ 32 (LOP accounts for 20% of the Amica Center for Immigrant Rights ("Amica Center")'s Detained Adult Program budget); Estrella Decl. ¶ 6 (13 staff at Estrella are exclusively funded through LOP and ICH); FIRRP Decl. ¶ 14 (18 FIRRP staff are dedicated primarily to LOP). As nonprofit organizations, Plaintiffs cannot continue this critical work at the core of their mission without the appropriated, allocated, and approved funding. In fact, Plaintiffs have already been forced to terminate, furlough, or reassign significant numbers of staff members. *See* CCLA Decl. ¶ 5; Estrella Decl. ¶18; Amer. Gateways Decl. ¶ 15; ProBAR Decl. ¶ 20. So have non-Plaintiff Program providers. *See, e.g.,* LCSNW Decl. ¶ 4; CSL Miami Decl. ¶ 9; El Pueblo Decl. ¶ 5; CC Newark Decl. ¶ 8; Just Neighbors Decl. ¶¶ –6.

Beyond these issues, Plaintiffs and non-Plaintiff organizations continue to face barriers to communicating with detained noncitizens as a result of Defendants' actions. *Supra* at 12–13. All the while, thousands of *pro se* noncitizens face removal proceedings without access to vital information about how to best navigate those proceedings. *See* ABA Infoline Decl. ¶¶ 11–12.

These imminent and already-occurring harms cannot be later remediated. Even if funding later resumes, organizations forced to lay off significant portions of their staff will be unable to

maintain the infrastructure and institutional knowledge needed to later restart their programs, including the loss of DOJ accreditation for former staff members. *See* Estrella Decl. ¶ 18. And because Defendants' actions prevent some Plaintiffs from speaking by limiting their access to immigration courts and detention facilities and cutting off crucial funding sources, Plaintiffs are irreparably harmed. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

By terminating the Programs, Defendants prevent Plaintiffs from providing thousands of noncitizens the services Congress prescribed, frustrate Plaintiffs' missions of supporting noncitizens in immigration proceedings by ensuring they are not removed without basic knowledge of their rights, and silence Plaintiffs' voices. *See, e.g.*, RMIAN Sherman Decl ¶ 30 ("RMIAN was unable to see roughly *ninety* individuals held in detention over a two-day period"). Immediate injunctive relief is thus warranted.

### B.    The Balance of Equities and Public Interest Favor an Injunction.

In considering whether to grant a preliminary or permanent injunction, the Court should "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014); *eBay*, 547 U.S. at 391. Where an injunction "will not substantially injure other interested parties," "the balance of equities tips in [plaintiffs'] favor." *Newby*, 838 F.3d at 12.

Here, there will be no harm to Defendants—or any other interested party—if this Court issues an injunction. "It is well established that the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020). On the contrary, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12. Defendants' actions contravene Congress's express funding mandates, and an injunction would merely prevent Defendants from unlawfully defying those mandates.

Maintaining funding for the Programs also furthers a critical public interest: an efficient and fair immigration system that reaches an appropriate result in individual cases. The Programs benefit noncitizens by informing them of their rights—helping more noncitizens obtain a just resolution to their immigration proceedings—and benefit taxpayers by promoting efficiency in the immigration system. The Programs provide a particularly important public service now, as the population in immigration detention increases significantly and it becomes increasingly difficult for noncitizens to navigate the immigration system alone. *See* RMIAN Brock Decl. ¶¶ 4–5; Amica Decl. ¶¶ 26–27. By appropriating money for these programs, Congress recognized funding the Programs is in the public interest. An injunction, therefore, is in the public interest. *See generally* Dkt. 41-1 (amicus brief of former immigration judges, explaining "[e]ven a brief interruption in these programs will disrupt the efficient and fair functioning of the immigration courts").

If the Court does not issue an injunction, Plaintiffs and thousands of noncitizens (and, in some cases, U.S. citizens who are detained) will continue to face clear, immediate, and irreparable harms, as described above. U.S. taxpayers, who will bear the increase in overall systems costs resulting from the elimination of the Programs, likewise will suffer from Defendants' actions. Defendants, meanwhile, will face no injury from an injunction to vacate their illegal termination of funding. Accordingly, the balance of equities weighs heavily in favor of issuing an injunction.

### C.    A Nationwide Injunction Is Appropriate

District courts' authority to issue nationwide injunctions is well-established; they "enjoy broad discretion in awarding injunctive relief." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). Accordingly, when "a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020).

44

Here, nationwide relief is necessary to prevent irreparable harm to Plaintiffs. Defendants' decision to terminate funding for the Programs directly contradicts Congress's express mandate and is contrary to law *in every case*—regardless of which organization provides the services. Plaintiffs operate the Programs in ten different states, and nationwide, through the ABA's telephonic LOP. A nationwide injunction is the only way to effectively preserve critical, congressionally approved programs. It will also serve the interest of non-plaintiff legal-service providers, who support injunctive relief. *See* Dkts. 30, 30-2–30-15, 43-2–43-5.

Moreover, a nationwide injunction will help maintain a "uniform" and "integrated" nationwide immigration system. *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015). And it will protect this Court and others from the risk of duplicative litigation, as "an injunction issued here only as to the plaintiff organizations and their members would cause all others affected by [the invalid rule] . . . to file separate actions for declaratory relief." *Nat'l Mining Ass'n*, 145 F.3d at 1409. Plaintiffs are located throughout the country, and piecemeal injunctive relief would be impractical and difficult to administer. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 326–27 (4th Cir. 2021); *see also Community Legal Servs.*, 2025 WL 1233674, at *13 ("[T]here is no practical way to limit injunctive relief relating to immigration law and policy by party or by geography."). Accordingly, a nationwide injunction is appropriate in this case.

## CONCLUSION

Defendants' decision to terminate funding for the Programs is contrary to the Constitution, violates express congressional appropriations and commands, and is arbitrary, capricious, and beyond the scope of executive power. Accordingly, their actions—which lack even a pretextual justification—violate the APA. This Court should grant summary judgment to restore the Programs as required by Congress. Until the Court issues a decision on Plaintiffs' motion for summary judgment, the Court should grant a preliminary injunction.

Respectfully submitted,

May 2, 2025

s/ Adina Applebaum                          s/ Laura Sturges

AMICA CENTER FOR IMMIGRANT              GIBSON DUNN & CRUTCHER
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)    Laura Sturges (C.O. Bar No. 36843)*
Samantha Hsieh (V.A. Bar No. 90800)*      1801 California Street, Suite 4200
Amelia Dagen (D.C. Bar No. 9004838)       Denver, CO 80202-2642
Amica Center for Immigrant Rights         (303) 298-5700
1025 Connecticut Avenue NW, Suite 701     lsturges@gibsondunn.com
Washington, DC 20036
(202) 331-3320                            Amer S. Ahmed (D.C. Bar No. 500630)
adina@amicacenter.org                     Richard W. Mark (D.D.C. Bar No. NY0378)
sam@amicacenter.org                       200 Park Avenue
amelia@amicacenter.org                    New York, NY 10166-0193
                                          (212) 351-4000
                                          rmark@gibsondunn.com
                                          aahmed@gibsondunn.com

                                          * admitted *pro hac vice*

46