# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, et al., *Plaintiffs,* v. UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, *Defendants.* | Case No. 1:25-cv-00298 **DECLARATION OF ATENAS BURROLA IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF** |

**DECLARATION OF ATENAS BURROLA**
**CO-DEPUTY PROGRAM DIRECTOR FOR THE DETAINED ADULT PROGRAM AT AMICA CENTER FOR IMMIGRANT RIGHTS (FORMERLY THE CAPITAL AREA IMMIGRANTS' RIGHTS (CAIR) COALITION)**

*I, Atenas Burrola, make the following statements on behalf of Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my colleague Kelly Rojas's Declaration in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 2) and Supplemental Declarations in Support of Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 51) as if fully set forth herein.

2. My name is Atenas Burrola, and I am the Co-Deputy Program Director overseeing the Detained Adult Program ("DAP") at Amica Center for Immigrant Rights (formerly the Capital Area Immigrants' Rights (CAIR) Coalition) ("Amica Center"). My colleague Kelly Rojas is Co-Director overseeing DAP. Amica Center is a Washington, DC-based nonprofit, legal services organization. Amica Center is the primary organization dedicated to providing legal services to indigent immigrant men, women, and children who are detained by the Immigration Customs Enforcement ("ICE") agency under the Department of Homeland Security ("DHS") throughout Virginia.

3. Amica Center strives to ensure equal justice for all immigrant men, women, and children at risk of detention and deportation in the DC metropolitan area and beyond.

4. Amica Center is comprised of three main programs: the Detained Adult Program ("DAP"), the Detained Children's program, and the Immigration Impact Lab. DAP helps detained noncitizens understand the Immigration Court and deportation process so they can make better-informed decisions about their cases, including whether or not to pursue immigration relief, and more effectively participate in their proceedings. We also help people connect with pro bono attorneys if they are unable to pay an attorney to represent them. Our goal is to help families stay together and out of harm's way.

5. In order to carry out this mission, DAP has four main work components: (1) providing educational and pro se services in the form of "know your rights" presentations, conducting individual intakes and one-one-one legal orientations, and conducting pro se workshops with all unrepresented detained noncitizens in the custody of ICE at facilities located in Virginia; (2) connecting unrepresented detained noncitizens who cannot afford a lawyer with pro bono attorneys from our various pro bono firm partners, for cases at both the trial and appellate court levels; (3) representing detained clients found legally incompetent while appearing pro se before an immigration judge as part of the National Qualified Representative Program ("NQRP"); and (4) operating an in-house universal representational pilot program of staff attorneys to directly represent clients who are residents of various localities.

6. To address the first programmatic focus area, Amica Center has been operating a Legal Orientation Program ("LOP") in Virginia since FY 2009 providing services to several

4

facilities housing noncitizens in that state and expanded in FY 2016 to cover three facilities housing noncitizens in Maryland. Amica Center provided LOP services across Maryland until 2021, when Maryland passed the Dignity Not Detention Act, which ended ICE detention in locally operated Maryland jails. Amica Center provided LOP services at both ICE over-72 hour detention facilities in Virginia: Farmville Detention Center ("Farmville") in Farmville, Virginia, and Caroline Detention Facility in Bowling Green, Virginia ("Caroline"). The combined detention bedspace in both of these facilities is 1,072 people. Farmville has beds to house 736 people and Caroline can house 336 people; although the detained population at Farmville declined significantly in past years due to COVID-19 pandemic-related litigation, ICE is now steadily increasing the number of people held there to get back up to maximum capacity. This program covers the complete immigrant population detained by ICE whose cases are heard in the Annandale Immigration Court, which is the sole Virginia immigration court with a detained docket.

7. Amica Center employs nine staff members dedicated to providing LOP services. Specifically, Amica Center employs a managing attorney, a senior attorney, a staff attorney, a DOJ accredited representative, four paralegals, and one data entry specialist. Because we were able to hire full time staff in reliance on LOP funding, we were able to engage and supervise one additional non-LOP funded paralegal fellow to assist with pro se assistance work at the jails and currently two semester-long undergraduate interns. Staff under LOP regularly travelled to each detention center to provide legal education presentations and individual orientations to detained noncitizens who do not have counsel. Amica Center staff visited both Farmville and Caroline once a month, typically for 2–4 days per visit, depending on the number of people detained. Amica Center further operated a free detention hotline that connects individuals in detention to attorneys and paralegals on our staff.

