**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, et al., | |
| *Plaintiffs,* | Case No. 1:25-cv-00298 |
| | **DECLARATION OF LAURA ST. JOHN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF** |
| *v.* | |
| UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, | |
| *Defendants.* | |

**DECLARATION OF LAURA ST. JOHN,**
**LEGAL DIRECTOR FOR THE FLORENCE IMMIGRANT & REFUGEE RIGHTS**
**PROJECT**

*I, Laura St. John, make the following statements on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 2) and Supplemental Declaration in Support of Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 51) as if fully set forth herein.

2. As explained in my prior declaration, my name is Laura St. John, and I am the Legal Director at the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). The Florence Project developed the model upon which the Legal Orientation Program ("LOP") was designed and has continuously operated as a provider under the LOP since that federal program was established.

**<u>Florence Project's Mission and Scope</u>**

3. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained in Immigration and Customs Enforcement ("ICE") custody in rural detention centers in Eloy and Florence, Arizona. With no public defender structure in immigration removal proceedings, the vast majority of people who are detained in ICE custody and facing removal are forced to go unrepresented in immigration court due to poverty or lack of access. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

4. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free legal services to people in immigration detention in Eloy and Florence, Arizona. Through our attorneys, accredited representative, legal assistants, and network of pro bono attorneys, the Florence Project provides free legal education and free representation to thousands of people who are detained in ICE custody and face removal in Arizona.

1

**<u>Florence Project's Services Under the Legal Orientation Program</u>**

5. The Legal Orientation Program ("LOP") is modeled after the Florence Project's years of innovative work serving detained adults in ICE detention centers in Florence and Eloy, Arizona. Florence Project staff created the original model upon which the LOP was based in response to the gap in representation created by the absence of a public defender system in immigration removal proceedings and the concern that individuals' statutory and due process rights were being violated as a result of this gap.

6. Since 1989, the Florence Project has established relationships with the courts, immigration officials, and detention facility officers to support programs that provide detained immigrants information and access to justice. Throughout the early 1990's, the Florence Project pioneered a service model that encouraged people in detention to play an active role in their own cases. Through the "rights presentation" model, the Florence Project strove to ensure that all detained individuals had access to accurate and accessible legal information and sought to empower individuals to make informed decisions about how to proceed with their immigration court cases. We also worked to address common questions and dispel common misconceptions about the immigration court system in our presentations in an effort to decrease people's anxiety, confusion, and discomfort about the legal process they were going through.

7. As the basis for the LOP model, the Florence Project was one of three organizations elected for a 1998 pilot program that preceded the LOP and was also one of the first LOPs to begin operating when the national program was initiated in 2003. The Florence Project has been operating a LOP in Arizona since the inception of the federal program. The Florence Project, in keeping with its mission, has always striven to provide pro se education and support services through the LOP to the entire immigrant population detained by ICE whose cases are heard in both the Florence and Eloy Immigration Courts – Arizona's two detained Immigration Court dockets.

8. As it pertains to adults detained in ICE custody, in order to carry out its mission of providing free legal and social services to detained adults facing removal proceedings, the Florence Project's Adult Legal Program is divided into three teams, each of which has a distinct primary area of focus, but each of which also work in synergy with the other components of the Florence Project's detained Adult Legal Program to provide high-quality, free legal education and representation to adults detained in ICE custody in Florence and Eloy, Arizona.

9. The first component of the Florence Project's Adult Legal Program, that forms the foundation of Florence Project's adult legal services, is based on our pro se model of services, which involves providing high-quality legal education, information, and pro se support to the thousands of people who are detained in immigration custody without counsel in Arizona every year. The Florence Project provides pro se services through a

combination of delivery methods including group rights orientations, group pro se workshops, individual orientations, and written pro se packets explaining forms of immigration relief. Prior to the program terminations, much of the Florence Project's pro se education and informational services were provided under the umbrella of the LOP with the ongoing goal of protecting the most fundamental due process rights of people who are detained by enabling people to effectively and efficiently represent themselves in their removal proceedings and other related matters before the immigration agencies. The team that is primarily tasked with these types of pro se education and support services is known at the Florence Project as our Detention Action & Response Team ("DART").

