# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*,<br><br>      *Plaintiffs,*<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>      *Defendants.* | Case No. 1:25-cv-00298<br><br>**DECLARATION OF LISA KOOP IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF** |

# DECLARATION OF LISA KOOP NATIONAL DIRECTOR OF LEGAL SERVICES FOR THE NATIONAL IMMIGRANT JUSTICE CENTER

*I, Lisa Koop, make the following statements on behalf of the National Immigrant Justice Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. I incorporate my Declaration in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 2) and Supplemental Declaration in Support of Plaintiffs' Renewed Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 51) as if fully set forth herein.

2. As explained in my prior declarations, my name is Lisa Koop. I am the national director of legal services at the National Immigrant Justice Center ("NIJC"), registered as a nonprofit organization under the name NIJC, NFP. NIJC's mission is to establish and defend the legal rights of immigrants and to transform the immigration system into one that affords equal opportunity for all. NIJC is a national organization headquartered in Chicago, Illinois. NIJC is the primary organization dedicated to providing legal orientation, consultations, and application support to unrepresented individuals appearing before the Chicago Immigration Court through NIJC's Immigration Court Helpdesk ("ICH"). NIJC also provides services in a small number of cases through the Counsel for Children Initiative ("CCI").

3. The ICH was developed to provide high volume legal services to unrepresented immigrants in a cost-effective manner. After NIJC piloted a privately funded ICH program and demonstrated success at the individual case level and in court efficiency, Congress appropriated funding for 14 help desks across the country. NIJC was in the first cohort of ICH providers. NIJC's federally funded ICH program began in 2016.

4. Without warning, on January 22, 2025, the Department of Justice issued a national contract stop work order, pursuant to Section 19 of the January 20, 2025, Executive Order titled "Protecting the American People Against Invasion." The national contract stop work order, which took effect immediately, extended to the following programs: the general Legal Orientation Program ("LOP"), the Immigration Court Helpdesk ("ICH"), the Counsel for Children Initiative ("CCI"), and Family Group Legal Orientation Program ("FGLOP") and stated that these programs were being paused while they undergo an audit.

5. NIJC learned of the stop work order through an email from the Acacia Center for Justice. At the time, an NIJC ICH attorney was at the Chicago Immigration Court providing

services to unrepresented individuals. That attorney was promptly instructed to terminate her ICH work and return to NIJC's office. The NIJC ICH team had dozens of remote individual consultations scheduled, some of which involved matters with imminent filing deadlines. The NIJC ICH team had a pro se asylum workshop scheduled for January 24, 2025, the Friday of that same week. Until the ICH program was suspended on January 22, 2025, NIJC provided legal services in person at the Chicago Immigration Court and/or remote services through a telephone hotline five days a week. During calendar year 2024, NIJC's ICH team provided approximately 3500 unique legal services to approximately 2000 different individuals or families. The services included individual information sessions to discuss case-specific questions, document preparation, group information sessions, self-help workshops for specific forms of relief, and Friend of the Court assistance. The ICH also assisted with motions to change venue. Suspending this program will cause significant harm to individuals who are seeking to exercise their legal rights in a complicated immigration system.

6. With ICH funding, NIJC employed nine staff members who provided ICH services. These included: two directors, a legal supervisor, two senior attorneys, two staff attorneys, a paralegal and a coordinator.

7. Before the January 2025 stop-work order, staff working on the ICH regularly went to the Chicago Immigration Court to provide legal education and individual consultations to noncitizens without counsel. NIJC ICH staff members were present at the Chicago Immigration Court three days per week. The NIJC ICH team staffed a hotline for ICH participants that was open at all times to receive calls and texts from participants. The NIJC ICH team assigned staff members to respond to calls and messages to the hotline four days a week.

8. In 2023 the Chicago Immigration Court's caseload tripled to about 270,000. The number of people appearing before immigration court who need help understanding the basics of their proceedings, their rights and options, and their eligibility for relief is much higher than the capacity of low-cost or pro bono legal service providers. Court staff are unable to respond to phone calls from immigrants appearing before the court. Mail filings routinely take six weeks or longer to be entered into the court's system, and the line at the filing window often has a several-hour wait. As a result, ICH staff are often the only source of information available to unrepresented people facing deportation.

9. Judges frequently referred individuals to the ICH because NIJC's ICH provided services that improved the efficiency of the court. For example, ICH staff explained documents and proceedings so that judges could spend less time with each individual respondent. Court staff at the filing window frequently directed unrepresented immigrants to NIJC's ICH to ask questions. NIJC's ICH staff also affirmatively sought

out people in the filing window line to screen for anyone who was there for something with which court staff could not assist; like filings with other agencies, questions about cases pending before United States Citizenship and Immigration Services cases, Immigration and Customs Enforcement appointments, filings for other immigration court locations, and issues that must be addressed by an immigration judge through a written motion and cannot be resolved verbally by a court clerk. The filing window clerks often rely on google translate to communicate with non-English speakers, which leads to additional confusion that NIJC's ICH staff members were able to address when participants were directed by the court to speak with them.

