**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-00298-RDM |
| UNITED STATES DEPARTMENT OF JUSTICE, *et al.*, | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND ...........................................................................................................3

    A.   Congress Funded the Programs to Promote Efficiency in the Immigration System. ..................................................................................................................3

    B.   Recognizing the Programs' Benefits, Congress Consistently Has Appropriated Funds to Continue Them, Most Recently in March 2024. .............................................4

    C.   Until 2025, Plaintiffs Provided Services to Thousands of Noncitizens Through the Programs. ..................................................................................................5

    D.   Defendants Failed to Provide a Reasoned Justification for Any of Their Three Attempts to Terminate the Programs. .............................................................6

    E.   Defendants' Action Has Already Drastically Harmed Plaintiffs. .................................7

STANDARD OF REVIEW ...............................................................................................7

ARGUMENT ...............................................................................................................8

    I.   This Court Has Jurisdiction over Plaintiffs' Claims. .................................................8

        A.   Plaintiffs Seek Equitable Relief Rather Than Money Damages. ...........................8

        B.   The Court of Federal Claims Does Not Provide an Adequate Alternative Forum for Plaintiffs' Claims. ..........................................................................13

    II.   Defendants' Termination of the Programs Is Reviewable Under the APA. ....................16

    III.   All of Plaintiffs Claims Are Viable. .................................................................18

        A.   Defendants' Termination Decision Violates the Appropriations Clause— an Action Plaintiffs Have Standing to Challenge. ...............................................18

        B.   Defendants' Termination Decision Violates the TVPRA. ...................................24

        C.   Defendants' Actions Violate Plaintiffs' First Amendment Rights. .......................26

CONCLUSION ...........................................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Action All. of Senior Citizens of Greater Phil. v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) ................................................................20

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) ................................................................... 27, 30

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    2025 WL 752378 (D.D.C. Mar. 10, 2025) ........................................ 21, 23, 24

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
    946 F.3d 615 (D.C. Cir. 2020) ................................................................19

*Am. Nat. Ins. Co. v. F.D.I.C.*,
    642 F.3d 1137 (D.C. Cir. 2011) ................................................................7

*Am. Petroleum Tankers Parent, LLC v. United States*,
    943 F. Supp. 2d 59 (D.D.C. 2013)................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................ 7, 8

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ................................................ 8, 9, 10, 14, 15, 18

*Bowen v. Mich. Acad. of Fam. Physicians*,
    476 U.S. 667 (1986) ................................................................16

*California v. United States Dep't of Educ.*,
    132 F.4th 92 (1st Cir. 2025)................................................................10

*Climate United Fund v. Citibank, N.A.*,
    2025 WL 1131412 (D.D.C. Apr. 16, 2025) ................................................22

*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*,
    2025 WL 1233674 (N.D. Cal. Apr. 29, 2025)......................... 8, 11, 13, 15, 17, 20, 23, 24, 26

*Crowley Gov't Servs., Inc. v. Gen Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) ................................................................12

*Ctr. for Biological Diversity v. Trump*,
    453 F. Supp. 3d 11 (D.D.C. 2020)................................................................17

*Department of Education v. California*,
    145 S. Ct. 966 (2025) ................................................................10

*Eastport S.S. Corp. v. United States*,
  372 F.2d 1002 (Ct. Cl. 1967) ................................................................... 14

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ...................................................................... 21, 22

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................ 16

*Globex Corp. v. United States*,
  54 Fed. Cl. 343 (2002) ........................................................................ 13

*Havens Realty Corp v. Coleman*,
  455 U.S. 363 (1982) ............................................................................ 22

*Hi-Tech Furnace Sys. v. FCC*,
  224 F.3d 781 (D.C. Cir. 2000) ............................................................ 16

*Katz v. Cisneros*,
  16 F.3d 1204 (Fed. Cir. 1994) ............................................................ 10

*Kidwell v. Department of the Army*,
  56 F.3d 279 (D.C. Cir. 1995) .............................................................. 11

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  2025 WL 1187730 (D.D.C. April 24, 2025) .................................... 21, 22

*Legal Servs. Corp. v. Velazquez*,
  531 U.S. 533 (2001) ............................................................................ 29

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ............................................................................ 25

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................ 17

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ............................................................................ 26

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ............................................................................ 14

*Maine v. U.S. Dep't of Agric.*,
  2025 WL 1088946 (D. Me. Apr. 11, 2025) ........................................ 10

*Matal v. Tam*,
  582 U.S. 218 (2017) ............................................................................ 28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ............................................................................ 25

*Med. Imaging & Tech. All. v. Libr. of Cong.*,
  103 F.4th 830 (D.C. Cir. 2024) .......................................................... 14

3

*Megapulse, Inc. v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ................................................................................. 14, 15

*Meta Platforms, Inc. v. Fed. Trade Comm'n*,
   723 F. Supp. 3d 64 (D.D.C. 2024) ................................................................................. 8

*Milk Train, Inc. v. Veneman*,
   310 F.3d 747 (D.C. Cir. 2002) ................................................................................. 17, 18

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
   496 F. Supp. 3d 116 (D.D.C. 2020) ............................................................................. 23

*New York v. Trump*,
   2025 WL 1098966 (D.R.I. Apr. 14, 2025) ..................................................................... 10

*Nw. Immigrant Rts. Project v. USCIS*,
   496 F. Supp. 3d 31 (D.D.C. 2020) .......................................................................... 20, 25

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ............................................................................. 26

*Pan Arctic Corp. v. United States*,
   8 Cl. Ct. 546 (1985) .................................................................................................... 13

*People for the Ethical Treatment of Animals v. Tabak*,
   109 F.4th 627 (D.C. Cir. 2024) .................................................................................... 27

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
   797 F.3d 1087 (D.C. Cir. 2015) ............................................................................. 19, 20

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009) .................................................................................................... 28

*Pub. Citizen, Inc. v. Trump*,
   361 F. Supp. 3d 60 (D.D.C. 2019) ............................................................................... 22

*Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*,
   573 F. Supp. 3d 324 (D.D.C. 2021) ............................................................................... 7

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) .................................................................................................... 29

*Rust v. Sullivan*,
   500 U.S. 173 (1991) .................................................................................................... 27

*San Francisco Unified School District v. Americorps*,
   2025 WL 1180729 (N.D. Cal. Apr. 23, 2025) ............................................................... 14

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) ............................................................................... 12, 15

*United States v. Johnson Controls, Inc.*,
   713 F.2d 1541 (Fed. Cir. 1983) ............................................................................... 9, 13

*United States v. Nassif,*
   97 F.4th 968 (D.C. Cir. 2024) ...................................................................30

*W. Org. of Res. Councils v. Zinke,*
   892 F.3d 1234 (D.C. Cir. 2018) ...................................................................8

*Webster v. Doe,*
   486 U.S. 592 (1988) ...................................................................17

## Statutes

5 U.S.C. § 701 ...................................................................16

5 U.S.C. § 702 ...................................................................8, 16

5 U.S.C. § 704 ...................................................................8

5 U.S.C. § 706 ...................................................................25, 26

8 U.S.C. § 1232 ...................................................................24, 26

Full-Year Continuing Appropriations and Extensions Act,
   2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025) ...................................................................4

Pub. L. No. 118-42, 138 Stat. 133 (2024) ...................................................................4, 26

## Other Authorities

S. Rep. No. 118-62 (2023) ...................................................................4

S. Rep. No. 118-198 (2024) ...................................................................5

Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025) ...................................................................29

## Rules

Federal Rule of Civil Procedure 12 ...................................................................7, 8

# INTRODUCTION

This case arises out of Defendants' decision to illegally terminate longstanding, congressionally funded programs without ever providing a reason. As Plaintiffs explained in their amended complaint, this decision violated the Administrative Procedure Act ("APA") because it defied Congress's express appropriations mandates, violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), was arbitrary and capricious, violated Plaintiffs' First Amendment rights by imposing unreasonable and discriminatory restrictions on speech, was *ultra vires*, and violated the separation of powers. Defendants cannot arbitrarily cut off congressionally mandated funds simply because they do not like the programs.

