# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 1:25-cv-00298 |
| UNITED STATES DEPARTMENT OF JUSTICE, et al., | § § § | |
| *Defendants*. | § § | |

### BRIEF OF *AMICUS CURIAE* HARRIS COUNTY, TEXAS
### IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

NINA L.M. OISHI
Assistant County Attorney
Texas State Bar No. 24142250
D.D.C. Bar ID: TX0085
HARRIS COUNTY ATTORNEY'S OFFICE
1019 Congress Street, Floor 15
Houston, TX 77002
nina.oishi@harriscountytx.gov
C: (832) 596-4809

*Counsel for Amicus Curiae Harris County, Texas*

**STATEMENT OF INTEREST**

Harris County[1] is the nation's third-largest county by population, with over 4.8 million residents as of the last census, or over one in every six residents of the State of Texas.[2] If Harris County were a state, it would be the 25th largest state in the country.[3] Like other localities across the country, Harris County receives significant federal funding to provide resources to its millions of residents. But Defendants' unlawful actions threaten the separation of powers and lay the groundwork for further executive disregard of federal funds—which would inevitably undermine the stability necessary for Harris County and other localities to operate.

Harris County also has a unique perspective to offer this case. Harris County is known for its international community and welcomes residents from more than 110 different countries.[4] International migration thus plays an essential element in Harris County's thriving economy and cultural life. From 2022 to 2023, over 41,000 new residents arrived via international migration.[5] When Defendants' actions unlawfully deprive Harris County residents of information about their legal rights, the flow-down affects will result in disproportionate financial harms to Harris County and its residents.

This issue is particularly of interest to Harris County given the significant number of immigration proceedings here. There are nearly 99,000 immigration cases pending in the three

---

[1] No counsel for a party authored this brief in whole or in part, and no entity, other than *amicus*, its officers, employees, or counsel, has made a monetary contribution to the preparation or submission of this brief.

[2] Peter Warren, *Harris County Led the Country in U.S. Census Growth. Here's What Fueled the Population Gain*, HOUSTON CHRON. (Mar. 16, 2024) https://www.houstonchronicle.com/news/houston-texas/trending/article/harris-county-population-growth-immigation-19080477.php.

[3] *Harris County Fast Facts*, HARRIS COUNTY INTERGOVERNMENTAL AFFS. (accessed Mar. 18, 2025) https://iga.harriscountytx.gov/Governance/Local.

[4] *American Fact Finder, Table B05006*, U.S. CENSUS BUR. (2009–2023) (Harris County, Texas).

[5] Warren, *supra* note 2.

2

immigration courts located in Houston, in Harris County.[6] The individuals in the proceedings in Harris County are likely to be unrepresented.[7] They are also particularly vulnerable: more than a quarter of those cases involve individuals under the age of 18.[8]

Several of the Programs harmed by Defendants' unlawful freeze operate in Harris County. Multiple non-party legal orientation program providers, including declarant Galveston-Houston Immigration Representation Project (GHIRP), operate in Harris County.[9] In short, Defendants' unlawful actions threaten to set precedent that would undermine Harris County's long-term stability and predictability, and do not serve the interests of Harris County or its residents.

## SUMMARY OF ARGUMENT

Harris County, like many other localities, relies on federal funding that its representatives in Congress have obtained. Harris County agrees with Plaintiffs' arguments regarding separation of powers to emphasize that a ruling favorable to Defendants' disregard for congressional appropriation mandates undermines the interests of local governments. If Defendants are granted the license to override spending laws at whim, local governments will lose the stability and predictability necessary for local government to operate and serve its residents.

In addition, from its perspective as a locality, Harris County supports the Programs' successful efforts to provide information to individuals and improve the workings of the

---

[6] Anna-Catherine Brigida, *Harris County Is the Top Destination for Unaccompanied Migrant Children. They Just Lost Funding for Legal Services*, HOUSTON CHRON. (Feb. 21. 2025) https://houstonlanding.org/harris-county-is-the-top-destination-for-unaccompanied-migrant-children-they-just-lost-funding-for-legal-services.

[7] *See, e.g.*, Anna-Catherine Brigida, *Immigrants in Houston's Courts Will Have One Less Resource After Trump's Changes*, HOUSTON LANDING (Jan. 27, 2025) https://houstonlanding.org/immigrants-in-houstons-courts-will-have-one-less-resource-after-trumps-changes.

[8] *See* Brigida, *supra* note 6.

