**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:25-cv-298-RDM |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

Pursuant to Federal Rule of Civil Procedure 56, Defendants hereby move for summary judgment on all claims in Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief, Dkt. 62, and oppose Plaintiffs' Motion for Summary Judgment and Request for Preliminary Injunctive Relief, Dkt. 67. The reasons supporting this motion and the arguments and authorities on which Defendants rely are set forth in the accompanying memorandum. For the reasons explained in the accompanying brief, the court should deny Plaintiffs' motion for summary judgment and request for preliminary injunctive relief, grant Defendants' cross-motion for summary judgment, and enter judgment for Defendants. A proposed order is attached.

DATED: May 9, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

ANDREW I. WARDEN
Assistant Director
Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD

1

Indiana Bar No. 37147-49
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Counsel for Defendant*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

)
AMICA CENTER FOR IMMIGRANT )
RIGHTS, *et al.*, )
)
    Plaintiffs, )
)
   v. )  Civil Action No. 1:25-cv-298-RDM
)
U.S. DEPARTMENT OF JUSTICE, *et al.*, )
)
    Defendants. )
_____ )


**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 2

I.      The Programs and the Acacia Contract ................................................ 2

II.     The April 10, 2025 Termination Decision ........................................... 3

III.    Procedural History ............................................................................... 4

LEGAL STANDARD ........................................................................................ 5

ARGUMENT ..................................................................................................... 6

I.      The Court Lacks Jurisdiction Under the APA To Compel the Government To Pay Money Under a Contract ............................................................................. 6

II.     Plaintiffs' APA Claims Fail For Independent Threshold Reasons ................... 16

        A.      Plaintiffs Have Other Adequate Remedies Available to Them ............... 17

        B.      Program Funding Decisions Are Committed to Agency Discretion By Law ....... 19

III.    Defendants Are Entitled To Summary Judgment On Plaintiffs' Statutory and Constitutional Claims ............................................................................. 22

        A.      Plaintiffs Fail To Assert a Viable Appropriations Clause Claim .......... 22

        B.      Plaintiffs Likewise Fail To Assert a Viable TVPRA Claim ................ 28

        C.      Plaintiffs' First Amendment Claim Fails on the Merits .................... 30

        D.      Plaintiffs' Duplicative *Ultra Vires* and Separation-of-Powers Claims Should Be Dismissed ............................................................... 37

IV.     Preliminary Relief Is Unwarranted ................................................... 39

V.      Any Relief Should Be Limited In Scope ............................................ 40

CONCLUSION .................................................................................................. 42

i

# TABLE OF AUTHORITIES

## CASES

*AIDS Vaccine Advoc. Coal. v. Dep't of State,*
-- F. Supp. 3d. --, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ............................................ 26, 41

*Albrecht v. Comm. on Emp. Benefits,*
357 F.3d 62 (D.C. Cir. 2004) ................................................................................ 7, 10, 15, 16

*Alphapointe v. Dep't of Veterans Affairs,*
745 F. Supp. 3d 1 (D.D.C. 2020) ..........................................................................8, 10, 11, 23

*Am. Ass'n of Colleges For Teacher Educ. v. McMahon,*
No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) ....................................................... 14

*Anderson v. United States,*
344 F.3d 1343 (Fed. Cir. 2003) ............................................................................................... 19

*Arbaugh v. Y&H Corp.,*
546 U.S. 500 (2006) .................................................................................................................. 6

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
897 F.3d 314 (D.C. Cir. 2018) ......................................................................................... 33, 34

*Associated Press v. Budowich,*
-- F. Supp. 3d --, 2025 WL 1039572 (D.D.C. Apr. 8, 2025) .................................................... 33

*Ateba v. Leavitt,*
-- F.4th --, 2025 WL 1036451 (D.C. Cir. Apr. 8, 2025) ............................................... 33, 35, 36

*Boarhog LLC v. United States,*
129 Fed. Cl. 130 (2016) .......................................................................................................... 17

*Bonumose, Inc. v. FDA,*
747 F. Supp. 3d 211 (D.D.C. 2024) ........................................................................................ 37

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ........................................................................................................... 12, 17

*California v. U.S. Dep't of Educ.,*
-- F. Supp. 3d --, 2025 WL 760825 (D. Mass. Mar. 10, 2025) ................................................ 12

*City of New Haven v. United States,*
634 F. Supp. 1449 (D.D.C. 1986) ..................................................................................... 26, 41

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
38 F.4th 1099 (D.C. Cir. 2022) ....................................................................................... *passim*

*Ctr. for Biological Diversity v. Regan,*
    597 F. Supp. 3d 173 (D.D.C. 2022) ........................................................ 6

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .............................................................................. 6

*Dalton v. Specter,*
    511 U.S. 462 (1994) ........................................................................ 37, 38

*Davenport v. Wash. Educ. Ass'n,*
    551 U.S. 177 (2007) ............................................................................ 31

*Dep't of Educ. v. California,*
    145 S. Ct. 966 (2025) ................................................................... *passim*

*Erickson Air Crane Co. of Wash. v. United States,*
    731 F.2d 810 (Fed. Cir. 1984) ............................................................. 19

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ...................................................................... 25, 26

*Fed'n For Am. Immigration Reform, Inc. v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) .............................................................. 29

*Franklin-Mason v. Mabus,*
    742 F.3d 1051 (D.C. Cir. 2014) ............................................................ 6

*Gill v. Whitford,*
    585 U.S. 48 (2018) .............................................................................. 41

*Greater New Orleans Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.,*
    639 F.3d 1078 (D.C. Cir. 2011) .......................................................... 39

*Great-West Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002) ......................................................................... 6, 9

*Great-West,*
    543 U.S. .............................................................................................. 13

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States,*
    114 Fed. Cl. 258 (2013) ...................................................................... 17

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ................................................................ 26, 27, 29

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) ........................................................... 39

*Hazardous Waste Treatment Council v. Thomas,*
   885 F.2d 918 (D.C. Cir. 1989) ................................................................. 29

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ........................................................................... 20

*Heller, Ehrman, White & MacAuliffe v. Babbitt,*
   992 F.2d 360 (D.C. Cir. 1993) ............................................................. 38

*Hodge v. Talkin,*
   799 F.3d 1145 (D.C. Cir. 2015) ............................................... 32, 33, 36

*Hometown Connections v. Noem,*
   No. 8:25-cv-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) ................. 13

*Ingersoll-Rand Co. v. United States,*
   780 F.2d 74 (D.C. Cir. 1985) ........................................................ *passim*

*Int'l Tech. Corp. v. Winter,*
   523 F.3d 1341 (Fed. Cir. 2008) ............................................................ 19

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan,*
   746 F.2d 855 (D.C. Cir. 1984) ............................................................. 20

*Janay v. Blinken,*
   743 F. Supp. 3d 96 (D.D.C. 2024) ....................................................... 27

*Jenkins v. Howard Univ.,*
   123 F.4th 1343 (D.C. Cir. 2024) ............................................................. 6

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil.,*
   *Recs.*, 56 F.3d 279 (D.C. Cir. 1995) ............................................. *passim*

*Kimberlin v. U.S. Dep't of Justice,*
   318 F.3d 228 (D.C. Cir. 2003) ............................................................. 32

*Kowalski v. Turner,*
   543 U.S. 125 (2004) ........................................................................... 41

*Lance v. Coffman,*
   549 U.S. 437 (2007) ........................................................................... 25

*Leopold v. Manger,*
   630 F. Supp. 3d 71 (D.D.C. 2022) ......................................................... 7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) ..................................................................... 29, 30

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .................................................................................................. 19, 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ......................................................................................................... 27

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ......................................................................................................... 30

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ......................................................................................................... 40

*Marshall Cnty. Health Care Auth. V. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ......................................................................................... 5

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ..................................................................................................... 7, 29

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) ............................................................................ 7, 8, 16, 18

*Miami Bldg. & Constr. Trades Council, AFL/CIO v. Sec'y of Def.*,
  493 F.3d 201 (D.C. Cir. 2007) ........................................................................................... 27

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002) ........................................................................................... 21

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 ...................................................................................................................... 40

*Montgomery v. Risen*,
  197 F. Supp. 3d 219 (D.D.C. 2016) .............................................................................. 30, 33

*Nat'l Urb. League v. Trump*,
  -- F. Supp. 3d --, 2025 WL 1275613 (D.D.C. May 2, 2025) .......................................... 32

*Navab-Sfavi v. Broad. Bd. of Governors*,
  650 F. Supp. 2d 40 (D.D.C. 2009) .................................................................................... 10

*Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*,
  435 F.3d 326 (D.C. Cir. 2006) ........................................................................................... 40

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ........................................................................................................... 37

*Off. of Pers. Mgmt. v. Richmond*,
  496 U.S. 414 (1990) ........................................................................................................... 22

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ........................................................................ *passim*

*Pulphus v. Ayers*,
  249 F. Supp. 3d 238 (D.D.C. 2017) ............................................................................ 33

*Regan v. Taxation With Representation of Wash.*,
  461 U.S. 540 (1983) ............................................................................................ 31, 32

*Rust v. Sullivan*,
  500 U.S. 173 (1991) ............................................................................................ 31, 32

*Sacchetti v. Gallaudet Univ.*,
  181 F. Supp. 3d 107 (D.D.C. 2016) .............................................................................. 5

*Savignac v. Day*,
  754 F. Supp. 3d 135 (D.D.C. 2024) .............................................................................. 5

*Seed v. EPA*,
  100 F.4th 257 (D.C. Cir. 2024) .................................................................................. 16

*Shaffer v. Veneman*,
  325 F.3d 370 (D.C. Cir. 2003) ...................................................................................... 7

*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986) .................................................................................. 12

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) ............................................................................ *passim*

*Teton Historic Aviation Found. v. U.S. Dep't of Def.*,
  785 F.3d 719 (D.C. Cir. 2015) .................................................................................. 27

*TigerSwan, Inc. v. United States*,
  110 Fed. Cl. 336 (2024) ...................................................................................... 10, 17

*TikTok v. Garland*,
  122 F.4th 930 (D.C. Cir. 2024) ............................................................................ 35, 36

*Tootle v. Sec'y of Navy*,
  446 F.3d 167 (D.C. Cir. 2006) ...................................................................................... 9

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ...................................................................................... 7

*Twin Metals Minn. LLC v. United States*,
  No. 22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023) .............................. 10, 11

*Twin Rivers Paper Co. LLC v. SEC,*
    934 F.3d 607 (D.C. Cir. 2019) ........................................................................ 29

*U.S. Conference of Catholic Bishops v. U.S. Dep't of State,*
    -- F. Supp. 3d --, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ............................. *passim*

*United States v. Am. Library Ass'n,*
    539 U.S. 194 (2003) ....................................................................................... 31

*United States v. Nassif,*
    97 F.4th 968 (D.C. Cir. 2024) ......................................................................... 35

*United States v. Texas,*
    144 S. Ct. 797 (2024) ..................................................................................... 14

*White v. Wash. Metro. Area Trans. Auth.,*
    258 F. Supp. 3d 175 (D.D.C. 2017) .................................................................. 7

*Widakuswara v. Lake,*
    2025 WL 1288817 (D.C. Cir. May 3, 2025) ...................................................... 14

*Winter v. FloorPro, Inc.,*
    570 F.3d 1367 (Fed. Cir. 2009) ....................................................................... 19

*Wright v. Foreign Serv. Grievance Bd.,*
    503 F. Supp. 2d 163 (D.D.C. 2007) ................................................................. 16

*Yee v. Jewell,*
    228 F. Supp. 3d 48 (D.D.C. 2017) ................................................................... 12

*Ysursa v. Pocatello Educ. Ass'n,*
    555 U.S. 353 (2009) .............................................................................. 11, 31, 32

**CONSTITUTION**

U.S. Const. art. I, § 9, cl. 7 .................................................................................. 22