8. LOP staff also worked with our volunteer manager to recruit, train and supervise hundreds of volunteers each year who accompany and assist staff during detention center visits, translate documents for pro se individuals to include in their filings in court, and transfer calls to staff on the detention hotline. Our volunteers are a critical part of Amica Center's mission and the LOP team's delivery of legal services to individuals detained in Virginia. It would be impossible to reach all detained individuals during these visits without volunteers present to fulfill their tasks of (i) completing intake forms for staff review, (ii) delivering know your rights packets on specific legal topics to individuals as directed by our staff, and (iii) reading and translating written messages with tailored legal information to individuals for whom we previously conducted intakes. We bring 2-5 volunteers with us on a typical detention center visit. In 2024, a total of 140 volunteers joined us on these visits. Some volunteers have worked with us for many years, bringing their experience to bear in the work they do on the visits. Others later become highly skilled interns, staff and pro bono attorneys with our organization. All volunteers on detention center visits receive training and are supervised by our staff. They also submit the same National Crime Information Center background checks for clearance by the DOJ and participate in an onboarding process with the prime contractor, the Acacia Center for Justice, like our LOP staff.

9. In our experience, LOP has been a shared endeavor between the Department of Justice and legal service providers, like Amica Center, to bridge the significant gap in basic

5

immigration information available to detained noncitizens. In our experience, there is significant variation between detention facilities in: (1) the availability and accessibility of a law library, current immigration applications and basic treatises and statutory text; (2) free copies and mailing to indigent clients; (3) access to case law search engines and access to current country condition reports, which are critical to an asylum application; and (4) other information that is necessary to put on an immigration case. This is because each facility is subject to different detention standards, which facilities on the ground may or may not be in full compliance with at a given time. Compounding these difficulties is wide variance in literacy levels, and potential disabilities and languages spoken by people in detention, impacting the person's ability to access in-facility systems and prepare their cases from detention. In our experience, the Department of Homeland Security has historically cooperated in addressing legal orientation services and documents, when facilitated through LOP.

10. In our experience, Immigration Judges, ICE and facility staff rely on our provision of LOP services to assist people in understanding how to represent themselves and navigate the system. Throughout the years, there have been many instances where ICE or facility staff have contacted our legal assistants or attorneys for assistance with detained individuals, including rare language speakers, who need assistance understanding and meeting court requirements or who have special needs relating to their legal cases that staff need our assistance to address with the individual. I have frequently observed instances in open court where detained noncitizens ask questions the judge is not able to address or describe evidence in support of their cases, and judges have referred them to Amica Center for assistance obtaining volunteer translation services and determining if they can be matched to a pro bono attorney as part of our LOP services. Immigration Judges also regularly acknowledge Amica Center's LOP services in helping detained noncitizens collect evidence, submit completed applications, and know which forms of immigration relief— if any—are available to them. In recent months for example, immigration judges have thanked LOP staff for explaining appeal rights to pro se individuals and working to identify and assist individuals with disabilities, individuals who are illiterate, speakers of rare languages, and young adults just reached the age of majority through the court process. We have further frequently witnessed individuals in detention, who upon realizing that their potential claims are tenuous or that they are not bond eligible, decide not to seek relief and accept a removal order or request voluntary departure. Through our volunteer translations, educational presentations, individualized orientations, and educational materials, LOP is a key part of Amica Center's ability to educate and teach pro se detained noncitizens about their options and responsibilities in removal proceedings.

11. Individual participants in LOP have also been referred to Amica Center's separately-funded representation programs, where noncitizens can be placed with in-house pro bono representation, or with pro bono representation with external law firms, who are able to represent clients with mentorship from our LOP staff. This is especially helpful where a noncitizen's case involves an untested area of law or a legal argument that is hard to teach to pro se parties. For example, Mr. Temu, a Tanzanian man with bipolar disorder who had been harmed as a result of his mental condition, was served through LOP and then placed with pro bono counsel, ultimately winning his case before the Fourth Circuit. *See Temu v. Holder*, 740 F.3d 887 (4th Cir. 2014) (finding that "individuals with bipolar