10. The second major component of the Florence Project's Adult Legal Program is our Pro Bono Team, who receive pro bono case referrals from DART and then connect unrepresented noncitizens with pro bono counsel from law firms or pro bono private immigration practitioners. Each year, our pro bono team places dozens of cases with volunteer attorneys before the immigration court, BIA, and the Ninth Circuit Court of Appeals and provides mentorship and technical support on those cases. Aspects of pro bono screening and mentorship in cases before the agency also are funded and conducted, in part, through the LOP.

11. The Florence Project's in-house Direct Representation Team is the final major component of the Florence Project's legal services for detained adults. Florence Project staff in the Direct Representation Team accept pro bono case referrals from DART and also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings under the National Qualified Representative Program and pursuant to the permanent injunction in Franco-Gonzalez v. Holder, No. CV 10-02211 DMG DTBX, 2013 WL 3674492 at *1 (C.D. Cal. Apr. 23, 2023). Thus, in addition to our pro se services provided through the LOP and our external pro bono placements, attorneys in our Adult Program provide in-house pro bono direct representation to hundreds of clients each year, representing individuals in a broad variety of matters before the Immigration Court, Board of Immigration Appeals, United States Citizenship and Immigration Services ("USCIS"), and the Ninth Circuit Court of Appeals. Florence Project's direct representation is conducted entirely separate and apart from the LOP.

12. In addition to our direct legal services, the Florence Project is nationally known for developing written pro se materials that are designed specifically to explain complex legal concepts to people with no legal knowledge and often limited education. We work with experts in explaining complex concepts in "plain language" and aim to have them understandable to people with approximately a sixth grade reading level. Florence Project pro se guides are distributed in detention centers throughout the country. While the Florence Project uses our pro se guides and materials extensively when providing LOP services, and while all of our pro se guides and related materials have been vetted and

approved for use under the LOP, the creation and updating of these materials is not funded under the LOP.

13. Until the April 2025 LOP termination, the Florence Project provided LOP services at all three current ICE detention facilities located in the State of Arizona – the Eloy Detention Center, the Florence Detention Center, and the Central Arizona Florence Correctional Complex. Combined, these three facilities have a currently contracted capacity to detain approximately 2,000 people in ICE custody on any given day. All three of these facilities are located in rural communities in Central Arizona, approximately one hour away from the nearest major metropolitan areas.

14. The Florence Project currently employs 18 staff who are dedicated primarily either to directly providing pro se legal education services under the LOP or to providing managerial or other administrative support to the LOP. Since our last declaration, one attorney has left the team for other services within the organization and one legal assistant became a fully accredited DOJ accredited representative. Specifically, Florence Project employs 3 managing attorneys and 1 managing legal assistant who directly oversee staff providing LOP services, help manage data compliance, and conduct pro se services themselves; 1 managing attorney who supervises our pro bono team and provides direct pro bono mentorship herself; 3 staff attorneys, 1 law grad, and 1 DOJ accredited representative who directly provide legal education and pro se support under the LOP; 1 pro bono mentor who screens, places, and provides technical support to pro bono attorneys; 1 pro bono legal assistant who helps screen and place pro bono referrals; 4 legal assistants who provide pro se workshops and individual orientations under attorney supervision; and 2 legal administrative assistants who support the team with LOP related data entry and billing requirements. Due to staff turnover, internal transitions, and promotions, the Florence Project also currently has 8 open positions that are contemplated under the Florence Project's LOP Program Operation Plan that we are now unable to backfill. While these 18 individuals make up the core LOP service providers, portions of the Adult Program Manager and Associate Adult Program Manager positions are also dedicated in part to administration of the LOP and as such a small portion of their work is also covered under the LOP subcontract. In order to maintain staff flexibility to nimbly respond to on the ground needs and maintain capacity in each staff member's work plan for professional development and assignments that fall outside of the scope of normal LOP services, none of the Florence Project's DART staff are funded entirely under the LOP, but most staff who are dedicated to these types of services have 42% to 85% of their time dedicated to LOP specific work. The total Full Time Employees ("FTE") under the Florence Project's LOP Program Operation Plan is 16.76 FTEs.