10. NIJC's ICH team has regularly identified viable asylum claims and referred such cases to pro bono attorneys or other NIJC programs for full representation. In 2024, about 100 people received pro bono representation services after their cases were identified and referred for representation by NIJC's ICH. Without NIJC's services, individuals who are fleeing persecution would be denied access to legal protections.

11. During the week of January 27, NIJC attorneys were initially told by court staff they could not provide services. A security guard told an immigrant at the court they could not access NIJC services because there was "no more pro bono." NIJC later confirmed with the Chicago Immigration Court that NIJC attorneys could provide services not funded or supported by the court. For example, NIJC was informed judges are no longer allowed to hand out flyers directing unrepresented immigrants to NIJC for (no-cost) services.

12. Pursuant to a contract with the Acacia Center for Justice, NIJC's annual contract for ICH services was in the amount of $475,676 per year. This has historically been paid based on periodic reporting of time spent on ICH activities. If this funding is not restored, NIJC will be compelled to scale back services and potentially staff. Although NIJC is seeking private funding from individual donors or foundations to maintain this work, in the absence of funding, NIJC will have to reduce services and potentially layoff staff or reallocate them to different otherwise funded work.

13. Even if NIJC is able to identify a private funder to support the ICH, the stop work order will continue to frustrate NIJC's mission of providing education and legal assistance to immigrants, refugees, and asylum seekers. That is because, in addition to the halting of federal funding, the stop-work order is already impeding access to the individuals that NIJC seeks to serve, and immigration court staff have already changed their practices for making referrals to the ICH, meaning that fewer people will know that NIJC's ICH is there and fewer people will be given the opportunity to speak to NIJC before speaking to a judge.

14. On April 10, 2025, the Department of Justice terminated the contracts for the Family

Group Legal Orientation Program (FGLOP), Counsel for Children Initiative (CCI), Immigration Court Helpdesk (ICH), Legal Orientation Program (LOP), and Legal Orientation Program for Custodians (LOPC), effective 12:01 am on April 16, 2025. NIJC learned of the contract termination by email from the Acacia Center for Justice.

15. When the ICH funding previously ceased, NIJC was forced to temporarily shift staff members to work on other NIJC projects. Without secure funding, NIJC's ability to continue its work of providing legal services to unrepresented people appearing before the Chicago Immigration Court is at imminent risk, without drastic restructuring.

16. Since January, NIJC has continued to see many people seeking services through NIJC's ICH at the Chicago Immigration Court. NIJC receives requests for services from more than 400 people per week through the ICH. During the week ending on April 11, 2025, NIJC was contacted by about 350 people through our telephonic ICH hotline, and about 50 people sought services in person at the Chicago Immigration Court.

17. NIJC's ICH staff members report many people seeking services are concerned they will be detained if they attend immigration court hearings. NIJC has observed indicators encouraging noncitizens to self-deport including the addition of posters that began appearing just before the April 10, 2025 termination notice encouraging self-deportation. Taken together with expansive enforcement against immigrant communities, there is a chilling effect on individuals' ability to exercise their rights and obtain fair adjudication of their claims. Terminating funding for our ICH services at this moment will deprive noncitizens of the key information they need at a critical time.

18. Through NIJC's telephonic hotline and in-person consultations, NIJC stresses the importance of attending court hearings to complete immigration processing. NIJC also fields many questions about the possible termination of parole status and what that means for individuals seeking forms of immigration relief before the immigration court, like asylum.

19. NIJC's assistance through the ICH leads to positive case resolutions. On April 9, 2025, an immigration judge granted cancellation of removal in a case that began with an ICH consultation and resulted in a referral for full representation by another NIJC project. Another former NIJC ICH participant is scheduled for an oath ceremony, having been granted cancellation and then United States citizenship.

20. NIJC is simultaneously contending with the termination of funding for legal services for unaccompanied minors and the termination of the Nationwide NQRP program. The lost funding in both of those areas puts the populations NIJC serves as risk. Irreparable harm has ensued not only to NIJC, but to the noncitizens who desperately need NIJC's expert assistance.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 2nd day of May 2025, in Goshen, Indiana.

/s/ *Lisa Koop*
Lisa Koop, National Director of Legal
Services National Immigrant Justice Center
110 E. Washington St.
Goshen, IN 46528
Tel. 312-660-1321 Fax. 312-660-150