Instead of engaging with these issues, Defendants raise unavailing jurisdictional arguments, asserting this Court is powerless to hold Defendants to their constitutional and statutory obligations. But Defendants' argument requires reading claims into the complaint that Plaintiffs never pleaded. Defendants have not put forward any arguments that would warrant dismissal of the claims *actually* pleaded in the amended complaint. The Court should deny Defendants' Motion to Dismiss ("Motion").

From its very first sentence, the Motion rests on the demonstrably false premise that this is a "contract" case involving "contract-based claims for monetary relief." Dkt. 64-1 ("Mot.") at 1. But Defendants cannot point to any part of the amended complaint that alleges breach of contract or seeks monetary damages or retroactive reimbursement. That is because Plaintiffs make no such claim. What Plaintiffs request is that the Court "declare" Defendants' conduct unlawful, "set aside" Defendants' unlawful actions, "enjoin" further unlawful actions, and award reasonable attorneys' fees. Dkt. 62 ("FAC") at 62–63. Plaintiffs do not even have a *contract* with Defendants, let alone a breach of contract claim. Defendants may be right that a different complaint, by different plaintiffs, in a different case, raising claims for monetary damages based on a breach of

contract, could be subject to the Tucker Act and could belong within the exclusive jurisdiction of the Court of Federal Claims. But that is not this complaint, and it is not this case.

Defendants' argument that their challenged actions were "committed to agency discretion by law" and thus unreviewable fares no better. Courts rarely apply that narrow exception to the usual presumption of reviewability of agency actions; when they do, it is only where Congress has expressly delegated decision-making to agencies. Here, Congress demanded that Defendants "shall" fund programs operated by Plaintiffs and warned Defendants multiple times to refrain from holding back funds, even during periods of program performance evaluation. Congress has expressly *not* delegated decision-making. Defendants had no discretion—much less unreviewable discretion—to unilaterally terminate these congressionally funded programs.

Finally, Defendants' challenge to some (but not all) of Plaintiffs' underlying claims fails to engage with the claims themselves, instead relying on flawed arguments about Plaintiffs' standing. For example, Defendants say Plaintiffs have suffered only one injury—loss of funds—and that restarting funding for the programs "would not result in the restoration of . . . funding to Plaintiffs." Mot. at 19. Defendants are wrong: Plaintiffs viably allege multiple forms of injury, including direct interference with their core mission and activities. Defendants' argument also misunderstands the demands of Article III standing, which requires only a *likelihood*, not a certainty, that a Court order will result in relief. Similarly, Defendants' prudential-standing argument fails because Plaintiffs plainly fall within the zone of interests protected by the relevant statutory appropriations here—including the TVPRA. And despite Defendants' incorrect arguments that their limitations on Plaintiffs' speech were viewpoint-neutral (they are not), Defendants make no attempt to claim the limitations were reasonable. That provides an independent basis for finding a First Amendment violation.

None of Defendants' jurisdictional arguments block this Court's review. And their Motion does nothing to suggest that their actions—defying Congress's demand that they "shall" run these programs by unilaterally terminating them, without any reasoning and without any plan for using the appropriated funds as Congress mandated—could be anything other than arbitrary, capricious, and unlawful agency action. The Court should deny Defendants' Motion and instead grant Plaintiffs' pending motion for summary judgment.

## BACKGROUND[1]

### A.    Congress Funded the Programs to Promote Efficiency in the Immigration System.

Congress has funded the Legal Orientation Program ("LOP") for more than two decades, and under four different Presidents. FAC ¶ 1. The federal government subsequently built on the successful foundation of LOP and created the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program ("FGLOP"), and Counsel for Children Initiative ("CCI") (collectively with LOP, the "Programs"). *Id.* ¶¶ 58–61. The Programs promote efficiency within immigration courts and reduce the cost of immigration adjudications. *Id.* ¶ 2. LOP, LOPC, FGLOP, and ICH provide safeguards for unrepresented noncitizens in an overburdened immigration system by informing them about their responsibilities and rights when appearing in immigration court, while CCI provides direct representation to unaccompanied children in removal proceedings. *Id.* ¶ 2.

The benefits of the Programs are widely recognized. For example, an April 2017 report based on a year-long study by the government's outside consultant, Booz Allen Hamilton,

---

[1] A more complete recitation of the background and facts relevant to this case can be found in Plaintiffs' motion for summary judgment. Dkt. 67-1 at 5–13. However, given Defendants' choice to file a challenge to the pleadings after this Court set briefing on summary judgment, Plaintiffs provide below a brief summary of facts alleged in their amended complaint.

recommended Defendants DOJ and Executive Office of Immigration Review ("EOIR") "[c]onsider expanding 'know your rights' and legal representation programs, such as the Legal Orientation Program through data-informed budget requests and justifications."  FAC ¶ 96. Similarly, in November 2017, the ICE Assistant Director for Custody Management issued guidance to ICE field offices emphasizing the effectiveness of LOP, instructing officers to support LOP, and identifying that the purpose of LOP was to "improve the efficiency of immigration court proceedings by increasing access to information and improving representation for individuals in proceedings." *Id.* ¶¶ 98–99.

**B.    Recognizing the Programs' Benefits, Congress Consistently Has Appropriated Funds to Continue Them, Most Recently in March 2024.**

On March 9, 2024, as it has done every year since 2003, Congress appropriated funds that "shall" be available for LOP programs:

> For expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000, of which $4,000,000 <u>shall</u> be derived by transfer from the Executive Office for Immigration Review fees deposited in the ''Immigration Examinations Fee'' account, and of which not less than $28,000,000 <u>shall be available</u> for services and activities provided by the Legal Orientation Program: Provided, That not to exceed $50,000,000 of the total amount made available under this heading shall remain available until September 30, 2028, for build-out and modifications of courtroom space.

FAC ¶ 116 (quoting Pub. L. No. 118-42, 138 Stat. 133 (2024) (emphasis added)).  Congress directed that a portion of this funding is for ICH, and a portion is for LOPC:  "LOP funding is also provided for LOP for Custodians [LOPC]"—and acknowledged that LOPC is funded "pursuant to [the TVPRA]." *Id.* ¶ 117 (quoting S. Rep. No. 118-62, at 85 (2023)).  Although funding for FY 2024 has ended, Congress continued funding (including for the Programs) at 2024 levels through at least September 30, 2025.  *See id.* ¶ 119 (citing Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101 (2025)).

Congress has repeatedly warned EOIR not to stop the Programs, as EOIR previously attempted in 2018 (before reversing course). *See* FAC ¶ 14. For example, in the Senate Appropriations Committee's July 25, 2024 report, the Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program." *Id.* at ¶ 117 (quoting S. Rep. No. 118-198, at 92 (2024)).