[9] *See, e.g.*, Brigida, *supra* note 7.

immigration system. Like Harris County's know-your-rights programs in the criminal-justice context, the Programs promote a more efficient process, to the benefit of the taxpayer and the County as a whole. For this reason, Harris County has an interest in ensuring that the Programs are not unlawfully terminated by Defendants. Harris County is an international community, and home to a significant number of immigration proceedings. If Defendants are permitted to continue with their unlawful termination, Harris County will disproportionately shoulder the resulting economic costs.

## ARGUMENT

**I. Defendants' actions violate essential constitutional separation of powers—setting a dangerous precedent that threatens Harris County.**

Local governments like Harris County rely on federal programs and related funding authorized by their representatives in Congress—like the Programs operated by Plaintiffs here. Each year, state and local governments across the country receive more than $1 trillion through federal programs and related grants.[10] That amount is significant, adding up to over 30% of total local government revenue per year. Harris County is no different, receiving roughly $600 million in federal grant funding every year, including $15 million a month for operating costs.[11] That funding covers a wide range of services essential to Harris County and its residents, including disaster relief, flooding mitigation, public health programs, public safety, and infrastructure.[12]

---

[10] Ben Leubsdorf & Adam G. Levin, *Impacts of Federal Grants and Other Funds on State and Local Budgets*, CONGRESS.GOV (Feb. 10, 2025) https://www.congress.gov/crs-product/IN12506#:~:text=Together%2C%20state%20and%20local%20governments,which%20final%20data%20is%20available.

[11] Sarah Grunau, *Sweeping Federal Funding Freeze Could Risk $600 Million for Harris County, Hidalgo Says*, HOUSTON PUB. MEDIA (Feb. 28, 2025) https://www.houstonpublicmedia.org/articles/news/harris-county/2025/02/28/515024/sweeping-federal-funding-freeze-could-risk-600-million-for-harris-county-hidalgo-says.

[12] Sammy Turner, *Harris County Judge Lina Hidalgo Says $600M in Federal Grants at Risk Due to Federal Funding Freeze*, KHOU11 (FEB. 27, 2025)

That power of authorizing federal funding and federal grant programs to local governments rests squarely in the hands of Congress—so when Defendants disregard those congressional powers, they violate the Constitution and undermine local governments. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Indeed, the Constitution exclusively grants the power of the purse to Congress, and that spending power is directly linked to Congress's power to legislate. *In re Aiken Cnty.*, 725 F.3d at 261 n.1; *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231-32 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). Thus, as the D.C. Circuit has explained, the Executive Branch does not have "unilateral authority" to refuse to spend the "full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

Because local governments like Harris County rely so heavily on federal funding, the precedent set here has wide-ranging consequences. If Defendants were allowed to terminate federal grant programs—like Plaintiffs' Programs here—at a whim, it could open the door for Defendants to unilaterally terminate Harris County's $600 million of annual federal grant funding. Defendants would thus fundamentally threaten stability and predictability for local governments like Harris County, rendering them unable to serve their residents. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (recognizing immediate, irreparable harm due to order that created "budget uncertainty by threatening to deprive the Counties of hundreds of millions of dollars in federal grants that support core services in their jurisdictions" and explaining that this "uncertainty interferes with the Counties' ability to budget, plan for the future, and

---

https://www.khou.com/article/news/local/harris-county-federal-funding-freeze-impacts/285-c6da517b-360b-4e91-a8a0-58c5699eeda0.

properly serve their residents" and that counties' need to "take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services . . . will cause the Counties irreparable harm").

*   *   *

Although the County has a continued interest in ensuring that these specific Programs are not unlawfully terminated by Defendants, *see infra*, this case has enormous import for Harris County beyond the Programs. If Defendants are permitted to continue in violation of the Constitution, they may set their sights on the federal grant programs essential to Harris County—thus harming Harris County and jeopardizing the millions of residents that Harris County serves.[13]

## II. The County has a continued interest in ensuring that the Programs are not unlawfully terminated by Defendants.

First, Harris County agrees with Plaintiffs that the Programs provide vital information and improve the efficiency of the immigration system. As Plaintiffs point out, these Programs educate individuals about "their legal alternatives, rights, and obligations in immigration proceedings, assisting them to make more informed decisions as they face a judge and a DHS prosecuting attorney." Am. Compl. ¶ 64.

Harris County supports and maintains similar know-your-rights programs, particularly in the criminal-law context. For example, Harris County provides and maintains free resources informing the public about their Miranda rights and constitutional restrictions on searches and seizures.[14] The Harris County Office of Managed Assigned Counsel also trains private attorneys

---

[13] Indeed, they already have. *See* Compl., ECF No. 1, *Harris County v. HHS et al.*, Civ No. 1:25-cv-01058-LLA (D.D.C. filed Apr. 8, 2025).