**ADMINISTRATIVE MATERIALS**

Protecting the American People Against Invasion,
    Exec. Order No. 14159 ...................................................................................... 3

**LEGISLATIVE MATERIALS**

S. Rep. No. 118-62 (2023) ............................................................................... 2, 20

**STATUTES**

5 U.S.C. § 701(a)(2) ..................................................................................... 19, 21, 22

5 U.S.C. § 702 ............................................................................................................. 7, 12

5 U.S.C. § 704 ........................................................................................................ 16, 17, 19

5 U.S.C. § 705(a)(2) ......................................................................................................... 22

5 U.S.C. § 706(2) ........................................................................................................ 23, 37

8 U.S.C. § 1232 ........................................................................................................... 5, 28

28 U.S.C. § 1491(a)(1) ........................................................................................................ 7

American Relief Act, 2025,
    Pub. L. No. 118-158, 138 Stat. 1722 (2024) ............................................................... 3

Consolidated Appropriations Act, 2024,
    Pub. L. No. 188-42, 138 Stat. 25 (2024) ..................................................................... 2

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. 119-4, 139 Stat. 9 (2025) ................................................................................ 3

**RULES**

Fed. R. Civ. P. 56(a) ..................................................................................................... 5, 37

Federal Rule of Civil Procedure 12(b)(1) ........................................................................... 7

**REGULATIONS**

48 C.F.R. § 44.203(c) ....................................................................................................... 19

48 C.F.R. § 52.242-15(a) .................................................................................................... 4

48 C.F.R. § 52.249-2(a) ...................................................................................................... 3

48 C.F.R. § 52.249-6(a)(1) .................................................................................................. 3

**OTHER AUTHORITIES**

U.S. Immigration & Customs Enforcement,
    *National Detention Standards For Non-Dedicated Facilities* (Revised 2019),
    https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf .................................. 34, 35

**INTRODUCTION**

This case is about a contract.  Defendant Executive Office for Immigration Review ("EOIR") administered several legal access programs that provided information and resources to individuals involved in immigration court proceedings, and the requirements for those programs— everything from the programs' implementation to how and by whom services were to be delivered—were left to EOIR's discretion.  EOIR elected to contract out the day-to-day management of the programs to a prime contractor, who in turn subcontracted with various legal services organizations to deliver program services throughout the country.  That arrangement ended on April 10, 2025, however, when EOIR notified the prime contractor that the operative task orders for the programs would be terminated for the convenience of the government pursuant to the express terms of the governing program contract ("Termination Decision").

The plaintiffs in this case—twelve nonprofit organizations that delivered program services as subcontractors to the prime contractor—sought a temporary restraining order ("TRO") in the wake of the April 10, 2025 Termination Decision, which this Court denied.  The parties are now briefing *for the fourth time* the jurisdictional and threshold legal arguments that should decide this case.  This time, however, they are cross-moving for summary judgment, meaning the Court has the opportunity to definitively resolve those dispositive legal issues.

As Defendants have argued since this case's inception, Plaintiffs' claims are, in essence, contract-based claims for monetary relief against the federal government over which this Court lacks subject-matter jurisdiction.  Indeed, a recent Supreme Court order in a near-identical case confirms that federal district courts lack jurisdiction under the Administrative Procedure Act ("APA") "to order" the federal government to "pay[] . . . money" under a contract—the very relief that Plaintiffs demand here.  *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). APA review is unavailable in any event because Plaintiffs have other adequate remedies available to them, and Defendants' discretionary decisions regarding the use of appropriated funds constitutes unreviewable agency action.  And Plaintiffs' statutory and constitutional claims fail for

1

various threshold and substantive reasons. Accordingly, the Court should deny Plaintiffs' motion for summary judgment and grant summary judgment to Defendants.

**BACKGROUND**

**I.      The Programs and the Acacia Contract**

This case concerns five legal access programs ("the Programs") administered by EOIR—the Legal Orientation Program ("LOP"), the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program ("FGLOP"), and the Counsel for Children Initiative ("CCI"). Dkt. 62 at 3 (¶ 1) ("Am. Compl."); *see* AR 53-54, 102, 122-29, 132-40 (describing LOP and LOPC); AR 54, 102, 151-57 (describing ICH); AR 102-03, 167-73 (describing FGLOP); AR 103, 184-88 (describing CCI).[1]

The scope and format of each of these Programs are not prescribed in any federal statutes or regulations. Rather, for the past several years, the Programs have been funded annually through congressional appropriations, and their implementation and administration have been left to EOIR. In March 2024, Congress appropriated $844 million to EOIR for "expenses necessary for the administration of immigration-related activities," and that same appropriations statute provided that "not less than" $28 million of that total appropriated amount "shall be made available for services and activities provided by the Legal Orientation Program." Consolidated Appropriations Act, 2024, Pub. L. No. 188-42, 138 Stat. 25, 133. The funds earmarked for the "Legal Orientation Program" only concern LOP, LOPC, and ICH. *See* S. Rep. No. 118-62, at 84-85 (2023) (indicating that the "Legal Orientation Program," as used in the 2024 Consolidated Appropriations Act, encompasses LOP, ICH, and LOPC). By contrast, neither FGLOP nor CCI is required by a specific appropriation. Instead, both programs are "discretionarily funded"—FGLOP via an interagency agreement with the Department of Homeland Security, and CCI through EOIR's general appropriations. Declaration of Sirce E. Owen ("Owen Decl.") at 3 (¶ 8). Since September 2024,

---

[1] Citations to the Administrative Record for the April 10, 2025 Termination Decision that Defendants previously filed in this case, *see* Dkt. 65, will be styled "AR [page number]."

EOIR and the Programs have been funded through continuing appropriations that maintain funding at fiscal year ("FY") 2024 levels. *See* American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722, 1723 (2024) (extending FY 2024 funding levels to March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9, 12 (2025) (extending FY 2024 funding levels to September 30, 2025).

EOIR contracted with non-party Acacia Center for Justice, a Washington, D.C.-based nonprofit organization, to manage the Programs. *See* AR 42. Acacia in turn subcontracted with various legal services organizations, including Plaintiffs, to deliver Program services on the ground at covered detention facilities and immigration courts. All LOP, LOPC, ICH, FGLOP, and CCI services were delivered pursuant to the prime contract between the Department of Justice ("DOJ") and Acacia ("the Acacia Contract" or "the Contract"). *See* AR 42-117. As relevant here, the Acacia Contract incorporated two provisions from the Federal Acquisition Regulation ("FAR") that permitted DOJ to "terminate the [C]ontract for the convenience of the Government." AR 82; *see* AR 88. More specifically, those provisions provided that "[t]he Government may terminate performance of work under th[e] [C]ontract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest." 48 C.F.R. § 52.249-2(a); *see id.* § 52.249-6(a)(1); *see also* AR 195-205.

## II.    The April 10, 2025 Termination Decision

Shortly after taking office on January 20, 2025, President Donald Trump signed an executive order titled "Protecting the American People Against Invasion." Exec. Order No. 14159. That Executive Order, in relevant part, directed the Attorney General to "[p]ause distribution of further funds pursuant to" government contracts that "provid[e] Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens" pending a review of those contracts for, among other things, "waste, fraud, and abuse" and compliance with "applicable law." *Id.* § 19(a)-(b). In response to that presidential directive, EOIR directed the DOJ Contracting Officer for the Acacia Contract to issue a stop work order on January 22, 2025 ("Stop Work Order"), which suspended the delivery of LOP,

ICH, FGLOP, and CCI services.  *See* Dkt. 44-3 at 2; *see also* 48 C.F.R. § 52.242-15(a) (authorizing the Contracting Officer to "require the Contractor to stop all, or any part, of the work called for by" the Acacia Contract "for a period of 90 days").  That Stop Work Order was later rescinded on February 2, 2025, in response to a TRO from a federal district court in a separate case.  *See* Dkt. 44-3 at 8; *see also id.* at 10 (explaining that the Stop Work Order was rescinded "[o]ut of an abundance of caution" in light of the district court order).  Services under the Programs resumed the following day.  Am. Compl. at 5 (¶ 8), 42-44 (¶¶ 120-130).

On April 3, 2025, DOJ's Justice Management Division ("JMD") was directed to terminate the operative task orders for the five Programs.  AR 4.  A letter was then sent to Acacia that same day purporting to effectuate such a termination.  AR 6-7.  That letter was sent in error.  On April 4, 2025, the Contracting Officer for the Acacia Contract sent a separate letter to Acacia that rescinded the April 3, 2025 letter and clarified that the latter communication "ha[d] no legal effect."  AR 13. No pause in Program funding occurred as a result of the April 3, 2025 letter.

On April 9, 2025, EOIR communicated to JMD that the operative task orders for the five Programs were to be terminated for the convenience of the government.  AR 17-28.  The next day, the Contracting Office for the Acacia Contract sent a letter to Acacia stating that the operative task orders for LOP, LOPC, ICH, FGLOP, and CCI were being terminated "for the convenience of the government," effective at 12:01 a.m. on April 16, 2025.  AR 29-30.  That termination has since gone into effect.

## III.    Procedural History

Plaintiffs filed this lawsuit on January 31, 2025, and sought preliminary relief from the January 22, 2025 Stop Work Order.  *See* Dkt. 1; Dkt. 2; Dkt. 2-1.  The Court held a hearing on Plaintiffs' motion for preliminary relief on March 17, 2025, and subsequently took the motion under advisement.  *See* March 17, 2025 Minute Order.

Shortly after Defendants gave notice of the April 10, 2025 Termination Decision, Plaintiffs notified the Court of their "intent" for their motion for preliminary relief "to be re-urged and re-heard."  Dkt. 51 at 1.  Plaintiffs subsequently filed a renewed motion for a TRO, Dkt. 53; Dkt. 53-

1, which Defendants opposed, Dkt. 60. The Court held a hearing on Plaintiffs' renewed TRO motion on April 15, 2025, and at the conclusion of the hearing, denied the motion from the bench. *See* April 15, 2025 Minute Order. The Court then set a hearing on Plaintiffs' pending challenge to Defendants' Termination Decision for May 14, 2025.

On April 18, 2025, Plaintiffs filed an Amended Complaint, in which they challenge the April 10, 2025 Termination Decision under the APA and on constitutional grounds. Dkt. 62. Plaintiffs specifically allege that the Termination Decision was arbitrary and capricious (Count 1); that the termination of the LOP, LOPC, and ICH task orders violates the Appropriations Clause (Count 2); that the termination of the LOP and LOPC task orders violates the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232(c)(4) (Count 3); that the Termination Decision violates Plaintiffs' First Amendment rights (Count 4); and that the Termination Decision violates the separation of powers and was ultra vires (Counts 5 and 6). Am. Compl. at 54-62 (¶¶ 158-98). Defendants moved to dismiss Plaintiffs' Amended Complaint on April 24, 2025, for lack of subject-matter jurisdiction and failure to state a claim. Dkt. 64; Dkt. 64-1. That motion to dismiss remains pending.

In accordance with the Court's April 19, 2025 Minute Order, Defendants filed the Administrative Record for the April 10, 2025 Termination Decision on April 24, 2025. Dkt. 65. The parties then agreed to cross-move for summary judgment in advance of the May 14, 2025 hearing. Dkt. 66; *see* Dkt. 67; Dkt. 67-1 ("Pls.' Summ. J. Br.").

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When parties file cross-motions for summary judgment, a court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Savignac v. Day*, 754 F. Supp. 3d 135, 163 (D.D.C. 2024). Summary judgment is a proper means by which a court can definitively resolve questions of law on the merits. *See Sacchetti v. Gallaudet Univ.*, 181 F. Supp. 3d 107, 117-18 (D.D.C. 2016) (citing *Marshall Cnty.*

*Health Care Auth. V. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)); *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 208-13 (D.D.C. 2022) (granting partial summary judgment on a claim that "turn[ed] on pure questions of law"). And jurisdictional questions can likewise be resolved at the summary judgment stage. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . . .").