6

disorder who exhibit erratic behavior" was a protected particular social group for asylum). In another example, LOP encountered Mr. Ilunga, a Congolese man fleeing political persecution, and was able to connect him with pro bono counsel. Pro bono counsel won remand from the Fourth Circuit when Mr. Ilunga was not provided reliable interpretation at his hearing and the inaccurate interpretation had resulted in an erroneous adverse credibility finding and the agency had impermissibly ignored record evidence of previous political persecution. *See Ilunga v. Holder*, 777 F.3d 199 (4th Cir. 2015). Amica Center also connected Mr. Santos Garcia to pro bono counsel, who won Mr. Santos Garcia withholding and protection under the Convention Against Torture and then won remand from the Fourth Circuit after the Board of Immigration Appeals reversed Mr. Santos Garcia's grant of relief on three separate occasions. *See Santos Garcia v. Garland*, 73 F.4th 219 (4th Cir. 2023).

12. Without warning, on January 22, 2025, the Department of Justice issued a national contract stop work order, citing to Section 19 of the January 20, 2025 Executive Order titled "Protecting the American People Against Invasion." The national contract stop work order, which took effect immediately, extended to the following LOP programs: the general LOP program for detained adults, the Immigration Court Helpdesk ("ICH"), the Counsel for Children Initiative ("CCI"), and Family Group Legal Orientation Program ("FGLOP"). As part of the stop work order, Amica Center was informed that we would receive payment for LOP services provided up to January 21, 2025 and potentially for part of the day on January 22, 2025, but not after. We did not receive further information regarding the duration of the stop work order or any accompanying audits as referenced in the Executive Order. LOP managing attorney Ana Dionne-Lanier and Co-Program Director Kelly Rojas spoke with staff at Washington ICE Enforcement and Removal Operations immediately after we received notice of the stop work order and communicated that Amica Center desired to continue providing LOP services, including group presentations and in-person intakes, without pause and without receiving remuneration during the stop work order, including at a detention facility visit already planned for the next day.

13. The following day—January 23, 2025—LOP staff from Amica Center was in the middle of a regularly-scheduled visit at Caroline, offering "know your rights" presentations and intake services when facility staff abruptly ordered Amica staff to leave the facility. Ms. Rojas was later informed by the Washington ICE Field Office that this action to remove LOP staff was pursuant to a national directive and that non-profit organizations would no longer be allowed to access ICE detention facilities to provide LOP services. Caroline facility staff informed us that they may need to remove posters regarding LOP services, as well as instructions detailing how to contact Amica Center through our detention hotline and packets of legal information we placed in the facility through LOP.

14. That same day, Amica LOP staff were also informed via email by the facility operations team that they had lost access to Farmville Detention Center due to LOP's suspension and Farmville staff also removed LOP posters, legal information packets, and hotline information. LOP staff were informed by the few individuals still able to connect to us through our hotline that staff at both facilities were informing them that Amica Center would no longer be permitted into the facility and not to contact Amica Center staff, who were unable to help them now.

7

15. Later that day, in response to my colleague's questions on access to facilities and whether we could continue our in-person visit to Caroline the following day without LOP remuneration and as a legal service provider apart from LOP, as we had without interruption in different instances in the past, Washington ICE Office of Principal Legal Advisor ("OPLA") Chief Counsel, stated that Amica Center could submit a request pursuant to ICE's 2011 Performance-Based National Detention Standards ("PBNDS") but that such request would not be reviewed by the following day, January 24, 2025, after the date of our scheduled LOP visit.

16. On January 27, 2025, we emailed the Assistant Chief Immigration Judge of the Annandale Immigration Court (ACIJ) to update the court regarding these developments and to reiterate our continued support for the noncitizens detained in Virginia. However, on January 28, 2025, we received a reply that the ACIJ was cancelling our pre-scheduled stakeholder meeting on February 6, 2025, due to the LOP "stop work order." My colleague responded the same day to reiterate that we wish to keep the meeting or reschedule as soon as possible to discuss our continued services, including pro bono placement efforts, as the only legal service provider focused on services to individuals on the court's detained docket.