15. Staff on the DART team who work under the LOP routinely travel to each of the three detention centers we serve to conduct in person legal services, including group orientations or Know Your Right presentations, pro se workshops, and individualized orientations and

consultations with people who are detained and do not have legal counsel. Florence Project staff provide weekly large group general orientations at all three Arizona detention centers. At the Eloy Detention Center, the largest of the three Arizona detention centers, Florence Project staff typically have general orientations two times a week on Tuesdays and Thursdays in order to accommodate both the number of participants and the varying populations because Eloy houses both men and women who cannot be brought together for group presentations under facility rules. Meanwhile, at the Florence Detention Center and the Central Arizona Florence Correctional Complex, Florence Project staff provide one large general orientation each week at each facility, typically on Wednesdays. At all three detention centers, Florence Project staff follow the large group orientation with a same day pro se workshop specifically diving into the details of how to make a request for release from custody either through bond or parole. The Florence Project creates lists for general orientation participants largely using information sharing made possible by the LOP. Specifically, the Florence Project uses as combination of the "Cognos report" (an EOIR generated report sharing initial master calendar hearing docket information), facility housing rosters showing (again shared specifically as a result of the LOP), as well as referrals and requests from detained individuals to create our participant lists for the general orientations, with a goal of providing as many people as possible their general orientation ideally two weeks before their first court hearing.

16. In addition to group general orientations and pro se workshops, Florence Project staff also conduct individual orientations, which can include both initial consultations as well as follow up pro se service visits. Individual orientations and follow-up visits occur on most days of the week in all three facilities. Initial individual orientations typically occur on the same day of the larger group orientations, following the general presentation. Given the size of the population we serve, follow up pro se service visits can occur any day of the work week and staff are routinely in all three of the detention centers. Follow up services typically include further legal orientation and education, or technical support, for example: translating court documents or helping individuals with low literacy or significant language barriers fill out their applications for relief.

17. In addition to our in-person services, the Florence Project also maintains a hotline for detained individuals which is currently operating once a week, on Thursdays, from 1 p.m. to 4 p.m. In recent years, all three detention facilities also have created additional methods for remote legal visits and communication, including telephone calls, virtual attorney visit televideo visitation systems, and the introduction of tablets in the housing units which enable detained individuals to send messages electronically to LOP providers. While our office tends to favor in-person services where possible, particularly when working with pro se respondents who remain in control of their own documents and filings such that remote assistance often poses unique operational challenges, Florence Project staff working on the

LOP also use these remote communication mechanisms to support LOP work as appropriate.

18. LOP education and pro se legal services are a critical safety net for the people who are detained in ICE custody in Arizona. The remote location of the detention centers, combined with a relatively sparse legal community able and willing to take detained removal cases in Arizona, and the frequent indigency of individuals who are detained and unable to work, means that the majority of people detained in Arizona go through their legal process entirely alone, without a lawyer. As noted above, the Florence Project is the only non-profit organization that provides free legal services to people who are detained by ICE in Arizona. The LOP helps those people understand the process, their rights, and their obligations in the legal proceedings as well as teaching them about the possible defenses to deportation, which helps people better prepare their claims and present them efficiently to the immigration court.

19. Additionally, the majority of individuals detained in the ICE detention centers in Arizona have limited English proficiency ("LEP"). This poses unique challenges for pro se respondents who do not speak English because, while court hearings themselves are interpreted, all documents filed with the EOIR must be in English and often pro se individuals require help understanding documents filed in their cases and/or assistance translating documents or evidence they are trying to submit. The Florence Project's LOP staff are all bilingual in English and Spanish and routinely provide support deciphering court documents and applications for pro se respondents who have limited English proficiency. Moreover, while a large majority of LEP individuals in ICE custody in Arizona speak Spanish, in 2023 FIRRP served individuals from 83 countries who spoke 45 languages. LOP staff often play a critical role in identifying individuals who speak neither Spanish nor English and helping conduct orientations with such individuals using interpretation services, also provided in connection with the LOP. In this way, LOP services provide a truly basic level of protection – helping people understand their legal process – while also helping improve court efficiency by decreasing confusion and delays caused by language barriers.