### C. Until 2025, Plaintiffs Provided Services to Thousands of Noncitizens Through the Programs.

Plaintiffs are non-profit organizations who, for years, have provided free legal services to innumerable noncitizens (and, occasionally, citizens) through the Programs. FAC ¶ 33. Plaintiffs' missions are "to provide educational programs, information, counseling, referrals, and other services to unrepresented noncitizens." *Id.* ¶ 22. Their role providing crucial, but limited, education to individuals in removal proceeding fills a critical gap in the U.S. immigration system, in which the vast majority of respondents appear unrepresented. *Id.* ¶ 64. Plaintiffs American Bar Association and Florence Project were among the first organizations to receive LOP funding when Congress initiated the program in 2003. *Id.* ¶¶ 35, 39. Plaintiffs operate throughout the country, providing critical legal services in detention facilities and immigration courthouses. *Id.* ¶¶ 34–45. Ensuring that individuals in removal proceedings have access to at least this basic legal support in essential to Plaintiffs' missions. *See id.* ¶ 46.

Plaintiffs have never contracted with Defendants to provide the Programs. Instead, EOIR contracted with the Acacia Center for Justice ("Acacia") to administer the Programs. FAC ¶ 62. In turn, Acacia subcontracted with legal service providers like Plaintiffs, whose staff provide the critical skills and experience necessary to successfully run the Programs. *Id.* ¶ 63.

### D.    Defendants Failed to Provide a Reasoned Justification for Any of Their Three Attempts to Terminate the Programs.

On January 22, 2025, Defendants DOJ and EOIR issued a Stop Work Order, halting funding for all Programs other than LOPC. FAC ¶¶ 122–25. The Stop Work Order offered no explanation for the stop, the duration of the stop, or whether the stop was intended to be temporary. *Id.* ¶ 124. Seeking to ensure the continuation of the Programs as required by Congress, Plaintiffs filed this case on January 31, 2025. Dkt. 1. Defendants rescinded the Stop Work Order two days later. *Id.* ¶ 130.

On February 5, 2025, Defendant Attorney General Pam Bondi issued a memorandum directing DOJ and EOIR to pause funding the Programs and review them for purported "waste, fraud, or abuse." FAC ¶ 131. Then, despite the Court's order requiring three days' notice before any termination, on April 4, 2025, Plaintiffs received—through Acacia—a DOJ notice immediately terminating the contract under which Defendants run the Programs. *Id.* ¶ 133. After being contacted by Plaintiff's counsel to discuss the apparent violation of this Court's order requiring three days' notice, Defendants rescinded the termination. *Id.*

On April 10, 2025, just six days after they rescinding the April 4 termination, Defendants provided a new termination notice, this time with a three-business day notice period. FAC ¶ 134. The April 10 termination notice (the "Termination Notice") terminated the contract through which Defendants fund and run the Programs "for the convenience of the government," effective April 16, 2025. *Id.* Other than invoking a procedural term in the contract between Defendants and Acacia, Defendants provided no justification for the termination. The administrative record filed by Defendants in this action reveals no justification was provided internally either, and that Defendants have not taken any other steps to continue the Programs through any other mechanism. Dkt. 65.

E.      **Defendants' Action Has Already Drastically Harmed Plaintiffs.**

Terminating the Programs has resulted in devastating and ongoing harm.  FAC ¶ 140.
Defendants' actions directly interfere with Plaintiffs' missions by impeding their core business
activities, forcing them to cut or reallocate resources, and censoring their speech.  *Id.* ¶ 140.
Plaintiffs also are being forced to terminate or reassign staff.  *Id.* ¶ 146.  Lost staff include those
with significant Program-related expertise, meaning that Plaintiffs will irreversibly lose substantial
institutional knowledge.  *Id.*  Additionally, Plaintiffs have lost or will lose access to noncitizens in
detention and at immigrations courts—limited public forums where they could have conversations
with noncitizens who know little about their rights.  *Id.* ¶ 144.

## STANDARD OF REVIEW

Defendants raise a "facial" challenge to the Court's subject-matter jurisdiction under
Rule 12(b)(1).  Mot. at 5.  "A facial challenge asks whether the complaint alleges facts sufficient
to establish the court's jurisdiction."  *Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of
Agric.*, 573 F. Supp. 3d 324, 332 (D.D.C. 2021).  In considering a motion to dismiss for lack of
subject matter jurisdiction, courts "assume the truth of all material factual allegations in the
complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that
can be derived from the facts alleged.'" *Am. Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C.
Cir. 2011).

Defendants also challenge the sufficiency of the complaint under Rule 12(b)(6).  Mot. at 5.
To survive such a challenge, Plaintiffs need only allege "enough facts to state a claim to relief that
is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially
plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Courts "treat
the complaint's factual allegations as true and must grant [the] plaintiff the benefit of all inferences

that can be derived from the facts alleged." *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240–41 (D.C. Cir. 2018) (cleaned up). "A plaintiff may survive a Rule 12(b)(6) motion even if 'recovery is . . . unlikely,' so long as the facts alleged in the complaint are 'enough to raise a right to relief above the speculative level.'" *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 78 (D.D.C. 2024) (quoting *Twombly*, 550 U.S. at 555–56).

**ARGUMENT**

**I.      This Court Has Jurisdiction over Plaintiffs' Claims.**

A court has jurisdiction to review agency action under the APA if (1) the plaintiff is "seeking relief other than money damages" and (2) "there is no other adequate remedy" available in another court. *Bowen v. Massachusetts*, 487 U.S. 879, 891, 901 (1988); 5 U.S.C. §§ 702, 704. Plaintiffs satisfy both prongs of this test because their claims for injunctive and declaratory relief are statutory and regulatory—not contractual claims for damages—and "the doubtful and limited relief available in the Claims Court under the Tucker Act is not an adequate substitute for review" by this Court. *Bowen*, 487 U.S. at 901.

**A.      Plaintiffs Seek Equitable Relief Rather Than Money Damages.**

Plaintiffs' amended complaint asks the Court to "declare" violations of law, "set aside" Defendants' unlawful actions, and "enjoin" further unlawful actions. FAC at 62–63. Nowhere do Plaintiffs request "monetary compensation for an injury." *Bowen*, 487 U.S. at 891. Plaintiffs challenge the lawfulness of Defendants' decision to terminate the Programs, not whether Defendants breach any contract or violate any contractual right. Further, "[e]ven if Plaintiffs brought a claim for breach of the contract . . . under a theory of third-party liability, they likely would not be able to litigate in the Court of Federal Claims—given the absence of privity between the Government and subcontractors like Plaintiffs, there is no express or implied contract that would implicate the Tucker Act." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of*

8

*Health & Hum. Servs.*, 2025 WL 1233674, at *6 n.3 (N.D. Cal. Apr. 29, 2025) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550–51 (Fed. Cir. 1983)).

Defendants cast Plaintiffs' claims as contractual, and seeking an order to "pay [Plaintiffs] money." Mot. at 9–10. But such a request is found nowhere in Plaintiffs' amended complaint, which makes clear that Plaintiffs' claims are not "effectively based on an alleged right to Program funding." Mot. at 9. Plaintiffs bring claims arising exclusively from appropriations statutes, the APA, and constitutional rights, asserting the right to be free from agency action that violates the law and the constitution. *See* FAC ¶¶ 158–98. None of these claims are premised on "an alleged right to Program funding," as Defendants claim. Mot. at 9. Defendants need not pay Plaintiffs any money to comply with the law and redress Plaintiffs' mission harms, and Plaintiffs have not asked for that relief in the complaint. Plaintiffs ask only that the Programs continue to be funded as required by Congress, without attempting to dictate *how* Defendants do so. The Court can remedy Defendants' unlawful actions without referring to a single contract or ordering Plaintiffs be paid a single cent. And Defendants can choose to fund the Programs through contracts with other providers (assuming they could do so despite the fact that, "in some of the[] areas [in which Plaintiffs operate], they are the only organizations that actually provide these services," 4/15/25 Hearing Tr. at 64:23–65:2), which still provides Plaintiffs relief by furthering their organizational goals and allowing them to divert resources to other initiatives. *See* Dkt. 67-1 at 26. Because Plaintiffs seek "declaratory and injunctive relief" under their statutory and constitutional rights instead of "money in compensation for . . . losses," the Tucker Act's jurisdictional bar does not apply. *Bowen*, 487 U.S. at 893, 895.