[14] *Client Resources: Know Your Rights*, HARRIS CTY. OFF. MANAGED ASSIGNED COUNSEL (accessed Mar. 27, 2025) https://mac.harriscountytx.gov/Community-Resources/Know-Your-Rights.

who provide court-appointed criminal defense services.[15] Finally, the Harris County Commissioners Court has continued to provide funding to the Harris County Public Defenders' Office, which—like Plaintiffs' Programs—provide free legal services to those most in need.[16]

Together, these existing efforts demonstrate the County's belief that government systems, and the public broadly, are better served when individuals have access to information and representation. Just as Plaintiffs' Programs do not "promote illegal immigration," Harris County's criminal-law programs do not "promote criminal activity." Instead, Harris County's criminal-law programs support judicial efficiency, save taxpayer dollars, and result in a fairer and more just system.[17] In Harris County's view, Plaintiffs' Programs do the same for the immigration system.[18]

Second, Harris County has an interest in ensuring that the Programs are not unlawfully terminated by Defendants. The loss of the Programs will result in financial harms and inefficiencies that harm Harris County. Existing studies have found that immigration detention results in costs to local governments, for several significant reasons.[19] For one, men comprise most of the

---

[15] *See Kenneth Hardin Selected to Lead Harris County's First Managed Assigned Counsel Program*, HARRIS CTY. OFF. CTY. ADMIN. (Oct. 13, 2020) https://oca.harriscountytx.gov/Media/Press-Releases/kenneth-hardin-selected-to-lead-harris-countys-first-managed-assigned-counsel-program.

[16] Clare Amari, *The Harris County Public Defender's Office Is Growing. But Is It Growing Fast Enough?*, HOUSTON LANDING (Oct. 15, 2024) https://houstonlanding.org/the-harris-county-public-defenders-office-is-expanding-but-is-it-growing-fast-enough.

[17] *See id.*; *Kenneth Hardin Selected*, *supra* note 15.

[18] Local reporting suggests that the Programs support efficiency in Houston-area immigration courts. *See, e.g.*, Brigida, *supra* note 7 (noting that when a legal orientation program provider is available in Houston immigration courts, "judges can often speed through procedural issues within three to five minutes," but "when [defendants are] unrepresented immigrants, this process slows down").

[19] *See, e.g.*, Alexandra Forter Sirota & Andrea Dreier, *Local Communities Face High Costs of Immigration Enforcement*, N. CAROLINA JUSTICE CTR.(Apr. 16, 2019) https://www.ncjustice.org/publications/local-communities-face-high-costs-of-federal-immigration-enforcement (citing the cost of resulting public-health toll to local governments).

immigration detention population and are more likely to be the primary earners in their family.[20] During their detainment—made longer by Defendants' unlawful termination of the Programs—these potentially-lawful Harris County residents are unable to perform their jobs. This loss of employment harms the local business and business community, thus impacting Harris County's economy. The economy will also be impacted as families navigate lost wages, steep prices for phone calls to the detention facility, legal fees, and exorbitant bond prices, and the emotional and physical toll.[21] And this effect is compounded when detained individuals might be eligible for relief from removal—but do not know because they lacked access to information.

Studies have reported that overall, the employment disruption, costs of fighting a legal case, and other obstacles results in $2.9 billion in financial losses per year to both immediate families and their wider communities.[22] These figures translate to less money for the local and regional economy and to revenue losses for local governments associated with income and sales tax.[23] These downstream effects also will increase the burden on the support services provided by Harris County to its residents in need, related to both short-term relief such as County-administered benefit programs and long-term impacts such as stress on local healthcare systems.[24]

By contrast, the Programs allow Harris County families to thrive and contribute to the community. One non-party provider of the Programs in Harris County is declarant Galveston-

---

[20] *See, e.g.*, Altaf Saadi et al., *Understanding U.S. Immigration Detention: Reaffirming Rights and Addressing Social-Structural Determinants of Health*, 22 HEALTH & HUM. RIGHTS J. 187, 190 (June 2020) https://pmc.ncbi.nlm.nih.gov/articles/PMC7348446.
[21] *See id.*
[22] Geoffrey Alan Boyce & Sarah Launius, *The Household Financial Losses Triggered by an Immigration Arrest, and How State and Local Government Can Most Effectively Protect Their Constituents*, J. MIGRATION & HUMAN SEC. (Dec. 27, 2020) https://journals.sagepub.com/doi/full/10.1177/2331502420973976.
[23] *Id.*
[24] *See, e.g.*, Sirota, *supra* note 19.