## ARGUMENT

### I. The Court Lacks Jurisdiction Under the APA To Compel the Government To Pay Money Under a Contract

Plaintiffs' APA claims should be dismissed at the threshold because, as the Supreme Court recently confirmed, this Court lacks jurisdiction under the APA "to enforce contractual obligation[s] to pay money" against the federal government. *Dep't of Educ.*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). And that jurisdictional principle applies with equal force to any such obligations created by the Acacia Contract or Program task orders at issue in this case.

"[T]he party asserting federal jurisdiction . . . has the burden of establishing it." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)); *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) ("Before delving into the merits, we pause to assure ourselves of our jurisdiction, as is our duty."). For a plaintiff "bring[ing] a claim against the United States," carrying that jurisdictional burden requires "identify[ing] an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see Perry Capital*, 864 F.3d at 619 (noting that sovereign immunity is "jurisdictional in nature"). Plaintiffs here assert claims under the APA, *see* Am. Compl. at 54-61 (¶¶ 158-89), which "provide[s] a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702). "But even for claims that are not for

money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting 5 U.S.C. § 702). This "important carveout" to the APA's sovereign immunity waiver "prevents plaintiffs from exploiting" that waiver "to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). And here, Plaintiffs' attempt to use the APA to compel the federal government to continue to provide Program funding pursuant to the terms of the Acacia Contract, related subcontracts, and Program task orders is "impliedly forbid[den]," 5 U.S.C. § 702, by the Tucker Act.[2]

The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has accordingly "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under . . . the APA." *Perry Capital*, 864 F.3d at 618-19 (citing *Albrecht*, 357 F.3d at 67-68); *see Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA." (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)). Thus, regardless of how a claim is styled, a district court lacks jurisdiction over that claim if it "is in 'its essence' contractual." *Perry Capital*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see Albrecht*, 357 F.3d at 67 ("[T]he district court lacks jurisdiction if [the plaintiff's] claim is essentially a contract action."). And that jurisdictional

---

[2] Courts in the D.C. Circuit often construe motions for summary judgment grounded on a sovereign immunity bar as motions to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See, e.g.*, *Leopold v. Manger*, 630 F. Supp. 3d 71, 74 (D.D.C. 2022); *White v. Wash. Metro. Area Trans. Auth.*, 258 F. Supp. 3d 175, 181-82 (D.D.C. 2017). Defendants previously filed such a motion to dismiss, *see* Dkt. 64, 64-1, meaning the Court can dismiss Plaintiffs' Amended Complaint for lack of jurisdiction by either granting that motion or the present one.

barrier matters. It ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law," *Alphapointe v. Dep't of Veterans Affairs*, 745 F. Supp. 3d 1, 11 (D.D.C. 2020), and it respects Congress's deliberate choice to limit the remedies available for such claims, *see Megapulse*, 672 F.2d at 971 (recognizing that a plaintiff "cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract"). *See also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes.").

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). In examining the "source of the rights" prong, the D.C. Circuit has "rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 1107). But the court has also warned that plaintiffs cannot avoid the Tucker Act and its jurisdictional consequences by artfully crafting a complaint to disguise what is essentially a contract claim as a claim for equitable relief under a separate legal authority. *See id.*; *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see also Megapulse*, 672 F.2d at 969-70 ("This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."). A court must therefore consider, among other factors, whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Crowley*, 38 F.4th at 1107 (citation omitted).

The second prong "considers 'the type of relief sought.'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). Money damages and specific performance are "explicitly contractual remed[ies]," for

instance. *Perry Capital*, 864 F.3d at 619. The D.C. Circuit has recently explained, moreover, that "the crux of" this relief-focused inquiry "boils down to" whether the plaintiff, "in whole or in part, . . . explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (quoting *Kidwell*, 56 F.3d at 284). Although a plaintiff does not necessarily seek monetary relief "merely because . . . success on the merits may obligate the United States to pay the complainant," as with the "source of the rights" prong, a plaintiff cannot avoid the Tucker Act's jurisdictional consequences by "converting" through creative pleading what is essentially a claim for money damages into one "requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284; *cf. Great-West*, 534 U.S. at 211 n.1 ("[A]ny claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction."). In assessing the type of relief a plaintiff seeks, a court must accordingly "look to the complaint's substance, not merely its form." *Kidwell*, 56 F.3d at 284. And a plaintiff's request for injunctive or declaratory relief is truly non-monetary only if that requested relief "has 'considerable value' independent of any future potential for monetary relief." *Id.* Compare *Tootle v. Sec'y of Navy*, 446 F.3d 167, 175-76 (D.C. Cir. 2006) (concluding that a plaintiff's request for injunctive relief was not a disguised claim for monetary relief because the injunctive relief sought had "non-negligible value" compared to any potential monetary recovery the plaintiff might have received), *with Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding that a plaintiff's claim was "one 'founded upon' a contract for purposes of the Tucker Act" in part because the plaintiff's request for an order "compelling the government to pay money owed . . . under an executory contract" was equivalent to the "classic contractual remedy of specific performance").

Applying the two-pronged test described in *Crowley* here confirms that Plaintiffs' APA claims amount to the very sort of contractual claims for monetary relief against the federal government over which this Court lacks jurisdiction. Those claims are premised on a contract with the government, challenge the government's exercise of an express contractual right, and seek to

compel the government to continue paying money pursuant to that contract. Such claims therefore belong, under the Tucker Act, in the Court of Federal Claims.

Starting with "the source of the rights" Plaintiffs assert here, *Crowley*, 38 F.4th at 1106, Plaintiffs' APA claims are effectively based on an alleged right to Program funding that is free from "abrupt termination[s]." Am. Compl. at 54 (¶ 160). The theories of standing, relief, and irreparable harm that Plaintiffs assert in their motion for summary judgment similarly hinge on "Plaintiffs' own [Program] funding being reinstated." Pls.' Summ. J. Br. at 26; *see id.* at 24 (asserting as an Article III injury the termination of "all funding for the Programs through which Plaintiffs fund and run their legal orientation activities"); *id.* at 50 ("Defendants' decision to terminate funding for the Programs has directly interfered with Plaintiffs' funding and ability to provide critical orientation services that are at the heart of Plaintiffs' activities."); *id.* at 20 (claiming that certain Plaintiffs "were forced to furlough or lay off large portions of their staff in direct response to the loss of [Program] funding"). Yet the only legal "source . . . upon which" Plaintiffs could even plausibly "base[]" their asserted right to ongoing Program funding, *see Crowley*, 38 F.4th at 1108, is the Acacia Contract, related subcontracts, and Program task orders. *See Navab-Sfavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009) ("[T]he APA itself does not 'confer a substantive right to be free from arbitrary agency action,' nor does it create any other substantive right that might be violated."). And deciding whether EOIR lawfully terminated Program funding pursuant to the termination-for-convenience clauses in the Acacia Contract "turns *entirely* on the terms of" that Contract and principles of federal contracting law. *Albrecht*, 357 F.3d at 69; *see also, e.g.*, *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 344-45 (2024) (describing the legal standard for assessing whether the government's termination of a contract for convenience was improper). Plaintiffs' asserted right to receive Program funding thus "in no sense . . . exist[s] independently of" the Acacia Contract and related subcontracts and task orders. *Spectrum*, 764 F.2d at 894 (finding a lack of jurisdiction in part because a contract "provide[d] the ultimate source of [the plaintiff's] rights"); *see Ingersoll-Rand Co.*, 780 F.2d at 78 (explaining that "it [was] possible to conceive of" a government contractor's challenge to a

termination decision "as entirely contained within the terms of the contract"); *Twin Metals Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at *7 (D.D.C. Sept. 6, 2023) (finding a lack of jurisdiction because the plaintiff "point[ed] to no other source of its asserted rights" beyond the lease agreements at issue).

Plaintiffs argue in their summary judgment motion that their claims "are not premised on their contracts with Acacia or Acacia's contract with the government," but instead "arise from statutory and constitutional rights that existed prior to and apart from rights created under any contract." Pls.' Summ. J. Br. at 31. But the vague "statutory . . . rights" that Plaintiffs invoke, *id.*, cannot flow from the appropriations statutes they cite throughout their summary judgment motion, *see, e.g.*, *id.* at 12 (claiming that Defendants' Termination Decision "contraven[es] mandatory congressional appropriations and allocations of funds"), for the simple reason that those statutes in no way mandate that a portion of the funds appropriated for the Programs be allocated to Plaintiffs specifically. Nor do Plaintiffs have an "affirmative" First Amendment right to "obtain[] [federal] funds for expression." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009). In short, the "ultimate source of [Plaintiffs'] rights" here is the Acacia Contract and related subcontracts and task orders, and the Plaintiffs have no colorable claim to Program funding whatsoever absent those contracts. *Spectrum*, 764 F.2d at 895.

The relief Plaintiffs seek, moreover, only bolsters the conclusion that their APA claims are essentially contractual in nature. *See Crowley*, 38 F.4th at 1110 ("We turn next to 'the type of relief sought.'"). In their Amended Complaint, Plaintiffs ask the Court to "[e]njoin Defendants . . . from refusing to expend" federal funds "as necessary to continue the Programs . . . , including funding to any persons previously authorized by DOJ to receive funding for the Programs." Am. Compl. at 63 (¶ 8). Plaintiffs seek, in other words, "an order compelling the government to pay [them] money," *Spectrum*, 764 F.2d at 894, pursuant to the only legal instruments that would arguably entitle them to any Program funding at all—*i.e.*, the Acacia Contract and related subcontracts and task orders. Such relief is indistinguishable from "the classic contractual remedy of specific performance," *id.*, confirming in turn that Plaintiffs' claims "sound in contract," *Perry Capital*,

864 F.3d at 619.  *See id.* (observing that "specific performance is an explicitly contractual remedy"); *see also Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or *specific performance* in contract cases . . . ." (emphasis added)).

In their summary judgment motion, Plaintiffs make much of the fact that they do not seek "money damages," as that term was construed by the Supreme Court in *Bowen v. Massachusetts*, 487 U.S. 879 (1988).  *See* Pls.' Summ. J. Br. at 28-30.  *Bowen*, however, addressed the provision of the APA's sovereign immunity waiver providing that judicial review is available for "[a]n action . . . seeking relief other than money damages," 5 U.S.C. § 702.  *See* 487 U.S. at 891-901. This case, in contrast, concerns whether Plaintiffs' attempt to compel the federal government to continue to provide them with Program funding pursuant to a contract is "impliedly forbid[den]" by the Tucker Act, 5 U.S.C. § 702, even if that same relief is not necessarily precluded by the APA's "money damages" bar.  *See Yee v. Jewell*, 228 F. Supp. 3d 48, 56 (D.D.C. 2017) (Moss, J.) (recognizing that a demand for "monetary relief" for purposes of Tucker Act jurisdiction is a "concept distinct from 'money damages' in the sense of *Bowen*").  And Plaintiffs cannot escape the Tucker Act's jurisdictional consequences merely by casting their demand for specific performance of a contract as a request "for only declaratory and injunctive relief," Pls.' Summ. J. Br. at 32.  *See Kidwell*, 56 F.3d at 284; *see also Ingersoll-Rand Co.*, 780 F.2d at 79-80 (explaining that a plaintiff "may not sidestep" Court of Federal Claims jurisdiction by "avoiding a request for damages" when the relief requested "amounts to a request for specific performance").