17. On January 28, 2025, we emailed the Washington ERO Field Office Director, requesting approval to post an updated poster in the detention facilities that removed any reference to LOP. This modified poster solely contained instructions for calling the Amica Center hotline. We also clarified that these instructions were important for clients to connect to their pro bono attorneys, in addition to allowing pro se people to contact us for information. We requested that ICE approve the poster and send copies to both Caroline and Farmville for posting. Later that day, the Field Office Director replied and did not approve our poster, only affirming that all facilities display the generic immigration court list of pro bono attorneys. However, that list only includes the general hotline number with which detained noncitizens have to pay per minute of the call. That list does not include step-by-step instructions or the code for free call access to the Amica Center hotline. We heard reports through the hotline that some of our hotline calling instructions may remain posted at Caroline, but it is our understanding that our hotline information was removed from Farmville. The only remaining specific Amica Center poster may be a poster required by recently settled litigation involving release for individuals granted withholding or protection under the Convention Against Torture, informing individuals of their rights under the settlement.

18. We also received reports that all our materials that had any reference to LOP— including "know your rights" materials in the law libraries at the facilities—were removed from the facilities. We asked Washington ICE if the facilities would be able to redact the words "LOP" or "Legal Orientation Program" from the materials – these are mentioned only in passing in the materials – so the substantive content would remain available, but that request was not followed. There was also a large poster at Farmville that contained no reference to the LOP program but detailed in Spanish and English how to contact our organization via the detention hotline and that we are a nonprofit organization offering in-person and remote support to pro se individuals and connections to pro bono attorneys; we received reports that this poster was removed.

19. The abrupt pausing of the LOP program at Amica Center directly affected and frustrated Amica Center's mission to assist all unrepresented detained noncitizens in the Washington, DC metropolitan region and specifically those with active proceedings before the Annandale Immigration Court, Arlington Asylum Office, or Washington ICE Field Office. First, Amica Center wishes to continue conducting "know your rights," individual orientations, and rendering pro se assistance with all unrepresented detained noncitizens in Virginia.

20. We communicated this intent to ICE and the court as soon as we received notice of the stop work order. We were denied the ability to do so, despite a history of providing these services without interruption to individuals detained in the region even during periods of time when services were provided outside of LOP. We were not permitted to return to the Caroline facility on January 24, 2025 despite our request to do so outside of LOP.

21. We were instructed we could submit a new request to do in-person group presentations and individual counseling pursuant to the 2011 PBNDS, which requires submitting all dates for proposed visits, names and SSNs for presenters, scripts and materials for review and approval by ICE. This is despite the fact that our staff were already cleared by the DOJ and facilities to conduct these visits, the DOJ had already thoroughly vetted and approved our scripts and written materials, and ICE and the facilities had agreed to dates for facilities visits through the end of the spring.

22. On April 3, 2025, Acacia Center for Justice (Acacia) received an emailed notice of termination letter signed by a contracting officer at the Department of Justice (DOJ) purporting to terminate the following seven programs: Family Group Legal Orientation Program (FGLOP), Counsel for Children Initiative (CCI), Immigration Court Helpdesk (ICH), Legal Orientation Program (LOP), Legal Orientation Program for Custodians (LOPC), the National Qualified Representative Program (NQRP), and Legal Access for Reunified Families (LASRF). Attached hereto as **Exhibit 1** is a true and correct copy of the April 3, 2025, Termination Notice. I learned of this the afternoon of the following day, April 4, from my Amica colleagues who are co-counsel in the present litigation, whom Acacia had emailed. Shortly after, without additional explanation, DOJ issued a rescission instructing Acacia to "disregard [the termination notice] in its entirety, which has no legal effect." Opposing counsel in this litigation also provided the rescission order. Attached hereto as **Exhibit 2** is a true and correct copy of the April 4, 2025, Rescission.

23. On April 4, 2025, my Amica colleagues also received results from a request under the Freedom of Information Act (FOIA) regarding the original, January 22, 2025 stop work order. I learned of these emails from my Amica colleagues who received the FOIA results and who are co-counsel in the present litigation. In the FOIA results, various emails from DOJ officials note that even after the issuance of the Executive Order *Protecting the American People Against Invasion*, DOJ planned to continue funding LOPC, LASRF, and NQRP. Attached hereto as **Exhibit 3** is a true and correct copy of the relevant emails as received through FOIA.

24. On April 10, 2025, DOJ again sent a termination notice for the contracts for the following five programs: FGLOP, CCI, ICH, LOP, and LOPC, effective 12:01 am on April 16, 2025. I learned of the termination shortly after it was issued from my Amica colleagues

because my organization is co-counsel in the present litigation. Opposing counsel in this litigation also confirmed the termination with my Amica Center colleagues.