20. Florence Project staff routinely encounter people through the LOP who have any number of characteristics that might make them particularly vulnerable and at risk in detention of due process violations. For example, many of Florence Project's pro se clients have limited education and have either low or no literacy in any language. Indeed, this is the reason that the Florence Project works with plain language experts and aims to develop written pro se materials that explain concepts at about a sixth grade education level. Florence Project staff also routinely work with individuals under the LOP who have experienced serious trauma; LGBTQ individuals; and individuals with significant disabilities including mental health conditions as well as physical conditions like blindness or deafness. For such individuals, the LOP is a critical safety net since, without the LOP, the vast majority of these

particularly vulnerable individuals would be left without any information and most likely would face significant barriers to adequately and efficiently preparing their cases without counsel.

21. The Florence Project has long enjoyed a cooperative stakeholder relationship with both the Florence and Eloy Immigration Courts. Beginning from the initial call to action by an Immigration Judge that led to the creation of the Florence Project, Immigration Judges in Arizona have consistently engaged with and welcomed the Florence Project's legal education services. This cooperation has included everything from willingness to provide Florence Project staff space in the physical courtrooms to conduct orientations when necessary, to smaller acts of appreciation, including donating used office supplies that otherwise would have been discarded from court filings to the Florence Project to reuse. Judges in Eloy and Florence have long relied on the Florence Project as a resource to which they may refer respondents who are confused or unclear about the next step in their immigration court process. In both EOIR and ICE stakeholder meetings, government partners routinely express thanks and emphasize the value of the services the Florence Project provides.

22. On April 10, 2025, the Department of Justice terminated the contracts for the Family Group Legal Orientation Program (FGLOP), Counsel for Children Initiative (CCI), Immigration Court Helpdesk (ICH), Legal Orientation Program (LOP), and Legal Orientation Program for Custodians (LOPC), effective 12:01 am on April 16, 2025. The Acacia Center for Justice officially notified the Florence Project of this contract termination through an email to our key LOP points of contact on April 10, 2025 at approximately 2:00 p.m. Pacific Time. After getting official notice of the termination of the LOP programming and this Court's decision not to grant a temporary restraining order, Florence Project leadership acted promptly to prepare communications with staff regarding the termination notice and to provide guidance on what to expect next.

23. Cancellation of LOP contract represents not only a budget shortfall of hundreds of thousands of dollars through the option year's end in July, but also likely a loss of approximately 1.7 million dollars for the coming option year budgets (assuming no major changes in detention capacity or services, based on the last option year on the contract). This LOP funding currently helps to pay for 42 to 85 percent of 18 staff members' salaries.

24. On April 14, 2025, in anticipation of the LOP cancellation effective date of April 16, 2025, Florence Project leadership emailed Deputy Field Officer in Charge of ICE Enforcement and Removal Operations, Jason Ciliberti, requesting permission in advance to conduct group presentations under section 6.4 of the Performance-Based National Detention Standards ("PBNDS"). This was a written request that indicated our desire and ability to continue to provide services that we had provided for decades at the facilities, long before LOP and most recently under the LOP. This request noted that transitioning our services

7

to the PBNDS had been approved in the past through similar email requests and had worked well in past work-stoppages under the LOP. It also suggested a proposed weekly schedule for such presentations and offered to provide updated materials and postings if approved.

25. On April 15, 2025, Officer Ciliberti responded, instructing that "to proceed with [our] request to provide group presentations on legal rights, please follow the required steps outlined in Section 6.4 of PBNDS 2011 (Rev. 2016)."

26. After receiving Officer Ciliberti's response and after the hearing in which the Motion for Temporary Restraining Order was denied, several members of Florence Project's leadership and managerial team, including myself, immediately set to work preparing a complete formal written request for access addressing each of the 10 elements of such a request outlined in Section 6.4 (V)(A) of the PBNDS. Although ICE was obviously familiar with Florence Project's materials and presentations, because we have provided these services in these facilities for decades and the U.S. Government itself distributes versions the Florence Project's pro se materials in detention law libraries and online self-help resources, given our experience during the January stop-work order with ICE denying our PBNDS request, we elected to make this request as thorough and complete as possible to minimize the chance of potential denial. The resulting request was a 61 page submission comprised of a 5 page letter addressing each of the 10 elements and 5 substantive attachments, which included a written outline of the content of the proposed presentation; a complete list of Florence Project's materials for distribution; updated informational posters regarding the nature, time, and language of presentations, a new sign-up sheet, and updated hotline information; copies of all visual aid materials intended for use in the group presentations; and a complete list of staff who would participate in the provision of group presentations. The full formal request was emailed to Officer Ciliberti at approximately 7:00 p.m. on April 15, 2025 seeking expedited processing of the request to minimize interruption of services.