That a remedy "may require [Defendants] to pay money to" Plaintiffs after resuming congressionally mandated appropriations is "not a sufficient reason to characterize the relief as

'money damages.'" *Bowen*, 487 U.S. at 893.  Numerous federal courts have upheld jurisdiction under the APA where claims could result in an order directing a federal agency to disperse funds. *See, e.g.*, *Katz v. Cisneros*, 16 F.3d 1204, 1208 (Fed. Cir. 1994) (suit seeking payments from HUD to which plaintiff alleged it was entitled did not "seek money as compensation for a loss suffered" and was properly brought in district court); *New York v. Trump*, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025) (same for claims relating to freeze of FEMA funds); *Maine v. U.S. Dep't of Agric.*, 2025 WL 1088946, at *1 (D. Me. Apr. 11, 2025) (same for claims relating to freeze of department of Agriculture funds).

The Supreme Court's *per curiam* order in *Department of Education v. California*, 145 S. Ct. 966 (2025), upheld this long line of precedent, and does not help Defendants here.  There, the Supreme Court reaffirmed *Bowen*'s holding and explained that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds."  *Id.* at 968 (quoting *Bowen*, 487 U.S. at 910); *see also New York v. Trump*, 2025 WL 1098966, at*2 (D.R.I. Apr. 14, 2024) (*Bowen* remains the "guiding compass" for Tucker Act arguments after *Department of Education*).  Applying well-settled law, the Court determined that, under the specific facts of that case, the relief awarded amounted to an order "to enforce a contractual obligation to pay money."  145 S. Ct. at 968.  That was so because the claims involved disputes over "the terms and conditions of each individual grant award" issued to plaintiffs by the defendant.  *California v. United States Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025).  Here, by contrast, the Court need not consider the terms of any contract to review Plaintiffs' claims—and Plaintiffs have no contract with Defendants.  Instead, Plaintiffs challenge Defendants' wholesale unlawful termination of the Programs.  *See New York*, 2025 WL 1098966, at *2 (finding *Department of Education* inapposite in the context of "a broad, categorical freeze on obligated

funds"). Because Plaintiffs "do not seek payout . . . *Department of Education* has no bearing here." *Cmty. Legal Servs.*, 2025 WL 1233674, at *7.

The cases Defendants cite as applying *Department of Education* to reach a different result presented very different facts. Mot. at 11–12. In *Solutions in Hometown Connections v. Noem*, for instance, the district court concluded it did not have jurisdiction over claims that turned on the terms incorporated in specific grant contracts, through which the plaintiffs explicitly sought back-pay due under the contracts—hallmarks of contract claims that are not present here. 2025 WL 1103253, at *8–*10 (D. Md. Apr. 14, 2025). Likewise, in *Massachusetts Fair Housing Center v. Department of Housing & Urban Development*, the court held it did not have jurisdiction over claims that the termination of certain grants was unlawful because those claims argued the termination did not comply with the statutory and regulatory termination requirements—contract claims that are not at issue here. 2025 WL 1225481, at*1 (D. Mass. Apr. 14, 2025). And in *American Association of Colleges for Teacher Education v. McMahon*, the court stayed claims because the plaintiffs conceded their case involved "termination of grants under the same federal program" the Supreme Court considered in *Department of Education*—facts clearly not present here. Case No. 25-1281, Dkts. 27, 30 (4th Cir. 2025). If Plaintiffs' claims turned on specific contracts or grant agreements directly between Plaintiffs and the government, these cases might be persuasive authority. But Plaintiffs' claims do not, so these cases have no bearing here.

Defendants' contention that this Court risks opening a "loophole" that would "undermine the jurisdictional scheme that Congress devised under the Tucker Act" ignores decades of case law showing that the kind of claims Plaintiffs bring were never meant to fall within the Tucker Act in the first place. Mot. at 12–14. The very cases on which Defendants rely show as much. Take *Kidwell v. Department of the Army*, 56 F.3d 279 (D.C. Cir. 1995). There, the D.C. Circuit

11

explained that courts must "respect the plaintiff's choice of remedies" for purposes of the Tucker Act analysis "as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary remedy"—and, importantly, even if the complaint "hinted at an interest in monetary relief." *Id*. at 284–86 (D.C. Cir. 1995) (cleaned up). The D.C. Circuit reaffirmed this analysis two decades later in *Perry Capital LLC v. Mnuchin*, where it upheld jurisdiction in an APA case that related, in part, to a contract.  864 F.3d 591 (D.C. Cir. 2017).The D.C. Circuit reasoned that the claims themselves were not "founded upon a contract," and had to be reviewable under the APA because the plaintiffs would have no other adequate forum for their requested relief otherwise. *Id.* at 620–21.

These cases follow longstanding precedent rejecting the "'broad' notion that 'any case requiring some reference to or incorporation of a contract'" cannot be heard in district courts. *Crowley Gov't Servs., Inc. v. Gen Servs. Admin*., 38 F.4th 1099, 1107 (D.C. Cir. 2022); *see also id.* at 1110 (declining to "impose a "but-for" test for identifying the source of the right").  Whether a case must be brought in Claims Court "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are *founded only on a contract*, or whether they stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992).  Plaintiffs' claims here plainly "stem from a statute [and] the Constitution" rather than any contract, and thus fall squarely within the well-established bounds of this Court's jurisdiction. *Id.*  Hearing this case would not break any new ground.  To the contrary, Defendants' interpretation of APA jurisdiction would result in the narrow exception for claims subject to the Tucker Act swallowing the broader presumption in favor of APA jurisdiction.  If this Court cannot hear Plaintiffs' claims to review Defendants' unlawful actions, no court can, and Defendants would be entirely insulated from judicial review.

Plaintiffs' claims are classic APA claims, seeking only equitable relief in the form of injunctions and declaratory relief against agency actions, and not direct monetary compensation. The Court should deny Defendants' challenge to its jurisdiction.

**B.    The Court of Federal Claims Does Not Provide an Adequate Alternative Forum for Plaintiffs' Claims.**

Defendants suggest this Court does not have jurisdiction under the APA because the Court of Federal Claims provides an alternative forum in which to hear Plaintiffs' claims. Dkt. 64-1 at 6–14. That is wrong for three reasons.

*First*, Plaintiffs' claims fall outside the remit of the Court of Federal Claims, which has jurisdiction only over claims by parties that directly contract with the government. *Globex Corp. v. United States*, 54 Fed. Cl. 343, 347 (2002). "It is a fundamental tenet of Claims Court jurisprudence that a subcontractor may not sue the government absent privity of contract." *Pan Arctic Corp. v. United States*, 8 Cl. Ct. 546, 547 (1985). Accordingly, "[e]ven if Plaintiffs brought a claim for breach of the contract . . . under a theory of third-party liability, they likely would not be able to litigate in the Federal Court of Claims" in light of "the absence of privity between the Government and subcontractors like Plaintiffs." *Cmty. Legal Servs.*, 2025 WL 1233674, at *6 n.3. Defendants admit Plaintiffs, who subcontract with Acacia, could sue in Court of Federal Claims only if they were somehow "sponsor[ed]" by Acacia—and, as this Court explained, no case "would ever suggest that APA jurisdiction turns on being able to show . . . I could get someone else to sponsor me and then I would have a remedy." 4/15/25 Hearing Tr. at 31:7–24; *see also Johnson Controls*, 713 F.2d at 1557 (Claims Court cannot "assum[e] jurisdiction over a direct appeal by the subcontractor" because there is "no privity of contract").