Houston Immigration Representation Project (GHIRP),who represents a twelve-year old named Walter. Thanks to GHIRP's representation, Walter's loving uncle—a Harris County resident—does not face exorbitant legal fees to protect his nephew's rights. Without fear of financial loss due to the immigration case, Walter is free to thrive at his local high school, and his family continues to contribute to Harris County's community and economy.

By reducing the time that individuals spend in detention and lowering the costs that families face when dealing with an immigration case, the Programs ameliorate these negative financial impacts on local governments. And because Harris County is home to a diverse community and a disproportionate number of immigration proceedings—including proceedings involving individuals who may be lawfully present—Defendants' unlawful termination of the Programs disproportionately harms Harris County's economy.

Finally, without Plaintiffs' Programs informing individuals of their legal rights, families seeking legal assistance may be more vulnerable to fraud and scams related to immigration legal services.[25] Individuals' vulnerability to immigration fraud and scams is made worse by the current atmosphere of fear in Texas, related to high-profile immigration raids.[26] The Programs act as a frontline defense to fraud and scams by ensuring that individuals have federally-approved, accurate information. For example, GHIRP represents two minor children, Esther and Ruth, who originally had sought inaccurate legal advice from an unlicensed notary; without GHIRP's services through the Programs, Esther and Ruth's asylum application would have fallen victim to the notary's

---

[25] *See* Anna-Catherine Brigida, *Fear Could Be Driving Immigration Fraud and Scams. Here Is How to Protect Yourself*, HOUSTON LANDING (Mar. 11, 2025) https://houstonlanding.org/fear-could-be-driving-immigration-fraud-and-scams-here-is-how-to-protect-yourself.

[26] *See, e.g.*, *id.*; Rachel Estrada, *Local Community Fears Rise After ICE Raids; FIEL Houston Addressing Concerns*, CW39 HOUSTON (Feb. 24, 2025) https://cw39.com/cw39/community-fears-rise-after-ice-raids-fiel-houston-to-hold-press-conference.

9

fraudulent legal representation. Harris County has a duty to protect its residents from such fraud and scams—so the loss of the Programs means that the increased cost of anti-scam enforcement will fall on the County.[27]

\* \* \*

Not only does Harris County have an interest in courts ensuring that Defendants follow their constitutional obligations—Harris County also has an interest in ensuring that these specific Programs are not terminated. These Programs do not "promote" "illegal immigration." Instead, like other initiatives supported by Harris County, the Programs inform residents of their rights. If Defendants are permitted to unlawfully terminate the Programs, the financial burdens will fall upon Harris County and impair Harris County's ability to serve its residents.

## CONCLUSION

Defendants' unlawful termination of congressionally-authorized federal programs sets dangerous precedent by violating separation-of-powers and will result in significant financial cost to Harris County. For these reasons, *amicus* respectfully urges this Court to grant Plaintiffs' motion for summary judgment.

Dated: May 8, 2025.

Respectfully submitted,

**CHRISTIAN D. MENEFEE**
HARRIS COUNTY ATTORNEY

---

[27] *See Stay Scam Free in Harris County*, OFF. HARRIS CTY. ATT'Y (accessed Mar. 27, 2025) https://cao.harriscountytx.gov/ScamFree.

*/s/ Nina L.M. Oishi*
**JONATHAN G.C. FOMBONNE**
Deputy County Attorney and First Assistant
Texas State Bar No. 24102702
D.D.C. Bar ID: TX0090
jonathan.fombonne@harriscountytx.gov

**TIFFANY BINGHAM**
Managing Counsel
Texas State Bar No. 24012287
D.D.C. Bar ID: TX0087
tiffany.bingham@harriscountytx.gov

**ELEANOR MATHESON**
Assistant County Attorney
Texas State Bar No. 24131490
D.D.C. Bar ID: TX0086
eleanor.matheson@harriscountytx.gov
C : (832) 712-3827

**NINA L.M. OISHI**
Assistant County Attorney
Texas State Bar No. 24142250
D.D.C. Bar ID: TX0085
nina.oishi@harriscountytx.gov
C: (832) 596-4809

**OFFICE OF THE HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5101
Facsimile: (713) 755-8924

***ATTORNEYS FOR AMICUS CURIAE HARRIS COUNTY***

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was filed electronically on May 8, 2025, with the Clerk of the Court of the U.S. District Court for the District of Columbia by using the CM/ECF system, causing electronic service upon all counsel of record.

>  /s/ Nina L.M. Oishi
> **NINA L.M. OISHI**
> Assistant County Attorney
> Harris County Attorney's Office