Any lingering doubts as to whether this Court has jurisdiction to hear Plaintiffs' contract-based claims have since been dispelled by the Supreme Court's recent order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam).  In *Department of Education*, a district court had issued a TRO "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue," *id.* at 968, after that court concluded, in relevant part, that the plaintiff grant recipients were likely to succeed on their claim that the government's termination

decision was arbitrary and capricious under the APA. *See California v. U.S. Dep't of Educ.*, -- F. Supp. 3d --, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025). The Supreme Court stayed the district court's TRO, however, after determining, among other things, that "the Government [was] likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ.*, 145 S. Ct. at 968. More specifically, the Supreme Court explained that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court [had] ordered." *Id.* (quoting *Great-West*, 543 U.S. at 212). "Instead," according to the Supreme Court, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.*

*Department of Education* further underscores that this Court lacks jurisdiction over Plaintiffs' contract-based claims here. Like the *Department of Education* plaintiffs, Plaintiffs seek relief from the termination of a government contract under which they received federal funding. Like the *Department of Education* plaintiffs, Plaintiffs challenge that contract-termination decision under the APA, including on the ground that the termination is arbitrary and capricious. Am. Compl. at 54-56 (¶¶ 158-67). And like the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the APA" to compel Defendants "to pay money" pursuant to a contract, including the Acacia Contract and related subcontracts and task orders. *Dep't of Educ.*, 145 S. Ct. at 968.

This Court should accordingly dismiss Plaintiffs' contract-based APA claims for lack of jurisdiction, which would be consistent with what other courts have done in similar cases involving government grants or contracts in accordance with the Supreme Court's reasoning in *Department of Education*. *See U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, -- F. Supp. 3d --, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (denying a TRO motion after concluding that the court lacked the authority to "order the Government to pay money due on a contract"); *U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, No. 25-5066 (D.C. Cir. Mar. 28, 2015) (per curiam) (denying a motion for injunction pending appeal); *Solutions in Hometown Connections*

*v. Noem*, No. 8:25-cv-885, 2025 WL 1103253, at *8-*10 (D. Md. Apr. 14, 2025) (denying the plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants in light of the Supreme Court's *Department of Education* order and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); Electronic Order, *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 3:25-cv-30041 (D. Mass Apr. 14, 2025), ECF No. 42 (dissolving a TRO after acknowledging that the *Department of Education* order is an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"); *see also* Order, *Am. Ass'n of Colleges For Teacher Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025) (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *Department of Education* order).[3]

Importantly, Plaintiffs cannot escape the conclusion that their APA claims are "at [their] essence" contractual, *see Crowley*, 38 F.4th at 1106, by pointing to their status as subcontractors. *See* Pls.' Summ. J. Br. at 30. Although Plaintiffs are not parties to the Contract between the federal government and Acacia, Plaintiffs' asserted right to Program funding is undoubtedly grounded in *a contract*—specifically, their respective subcontracts with Acacia, which are derived in turn from

---

[3] In *Widakuswara v. Lake*, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam), a D.C. Circuit motions panel relied on *Department of Education* to stay a preliminary injunction that required the federal government to restore grants to federally funded broadcast networks that the government had terminated. The *Widakuswara* panel explained in its stay order that the district court's injunction, "[w]hether phrased as a declaration that the agreements remain in force" or "an order to pay the money committed by those agreements," amounted "in substance" to an order for "specific performance of the grant agreements"—a remedy that is "quintessentially contractual." *Id.* at *4. The panel accordingly concluded that because the plaintiffs' "claims of government nonpayment necessarily challenge[d]" the government's "performance under the grants," such claims "are squarely contract claims under the Tucker Act." *Id.* At the time of this filing, that order has been administratively stayed by the en banc D.C. Circuit. *See Widakuswara v. Lake*, No. 25-5150 (D.C. Cir. May 7, 2025). *But see United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay) ("Administrative stays do not typically reflect the court's consideration of the merits of the stay application.").

the primary Contract.  And while Plaintiffs' APA claims here are not strictly based on a contract between Plaintiffs and the federal government, those claims nonetheless "turn[] *entirely* on" contracts terms, *Albrecht*, 357 F.3d at 69—namely, the termination-for-convenience clauses found in the Acacia Contract.  *See Ingersoll-Rand*, 780 F.2d at 78 (noting that a plaintiff could challenge the Air Force's invocation of a termination-for-convenience clause "based solely on contract principles").  Consequently, Plaintiffs' claims can still be fairly characterized as the sort of claims "sound[ing] in contract" over which the Court lacks jurisdiction under the APA.  *Perry Capital*, 864 F.3d at 619.

Additionally, a conclusion that claims sounding in contract would necessarily fall within the APA's waiver of sovereign immunity so long as they are brought by government subcontractors who are not in direct privity with the government would have perverse consequences.  The Tucker Act's "primary purpose" is "to ensure that a central judicial body adjudicates most claims against the United States Treasury," *Kidwell*, 56 F.3d at 284, and to that end, the statute "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims," *Crowley*, 38 F.4th at 1106 (citation omitted); *see also Spectrum*, 764 F.2d at 895 (observing that "Congress intended the jurisdiction and remedies of the Tucker Act to be exclusive in cases based on government contracts").  The D.C. Circuit has consistently respected this jurisdictional boundary by reading the Tucker Act to "'impliedly forbid[]' contract claims against the Government from being brought in district court" under the APA's waiver of sovereign immunity.  *Perry Capital*, 864 F.3d at 619 (quoting 5 U.S.C. § 702).  Yet concluding here that Plaintiffs' APA claims fall within that waiver merely because Plaintiffs are not in direct privity with the government would create an easily exploitable jurisdictional loophole, whereby claims for monetary relief that are grounded in a contract between the government and a prime contractor—claims that ordinarily should be brought in and resolved by the Court of Federal Claims, *see Crowley*, 38 F.4th at 1106; *Spectrum*, 764 F.2d at 895—could instead be reviewed by district courts under the APA so long as a *subcontractor* who benefits indirectly from the prime contract is the one bringing suit.

The Court's endorsement of such a novel jurisdictional strategy here would threaten to undermine the jurisdictional scheme that Congress devised under the Tucker Act. *Cf. Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 181 (D.D.C. 2007) ("To allow a plaintiff to utilize the [APA's] waiver of sovereign immunity . . . to obtain a district-court judgment that a government contract is void would 'create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims.'" (quoting *Megapulse*, 672 F.2d at 967)). Such an outcome would also upend the settled expectations and agreed-upon obligations reached by the federal government in its contracts by subjecting any consequential exercise of a contractual right to APA lawsuits brought by subcontractors in district court, whereas an identical contract-based claim brought by a prime contractor could only be brought in the Court of Federal Claims. The APA's waiver of sovereign immunity should not be read to permit such an absurd result. *See Seed v. EPA*, 100 F.4th 257, 265 (D.C. Cir. 2024) ("Courts, in turn, must strictly construe a waiver of sovereign immunity in terms of its scope, in favor of the sovereign." (cleaned up)).

At bottom, when Plaintiffs' claims here are "[s]tripped" of their APA embellishments and "equitable flair," their "requested relief seeks one thing": they "want[] the Government to keep paying up" under the Acacia Contract and related subcontracts and task orders. *U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *5; *see* Am. Compl. at 63 (¶ 8); Pls.' Summ. J. Br. at 25. But because this Court lacks jurisdiction "to enforce" Defendants' "contractual obligation[s] to pay money," *Dep't of Educ.*, 145 S. Ct. at 968, or to otherwise resolve claims against the federal government that are "essentially" contractual, *Albrecht*, 357 F.3d at 68, Plaintiffs' claims should be dismissed and judgment entered in Defendants' favor.

## II.    Plaintiffs' APA Claims Fail For Independent Threshold Reasons

Even if the Court were to conclude that it has subject-matter jurisdiction over Plaintiffs' APA claims, judicial review of the April 10, 2025 Termination Decision is nonetheless unavailable under the APA for the separate threshold reasons that (1) Plaintiffs have "other adequate remed[ies]" available to them, 5 U.S.C. § 704, and (2) Defendants' decisions concerning the

allotment and expenditure of Program funds constitute unreviewable agency action "committed to agency discretion by law," *id.* § 701(a)(2).

### A.    Plaintiffs Have Other Adequate Remedies Available to Them

Notwithstanding the jurisdictional defects with Plaintiffs' contract-based APA claims, those claims fail for the independently sufficient reason that Plaintiffs have "other adequate remed[ies]" available to them to vindicate their asserted right to continuous Program funding under the Acacia Contract and related subcontracts and task orders. 5 U.S.C. § 704.[4] APA review is limited to "final agency action for which there is no other adequate remedy in a court." *Id.* The APA's "adequate remedy" bar "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).

Here, Plaintiffs challenge Defendants' decision to terminate the operative Program task orders under the Acacia Contract's termination-for-convenience clauses. But Plaintiffs fail to clearly show why they lack an adequate remedy for such a contract-based claim in the Court of Federal Claims, which routinely adjudicates similar challenges to the lawfulness of such contract termination decisions. *See TigerSwan, Inc.*, 110 Fed. Cl. at 347 ("[The plaintiff] has alleged sufficient facts to demonstrate a potential breach of contract for improper termination for convenience . . . ."); *Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134-35 (2016) ("[The plaintiff] has not shown or alleged that [the defendant] committed bad faith or abused its discretion in terminating the contract for convenience."); *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 370 (2013) ("The termination for convenience . . . was within the contracting officer's discretion and, therefore . . . was not a breach of contract."); *see also Ingersoll-Rand*, 780 F.2d at 78, 80 (D.C. Cir. 1985) (concluding that claims based on the government's termination of

---

[4] In their motion for summary judgment, Plaintiffs address the APA's "adequate remedy" bar as part of their arguments concerning the Court's subject-matter jurisdiction. *See* Pls.' Summ. J. Br. at 28, 30-32. The D.C. Circuit has made clear, however, that § 704's "finality requirement and adequate remedy bar . . . determine whether" there is a "cause of action under the APA, not whether there is federal subject matter jurisdiction." *Perry Capital*, 864 F.3d at 621.

a contract for convenience were "based solely on contract principles" and thus "should be resolved in the Claims Court").

Plaintiffs attempt to evade the jurisdictional consequences of their contract-based claims by contending that they are seeking the sort of prospective relief—*i.e.*, an injunction barring Defendants "from refusing to expend" Program funds, Am. Compl. at 63—that the Court of Federal Claims ordinarily cannot grant. *See* Summ. J. Br. at 32; *see also* Dkt. 67 at 2 (requesting an injunction barring Defendants from "taking any action that . . . pauses, stops, impedes, blocks, cancels, or terminates" funding for the Programs). But Plaintiffs cannot "bypass Tucker Act jurisdiction" simply by "converting" through artful pleading what are essentially claims for monetary relief into ones "requesting injunctive relief or declaratory actions." *Kidwell v. Dep't of Army, Bd. of Correction for Military Records*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see Crowley*, 38 F.4th at 1107. And in any event, the injunctive relief Plaintiffs demand—which is essentially equivalent to specific performance of the Acacia Contract and operative Program task orders—is not available in this Court either, and thus cannot serve as a basis for avoiding the APA's "adequate remedy" bar. *See Megapulse*, 672 F.2d at 971 (noting the "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims seeking specific performance of a contract"); *Spectrum*, 764 F.2d at 893 n.2 (citing legislative history indicating that Congress intended for the Tucker Act to "foreclose specific performance of government contracts" (citation omitted)); *see also U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *6 ("Like [the plaintiffs in *Spectrum Leasing* and *Ingersoll-Rand*], the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do.").