25. In Virginia, where we are the sole LOP provider for the Farmville and Caroline detention facilities, facility populations are now either nearly at or in one case above maximum capacity. Over one thousand individuals are detained by ICE in the state on any given day, most without access to private legal counsel. The greatly increased population also means that there is more limited access to other ways for detained people to connect to the outside world for legal support through, for example, phone calls or video. Detained people in Virginia depend on our in-person LOP visits for intake, legal screenings, basic information about the legal processes they are facing, and connections to pro bono counsel.

26. The importance of uninterrupted and timely access to LOP services has also become more critical as more individuals we meet are subject or at risk of becoming subject to expedited immigration processes with shortened timeliness and fewer rights, such as summary expulsions under the Alien Enemies Act, revocations of parole status, and expanded use of expedited removal without the guaranteed opportunity to appear before an immigration judge. For example, our LOP team recently provided services to a Venezuelan father terrified of being summarily deported under the Alien Enemies Act because he saw "Tren de Aragua" displayed on a screen when ICE interviewed them, despite their having no criminal history or involvement in the gang. We also provided services to two individuals with final court orders recognizing they cannot be removed to their home countries under the Convention Against Torture who were nonetheless swept up by ICE in recent weeks. And we provided services to a man who waited months to enter the U.S. via the CBPOne app to seek asylum after escaping political persecution and violence at the hands of government agents in his country, only to be detained during a routine ICE check in.

27. These people and everyone detained by ICE need the access to justice, information and referrals LOP facilitates. Every day LOP is shut down, we lose the opportunity to offer legal information and promote access to justice for detained pro se people. We already lost the opportunity to intake and offer legal guidance and support to an estimated over one hundred individuals who were deported or transferred quickly to other places with restricted legal access during the last stop work order. On an average day, our detention hotline receives between 50 and 60 calls from people detained at Farmville and Caroline seeking LOP services; more individuals also reach out to us electronically via the LOP function on tablets available in both facilities. When we travel to the facilities for our multiday monthly in-person LOP visits, we provide LOP services to approximately 50 to 100 detained people each day.

28. Without LOP, we have been conducting KYR presentations at the detention centers under the 2011 PBNDS. However, we are not able to present the same materials and no longer receive roster information for individuals at the detention centers. Attendance was markedly down on at our first visit, likely due to a combination of lack of roster access to be able to identify and specifically call all newly arrived people at the jail and any messaging detained people had received from jail staff or ICE that disincentivized participating in the non-LOP visit. For example, during our March LOP visit, we were

10

able to meet with and provide group KYR/intakes to 63 newly arrived individuals (out of 143 newly arrived total individuals at the facility). In our April visit without rosters under the PBNDs, only 36 newly arrived people at the facility came to see us. We do not have a count for the total number of newly arrived people at the jail because the jail no longer provides that information, but we do know that they reported a total of 300 people detained at that time. Instead of receiving critical legal information, it has also come to our attention that posters have been going up in detention centers urging individuals to self-deport. A copy of the poster is attached as **Exhibit 4**. We are concerned that the post-termination limitations on our access to pro se individuals in detention combined with the posting of self-deportation posters will lead to many individuals electing to self-deport without ever knowing their rights and eligibility for immigration relief.

29. As a result of the LOP termination, in addition to decreasing the number of people we are able to physically meet with inside detention facilities due to more limited access under the PBNDS, our staff are now unable to communicate with detained individuals using remote interpreters. Prior to the termination, our staff were able to use ICE's Virtual Attorney Visitation (VAV) program to remotely meet with non-English or Spanish speaking pro se individuals using an interpreter through the Jeenie translation platform. Because of the termination, we no longer have access to Jeenie and must pay for Language Line interpreters using separate funding. However, there is no mechanism to connect a Language Line interpreter to the VAV call. When my colleagues raised this issue to facility staff, they were told to have the individual call Amica staff from the dorm phones, which are not private legal calls.

30. Another key service that LOP staff provide for pro se individuals is translating documents for submission to the court. Since the LOP termination, facility staff at the Caroline Detention Facility have informed our staff that they will only be able to send documents for those for whom we have filed a Form G-28 Notice of Entry of Appearance. This would require an attorney or accredited representative to complete, sign, and file a G-28 for every single pro se individual we help with translations—dozens every single month.