27. On April 16, 2025, at 11:30 a.m., Officer Ciliberti emailed to notify Florence Project that our request had been approved, but noted that "ICE retains the right to modify or cancel this approval at its discretion."

28. Based on this email approval, Florence Project staff were able to submit a list of participants for a group presentation to occur on April 17, 2025 at the Eloy Detention Center.  The Florence Project has continued to provide group rights presentations on a weekly basis at both the Florence Detention Center and Florence Correctional Center and twice a week at the Eloy Detention Center.

29. There are a number of noteworthy ways in which provision of group rights presentations under the PBNDS differ from the LOP, reducing key efficiencies and making it more difficult for Florence Project to ensure that all people facing deportation have access to our legal services, in keeping with our mission.

30. One example of a key difference between providing services under the PBNDS as compared to the LOP is in the access to information we get to make lists of participants for group legal services. Under the LOP, U.S. Government entities shared key information with the Florence Project to facilitate creation of accurate lists of participants for group orientation services. This included the "Cognos report" a docket report from the Executive Office of Immigration Review ("EOIR") listing all people with upcoming initial court hearings. For years, Florence Project has used these resources (or similar docket resources from EOIR) to try to ensure that all people who have an upcoming initial master calendar hearing have been scheduled for an orientation prior to their first court date in our effort to both reach as many people who are in custody as possible with free legal services and to do so in a timely way, before they've already begun their court proceedings.

31. In contrast, under the PBNDS, Florence Project does not have access to the Cognos report or other advanced docket information from EOIR. As a result, we must rely on potential participants contacting us, either directly or through family or friends, to be added to our list for a group presentation on legal rights. Because we do not get the docket information in advance to help make our lists, we likely and increasingly will miss people before their first court date. Having people who are scared, stressed, and confused when they come to court undermines both the efficiency and humanity of the immigration court system – indeed, this was one of the main reasons why the LOP had so much support over the years. Not being able to provide people with rights presentations prior to their first court date also increases the likelihood that individuals will make critical decisions in that first immigration hearing with no real information or understanding of what their rights are, of whether they may be eligible for bond or other forms of release from detention, or whether they may qualify for legal relief from removal. This is an anathema to due process and cuts at the core of why the Florence Project exists, since the Florence Project was created as a response to an Immigration Judge's call to action given the regular due process concerns he saw in his courtroom where people seeking asylum went through the process pro se and detained with no information about the immigration system and no support.

32. It is also critical to note that a sign-up procedure can easily leave behind those who are most vulnerable, including those who have limited language proficiency in English and Spanish – the language in which most postings and information are available; limited literacy levels to read and understand the postings; and those with serious mental health or other medical conditions that may prevent them from being able to learn of or sign up for services, such as severe visual impairments or blindness, hearing impairment, and being non-verbal. In particular, with regard to individuals with serious mental health conditions, loss of access to docket information will almost certainly interfere with the Florence Project's ability to identify and support individuals who may be in need of additional accommodations as a result of their mental health condition. Providing representation and support to people with serious mental health conditions is another core service of the

Florence Project, as we have provided such services for decades both apart from any formalized programs prior to 2013 and as appointed counsel under the permanent injunction in *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013) and under the National Qualified Representative Program ("NQRP"). Unfortunately, Government entities in Arizona have a long history of failing to appropriately and timely identify people who are experiencing serious mental health conditions who may qualify for services under *Franco-Gonzalez* and the NQRP. *See e.g. Franco-Gonzalez v. Wolf*, No. CV 10-02211 DMG, Dkt. 1072 (C.D. Cal. Jan. 10, 2020) (Order reopening limited discovery to establish non-compliance with Franco Injunction citing numerous examples of potential non-compliance in Arizona). As such, limitations on our ability to learn about, access, and help identify individuals in custody who are experiencing serious mental health conditions is a serious concern from both a mission standpoint and with regards to one of Florence Project's sole remaining federal sources of funding for those cases where individuals are ultimately found not competent and appointed counsel.