Moreover, the Court of Federal Claims has jurisdiction over claims founded on statutes only if the "legislation which the claimant cites can fairly be interpreted as mandating

compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967), *overruled on other grounds by Malone v. U.S.*, 849 F.2d 1441, 1444–45 (Fed. Cir. 1988). Statutes that give the Court of Federal Claims jurisdiction generally are ones that "attempt to compensate a particular class of persons for past injuries or labors." *Bowen*, 487 U.S. at 907 n.42. By contrast, district courts—not the Court of Federal Claims—have jurisdiction "when the [APA] provides an avenue for relief." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 323–24 (2020); *San Francisco Unified School District v. Americorps*, 2025 WL 1180729, at *7 (N.D. Cal. Apr. 23, 2025) (no Tucker Act jurisdiction where the "APA . . . provide[s] Plaintiffs with avenues for relief"). Because Plaintiffs' claims for injunctive relief arise under the APA, which provides its own "avenue for relief," the Court of Federal Claims does not have jurisdiction—and in any event would not have the power to decide any of Plaintiffs' statutory and constitutional claims, entirely insulating Defendants' actions from review. *Cf. Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 839 (D.C. Cir. 2024) (explaining that "judicial review of administrative action" under the APA "reflects the importance of an independent check on the exercise of executive power").

*Second*, the Tucker Act neither deprives this Court of jurisdiction nor creates jurisdiction in the Court of Federal Claims. The Tucker Act forces truly contractual claims to the Court of Federal Claims only if both of the following are true: (1) the claims are founded on contract-based rights, and (2) the claims seek a contract-based remedy. *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Neither condition is satisfied here. Plaintiffs' claims are not premised on their contracts with Acacia or Acacia's contract with the government, and Plaintiffs do not even have a contract with Defendants. Instead, their claims arise from statutory and constitutional rights that existed prior to and apart from rights created under any contract. The "contract underlying

14

the [termination] was between [the government] and Acacia Center" and Plaintiffs "were not parties to that contract and assert no rights related to that contract." *Cmty. Legal Servs.*, 2025 WL 1233674, at *6; *see Transohio*, 967 F.2d at 609 (Tucker Act jurisdiction "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are *founded only on a contract*, or whether they *stem from a statute or the Constitution*" (emphasis added)).  Defendants concede that "a Plaintiff does not necessarily seek monetary relief merely because . . . success on the merits may obligate the United States to pay the complainant." Dkt. 35 at 5.  Defendants also recognize that "the D.C. Circuit has 'rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'"  *Id.* at 32; *see also Megapulse*, 672 F.2d at 968 (explaining that "the mere fact that a court may have to rule on a contract issue does not . . . automatically transform an action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have").  Defendants cannot overcome these fatal concessions by ignoring the plain fact that Plaintiffs do not seek a contract-based remedy.

*Third*, the Court of Federal Claims cannot provide Plaintiffs the relief they seek because that court "does not have the general equitable powers of a district court to grant prospective relief," *Bowen*, 487 U.S. at 905, and a claim "for damages . . . in the Claims Court" is not an "adequate substitute for prospective relief," *Transohio*, 967 F.2d at 608.  By canceling the Programs' funding, interrupting Plaintiffs' Program activities, and failing to create any alternative plan to continue the Programs, Defendants have unconstitutionally terminated the Programs.  Post-hoc monetary relief—the only relief the Federal Claims Court could provide—cannot redress the harms caused by Defendants because ending the Programs irreparably harms Plaintiffs' missions by, among other things, preventing noncitizens from receiving the Program support Congress has

funded.  This is not a contract issue and cannot be treated as such without foreclosing *any* plaintiff from challenging unconstitutional, illegal acts.

## II.    Defendants' Termination of the Programs Is Reviewable Under the APA.

Courts apply a "strong presumption that Congress intends judicial review of administrative action."  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986).  The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  A plaintiff "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law."  5 U.S.C. §§ 701(a), 704.

Defendants do not dispute that terminating all funding for the Programs constitutes a final agency action.  As demonstrated above, there is no adequate remedy available to Plaintiffs in another court.  *See supra* § I.B; Dkt. 67-1 at 24–26.  This leaves Defendants' only remaining argument: that decisions related to funding for the Programs are "committed to agency discretion." Mot. at 14–16.  Not so.

The APA's carveout for actions that are "committed to agency discretion by law . . . provides a 'very narrow exception' that applies only in 'rare instances.'"  *Am. Petroleum Tankers Parent, LLC v. United States*, 943 F. Supp. 2d 59, 66 (D.D.C. 2013); *Hi-Tech Furnace Sys. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000).  An agency's action "is committed to agency discretion by law" *only* "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply" and "review is not to be had if the statute is drawn so that a court

would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe*, 486 U.S. 592, 599–600 (1988) (cleaned up). If there is any "statutory reference point" by which a court can judge an agency's actions, the carveout does not apply. *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 37 (D.D.C. 2020).

The rare agency-discretion exception does not apply in this case. No statute gives Defendants *any* authority to decide whether to cancel the Programs, let alone unreviewable authority. In fact, the opposite is true here: Congress warned multiple times that Defendants had *no* authority to cancel LOP. *See supra* at 5. Even for those Programs that were run through lump-sum appropriations, the relevant statutes feature no language suggesting Defendants' decisions regarding the Programs should be exempt from the APA's usual "arbitrary and capricious" standard or any other form of scrutiny.

The court in *Community Legal Services* recently rejected a similar argument in an analogous funding dispute. There, the government argued that decisions related to funding for programs providing counsel to unaccompanied children were committed to agency discretion. 2025 WL 1233674, at *8. The court rejected this argument, explaining that, because "Congress has expressly appropriated funds for services," the "Government's cancellation of all funding for direct representation is not the type of judgment regarding how to spend appropriated funds that is presumptively committed to agency discretion." *Id.* at *9. The same is true here: Defendants' decision to terminate congressionally funded programs is not a decision that lies within their power—much less within an area of unreviewable discretion.

In arguing otherwise, Defendants principally rely on two decisions: *Lincoln v. Vigil*, 508 U.S. 182 (1993), and *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002). Neither is helpful or applicable here. In *Lincoln*, the Court held that an agency's allocation of funds from a

lump-sum appropriation was committed to agency discretion and unreviewable under the APA, but cautioned that the purpose of the appropriation at issue was to provide flexibility to adapt to changing circumstances and fulfill the agency's "statutory objectives." *Id.* at 192–93. In other words, the appropriation was designed to provide agency discretion. Here, Defendants did not merely decide "how" funds are spent—they terminated the Programs entirely, in contravention of Congress's clear intent to fund and continue the Programs. And unlike *Lincoln*, Defendants cannot point to any changing circumstances to warrant terminating the Programs, and their decision to do so can plainly be measured against statutory standards for funding those Programs. Similarly, *Milk Train* is inapplicable because that court determined that "Congress ha[d] left to the [agency's] sole judgment the determination of the *manner* for providing assistance to dairy farmers." 310 F.3d at 751 (emphasis added). Again, this case does not involve the "manner" in which funds were distributed—it involves a blanket refusal to run the Programs at all.

In sum, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial review" of the challenged administrative actions. *Bowen*, 476 U.S. at 670–71. This Court can and should exercise review.