That Plaintiffs are subcontractors rather than prime contractors in direct privity with the federal government does not necessarily mean Plaintiffs are categorically barred from bringing suit in the Court of Federal Claims. *See* Pls.' Summ. J. Br. at 30 (arguing that Plaintiffs' claims "fall outside the jurisdiction of the Court of Federal Claims" because that court "has jurisdiction only over claims by parties that directly contract with the government"). While it is generally true

that "[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States," *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003), prime contractors "are permitted to sponsor claims brought by subcontractors against the government . . . through, and with the consent and cooperation of, the prime, and in the prime's name.'" *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1369 (Fed. Cir. 2009) (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 814 (Fed. Cir. 1984)); *see* 48 C.F.R. § 44.203(c). Alternatively, a "pass-through claim allows a prime contractor to assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1347 (Fed. Cir. 2008). Plaintiffs do not even attempt to show why these alternative—and potentially "adequate," 5 U.S.C. § 704—procedural mechanisms are wholly unavailable to them, and they cannot simply disregard their contractual rights and obligations vis a vis Acacia altogether by trying to seek relief against the federal government under the APA instead.

## B.   Program Funding Decisions Are Committed to Agency Discretion By Law

Plaintiffs' challenge to Defendants' termination of the Program task orders fails for a separate reason: such a decision concerning how to allocate and expend federal funding is "committed to agency discretion by law" and is thus not subject to APA review. 5 U.S.C. § 701(a)(2). In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court underscored that the APA, by its own terms, "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" 508 U.S. at 191 (quoting 5 U.S.C. § 701(a)(2)). The *Lincoln* Court then held that an agency's "allocation of funds from a lump-sum appropriation" is one such "administrative decision traditionally regarded as committed to agency discretion," given that "the very point of a lump-sum appropriation," the Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court accordingly concluded that the Indian Health Service's decision to discontinue a program that was (1) funded through the agency's yearly lump-sum

appropriations from Congress (2) but not otherwise mandated or prescribed by statute was "committed to the [agency's] discretion" and thus "unreviewable" under the APA. *Id.* at 193-94.

That same principle from *Lincoln* applies to at least two of the Programs at issue in this case—FGLOP and CCI. Like all of EOIR's legal access programs, neither FGLOP nor CCI is prescribed by federal statute or regulation. And as Plaintiffs themselves concede, neither program is funded through targeted appropriations, but rather through other lump-sum funding sources. *See* Owen Decl. at 3 (¶ 8) (describing FGLOP and CCI as "discretionarily funded"); Am. Compl. at 31 (¶ 88) (same); *see also* S. Rep. No. 118-62, at 84-85 (2023) (explaining that the $28 million minimum earmarked for "the Legal Orientation Program" in the 2024 Consolidated Appropriations Act applies to funding for LOP, LOPC, and ICH). As *Lincoln* made clear, EOIR's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another," and "whether a particular program 'best fits the agency's overall policies.'" *Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). For programs like FGLOP and CCI, then, which are funded entirely out of such lump-sum appropriations, any decisions regarding how much funding to allocate to either program, or whether to fund either program at all, are committed entirely to EOIR's discretion. *See Lincoln*, 508 U.S. at 193-94; *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."). And that discretion includes the authority to terminate both programs entirely. *See* Owen Decl. at 3 (¶ 8) (noting that "EOIR does not have a requirement to continue funding" FGLOP or CCI). Defendants' "decision to discontinue" funding for those two programs is "accordingly unreviewable under § 701(a)(2)" of the APA. *Lincoln*, 508 U.S. at 193. Defendants are therefore entitled to summary judgment on any of Plaintiffs' APA claims that challenge Defendants' termination of the FGLOP and CCI task orders.

The D.C. Circuit has extended *Lincoln*'s reasoning to agency decisions involving specific appropriations as well. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 750-52 (D.C. Cir. 2002). LOP, LOPC, and ICH are funded through such targeted appropriations, and the corresponding appropriations statutes set a minimum amount of funding that must be collectively allocated to the three programs. *See* Consolidated Appropriations Act, 2024, 138 Stat. at 133 (providing that "not less than $28 million shall be available for services and activities provided by the Legal Orientation Program"). But those statutes otherwise say nothing about the means by which those funds should be disbursed, the timeline for such disbursements, who should receive Program funding or deliver Program services (*e.g.*, a prime contractor versus the agency itself), or the precise scope and format of such services. That statutory silence thus indicates that Congress committed such programmatic decisions entirely to EOIR's discretion. *See Milk Train*, 310 F.3d at 751 (explaining that an agency's implementation of a subsidy program for milk producers was unreviewable under § 701(a)(2) because the applicable appropriations statute "provide[d] no relevant 'statutory reference point' for the court" to assess the agency's "determination of the manner for providing assistance to dairy farmers").

Accordingly, any such discretionary decisions regarding *how* EOIR chooses to allocate the funds specifically appropriated for LOP, LOPC, and ICH—including by creating, modifying, or terminating contracts that govern the use of those funds or electing to deliver Program services via a "consolidated federalized program," Owen Decl. at 2-3 (¶ 5)—are unreviewable under the APA. *See* 5 U.S.C. 701(a)(2). The same is true of decisions concerning the scope, frequency, and format of Program services. Here, Defendants have decided to replace a decentralized arrangement under which legal orientation services were delivered by various subcontractors with a "consolidated federalized program" under which individuals involved in removal proceedings will receive legal information and services from EOIR employees and the Immigration Judge corps and have access to "hard copy and online . . . self-help legal materials." Owen Decl. at 3 (¶¶ 6-7). Such a programmatic restructuring may not align with Plaintiffs' preference to deliver Program services themselves. *See* Pls.' Summ. J. Br. at 23 (asserting for injury-in-fact purposes that Defendants'

Termination Decision "means Plaintiffs are unable to provide noncitizens with critical information regarding their rights and responsibilities in immigration proceedings"). But because the appropriations statutes that fund the "Legal Orientation Program" only prescribe the minimum amount of appropriated funds that must be spent on the delivery of such services (and nothing more), that restructuring is an unreviewable agency decision "committed to agency discretion by law." 5 U.S.C. § 705(a)(2).

### III. Defendants Are Entitled To Summary Judgment On Plaintiffs' Statutory and Constitutional Claims

As explained above, the Court lacks jurisdiction over Plaintiffs' contract-based claims for monetary relief, and APA review is unavailable in any event, *see* 5 U.S.C. §§ 701(a)(2), 704. But even if the Court were to consider Plaintiffs' statutory and constitutional theories of relief— namely, that Defendants' Termination Decision violates the Appropriations Clause, the TVPRA, and the First Amendment, *see* Pls.' Summ. J. Br. at 34-37, 43-47—those claims all fail as a matter of law for various threshold and substantive reasons, warranting summary judgment in Defendants' favor.

#### A. Plaintiffs Fail To Assert a Viable Appropriations Clause Claim

Plaintiffs argue in their motion for summary judgment that Defendants' termination of the operative task orders for LOP, LOPC, and ICH violates the Appropriations Clause. *See* Pls.' Summ. J. Br. at 34-36. The Appropriations Clause, however, simply provides that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "In other words," the Clause generally concerns whether a certain "payment of money from the Treasury" is "authorized by statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). And as Plaintiffs acknowledge, the federal funds that EOIR provided for LOP, LOPC, and ICH services were appropriated by an act of Congress. *See* Pls.' Summ. J. Br. at 16 (noting that Congress appropriated $28 million for LOP, LOPC, and ICH); *see also* Am. Compl. at 3 (¶ 1), 40-42 (¶¶ 115-19). Plaintiffs' "Appropriations Clause" claim instead hinges on Plaintiffs' argument that Defendants' termination of the operative Program task orders constitutes a

"withhold[ing]" of congressionally appropriated funds and thus "violates the mandate" set forth in the 2024 Consolidated Appropriations Act.  Pls.' Summ. J. Br. at 34-35; *see id.* at 34 ("Yet Defendants are not spending the appropriated funds on any Program services.  That violates the APA.").  But that statutory unlawful-withholding claim fails on both the facts and the law.

The viability of Defendants' unlawful-withholding claim turns on Defendants "not spending" *any* "appropriated funds on *any* Program services" moving forward.  Pls.' Summ. J. Br. at 24 (emphasis added); *see id.* at 12 ("Defendants' termination of the Programs . . . contraven[es] mandatory congressional appropriations and allocations of funds the Executive does not have authority to stop.").  As a factual matter, however, the termination of the operative LOP, LOPC, and ICH task orders was not tantamount to a "permanent[] terminat[ion]" of legal orientation services altogether, as Plaintiffs claim.  Pls.' Summ. J. Br. at 9.  To the contrary, EOIR will continue to provide such services through a "consolidated federalized program," which will include "rights advisals provided by the Immigration Judge corps," "self-help legal materials," and EOIR's online "centralized repository for information and resources about immigration proceedings."  Owen Decl. at 3-4 (¶¶ 7, 11).  Those legal orientation services will be funded, moreover, with the appropriated funds that were previously obligated under the now-terminated Program task orders. *Id.* at 2-4 (¶¶ 5, 11).  Indeed, EOIR intends to "disburse at least $28 million in [FY 2024] funding" for such services, which is all that the 2024 Consolidated Appropriations Act requires.  *Id.* at 4 (¶ 9).

Even taking Plaintiffs' unlawful-withholding claim at face value—*i.e.*, that the LOP, LOPC, and ICH programs as previously structured were statutorily mandated, rendering their "wholesale . . . termination" unlawful, Pls.' Summ. J. Br. at 29—that claim still fails a matter of law for various threshold reasons.  For one, Plaintiffs appear to argue that Defendants' Termination Decision contravenes Congress's "mandated continuation of the Programs," meaning that the Decision was "not in accordance with law" as a general matter, 5 U.S.C. § 706(2)(A), which in turn provides a basis for the Court to grant Plaintiffs' more specific request that Defendants' "termination of the Programs" be "vacate[d]" and that "any future attempts to withhold [Program]

funds" be enjoined.  Pls.' Summ. J. Br. at 36.  Plaintiffs suggest that they have standing to seek such general relief because the restoration of the Programs will somehow "ensur[e] that Plaintiffs' missions to provide noncitizens with . . . critical legal information are fulfilled."  *Id.* at 25.  But the injuries in fact that Plaintiffs assert for Article III standing purposes flow directly from the termination of Program *funding*.  Plaintiffs contend, for instance, that the termination of the Program task orders caused them to lose "millions of dollars," a financial injury that they describe as the "gold standard" for an Article III injury in fact.  *Id.* at 24.  And while Plaintiffs also make vague assertions about the Termination Decision "interfering with [their] core business operations" and "missions," *id.* at 23, they repeatedly indicate that such interference is inextricably linked to a loss of funding; that is, Plaintiffs will only be able to "fulfill[]" their "missions" and "organizational goals" if Program funding is restored to them specifically.  *Id.* at 17-18; *see, e.g.*, *id.* at 12 (claiming that the loss of Program funding is "forcing [Plaintiffs] to cut programs and staff and preventing them from carrying out their core mission-based activities"); *id.* at 25 ("Halting funding for the Programs is crippling the nonprofit organizations that provide Program serves . . . ."); *id.* at 50 ("Defendants' decision to terminate funding for the Programs has directly interfered with Plaintiffs' funding and ability to provide critical orientation services that are at the heart of Plaintiffs' activities.").  In fact, Plaintiffs make clear that the "relief" they principally seek is a reinstatement of "Plaintiffs' own funding," presumably pursuant to the Acacia Contract and related subcontracts and task orders that provided Plaintiffs with Program funding in the first place.  *Id.* at 26.