31. Since Ms. Rojas' last declaration, Amica Center's financial situation has once again worsened, making it even more difficult for us to weather the impact of DOJ's termination of these programs. On April 16, Acacia informed us that they had received notice that DOJ would also be terminating the National Qualified Representative Program (NQRP). Acacia subsequently informed us on April 25 that NQRP funding was terminated effective that day. While not at issue in this litigation, this additional loss in funding further limits our ability to absorb the costs for providing LOP services. We have limited funding available to us as a nonprofit and use different funding streams to fund our staff and services. As a result, the loss of any one funding stream has a major impact on our organization.

32. LOP funding comprises 20% of our budget for the Detained Adult Program at Amica Center and Amica Center employs nine staff members dedicated to providing LOP services. Without LOP funding, Amica Center will not be able to reallocate other funding to keep providing LOP services in their entirety.

11

33. The federal government currently owes us approximately $1.5 million in back payments for two to three months of work across multiple programs, including LOP, NQRP, and the representation of unaccompanied children. This is funding we cannot use to fund LOP services after the termination of LOP funding.

34. Given our lack of financial resources as a nonprofit, we simply cannot self-fund the same LOP services we were able to offer under the LOP contract. We have limited streams of alternate funding that cannot be utilized for LOP services: for example, we receive funding from the state of Maryland to represent Maryland residents who are detained in ICE custody, but we cannot use that funding for any programs we choose outside of representing Maryland residents.

35. Given our current more precarious financial posture, we anticipate potentially having to lay off eight DAP staff within the next two months due to the termination of LOP funding. We also have elected to not rehire for attorney and paralegal positions when staff depart or have informed us they will be departing in the coming months (four total positions so far) and have rescinded offers to two support staff who were set to join us in May. These two support staff would have filled longstanding vacancies and performed essential work to support program financial operations and reporting. In total, the termination of LOP funding could lead to a loss of 14 DAP staff positions.

36. If we are forced to do layoffs, any LOP staff that remain will need to be reassigned to work that is focused more exclusively or entirely on identifying and intaking eligible individuals for our other existing direct representation programs (eg, Marylanders) or providing that direct representation. We will not be able to continue individualized pro se education and support and pro bono placement/mentoring efforts for the vast majority of people detained in Virginia, who were either Virginia residents prior to their detention, lived in other states, or have recently arrived to the U.S. seeking asylum, since we currently have no alternative funding for this work. To the extent we can continue any of these services to a lesser degree, they will be very limited.

37. In addition to potential layoffs, we are taking cost-cutting measures such as suspending all future spending on trainings, conferences, and voluntary professional memberships for DAP staff. We are also asking our remote attorneys to petition immigration courts to conduct all hearings, including trials, remotely, even though the best practice for effective advocacy is appearing in person so as not to miss important procedural nuances. We further are requesting that all DAP attorneys conduct client meetings, including ones regarding trial preparation, virtually while acknowledging that most of our clients, especially those dealing with trauma and mental health issues, benefit from in-person meetings. Further, we are limiting the use of paid expert witnesses to support our clients' immigration cases. These cost-cutting measures will unfortunately limit the effectiveness of our advocacy for our clients, potentially leading to losses in some immigration cases where increased resources would have made a difference in outcome.

38. The Amica Center operates with limited reserves, as our funding is dedicated to fulfilling its mission and much of our funding is restricted. If we kept operating LOP in its entirety without funding, causing Amica Center as a whole to deplete reserves, we would not be able to fulfill our financial obligations, leading us to be forced to shutter all our programs and close the organization as a whole.

39. My Amica colleagues have connected with other organizations who provided services under the terminated programs. Although not plaintiffs, these organizations are experiencing similar harms as plaintiff organizations and have provided supplemental declarations detailing the harm that they have experienced from the termination. These supplemental declarations are being concurrently submitted to the court. Many of these providers previously submitted declarations indicating they did not oppose nationwide relief in this case (Dkt. 30).

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 2 day of May 2025, in Washington, DC.

/s/Atenas Burrola

**Atenas Burrola**
Deputy Program Director, Detained Adult Program
Amica Center for Immigrant Rights 1025 Connecticut Ave. NW, Suite 701
Washington, DC 20006
P: 202-899-8621
F: 202-331-3341
atenas@amicacenter.org