33. Florence Project has also provided, in our formal request for access, a sign-up sheet to be used in the various facilities to try to maximize people being able to attend our regular group presentations on legal rights. However, in the Florence facilities, despite emailing twice – on April 18, 2025 and again on April 25, 2025 – and calling various ICE officer contacts on April 29, 2025 we have yet to hear a response from ICE regarding whether and how often they will provide us the filled out sign-up sheets. Nor have we received confirmation as of this time as to whether the sign-up sheets we provided are available in the housing units at all at this point. In the Eloy Detention Center, we have communicated with Eloy staff typically in charge of our group requests and arranged to have the sign-up sheets emailed to our office each week so that we can add individuals to our group legal presentations. However, to date, in the Eloy Detention Center, we have received lists using an out-of-date version of a sign-up sheet that is missing critical information that we now require in order to be able to add a person to our participant list for the group presentations on legal rights.

34. Another example of loss of information that we used to receive under the LOP impacting how effectively we can provide similar group presentation services under the PBNDS is the loss of access to facility rosters. Under the LOP, Florence Project was provided with daily rosters, provided by ICE, listing who is currently in custody in each of the three detention centers we serve. These rosters or population lists typically included key information such as the names and A numbers of the people in custody, the detention location, the individual's country of origin (which is helpful for guessing possible language access and interpretation needs), and, in the largest of the facilities we serve, the individuals' gender and ICE security level designations (which are necessary pieces of information to ensure compliance with ICE security protocols that prohibit mixing men

and women in group presentations and/or low security individuals with high security individuals). On April 16, 2025, we received email notice from Officer Murrieta, a CoreCivic employee who helps coordinate visitation requests at the Eloy Detention Center, confirming that "ICE also notified us that we are no longer authorized to provide you a facility roster."

35. Lack of access to the full roster under the PBNDS undermines Florence Project's ability to present group presentations on legal rights to those who need it. Again, we must rely almost solely on requests from detained individuals or their families to make our lists of participants for group presentations under the PBNDS. However, both families and detained individuals at times provide incomplete information in the messages and mailings they send asking to be added for legal services. We need the person's full name and full A number to add them as a participant to the group presentation. However, many people do not know or provide their A number. The A number – or Alien Number – is an identification number used in immigration proceedings that is critical to setting up any and all visits with detained individuals. However, in my experience in over 14 years of working with individuals detained in ICE custody, the vast majority of people involved in this system have no idea what their A number is or even where to find it. I recall routinely instructing or asking people to look at their ID cards, or ID bracelets to try to find their A number and explaining to them the importance of this number going forward. This is crucial to understand because it provides context as to why so many people who reach out for services from the Florence Project may not know what their A number is or even where to find it to provide it in a message requesting services. Yet, without that number, we typically cannot add those people for a visit. With the resources we had access to under the LOP, when we got requests for services from people that had incomplete information, we were able to look people up on the rosters - for example with just a name, we could also find a person's A number. However, now, because we don't have access to those rosters, in Eloy we must try to either follow up with people to obtain more information, which itself is complicated for detained individuals because, again, one needs the full name and A number to set a visit, or we can try to use the ICE detainee locator to get more information, but this also requires us to have more information such as the country of origin and birth date of the individual in question.

36. Additionally, without access to the rosters, it is difficult for our staff to effectively prepare and divide our presentations in advance by things like security level and even to an extent gender–information that, without the facility rosters, we have little to no way of knowing until we arrive at the facility for the presentation. This can create significant confusion and difficulty for facility staff who are prohibited from mixing different security levels in the same space. It can also cause inefficiencies for our staff because we do not know in advance if we will be giving a single presentation with follow up or if we will be giving multiple presentations.

37. In Eloy, officers have been providing a version of a sign-up list for Florence Project group presentations on a weekly basis. However, the staff appear to be using an outdated version of the sign up sheet that only asks individuals to provide the last 4 digits of their A number in conjunction with their name to sign up. Again, to add someone for a group presentation on legal rights, Florence Project staff must provide the full name and A number for each participant. Having only a partial A number poses a significant challenge for Florence Project staff tasked with creating our group presentation participant lists because, while in the past we could have used the facility rosters to look up the person and learn the full A number, we can no longer do that as we no longer have access to updated daily rosters. We have tried to clarify with the Eloy visitation staff the importance of using the updated sign-up sheets we provided as part of our access request under the PBNDS, but thus far, we continue to get incomplete information on an outdated version of the sign-up sheets, effectively preventing us from adding people for presentations when they believe they've signed up for that support. This not only undermines Florence Project's core work of providing this legal education to everyone in detention who wants it, but also undermines Florence Project's reputation and detained people's trust in the system to seek and obtain help. Rumors move quickly in detention facilities, and if people who sign up for presentations are regularly not put on the call-up list for those presentations, it can do lasting damage to establishing a functioning system that detained people can trust.