**III.    All of Plaintiffs' Claims Are Viable.**

**A.    Defendants' Termination Decision Violates the Appropriations Clause—an Action Plaintiffs Have Standing to Challenge.**

Defendants do not dispute that their decision to unilaterally withhold congressionally appropriated funds for the Programs directly contravenes Congress's command that they "shall" fund the Programs, nor do they otherwise dispute the validity of Plaintiffs' claims relating to the Appropriations Clause. *See generally* FAC ¶¶ 168–72; Dkt. 67-1 at 26–28. Instead, Defendants raise challenges to Plaintiffs' ability to pursue such claims. None has merit.

To start, Defendants reiterate their argument that Plaintiffs "effectively" ask the Court to order that Defendants "pay [Plaintiffs] money."  Mot. at 17.  Defendants stretch the word "effectively" beyond its limits; *nothing* in Plaintiffs' complaint asks the Court for damages or any other kind of monetary relief, or seeks to compel Defendants to contract with Plaintiffs or Acacia—or even to have any contract at all.  *See supra* § I.A.  Instead, Plaintiffs seek solely declaratory and injunctive relief aimed at ensuring Defendants comply with their constitutional obligation to disburse funds appropriated by Congress.  Defendants retain discretion as to *how* to fulfill those obligations, but they do not have discretion to ignore Congress's mandates entirely.

As a fallback, Defendants argue that Plaintiffs do not have standing to seek declaratory or injunctive relief because they lack a concrete injury, and no injury could be redressed by this Court.  Mot. at 18–20.  Wrong again.  Organizational plaintiffs have standing to sue in their own right when they have suffered an "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."  *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.* ("*PETA*"), 797 F.3d 1087, 1093 (D.C. Cir. 2015).  That test is satisfied here.[2]

### 1.    Plaintiffs satisfy the injury-in-fact requirement.

"To demonstrate injury in fact, an organization must allege a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'"  *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020).  In the D.C. Circuit, this means showing the agency's action injured the organization's interest and the organization used its resources to counteract that harm.  *PETA*, 797

---

[2] Plaintiffs' injuries are directly traceable to Defendants' conduct.  Dkt. 67-1 at 16–17.  Because Defendants do not challenge that prong of the analysis, Plaintiffs do not address it separately here.

F.3d at 1094. Here, Plaintiffs have suffered at least two injuries that give rise to Article III standing: direct interference with their core business activities and loss of funding.

*First*, Defendants' actions directly interfere with Plaintiffs' core business operations. Plaintiffs' access to noncitizens detained at immigration detention facilities and at immigration courts across the country has been curtailed and frustrated. FAC ¶¶ 141, 148. Plaintiffs are being forced to renegotiate their relationships with detention centers and immigration courts, and they are no longer receiving critical information from detention facilities enabling them to serve their populations. *Id.* ¶ 141. This inhibits Plaintiffs' abilities to provide legal services, through the Programs or otherwise. *Id.* ¶¶ 148–49.

Most importantly, the termination means Plaintiffs are unable to provide noncitizens with critical information regarding their rights and responsibilities in immigration proceedings, a core aspect of their missions. FAC ¶¶ 140–42, 149; *see also Cmty. Legal Servs.*, 2025 WL 1233674, at *4 (by cancelling all funding, "the Government 'perceptibly impair[s]' Plaintiffs' ability to fulfill their shared organizational mission"). Plaintiffs are forced to conduct their missions in a "less efficient and effective" way, increasing the cost of providing services and dramatically reducing the number of noncitizens Plaintiffs can serve. *PETA*, 797 F.3d at 1091; *see* FAC ¶¶ 141, 148. These are exactly "the type[s] of 'substantial, tangible costs' that are cognizable for purposes of organizational standing." *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 48 (D.D.C. 2020).

Defendants' actions "deny [Plaintiffs] access to information and avenues . . . they wish to use in their routine information-dispensing, counseling, and referral activities." *Action All. of Senior Citizens of Greater Phil. v. Heckler*, 789 F.2d 931, 937–38 (D.C. Cir. 1986). These harms impede Plaintiffs' "core business activities"—their programs providing legal information to

noncitizens.  *League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730, at \*22–23 (D.D.C. April 24, 2025) (finding organizational standing where executive order relating to proof of citizenship implicated voter-registration nonprofits' core mission); *see also* FAC ¶ 46.

*Second*, Defendants have terminated all funding for the Programs through which Plaintiffs fund and run their legal orientation activities—a loss of millions of dollars, which represents substantial portions of Plaintiff organizations' overall budget.  FAC ¶¶ 140, 146.  Financial injuries like these are the "gold standard or 'prototypical form of injury in fact.'"  *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at \*6 (D.D.C. Mar. 10, 2025).[3]  These injuries are forcing Plaintiffs to reassign, furlough, or terminate staff, shift funding between programs, and expend resources reorganizing their operations and looking for other sources of funding.  FAC ¶¶ 140, 146.  Some of the smaller Plaintiffs may be forced to charge fees for their services (which itself requires them to compromise their missions) or even to close their doors entirely.  *Id.* ¶ 146.  All of this will leave a large gap in the services Plaintiffs are able to provide to noncitizens.  *Id.* ¶ 149.

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), does not change this analysis.  There, the Court held that organizations do not suffer an injury "simply because they object to [an agency's] actions" on ideological grounds, and that they cannot "spend [their] way into standing simply by expending money to gather information [about] and advocate against" those actions.  *Id.* at 394.  Here, Plaintiffs are not mere "issue-advocacy organization[s]," whose only costs are in "gather[ing] information [about] and advocat[ing] against the defendant's action."  *Id.* at 394–95.  Plaintiffs operated services for individuals in removal proceedings for years before

---

[3] As explained above, the mere fact that Plaintiffs have suffered financial harm does not mean this is a "contract" case seeking monetary damages.  *See supra* § I.

LOP was established by Congress, and these services form the core of their organizational missions. FAC ¶ 33. Defendants' actions have "impaired their ability to provide [these] services," which has "directly affected and interfered with [their] core business activities"—a basis for injury the Supreme Court has recognized as viable in the organizational-standing context. 602 U.S. at 395 (quoting *Havens Realty Corp v. Coleman*, 455 U.S. 363, 379 (1982)). Plaintiffs thus have standing under the rules described in *Alliance for Hippocratic Medicine*, which are consistent with prior circuit precedent on organizational standing. *See, e.g.*, *League of United Latin Am. Citizens*, 2025 WL 1187730, at *23.

### 2. Plaintiffs satisfy the redressability requirement.

To satisfy the redressability prong for Article III standing, a plaintiff need not demonstrate that "victory in court will without doubt cure the identified injury," but "only that it is likely to do so." *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 82 (D.D.C. 2019); *see also Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *7 (D.D.C. Apr. 16, 2025) (a "plaintiff need not negate speculative and hypothetical possibilities in order to demonstrate the likely effectiveness of judicial relief" (cleaned up)).

Defendants' actions have harmed Plaintiffs' core business activities and organizational missions. Terminating the Programs is crippling the nonprofit organizations that provide Program services, preventing thousands upon thousands of noncitizens from receiving legal services for which Congress has appropriated funding. The requested injunctive relief will redress these harms by restarting the Programs, ensuring that Plaintiffs' missions to provide noncitizens with this critical legal information are fulfilled.

Reinstatement of the legally required funding for the Programs significantly increases the likelihood that Plaintiffs will obtain relief. Defendants have announced no plan to provide the Programs through other providers, despite Defendants' representation to the contrary to this Court.