At bottom, in requesting that the Court "vacate the termination of the Programs," *id.* at 36, Plaintiffs effectively ask that the Court reinstate the terminated Program task orders and "enforce" Defendants' "contractual obligation[s]" under those task orders "to pay [Plaintiffs] money" in the form of Program funding.  *Dep't of Educ.*, 145 S. Ct. at 968 (citation omitted).  But as explained above, that is the very sort of contract-based claim for specific performance over which this Court lacks jurisdiction, *see id.*, and Plaintiffs' invocation of separate appropriations statutes does not render their claims any less contractual in nature.  Because those statutes do not mandate that any

portion of Program funds be disbursed to Plaintiffs specifically, the statutes "in no way create[] the substantive right to the remedy" Plaintiffs seek here—namely, a reinstatement of Program funding. *Spectrum*, 764 F.2d at 894. That right is instead "created in the first instance by" the Acacia Contract and related subcontracts and task orders and "in no sense . . . exist[s] independently of th[ose] contract[s]." *Id.* Notwithstanding its label, then, Plaintiffs' unlawful-withholding claim is still, in essence, "founded upon a contract for purposes of the Tucker Act" and cannot be adjudicated by this Court. *Id.*; *see Ingersoll-Rand*, 780 F.2d at 78 ("That the [contract] termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action."); *see also U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *6 ("Like [the plaintiffs in *Spectrum Leasing* and *Ingersoll-Rand*], the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do.").

To the extent that Plaintiffs attempt to claim that they are not seeking a reinstatement of the terminated Program tasks orders and are instead merely asking the Court to require Defendants to comply with certain appropriations statutes, they lack standing to assert such an "undifferentiated, generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). Indeed, the Supreme Court has long held that "[a] citizen may not sue" in federal court "based only on an 'asserted right to have the Government act in accordance with law.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citation omitted); *see Lance*, 549 U.S. at 439 ("Our refusal to serve as a forum for generalized grievances has a lengthy pedigree."). Any effort by Plaintiffs here to detach Defendants' alleged noncompliance with certain appropriations statutes from the contract-based remedy that Plaintiffs seek here—*i.e.*, a reinstatement of the Program task orders and renewed Program funding to Plaintiffs specifically—would effectively amount to Plaintiffs merely lodging "a general legal, moral, ideological, or policy objection to a particular government action," which they lack standing to do. *All. for Hippocratic Med.*, 602 U.S. at 381.

Furthermore, even assuming for the sake of argument that Plaintiffs can plausibly establish that Defendants' purported noncompliance with appropriations statutes causes them a sufficiently particularized Article III injury, *see id.* at 381, Plaintiffs separately fail to establish that the injuries in fact they assert are "'likely' to be 'redressed by judicial relief'" here. *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023). As other D.C. district courts have recognized recently, this Court cannot "specifically order" the federal government "to continue to contract" with specific parties, as such relief would undermine the "Executive's discretion" that "both the Constitution and Congress's laws have traditionally afforded" with respect to "how to spend" appropriated funds "within the constraints set by Congress." *AIDS Vaccine Advoc. Coal. v. Dep't of State,* -- F. Supp. 3d. --, 2025 WL 752378, at *23 (D.D.C. Mar. 10, 2025); *see U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *7 ("The relief the Conference seeks in its preliminary injunction—reinstatement of contracts terminated by the Government—is beyond the power of this Court."). Rather, "the appropriate remedy" for an allegedly impermissible withholding of congressionally appropriated funds by the Executive Branch is "to order" the agency in question "to 'make available for obligation the full amount of funds Congress appropriated' under the relevant laws." *AIDS Vaccine Coal.*, 2025 WL 752378, at *23 (quoting *City of New Haven v. United States*, 634 F. Supp. 1449, 1460 (D.D.C. 1986)). Yet granting that limited remedy here would not result in the restoration of Program funding to Plaintiffs, given that the Acacia Contract and Program task orders have been terminated. The various funding-related injuries that Plaintiffs will allegedly suffer as a result of Defendants' Termination Decision—a substantial loss of funds for their operations, staff layoffs, a reduction in the number of noncitizens Plaintiffs can serve, and an attendant burden on Plaintiffs' organizational "missions," Summ. J. Br. at 23-24—would thus go unredressed.

Plaintiffs argue that the "[r]einstatement of the legally required funding for the Programs" would "significantly increase[] the likelihood that Plaintiffs will obtain some relief" because "an order granting [Plaintiffs'] requested injunction" would likely "result in Plaintiffs' own funding being reinstated." *Id.* at 25-26. And they suggest that the mere "likelihood" that their funding-related injuries would be redressed is sufficient to establish their standing. *Id.* at 25. But the

redress that Plaintiffs anticipate would require that a court order directing Defendants to make available at least $28 million for obligation to the "Legal Orientation Program" would cause EOIR to (1) readopt the decentralized prime contractor-subcontractor arrangement that the agency decided to restructure in favor of a federalized plan and (2) reinstate the now-terminated Program task orders. That outcome is wholly speculative at this point. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" (citation omitted)); *Miami Bldg. & Constr. Trades Council, AFL/CIO v. Sec'y of Def.*, 493 F.3d 201, 206 (D.C. Cir. 2007) (finding no standing where redress depended on a future decision "beyond the court's control or ken"). Moreover, even if the terminated task orders were reinstated, those task orders only obligated *Acacia* to provide Program services, and Plaintiffs present no record evidence indicating that Acacia—which is not a party to this case—would also choose to reinstate its subcontracts with Plaintiffs. *See Teton Historic Aviation Found.v. U.S. Dep't of Def.*, 785 F.3d 719, 727 (D.C. Cir. 2015) ("When redress depends on the cooperation of a third party, 'it becomes the burden of the [plaintiff] to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" (citations omitted)).

Additionally, the Supreme Court recently made clear that "[i]t is a federal court's judgment" rather than "its opinion," or predictions about how parties might respond to an opinion, "that demonstrates redressability." *Haaland*, 599 U.S. at 294. And here, a judgment in Plaintiffs' favor—which could at most require Defendants to obligate a certain amount of appropriated funds in a manner that is left entirely to Defendants' discretion—would not, standing alone, yield the reinstatement of Program funding via the terminated task orders that is necessary to redress Plaintiffs' asserted injuries. That lack of redressability fails to satisfy Article III's standing requirements, *Haaland*, 599 U.S. at 294, and such a "defect[] of standing" requires the dismissal of Plaintiffs' unlawful-withholding claim. *Janay v. Blinken*, 743 F. Supp. 3d 96, 103 (D.D.C. 2024).

**B.      Plaintiffs Likewise Fail To Assert a Viable TVPRA Claim**

Plaintiffs also contend that Defendants' "termination" of the LOP and LOPC task orders violates the TVPRA, Pls.' Summ. J. Br. at 36, but that claim fails for many of the same reasons that Plaintiffs' unlawful-withholding claim does.  The provision of the TVPRA that Plaintiffs rely on provides that the "Secretary of Health and Human Services shall cooperate with [EOIR] to ensure that custodians" of certain "unaccompanied alien children," *see* 8 U.S.C. § 1232(g), "receive legal orientation presentations provided through the Legal Orientation Program administered by [EOIR]," *id.* § 1232(c)(4).  Like the appropriations statutes on which Plaintiffs' unlawful-withholding claim is based, the TVPRA provision that Plaintiffs cite does not "create[] a substantive right" to the renewed Program funding that they seek.  *Spectrum*, 764 F.2d at 894.  Any such right to Program funding on Plaintiffs' part can, once again, only be plausibly derived from the Acacia Contract and related subcontracts and task orders, and Plaintiffs' invocation of the TVPRA does not change the fact that their claims are "founded upon a contract for purposes of the Tucker Act." *Id.*; *cf. Ingersoll-Rand*, 780 F.2d at 78 (explaining that a plaintiff's "decision to allege only a violation of . . . regulations" did not "change the essential character of" what amounted to a contract-based action).  Plaintiffs' TVPRA claim, moreover, is premised on Defendants "*not* provid[ing] the orientation that [the statute] mandates."  Pls.' Summ. J. Br. at 37.  But Defendants will continue providing LOPC orientations, just not via subcontractors like Plaintiffs.  Owen Decl. at 2-3 (¶¶ 5-7).

To the extent Plaintiffs seek relief from an abstract violation of the TVPRA, they lack standing to do so.  As with the appropriations-related violation that Plaintiffs allege, a violation of the TVPRA here could only be remedied by a court order requiring Defendants to provide "legal orientation presentations" of some sort to custodians of unaccompanied children, 8 U.S.C. § 1232(c)(4), the precise content and format of which are largely left to EOIR's discretion, *see id.* (requiring only that "[a]t a minimum, such presentations shall address the custodian's responsibility to attempt to ensure the child's appearance at all immigration proceedings and to protect the child from mistreatment, exploitation, and trafficking").  But such a remedy would not

result in a reinstatement of the now-terminated LOPC task order and, by extension, renewed Program funding to Plaintiffs. *See U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *7 ("The relief the Conference seeks in its preliminary injunction—reinstatement of contracts terminated by the Government—is beyond the power of this Court."). Consequently, even if Plaintiffs plausibly assert a violation of the TVPRA, remedying that violation would leave their various funding-related injuries unredressed. *See Haaland*, 599 U.S. at 292.

Beyond these justiciability issues, another threshold flaw with Plaintiffs' TVPRA claim is that Plaintiffs fall outside the "zone of interests" protected by § 1232(c)(4). The zone-of-interests requirement is a general presumption about Congress's intended limits on the scope of the APA's cause of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014); *Patchak*, 567 U.S. at 224. The zone-of-interests test requires courts to assess whether the plaintiff's interests fall within the zone of interests "that Congress sought to protect or regulate under the statute in question." *Fed'n For Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996); *see Patchak*, 567 U.S. at 224 ("The interest [the plaintiff] asserts must be arguably within the zone of interests to be protected or regulated by the statute that he says was violated." (cleaned up)). That test thus forecloses suit where a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Patchak*, 567 U.S. at 399.

Furthermore, because § 1232(c)(4) does not regulate Plaintiffs here, their claims "necessarily rest[] on the idea that [their] members' interests are among those Congress sought to protect." *Reno*, 93 F.3d at 900; *see Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922-23 (D.C. Cir. 1989) (explaining the difference between "regulated interests" and "protected interests" for purposes of the zone-of-interests inquiry). The D.C. Circuit has explained that "[p]rotected interests are ones asserted either by intended beneficiaries of the statute at issue or by other suitable challengers—*i.e.*, parties whose interests coincide systemically, not fortuitously with those of intended beneficiaries." *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (cleaned up).

29

Here, nothing in the text of § 1232(c)(4) suggests that Congress intended to permit enforcement of that statute by subcontractors who assert indirect financial injuries associated with a contract termination. The statute does not regulate government subcontractors, nor does it protect their financial interests. Instead, § 1232(c)(4) protects, at most, the interests of "unaccompanied alien children" and their potential custodians by directing the HHS Secretary to "cooperate" with EOIR to ensure custodians receive certain legal orientation materials. The "interests protected by" the statute are therefore completely unrelated to the contract-based financial interests Plaintiffs seek to vindicate here. *See Lexmark*, 572 U.S. at 131.

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), is instructive in this regard. In that case, the Supreme Court noted that an agency's failure "to comply with a statutory provision requiring 'on the record' hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings." 497 U.S. at 883. But the Supreme Court nonetheless made clear that the court reporter in that scenario would not fall within the zone of interests of the "on the record" statutory provision, and thus could not seek relief from a violation of that provision under the APA, because "the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters." *Id.* So too here. It cannot be plausibly inferred from the text of the TVPRA that Congress intended to give government subcontractors a judicial cause of action under that statute to protect their financial interests based on alleged non-cooperation between EOIR and HHS.

### C.    Plaintiffs' First Amendment Claim Fails on the Merits

Plaintiffs separately assert that Defendants' termination of the operative Program task orders violates their First Amendment rights. Pls.' Summ. J. Br. at 43-47. As a threshold matter, Plaintiffs nowhere establish with record evidence that the Termination Decision they challenge somehow restricts what they can or cannot say about immigration proceedings or immigration policy writ large, or that the Decision otherwise "censor[s]" certain content, *id.* at 46. *See Montgomery v. Risen*, 197 F. Supp. 3d 219, 262 (D.D.C. 2016) ("[C]onclusory statements unaccompanied by supporting facts in the record are insufficient to defeat a motion for summary

judgment."). Instead, Plaintiffs' First Amendment claim is based on two distinct theories of injury: (1) that the Termination Decision unlawfully "den[ies]" Plaintiffs "access to congressionally authorized funds because Defendants want to suppress the information [Plaintiffs] have traditionally shared with noncitizens," and (2) that the Decision impermissibly limits Plaintiffs' access to immigration courts and detention facilities where Program services were previously provided. Pls.' Summ. J. Br. at 28. Both theories fail on the merits.