38. Since the termination, we can no longer confirm that our materials providing detainees legal information are still in detention center law libraries. And while we are aware that our posters from under the LOP have been taken down, we cannot confirm that our updated posters have been put up in housing units in the facilities. Our pro se educational materials are available for the public to view at https://firrp.org/resources/prose/. Attached as **Exhibit 1** is an example of a poster that previously hung in detention facilities. Additionally, since the termination, we have heard reports about new posters from DHS that currently hang in the detention centers that encourage people to self-deport. A copy of that poster is attached as **Exhibit 2**.

39. Another major difference between providing services under the PBNDS as compared to the LOP is the lack of funding for interpretation services. Under the LOP, the program provided access to an interpreter line for any LOP participants who did not speak either English or Spanish. However, as an organization authorized only to provide presentations under the PBNDS, the Florence Project must directly shoulder the cost of ensuring language access to the individuals we serve who do not speak English or Spanish. In 2023, for example, the Florence Project served clients from 83 countries who spoke 45 different languages, including many who speak indigenous languages that require specialized and often costly interpretation services. With the cancellation of LOP, these interpretation costs that the Florence Project must now bear alone to stay true to our mission and ensure all people have access to counsel and understand their rights in immigration court are

substantial. Between April 15, 2025 and May 1, 2025, the Florence Project has spent over $1,000.00 on interpretation alone.

40. On April 25, 2025, Florence Project leadership officially notified the Union and our staff that, under current conditions, a workforce reduction is necessary. The loss of funding and programmatic support for the LOP was critical in reaching this unfortunate conclusion because these educational services are core to the Florence Project's work and organizational identity, which has required us to consider both restructuring staffing as well as drawing on other funding sources to sustain this critical work. Florence Project leadership is finalizing proposals regarding the staffing reduction, which must go through our Union before being finalized or publicly announced in any way. That process is expected to take place the week of May 5th.

41. Assessing the need for and preparing for the likelihood of a workforce reduction has been an all-consuming task for all members of the Florence Project's leadership team over the past several weeks. This has meant that across the board, members of our Leadership Team, including our Executive Director, Deputy Director, myself as Legal Director, Director of Philanthropy, Director of the Office of People and Culture, and the Program Managers for our Adult, Children, and Social Services programs as well as our contracted financial consultant, have dedicated multiple hours essentially every day for weeks working through staff, program, and budget restructuring necessary as a result of the end of this programming and/or fundraising efforts to attempt to replace these lost funds. This has taken these key leadership staff away from direct supervision and other support to staff as well as efforts to move forward other critical organizational goals.

42. Additionally, our team providing pro se services that used to fall under the LOP has been forced to do less with less, as there are currently eight (8) positions that are currently open that are designed to provide half their time or more to support the LOP and which we are currently unable to fill due to the terminated LOP funding and the resulting need for a hiring pause. This can contribute to staff burn-out and overwhelm, which is already at an extreme high given the onslaught of cuts to funding and changes in policy that negatively impact our clients and our core work. The sense of uncertainty as well as the impact of seeing needed positions go un-filled has also caused negative ripple effects in morale across the organization, well beyond only those teams that are directly funded through this cancelled program.

43. A further workforce reduction on top of those vacancies will undoubtedly have a negative impact on FIRRP's ability to achieve our core mission of ensuring that all people have access to counsel and know their rights in immigration removal proceedings. The negative impact on morale that the formal announcement of a workforce reduction has had is palpable. We have already received several resignations from long-term, highly skilled

staff from our adult program in relation to the ongoing uncertainty regarding the future at the Florence Project.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 2nd of May 2025, in Flagstaff, Arizona.

Laura St. John
Legal Director
Florence Immigrant & Refugee Rights Project

14