4/15/25 Hearing Tr. at 34:4–19.  In fact, there is no record that there *are* any other qualified providers.  As the Court correctly recognized at the April 15, 2025 hearing, "in some of the[] areas [in which Plaintiffs operate], they are [the] only organizations that actually provide these services.  And so if the program goes forward through private entities, [Plaintiffs] may be the only ones that are available to do it."  *Id.* 64:23–65:2; *see, e.g.*, FAC ¶¶ 35, 45, 147.  It is thus highly likely that an order granting the requested injunction will result in Plaintiffs' own funding being reinstated.  Even if Defendants choose to fund the Programs through other providers or some other method, this still provides Plaintiffs relief by furthering their organizational goals and allowing them to divert resources to other initiatives rather than spend time and money filling the gap left by Defendants' termination of the Programs.  *See Cmty. Legal Servs.*, 2025 WL 1233674, at *5 ("[I]f the Government . . . ensure[s] direct representation through others, the harm Plaintiffs suffer in the form of providing representation without payment or diverting resources would be alleviated."); *AIDS Vaccine Advoc.*, 2025 WL 752378, at *7.

Further, Plaintiffs' requested injunction prohibiting Defendants "from preventing Plaintiffs from accessing Defendants' facilities" and "from removing . . . Plaintiffs' posters, literature, or other written communications" will directly redress Plaintiffs' access and other First Amendment harms.  *See* FAC ¶¶ 143–44, 148; Dkt. 67-31.  This, too, will ensure the noncitizens Plaintiffs serve continue to have access to legal information.  And Plaintiffs' request for "declaratory relief would provide [them] ammunition for any future legal attack" on Defendants' actions hampering their access to facilities crucial to their organizational missions.  *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 131 (D.D.C. 2020).

Defendants argue that there is no redress here because the Court cannot order "the federal government 'to continue to contract' with" Plaintiffs.  Mot. at 19 (quoting *AIDS Vaccine Advoc.*,

2025 WL 752378, at *23). That is beside the point. Any order requiring Defendants to fund and operate the Programs, as Plaintiffs request, would redress Plaintiffs' injury—either because Plaintiffs' own funding would be restored (which is quite likely, especially in areas where Plaintiffs are the only possible providers of these services) or because the government would find some way to provide the Programs through other means, ensuring that Plaintiffs' organizational goals are achieved without Plaintiffs needing to divert significant resources from other initiatives. In fact, the same case Defendants cite for the proposition that Plaintiffs' harm is not redressable by a court order actually *did* find redressability and standing. *AIDS Vaccine Advoc.*, 2025 WL 752378, at *6 & n.3 ("[A] determination that the blanket [termination] was unlawful, and therefore cannot be given effect, would likely redress at least some of the harms Plaintiffs have suffered. . . . Plaintiffs' standing is plain."); *see also Cmty. Legal Servs.*, 2025 WL 1233674, at *5. The same analysis applies here.

In sum, Plaintiffs are not seeking monetary relief; they have standing to seek declaratory and injunctive relief that would undoubtably further their organizational missions (which reasonably may also result in indirect financial relief). Defendants have pointed to nothing that would interfere with this Court's ability to reach the merits of Plaintiffs' claims under the Appropriations Clause.

### B.    Defendants' Termination Decision Violates the TVPRA.

As with the Appropriations claim, Defendants do not challenge Plaintiffs' underlying theory relating to the TVPRA, nor do they dispute that Congress has demanded Defendants "shall . . . ensure that custodians receive legal orientation presentations provided through the [LOP] administered by" EOIR. 8 U.S.C. § 1232(c)(4). Instead, Defendants raise the same meritless arguments related to supposed "justiciability issues." Mot. at 20–22. They argue again that the TVPRA claim is "founded upon a contract" and thus should be heard in the Court of Federal

Claims, which is wrong for the reasons discussed above. *Supra* § I. And they argue that "a court order requiring Defendants to keep [LOP] in operation" would leave Plaintiffs' "injuries unredressed," Mot. at 20—which, again, is wrong for the reasons discussed above, *supra* § III(A)(2).

The only new argument Defendants raise with respect to the TVPRA is their contention that Plaintiffs are not within the TVPRA's "zone of interests," and thus do not have prudential standing. Mot. at 20–21. Defendants get the wrong answer here for two reasons.

First, they look to the wrong statute. Plaintiffs do not bring a direct claim under the TVPRA, but instead a claim under the APA based on Defendants' administrative action that was "not in accordance with law." 5 U.S.C. § 706(2)(A); FAC ¶¶ 173–77.

Second, Plaintiffs plainly fall within the zone of interests protected by statute. Prudential standing exists so long as a "plaintiff's complaint fall[s] within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). In APA cases, agency action is "presumptively reviewable" unless a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

Plaintiffs have prudential standing because their APA claims are in the zone of interests protected by the TVPRA. Plaintiffs' interests in sustaining their core activities and organizational missions—including their commitment to ensuring noncitizen children are not left to navigate the immigration system alone and uninformed—are more than "marginally related to" the TVPRA appropriations at issue here. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225. In fact, these statutes "contemplate[] an important role for organizations like Plaintiffs." *Nw. Immigrant Rts. Project*,

496 F. Supp. 3d at 52. The relevant congressional appropriation provides that "not less than $28,000,000 shall be available for services and activities provided by the Legal Orientation Program," Consolidated Appropriations Act, Pub. L. No. 118-42, 138 Stat. 133 (Mar. 9, 2024), and the TVPRA directs the Secretary of Health and Human Services to work with EOIR to conduct an LOPC program, 8 U.S.C. § 1232(c)(4).

Courts have held that organizational plaintiffs "easily meet" the test for prudential standing under similar circumstances. For instance, in *O.A. v. Trump*, 404 F. Supp. 3d 109 (D.D.C. 2019), this Court determined that nonprofits providing legal services to refugees had prudential standing for an APA challenge because various provisions of federal immigration law expressly envision engagement from nonprofits. *Id.* at 144–45. Likewise, the court in *Community Legal Services* determined that nonprofits providing legal services to unaccompanied children had prudential standing because "their interests are congruent with the TVPRA's and Foundational Rule's beneficiaries." 2025 WL 1233674, at *5. The same analysis applies here.

Defendants rely on *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), to argue otherwise, but fail to mention that the Supreme Court determined that the plaintiffs in that case *did* satisfy the "zone of interest" test and explained that the "relevant statute" for that analysis "is the statute whose violation is the gravamen of the complaint." *Id.* at 886. Here, Plaintiffs' complaint centers on multiple statutes that authorize funding for programs that go directly to their organizational missions and interests—and which have long been used to fund them directly. Plaintiffs thus satisfy the requirements for prudential standing for all their claims.

## C. Defendants' Actions Violate Plaintiffs' First Amendment Rights.

This Court may set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Defendants correctly note that Plaintiffs raise "two distinct" claims that Defendants' actions violate their First Amendment rights by (1) denying them

access to congressionally authorized funds because Defendants want to suppress the information they have traditionally shared with noncitizens; and (2) limiting Plaintiffs' access to limited public forums, including immigration courthouses and detention facilities, where they have spoken to noncitizens for more than 20 years.  Mot. at 22–23; FAC ¶¶ 178–89.  Both arguments provide independent bases for this Court to overturn Defendants' actions under the APA.

Defendants argue that, because Congress can choose to selectively fund certain activities over others, they cannot violate Plaintiffs' First Amendment rights by withdrawing funding that Congress has already appropriated specifically to fund Plaintiffs' speech.  Mot. at 22–23.  But Defendants conflate *Congress's* ability to define what constitutes a program it wishes to fund with *Defendants'* ability to cut off appropriated funding for an existing program based on the Executive Branch's desire to cease funding for certain viewpoints.  Although a legislature is not required to create programs that subsidize all viewpoints equally, *Rust v. Sullivan*, 500 U.S. 173, 193 (1991), once Congress has chosen to encourage activity related to one viewpoint, the government may not directly interfere with that activity in violation of the First Amendment, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013).  Congress has chosen to fund the Programs, and Plaintiffs are "insisting that public funds be spent for the purposes for which they were authorized," *Rust*, 500 U.S. at 196, in a manner that is "not inconsistent with Congressional intent," *id.* at 188.