Starting with Plaintiffs' funding-related theory of injury, Plaintiffs basically contend that the termination of the Program funding they formerly received under the Acacia Contract and related subcontracts and task orders amounts, on its own, to a First Amendment violation. Yet it is well settled that the federal government "can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *see Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188-89 (2007) ("[I]t is well established that the government can make content-based distinctions when it subsidizes speech."). And it is equally well settled that the government does not run afoul of the First Amendment simply by electing not to fund certain activities, including ones that facilitate speech on issues of public importance. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (confirming that the government is "not required" by the First Amendment "to assist others in funding the expression of particular ideas, including political ones"); *cf. Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right . . . ."). Put simply, then, Defendants do not violate Plaintiffs' First Amendment rights merely "by declining to" further "subsidize" Plaintiffs' alleged "First Amendment activities" with Program funding. *Regan*, 461 U.S. at 548; *see United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion) ("A refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty on that activity." (cleaned up)). "Because the government is not constitutionally obligated to fund Plaintiffs' preferred speech," any "chill" that Plaintiffs might feel as a result of Defendants'

Termination Decision is accordingly "not the sort that can support a First Amendment claim." *Nat'l Urb. League v. Trump*, -- F. Supp. 3d --, 2025 WL 1275613, at *22 (D.D.C. May 2, 2025); *see also Ysursa*, 555 U.S. at 355 (explaining that the First Amendment "does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression").

Plaintiffs appear to suggest that the termination of Program funding was the product of "viewpoint discrimination" because, they claim, Defendants are "attempt[ing] to silence speech that informs noncitizens broadly about their rights and responsibilities." Pls.' Summ. J. Br. at 45. As a factual matter, Defendants are not silencing such speech, but are instead choosing to deliver that speech (i.e., "legal orientation information and services") via a "consolidated federalized program" rather than through subcontractors. Owen Decl. at 2-3 (¶¶ 5-6). And as a legal matter, Defendants' decision to no longer subsidize Plaintiffs' speech "regarding litigants' rights" in immigration court, Pls.' Summ. J. Br. at 46, in no way amounts to "discriminat[ion] on the basis of viewpoint. *Rust*, 500 U.S. at 193. Indeed, such a decision is just as permissible as a decision to not channel federal funding to "abortion-related activities," *Rust*, 500 U.S. at 178, or "lobbying," *Regan*, 461 U.S. at 546. *See also Nat'l Urb. League*, 2025 WL 1275613, at *21 (concluding that provisions telling agencies to terminate "equity-related grants and contracts" and federal funding for "gender ideology" did not violate the First Amendment because such provisions were "part of a government effort . . . to contract for certain purposes to the exclusion of others"); *cf. Kimberlin v. U.S. Dep't of Justice*, 318 F.3d 228, 232-33 (D.C. Cir. 2003) (finding that a Bureau of Prisons regulation prohibiting inmates "from possessing electric or electronic musical instruments" did not violate the First Amendment because "BOP ha[d] simply chosen not to subsidize inmates' use or possession of a class of instruments requiring the expenditure of funds for electricity and care").

As for Plaintiffs' access-related theory of injury, it is equally well settled that a plaintiff "does not have an automatic entitlement to engage in" expressive activity "wherever (and whenever) he would like." *Hodge v. Talkin*, 799 F.3d 1145, 1157 (D.C. Cir. 2015). And whether classified as nonpublic or limited public forums, the immigration courts and detention facilities

where Plaintiffs want to "shar[e] their viewpoints" regarding noncitizens' legal rights in immigration proceedings, Pls.' Summ. J. Br. at 12, are government-owned properties in which the government "has wide latitude" to restrict certain expressive activity, *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 324 (D.C. Cir. 2018), so long as such restrictions are "reasonable" and "viewpoint-neutral," *Hodge*, 799 F.3d at 1170. *See Ateba v. Leavitt*, -- F.4th --, 2025 WL 1036451, at *6 (D.C. Cir. Apr. 8, 2025) ("'Control over access to a nonpublic forum can be based' even 'on subject matter and speaker identity so long as' it meets the requirements of reasonableness and viewpoint neutrality"); *see also Pulphus v. Ayers*, 249 F. Supp. 3d 238, 246-47 (D.D.C. 2017) (explaining that speech restrictions in nonpublic and limited public forums are governed by the same standard).

Plaintiffs assert that Defendants are "preventing Plaintiffs from accessing immigration courts and detention facilities" to "shar[e] information about the legal process and legal rights to noncitizens." Pls.' Summ. J. Br. at 12. As an initial matter, being denied access to a nonpublic forum like a detention facility does not constitute a per se First Amendment violation, as Plaintiffs seem to claim, given that "the government is not required to open" a nonpublic forum "for any speech at all." *Ateba*, 2025 WL 1036451, at *5; *see Associated Press v. Budowich*, -- F. Supp. 3d --, 2025 WL 1039572, at *9 (D.D.C. Apr. 8, 2025) (noting that a plaintiff "ha[d] no standalone right of access" under the First Amendment to a restricted location like the Oval Office). More saliently, though, Plaintiffs point to no record evidence indicating that they are being denied access to immigration courts and detention facilities entirely, let alone because of the speech they intend to engage in within those facilities. *See, e.g.*, Pls.' Summ. J. Br. at 20-21 (claiming only that certain Plaintiffs have not been able to "conduct group presentations" in certain detention facilities and that one Plaintiff "could not use EOIR space at immigration courthouses" to provide certain orientation services); *see also Montgomery v. Risen*, 197 F. Supp. 3d 219, 262 (D.D.C. 2016) ("[C]onclusory statements unaccompanied by supporting facts in the record are insufficient to defeat a motion for summary judgment."). Nor is there any record evidence indicating that Plaintiffs have been wholly barred from meeting with the individuals they wish to serve in those

same facilities.  *See, e.g.*, Pls.' Summ. J. Br. at 20-21 (acknowledging that one Plaintiffs has "been able to arrange . . . individual consultations").

To the contrary, immigration courts "are open to the public" as a general matter, and former Program subcontractors, including Plaintiffs, "have the same rights of access to public spaces within Immigration Courts," and are "subject to the same rules and restrictions, as any other member of the general public."  Declaration of Stephanie E. Gorman ("Gorman Decl.")  at 2-3 (¶¶ 6, 8); *see id.* at 3 (¶ 7) (describing the rules and guidance "governing public access to Immigration Courts").  The same is true regarding Plaintiffs' access to U.S. Immigration and Customs Enforcement ("ICE") detention facilities.  Indeed, "[f]ormer LOP contractors and service providers may continue to enter ICE facilities, have access to such facilities, and conduct meetings with detained persons in accordance with the same rules and regulations that apply to attorneys and members of the public."  Dkt. 70-3 at 1.  Plaintiffs themselves, in fact, acknowledge that such facilities allow for visitations by members of the public, including legal representatives, subject to uniform "National Detention Standards."  Am. Compl. at 46 (¶ 135).[5]

The general access rights that Plaintiffs are now afforded may not be as robust as the access they had when they were delivering Program services within detention and immigration court facilities.  *See, e.g.*, Dkt. 67-12 at 6 (¶ 17) (claiming that Plaintiff Estrella Del Paso can "no longer access . . . EOIR space to continue to conduct KYR presentations and individual orientations"); *see also* Gorman Decl. at 4 (¶ 12) (stating that "no member of the public may utilize . . . EOIR space to the total exclusion of others, nor may any member of the public engage in activities to the exclusion of the use of EOIR facilities by other members of the public"); Dkt. 70-3 at 1 ("You may also restrict access by former LOP contractors and service providers to areas of ICE facilities previously utilized for LOP program services, but not otherwise available to visitors, members of the public, or attorneys.").  But Plaintiffs cite no legal authority for the proposition that losing

---

[5] *See* U.S. Immigration & Customs Enforcement, *National Detention Standards For Non-Dedicated Facilities* (Revised 2019), https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

certain "special access rights" within a nonpublic forum, Gorman Decl. at 2-3 (¶ 6), and being subjected instead to generally applicable access restrictions amounts to a First Amendment violation.  *Cf. Archdiocese of Wash.*, 897 F.3d at 323 (recognizing that the government "is not required to indefinitely retain the open character" of a particular forum and "'retains the choice' regarding the status of its forum" (citations omitted)).  Nor do Plaintiffs claim, let alone persuasively so, that any of the access-related rules and regulations applicable in immigration courts and detention facilities are unreasonable "in light of the government's interest in preserving" those facilities "for 'the use to which [they are] lawfully dedicated.'"  *United States v. Nassif*, 97 F.4th 968, 978 (D.C. Cir. 2024) (citation omitted); *Ateba*, 2025 WL 1036451, at *6 ("The Supreme Court gives the government substantial leeway to regulate access to a nonpublic forum and has upheld a range of restrictions that were justified in light of the forum's purpose.").

Plaintiffs point to a handful of instances where Defendants purportedly "made it difficult for Plaintiffs to access immigration courthouses and detention facilities."  Pls.' Summ. J. Br. at 44; *see id.* at 20-21.  But Plaintiffs offer no record evidence suggesting that such "difficult[ies]" were in any way related to their expressive activity, as opposed to generally applicable (and speech-neutral) access regulations.  *See TikTok v. Garland*, 122 F.4th 930, 949 (D.C. Cir. 2024) ("Enforcement of a generally applicable law unrelated to expressive activity does not call for any First Amendment scrutiny.").  Plaintiffs also claim that certain posters that "provide[d] information about the Programs" and notified noncitizens "about how to contact Plaintiffs for potential representation" were removed in certain facilities.  *Id.* at 44.  But such posters were removed to avoid "direct[ing] people" to Program services that were no longer being offered, Gorman Decl. at 2 (¶ 5), a response that the Court recognized as reasonable.  *See* Apr. 15, 2025 Hearing Tr. at 5:8-11.

Plaintiffs additionally claim that "[c]utting off access to information to ensure individuals in removal proceedings are unable to access legal services plainly runs contrary to the First Amendment."  Pls.' Summ. J. Br. at 46.  They cite no case law supporting that proposition—that is, that difficulties accessing legal services violate the First Amendment specifically.  Nor do they

explain why any hypothetical difficulties that *noncitizens* might face in accessing legal services burden *Plaintiffs'* First Amendment rights.  In any event, Plaintiffs' suggestion that noncitizens in detention facilities and immigration courts no longer have access to legal services is inaccurate.  Lawyers and legal assistants are able to meet with and advise noncitizens in ICE detention facilities.  *See National Detention Standards For Non-Dedicated Facilities* (Revised 2019) at § 5.5(I)(G); *see also id.* ("ICE/ERO shall provide the facility with the official list of pro bono legal services providers on a regular basis.  The facility shall post the current list in detainee housing units and other appropriate areas."); *id.* §5.4(II)(E) ("The facility shall enable all detainees to make calls to the ICE/ERO-provided list of pro bono legal service providers . . . at no charge to the detainee or the receiving party."); Dkt. 70-3 at 3 ("[W]hile DOJ EOIR's LOP contract is being terminated, the American Bar Association's Legal Orientation Program Information Line, will continue to operate . . . .").  ICE Detention Standards also authorize "persons to make presentations to groups of detainees for the purpose of informing them of U.S. immigration law and procedures, consistent with the security and orderly operation of each facility," subject to ICE's approval.  *Id.* § 6.4; see Dkt. 70-3 at 3 ("Please note that authorized entities shall still be permitted to provide legal rights group presentations, upon request.").  And individuals involved in removal proceedings in immigration courts likewise have access to legal information and resources, including a list of pro bono legal service providers, written "Self-Help" materials, and online resources that "provide[] general information about immigration hearings and how to prepare for those hearings."  Gorman Decl. at 5-6 (¶¶ 16, 19-20).