Similarly, when the government creates a limited public forum or chooses to fund private speech, it may impose speech restrictions only if they are "viewpoint neutral and 'reasonable in light of the purpose served by the forum.'"  *People for the Ethical Treatment of Animals v. Tabak*, 109 F.4th 627, 633 (D.C. Cir. 2024).  Here, courthouses and detention facilities where Plaintiffs implement the Programs are limited public forums because Congress (by mandating LOP

programs) and Defendants (by running LOP programs through its contract with Acacia) made all such government property where the Programs are implemented available for "use by [Plaintiffs]" for more than 20 years. *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009). Defendants focus exclusively on the first part of this test, arguing that their decision to restrict access to these forums is viewpoint neutral (it is not) without addressing whether the decision is reasonable (it also is not). Mot. at 25–26.

Compounding Defendants' decision to terminate Programs that provide information to individuals in removal proceedings, Defendants are impeding Plaintiffs' access to immigration courthouses and detention facilities in an effort to prevent that information from being shared at all, including through removing posters, signs, and educational materials that Plaintiffs have long been allowed to share in such facilities. FAC ¶ 189. Plaintiffs' posters in these facilities not only provide information about the Programs, but also generally inform noncitizens about how to contact Plaintiffs for potential representation. As Plaintiffs alleged in their Amended Complaint, Plaintiffs have lost access to immigration courthouses and detention facilities and those facilities have removed their posters and educational materials in an effort to restrict their speech. *Id.* ¶ 144. This has only worsened since the amended complaint was filed; many Plaintiffs can no longer access immigration courthouses, and their posters are being removed while alternative posters encouraging noncitizens to "self-deport" are put up. Dkt. 67-1 at 36–37. Such viewpoint-based restrictions and allowances violate the First Amendment.

*First*, as Defendants' appear to concede, Plaintiffs' speech is private speech, not government speech. Courts "must exercise great caution" in assessing what constitutes government speech, and private speech does not transform into "government speech by simply affixing a government seal of approval." *Matal v. Tam*, 582 U.S. 218, 235 (2017). Here, the

Programs were "designed to facilitate private speech"—i.e., provision of information to those in immigration court—"not to promote a governmental message." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001). The Programs thus facilitate Plaintiffs' private speech rather than any message attributable to the U.S. government. *See* Dkt. 67-1 at 37.

    *Second*, the termination of the Programs is not viewpoint-neutral. Defendants attempt to silence speech that informs noncitizens broadly about their rights and responsibilities based on Defendants' apparent belief that such speech "promote[s] or facilitate[s] violations of our immigration laws." Exec. Order No. 14159, 90 C.F.R. 8443, 8447 (2025); *see also* Dkt. 30-1 at 4. Defendants argue this language is viewpoint neutral because it is just an "objective descriptor" of the activities at issue. Mot. at 23. But this language shows an intent to cut funding to censor Plaintiffs' speech nationwide based on Plaintiffs' attempts to provide assistance to noncitizens in their immigration proceedings that goes beyond encouraging noncitizens to "self-deport." The government engages in viewpoint discrimination when it "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). The government may not leverage its power to subsidize or restrict speech in a limited public forum to silence speech regarding litigants' rights or to prevent them from defending themselves in court proceedings. *Cf. Velazquez*, 531 U.S. at 547–48. Yet here, Defendants apparently want to shield noncitizens from available information about legal and factual bases for removal and instead sponsor messages to "self-deport." *See* FAC ¶¶ 139, 144, 184. The Programs often provide the only legal advice available to noncitizens, and Defendants' actions squelch Plaintiffs' speech to non-citizens concerning their other rights and options. *Id.* ¶ 145. As in *Velazquez*, the Government may not hamstring this legal advice by preventing Plaintiffs from speaking to noncitizens or threatening their ability to exist by withdrawing funding upon which

they rely.  531 U.S. at 548–49 ("Where private speech is involved, even Congress' antecedent funding decision cannot be aimed at the suppression of ideas thought inimical to the Government's own interest.").  Cutting off access to information to ensure individuals in removal proceedings are unable to access legal services plainly runs contrary to the First Amendment.  *See* 4/15/25 Hearing Tr. at 46:1–10.

*Third*, terminating the Programs is not reasonable.  Even if this Court finds the restrictions are not viewpoint-based, Defendants must justify their funding and access restrictions based on the purposes of the funding program or on the purposes of the forum.  *See Agency for Int'l Dev.*, 570 U.S. at 215–16 (in funding cases, "the relevant distinction that has emerged . . . is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself"); *United States v. Nassif*, 97 F.4th 968, 978 (D.C. Cir. 2024) ("So long as the restrictions on speech are not viewpoint-based, that review requires only that we determine whether the regulation is 'reasonable' in light of the purpose of the forum.").

Just as Defendants fail to identify a basis for why they have terminated the Programs as required under the APA, they fail to identify *any* government interest justifying their decision to cut off funding for Plaintiffs or to prevent Plaintiffs from accessing these forums, particularly in light of the long history of the speech at issue.  Defendants' contention that preexisting standards on visitation in immigration facilities are not "unreasonable," Mot. at 35, says nothing about the reasonableness of the conduct at issue here:  their decision to terminate the Programs and hinder Plaintiffs' long-established access to facilities.  Instead, Defendants focus exclusively on whether their attempts to censor Plaintiffs' speech is viewpoint neutral, but, as the cases they cite recognize,

the reasonableness of the restriction is an independent reason to strike down speech restrictions. Mot. at 25–26. Plaintiffs have accessed these facilities for decades to provide these orientations; cutting off access prevents noncitizens from receiving any legal advice whatsoever and is unreasonable. *See, e.g.*, FAC ¶ 24. Because Defendants' actions directly censor Plaintiffs' speech, Defendants cannot cut off congressionally mandated funding or restrict Plaintiffs' access to these forums without any justification or reasoning at all, just as they cannot do so with the intent to censor Plaintiffs' viewpoints.

## CONCLUSION

The Court should deny Plaintiffs' belated motion to dismiss and instead resolve this case on summary judgment. *See* Dkt. 67.

Respectfully submitted,

May 8, 2025

s/ Adina Appelbaum                                    s/ Laura Sturges

AMICA CENTER FOR IMMIGRANT                GIBSON DUNN & CRUTCHER
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)      Laura Sturges (C.O. Bar No. 36843)*
Samantha Hsieh (V.A. Bar No. 90800)*        1801 California Street, Suite 4200
Amelia Dagen (D.C. Bar No. 9004838)         Denver, CO 80202-2642
Amica Center for Immigrant Rights           (303) 298-5700
1025 Connecticut Avenue NW, Suite 701       lsturges@gibsondunn.com
Washington, DC 20036
(202) 331-3320                              Amer S. Ahmed (D.C. Bar No. 500630)
adina@amicacenter.org                       Richard W. Mark (D.D.C. Bar No. NY0378)
sam@amicacenter.org                         200 Park Avenue
amelia@amicacenter.org                      New York, NY 10166-0193
                                            (212) 351-4000
                                            rmark@gibsondunn.com
                                            aahmed@gibsondunn.com

                                            * admitted *pro hac vice*

32