Finally, Plaintiffs suggest that any restrictions on their access to detention facilities and immigration courts impermissibly "prevent[s] [them] from sharing their viewpoint in limited public forums."  Pls.' Summ. J. Br. at 12.  But what matters in a First Amendment forum analysis is whether the speech restrictions in question "target[] specific viewpoints" for differential treatment.  *Hodge*, 799 F.3d at 1150.  And here, Plaintiffs offer no record evidence indicating that access to detention facilities and immigration courts is denied to individuals who express a certain viewpoint on immigration-related matters but is granted to others who espouse a different

viewpoint. *See id.* at 1170 (finding no viewpoint discrimination where a regulation "ban[ned] demonstrations and displays in the [Supreme Court] plaza regardless of whether they support or oppose (or even concern) the Court"); *Ateba*, 2025 WL 1036451, at *7 ("The [speech restriction in question] does not reference viewpoints in any way, and [the plaintiff] does not allege that either the White House or the Senate Daily Press Gallery denies press credentials based on the content of a correspondent's writing.").

In sum, whether grounded on the termination of Program funding or restrictions on access to certain government facilities, Plaintiffs' First Amendment claim fails as a matter of law on its own terms, which warrants summary judgment on that claim in Defendants' favor. *See* Fed. R. Civ. P. 56(a).

### D.    Plaintiffs' Duplicative *Ultra Vires* and Separation-of-Powers Claims Should Be Dismissed

Finally, the duplicative *ultra vires* and separation-of-powers claims that Plaintiffs allege in their Amended Complaint, *see* Am. Compl. at 61-62 (¶¶ 190-98); *see also* Pls.' Summ. J. Br. at 47-49, should be readily dismissed. The gravamen of Plaintiffs' *ultra vires* claim is that Defendants "acted far beyond their power" under federal law by "cancel[ing]" Programs that "Congress has mandated and funded." Pls.' Summ. J. Br. at 47-48. And Plaintiffs' separation-of-powers claim similarly asserts that Defendants acted "unlawfully . . . by refusing to distribute congressionally mandated appropriations" earmarked for the Programs. *Id.* at 48. Both claims, in other words, effectively hinge on the argument that Defendants' Termination Decision was purportedly "in excess of" Defendants' "statutory . . . authority" or "otherwise not in accordance with" with the appropriations statutes that provide funding for the "Legal Orientation Program", 5 U.S.C. § 706(2)—a theory of relief that is indistinguishable from Plaintiffs' statutory unlawful-withholding claim. *See* Pls.' Summ. J. Br. at 35 (arguing as part of Plaintiffs' unlawful-withholding claim that "Defendants have no authority under the Constitution to withhold the relevant funds because Congress authorized those funds and obligated the funds to be spent on the Programs"). Plaintiffs' *ultra vires* and separation-of-powers claims thus amount to little more than an attempt

to repackage a statutory claim in constitutional parlance and should therefore be rejected. *See Dalton v. Specter,* 511 U.S. 462, 473-74 (1994) (stating that claims alleging that an Executive Branch official has "exceeded his statutory authority are not 'constitutional' claims"); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("[I]t is a well-established principle . . . that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (citation omitted)); *Bonumose, Inc. v. FDA*, 747 F. Supp. 3d 211, 232 (D.D.C. 2024) (Moss, J.) ("[C]ourts have long adhered to the principle that it is prudent to 'avoid deciding constitutional questions presented unless essential to proper disposition of a case.'" (citation omitted)).

To the extent Plaintiffs assert duplicative *ultra vires* and separation-of-powers claims in an attempt to skirt the fatal jurisdictional flaws with their contract-based APA claims, such a maneuver fails as well. Again, as a general matter, a plaintiff cannot evade "the Tucker Act and its jurisdictional consequences" through "the creative drafting of complaints." *Kidwell*, 56 F.3d at 284; *cf. Heller, Ehrman, White & MacAuliffe v. Babbitt*, 992 F.2d 360, 363 (D.C. Cir. 1993) (explaining that plaintiffs "may not, by creatively framing their complaint, circumvent a congressional grant of exclusive jurisdiction"). Consequently, Plaintiffs' decision to allege constitutional violations here does not "change the essential character of th[is] action," *Ingersoll-Rand*, 780 F.2d at 78 (concluding that the district court lacked jurisdiction under the Tucker Act despite the plaintiff having "allege[d] only a violation of . . . regulations"), which, at its essence, involves contractual claims for monetary relief against the federal government over which this Court lacks jurisdiction. *See Dep't of Educ.*, 604 U.S. at 968. Plaintiffs' constitutional claims, in any event, simply flow from their argument that Defendants have failed to abide by governing congressional statutes, and such statutory claims cast in constitutional language do not suffice to trigger judicial review that is otherwise barred by the APA's sovereign immunity waiver. *Cf. Dalton*, 511 U.S. at 472 ("Our cases do not support the proposition that every action . . . by another executive official[] in excess of his statutory authority is *ipso facto* in violation of the Constitution.")

## IV.    Preliminary Relief Is Unwarranted

The parties agreed to move for summary judgment so that the Court can definitively resolve the legal issues that should decide this case.  Yet Plaintiffs still insist on obtaining preliminary relief here—the third time they have done so in as many months, *see* Dkt. 2, 53—and claim that a preliminary injunction is necessary "until the Court issues a decision on Plaintiffs' motion for summary judgment."  Pls.' Summ. J. Br. at 49.  Such a request should be rejected outright.

To obtain a preliminary injunction, the moving party must show that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [the party's] favor," and (4) "issuing 'an injunction is in the public interest.'"  *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (citation omitted).  That Plaintiffs are unlikely to succeed on the merits of their claims—as explained above, Defendants are entitled to summary judgment on all of Plaintiffs' claims—is sufficient on its own to deny their request for preliminary relief.  *See Greater New Orleans Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1089 (D.C. Cir. 2011).  Nevertheless, the other preliminary injunction factors that Plaintiffs address in their summary judgment motion, *see* Pls.' Summ. J. Br. at 49-52, likewise do no warrant granting preliminary relief here, and they certainly do not overcome Plaintiffs' complete failure to show a likelihood of success on the merits.

Starting with irreparable harm, Plaintiffs assert the same alleged injuries purportedly caused by Defendants' Termination Decision—a loss of a funding source that constituted a "substantial portion[] of Plaintiffs' overall operating budgets," reductions in the services that Plaintiffs deliver, staff layoffs, and interference with Plaintiffs' respective organizational missions, Pls.' Summ. J. Br. at 50-51—that they asserted in their unsuccessful renewed motion for a TRO, *see* Dkt. 53-1 at 39-41.  Yet Plaintiffs fail to show how those same injuries are any more imminent or irreparable now than they were when the Court denied their TRO motion nearly a month ago. *See* Apr. 15, 2025 Hearing Tr. at 67:23-68:2 (concluding that Plaintiffs had not "carried their burden on demonstrating there is a need for a TRO to avoid irreparable injury over the next couple of weeks or so").  Accordingly, if preliminary relief was unwarranted during the time between the

Court's denial of Plaintiffs' TRO motion on April 15, 2025, and the parties' next hearing on May 14, 2025, then such relief is similarly unwarranted during the time it will take the Court to resolve the parties' cross-motions for summary judgment, especially in light of the Court's expressed intention to issue a decision "relatively promptly." *Id.* at 71:20-21.

As for the balance of equities and public interest, *see* Pls.' Summ. J. Br. at 51-52, those factors weigh against preliminary relief here for the same reasons described in Defendants' opposition to Plaintiffs' renewed TRO motion. *See* Dkt. 60 at 27-28; *see also* Dkt. 35 at 51-52. The Supreme Court's order in *Department of Education* underscores why preliminary relief is inappropriate here. As that order noted, the harm Defendants would face if the Court were to reinstate the Program task orders here pending its resolution of the parties' cross-motions for summary judgment—which is what Plaintiffs' effectively demand—would be irreparable given that Defendants would be "unlikely to recover . . . [Program] funds once they are disbursed." *Dep't of Educ.*, 604 U.S. at 969. The public also has an interest in the judiciary respecting the jurisdictional limits set by Congress, and the preliminary relief Plaintiffs seek would likewise interfere with the Executive Branch's ability to lawfully direct and guide agencies' spending decisions.

In sum, whether assessed in accordance with Plaintiffs' request for a preliminary injunction or their ultimate request for permanent injunctive relief, *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (describing the "traditional four-factor test [that] applies when a plaintiff seeks a permanent injunction"), the likelihood-of-success, irreparable-harm, and balance-of-the-equities factors all decidedly weigh against any grant of injunctive relief here.

## V.    Any Relief Should Be Limited In Scope

For the reasons explained above, Plaintiffs are not entitled to any relief here. But in the event the Court concludes otherwise and decides to grant injunctive relief, it is well settled that such relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. U.S. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete

relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  In light of these principles, any injunctive relief the Court grants should be limited in at least three respects.

First, the scope of any such relief should be limited to the particular Programs that are implicated by the claims on which the Court determines Plaintiffs are entitled to summary judgment.  For instance, if the Court were to conclude that Plaintiffs are likely to succeed on their statutory unlawful-withholding claim, any corresponding injunction should not encompass funding for FGLOP or CCI, which are not subject to the specific appropriations provision that, according to Plaintiffs, Defendants' Termination Decision purportedly violates.  Second, any relief should be limited to Plaintiffs alone.  "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  *Gill v. Whitford*, 585 U.S. 48, 72 (2018).  Plaintiffs therefore cannot seek relief on behalf of former Program providers who are not parties to this suit.  *See Kowalski v. Turner*, 543 U.S. 125, 129 (2004) (explaining that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

And third, the scope of injunctive relief that the Court can grant here is limited by separation of powers principles.  As other D.C. district courts have recognized recently, the Court cannot "specifically order" the federal government "to continue to contract" with specific parties, as such relief would undermine the "Executive discretion" that "both the Constitution and Congress's laws have traditionally afforded" with respect to "how to spend" appropriated funds "within the constraints set by Congress."  *AIDS Vaccine Coal.*, 2025 WL 752378, at *23.  "The relief" that Plaintiffs seek here—namely, "reinstatement of contracts terminated by the Government"—is "beyond the power of this Court."  *U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *7.  Accordingly, the Court should, at most, order Defendants to "make available for obligation the full amount of funds Congress appropriated" for the "Legal Orientation Program," *AIDS Vaccine Coal.*, 2025 WL 752378, at *23 (quoting *City of New Haven*, 634 F. Supp.

at 1460), and leave decisions as to how, when, and to whom to disburse those funds to Defendants' discretion.

## CONCLUSION

For the reasons set forth above, the Court should deny Plaintiff's motion for summary judgment, grant Defendants' cross-motion for summary judgment, and enter judgment in Defendants' favor.


DATED: May 9, 2025                                Respectfully submitted,

                                                 YAAKOV M. ROTH
                                                 Acting Assistant Attorney General

                                                 ANDREW I. WARDEN
                                                 Assistant Director
                                                 Federal Programs Branch

                                                 */s/ Zachary W. Sherwood*
                                                 ZACHARY W. SHERWOOD
                                                 Indiana Bar No. 37147-49
                                                 Trial Attorney
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 1100 L Street NW
                                                 Washington, DC 20005
                                                 Phone: (202) 616-8467
                                                 Fax: (202) 616-8470
                                                 Email: zachary.w.sherwood@usdoj.gov

                                                 *Counsel for Defendant*