## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) Civil Action No. 1:25-cv-298-RDM |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF SIRCE E. OWEN

I, Sirce E. Owen, declare as follows:

1.   I am the Acting Director of the Executive Office for Immigration Review ("EOIR") in the U.S. Department of Justice ("DOJ").  EOIR's mission is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws.  Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings.  I was appointed EOIR Acting Director in January 2025. Prior to assuming this position, I served as an Appellate Immigration Judge from 2020 to 2025, Assistant Chief Immigration Judge from 2018 to 2020, and Acting Deputy Director of EOIR from 2019 to 2020.

1

2.     This declaration is based on my personal knowledge and information made available to me in the course of performing my official duties.

3.     Based upon my current and former job duties with EOIR, I am familiar with the five formerly titled legal access programs at issue in this case ("the Programs")—the Legal Orientation Program ("LOP"), the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program ("FGLOP"), and the Counsel for Children Initiative ("CCI").

4.     The purpose of this declaration is to provide information in support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment and Preliminary Injunction, which is being filed on May 9, 2025.  This declaration details the status of the Programs following the April 10, 2025, decision to terminate the operative Program task orders for the convenience of the government, pursuant to EOIR's contract with the Acacia Center for Justice ("Acacia Contract").

**<u>Status of the Programs</u>**

5.     The 2024 Consolidated Appropriations Act provided that "not less than" $28 million of the total appropriated amount to EOIR "shall be made available for services and activities provided by the Legal Orientation Program."  The "Legal Orientation Program," as used in the 2024 Consolidated Appropriations Act,

2

encompasses, *inter alia*, LOP, LOPC, and ICH.  Notwithstanding the termination of the operative task orders for 2024-25, EOIR will satisfy its legal orientation services' obligation by providing a consolidated federalized program.

6.      The federalized program will be administered by a team of EOIR employees including the Immigration Judge corps.  EOIR will provide legal orientation information and services to aliens in proceedings before the Immigration Court and the Board of Immigration Appeals.  The program will enable aliens by providing information, resources, and tools to equip them to navigate their immigration proceedings.

7.      Program services will include Immigration Judges orienting aliens to their rights, obligations, and available legal options.  Additional program services will include, *inter alia*, hard copy and online legal tools such as self-help legal materials and EOIR's Immigration Court Online Resource (ICOR), a centralized repository for information and resources about immigration proceedings.  Services will not include legal advice or representation.

8.      CCI is funded through EOIR's general appropriations and is not required by any specific statutory legislation, and FGLOP is funded by the Department of Homeland Security through an interagency agreement.  Therefore, they are discretionarily funded and EOIR does not have a requirement to continue funding these programs.  Further, pursuant to 8 U.S.C. § 1362, EOIR is not

Admin. Rec. 208

authorized to provide counsel to aliens at Government expense. EOIR will not provide these services.

### Status of Appropriated Funds

9.  EOIR will disburse at least $28 million in fiscal year 2024 (FY 2024) funding for legal orientation as required by statutory appropriation. Appropriated funds are government funds that have been legally authorized and allocated for specific purposes through an act of Congress or other legislative body. The appropriation requirement will be met for FY 2024 through a combination of Acacia contract spending and federalized program efforts.

10.  Approximately $20 million remains unused/undisbursed relating to the LOP/LOPC and ICH task orders associated with Acacia. However, this number is subject to change as close-out costs are finalized.

11.  The remainder of appropriated spending will be from the federalized program as described above. Legal orientation services will include rights advisals provided by the Immigration Judge corps, self-help legal materials, and EOIR's ICOR program.

12.  For fiscal year 2025 (FY 2025), Congress again appropriated funds for EOIR for the purpose of legal orientation services. Although the Acacia contract's period of performance crosses fiscal years (FY 2024 and FY 2025), to date, no FY 2025 funds have been obligated by EOIR for the Acacia contract. For FY 2025,

Admin. Rec. 209

EOIR will satisfy all appropriation requirements through EOIR's federalized program.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing declaration is true and correct.

Executed on this 7th day of May 2025.

SIRCE OWEN

Digitally signed by SIRCE OWEN
Date: 2025.05.07 10:18:30 -04'00'

Sirce E. Owen
Acting Director
Executive Office for Immigration Review

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:25-cv-298-RDM |

## DECLARATION OF STEPHANIE E. GORMAN

I, Stephanie E. Gorman, declare as follows:

1.     I am the Acting Assistant Director of Policy for the Executive Office for Immigration Review ("EOIR"), which is an agency with the U.S. Department of Justice (DOJ).  The Office of Policy is responsible for all agency policy and regulatory review and development; internal and external communications; oversight of pro bono and legal orientation program activities; and legal education, research, and certifications.  I was appointed as the Acting Assistant Director of Policy in February 2025.  Prior to assuming this position, I served as an Assistant Chief Immigration Judge from January 2025 to February 2025, an Appellate Immigration Judge from 2019 to 2025, and an Immigration Judge from 2017 to 2019.

2.     This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

1

3.     Based upon my current and past job duties with EOIR, I am familiar with the five formerly titled legal access programs at issue in this case ("the Programs")—the Legal Orientation Program ("LOP"), the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program ("FGLOP"), and the Counsel for Children Initiative ("CCI").

4.     The purpose of this declaration is to provide information in support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment and Preliminary Injunction, which is being filed on May 9, 2025.  This declaration details Plaintiffs' access to Immigration Court facilities following the April 10, 2025, decision to terminate the operative Program task orders for the convenience of the government, pursuant to EOIR's contract with the Acacia Center for Justice ("Acacia Contract"), as well as the provision of legal resources to individuals involved in Immigration Court proceedings.

## Access to Immigration Court Facilities

5.     On April 16, 2025—the date the termination of the operative Program task orders went into effect—the Chief Immigration Judge sent an email to all Immigration Court staff that, *inter alia*, (1) explained that the task orders for LOP, LOPC, ICH, FGLOP, and CCI had been terminated; (2) instructed staff to remove any signage in the Immigration Courts that directed people to any now-terminated Program services; and (3) explained that any legal service providers who previously delivered Program services as subcontractors no longer had "any particular special access rights" within Immigration Court facilities and should otherwise "be treated the same as any other member of the public."

6.     As a result of the termination of the Program task orders, former Program subcontractors will no longer receive remuneration from the federal government for any legal access services they provide within Immigration Court

2

facilities, and they will no longer have special access rights within those facilities. But former Program subcontractors, including Plaintiffs, will otherwise have the same rights of access to public spaces within Immigration Courts, and will be subject to the same rules and restrictions, as any other member of the general public.

7.     Rules governing public access to Immigration Courts can be found in 8 C.F.R. §§ 1003.27, 1003.31(d), 1003.46, 1208.6, 1240.10(b), and 1240.11(c)(3)(i). Part II of the EOIR Policy Manual, which consists of the Office of the Chief Immigration Judge Practice Manual ("OCIJ PM"), also provides guidance on public access to EOIR facilities.  Such guidance can be found in Chapters 1.5, 4.9, and 4.14.

8.     EOIR facilities are open to the public.  *See* OCIJ PM Chapter 1.5.  All Immigration Courts require individuals entering an EOIR facility to pass through security screening prior to entering.  *See* OCIJ PM Chapter 4.14.  After clearing the security screening, members of the public generally have access to EOIR facility common areas, including but not limited to the waiting areas, reception areas, hallways, the filing window, public restrooms, and public notice boards.

9.     For hearings held in the Department of Homeland Security's (DHS's) detention facilities, or federal, state, or local correctional facilities, compliance with additional security restrictions may be required.  *Id.*  For example, individuals may be required to obtain advanced clearance to enter these detention facilities.  *Id.* Additionally, cellular telephones, laptop computers, and other electronic devices may not be permitted depending upon the rules of the particular detention facility. *Id*.

10.     As a general matter, hearings before Immigration Judges are open to the public, although access can be restricted in certain limited circumstances.  *See e.g.*,  8 C.F.R.  §§  1003.27,  1003.31(d),  1003.46,  1208.6,  1240.10(b), 1240.11(c)(3)(i); OCIJ PM Chapter 4.9.  Immigration Judges also have the discretion to limit attendance or close a hearing to protect parties, witnesses, or the public

3

interest and parties may motion the Immigration Court to close a hearing not otherwise subject to rules limiting public access. *See* 8 C.F.R. § 1003.27(b).

11.   Access to each Immigration Court's administrative offices and the chambers of each Immigration Judge is not open to the public and is limited to Immigration Court staff and other authorized personnel.   Parties appearing in Immigration Court or conducting business with the Immigration Court are not allowed access to telephones, photocopying machines, or other court equipment within the Immigration Court's administrative offices. *See* OCIJ PM Chapter 4.14. EOIR does not maintain a library at any Court that is open to the public and does not maintain libraries in any DHS detention facilities.

12.   The general public have the same access to EOIR facilities as legal counsel, except as described above related to closed or restricted hearings.   Some Immigration Courts also have meeting rooms where private consultations may occur. However, no member of the public may utilize these rooms or any EOIR space to the total exclusion of others, nor may any member of the public engage in activities to the exclusion of the use of EOIR facilities by other members of the public. Members of the public may not direct aliens to remain in any specific location within EOIR space, and EOIR cannot order an alien to interact with or attend a meeting with a particular member of the public. Members of the public who are disruptive within EOIR space or otherwise prevent the orderly processing of cases may be asked to leave.

## Provision of Legal Resources Within Immigration Courts

13.   Notwithstanding the termination of the aforementioned task orders, respondents in Immigration Court proceedings continue to have access to legal orientation information and resources.

14.   Immigration Judges conduct rights advisals during removal proceedings and ensure that cases are handled fairly.   These advisals include the

following information: 1) aliens have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing;  2) aliens are also advised of the availability of pro bono legal service providers and are provided with a list of such providers;  and 3) aliens have a reasonable opportunity to examine the evidence against them, to present evidence on their own behalf, and to cross-examine witnesses presented by the Government.  *See* INA § 240(b)(4) and 8 C.F.R. § 1240.10.

15.     Immigration Judges also explain the charges and factual allegations contained in the charging document -- the Notice to Appear (Form I-862) or the Notice of Referral (Form I-863) -- in non-technical language.  See 8 C.F.R. §§ 1240.10(a)(5)-(a)(7).  Immigration Judges have a duty to develop the record and to inform aliens of any relief for which they are eligible.  *See* 8 C.F.R. § 1240.11(a)(2).  Immigration Judges also provide warnings related to background and security investigations; advise aliens of the consequences of failing to appear at subsequent hearings; and advise them of their right to appeal to the Board of Immigration Appeals.  *See* INA § 240(b)(5), (b)(7), (e)(1) and 8 C.F.R. §§ 1003.38, 1003.39, 1003.47(c), 1240.10(a)(3).

16.     While it is not uncommon for a represented respondent, through counsel, to waive reading of the advisals, if the respondent is unrepresented ("pro se") or if reading of the advisals is not waived, the Immigration Judge provides the respondent with all advisals and ensures that the respondent has received, or is provided, a List of Pro Bono Legal Service Providers.

17.     In addition to information and advisals provided by the Immigration Judge, legal information and resources are available to individuals at the Immigration Courts and online.

18.     Available information includes the List of Pro Bono Legal Service Providers ("List"), referenced above.  This list, published quarterly, contains

5

information on non-profit organizations, referral services, and attorneys who may be able to assist in providing pro bono legal services in immigration proceedings. Non-profit organizations and attorneys on the list commit to providing at least 50 hours per year of pro bono legal services before the court. The rules for qualifying organizations, pro bono referral services, and attorneys to be placed on the List can be found in the Code of Federal Regulations. *See* 8 C.F.R. § 1003.61 et seq. (80 Fed. Reg. 59503).

19.    EOIR provides Self-Help written materials within Immigration Courts throughout the country. These Self-Help written materials include general legal information as well as specific information about the local Immigration Court for pro se respondents and other interested individuals. Individuals are also provided with needed forms, such as those for change of address and fee waivers; applications for relief, including Asylum; and may also include answers to frequently asked questions about the local Immigration Court. Self-Help materials are provided in multiple languages.

20.    EOIR's Immigration Court Online Resource (ICOR) provides further Self-Help information online in multiple languages to help individuals navigate immigration proceedings. This resource provides general information on immigration hearings and how to prepare for those hearings. This includes *inter alia* information on how to contact the Immigration Court, check the status of a case, find legal representation, appeal an Immigration Judge's decision, and more.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing declaration is true and correct.

6

Executed on this 7th day of May 2025.

STEPHANIE
GORMAN

Digitally signed by STEPHANIE
GORMAN
Date: 2025.05.07 10:32:33 -04'00'

Stephanie E. Gorman
Acting Assistant Director for Office of Policy
Executive Office for Immigration Review

7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*, | ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action No. 1:25-cv-298-RDM |
| v. | ) ) |  |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) ) ) |  |
| Defendants. | ) |  |

## DECLARATION OF SIRCE E. OWEN

I, Sirce E. Owen, declare as follows:

1.      As of May 20, 2025, I was the Acting Director of the Executive Office for Immigration Review ("EOIR") in the U.S. Department of Justice ("DOJ"). EOIR's mission is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws.  Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings.  I was appointed EOIR Acting Director in January 2025.  Prior to assuming this position, I served as an Appellate Immigration Judge from 2020 to 2025, Assistant Chief Immigration Judge from 2018 to 2020, and Acting Deputy Director of EOIR from 2019 to 2020.

1

2.      This declaration is based on my personal knowledge and information made available to me in the course of performing my official duties.

3.      Based upon my current and former job duties with EOIR, I am familiar with the five formerly titled legal access programs at issue in this case ("the Programs")—the Legal Orientation Program ("LOP"), the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program ("FGLOP"), and the Counsel for Children Initiative ("CCI").

4.      The purpose of this declaration is to provide additional information in support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment and Preliminary Injunction, Dkt. 70, which was filed on May 9, 2025.  In particular, this declaration is made in response to the Court's May 14, 2025 Order, Dkt. 75, which directs Defendants to supplement the previously filed Administrative Record in this case to address Defendants' "intention to 'federalize,'" *id.* at 3, the legal orientation services and activities that are provided as part of the "Legal Orientation Program," *see, e.g.*, 2024 Consolidated Appropriations Act, 2024, Pub. L. No. 188-42.

5.      The 2024 Consolidated Appropriations Act provided that "not less than" $28 million of the total funds appropriated to EOIR by the Act "shall be made available for services and activities provided by the Legal Orientation Program."

The term "Legal Orientation Program" has been included in several recent appropriations statutes, *see, e.g.*, Consolidated Appropriations Act, 2020, Pub. L. No. 116-93 (2019). The scope and format of the services encompassed by the term "Legal Orientation Program" are not set forth in any federal statutes or regulations, and there is not a consensus on its precise meaning or contours. At most, EOIR interprets the term to require funding for LOP and LOPC services, though it acknowledges that in the past it also used funds under that rubric to fund other programs, including ICH, though it was not required to do so. EOIR previously contracted with Acacia Center for Justice to manage the programs, and program services were delivered by subcontractors.

6.    The means by which "Legal Orientation Program" services are to be provided are likewise not prescribed in any federal statutes or regulations. Accordingly, EOIR has previously considered transitioning away from a model in which "Legal Orientation Program" services are delivered by government contractors in light of concerns about that model's efficacy and efficiency.

7.    In 2017, for instance, EOIR began to have concerns about the utility of the LOP and its contract provider due to an inability to support or substantiate claims about the LOP's efficacy and the provider's reluctance to cooperate with an internal review. On or about April 10, 2018, EOIR paused new task orders to the LOP contractor pending a comprehensive review of the program. On or about April 25,

2018, however, DOJ, in response to requests from members of Congress, agreed to resume funding new LOP task orders while continuing its review of the program.

8.    In September 2018, EOIR published a study from the first phase of that review, which found that LOP was a wasteful program, as reflected by several quantitative metrics.  *See* Dkt. 62 at 39-40 (¶ 113) (referencing the September 2018 study).  More specifically, contrary to what had been previously represented, LOP was found to increase detention times for aliens and increase overall costs to the Government.  The 2018 study also noted serious methodological flaws in a prior study of LOP in 2012 that found the program to be beneficial.  *See* Dkt. 62 at 26 (¶ 78) (referencing the 2012 study).  Those flaws included that (1) the 2012 results could not be replicated, (2) the 2012 study was not conducted by a statistician or analyst, and (3) the 2012 study was conducted by an inappropriately interested EOIR employee, namely, the individual responsible for administering the LOP.  In January 2019, EOIR published a study from the second phase of the same internal review. That study addressed other quantitative metrics related to the LOP program, including the length of hearings involving LOP and non-LOP participants.  Based on the results of this internal review, EOIR publicly deemed LOP as a wasteful program in December 2020. *See* Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 82750, 82754 (Dec. 18, 2020); *accord* 5 C.F.R. § 2635.101(b)(11) (requiring federal employees to "disclose waste, fraud, abuse, and

4

corruption"); 28 C.F.R. § 0.29b (requiring DOJ employees to disclose waste in government programs).

9.    EOIR conducted a follow-up study of the LOP in May 2021, which reaffirmed that LOP was a wasteful program because it lengthened detention times and increased net costs to the Government by a considerable margin.   However, EOIR refused to release that study publicly and successfully hid it from relevant stakeholders. EOIR subsequently misrepresented the LOP's efficacy to both DOJ and Congress while continuing to seek additional funding for it. The May 2021 study was finally released publicly on or about January 2025.

10.    In short, as noted in my January 31, 2025 Policy Memorandum 25-15, "Office     of     Legal     Access     Programs,"     available     at https://www.justice.gov/eoir/media/1387916/dl?inline, numerous studies conducted since 2018 have demonstrated that LOP was a wasteful program that "increases the length of proceedings and the length of time in detention, which, in turn, increases costs to the federal government."

11.    EOIR's prior studies indicated that LOP was a wasteful program that should not continue in its current form.   EOIR has known this since at least 2018. EOIR also recognizes that it is obligated to spend funding that is appropriated for legal orientation services and, by statute, to provide certain legal orientation services to custodians of unaccompanied alien children.   When the operative task orders were

Admin. Rec. 222

terminated on April 16, 2025, EOIR recognized and was prepared to assume those responsibilities itself, *i.e.* for the LOP and LOPC.

12.     These prior studies demonstrate that EOIR has had doubts for several years about the efficacy and efficiency of the prior "Legal Orientation Program" model, under which services and resources were delivered by subcontractors via the LOP, LOPC, ICH, FGLOP, and CCI programs.  The studies also informed the determination to utilize existing federal agency resources instead of outside contractors to deliver "Legal Orientation Program" services following the termination of the operative task orders on April 16, 2025.  At the time those task orders were terminated, however, alternative models for delivering "Legal Orientation Program" services, including a federalized program, were still being developed and considered.

13.     EOIR recognizes that it is obligated to spend no less than the minimum amount of funding that Congress has specifically appropriated for the "Legal Orientation Program."  Further, as required by 8 U.S.C. § 1232, EOIR must also provide certain legal orientation services to custodians of unaccompanied alien children.

14.     EOIR continues to implement this federalized program and determine how to best utilize federal agency resources using an iterative approach.  Although work remains ongoing, the federalized program continues to provide information to

6

aliens in proceedings about immigration court and other immigration adjudication practices, procedures, and resources.

15.    Similarly, EOIR will provide legal orientation services to custodians of unaccompanied alien children in order to fulfill its obligations under the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C. § 1232.  The services provided to custodians of unaccompanied alien children will include group presentations, self-help written materials, as well as potential outreach to custodians of unaccompanied alien children to ensure that they are aware of the child's upcoming hearings and to reiterate the importance of attending those hearings.    These services will also serve as important steps in identifying mistreatment, exploitation, and trafficking of unaccompanied alien children.

16.    In addition, EOIR continues to provide resources to all aliens in removal proceedings through the Access EOIR website, located at https://www.justice.gov/eoir/access-eoir-initiative.  It also maintains self-help materials at most courts.

17.    The services that were delivered under FGLOP, ICH, and CCI, are not required by any specific statute or regulation and will no longer be provided.

18.    In implementing the federalized "Legal Orientation Program," EOIR will exercise its discretion to provide services in the manner that best utilizes resources efficiently and effectively, while also safeguarding the responsible use of

Admin. Rec. 224

taxpayer dollars.  EOIR will also take appropriate steps to ensure that the minimum level of funding specifically appropriated by Congress for the "Legal Orientation Program" is obligated and expended as required.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing declaration is true and correct.

Executed on this 21st day of May 2025.

SIRCE OWEN

Digitally signed by SIRCE OWEN
Date: 2025.05.21 18:45:26 -04'00'

Sirce E. Owen
Executive Office for Immigration Review

8

# LOP Cohort Analysis

Executive Office for Immigration Review
September 5, 2018

Admin. Rec. 226



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

## TABLE OF CONTENTS

Executive Summary .............................................................................................................3

Key Takeaways .................................................................................................................4

The Three Phases of the LOP Cohort Analysis ..............................................................5

Introduction and Background ........................................................................................6

Phase I Analysis ............................................................................................................8

Appendix A:  Additional Financial Details ..................................................................22

Appendix B:  Phase I Methodology ............................................................................23

Admin. Rec. 227

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

## EXECUTIVE SUMMARY

The Executive Office for Immigration Review (EOIR) conducted an analysis comparing multiple key performance metrics between respondents who participated in EOIR's general Legal Orientation Program (LOP) and those who did not. The LOP provides information to detained immigrants about their rights and the immigration court process so that they can make informed decisions about their legal cases.[1] Within EOIR, the LOP is administered by the Office of Legal Access Programs (OLAP). In fulfillment of the LOP, representatives from non-profit organizations provide information about immigration court procedures and other basic legal information to predominantly detained individuals in facilities operated by the Department of Homeland Security (DHS).[2] The LOP offers the following services to detained individuals:

- **Group Orientation:** An interactive general overview of immigration removal proceedings, forms of relief, and an opportunity to ask general questions.
- **Individual Orientation:** Unrepresented individuals can briefly discuss their cases with experienced LOP providers and pose more specific questions.
- **Self-Help Workshops:** Those with potential for relief or those who wish to voluntarily depart the country are provided guidance on specific topics (e.g., how to complete an asylum application or prepare for a bond hearing) and given self-help legal materials.
- **Individual Referrals to Pro Bono Legal Services**

Using the data available to EOIR, EOIR developed a quantitative analysis that measures performance and operations in the following high-level areas:

1. Length of Stay at Detention Facilities[3]
2. Respondent Representation Rates
3. Proceeding Outcomes
4. Proceeding Length and Case[4] Length
5. Number of EOIR Hearings
6. Likelihood of Proceeding[5] and Case[6] Completions
7. Adjournments and Adjournment Attribution

---

[1] https://www.justice.gov/eoir/legal-orientation-program

[2] The LOP may occasionally assist non-detained respondents. This analysis focuses on detained and released respondents.

[3] Length of stay for each respondent was calculated with data sourced from EOIR court staff data entry and Form I-830, *Notice to EOIR: Alien Address*. As Phase I was being finalized for release, DHS provided EOIR with potentially more granularly precise data, including book-in and book-out dates. Accordingly, EOIR intends to re-run any Phase I analysis related to the detention data using the DHS data and will publish those results once available.

[4] A "case" is defined as a collection of "proceedings," during which hearings are conducted and an immigration judge makes a ruling. Cases may have multiple proceedings, and proceedings can have multiple hearings. At the proceeding level, immigration judges may make decisions that result in a completed case, such as a grant of relief or removal order, or a decision that results in the creation of a new proceeding, such as a Change of Venue (COV).

[5] Completed proceedings were those which had a completion date and a decision recorded that was not a COV, transfer, or administrative closure.

[6] Completed cases were those where the last proceeding had a completion date and a decision recorded that was not a COV, transfer, or administrative closure.

3



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

## KEY TAKEAWAYS

The following are key takeaways from the LOP Cohort Analysis Phase I over the Fiscal Year (FY) 2013 to FY 2017 timeframe:

1. **LOP participants had longer detention stays which increased costs to the federal government.** On average LOP participants spent 25 more days per respondent in DHS custody than non-LOP participants. EOIR estimates that the longer average detention stays of LOP participants cost the federal government an estimated $3,100[7] more per respondent from FY 2013 to FY 2017 than non-LOP participants.[8] This results in an estimated $40 million per year in additional housing costs to the federal government.[9]

2. **LOP respondents were less likely to obtain representation during their case history than non-LOP respondents.** From FY 2013 to FY 2017 LOP respondents were five percent less likely than non-LOP respondents to have representation at any time in their case histories.

3. **Proceeding outcomes between LOP and non-LOP respondents do not vary greatly.** LOP participants with a detained custody status have slightly higher likelihoods of being granted relief than non-LOP participants. Conversely, LOP participants with a released custody status have slightly lower likelihoods of being granted relief and slightly higher likelihoods of being issued a removal order than non-LOP participants.

4. **LOP respondents had longer proceedings and cases.** For both detained and released respondents, LOP respondents had longer case lengths and proceeding lengths beginning in each year from FY 2013 through FY 2017.

5. **LOP respondents had slightly more hearings**. Respondents who participated in the LOP had an average of 0.3 more master calendar hearings and 0.1 more individual merits hearings compared to respondents who did not participate in the LOP.

6. **LOP and non-LOP participants were about equally likely to have their cases and proceedings completed by June 2018.** Of all cases and proceedings initiated from FY 2013 through FY 2017, the cases and proceedings of detained LOP respondents and non-LOP respondents were completed at about the same rate. Released LOP respondents were slightly less likely to have their cases completed if they were initiated in recent fiscal years.

7. **Hearing location, custody status, and other factors were found to be statistically significant for certain findings.** EOIR found these factors to have significant impacts on some of the performance metrics in this paper, suggesting that they may also be primary drivers of particular findings in each section. Using regression analyses, EOIR determined that even when evaluated separately (holding the remaining factors constant), each of these factors independently may potentially impact the findings.

---

[7] A table with yearly funding information for the LOP program is provided in Appendix A.

[8] Detention length was calculated using EOIR's CASE (Case Access System for EOIR) data. EOIR detention data is not mandatory and must be entered manually. The cost of detention is generated from DHS budgets. More accurate detention length and detention costs data could impact the findings in this section, and EOIR intends to re-run any Phase I analysis related to the detention data using DHS data. More information on how detention length and cost was calculated for LOP and non-LOP participants is included in the "Length of Stay at Detention Facilities" section.

[9] Roughly 43 percent of LOP respondents and 46 percent of non-LOP respondents had complete detention dates recorded in the available data and were therefore included in this portion of the analysis.

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

## THE THREE PHASES OF THE LOP COHORT ANALYSIS

EOIR commenced a review of the general LOP in November 2017. Due to heightened interest in the review by Congress and the public beginning in April 2018, EOIR determined that the review should be broken into three phases to ensure that reliable findings were delivered to the Department of Justice, Congress, and the public in a timely manner.  Phase I focuses on comparing LOP and non-LOP participants across multiple, relevant measurements of EOIR operations. Phase II broadens the analysis from Phase I to include more operations. Phase III focuses on the Immigration Court Helpdesk Program, which has not been evaluated since its launch in 2016.

The following provides a brief description of each phase of the analysis and estimated timeframe for completion.

**Phase I** of the LOP Cohort Analysis analyzes several measurements of EOIR court operations. Across LOP and non-LOP participants, the paper compares detention length, representation rates, the number of EOIR hearings, time in EOIR proceedings, likelihood of completion, adjournment attributions, and case outcomes. Phase I is included in this report.

**Phase II** of the LOP Cohort Analysis builds upon Phase I by providing additional measurements of EOIR operations. Across the same LOP and non-LOP cohorts evaluated in Phase I, the Phase II analysis compares hearing durations, relief sought, and any relationships between the two. Additionally, Phase II will show the distribution of when in the course of their proceedings LOP participants received their LOP service. Phase II is tentatively expected to be completed by the end of September 2018.

**Phase III** is an analysis of the Immigration Court Helpdesk (ICH), which educates non-detained immigrants in removal (deportation) proceedings and court processes. The goal of ICH is to help individuals make informed decisions about their legal cases and, in doing so, improve the efficiency and effectiveness of immigration court proceedings. Phase III will look into whether the ICH can be related to any costs or savings to the federal government and evaluate the effectiveness of the program in relation to its stated goals. Phase III is tentatively expected to be completed by the end of October 2018.

## INTRODUCTION AND BACKGROUND

In the following report, EOIR compares multiple key performance metrics between respondents who participated in the LOP and those who did not. Phase I of this study is limited to EOIR's general LOP for detained aliens and does not include the four other legal orientation programs administered by EOIR. This study was conducted by a team consisting of both contractors and career federal employees within EOIR's Planning, Analysis, and Statistics Division (PASD), all of whom are trained analysts, statisticians, or operations researchers. PASD neither oversees the LOP, nor is it involved in EOIR's administration of legal orientation programs; consequently, it provided an independent analysis of the LOP with no stake in the outcome. A prior study regarding the LOP was conducted in 2012 by a single EOIR employee, who was neither an analyst, statistician, nor operations researcher and who directly oversaw the administration and continuation of the LOP. Although the 2012 study, issued in a report entitled "Legal Orientation Program Cost Savings Analysis – April 2012," was reviewed at the time by other individuals within EOIR and the Department of Justice, PASD was not provided with the detailed methodology used in connection with the data underlying the 2012 report and, therefore, could not replicate it or its findings. EOIR no longer relies on the robustness of the 2012 study in assessing the LOP and, accordingly, is performing an updated, independent analysis to assess the efficacy of the LOP.

In carrying out this most recent study, EOIR requested data from the LOP contractor and from DHS that it believed would make the study more analytically robust. Although the LOP contractor provided much of the data requested, certain datasets were not provided for a variety of reasons, including that the data was unavailable or not tracked by the contractor. DHS also did not provide data requested by EOIR until Phase I was being finalized. Although EOIR developed alternative methodologies to account for the data not received and is confident in its methodologies, the inclusion of this additional data could have made the study more robust and could potentially have affected its conclusions. Thus, EOIR will re-run the relevant analyses using DHS detention data. Similarly, the LOP contractor has indicated that it is conducting its own internal study of the general LOP, but has not provided the complete results of that study to EOIR at the time of the completion of Phase I.

This study does not address several LOP-related legal and policy issues that are beyond its scope, including whether the LOP should be continued in its present form, modified, or terminated. For example, this study does not assess whether LOP programs are most effective within EOIR or would be more effective within another federal agency or within another component of the Department of Justice. Additionally, it does not address any legal considerations associated with the LOP. For instance, the current Blanket Purchase Agreement (BPA) governing the provision of general LOP services was signed by the Department of Justice and LOP contractor in May 2017.[10] That BPA included a provision allowing for the possibility of direct legal representation funded by the BPA as part of the general LOP,[11] though it also requires the LOP contractor to state at the beginning of each group or individual

---

[10] Through a BPA, the Department of Justice's Justice Management Division enters into a cooperative agreement with the primary LOP contractor for general LOP services. EOIR's OLAP Director serves as the Contracting Officer's Representative (COR) and administers the LOP.

[11] On July 25, 2018, the Department of Justice and the LOP contractor agreed to remove the language allowing for the possibility of direct legal representation through the general LOP from the BPA.



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

presentation that the presenter is not the attorney nor representative of the detained aliens. According to EOIR's OLAP, the LOP contractor has asserted attorney-client privilege in declining to provide certain data about group and individual presentations to EOIR that was requested to conduct this quantitative analysis. Whether taxpayer-funded legal representation has been provided under the auspices of the general LOP in contravention of 8 U.S.C. § 1362 and whether LOP providers established attorney-client relationships with the detained aliens to whom they provided presentations in conflict with the BPA are legal and factual questions that are far beyond the purview of this analysis.

For the last three fiscal years, LOP has been funded at $8.024 million annually.[12] A table with yearly funding for LOP is provided in Appendix A of the LOP Cohort Analysis, but the cost of funding LOP itself was not considered in this analysis. Additionally, some of the information that LOP provides to detained aliens may be duplicative of the information immigration judges (IJs) are required to provide to detained aliens under applicable federal regulations; however, quantifying the costs of this duplication is difficult to model. Accordingly, those costs were also not included in this study. Including any costs surrounding LOP funding or court operational redundancies, however, would likely increase the overall cost to the government in this analysis.

In 2016, the same EOIR/PASD contractor who assisted in conducting this study also conducted the Legal Case Study, which required the EOIR contractor to develop objective and standard measures of judicial and court staff workload and to formulate a mathematical model to inform the staffing of EOIR's immigration courts. Although this proprietary model was the primary purpose of the Legal Case Study, EOIR also required that the study include the "identification of process changes that would enable EOIR to complete cases more efficiently without compromising fairness." To address this requirement, the contractor provided a series of qualitative recommendations based on interviews and observations conducted during the course of the study. The qualitative portion of the study reflected commentary and feedback from individuals and observations of court operations and hearings across 18 EOIR courts conducted over four months in the spring and summer of 2016. Those courts were selected by EOIR management at the time and did not necessarily reflect a representative sample of courts nationwide.[13] Further, the qualitative portion of the study included interviews with not only court personnel, but also with external entities including adversarial parties and advocacy organizations whose interests are not necessarily convergent with those of EOIR. One of the non-staffing recommendations in the Legal Case Study based on this qualitative process was to consider expanding programs such as the LOP through "data-informed" requests and justifications. This analysis is a follow-up study to the Legal Case Study recommendation and provides a "data-informed" quantitative assessment of the operational impacts associated with the LOP using the data that was available to EOIR.

---

[12] The estimated aggregate value of all task orders to be issued under the BPA for all LOP programs is $100,000,000 for the entire term of the BPA, which is up to five years. That number is not a maximum ceiling amount and may be exceeded at the discretion of the Government on a unilateral basis.

[13] Although EOIR operated courts in 29 states and territories in 2016, the qualitative portion of the study included courts operating in only eight states. The study did not include immigration courts in the Midwest, the Mountain West, the Northwest, and the Southeast, nor did it include courts operating in a majority of the federal circuits that review immigration court decisions.

Admin. Rec. 232



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

## PHASE I ANALYSIS

EOIR generated this analysis based on over 155,000 LOP-participant respondents (representing over 830,000 hearings) from FY 2013 to FY 2017, and compared them to the over 350,000 respondents (representing over 1.5 million hearings) who were detained or released and were not involved with the LOP program.[14] Previous analysis has shown that the hearing location, base city, circuit, and custody status are statistically significant with many of the metrics presented in this analysis. EOIR therefore also performed regression analyses on the metrics used in the paper to control for the effect of hearing location and respondent custody status to verify the relationship between LOP participation in each metric. The trends observed as a result of the regression analyses were included towards the end of each section.

## LENGTH OF STAY AT DETENTION FACILITIES

Holding respondents in detention for extended periods of time increases costs across the federal government, and for DHS in particular. EOIR did not have access to primary detention information (book-in and book-out dates) from DHS for this analysis. In lieu of primary data from DHS, EOIR used detention information found in the EOIR database. EOIR only included respondents with full and complete detention history (both a detained and released date in EOIR's database) for the detention length analysis and, therefore, analyzed a subset of the LOP and non-LOP cohort populations included in the rest of the analysis.[15]

EOIR found that:

- Respondents who have been through the LOP program stay in detention longer than respondents who have not been through the LOP program, with LOP respondents averaging 72 days in detention and non-LOP respondents averaging 47 days in detention.
- LOP participants on average spent 25 more days in detention than non-LOP participants, which results in an estimated additional $3,100 in detention costs per LOP respondent.[16]

---

[14] EOIR uses input date as the parameter to determine proceedings from FY 2013 to FY 2017. Input date is also used to identify, group, and measure cases or proceedings because input date is system generated at the proceeding level. Input date can be combined with proceeding generation to determine the first and last proceedings in a case (and, thereby, the overall case length). Additionally, EOIR's standard reporting practice is to measure cases or proceedings considering the entire adjudication lifecycle, including case processing time outside of hearings. Using Initial Master Calendar Hearing (IMCH) Dates does not include the time between receipt and hearing, which is usually when LOP services are received. However, as a quality control measure EOIR generated findings using both the Notice to Appear (NTA) received date as a parameter of case initiation within FY 2013 and FY 2017, and, alternatively, the IMCH date as a parameter of case initiation. Using these different dates as case initiation dates did not significantly alter EOIR's findings using the input date.

[15] For purposes of this analysis, EOIR possessed complete detention data for 67,000 LOP participants and 161,000 non-LOP participants. Differences between EOIR detention data and DHS detention data may not be equally distributed by hearing location and, thus, may ultimately impact EOIR findings upon receipt of DHS data. For this reason, the study did not perform a regression analysis in this section. As indicated EOIR will re-run any relevant analyses now that it has been provided DHS detention data.

[16] The DHS FY 2016 and FY 2017 Congressional Budget Justifications were used to determine the average cost of an adult detention bed per night for FY 2013 to FY 2016. For FY 2017, DHS provided the cost of an adult detention bed as of the end

Admin. Rec. 233

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

Note that other internal, external, and DHS-related factors may also contribute to detention length. For example, EOIR found that at each hearing location, there is significant variation in the number of days LOP and non-LOP respondents stay in detention; thus, hearing location may be an important factor for detention length. Further, EOIR also found that slight differences in adjournments to file asylum applications may impact the length of stay, with six percent of LOP participants requesting this adjournment and four percent of non-LOP participants making this request.

**Table 1.  Average Detention Length (Days) and Costs (Dollars) from FY 2013 to FY 2017[17,18]**

| Fiscal Year of Receipt | Average Detention Length (Days) per Respondent and Cost | | | | |
| | Detention Length per Respondent | | | Detention Cost | |
| | LOP | Non-LOP | Difference (LOP - Non-LOP) | Average Detention Cost Added per LOP Respondent ($) | Total Cost Added by LOP Respondents ($) |
|---|---|---|---|---|---|
| 2013 | 64 | 36 | 28 | $3,400 | $42,000,000 |
| 2014 | 69 | 42 | 26 | $3,200 | $38,000,000 |
| 2015 | 73 | 52 | 21 | $2,600 | $32,000,000 |
| 2016 | 74 | 53 | 21 | $2,800 | $42,000,000 |
| 2017 | 78 | 50 | 28 | $3,600 | $46,000,000 |
| **Average** | **72** | **47** | **25** | **$3,100[19]** | **$40,000,000** |

Note that the average detention length for both respondent types grew year over year except for non-LOP participants in FY 2017.[20]

## REPRESENTATION RATES

EOIR also evaluated whether LOP participants have greater rates of representation. EOIR analyzed those respondents who were detained or released from FY 2013 to FY 2017 and determined whether a respondent had an attorney at any point in his or her case history.[21] From FY 2013 to FY 2017, LOP

---

of FY 2017's 3rd quarter. More granular detention cost information from DHS could improve the robustness of the study, and the level of detail of costs could potentially change EOIR's findings.

[17] Fiscal Year represents the input date of a respondent's NTA.

[18] See Appendix A for the average cost of detaining an adult per day from DHS Congressional Budget Justifications (FY 2013 – FY 2016) and as provided by DHS (FY 2017). Note that average length of stay calculations are rounded to the nearest whole number for the purposes of presentation.

[19] Due to rounding, the five-year average of the rounded costs displayed in the table will not necessarily equal the total average displayed. This number is a rounding of the actual total average cost.

[20] This shorter detention length in FY 2017 for non-LOP participants may be a product of data lag or incomplete proceedings that affect the custody data.

[21] The representation rate analysis included both respondents with completed and pending cases.

Admin. Rec. 234

Case 1:25-cv-00298-RDM    Document 78-1    Filed 05/21/25    Page 30 of 132

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

respondents were five percent less likely than non-LOP respondents to have representation, which is shown in Table 2. below.

Table 2. Percent of Respondents with an Attorney at Any Point in their Case History from FY 2013 to FY 2017[22]

| Fiscal Year of Receipt | Percent of Respondents with an Attorney at Any Point in their Case History | |
|---|---|---|
| | LOP participants | Non-LOP participants |
| 2013 | 46% | 53% |
| 2014 | 46% | 52% |
| 2015 | 53% | 56% |
| 2016 | 56% | 58% |
| 2017 | 51% | 55% |
| **Total** | **50%** | **55%** |

EOIR conducted a regression analysis to account for the hearing location, fiscal year the Notice to Appear (NTA) was received for the respondent's initial proceeding, and the custody status of the respondent. The analysis revealed that non-LOP respondents were still more likely to have an attorney even when accounting for those factors.

## PROCEEDING OUTCOMES[23]

The findings in Table 3 suggest that detained LOP participants have a slightly higher likelihood of being granted relief and lower likelihood of being issued a removal order than detained non-LOP participants.

Table 3. Proceeding Outcomes for Detained Proceedings, FY 2013 to FY 2017[24]

| Proceeding Outcomes for Detained Proceedings | | |
|---|---|---|
| Decision | LOP Participants | Non-LOP Participants |
| Relief Granted | 8.25% | 6.33% |
| Remove | 75.64% | 77.86% |
| Terminated | 2.06% | 2.52% |
| Voluntary Departure | 13.38% | 12.87% |
| Other | 0.60% | 0.34% |

---

[22] Fiscal Year is determined by receipt date of the first NTA associated with the respondent.

[23] Proceeding outcomes are independent decisions made by immigration judges; therefore, they do not necessarily have a direct relationship to the LOP. This section simply provides analytical observations regarding proceeding outcomes for LOP and non-LOP participants and does not prescribe any conclusions about the relationship between outcomes and particular policy or operational decisions.

[24] Terminated decisions include decisions labeled "Prosecutorial Discretion-Terminated." Other decisions include only decisions marked as "Other."

Admin. Rec. 235

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

When LOP participants are released, they have a slightly lower likelihood of being granted relief than released non-LOP participants and a higher likelihood of being issued a removal order than non-LOP participants, as demonstrated in Table 4.

**Table 4. Proceeding Outcomes for Released Proceedings, FY 2013 to FY 2017**

| Proceeding Outcomes for Released Proceedings | | |
|---|---|---|
| **Decision** | **LOP Participants** | **Non-LOP Participants** |
| Relief Granted | 12.10% | 12.42% |
| Remove | 67.19% | 59.64% |
| Terminated | 9.47% | 15.97% |
| Voluntary Departure | 10.34% | 10.92% |
| Other | 0.43% | 0.47% |

## AVERAGE LENGTH OF PROCEEDING

EOIR found that completed proceedings [25] for detained LOP participants took, on average, 25 days longer than those of detained non-LOP participants, as found in Figure 1. The results corroborate the findings in previous sections, which found that detention length per respondent was similarly longer for LOP participants and that LOP respondents were slightly less likely to have their proceedings completed in recent fiscal years.

---

[25] Completed proceedings were those which had a completion date and a decision recorded that was not a COV, transfer, or administrative closure.

Admin. Rec. 236

Case 1:25-cv-00298-RDM    Document 78-1    Filed 05/21/25    Page 32 of 132

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

**Figure 1. Average Proceeding Length (Days) from FY 2013 to FY 2017 for Detained Respondents**



|  | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| LOP Proceeding Length | 54 | 57 | 73 | 81 | 75 |
| Non-LOP Proceeding Length | 36 | 37 | 44 | 48 | 48 |
| Volume of LOP Completed Proceedings | 18,047 | 17,424 | 17,240 | 18,263 | 21,842 |
| Volume of Non-LOP Completed Proceedings | 35,447 | 35,564 | 27,670 | 28,422 | 37,224 |

Fiscal Year of Proceeding Input

EOIR conducted a regression analysis to account for the hearing location and custody status of the respondent and found that LOP respondents still had longer proceeding lengths than their non-LOP counterparts, which confirms the trends seen in Figure 1.

EOIR also found that, similar to detained respondents, released LOP participants had consistently higher proceeding lengths than released non-LOP participants for receipts originating in the same year. Two other trends of note are:

1. The proportion of LOP proceedings out of all proceedings increased from 27 percent to 33 percent between FY 2013 and FY 2017.

2. As shown in Figure 2, completed proceeding lengths for more recent receipts are shorter due to the necessarily shorter time horizon between receipt and the final date of the analysis. There is a significant amount of proceedings initiated in recent years that were or will be completed after the date of data extraction for the Phase I analysis. While the volume of non-LOP proceedings fluctuates in each FY studied, the number of LOP proceedings steadily increases.

Admin. Rec. 237

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM: COHORT ANALYSIS
September 5, 2018

**Figure 2. Average Proceeding Length (Days) from FY 2013 to FY 2017 for Released Respondents**



| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| —— LOP Proceeding Length | 637 | 612 | 471 | 346 | 187 |
| —— Non-LOP Proceeding Length | 612 | 555 | 421 | 309 | 170 |
| - - - Volume of LOP Completed Proceedings | 4,205 | 5,025 | 4,843 | 4,709 | 3,793 |
| - - - Volume of Non-LOP Completed Proceedings | 18,758 | 16,202 | 12,925 | 11,744 | 9,946 |

Fiscal Year of Proceeding Input

## AVERAGE LENGTH OF CASE

EOIR found that detained and released LOP respondents had longer case lengths for completed cases[26] initiated from FY 2013 to FY 2017 than detained and released non-LOP participants, respectively. These trends are shown in Figures 3 and 4 and mirror the results seen for proceeding lengths.

---

[26] Completed cases were those where the last proceeding had a completion date and a decision recorded that was not a COV, transfer, or administrative closure.

Admin. Rec. 238

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

**Figure 3. Average Case Length from FY 2013 to FY 2017 for Detained Respondents**



| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| LOP Case Length | 69 | 67 | 80 | 87 | 77 |
| Non-LOP Case Length | 46 | 43 | 49 | 54 | 49 |
| Volume of LOP Completed Cases | 17,424 | 16,447 | 16,225 | 17,352 | 20,493 |
| Volume of Non-LOP Completed Cases | 33,192 | 33,546 | 25,905 | 26,863 | 34,827 |

Fiscal Year of Case Input

The average difference between LOP and non-LOP case length was 28 days for detained respondents and 63 days for released respondents. While the volume of non-LOP proceedings fluctuates in each FY studied, the number of LOP proceedings steadily increases. EOIR also conducted a regression analysis that revealed that the hearing location of a case (whether at the hearing location, base city, or circuit level) had more of an impact on case length than whether or not the respondent had received the services of the LOP program.

14

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

Figure 4. Average Case Length from FY 2013 to FY 2017 for Released Respondents



| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| LOP Case Length | 879 | 805 | 621 | 435 | 245 |
| Non-LOP Case Length | 787 | 728 | 545 | 391 | 219 |
| Volume of LOP Completed Cases | 5,439 | 4,559 | 3,940 | 3,378 | 1,625 |
| Volume of Non-LOP Completed Cases | 16,082 | 13,703 | 8,631 | 7,116 | 5,044 |

Fiscal Year of Case Input

## EOIR HEARINGS (MASTER CALENDAR, INDIVIDUAL, CUSTODY)

EOIR considers the number of hearings per proceeding a measure of operational performance. This analysis compares the number of master calendar, individual (merits), and custody hearings between LOP participants and those who did not participate in the LOP. An increased number of hearings may lead to increased proceeding length for a respondent, although there are a variety of factors such as custody status (detained or released), case type, and scheduling that may also influence proceeding length. EOIR found that respondents who participated in the LOP had on average 0.3 more master calendar hearings per proceeding than respondents who did not participate in the LOP.

Figure 5 below demonstrates the consistent difference in hearings between LOP and non-LOP participants across the five year period.

Admin. Rec. 240



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

**Figure 5.  Master Calendar Hearings per Proceeding[27]**



| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| LOP | 2.28 | 2.18 | 2.23 | 2.03 | 2.01 |
| Non-LOP | 1.93 | 1.81 | 1.87 | 1.77 | 1.72 |

Fiscal Year of Proceeding Input

Individual hearings (merits hearings) usually take longer than master calendar hearings. EOIR found that:

- Proceedings involving LOP participants are more likely to progress to a merits hearing (26 percent of LOP participants and 20 percent of non-LOP participants).
- LOP participants had slightly more merits hearings per respondent than non-LOP participants (average of 0.10 more from FY 2013 through FY 2017).

---

[27] This graphic, and all subsequent graphics relating to hearing counts, include all proceedings.

Admin. Rec. 241



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

Figure 6.  Individual Calendar Hearings per Proceeding



| | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| LOP | 0.44 | 0.49 | 0.52 | 0.44 | 0.39 |
| Non-LOP | 0.41 | 0.36 | 0.39 | 0.35 | 0.24 |

Fiscal Year of Proceeding Input

Using CASE data, EOIR determined that LOP participation and hearing location influenced the number of master and merits hearings per proceeding. When the effect of the LOP program on a proceeding was isolated from the effect of which hearing location the proceeding was held at, the group of individuals who participated in the LOP had a greater number of both masters and merits hearings per proceeding.

EOIR also evaluated custody hearings to ensure that all hearing types are taken into account and to check for any potential relationships between the number of custody hearings per proceeding (regardless of custody status) and the length of stay in DHS detention facilities. EOIR found that:

- For every year between FY 2013 and FY 2017, detained LOP participants had more custody hearings per respondent than detained non-LOP participants.
- However, the difference between LOP and non-LOP custody hearings per proceeding was never larger than 0.2 hearings per proceedings and decreased in all of the fiscal years studied.

17

Case 1:25-cv-00298-RDM    Document 78-1    Filed 05/21/25    Page 38 of 132

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

**Table 5. Custody Hearings per Proceeding**

| Fiscal Year of Receipt | Custody Hearings | | |
|---|---|---|---|
| | LOP Participants | Non-LOP Participants | Difference |
| 2013 | 0.50 | 0.31 | 0.20 |
| 2014 | 0.45 | 0.33 | 0.12 |
| 2015 | 0.57 | 0.44 | 0.13 |
| 2016 | 0.52 | 0.39 | 0.12 |
| 2017[28] | 0.54 | 0.44 | 0.10 |
| **Average** | **0.52** | **0.38** | **0.13** |

EOIR performed a regression analysis to account for the hearing location, fiscal year of Notice to Appear (NTA) corresponding with the proceeding, and the custody status of the respondent on the number of masters, merits, and custody hearings per proceeding. For all three hearing types, LOP hearings per proceeding were higher than non-LOP hearings per proceeding, which is the same trend seen in Figure 5, Figure 6, and Table 5.

## LIKELIHOOD OF PROCEEDING COMPLETION

EOIR evaluated the rate at which proceedings reach completion[29] for LOP and non-LOP participants. For both LOP and non-LOP participants, the likelihood of completion decreased annually, due to inherently less time for case maturation. EOIR found that of proceedings initiated between FY 2013 and FY 2017, detained LOP respondents' proceedings were about as likely to be completed by June 2018 as the proceedings of detained non-LOP respondents. There was also little variation in likelihood of completion between fiscal years of when the proceeding was initiated.

**Table 6. Likelihood that a Proceeding from FY 2013 to FY 2017[30] of a Detained Respondent has Reached Completion**

| Fiscal Year of Receipt | Likelihood that the Proceeding of a Detained Respondent has Reached Completion | | |
|---|---|---|---|
| | LOP Participants | Non-LOP Participants | Difference |
| 2013 | 100% | 100% | 0% |
| 2014 | 100% | 100% | 0% |
| 2015 | 100% | 100% | 0% |
| 2016 | 100% | 100% | 0% |
| 2017 | 99% | 99% | 0% |

---

[28] The FY 2017 numbers may be lower than expected due to the fact that proceedings have only had time to extend through June 2018, which means proceedings initiated in the most recent fiscal year are disproportionately limited by the length of potential proceedings.

[29] Completed proceedings were those which had a completion date and a decision recorded that was not a COV, transfer, or administrative closure.

[30] Fiscal Year is determined by input date of the NTA.

Admin. Rec. 243

Consistent across both detained and released respondents, the likelihood of completion does not change greatly across LOP participants and non-LOP participants.

**Table 7. Likelihood that a Proceeding from FY 2013 to FY 2017[31] of a Released Respondent has Reached Completion**

| Fiscal Year of Receipt | Likelihood that the Proceeding of a Released Respondent has Reached Completion | | |
|---|---|---|---|
| | LOP Participants | Non-LOP Participants | Difference |
| 2013 | 67% | 68% | -1% |
| 2014 | 59% | 59% | 0% |
| 2015 | 49% | 51% | -2% |
| 2016 | 35% | 39% | -5% |
| 2017 | 24% | 26% | -2% |

## LIKELIHOOD OF CASE COMPLETION

Similar to proceedings, EOIR also measured the rate at which cases for LOP participants and non-LOP participants reached completion.[32] EOIR found that for both detained and released respondents, of cases initiated between FY 2013 and FY 2017, LOP respondents' cases were completed at similar rates to non-LOP respondents' cases. There was no differentiating trend between detained LOP and non-LOP participants in likelihood of case completion.

**Table 8. Likelihood that a Case from FY 2013 to FY 2017[33] has Reached Completion for Detained Respondents**

| Fiscal Year of Receipt | Likelihood that the Case Involving a Detained Respondent has Reached Completion | | |
|---|---|---|---|
| | LOP Participants | Non-LOP Participants | Difference |
| 2013 | 100% | 100% | 0% |
| 2014 | 100% | 100% | 0% |
| 2015 | 100% | 100% | 0% |
| 2016 | 100% | 100% | 0% |
| 2017 | 99% | 99% | 0% |

Released respondents who participated in the LOP were slightly less likely to have their cases completed in recent fiscal years than released respondents who did not participate in the LOP, with LOP cases four and three percent less likely to be completed in FY 2016 and FY 2017.

---

[31] Fiscal Year is determined by input date of the NTA.
[32] Completed cases were those where the last proceeding had a completion date and a decision recorded that was not a COV, transfer, or administrative closure.
[33] Fiscal Year is determined by the input date corresponding to the initial proceeding in the case.

Admin. Rec. 244

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

**Table 9. Likelihood that a Case from FY 2013 to FY 2017[34] has Reached Completion for Released Respondents**

| Fiscal Year of Receipt | Likelihood that a Case Involving a Released Respondent has Reached Completion | | |
|---|---|---|---|
| | LOP Participants | Non-LOP Participants | Difference |
| 2013 | 60% | 60% | 0% |
| 2014 | 50% | 49% | 1% |
| 2015 | 40% | 42% | -2% |
| 2016 | 26% | 30% | -4% |
| 2017 | 20% | 23% | -3% |

## ADJOURNMENTS AND ADJOURNMENT ATTRIBUTION

Repeated adjournments add additional hearings to a case.[35] Across both LOP and non-LOP participants, EOIR evaluated adjournment types and the parties to which adjournments are attributed.[36]

**Figure 7.  Adjournment Attributions from FY 2013 to FY 2017**



---

[34] Fiscal Year is determined by the input date corresponding to the initial proceeding in the case.
[35] The adjournments and adjournment attribution analysis included respondents with both completed and pending cases.
[36] EOIR used the attributions for each adjournment code that are defined in Operating Policies and Procedures Memorandum (OPPM) 18-02 "Definitions and Use of Adjournment, Call-Up, and Case Identification Codes." A full list of adjournments and their attribution categorization is available here: https://www.justice.gov/eoir/oppm-log

Admin. Rec. 245



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

The clearest delineation between LOP participants' and non-LOP participants' adjournments is that hearings involving LOP participants have more adjournments due to the respondent (alien).

EOIR also evaluated the difference between hearings for LOP and non-LOP participants that are adjourned for the respondent to receive additional time to acquire representation. From FY 2013 to FY 2017, 11 percent of hearings involving LOP participants were adjourned for such requests, while 9 percent of non-LOP respondents' hearings were adjourned for this reason. EOIR conducted a regression analysis to control for hearing location and custody status of the respondent and these trends continued to hold true.

## CONCLUSIONS

To summarize, the LOP program participants in this study were in detention 25 days longer than non-LOP participants, costing the government an additional estimated $40 million per year. LOP respondents were also less likely to have representation at some point in their case. In terms of time spent in EOIR proceedings, LOP respondents had slightly longer proceedings and cases with 0.3 more master calendar hearings per respondent. Detained LOP participants were slightly more likely to obtain relief from removal compared to detained non-LOP respondents, but released LOP participants were less likely to obtain relief from removal than released non-LOP respondents.

21

**EXECUTIVE OFFICE FOR**
**IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

## APPENDIX A:  ADDITIONAL FINANCIAL DETAILS

From FY 2013 to FY 2017, the general LOP's total funding is below. This funding does not include the Legal Orientation Program for Custodians of Unaccompanied Alien Children, the National Qualified Representative Program, or any other LOP programs administered by OLAP. It also does not include projections of future funding.

**Table 10.  LOP Funding FY 2013 to FY 2017 in Millions**

| FY | LOP Funding (in millions) |
|----|---------------------------|
| 2013 | $4.54 |
| 2014 | $6.61 |
| 2015 | $8.024 |
| 2016 | $8.024 |
| 2017 | $8.024 |

Below is the average cost of detention for an adult per day, as provided by DHS.

**Table 11.  Cost of Detaining an Adult Respondent per Day**

| FY | Cost of Adult Detention per Day |
|----|--------------------------------|
| 2013 | $118.88 |
| 2014 | $121.16 |
| 2015 | $121.69 |
| 2016 | $128.88 |
| 2017 | $127.37 |

22

Case 1:25-cv-00298-RDM    Document 78-1    Filed 05/21/25    Page 43 of 132

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

## APPENDIX B:  PHASE I METHODOLOGY

In this analysis, EOIR considered completed and pending cases[37] for detained or released respondents with a proceeding at EOIR between FY 2013 and FY 2017. Completed cases do not include COVs, transfers, or administrative closures. EOIR used this definition of completed proceeding for all points in the study where completed proceedings needed to be identified unless otherwise specified. EOIR considered a respondent released if he or she had a custody status of "released" during any given hearing, even if he or she had a custody status of "detained" at a different hearing. EOIR did not include cases that involved the Institutional Hearing Program, juvenile cases, or zero bonds.

To identify which of these respondents received LOP, EOIR used data provided by the LOP contractor. This data identified all respondents who participated in LOP from FY 2013 to FY 2017 and indicated the LOP service date. Respondents who received the LOP after their last hearing or proceeding completion were removed from the dataset, as well as those that were determined to have received the LOP prior to FY 2013 but not during the study period. EOIR used this data to categorize the respondents in EOIR data as LOP participants or non-LOP participants. This base dataset was used as the starting point for the measures defined in this paper.

### LENGTH OF STAY AT DETENTION FACILITIES

EOIR did not have access to DHS's internal detention length or cost data. Instead, EOIR used detention information from EOIR's database and DHS costs from DHS Congressional Budget Justifications.

EOIR combined the data indicating LOP participation or non-LOP participation from FY 2013 to FY 2017 with the EOIR detention date(s) and release date(s) for each respondent. EOIR excluded any respondents who began detention before FY 2013 to avoid data quality issues. EOIR identified each respondent's unique detained date and released date to identify individual detention stays for each respondent. Only cases with a date detained and a released date recorded in EOIR's system were considered for calculating length of stay. EOIR possessed complete detention data for 67,000 LOP participants and 161,000 non-LOP participants. Detention lengths were assigned a corresponding fiscal year based on the input date of the first NTA associated with a respondent.

EOIR determined the DHS detention bed rate (cost per day per bed) using DHS Congressional Budget Justifications for FY 2013 to FY 2017. For each fiscal year, the average cost in dollars for LOP and non-LOP respondents was calculated by multiplying the average detention stay in days by the average daily bed rate. EOIR then calculated the average cost difference between LOP and non-LOP for each fiscal year.

---

[37] All case types were included throughout the analysis in order to evaluate the overall differences between LOP and non-LOP respondents across the metrics with the exception of the proceeding outcomes section. The proceeding outcomes section only considers removal cases, in order to focus on the case type that makes up 90 percent of the cases included in this analysis. Therefore, in all sections of the analysis, the findings are primarily influenced by respondents in Section 240 removal proceedings. Furthermore, EOIR found the distribution of case types for LOP and non-LOP respondents to be similar.

Admin. Rec. 248

Case 1:25-cv-00298-RDM    Document 78-1    Filed 05/21/25    Page 44 of 132

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

## REPRESENTATION RATES

The times at which a respondent acquires representation can vary throughout the case. Further, EOIR collects attorney information at the case level; therefore, EOIR identifies a respondent as having an attorney at some point during his or her case history. The respondents were grouped by fiscal year of the first proceeding input date. To calculate the representation rate, the number of respondents with representation in each fiscal year was divided by the total number of respondents in that fiscal year.

## PROCEEDING OUTCOMES

For completed proceedings in removal cases only, the total number of proceeding outcomes for each decision type was calculated for proceedings with an input date from FY 2013 to FY 2017, excluding COVs, transfers, and administrative closures. The final tables are broken out by custody status for LOP participants and non-LOP participants.

## CASE AND PROCEEDING LENGTHS

The average proceeding length, in days, for LOP and non-LOP respondents was calculated by subtracting the proceeding input date from the proceeding completion date. EOIR only considered completed proceedings for this calculation. Then, EOIR averaged the proceeding lengths for each fiscal year of the proceeding input.

The average case length, in days, for LOP and non-LOP respondents was calculated by subtracting the NTA input date corresponding with the initial proceeding in the case from the case completion date. Only completed cases were considered for this calculation. The cases were grouped by the fiscal year of the NTA input date. Then, EOIR averaged the case lengths for each fiscal year.

## EOIR HEARINGS PER PROCEEDING

This section of the paper analyzed all hearings for LOP and non-LOP respondents with cases beginning in FY 2013 through FY 2017. EOIR recorded the number of each type of hearing (master calendar, individual, and custody) in each proceeding. EOIR then took the average of the number of each hearing type per proceeding.

EOIR considered a respondent released if they had a custody status of "released" during any given hearing, even if they had a custody status of "detained" at a different hearing. Master and merits hearings per proceeding for detained and released LOP and non-LOP respondents were calculated using the same methodology for hearing type above.

## CASE AND PROCEEDING LIKELIHOOD OF COMPLETION

Proceedings were organized into fiscal years by the fiscal year of the proceeding input date. The likelihood that the proceeding reached completion for LOP and non-LOP respondents was calculated by dividing the number of completed proceedings by the total number of proceedings (completed and pending).

24

Case 1:25-cv-00298-RDM    Document 78-1    Filed 05/21/25    Page 45 of 132

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
September 5, 2018

Cases were organized into fiscal years by the fiscal year of the NTA input date of the initial proceeding in a case. The likelihood that the case reached completion for LOP and non-LOP respondents was calculated by dividing the number of completed cases by the total number of cases (completed and pending).

## ADJOURNMENTS AND ADJOURNMENT ATTRIBUTION

Adjournment reasons and attributions are defined by Operating Policies and Procedures Memorandum 18-02 "Adjournment, Call-Up, and Case ID Codes." To calculate the percentage of adjournments to provide time to seek representation for LOP and non-LOP respondents, EOIR divided the number of adjournments to seek representation by the total number of adjournments in a given fiscal year.

## REGRESSION ANALYSES

EOIR calculated key descriptive characteristics for each of the above measures, including minimum, average, median, and maximum values. These calculations showed that the metrics in this paper tended to have some outliers. For example, a select few proceedings took exceedingly long to complete compared to the majority of proceedings.

In order to account for these outliers, as well as hearing location and custody status, regression analyses were used to isolate and evaluate the LOP's relationship with court operations.

Admin. Rec. 250

# LOP Cohort Analysis: Phase II

Executive Office for Immigration Review
January 29, 2019

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

## TABLE OF CONTENTS

Executive Summary ............................................................................................................3

Key Takeaways – Phase II....................................................................................................4

Phase II Analysis .................................................................................................................5

Conclusions..........................................................................................................................9

Appendix A: Phase II Methodology...................................................................................11

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

## EXECUTIVE SUMMARY

The Executive Office for Immigration Review (EOIR) conducted an analysis comparing multiple key performance metrics between respondents who participated in EOIR's general Legal Orientation Program (LOP) and those who did not. The LOP provides information to detained immigrants about their rights and the immigration court process so that they can make informed decisions about their legal cases.[1] Within EOIR, the LOP is administered by the Office of Legal Access Programs (OLAP).

In fulfillment of the LOP, representatives from legal service organizations provide information about immigration court procedures and other basic legal information to predominantly detained individuals in facilities operated by the Department of Homeland Security (DHS).[2] The LOP offers the following services to detained individuals:

- **Group Orientation:** An interactive general overview of immigration removal proceedings, forms of relief, and an opportunity to ask general questions.
- **Individual Orientation:** Unrepresented individuals can briefly discuss their cases with experienced LOP providers and pose more specific questions.
- **Self-Help Workshops:** Those with potential for relief or those who wish to voluntarily depart the country are provided guidance on specific topics (e.g., how to complete an asylum application or prepare for a bond hearing) and given self-help legal materials.
- **Individual Referrals to Pro Bono Legal Services**

Using the data available to EOIR, EOIR developed a quantitative analysis that measures performance and operations in the following high-level areas by comparing LOP participants with those who did not participate in the LOP:

1. Timing of First LOP Service Provided
2. Hearing Duration by Hearing Type
3. Applications per Case[3]
4. Hearing Duration by Application Type

This analysis is a follow-up to the LOP Cohort Analysis Phase I. By analyzing when LOP services are provided, how long hearings last for LOP participants and non-LOP participants, and the difference in applications filed between LOP participants and non-LOP participants, this analysis provides additional metrics to evaluate LOP beyond those presented in Phase I.

---

[1] https://www.justice.gov/eoir/legal-orientation-program.

[2] This analysis focuses on detained and released respondents.

[3] A "case" is defined as a collection of "proceedings," during which hearings are conducted and an immigration judge makes a ruling. Cases may have multiple proceedings, and proceedings can have multiple hearings. At the proceeding level, immigration judges may make decisions that result in a completed case, such as a grant of relief or removal order, or a decision that results in the creation of a new proceeding, such as a Change of Venue (COV).

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
LOP COHORT ANALYSIS PHASE II
January 29, 2019

## KEY TAKEAWAYS – PHASE II

The following are key takeaways from the Phase II analysis over the Fiscal Year (FY) 2013 to FY 2017 timeframe:

1. **Most LOP participants receive their first LOP service close to their first hearing date.** Seventy-six percent of LOP respondents received their first LOP service prior to their first hearing date.
2. **LOP participants had marginally longer hearings.** LOP participants' master hearings are nearly the same length as non-LOP participants' master hearings, but the average LOP participants' merits hearing is about nine minutes longer than non-LOP participants'.
3. **LOP participants were more likely to file applications for relief or protection.** Forty-nine percent of completed removal cases involving LOP participants had an application filed, while forty-three percent of completed removal cases with non-LOP participants had an application filed.
4. **LOP participants' merits hearings in removal cases are slightly longer if they have filed at least one application.** LOP participants' merits hearings in removal cases with only one application last on average about seven minutes longer than non-LOP participants'. In removal cases with multiple applications, LOP respondents' merits hearings last on average about six minutes longer than non-LOP respondents' merits hearings.
5. **Hearing location and custody status have an impact on hearing duration and applications filed.** Regression analyses found that while LOP participation does have a relationship with hearing duration and applications filed, so do hearing location and custody status.

Admin. Rec. 254



**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
LOP COHORT ANALYSIS PHASE II
January 29, 2019

## PHASE II ANALYSIS

EOIR generated this analysis based on over 155,000 LOP participants[4] (representing over 830,000 hearings) from FY 2013 to FY 2017 and compared them to the over 350,000 respondents (representing over 1.5 million hearings), who were detained or released and were not involved with the LOP program. Similar to Phase I, EOIR performed regression analyses on the metrics in the Phase II analysis to control for the effect of hearing location and respondent custody status and to verify the relationship between LOP participation and each metric.

### TIMING OF FIRST LOP SERVICE PROVIDED

Analyzing the point at which the respondent first received LOP service allows EOIR to better understand if LOP delivers assistance at the onset of a respondent's case. Figure 1 shows when LOP participants received LOP services for the first time, relative to their first hearing date (in days).[5,6] On average, LOP participants received LOP service for the first time seven days prior to their first hearing. The majority (76 percent) of LOP respondents received their first LOP service prior to their first hearing.[7] The remaining 24 percent of LOP participants included in the study received LOP service for the first time sometime before their last hearing. More specifically, 90 percent received their first LOP service by 15 days after their first hearing, and 95 percent received LOP service by 49 days after their first hearing.

---

[4] For the purposes of this analysis, respondents who either: 1) first received LOP after their last hearing, regardless of case completion status, or 2) first received LOP after their last proceeding completion, were excluded from this dataset. Of all LOP participants, 95 percent received the LOP prior to their last hearing or last proceeding completion. Five percent (8,000 respondents) received the LOP after their last hearing or proceeding completion and were consequently removed from the analysis.

[5] Each respondent's "first hearing" is the first hearing that occurs within his or her first proceeding that is input between FY 2013 and FY 2017.

[6] Each figure in this analysis eliminates outliers. As 96 percent of LOP participants received their first LOP service within 150 days before or after their first hearing, the four percent of respondents who received their first LOP service outside of that range were excluded, allowing for a more robust interpretation less sensitive to outliers.

[7] For those respondents who received LOP more than 50 days prior to their first hearing, this extended time between service and hearing is largely due to proceedings, such as change of venue or transfers, that do not have an associated hearing or adjournment date. These proceedings, therefore, do not appear as hearings prior to the "first hearing." Additionally, variations in docketing practices between courts and case types can result in longer pending periods prior to a hearing.

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
LOP COHORT ANALYSIS PHASE II
January 29, 2019

**Figure 1. Days between First Hearing and First LOP Service**



## HEARING DURATION BY HEARING TYPE[8]

EOIR evaluated hearing lengths for respondents who had received LOP services prior to a hearing and those who had not. LOP respondents tend to have slightly longer master and individual calendar (merits) hearing durations by both average and median. As shown in Table 1, LOP participants' master hearings are nearly the same length as non-LOP participants' master hearings. However, the average merits hearing is little under ten minutes longer for LOP participants than non-LOP participants. Additionally, the average master and merits hearing lengths for both LOP and non-LOP respondents are significantly longer than the median hearing lengths, indicating that there is a small number of hearings that last much longer than the typical hearing.

---

[8] For this section of the analysis, an LOP hearing is that in which the respondent has received his or her first LOP service prior to the hearing date. For example, if an LOP participant received his or first LOP service one day after his or her first hearing, the first hearing was considered a non-LOP hearing. Note that this section defines LOP and non-LOP participation at the hearing level rather than at the respondent level.

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
LOP COHORT ANALYSIS PHASE II
January 29, 2019

**Table 1.  Master and Merits Hearing Durations (Minutes) by LOP Status at Date of Hearing**

| Hearing Type | Average Hearing Duration | | Median Hearing Duration | |
|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP |
| Master | 7.6 | 7.5 | 5.4 | 5.2 |
| Merits | 71.5 | 62.8 | 51.4 | 37.0 |

When controlling for factors such as hearing location, application type, representation, and custody status, LOP participation still has a small but statistically significant effect on the length of a master calendar and merits hearings.[9]

## APPLICATIONS PER CASE

In this section, EOIR analyzes the number of applications[10] per completed removal case[11] by LOP status.[12] LOP participants[13] were six percent more likely to submit one application in completed removal cases than non-LOP participants and equally as likely to submit multiple applications. Table 2 shows that seven percent more of non-LOP participants did not file any application.

**Table 2. Percentage of Completed Removal Cases by Number of Applications (Detained and Released)**

| Number of Applications | LOP | Non-LOP[14] |
|---|---|---|
| No Application | 51% | 58% |
| One Application | 41% | 35% |
| Multiple Applications | 8% | 8% |

As indicated in Table 3, LOP respondents are more likely to have an application filed, regardless of whether the respondent is detained or released. Notably, LOP cases are more likely to have an asylum application filed. The increased likelihood of filing applications, such as an asylum application, for LOP cases may contribute to their longer case lengths and increased likelihood of progression to a merits hearing, which was found in Phase I. Conversely, non-LOP participants were more likely to file no applications in their cases, regardless of custody status. There are no notable differences in applications filed by LOP and non-LOP respondents when looking at 42A Cancellation of Removal,

---

[9] The additional cost, if any, imposed by longer hearings is beyond the scope of Phase II, but EOIR may evaluate at a future date whether longer hearings lead to increased costs.
[10] Application categories are provided in the table in Appendix A.
[11] Completed cases were those where the last proceeding had a completion date and a decision recorded that was not a COV, transfer, or administrative closure.
[12] There are 290,000 completed removal cases (212,000 detained and 78,000 released) used to analyze applications for LOP and non-LOP participants.
[13] Consistent with Phase I, the definition of an LOP participant is a respondent who has received LOP service prior to his or her case completion or last hearing.
[14] Due to rounding, these numbers do not sum to 100 percent.

Admin. Rec. 257

Case 1:25-cv-00298-RDM    Document 78-1    Filed 05/21/25    Page 53 of 132

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
LOP COHORT ANALYSIS PHASE II
January 29, 2019

42B Cancellation of Removal, Adjustment of Status, Voluntary Departure, or other applications.[15]

**Table 3. Percentage of Completed Removal Cases with Applications by Custody Status[16]**

| Type of Application | Detained Cases | | Released Cases | |
|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP |
| 42A | 6% | 5% | 2% | 2% |
| 42B | 5% | 4% | 10% | 9% |
| Asylum | 23% | 15% | 41% | 34% |
| Adjustment | 1% | 1% | 2% | 3% |
| No Application | 53% | 62% | 42% | 48% |
| Voluntary Departure | 19% | 19% | 13% | 13% |
| Other | 2% | 2% | 2% | 2% |

When controlling for custody status and hearing location, regression analyses revealed that LOP status has a statistically significant effect on the types of applications filed in a removal case, except voluntary departure applications. For cases with voluntary departure applications, custody status and hearing location had a statistically significant relationship to the type of application filed, but LOP status did not.

## HEARING DURATION BY APPLICATION TYPE[17]

Merits hearings are longer on average for LOP respondents than non-LOP respondents, regardless of the number of applications filed in the case. These results confirm the analysis found in the hearing duration analysis section of this paper. Of additional note, cases in which multiple applications were filed typically tend to have shorter merits hearings than cases with only one application filed, regardless of custody status. Cases in which multiple applications are filed generally have more hearings than those with one application. The shortest hearing durations were for cases that did not include an application, which was also seen across both custody statuses.[18]

As previously discussed, for all master hearings, regardless of LOP or non-LOP status, there are a small number of hearings that last significantly longer than the average. This trend is demonstrated

---

[15] Asylum applications throughout the analysis were categorized as asylum, withholding of removal, and withholding or deferral of removal under the Convention Against Torture applications, as found on form I-589. These were also considered to be one application in the corresponding tables.

[16] Columns do not sum to 100 percent, as cases may contain multiple applications, per Table 2.

[17] For this section of the analysis, an LOP hearing is that in which the respondent has received his or her first LOP service prior to the hearing date. For example, if an LOP participant received his or first LOP service one day after his or her first hearing, the first hearing was considered a non-LOP hearing. Note that this section defines LOP and non-LOP participation at the hearing level rather than at the respondent level.

[18] Applications for relief or protection are generally not adjudicated at master hearings and are therefore not analyzed in this section.

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
LOP COHORT ANALYSIS PHASE II
January 29, 2019

again in Table 4, as the average hearing duration, regardless of the number of applications filed or LOP status, is longer than the median hearing duration.

**Table 4.  Merits Hearing Duration (Minutes) by Number of Applications in Removal Cases and LOP Status at Date of Hearing**

| Number of Applications[19] | Average Hearing Duration | | Median Hearing Duration | |
|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP |
| No Application | 34.2 | 26.5 | 17.2 | 13.2 |
| One Application | 78.8 | 71.5 | 63.8 | 53.6 |
| Multiple Applications | 73.7 | 67.9 | 55.5 | 43.8 |

For completed removal cases in which only one application was filed, LOP participants had longer merits hearings than non-LOP participants for each application type outside of 42B Cancellation of Removal and Voluntary Departure. Table 5 shows that merits hearings for LOP participant cases with 42B Cancellation of Removal applications were slightly shorter on average than non-LOP participants, while merits hearings in cases with Voluntary Departure applications were nearly the same length (22 minutes) for both LOP and non-LOP participants.

**Table 5.  Merits Hearing Duration (Minutes) in Single Application Removal Cases by Type of Application and LOP Status at Date of Hearing**

| Type of Application[20] | Average Hearing Duration | | Median Hearing Duration | |
|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP |
| 42A | 70.5 | 67.4 | 55.9 | 50.9 |
| 42B | 70.7 | 71.3 | 55.0 | 55.1 |
| Adjustment | 53.0 | 52.9 | 31.8 | 27.1 |
| Asylum | 84.9 | 77.2 | 72.3 | 61.9 |
| Voluntary Departure | 21.9 | 21.8 | 13.8 | 13.9 |

## CONCLUSIONS

Seventy-six percent of LOP participants receive his or her first LOP service prior to his or her first hearing. The LOP participants in this analysis apply for asylum more frequently and are more likely to submit an application throughout their cases than non-LOP participants. Additionally, merits hearings

---

[19] The number of applications in the completed removal case for which that merits hearing was held.
[20] Only includes cases where exactly one application was filed.

for removal cases with zero, one, or multiple applications filed are longer for LOP participants than for non-LOP participants.

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

## APPENDIX A: PHASE II METHODOLOGY

### OVERVIEW

The Executive Office for Immigration Review (EOIR) conducted an analysis comparing multiple key performance metrics between respondents who participated in EOIR's general Legal Orientation Program (LOP) and those who did not. This supplemental document summarizes the methodology taken in conducting Phase II of this analysis.

In this analysis, EOIR considered a respondent released if the respondent had a custody status of "released" during any given hearing, even if the respondent had a custody status of "detained" at a different hearing. EOIR did not include cases that involved the Institutional Hearing Program, juvenile cases, or zero bonds. Completed cases do not include changes of venue, transfers, or administrative closures. EOIR only considered removal cases when analyzing application data.

To identify which of these respondents received LOP, EOIR used data provided by the LOP contractor. This data identified all respondents who participated in LOP from Fiscal Year (FY) 2013 to FY 2017 and indicated the LOP service date. Respondents who received the LOP after their last hearing or proceeding completion were removed from the dataset, as well as those that were determined to have received the LOP prior to FY 2013 but not during the study period. EOIR used this data to categorize the respondents in EOIR data as LOP participants or non-LOP participants. For the hearing duration analyses, EOIR defined a hearing as an LOP hearing if the respondent first received the LOP service prior to the hearing adjudication date. This base dataset was used as the starting point for the measures defined in this paper.

### TIMING OF FIRST LOP SERVICE PROVIDED

To calculate the days between a respondent's first hearing and his or her first LOP service date, EOIR subtracted his or her first LOP service date from the first hearing date of his or her first proceeding input between FY 2013 and FY 2017.

### HEARING DURATION BY HEARING TYPE

The duration of each hearing was developed using data from the Digital Audio Recording (DAR) system, which uses digital audio recording equipment to record audio files and the start and end times of EOIR hearings. Cases were removed that had data entry errors, including: hearings with duplicated recordings, hearings with lengths over nine hours (most likely the result of the DAR system being inadvertently left on), or hearings in which either on-record or off-record time was missing. EOIR calculated the average and median hearing durations for master and individual calendar (merits) hearings, excluding call-up codes (aside from reserved decisions), custody hearings, and *in absentia* hearings, as well as adjournments labeled "Data Entry Error" or related to operational rescheduling.

For this analysis, EOIR analyzed the number of applications filed (by type) per completed removal case. EOIR measured the overall number of applications filed per case, looking at the number of cases with zero, one, or multiple applications by LOP status. Applications filed that were not for asylum, adjustment of status, 42A Cancellation of Removal, Voluntary Departure, or 42B Cancellation of



**EXECUTIVE OFFICE FOR**
**IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
LOP COHORT ANALYSIS PHASE II
January 29, 2019

Removal were recorded in the data as "Other." The asylum application type used throughout the analysis consisted of asylum, withholding of removal, and withholding or deferral of removal under the Convention Against Torture applications, as found on form I-589. Any combination of the aforementioned I-589 applications was considered a single asylum application when counting the number of applications filed per case.

To measure trends in applications filed, EOIR calculated the totals for each type of application filed, grouping by LOP participation and custody status of the respondent in the case and dividing by the total number of cases within each group.

## HEARING DURATION BY APPLICATION TYPE

To measure the effect of applications on hearing duration, EOIR analyzed hearing durations within completed removal cases with zero, one, or multiple applications. As applications for relief are generally not discussed in master calendar hearings, EOIR considered only merits hearings for this section.

EOIR only considers cases in which all of their proceedings contain a single application type filed. For cases in which a single application was filed, EOIR categorized all merits hearings by application type, grouped by LOP status at the hearing date, and measured the average and median hearing durations for each type and group accordingly.

## REGRESSION ANALYSES

EOIR calculated key descriptive characteristics for each of the above measures, including minimum, average, median, and maximum values. These calculations showed that the metrics in this paper tended to have outliers. For example, a select few hearings had exceedingly long hearing durations.

In order to account for these outliers, as well as hearing location, attorney representation, application type, and custody status, regression analyses were used to isolate and evaluate the LOP's relationship with court operations.



**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
January 29, 2019

## ADDENDUM TO LOP COHORT ANALYSIS, PHASE I: DETENTION LENGTH WITH DHS DATA

The Executive Office for Immigration Review (EOIR) conducted an analysis comparing multiple key performance metrics between respondents who participated in EOIR's general Legal Orientation Program (LOP) and those who did not. EOIR completed Phase I of that analysis and presented its results on September 5, 2018.

At the time Phase I began, EOIR did not possess certain detention data from the Department of Homeland Security (DHS) that would have made the analysis of particular questions regarding detention length and cost more robust. As Phase I was being finalized for release, however, DHS provided EOIR with more granularly precise data regarding detention, including book-in and book-out dates. Rather than delay the release of its Phase I findings, EOIR pledged to re-run any Phase I analysis related to the detention data using the DHS data and to publish those results once available. The instant Addendum fulfills that pledge and should be read in concert with the other findings from Phase I.

### LENGTH OF STAY AT DETENTION FACILITIES

Holding respondents in detention for extended periods of time increases costs across the federal government, and for DHS in particular. EOIR was provided DHS detention data for this analysis. EOIR included all respondents with full and complete DHS detention history (both a DHS book-in and book-out date).

EOIR found that:

- Respondents who have been through the LOP program stay in detention longer than respondents who have not been through the LOP program, with LOP respondents averaging 106 days in detention and non-LOP respondents averaging 76 days in detention.

- LOP participants on average spent 30 more days in detention than non-LOP participants, which results in an estimated additional $3,700 in detention costs per LOP respondent.[1]

In general, these findings, using more precise data from DHS, confirm and expand similar findings from Phase I using only EOIR data.[2] The specific results are provided in more detail below.

---

[1] The DHS FY 2016 and FY 2017 Congressional Budget Justifications were used to determine the average cost of an adult detention bed per night for FY 2013 to FY 2016. For FY 2017, DHS provided the cost of an adult detention bed as of the end of FY 2017's 3rd quarter. More granular detention cost information from DHS could improve the robustness of the study, and the level of detail of costs could potentially change EOIR's findings.

[2] EOIR's initial findings from Phase I, using only EOIR detention data, indicated that LOP respondents averaged 72 days in detention and non-LOP respondents averaged 47 days in detention. The average of 25 additional days in detention for LOP respondents resulted in an estimated additional $3,100 in detention costs per LOP respondent.

Admin. Rec. 263

**EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM:
COHORT ANALYSIS
January 29, 2019

While analyzing length of stay, EOIR separated detained and released populations, as they have marked differences in length of detention stays for both LOP and non-LOP respondents. For this section, detained respondents are those with full and complete detention history and a custody status of "detained" at all points in their case history, capturing respondents with cases completed while in detention. EOIR considered a respondent released if he or she had a custody status of "released" at any point during the case history, even if there was a custody status of "detained" at other times.

**Table 1. Estimated Total Cost Added by LOP Respondents (Dollars) (Detained and Released)[3]**

| Custody Status | Total Cost Added by LOP Respondents |
|---|---|
| Detained | $60,000,000 |
| Released | $43,000,000 |
| **Total** | **$103,000,000** |

Note that other internal, external, and DHS-related factors may also contribute to detention length. For example, EOIR found that at each hearing location, there is significant variation in the number of days LOP and non-LOP respondents stay in detention; thus, hearing location may be an important factor for detention length.

**Table 2.  Average Detention Length (Days) and Costs (Dollars) from FY 2013 to FY 2017 (Detained)[4,5]**

| Fiscal Year of Receipt | Average Detention Length (Days) per Respondent and Cost | | | | |
|---|---|---|---|---|---|
| | Detention Length per Respondent | | | Detention Cost | |
| | LOP | Non-LOP | Difference (LOP - Non-LOP) | Average Detention Cost Added per LOP Respondent ($) | Total Cost Added by LOP Respondents ($) |
| 2013 | 109 | 86 | 24 | $2,800 | $42,000,000 |
| 2014 | 116 | 92 | 24 | $2,900 | $43,000,000 |
| 2015 | 138 | 106 | 32 | $3,900 | $55,000,000 |
| 2016 | 148 | 109 | 39 | $5,000 | $76,000,000 |
| 2017 | 131 | 94 | 37 | $4,700 | $85,000,000 |
| **Average** | **128** | **97** | **31** | **$3,900[6]** | **$60,000,000** |

---

[3] The difference in the total cost stems from the expansion of the cohort studied due to the provision of data by DHS.

[4] Fiscal year represents the input date of a respondent's Notice to Appear.

[5] Note that average length of stay calculations are rounded to the nearest whole number for the purposes of presentation.

[6] Due to rounding, the five-year average of the rounded costs displayed in the table will not necessarily equal the total average displayed. This number is a rounded average cost across all fiscal years.

Admin. Rec. 264

**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

LEGAL ORIENTATION PROGRAM: COHORT ANALYSIS
January 29, 2019

Table 3 shows that released respondents have shorter detention stays than detained respondents.

Table 3.  Average Detention Length (Days) and Costs (Dollars) from FY 2013 to FY 2017 (Released)

| Fiscal Year of Receipt | Average Detention Length (Days) per Respondent and Cost | | | | |
| | Detention Length per Respondent | | | Detention Cost | |
| | LOP | Non-LOP | Difference (LOP - Non-LOP) | Average Detention Cost Added per LOP Respondent ($) | Total Cost Added by LOP Respondents ($) |
|---|---|---|---|---|---|
| 2013 | 79 | 49 | 31 | $3,600 | $40,000,000 |
| 2014 | 78 | 51 | 28 | $3,300 | $37,000,000 |
| 2015 | 82 | 59 | 23 | $2,800 | $32,000,000 |
| 2016 | 90 | 64 | 26 | $3,400 | $50,000,000 |
| 2017 | 85 | 51 | 35 | $4,400 | $55,000,000 |
| **Average** | **83** | **55** | **28** | **$3,500[7]** | **$43,000,000** |

Note that the average detention length for both respondent types grew year over year except for FY 2017, which may be in part due to recency bias.

---

[7] Due to rounding, the five-year average of the rounded costs displayed in the table will not necessarily equal the total average displayed. This number is a rounded average cost across all fiscal years.

Admin. Rec. 265





**Executive Office for
Immigration Review**



**2021**

# FY 2014 to FY 2019
# Legal Orientation
# Program
# Cost Evaluation



**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
PLANNING, ANALYSIS, AND STATISTICS DIVISION (PASD)**

# Contents

Tables ........................................................................................................................ 2

Figures ...................................................................................................................... 5

Glossary/Acronyms .................................................................................................. 6

Executive Summary .................................................................................................. 9

Analytic Overview .................................................................................................... 14

Component I: LOP Funding and Cost Of Detention .................................................. 20

Component II: Hearings, Schedules, Applications, Bonds, and Motions ................. 32

Final Analysis-End Matter ........................................................................................ 44

Appendix A: Supplemental Material ......................................................................... 46

Appendix B-Methodological Details ......................................................................... 54

Appendix C-Brief LOP Locations Analysis ............................................................... 57

Appendix D-Released-Pending Data Analysis .......................................................... 63

Appendix E-Other Comparative Data ....................................................................... 69

## Tables

| Tables and Titles | Page Number |
|---|---|
| Table 1.  Data Characteristics (Criteria) and Decision Rationale | 16 |
| Table 2. Master of LOP and Non-LOP Data Studied | 19 |
| Table 3.  Office of Legal Access Program (OLAP) Funding by FY | 20 |
| Table 4. Number and Percent of LOP and Non-LOP Respondents across FY and Custody Status | 21 |
| Table 5. Percentage of Respondents by LOP and Custody Status across Fiscal Year (%) | 22 |
| Table 6. Overall Proportion of LOP and Non-LOP Respondents by Custody Status Based on Total Respondents by FY (%) | 22 |
| Table 7. Number of Respondents across LOP Service Type and Custody Status by FY | 23 |
| Table 8. Average (Mean) Cost of Detention for One Adult Respondent per One Overnight Stay | 26 |
| Table 9. Average (Mean) Number of Days Detained by Custody Status and FY | 26 |
| Table 10. Average Number of Days Detained per Respondent Cost (Detained) | 27 |
| Table 11. LOP and Non-LOP Average Number of Days Detained with Corresponding  SEMs by FY (Detained) | 28 |
| Table 12. Average (Mean) Detention Length (Days) and Costs (Dollars) for FY 2014 through FY 2019 (Released) | 28 |
| Table 13. LOP and Non-LOP Average Days with Corresponding SEMs by FY | 29 |
| Table 14. Costs Related to the LOP Programs Evaluated in the Current Study across FY and Custody Status | 30 |
| Table 15.  Total Number of Respondents Attending Proceedings across Custody Status and FY | 32 |

| | |
|---|---|
| Table 16.  Number of Attended Proceedings across Custody Status and FY | 33 |
| Table 17. Average Initial Masters Hearings Duration (in Minutes) and Average Cost (Dollars) across Custody and LOP Status (Detained) | 35 |
| Table 18. Average Initial Masters Hearings Duration (in Minutes) and Average  Cost (Dollars) across LOP Status (Released w/ ICC Date Only) | 35 |
| Table 19. Average Individual Merits Hearings Duration (in Minutes) and Average Cost (Dollars) across LOP Status and FY (Detained) | 36 |
| Table 20. Average Individual Merits Hearings Duration (in Minutes) and Average Cost (Dollars) across FY (Released) | 37 |
| Table 21.Average Application Duration (in minutes) and Average Cost (Dollars) across FY (Detained) | 37 |
| Table 22. Average Application Duration (in minutes) and Average Cost (Dollars) across FY (Released) | 38 |
| Table 23. Average Bond Duration (in minutes) and Average Cost (Dollars) across FY (Detained) | 39 |
| Table 24. Average Bond Duration (in minutes) and Average Cost (Dollars) across FY (Released) | 39 |
| Table 25. Average Motions Duration (in minutes) and Average Cost (Dollars) across FY (Detained) | 40 |
| Table 26. Average Motions Duration (in minutes) and Average Cost (Dollars) across FY (Released) | 40 |
| Table 27. Annual LOP Cost of Five Adjudication or Processing Types FY (Detained) | 41 |
| Table 28. Annual LOP Cost of Five Adjudication or Processing Types across FY (Released) | 42 |
| Table 29. Component II On-Record Costs | 42 |
| Table 30. The Total and Average Cost of Components I and II cross Custody Status and FY | 43 |
| Table 31. The Number of Respondents with Legal Representation at any Time During their Detention | 47 |
| Table 32. The Proportion of Respondents with Legal Representation at any Time | 48 |

| | |
|---|---|
| Table 33. Median Number of Days Detained across Custody Status and Fiscal Year for Comparison Purposes Only | 53 |
| Table 34. Number and Percent of Respondents by LOP Status for Matched LOP Locations | 57 |
| Table 35. LOP Matched Locations with Average (Mean) Number of Days Detained with LOP SEMs > 2.58 (High-SEM Data) | 58 |
| Table 36. LOP matched Locations with Average (Mean) Number of Days Detained with LOP SEMs < 2.58 (Low-SEM Data) | 59 |
| Table 37. Average Number of Days Detained across Base-Cities from Highest to Lowest | 61 |
| Table 38. Number of Released-Pending Respondents across FY | 63 |
| Table 39. Number of Proceedings Attended by Released-Pending Respondents | 65 |
| Table 40. Total Number of Released-Pending Respondents Attending Initial Masters Hearings across Custody Status and FY | 65 |
| Table 41. Total Number of Released-Pending Respondents Attending Individual Merits Hearings across and FY | 66 |
| Table 42. Total Number of Released-Pending Respondents Attending Application Hearings across FY | 66 |
| Table 43. Total Number of Released-Pending Respondents Attending Bond Hearings across FY | 67 |
| Table 44. Total Number of Released-Pending Respondents Attending Motion Hearings across FY | 67 |
| Table 45. Costs for Released-Pending Respondents Only | 68 |
| Table 46. Average Duration and Number of Proceedings for Detained Component II Respondents | 69 |
| Table 47. Average Duration and Number of Proceedings for Released Component II Respondents | 69 |

## Figures

| Figures | Page Number |
|---|---|
| *Figure 1. Costs for LOP Detained and Released Respondents Above and Beyond the Non-LOP Costs across FY* | *12* |
| *Figure 2. Component II Costs by Custody Status and FY* | *13* |
| *Figure 3. Average Number of Services Attended per Respondents across Custody Status and FY* | *24* |
| *Figure 4. Average Number of Services Attended per Respondent by Custody Status and FY* | *24* |
| *Figure 5. Average Number of Days Detained for LOP and Non-LOP Respondents by Custody Status* | *29* |
| *Figure 6. Proportion of Respondents with Legal Representation by Custody Status across FY (Illustrating Point A Above)* | *49* |
| *Figure 7. Proportion of Respondents with Legal Representation by Custody Status and FY (Illustrating Points A-D Above)* | *49* |
| *Figure 8. Distribution of LOP and Non-LOP Respondents by Custody and across FY* | *51* |
| *Figure 9. Q-Q Plots to show Linearity and Outliers for LOP and Non-LOP Respondents by Custody Status and across FY* | *52* |
| *Figure 10. Number of Released-Pending Respondents across LOP Status and FY* | *63* |
| *Figure 11. Number of Released and Released-Pending Respondents by LOP Status across FY* | *64* |

## GLOSSARY/ACRONYMS

| Word/Acronym | Definition |
|---|---|
| Base City | Immigration courts are located around the Unites States and U.S. territories and fall within the larger base city areas, which may cover more than one hearing location |
| CBO | Congressional Budget Office |
| COV | Change of Venue of a case at any point during the CASE |
| Custody Status | Detained, Released, Released-Pending, or Never Detained  Respondents |
| DAR | Digital Audio Recordings used to calculate time of hearings |
| DHS | Department of Homeland Security |
| DV | Dependent Variable: The outcome variable. For example, in Component I of this evaluation, the DV is length of stay |
| Detained | Respondents who are actively detained in custody for the entirety of their case |
| EOIR | Executive Office for Immigration Review |
| FY | Fiscal Year |
| Homogeneity | Equal variances between group residuals |
| I-862 | See Immigration Court Case |
| ICC | Initial Case Completion |
| ICE | The U.S. Immigration and Customs Enforcement is a federal law enforcement agency under the U.S. Department of Homeland Security. ALL respondents are found in the ICE data sets, but not all respondents attended the LOP program. |
| IJ | Immigration Judge |
| Immigration Court Case | Immigration court cases include twelve case types, divided into four categories: |
| | Category 1: I-862 case types include removal, deportation, and exclusion cases. |
| | Category 2: I-863 case types include asylum-only and withholding-only cases. |
| | Category 3: Review case types include credible fear review, reasonable fear review, and claimed status review cases. |

<u>Category 4</u>: Other case types include rescission, non-removal Nicaraguan Adjustment and Central American Relief Act (NACARA), departure control, and continued detention review cases.

| | |
|---|---|
| **Independence** | Refers to the assumption that data are independent, which means that groups are mutually exclusive and observations are independent. |
| **IV** | Independent Variable: explanatory variables that are used to determine their effect on the DV.  For example, in Component I of this evaluation, the IV's are LOP Status, Custody Status, and FY. |
| **JLC** | Judicial Law Clerk |
| **LA** | Legal Assistant |
| **Linearity** | Refers to the assumption that data have a measureable relationship |
| **LOP** | Refers to the Legal Orientation Program |
| **LOP Respondent** | Refers to respondents who attended the Legal Orientation Program |
| **Non-LOP Respondent** | Refers to respondents who did not attend the Legal Orientation Program |
| **Normality** | Refers to the assumption that data are normally distributed with a mean = 0 and standard deviation = 1 (symmetric) |
| **Nonparametric Statistics** | A classification of statistics used when data do not fit a known underlying distribution. Also referred to as distribution free. For example, if data are highly skewed, or violate the assumptions of parametric statistics, non-parametric tools are used. These tools include: Chi Square, Mann-Whitney, Kruskal Wallis, and Moods Median tests |
| **OLAP** | Office of Legal Access Program |
| **Parametric Statistics** | Parametric statistics are a classification of statistics, which assumes data comes from a population that can be adequately modeled by a probability distribution with a fixed set of parameters. There are four underlying assumptions of a given data distribution: Linearity, Independence, Normality (symmetry), and Homogeneity (equal variances). Example of tools included: ANOVA, t-test, Simple Linear Regression |
| **Released** | Respondents released from custody at any point the case is in EOIR's jurisdiction to adjudicate. |
| **Removed** | Refers to Respondents in EOIR Removal Hearings ordered removed |

| | |
|---|---|
| **SEM** | Standard Error of Measurement: A function of the estimated parameters such as means (averages) and the precision of those estimates. When the estimates are exact the standard error of measurement = 0. With $\alpha = 0.01$, standard errors $\leq 2.58$ reflect stability with 99% confidence. |
| **VERA** | The VERA Institute of Justice oversees the Legal Orientation Program (LOP) for providers across the United States and U.S. territories |

## EXECUTIVE SUMMARY

### Introduction

The Executive Office for Immigration Review (EOIR) conducted an analysis to report the overall cost associated with EOIR's Legal Orientation Program (LOP).  This analysis is a follow-up to LOP Cohort Analysis Phase I and LOP Cohort Analysis Phase II, in which EOIR compared multiple performance metrics between respondents who participated in EOIR's general LOP and those who did not. Analyzing the tangible financial costs[1] in U.S. dollars incurred provides an understanding of the program's impact on government agencies' resources.

While other types of evaluations/analyses may be considered to assess the non-cost impacts and/or possible benefits of the LOP program,[2] this evaluation focuses solely on government expenditures generated by the LOP program, beyond Non-LOP costs between FY 2014 and FY 2019[3].

Using the data available to EOIR, EOIR developed a quantitative analysis to capture costs relating to overall LOP program funding, as well as the difference in costs incurred by EOIR and other governmental agencies associated with proceedings of respondents who did and did not receive LOP services. These analyses consider the various costs associated with the differences in performance and operations between LOP and non-LOP cases as studied in both phases of the LOP Cohort Analysis.

This FY 2014 through FY 2019 analysis has two major components. First, the costs associated with respondent's[4] average length of detention (number of days detained) is examined along with related LOP program costs (Component I). Second, the average length of proceedings, hearings, schedules, and motions, henceforth referred to as *proceedings,* is provided in minutes, and the average number of proceedings across proceeding types (initial masters, individual merits, applications, bonds, and motions) are calculated. The average cost of these proceedings is then calculated by using the sum of the weighted average of the salaries per minute of court staff (Component II) for detained and released respondents.

Since this is an evaluation of costs, broad recommendations based on these analyses are provided at the end of this report to monitor and manage costs moving forward.  These recommendations are not intended to be a finite set, but a starting point for any potential discussions resulting from this study.

---

[1] This evaluation does not include non-financial, non-monetary costs nor benefits in this study.

[2] EOIR performed various other analyses in LOP Cohort Analyses Phase I and II.  EOIR does not preordain which analytic tools and processes it will and will not use, but rather designs and constructs its analyses based upon the data and information available., .

[3] LOP respondents are persons in the ICE database and enrolled in the LOP program. Non-LOP respondents are persons in the ICE database but not enrolled in the LOP program

[4] In the current study, respondents are persons who are detained, released, or released-pending while in EOIR's jurisdiction. Released respondents represent individuals who were once detained and then released from custody and have a valid initial case completion date (ICC) and judicial decision in their case file. Table 1 in this report provides all data characteristics applicable to these data.

**Background on the Legal Orientation Program**

Through the Legal Orientation Program (LOP), representatives from nonprofit organizations provide comprehensive explanations about immigration court procedures along with other basic legal information to large groups of detained individuals.[5] Within EOIR, the LOP is administered by the Office of Legal Access Programs (OLAP). In fulfillment of the LOP, representatives from non-profit organizations provide information and services regarding immigration court procedures and other basic legal information to detained and released individuals in facilities operated by the Department of Homeland Security (DHS)[6]. The LOP offers the following services to detained individuals:

- **Group Orientation,** which provides an interactive general overview of immigration removal proceedings, forms of relief, and is open to general questions;
- **Individual Orientation**, where unrepresented individuals can briefly discuss their cases with experiences LOP providers and pose more specific questions;
- **Self-help Workshops**, where those with potential relief or those who wish to voluntarily depart the country, are provided guidance on specific topics (such as how to complete an asylum application or prepare for a bond hearing), and given self-help legal materials;
- **Referral to Pro Bono Legal Services**, where available (in some immigration cases, respondents are provided referrals to no-cost legal services).

**Key Results for Component I**

The Component I analysis provides the total detention cost of $767,539,762 added by LOP respondents for FYs 2014 through 2019 (See Table 14 on page 30).

| Type of LOP Cost for FY 2014 through FY 2019 | Total Cost Added by LOP Respondents between FY 2014 and FY 2019 ($) |
|---|---|
| Actual LOP Funding* | $56,164,698 |
| Detained** | $498,453,482 |
| Released*** | $212,921,582 |
| **Total Cost** | **$767,539,762** |
| **AVERAGE Cost across Six (6) Fiscal Years** | **$127,923,294** |

*From Table 2 in Report, ** From Table 10 in Report, *** From Table 12 in Report*

For the analyses of FY 2014 and FY 2019 costs for LOP and Non-LOP respondents across custody status, Component I results highlight four important takeaways:

1. On average, LOP respondents ($\mu$ = 109 days) are detained, 30 days longer than Non-LOP respondents ($\mu$ = 79 days) across location, custody status, and fiscal year.[7]

---

[5] https://www.justice.gov/eoir/legal-orientation-program

[7] When using an independent samples t-test, the test statistic and degrees of freedom (df) reported depend on whether the tested groups of data have equal variances. If there are equal variances, the dfs are calculated using n-1, if variances are not equal, the dfs are calculated by using the Satterthwaite formula which calculates the "effective degrees of freedom", rather than the actual df. An independent samples t-test with the number of days detained as the dependent variable and LOP status (LOP and Non-LOP) as the independent or grouping variable show that LOP respondents stayed significantly longer than released respondents. Using equal variances not assumed because of a significant Levine's test of equal variances, with $\alpha$ = .01, t (257864.639) =107.678, p < 0.0001. All LOP and Non-LOP respondents show long average mean detention stays ($\geq$ 49 days) across fiscal years and reported by custody status.

2. Detained respondents stay an average of 51 days longer than released respondents (Detained: μ = 119 days and Released: μ = 68 days) regardless of LOP status.[8,9]
3. The probability of a respondent self-selecting into LOP programs across fiscal years was 0.375 for detained respondents and 0.279 for released respondents.[10] This demonstrates the low likelihood of self-selecting into the LOP program which allows the EOIR to better predict future costs.
4. Base city (location) was a significant factor in 52 of the 55 matched base city locations[11] regardless of LOP or custody status across fiscal year (not significant in Denver, Oakdale, or Ulster). Appendix C contains additional information regarding the 52 significant base city locations. Note that base cities may reflect the base city from the original Notice to Appear (NTA) or from the ICC.[12]

## Key Results from Component II

The Component II analysis provides the total court costs added by LOP respondents for FYs 2014 through 2019 (see Table 29). The average additional cost from LOP respondents across six fiscal years was $2,025,605, while the total average additional court costs in Component II was $12,153,070 rounded to the nearest whole dollar (See Table 29 on Page 42).

| Component II Court Costs | |
|---|---|
| Custody Status | Additional Average Costs across Fiscal Years Added by LOP Respondents ($) |
| Detained | $10,127,465 |
| Released(w/ ICC Date Only) | $2,025,605 |
| **Total Component II Cost** | **$12,153,070** |
| **Average Cost across 6 Fiscal Years** | **$2,025,512** |

## Total Costs from this Evaluation

For Components I and II only, the total average cost of $779,692,832 was added, beyond the cost of Non-LOP respondents, across six fiscal years. These costs related to the LOP program do not include all costs associated with on-record costs or other respondents not included, but are representative of the costs associated with LOP respondents in removal hearings across all court locations.

---

8 An independent samples t-test with the number of days detained as the dependent variable and custody status (detained or released) as the independent or grouping variable show that detained respondents stay significantly longer than released respondents. Using equal variances not assumed because of a significant Levine's test of equal variances, with α = .01, t (394301.926) =186.388, p < 0.0001.
9 The Standard Errors of Measurement (SEMs) provide strong evidence of data precision and low variance at a 99% confidence level for all respondents across FY, LOP and custody status, regardless of location. In other words, the data used in this cost evaluation are (a) representative of the population of form I-862 cases and (b) representative of respondents across custody status, LOP status, and FY.
10 The probability of an event taking place ranges between 0 and 1 with values closer to 0 being less likely to occur and values closer to 1 more likely to occur. Probabilities of 0 can never happen and probabilities of 1 always happen. The probability values of LOP = .0375 and Non-LOP = 0.279 indicate that just over 1/3 of all respondents self-select into LOP services.
11 An Analysis of Variance (ANOVA), showed with α = .01, that out of 55 matched LOP locations, the number of days detained between LOP and Non-LOP respondents was significantly higher for LOP respondents (p <.0001) in all but Denver (p = .158), Oakdale (p = .188), and Ulster Correctional Facility (p = .151) where there were no significant differences.
12 Please see Appendix C for more detailed information on location of detention/hearings

Together, the total average cost associated with the current LOP cost evaluation for Components I and II, across FY and custody status, is $779,692,832.00 (See Table 30 on page 43).

| All Average LOP Costs across FY and Custody Status | |
|---|---|
| Cost From: | Additional Average Costs across Fiscal Year Added by LOP Respondents ($) |
| Component I * | $767,539,762 |
| Component II** | $12,153,070 |
| **Total Cost** | **$779,692,832** |
| **Average Costs across FY** | **$129,948,805** |

 *From Table 14, ** From Table 29*

Figure 1 below illustrates the Component I LOP costs, beyond the Non-LOP costs; between detained and released LOP respondents across FY. Figure 2 below illustrates the Component II LOP costs, beyond the Non-LOP costs; between detained and released LOP respondents across FY.

*Figure 1. Costs for LOP Detained and Released Respondents Beyond the Non-LOP Costs across FY*



In Figure 1, Component I, released respondents cost **less** (detention costs) year over year than detained respondents.

Note in Figure 1, the data show a decreasing cost difference between LOP and Non-LOP respondents across custody status in FY 2018 and FY 2019.  This is likely due the uptick of the number of respondents seen in FY 2017 and the decreasing proportion of LOP respondents beginning in FY 2018 through FY 2019 when compared to the proportion of Non-LOP respondents the same fiscal years.

In Figure 2, Component II, the on-record costs peaked in 2017 and then began to decline as the number and duration of proceedings for LOP respondents declined.

*Figure 2. Component II: LOP Costs by Custody Status and FY*



Figure 2 shows that released respondents, on average, cost **less** (on-record costs) year over year than detained respondents. Both figures show a spike in both detained and released respondent costs in FY 2017 and a decline in FYs 2018 and 2019.



# ANALYTIC OVERVIEW

## Introduction and Background

In the following report, EOIR compares multiple key performance metrics and their resultant costs between respondents who participated in the LOP and those who did not.  A team of career federal employees within EOIR's Planning, Analysis, and Statistics Division (PASD), all of whom are trained analysts and statisticians, conducted this study.  Several members have multiple years of experience working with EOIR data and/or immigration-related operational experience.  PASD neither oversees the LOP, nor is it involved in EOIR's administration of legal orientation programs; consequently, it provided an independent analysis of the LOP with no stake in the outcome.

In carrying out this most recent study, EOIR requested data from the LOP contractor and from DHS.  It also used improved methodologies to both confirm the results of prior studies as well as enhance this current version.

As in the prior studies, this study does not address several LOP-related legal and policy issues that are beyond its scope.  For example, this study does not assess whether LOP programs are most effective within a particular EOIR program, as a standalone, or within another component of the Department of Justice.

The EOIR team made decisions regarding data constraints (filters) at every step of any research process. In this current evaluation, the data characteristics were examined, considered, and discussed at length with the entire EOIR team, which includes a research methodologist and statistician, program directors, analysts, data scientists and Subject Matter Experts (SMEs)

The data characteristics outlined in this report provide the most comprehensive catalogue of each data filter and the rationale behind the final decision of inclusion or exclusion. This study is reproducible explicitly because of the care taken to outline each data decision and rationale at each step of the evaluation process. For example, to standardize comparisons, only I-862 removal cases were examined since these cases represent the largest proportion of cases across EOIR (95%) ,and thus the most likely to have an LOP orientation. Additionally, in Component II, the five most common on-record proceedings were included.

In Component I, the dependent variables (DVs) related to the LOP respondent's cost of the length of stay beyond the Non-LOP respondents' cost. LOP status (LOP or Non-LOP) was independent variable (IV). In Component II, the DVs related to the LOP respondent's cost of the proceedings beyond the coat for Non-LOP respondents. The IV was again LOP status.

EOIR did not focus on other IVs such as age, gender, nationality, language spoken, whether they arrived alone or with a family unit, those flagged as known criminals, those with a reasonable or credible fear justification, or other confounding personal characteristics. Additionally they did not control for specific court backlog, and/or clear or unclear governmental immigration policy decisions and changes influencing the number of days detained. These factors are extremely difficult, if not impossible, to accurately project in an immigration system where policies,

migration patterns, and operational norms are constantly changing (and where data entry is not mandated). Trying to project results on such metrics is akin to measuring a moving and ever-changing target. As such, deriving costs were calculated with metrics that are generally fixed/completed. While challenging, the following results provide complete transparency as to the approach and data used.

**Structure of Evaluation and Demographics**

This evaluation considers the specific length of stay and on-record adjudication costs associated with LOP and Non-LOP cases, including the following cost components and considerations.

**Component I** includes all LOP funding and detention costs by FY, LOP status (LOP and Non-LOP), and custody status (detained or released):[13]
- Based on ICE Initial Book-in and Final Book-out data
- Pending cases, those without an ICC date or judicial decision, are subsumed within the released custody status
- Average bed cost for one night detention[14]
- LOP Funding from EOIR
  Average costs between LOP and Non-LOP respondents across fiscal year and custody status (detained or released)[15] across FYs 2014 through 2019

**Component II** includes LOP court costs across proceedings:
- Based on EOIR Initial Case Completions (ICCs) In Component II, only released custody status cases with an initial case completion (ICC) date and judicial decision are presented in the body of the report.[16]
- Number, type, and length of proceedings, hearings, and motions for applicable detained and released completed cases between FY 2014 through FY 2019.
- 

**Appendices**

To assist the reader with information supporting this study, EOIR inserted five appendices:
- Appendix A: All supplemental material describing the data filtering techniques, detailed legal representation, and decisions made throughout the process
- Appendix B: Methodological detail,
- Appendix C: Additional analyses on the impact of locations on these results,
- Appendix D: Released-pending costs which represent respondents released with no ICC dates or judicial decisions,
- Appendix E: Component II duration and time across proceedings.

---

13 The dependent variable in Component I is length of stay and the independent variables were LOP status, custody status, and FY. Costs calculated using the length of stay variable.
14 Source: Department of Homeland Security U.S. Immigrations and Customs Enforcement Budget Overview: FY 2014 through FY 2019
15 A respondent is considered detained if he/she is detained for the entire length of stay, and released, if at any point in his/her detention, are released for any reason.
16 Detained and released respondents in Component II of this study include only respondents with initial case completions (ICCs) and judicial decisions.

**Data Characteristics**

Using available data, EOIR analysts developed a quantitative analytic approach to capture costs relating to overall LOP program funding, as well as the difference in costs incurred by EOIR and other governmental agencies associated with detention and proceedings of respondents who did and did not receive LOP services. See Appendix A: Supplemental Material 1 (SM1) for more information regarding data selection.

In order for this study to be transparent and reproducible, steps in how data were obtained and the fifteen specific data characteristics selected are included in Table 1. Note that the data filtering procedures used in the BAH cohort study have been reviewed, and when necessary, updated to reflect the amount, type, and completion of current data.

In the current study, I-862 CASES with final detained (D) or released (R) status were selected from the EOIR CASE file.  After filtering the data as detailed in Table 1 below, all flagged remaining respondents were removal cases, which represent 96% of all EOIR cases. These updates provided EOIR analysts with a more broad set of data by FY, enhancing the analyses with data resources not previously available.

The original BAH FY 2014 through FY 2017 cases, matched on key variables, were included and updated in this current evaluation if they met the current criteria outlined below. The updates to the previous BAH study are noted with an asterisk in Table 1.

Table 1.  Data Characteristics (Criteria) and Decision Rationale

| LOP and Non-LOP Data Characteristics | Decision Rationale |
|---|---|
| Only cases provided by DHS-ICE and found within the EOIR Case, Proceedings, and Hearing data files were included.  Data with EOIR received dates between FY 2014 and 2019 were included | Case types and custody status were designated within the EOIR data repositories and matched on key unique variables (IDNCASE and ALIEN_NBR). |
| Fiscal Year was calculated using the EOIR Case-file received date in EOIR DB | The date a case is received by EOIR provides the most consistent baseline parameter from which to examine all cases. |
| *Only I-862 (DHS Notice to Appear form) flagged data were used in this evaluation | A Notice to Appear (NTA), Form I-862, is a charging document that the Department of Homeland Security (DHS) issues and files with the EOIR to start removal proceedings. Once filtered, respondents represented *only* removal cases, which account for 96% of all EOIR cases. |

| LOP and Non-LOP Data Characteristics (Continued) | Decision Rationale (Continued) |
|---|---|
| The VERA Institute provided LOP data that were matched to DHS-ICE and EOIR data for inclusion. Only LOP and DHS-ICE data found in the EOIR repositories were selected | The EOIR data repositories provide the most complete data picture of a given case/proceeding. |
| The EOIR Custody in the CASE file was used to determine the most recent custody statuses and cases with no custody designation were removed | The EOIR Custody variable in the CASE file provides the most updated custody status based on key variables. |
| *Only DHS-ICE respondents who had an ICE initial Book-in date w/in +/- 18 months of the EOIR received date were used. | To ensure data precision and maximize data fidelity. |
| Only EOIR cases with adult respondents. Juveniles, as well as IHP, mental competency, Franco, and *MPP cases after 1/25/19 were removed | These variables may have unknown and/or unmeasured confounding variables that impact the number of days detained. |
| Identical Cases and overlapped cases were removed from data sets and duplicate IDNCASE number (#) of days were summed across cases | Identical cases and overlapped cases were removed so duplicate number of days were not counted. Additionally, if there was more than one unique IDNCASE number then the number of days detained were subtotaled across matching cases and consolidated for correct analyses. For an anonymized example of each, please see Supplemental Material 1 (SM1). |
| Blank Custody variables were removed. Only cases marked as detained (D) or released (R) were selected | Since the focus is detained or released (previously detained) respondents' actual number of days detained. |
| *Cases with days detained of zero (0) were removed | DHS-ICE considers ≥ 1 overnight stay as "detained", therefore cases with zero (0) days detained were removed. |

| LOP and Non-LOP Data Characteristics (Continued) | Decision Rationale (Continued) |
|---|---|
| **Component I: Costs based on cases with DHS-ICE Initial Book-in and Final Book-out dates.** *Cases with no DHS-ICE Initial Book-in and Final Book-out dates were removed | The number of days detained is calculated using ICE Initial Book-in and Final Book-out dates. |
| **Component I**: Detained Cases with no Initial Case Completion date (ICC) and no judicial decision in EOIR data files were removed. | The choice to use only completed cases with court decisions for detained respondents was made since over 92% of the current dataset are completed within one year of NTA. Therefore, these data are representative of all detained I-862 cases. Year over year, the number of I-862 cases increased, which impacts the percentage of completions. |
| **Component I:** *Released Cases may or may not have an ICC. Released cases without an ICC and/or a judicial decision are referred to as released-pending cases and presented in Appendix C | The number of days detained are based on DHS-ICE Initial Book-in and Final Book-out dates and not on case completion; costs for released AND pending cases are included together |
| ***Component II: Costs based on detained and released respondent cases with ICCs and a judicial decision**. No released-pending respondents were included in the body of the report. Released-pending costs are presented in Appendix C | Costs are based on ICC status, released respondents with ICCs are included in the body of this report under Component II and released-pending (released respondents with no ICC and/or judicial decision) are presented in Appendix C and summed with respondents with  released with ICCs only. |
| When assessing locations, base-cities were used rather than hearing locations | Base-cities cover a more expanded area of inclusion for hearings and proceedings, allowing  a more broad examination of data |

* Denotes updated filtering procedures and data characteristics from the previous (FY 2018) Cohort study. These filters, the addition of FY 2018 through FY 2019, and the number of updated FY 2014 through FY 2017 completed cases expanded this data set by over 312,000 cases, providing more meaningful and accurate results.

**Study Population**

The raw data used for this study, as with the previous studies, were provided to EOIR by VERA and DHS-ICE and merged with EOIR's repository of Case, Proceeding, Digital Audio Recording (DAR), and Scheduling data.

EOIR detailed information by the respondents' characteristics in Table 1 above, which converge to form the demographics in Table 2 below.

The proportion of LOP respondents compared to Non-LOP respondents, regardless of FY or custody status, is 32.77% for LOP and 67.23% for Non-LOP. The actual discrepancy between the size of LOP and Non-LOP populations is not concerning since population parameters can be calculated rather than estimated.

The data in Table 2 represent what EOIR refers to as the "Master LOP and Non-LOP Data" and is the universe of LOP and ICE data merged and used in this cost evaluation. In Component I, recall from the structure of data section that released-pending respondents are subsumed under released respondents since, in Component I, EOIR based these data, not on ICCs, but on ICE initial Book-in and Final Book-out dates.

Table 2.  Master LOP and Non-LOP Data across Custody Status and FY

| FY of Receipt | Master LOP and Non-LOP  Data | | | | | | Grand Total |
| | LOP Respondents (#) | | | Non-LOP Respondents (#) | | | |
| | Detained | Released | ALL LOP Respondents (#) | Detained | Released | ALL Non-LOP Respondents (#) | |
|---|---|---|---|---|---|---|---|
| 2014 | 16,223 | 9,971 | 26,194 | 27,905 | 30,594 | 58,499 | 84,693 |
| 2015 | 14,939 | 11,073 | 26,012 | 20,803 | 23,120 | 43,923 | 69,935 |
| 2016 | 14,389 | 14,058 | 28,447 | 19,776 | 25,605 | 45,381 | 73,828 |
| 2017 | 19,775 | 12,896 | 32,671 | 29,372 | 28,773 | 58,145 | 90,816 |
| 2018 | 20,832 | 11,956 | 32,788 | 34,291 | 38,549 | 72,840 | 105,628 |
| 2019 | 17,091 | 13,950 | 31,041 | 40,202 | 44,532 | 84,734 | 115,775 |
| **Totals** | **103,249** | **73,904** | **177,153** | **172,349** | **191,173** | **363,522** | **540,675** |

This Master LOP and Non-LOP file was used to calculate costs in Components I and II. Table 2. Master Data File for LOP and Non-LOP Respondents across Custody Status and FY

## COMPONENT I: LOP FUNDING AND COST OF DETENTION

**LOP Funding**

From FY 2014 through FY 2019, the general LOP's total funding, both allotted and actual, is found in Table 2. This funding does not include the Legal Orientation Program for Custodians of Unaccompanied Alien Children, the National Qualified Representative Program, or any other LOP programs administered by OLAP.

Table 3. Office of Legal Access Program (OLAP) Funding by FY

| Fiscal Year | Program Name | Period of Performance | Total Allotted Funding ($) | Actual Cost ($) | Difference ($) |
|---|---|---|---|---|---|
| 2014 | LOP | 10/1/2013-9/31/2014 | $4,520,000 | $4,483,341 | ($36,659) |
| 2014 | LOP Expansion | 9/5/2014-9/4/2015 | $1,146,000 | $1,139,722 | ($6,278) |
| 2014 | LOP Family Facilities | 9/22/2014-9/21/2015 | $870,000 | $868,037 | ($1,963) |
| 2015 | LOP | 10/1/2014-3/31/2015 | $4,520,000 | $4,486,646 | ($33,354) |
| 2015 | LOP Travel | 10/1/2014-9/30/2015 | $6,000 | $4,710 | ($1,290) |
| 2015 | LOP Consolidation | 6/8/2015-8/31/2015 | $1,500,000 | $1,478,507 | ($21,493) |
| 2015 | LOP Consolidation 2 | 9/1/2015-4/1/2016 | $4,227,851 | $4,227,851 | $0 |
| 2016 | LOP | 4/11/2016-3/31/2017 | $6,969,074 | $6,954,869 | ($14,205) |
| 2016 | LOP Expansion | 9/26/2016-7/31/2017 | $3,139,926 | $3,117,785 | ($22,141) |
| 2017 | LOP | 8/1/2017-4/30/2018 | $5,909,000 | $5,863,209 | ($45,791) |
| 2018 | LOP | 5/1/2018-4/30/2019 | $8,009,000 | $7,924,970 | ($84,030) |
| 2019 | LOP | 5/1/2019-9/15/2019 | $3,002,125 | $3,002,125 | $0 |
| 2019 | LOP Supplemental | 9/16/2019-9/15/2020 | $12,832,245 | $12,612,926 | ($219,319) |
| **Totals** | | | **$56,651,221** | **$56,164,698** | **($486,523)** |

The allotted LOP funding across all fiscal years exceeded actual cost, resulting in a difference of (-$486,523.00). Using these metrics, LOP was provided $56,164,698.00 across six years for an average cost of $9,360,783.00 per year.

## Methodology

The complete methodological design, including data access, research questions, and data analyses is in Appendix B. Below is a synopsis of the current methodology.

Table 4 provides more detail about the number and proportion of respondents across FY and custody status in this current cost evaluation.[17]

Table 4. Number and Percent of LOP and Non-LOP Respondents across FY and Custody Status

| FY of Receipt | LOP Status | Detained (#) | Released (#) | Total Across Custody Status (#) | Percent Detained (%) | Percent Released (%) |
|---|---|---|---|---|---|---|
| 2014 | LOP | 16,223 | 9,971 | 26,194 | 61.93% | 38.07% |
| | Non-LOP | 27,905 | 30,594 | 58,499 | 47.70% | 52.30% |
| | **Total Respondents** | **44,128** | **40,565** | **84,693** | 52.10% | 47.90% |
| 2015 | LOP | 14,939 | 11,073 | 26,012 | 57.43% | 42.57% |
| | Non-LOP | 20,803 | 23,120 | 43,923 | 47.36% | 52.64% |
| | **Total Respondents** | **35,742** | **34,193** | **69,935** | 51.11% | 48.89% |
| 2016 | LOP | 14,389 | 14,058 | 28,447 | 50.58% | 49.42% |
| | Non-LOP | 19,776 | 25,605 | 45,381 | 43.58% | 56.42% |
| | **Total Respondents** | **34,165** | **39,663** | **73,828** | **46.28%** | **53.72%** |
| 2017 | LOP | 19,775 | 12,896 | 32,671 | 60.53% | 39.47% |
| | Non-LOP | 29,372 | 28,773 | 58,145 | 50.52% | 49.48% |
| | **Total Respondents** | **49,147** | **41,669** | **90,816** | **54.12%** | **45.88%** |
| 2018 | LOP | 20,832 | 11,956 | 32,788 | 63.54% | 36.46% |
| | Non-LOP | 34,291 | 38,549 | 72,840 | 47.08% | 52.92% |
| | **Total Respondents** | **55,123** | **50,505** | **105,628** | **52.19%** | **47.81%** |
| 2019 | LOP | 17,091 | 13,950 | 31,041 | 55.06% | 44.94% |
| | Non-LOP | 40,202 | 44,532 | 84,734 | 47.44% | 52.56% |
| | **Total Respondents** | **57,293** | **58,482** | **115,775** | **49.49%** | **50.51%** |
| **Grand Total** | | | | **540,675** | | |

[17] Data were gleaned from data files provided by VERA, and DHS-ICE detention data and merged with EOIR data across FYs 2014 through 2019. All analyses in this report are restricted to these data provided.

The number of respondents increased year over year for all FYs with the exception of FYs 2015 and 2016, indicating a significant increase in detained and released persons to the United States across four of the six fiscal years in this evaluation.

Table 5 shows the proportion of LOP and Non-LOP respondents by FY and custody status, inclusive of all six fiscal years in this evaluation, and Table 6 presents these percentages by LOP and custody status and fiscal year.

Table 5. Percentage of Respondents by LOP and Custody Status across Fiscal Year (%)

| Percentage of Respondents by Custody Status across Fiscal Year | | | |
|---|---|---|---|
| LOP Respondents (%) | | Non-LOP Respondents (%) | |
| Detained | Released | Detained | Released |
| 19.10% | 13.67% | 31.88% | 35.36% |
| 32.77% | | 67.23% | |

Table 6. Overall Proportion of LOP and Non-LOP Respondents by Custody Status Based on Total Respondents by FY (%)

| FY of Receipt | Overall Proportion of LOP and Non-LOP Respondents by Custody Status Based on Total Respondents (%) | | | | | |
|---|---|---|---|---|---|---|
| | LOP Respondents (%) | | | Non-LOP Respondents (%) | | |
| | Detained | Released | Total % of ALL LOP | Detained | Released | Total % of ALL Non-LOP |
| 2014 | 15.71% | 13.49% | 14.79% | 16.19% | 16.00% | 16.09% |
| 2015 | 14.47% | 14.98% | 14.68% | 12.07% | 12.09% | 12.08% |
| 2016 | 13.94% | 19.02% | 16.06% | 11.47% | 13.39% | 12.48% |
| 2017 | 19.15% | 17.45% | 18.44% | 17.04% | 15.05% | 15.99% |
| 2018 | 20.18% | 16.18% | 18.51% | 19.90% | 20.16% | 20.04% |
| 2019 | 16.55% | 18.88% | 17.52% | 23.33% | 23.29% | 23.31% |

For example, Table 6 illustrates that for FY 2014, 15.71% of all respondents were detained LOP respondents and 16.19% were detained Non-LOP respondents.

**Probabilities of Self-selecting into LOP Programs and Services**

The average probability of respondents self-selecting LOP services across fiscal years for detained respondents is 0.375 and for released respondents is 0.279.[18] The overall probability for any respondent to self-select into the LOP program is 0.327. This means that self-selection to LOP programs is just about 1/3 of respondents.

**LOP Programs and Services**

Table 7 represents the number of services provided to respondents by the LOP, across custody status (detained, pending, or released) and type of service offered. Respondents were able to attend more than one type of service, or the same service more than once, which led to a confounding count of respondents.

Table 7. Number of Respondents across LOP Service Type and Custody Status by FY

| FY of Receipt | Custody Status of Respondents | Group Orientation (#) | Individual Orientation (#) | Pro Bono Placement (#) | Pro Se Workshop (#) | Unknown Service (#) | Total Number of Services (#) |
|---|---|---|---|---|---|---|---|
| 2014 | Detained | 14,844 | 6,521 | 260 | 2,652 | 68 | 24,345 |
| | Released | 9,187 | 3,022 | 105 | 1,633 | 47 | 13,994 |
| 2015 | Detained | 13,492 | 6,563 | 293 | 2,467 | 127 | 22,942 |
| | Released | 10,183 | 3,442 | 97 | 2,790 | 292 | 16,804 |
| 2016 | Detained | 13,429 | 6,479 | 267 | 3,443 | 292 | 23,910 |
| | Released | 13,197 | 4,247 | 163 | 4,629 | 336 | 22,572 |
| 2017 | Detained | 18,355 | 8,266 | 326 | 4,531 | 514 | 31,992 |
| | Released | 11,622 | 3,490 | 209 | 4,154 | 811 | 20,286 |
| 2018 | Detained | 19805 | 9032 | 458 | 5209 | 6 | 31,992 |
| | Released | 11406 | 3417 | 288 | 3292 | 6 | 20,286 |
| 2019 | Detained | 16,413 | 8,402 | 527 | 5,336 | 10 | 30,688 |
| | Released | 13,998 | 4,944 | 490 | 4,890 | 1 | 24,323 |
| **Totals** | | **165,931** | **67,825** | **3,483** | **45,026** | **2,510** | **284,134** |

A total of 177,153 LOP respondents attended 284,134 services for an average of 1.60 services provided to each LOP respondent over six fiscal years.

Figures 3 and 4 below represent two perspectives of the average number of services attended by a given respondent across custody status and FY. The average number of services attended per respondent across all fiscal years ranged between 1.40 (2014-released) and 1.80 (2019-detained)

---

[18] The probability of an event is represented as 0 (no probability at all) to 1 (absolutely will happen). The closer a probability is to + 1, the more likely it is to happen.

*Figure 3.  Average Number of Services Attended per Respondents across Custody Status and FY*



*Figure 4.  Average Number of Services Attended per Respondent by Custody Status and FY*



The average number of services attended per respondent increased between FY 2014 and FY 2019 ($\mu$ = 1.40 in 2014 to $\mu$ = 1.80 in 2019) regardless of custody status. The average number of services attended for detained respondents is 1.61 and for released respondents is 1.59.

**Data Collection**

For this FY 2014 through FY 2019 cost evaluation, archival data were compiled using LOP and Non-LOP data sets derived from original data sets provided by VERA and DHS-ICE service and/or detention data matched with EOIR data repositories.  These data represent each respondent's decision to attend LOP services (LOP) or not (Non-LOP) in locations where LOP services are provided.

**Study Design**

Due to the self-selection aspect of this cost evaluation, the study design falls under the umbrella of a *quasi-experimental design*. Quasi-experimental designs account for pre-determined, usually self-selected group assignment, rather than random assignment to a group, as in a full experimental design. Quasi-experimental designs use observational methods when respondents have either joined the treatment available or not.  In other words, the current study is a retrospective study (using archival data) of a single treatment cohort (LOP) and a non-equivalent but comparable control cohort (Non-LOP).

**Data Analyses**

The purpose of Component I of the current LOP cohort cost evaluation is to determine and report the cost in USD ($) to the U.S. government for the detention of LOP respondents when compared to Non-LOP respondents based on the average (mean) number of days detained across FY, LOP and custody status.[19] Therefore the differences in the number of days detained between LOP and Non-LOP respondents reflects the number of days LOP respondents stayed, beyond, the Non-LOP respondents.

**Statistical Assumptions**

The costs for Component I are calculated using the average (mean) number of days detained in order to provide useful budgeting parameters regardless of the underlying distribution of the number of days detained (Table 8).[20] Since the underlying data are non-normal in Component I, for example, violate statistical assumptions of normality, linearity, independence, and/ or homogeneity (high skew and kurtosis for both LOP and Non-LOP respondents across custody status and FY), the median is reported in Supplemental Material 3 (SM3) only as a comparison and further discussion is provided.[21]

**Component I Results**

As mentioned previously, costs were calculated by using the average (mean) number of days detained for LOP and Non-LOP respondents across custody status (detained and released) and FY 2014 through FY 2019.[22] The costs in this paper represent LOP and Non-LOP respondents across all base city locations. Appendix B provides further examination of the length of days detained for base city locations by comparing only the LOP locations found in these data.

---

[20] These rounded numbers may not equal exactly 100% due to the rounding.
[21] See Appendix A: SM3 for a more detailed review of the underlying data distributions and measures of central tendency.
[22] Recall that identical and overlapping cases were removed from these analyses and respondents with the same IDNCASE number who were detained on different days were summed and reported in the CASE_FY of original receipt date (See SM1).

**Average Daily cost of Detention**

All of the costs given below are rounded to the nearest whole dollars for ease of interpretation. Table 8 shows the *average* daily detention cost, based on the DHS FY 2014 through FY 2019 Congressional Budget Justifications published each fiscal year.

Table 8. Average (Mean) Cost of Detention for One Adult Respondent per One Overnight Stay

| FY of Receipt | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Average Cost of Adult Detention per Day ($) | $121 | $122 | $129 | $127 | $134 | $136 |

Table 9 represents the average (mean) number of days detained across custody status and fiscal year. The differences in mean days between the previous BAH FY 2014 through FY 2017 study are an artifact of (a) the number of FY 2014 through FY 2017 cases completed since the close of FY 2017, and (b) the data characteristics, which reflects how these data were filtered in the current evaluation.

Table 9.  Average (Mean) Number of Days Detained by Custody Status and FY

| FY of Receipt | Average (Mean)  Number of Days Detained and Average Differences | | | | | |
|---|---|---|---|---|---|---|
| | LOP Respondents (#) | | Non-LOP Respondents (#) | | Differences  (#) | |
| | Mean Days (#) | | Mean Days (#) | | | |
| | Detained | Released | Detained | Released | Detained | Released |
| 2014 | 115 | 70 | 82 | 49 | 33 | 21 |
| 2015 | 139 | 77 | 102 | 58 | 37 | 19 |
| 2016 | 161 | 91 | 113 | 66 | 48 | 25 |
| 2017 | 155 | 89 | 104 | 55 | 50 | 34 |
| 2018 | 134 | 70 | 101 | 51 | 32 | 19 |
| 2019 | 126 | 79 | 100 | 63 | 26 | 16 |
| Average # Days Detained | 138 | 79 | 100 | 57 | 38 | 22 |

The average number of days detained across LOP status, regardless of custody status, demonstrate that LOP respondents are detained 30 days longer than Non-LOP respondents.[23] Additionally, detained LOP respondents stay an average of 38 days longer than detained Non-LOP respondents and LOP released respondents stay on average of 22 days longer than Non-LOP released respondents.

---

[23] Equals 38 days + 22 days divided by 2 = 60/2=30

## Costs Related to LOP and Non-LOP Respondents

As mentioned previously, costs for detention were calculated by examining any differences between the **average** lengths of stay for LOP respondents and Non-LOP respondent.[24] This was then multiplied by average (mean) daily detention cost by FY found in Table 8 above, and then the total number of LOP respondents by fiscal year found in Table 3. These costs are reported by custody status (detained and released).[25]

The number of respondents and average (mean) number of days detained are presented in Tables 10 and 12 below. Each Table is followed by its corresponding standard error of measurement (SEM) to assess data precision (Tables 11 and 13).[26] For social science data, at a 99% confidence level,[27] the rule of thumb for an excellent SEM is ≤ 2.58.[28] SEM is dependent on sample size, therefore, for higher sample sizes, lower SEMs are realized.

Table 10. Average Number of Days Detained per Respondent Cost (Detained)

| FY of Receipt | Average (Mean) Number of Days Detained per Respondent and Cost (Detained) | | | | | | |
|---|---|---|---|---|---|---|---|
| | Detention Length per Respondent | | | Detention Cost | | | |
| | LOP (#) Days | Non-LOP (#)) Days | Difference (LOP-Non-LOP) (# Days) | Average Cost per Adult Respondent for One Day of Detention ($) | Average Detention Cost Added per LOP Respondent ($) | Number of Detained LOP Respondents (#) | Total Average Cost Added by LOP Respondents ($) |
| 2014 | 115 | 82 | 33 | $121 | $4,028 | 16,223 | $65,350,719 |
| 2015 | 139 | 102 | 37 | $122 | $4,549 | 14,939 | $67,951,332 |
| 2016 | 161 | 113 | 48 | $129 | $6,191 | 14,389 | $89,084,872 |
| 2017 | 155 | 104 | 50 | $127 | $6,398 | 19,775 | $126,525,826 |
| 2018 | 134 | 101 | 32 | $134 | $4,330 | 20,832 | $90,204,926 |
| 2019 | 126 | 100 | 26 | $136 | $3,472 | 17,091 | $59,335,806 |
| Average | 138 | 100 | 38 | | DETAINED | Total Added Cost across FYs | $498,453,482 |

---

[24] These costs are also examined by detention status. Respondents released from detention were at one point in detention, and therefore their length of detention can be determined by a count of days in these data sets.
[25] Recall SM1 shows the steps taken to determine the accurate number of days detained per respondent.
[26] Days detained are rounded to the nearest whole number and the costs are rounded to the nearest whole dollar.
[27] This represents a researcher to be 99% confident that the actual population average is captured in the results
[28] Nunnally, J. C. (1967, 1978). Psychometric Theory. McGraw Hill. New York

The current SEMs indicate that the average number of days detained reported across custody status and fiscal year for both LOP and Non-LOP detained and released respondents meet the index of expected variation in observed averages based on the SEM calculations. In other words, these data are representative of all I-862 removal cases.

Table 11. LOP and Non-LOP Average Number of Days Detained with Corresponding SEMs by FY (Detained)

| Mean and Standard Errors of the Mean (SEM) for the Average Number of Days Detained Across FY (Detained) | | | | |
|---|---|---|---|---|
| FY of Receipt | Detained LOP Mean Detention Days (#) | LOP Standard Errors of the Mean (SEM) | Detained Non-LOP Mean Days (#) | Non-LOP Standard Errors of the Mean (SEM) |
| 2014 | 115 | 1.226 | 82 | 0.587 |
| 2015 | 139 | 1.458 | 102 | 0.886 |
| 2016 | 161 | 1.510 | 113 | 0.945 |
| 2017 | 155 | 1.176 | 104 | 0.681 |
| 2018 | 134 | 0.909 | 101 | 0.576 |
| 2019 | 126 | 0.740 | 100 | 0.429 |

Table 12. Average (Mean) Detention Length (Days) and Costs (Dollars) for FY 2014 through FY 2019 (Released)

| Average (Mean) Number of Days Detained per Respondent and Cost (Released) | | | | | | | |
|---|---|---|---|---|---|---|---|
| FY of Receipt | Detention Length per Respondent | | | Detention Cost | | | |
| | LOP (#) Days | Non-LOP (#) Days | Difference (LOP-Non-LOP) (# Days) | Average Cost per Adult Respondent for One Day of Detention ($) | Average Detention Cost Added per LOP Respondent ($) | Number of Released LOP Respondents (#) | Total Average Cost Added by LOP Respondents ($) |
| 2014 | 70 | 49 | 21 | $121 | $2,537 | 9,971 | $25,297,573 |
| 2015 | 77 | 58 | 19 | $122 | $2,268 | 11,073 | $25,114,117 |
| 2016 | 91 | 66 | 25 | $129 | $3,173 | 14,058 | $44,605,983 |
| 2017 | 89 | 55 | 34 | $127 | $4,369 | 12,896 | $56,338,255 |
| 2018 | 70 | 51 | 19 | $134 | $2,574 | 11,956 | $30,777,370 |
| 2019 | 79 | 63 | 16 | $136 | $2,207 | 13,950 | $30,788,284 |
| Average | 79 | 57 | 22 | | RELEASED | Total Added Cost across FYs | $212,921,582 |

Table 13. LOP and Non-LOP Average Days with Corresponding SEMs by FY (Released)

| Mean and Standard Errors of the Mean (SEM) for the Average Number of Days Detained Across FY (Released) | | | | |
|---|---|---|---|---|
| FY of Receipt | Released LOP Mean Detention Days (#) | LOP Standard Errors of the Mean (SEM) | Released Non-LOP Mean Days (#) | Non-LOP Standard Errors of the Mean (SEM) |
| 2014 | 70 | 0.798 | 49 | 0.291 |
| 2015 | 77 | 0.780 | 58 | 0.390 |
| 2016 | 91 | 0.650 | 66 | 0.367 |
| 2017 | 89 | 0.743 | 55 | 0.321 |
| 2018 | 70 | 0.543 | 51 | 0.237 |
| 2019 | 79 | 0.449 | 63 | 0.238 |

Figure 5 illustrates the average number of days detained along with the standard errors of measurement for LOP and Non-LOP respondents by custody status and fiscal year.

*Figure 5. Average Number of Days Detained for LOP and Non-LOP Respondents by Custody Status*









Table 14. Costs Related to the LOP Programs Evaluated in the Current Study across FY and Custody Status

| Type of LOP Cost for FY 2014 through FY 2019 | Total Cost Added by LOP Respondents between FY 2014 and FY 2019 ($) |
|---|---|
| Actual LOP Funding* | $56,164,698 |
| Detained | $498,453,482 |
| Released | $212,921,582 |
| **Total Cost** | **$767,539,762** |
| **AVERAGE Cost across Six (6) Fiscal Years** | **$127,923,294** |

*\* From Table 2*

Due to the length of respondent's detention, the average overall cost expended by OLAP across LOP and custody status, beyond Non-LOP average number of days detained, is $767,539,762.00, with 64.94% of the total cost derived from fully detained respondents (never released). These costs do not reflect the human impact of the LOP program, which is beyond the scope of these analyses. These costs are also not to be interpreted as causation. In other words, these costs do not mean that LOP programs *cause* higher costs since their programs are only one of many unmeasured/unknown variables impacting the length of detention.[29]

**Costs Related Discussion**

The results of Component I provide strong statistical evidence of the following:

1. On average, LOP respondents ($\mu$ = 109 days) are detained 30 days longer than Non-LOP respondents ($\mu$ = 79 days) across location, custody status, and fiscal year.[30]
2. All LOP and Non-LOP respondents show long average mean detention stays ($\geq$ 49 days) across fiscal years and reported by custody status.
3. Detained respondents stay detained an average of 51 days longer than released respondents (Detained: $\mu$ = 119 days and Released: $\mu$ = 68 days) regardless of LOP status.[31]
4. The SEMs provide strong evidence of data precision and low variance at a 99% confidence level for all respondents across FY, LOP and custody status.
5. Examination of data distribution and outliers (the histograms and Q-Q plots in Appendix A) show that the underlying distribution is non-normal (high skew and kurtosis) and outliers do exist but these issues do not significantly impact these results.

---

[29] As with previous Phases I and II of the LOP Cohort Analysis, the LOP programs are not considered the causal driver of the observed differences between LOP and Non-LOP respondents. Similarly in this analysis, any costs assigned to the observed differences in respondents may not be due to the LOP. EOIR limited these analyses to quantifiable cost elements. Therefore, these analyses do not necessarily include all possible costs or cost savings. Further, EOIR recognizes that other governmental agencies and components incur additional costs and savings, which are beyond the scope of this evaluation.

[30] An independent samples t-test with the number of days detained as the dependent variable and LOP status (LOP and Non-LOP) as the independent or grouping variable show that LOP respondents stay significantly longer than released respondents. Using equal variances not assumed because of a significant Levine's test of equal variances, with $\alpha$ = .01, $t$(257864.639) =107.678, $p$ < 0.0001.

[31] An independent samples t-test with the number of days detained as the dependent variable and custody status (detained or released) as the independent or grouping variable show that detained respondents stay significantly longer than released respondents. Using equal variances not assumed because of a significant Levine's test of equal variances, with $\alpha$ = .01, $t$(394301.926) =186.388, $p$ < 0.0001.

6. The probability of a respondent self-selecting into LOP programs across fiscal years was 0.375 for detained respondents and 0.279 for released respondents which represents only about 1/3 of all respondents.[32]

7. Location was a significant factor in 52 of the 55 matched base city locations[33] regardless of LOP or custody status across fiscal year (not significant in base cities Denver, Oakdale, or Ulster). Appendix B contains additional information regarding the 52 significant base city locations.

---

[32] The probability of an event taking place ranges between 0 and 1 with values closer to 0 being less likely to occur and values closer to 1 more likely to occur. Probabilities of 0 can never happen and probabilities of 1 always happen. The probability values of LOP = .0375 and Non-LOP = 0.279 indicate that just over 1/3 of all respondents self-select into LOP services.

[33] An Analysis of Variance (ANOVA), showed with $\alpha = .01$, that out of 55 matched LOP locations, the number of days detained between LOP and Non-LOP respondents was significantly higher for LOP respondents ($p < 0.0001$) in all but Denver ($p = 0.158$), Oakland ($p = 0.188$), and Ulster Correctional Facility ($p = 0.151$)

## COMPONENT II: HEARINGS, SCHEDULES, APPLICATIONS, BONDS, AND MOTIONS

**Methodology**

Hearings, schedules, applications, bonds and motions are, heretofore referred to as *proceedings*. In Component II, five proceeding types are examined and the differences in duration and time of proceedings between LOP and Non-Lop respondents is determined. From these data, costs are calculated based on the Methodology presented previously and in Appendix A.

**Study Population**

The data used for this section of analyses were drawn from the respondent data used in Component I, and detailed in Table 1 under the filter named Component II data. In Component II, both detained and released respondents included below have ICCs and judicial decisions recorded.

Table 15.  Total Number of Respondents Attending Proceedings across Custody Status and FY

| FY of Receipt | Master LOP and Non-LOP (ICE only) Data | | | | | | Grand Total |
| | LOP Respondents (#) | | | Non-LOP Respondents (#) | | | |
| | Detained | Released | ALL LOP Respondents (#) | Detained | Released | ALL Non-LOP Respondents (#) | |
| 2014 | 16,223 | 5,963 | 22,186 | 27,905 | 17,715 | 45,620 | 67,806 |
| 2015 | 14,939 | 5,466 | 20,405 | 20,803 | 11,172 | 31,975 | 52,380 |
| 2016 | 14,389 | 5,988 | 20,377 | 19,776 | 10,877 | 30,653 | 51,030 |
| 2017 | 19,775 | 4,688 | 24,463 | 29,372 | 10,401 | 39,773 | 64,236 |
| 2018 | 20,832 | 3,030 | 23,862 | 34,291 | 10,029 | 44,320 | 68,182 |
| 2019 | 17,091 | 1,186 | 18,277 | 40,202 | 4,286 | 44,488 | 62,765 |
| Totals | 103,249 | 26,321 | 129,570 | 172,349 | 64,480 | 236,829 | |
| | 129,570 | | | 236,829 | | | |
| Grand Total | | | | 366,399 | | | |

Respondents may have attended more than one proceeding or the same type of proceeding more than once, resulting in a confounding number of cases across the 366,399 unique detained and released ICC only respondents in this study.

Table 16 provides a more detailed description of the number of proceedings attended across the five types of processes (Initial Masters, Individual Merits, Applications, Bonds, and Motions) and the average number of proceedings per case across LOP and custody status and FY. As presented below, note that across FY, LOP, and custody status, 366,399 respondents attended 487,923 on-record proceedings for an average of 1.33 court proceedings per respondent.

Table 16. Number of Attended Proceedings across Custody Status and FY

| Type of Court Proceeding | Number of Respondents Attending Court Proceedings | | | | Grand Total of Cases |
| | LOP Respondents (#) | | Non-LOP Respondents (#) | | |
| | Detained | Released (w/ ICC Date) | Detained | Released (w/ ICC Date) | |
|---|---|---|---|---|---|
| Masters | 42,551 | 10,349 | 58,861 | 26,663 | 138,424 |
| Merits | 9,275 | 12,304 | 10,554 | 27,617 | 59,750 |
| Application | 35,310 | 10,746 | 49,808 | 18,813 | 114,677 |
| Bond | 33,283 | 12,237 | 68,726 | 20,332 | 134,578 |
| Motion | 12,880 | 13,294 | 14,320 | 0 | 40,494 |
| **Totals** | **133,299** | **58,930** | **202,269** | **93,425** | **487,923** |

**Data Collection Procedures**

EOIR analysts examined LOP and Non-LOP removal cases and calculated the average number of schedules, hearings, bonds, and motions for FY 2014 through FY 2019. To generate an estimated processing and adjudication cost, EOIR calculated the differences in proceedings within (a) detained and released completed (ICC) removal cases for LOP and Non-LOP respondents, and (b) the average time spent by staff on related tasks from the previous BAH survey. EOIR matched these data by the variable IDNCASE. The average amount of time spent by proceeding type was provided in the DAR database in seconds and calculated to represent hearing in minutes.

**Statistical Assumptions**

The number of types of on-record processes, to include initial masters, individual merits, applications, bonds, and motions, as well as the length of time for each type of schedule, hearing, and/or applications, showed a fairly normal underlying distribution of data across LOP and custody status. Consequently, since the skew never exceeded 2.20,[34] parametric tools are robust enough to be used and the population parameters reported (for example: Mean, Standard Error of the Mean (SEM)), used t-tests, and Analysis of Variance (ANOVA).[35]

---

[35] Independent samples t –test is a means test with one continuous DV (in this case these are (1) average duration and (2) number of proceedings for each type of proceeding, and the IV was only one grouping variable selected from proceeding type, LOP status, custody status, and FY. ANOVA: Analysis of Variance is a means test with one continuous dependent variable (in this case the average duration and number of processes for each process type) and more than two categorical independent variables (in this case hearing type, LOP status, custody status and FY).

**Data Analyses**

To begin the analyses of Component II costs: (1) the difference in average (mean) costs between LOP and Non-LOP respondents associated with the average number of on-record proceedings (Initial Masters, Individual Merits, Applications, Bonds, and Motions) per respondent was computed, (2) time in minutes was determined from the DAR database, and (3) the calculated weighted averages of court staff salaries per minute were determined from OMB data and multiplied by time (in minutes) across all processes, custody status, and FY.

**On-Record Proceeding Costs**

EOIR considered the differences between LOP and Non-LOP respondents for the average length and number of hearings, as well as the FY 2014 through FY 2019 weighted salaries and/or contract rates of Immigration Judges (IJs), Judicial Law Clerks (JLCs), Legal Assistants (LAs), DHS attorneys, and translators found on (a) the Office of Personnel Management, (b) EOIR websites, and (c) OCJI-DAR data sets across fiscal years and number of professionals at each position level.

Arrangement of the presentation of cost for each hearing type:

- Table 17: Initial Masters (Detained)
- Table 18: Initial Masters (Released)
- Table 19: Individual Merits (Detained)
- Table 20: Individual Merits (Released)
- Table 21: Applications (Detained)
- Table 22: Applications (Released)
- Table 23: Bond (Detained)
- Table 24: Bond (Released)
- Table 25: Motion (Detained)
- Table 26: Motion (Released)
- Table 27: ALL (Detained)
- Table 28: ALL (Released)

**Component II Results**

Tables 17 and 18 show the average number and duration of initial master's calendar hearings by custody status and fiscal year. Table 17 represents detained respondents and Table 18 represents released respondents.

In Table 17 below, overall and on average, detained LOP respondents spent 1.66 minutes more in initial master's proceedings and attended 0.17 more proceedings than Non-LOP respondents. Note that in both FY 2018 and FY 2019 only, LOP detained respondents, on average, spent less time in proceedings than Non-LOP detained respondents.

Table 17. Average Initial Masters Hearings Duration (in Minutes) and Average Cost (Dollars) across Custody and LOP Status (Detained)

| Fiscal Year of Receipt | Average Initial Masters Hearing Duration (minutes) | | Average Number of Initial Masters Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Detained LOP Respondents (#) | Total Average Annual Cost Added by LOP Detained Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 22.82 | 16.83 | 0.82 | 0.66 | $40.58 | 16,223 | $658,332 |
| 2015 | 24.07 | 19.51 | 0.87 | 0.71 | $38.00 | 14,939 | $567,650 |
| 2016 | 19.70 | 17.75 | 0.87 | 0.75 | $19.26 | 14,389 | $277,094 |
| 2017 | 16.49 | 16.14 | 0.91 | 0.72 | $15.62 | 19,775 | $308,891 |
| 2018 | 14.66 | 16.23 | 0.94 | 0.73 | $8.88 | 20,832 | $184,885 |
| 2019 | 12.47 | 13.79 | 1.05 | 0.85 | $6.89 | 17,091 | $117,814 |
| **Average** | **18.37** | **16.71** | **0.91** | **0.74** | **$21.54** | **17,208** | **$352,444** |
| **Total Costs** | | | | | | | **$2,114,667** |

Table 18 below represents released respondents. Note that year over year, with the exception of FY 2019, LOP released respondents had longer initial master's hearings and attended more initial master's hearings than Non-LOP respondents.

Table18.  Average Initial Masters Hearings Duration (in Minutes) and Average Cost (Dollars) across LOP Status (Released w/ ICC Date Only)

| Fiscal Year of Receipt | Average Initial Masters Hearing Duration (minutes) | | Average Number of Initial Masters Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released LOP Respondents (#) | Total Average Annual Cost Added by LOP Released Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 4.48 | 4.31 | 0.81 | 0.80 | $0.70 | 5,963 | $4,156 |
| 2015 | 5.05 | 4.81 | 0.85 | 0.83 | $1.64 | 5,466 | $8,954 |
| 2016 | 4.63 | 4.52 | 0.79 | 0.75 | $0.44 | 5,988 | $2,641 |
| 2017 | 4.78 | 4.33 | 0.90 | 0.89 | $2.16 | 4,688 | $10,147 |
| 2018 | 4.53 | 4.30 | 0.98 | 0.93 | $1.99 | 3,030 | $6,020 |
| 2019 | 3.76 | 3.89 | 0.93 | 0.82 | $1.55 | 1,186 | $1,842 |
| **Average** | **4.54** | **4.36** | **0.88** | **0.84** | **$1.41** | **4,387** | **$5,626** |
| **Total Costs** | | | | | | | **$33,759** |

As computed in Table 18, on average, released LOP respondents spent 0.18 more minutes in initial master's hearings and attended 0.04 more hearings than Non-LOP released respondents.[36]

Tables 19 and 20 show the average number and duration of individual merits hearings by custody status and fiscal year. Table 19 represents detained ICC respondents and Table 20 represents released ICC respondents.

Table 19. Average Individual Merits Hearings Duration (in Minutes) and Average Cost (Dollars) across LOP Status and FY (Detained)

| Fiscal Year of Receipt | Average Individual Merits Hearing Duration (minutes) | | Average Number of Individual Merits Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Detained LOP Respondents (#) | Total Average Annual Cost Added by LOP Detained Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 57.45 | 50.72 | 0.33 | 0.23 | $39.49 | 16,223 | $640,727 |
| 2015 | 61.87 | 55.20 | 0.42 | 0.29 | $54.21 | 14,939 | $809,841 |
| 2016 | 62.75 | 55.66 | 0.46 | 0.31 | $56.36 | 14,389 | $810,929 |
| 2017 | 64.81 | 55.83 | 0.47 | 0.29 | $68.29 | 19,775 | $1,350,366 |
| 2018 | 63.05 | 53.40 | 0.40 | 0.28 | $49.40 | 20,832 | $1,029,053 |
| 2019 | 64.93 | 57.58 | 0.50 | 0.34 | $63.23 | 17,091 | $1,080,688 |
| Average | 62.48 | 54.73 | 0.43 | 0.29 | $55.16 | 17,208 | $953,601 |
| Total Costs | | | | | | | $5,721,604 |

Note that year over year, LOP respondents had longer individual merits hearings and attended more individual merits hearings than Non-LOP respondents. As computed in Table 19, on average, detained LOP respondents spent 7.75 more minutes in individual merits hearings and attended 0.14 more hearings than Non-LOP detained respondents.

Table 20 shows that year over year, with the exception of 2019, released LOP respondents had slightly longer individual merits hearings and attended more individual merits hearings than Non-LOP respondents. As computed in Table 20, on average, released LOP respondents spent 3.02 more minutes in individual merits hearings and attended 0.04 more hearings than Non-LOP released respondents.[37]

---

[36] These data had unequal variance, therefore, with α =.01, $t(36462.723) = 8.224$, $p < .0001$,. LOP respondents, regardless of custody status or FY, spent more time in initial master hearings than Non-LOP respondents. With α =.01, $t(290390.277) = 23.804$ $p < .0001$. LOP respondents, regardless of custody status or FY, attended more initial master hearings than Non-LOP respondents
[37] These data had unequal variances, therefore, with α =.01, $t(106432.722) = 8.854$, p < 0.0001. LOP respondents, regardless of custody status or FY, spent more time in individual merit hearings than Non-LOP respondents.
With α =.01, $t(554.267) = 3.270$, p < 0.0001. LOP respondents, regardless of custody status or FY, attended more individual merit hearings than Non-LOP respondents.

Table 20. Average Individual Merits Hearings Duration (in Minutes) and Average Cost (Dollars) across FY (Released)

| Fiscal Year of Receipt | Average Individual Merits Hearing Duration (minutes) | | Average Number of Individual Merits Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released LOP Respondents (#) | Total Average Annual Cost Added by LOP Released Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 62.00 | 61.64 | 0.62 | 0.59 | $9.55 | 5,963 | $56,950 |
| 2015 | 70.83 | 69.00 | 0.63 | 0.55 | $35.55 | 5,466 | $194,298 |
| 2016 | 74.64 | 70.05 | 0.84 | 0.86 | $12.29 | 5,988 | $73,576 |
| 2017 | 73.72 | 71.51 | 0.64 | 0.58 | $26.87 | 4,688 | $125,966 |
| 2018 | 70.39 | 70.31 | 0.51 | 0.41 | $33.98 | 3,030 | $102,950 |
| 2019 | 75.28 | 66.19 | 0.26 | 0.27 | $8.14 | 1,186 | $9,654 |
| **Average** | **71.14** | **68.12** | **0.58** | **0.54** | **$21.06** | **4,387** | **$93,899** |
| **Total Costs** | | | | | | | **$563,394** |

Table 21. Average Application Duration (in minutes) and Average Cost (Dollars) across FY (Detained)

| Fiscal Year of Receipt | Average Application Hearing Duration (minutes) | | Average Number of Applications per Case (#) | | Average Cost Added per LOP Case ($) | Number of Detained LOP Respondents (#) | Total Average Annual Cost Added by LOP Detained Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 19.23 | 14.21 | 0.421 | 0.494 | $5.81 | 16,223 | $94,202 |
| 2015 | 18.42 | 15.01 | 0.382 | 0.465 | $0.37 | 14,939 | $5,495 |
| 2016 | 17.21 | 13.04 | 0.364 | 0.446 | $2.24 | 14,389 | $32,212 |
| 2017 | 18.15 | 12.29 | 0.386 | 0.472 | $5.68 | 19,775 | $112,241 |
| 2018 | 16.45 | 12.77 | 0.444 | 0.533 | $2.37 | 20,832 | $49,317 |
| 2019 | 15.60 | 13.26 | 0.419 | 0.491 | $0.20 | 17,091 | $3,359 |
| **Average** | **17.51** | **13.43** | **0.40** | **0.48** | **$2.78** | **17,208** | **$49,471** |
| **Total Costs** | | | | | | | **$296,826** |

Table 21 above shows that detained LOP respondents spend, on average, 4.08 minutes longer in application proceedings than Non-LOP respondents. However; LOP respondents have, on average, 0.08 fewer application proceedings than Non-LOP respondents over the same time.[38]

Table 22. Average Application Duration (in minutes) and Average Cost (Dollars) across FY (Released)

| Fiscal Year of Receipt | Average Application Hearing Duration (minutes) | | Average Number of Applications per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released LOP Respondents (#) | Total Average Annual Cost Added by LOP Released Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 14.66 | 11.01 | 0.344 | 0.219 | $14.03 | 5,963 | $83,689 |
| 2015 | 12.30 | 8.77 | 0.450 | 0.325 | $14.32 | 5,466 | $78,264 |
| 2016 | 12.34 | 9.67 | 0.441 | 0.361 | $9.53 | 5,988 | $57,051 |
| 2017 | 13.68 | 9.92 | 0.456 | 0.344 | $13.41 | 4,688 | $62,889 |
| 2018 | 13.93 | 10.71 | 0.375 | 0.284 | $10.37 | 3,030 | $31,418 |
| 2019 | 13.26 | 9.96 | 0.266 | 0.220 | $6.55 | 1,186 | $7,770 |
| **Average** | **13.36** | **10.01** | **0.39** | **0.29** | **$11.37** | **4,387** | **$53,514** |
| **Total Costs** | | | | | | | **$321,082** |

Table 22 above shows that released respondents spend, on average, 3.35 minutes longer, in application hearings than Non-LOP respondents. In addition, LOP respondents have, on average, 0.10 more application hearings compared to Non-LOP respondents.

Table 23 below shows that year over year, LOP detained respondents had longer bond hearings and attended a slightly more bond hearings than Non-LOP respondents. On average, LOP detained respondents spent 4.04 minutes longer and have 0.03 more bond hearings than Non-LOP respondents do.

---

[38] These data had unequal variances, therefore, with $\alpha = .01$, $t(120657.761) = 41.756$, $p < 0.0001$. LOP respondents, regardless of custody status or FY, spent more time in application proceedings than Non-LOP respondents.

Table 23. Average Bond Duration (in minutes) and Average Cost (Dollars) across FY (Detained)

| Fiscal Year of Receipt | Average Bond Hearing Duration (minutes) | | Average Number of Bond Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Detained LOP Respondents (#) | Total Average Annual Cost Added by LOP Detained Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 19.34 | 13.82 | 0.453 | 0.368 | $19.56 | 16,223 | $317,382 |
| 2015 | 18.33 | 14.72 | 0.352 | 0.342 | $7.54 | 14,939 | $112,612 |
| 2016 | 16.35 | 13.09 | 0.326 | 0.322 | $5.47 | 14,389 | $78,773 |
| 2017 | 17.38 | 11.89 | 0.374 | 0.360 | $10.50 | 19,775 | $207,719 |
| 2018 | 15.80 | 12.17 | 0.485 | 0.425 | $11.87 | 20,832 | $247,265 |
| 2019 | 15.20 | 12.47 | 0.631 | 0.631 | $8.52 | 17,091 | $145,650 |
| **Average** | **17.07** | **13.03** | **0.44** | **0.41** | **$10.58** | **17,208** | **$184,900** |
| **Total Costs** | | | | | | | **$1,109,400** |

Table 24. Average Bond Duration (in minutes) and Average Cost (Dollars) across FY (Released)

| Fiscal Year of Receipt | Average Bond Hearing Duration (minutes) | | Average Number of Bond Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released LOP Respondents (#) | Total Average Annual Cost Added by LOP Released Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 14.43 | 10.73 | 0.393 | 0.245 | $9.56 | 5,963 | $57,002 |
| 2015 | 12.28 | 8.62 | 0.547 | 0.398 | $7.00 | 5,466 | $38,288 |
| 2016 | 12.63 | 9.20 | 0.467 | 0.339 | $5.77 | 5,988 | $34,521 |
| 2017 | 13.72 | 9.56 | 0.498 | 0.342 | $7.58 | 4,688 | $35,524 |
| 2018 | 13.27 | 9.83 | 0.447 | 0.307 | $10.50 | 3,030 | $31,819 |
| 2019 | 12.28 | 9.57 | 0.355 | 0.277 | $7.75 | 1,186 | $9,189 |
| **Average** | **13.10** | **9.58** | **0.45** | **0.32** | **$8.03** | **4,387** | **$0** |
| **Total Costs** | | | | | | | **$206,342** |

As computed from Table 24 above, on average, released LOP respondents spent 3.52 more minutes in bond hearings and attended 0.13 more bond hearings than released Non-LOP respondents, which is an artifact of having already been released.[39]

---

[39] These data had unequal variances, therefore, with $\alpha = .01$, $t(19691.064) = 20.225$, $p < 0.0001$. LOP respondents, regardless of custody status or FY, spent more time in bond hearings than Non-LOP respondents

Table 25 represents detained LOP and Non-LOP respondents for motion hearings. As computed in Table 25, LOP detained respondents spent, on average, 3.30 minutes longer in motion hearings than Non-LOP detained respondents and had, on average, 0.08 more motion hearings than detained Non-LOP respondents.

Table 25. Average Motions Duration (in minutes) and Average Cost (Dollars) across FY (Detained)

| Fiscal Year of Receipt | Average Motion Hearing Duration (minutes) | | Average Number of Motion Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Detained LOP Respondents (#) | Total Average Annual Cost Added by LOP Detained Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 18.92 | 14.32 | 0.210 | 0.186 | $6.97 | 16,223 | $113,135 |
| 2015 | 20.60 | 13.00 | 0.181 | 0.121 | $11.47 | 14,939 | $171,387 |
| 2016 | 17.11 | 13.27 | 0.171 | 0.055 | $10.71 | 14,389 | $154,071 |
| 2017 | 15.00 | 13.72 | 0.241 | 0.119 | $9.39 | 19,775 | $185,651 |
| 2018 | 15.64 | 14.44 | 0.299 | 0.181 | $9.85 | 20,832 | $205,100 |
| 2019 | 15.71 | 14.38 | 0.267 | 0.246 | $3.25 | 17,091 | $55,624 |
| Average | 17.16 | 13.86 | 0.23 | 0.15 | $8.61 | 17,208 | $147,495 |
| Total Costs | | | | | | | $884,968 |

Table 26.  Average Motions Duration (in minutes) and Average Cost (Dollars) across FY (Released)

| Fiscal Year of Receipt | Average Motion Hearing Duration (minutes) | | Average Number of Motion Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released LOP Respondents (#) | Total Average Annual Cost Added by LOP Released Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 14.11 | 0.00 | 0.436 | 0.000 | $32.84 | 5,963 | $195,802 |
| 2015 | 12.63 | 0.00 | 0.563 | 0.000 | $37.90 | 5,466 | $207,137 |
| 2016 | 12.74 | 0.00 | 0.519 | 0.000 | $32.29 | 5,988 | $193,343 |
| 2017 | 14.19 | 0.00 | 0.533 | 0.000 | $35.80 | 4,688 | $167,840 |
| 2018 | 14.27 | 0.00 | 0.496 | 0.000 | $33.74 | 3,030 | $102,238 |
| 2019 | 13.88 | 0.00 | 0.426 | 0.000 | $29.23 | 1,186 | $34,668 |
| Average | 13.64 | 0.00 | 0.50 | 0.00 | $33.63 | 4,387 | $150,171 |
| Total Costs | | | | | | | $901,028 |

Table 26 above represents released respondent motion proceedings and it is important to note that only LOP released respondents with an ICC and judicial decision were found and recorded, As computed from Table 26 above, on average, detained LOP respondents spent 13.64 more

minutes in motions proceedings and attended 0.50 more motions hearings than Non-LOP detained respondents[40].

**Omnibus Analyses**

For overall on-record proceeding costs, respondents who attended LOP programs showed additional costs related to the duration and number of proceedings, across proceeding type and fiscal year.

Two independent samples *t-tests* were conducted as omnibus tests to find the statistical significance of the mean differences between LOP and Non-LOP average duration and number of proceedings attended across the five proceeding types (Initial Masters, Individual Merits, Applications, Bonds, and Motions) and fiscal year.

The omnibus results provide strong evidence that LOP respondents had longer proceedings, on average (LOP μ = 40.43 minutes and Non-LOP μ = 36.85 minutes) and slightly more proceedings (LOP μ = 0.4915 and Non-LOP μ =0.4239) when compared to Non-LOP respondents resulting in higher costs for LOP year over year across all hearing types.[41]

Tables 27 and 28 represent a composite of the overall LOP costs beyond the Non-LOP costs associated with the five types of hearings included in these analyses, by custody, status and across fiscal year.

Table 27. Annual LOP Cost of Five Adjudication or Processing Types FY (Detained)

| Detained | | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal Year of Receipt** | **Masters Annual Cost ($)** | **Merit Annual Cost ($)** | **Applications Annual Cost ($)** | **Bond Annual Cost ($)** | **Motions Annual Cost ($)** | **Total Average Annual DETAINED LOP Costs ($)** |
| 2014 | $658,332 | $640,727 | $94,202 | $317,382 | $113,135 | **$1,823,778** |
| 2015 | $567,650 | $809,841 | $5,495 | $112,612 | $171,387 | **$1,666,984** |
| 2016 | $277,094 | $810,929 | $32,212 | $78,773 | $154,071 | **$1,353,079** |
| 2017 | $308,891 | $1,350,366 | $112,241 | $207,719 | $185,651 | **$2,164,867** |
| 2018 | $184,885 | $1,029,053 | $49,317 | $247,265 | $205,100 | **$1,715,621** |
| 2019 | $117,814 | $1,080,688 | $3,359 | $145,650 | $55,624 | **$1,403,135** |
| **Total Detained Costs across FY** | **$2,114,667** | **$5,721,604** | **$296,826** | **$1,109,400** | **$884,968** | **$10,127,465** |

[40] With α = .01, $t(169826.532)$ = 31.589, $p$ < .0001. For the number of motion hearings with α = .01, t(58) = 18.63, $p$ < .0001. These results provide evidence that the duration and number of motion hearings are significantly different between LOP and Non-LOP respondents. It is important to note that NO Non-LOP respondents were found in motion hearings.

[41] With α = .01, $t(39741.405)$ = 8.434, $p$ < .0001. These results provide evidence that the duration and number of all proceedings combined are significantly higher for LOP respondents than Non-LOP respondents.

Table 28. Annual LOP Cost of Five Adjudication or Processing Types across FY (Released)

| Fiscal Year of Receipt | Released | | | | | |
|---|---|---|---|---|---|---|
| | Masters Annual Cost ($) | Merit Annual Cost ($) | Applications Annual Cost ($) | Bond Annual Cost ($) | Motions Annual Cost ($) | Total Average Annual RELEASED LOP Costs ($) |
| 2014 | $4,156 | $56,950 | $83,689 | $57,002 | $195,802 | $397,599 |
| 2015 | $8,954 | $194,298 | $78,264 | $38,288 | $207,137 | $526,942 |
| 2016 | $2,641 | $73,576 | $57,051 | $34,521 | $193,343 | $361,132 |
| 2017 | $10,147 | $125,966 | $62,889 | $35,524 | $167,840 | $402,366 |
| 2018 | $6,020 | $102,950 | $31,418 | $31,819 | $102,238 | $274,444 |
| 2019 | $1,842 | $9,654 | $7,770 | $9,189 | $34,668 | $63,123 |
| Total Released Costs across FY | $33,759 | $563,394 | $321,082 | $206,342 | $901,028 | $2,025,605 |

Table 29. Component II On-Record Costs

| Component II Court Costs | |
|---|---|
| Custody Status | Additional Average Costs across Fiscal Years Added by LOP Respondents ($) |
| Detained | $10,127,465 |
| Released(w/ ICC Only) | $2,025,605 |
| Total Component II Costs | $12,153,070 |
| Average of Component II Costs across 6 Fiscal Years | $2,025,512 |

**On-Record Proceedings Cost-Related Discussion**

Due to the length of time, number of LOP respondents, and the average number of proceedings, the overall cost, beyond the Non-LOP cost, for LOP respondents in Component II was $12,153,070 across six fiscal years. The LOP costs reflect the following five details:

1. Component II LOP respondents accounted for 35.36% of respondents across FY and custody status and Non-LOP respondents accounted for 64.64% of respondents.
2. On average, detained LOP respondents spent more time ($\mu_{LOP}$ = 20.83 more minutes) during all on-record proceedings than Non-LOP respondents.[42]

---

[42] Since equal variances were significant, with $\alpha$=.01, $t(163173.055)$= 30.961, $p < .0001$ indicating that detained LOP respondents spend significantly more time in proceedings than Non-LOP respondents.

3. On average, detained LOP respondents had slightly more proceedings ($\mu_{LOP} = 0.341$ more proceedings) across all on-record proceedings than Non-LOP respondents[43].

4. On average, released LOP respondents with ICCs spent more time (LOP $\mu_{LOP} = 4.581$ more minutes) during all on-record proceedings than Non-LOP respondents[44].

   On average, released LOP respondents with ICCs had slightly more proceedings (LOP $\mu_{LOP} = 0.161$ more proceedings) across all on-record proceedings than Non-LOP respondents[45].

---

[43] Since equal variances were significant, with $\alpha$=.01, $t$(2563.444)= 6.527, $p < .0001$ indicating that detained LOP respondents attended significantly more proceedings than Non-LOP respondents.

[44] Since equal variances were significant, with $\alpha$=.01, $t$(42943)= 8.639, $p < .0001$ indicating that LOP respondents spend significantly more time in proceedings than Non-LOP respondents.

[45] Since equal variances were significant, with $\alpha$=.01, $t$(538.662)= 4.655, $p < .0001$ indicating that LOP respondents attended significantly more proceedings than Non-LOP respondents.

# FINAL ANALYSIS-END MATTER

For Components I and II only, the total cost, on average, of $779,692,832 was added, beyond the cost of Non-LOP respondents, across six fiscal years. These costs related to the LOP program do not include all costs associated with on-record costs or other respondents not included, but are representative of the costs associated with LOP respondents in removal hearings across all court locations.

Table 30. The Total and Average Cost of Components I and II cross Custody Status and FY

| All Average LOP Costs across FY and Custody Status | |
|---|---|
| Cost From: | Additional Average Costs across Fiscal Year Added by LOP Respondents ($) |
| Component I * | $767,539,762 |
| Component II** | $12,153,070 |
| **Total Cost** | **$779,692,832** |
| **Average Costs across FY** | **$129,948,805** |

*\* From Table 14, \*\* From Table 29*

**Limitations for Components I and II**

As with any evaluation, limitations exist, and in the current study these limitations include data constraints such as data access, the number of LOP respondents compared to Non-LOP respondents, data reporting errors, and/or missing data provided to EOIR by DHS-ICE and VERA[46]. Additionally, data in this evaluation represent only a snapshot in time, which means if any conditions change, data results will change. As discussed previously, all data shared the data characteristics presented in Table 1 above.

**Recommendations**

1. It would benefit VERA to standardize their data entry of LOP respondents to consistently keep track of service dates as well as case completion dates for each LOP respondent. This would ensure a more confident EOIR match and provide more results that are meaningful.

2. LOP program leaders should consider monitoring their respondent's length of stay and assist the respondent in timely filing of all documents.

---

[46] Missing or incorrectly coded data were found n the ICE and VERA data sets exclusively. Missing data includes date in, date out, Null Alien_NBR, incorrect input of dates (such as 02/16/No year). Respondents with more than one row in VERA data was concatenated into one row representing all services attended by one respondent to avoid duplicate responses. (See SM1).

**Future Studies**

Observed differences in means and SEMs across the 52 matched locations served by LOP providers demonstrate that a respondent's length of stay is affected by base city locations in the VERA FY 2014 through FY 2019 data sets.

The underlying factors influencing these findings are unclear. If desired, EOIR analysts could pursue other potential studies to better qualify these and other aspects of this study

**Conclusions**

This cost evaluation focuses upon two types of costs related to the LOP program: (1) the number of days detained and related LOP program costs; and (2) the number and duration of the five most common types of proceedings. Between FY 2014 and FY 2019, LOP respondents, on average, stayed in detention longer, attended more proceedings, hearings, schedules, and motions, and spent longer, on average, in most of the five on-record processes measured than Non-LOP respondents over the same time period. From an average-cost basis standpoint, respondents attending LOP programs cost money above and beyond respondents not attending LOP programs.  EOIR focused only upon the tangible, primary financial costs EOIR identified. It did not attempt to identify any non-tangible costs that the LOP program may (or may not) provide.

LOP is designed to promote respondents' informed decision-making. As such, EOIR's findings that LOP respondents had slightly longer hearings and submitted more motions and applications of relief than non-LOP respondents may not be surprising. Note that EOIR has not assigned any causal behavior to the LOP. Anecdotally, the increases in the length of hearings and the numbers of motions and applications could potentially be a result of the additional time spent to attend an LOP orientation to potentially inform their decision-making, and/or it may be an indication of respondents exercising the options available to them within immigration proceedings.  There could be other causal factors.  EOIR would need to conduct additional, rigorous analysis to draw definitive conclusions regarding any potential causal factors.



## APPENDIX A: SUPPLEMENTAL MATERIAL

**SM1. Examples of Calculations for the Number of Days Detained**

The original data sets from DHS-ICE and VERA exhibited identical cases (the same ALIEN_NBR, IDNCASE, and Dates) which were removed so the number of days detained were not duplicated. These data also had overlapping dates, which were filtered out so the number of days detained were accurate. Finally, if a respondent had more than one case or cases with day's detained > 0, EOIR analysts  subtotaled their days and reported them all in the fiscal year of receipt. The examples below clarify these data situations and data decisions and filters.

1. **Identical Cases Example:**

   The four cases below (one case per row) represent only **one** actual case with **10 days** detained.

| ALIEN_NBR[47] | IDNCASE[48] | # Days Detained | Book-in Date | Book-out Date | Custody | I-862 | LOP | FY OF RECEIPT |
|---|---|---|---|---|---|---|---|---|
| 123456789 | 12345678 | 10 | 8/1/2014 | 8/11/2014 | D | X | Yes | 2014 |
| 123456789 | 12345678 | 10 | 8/1/2014 | 8/11/2014 | D | X | Yes | 2014 |
| 123456789 | 12345678 | 10 | 8/1/2014 | 8/11/2014 | D | X | Yes | 2014 |
| 123456789 | 12345678 | 10 | 8/1/2014 | 8/11/2014 | D | X | Yes | 2014 |

Therefore, so that 40 days are not counted, the above identical cases become:

| ALIEN_NBR | IDNCASE | # Days Detained | Book-in Date | Book-out Date | Custody | I-862 | LOP | FY OF RECEIPT |
|---|---|---|---|---|---|---|---|---|
| 123456789 | 12345678 | 10 | 8/1/2014 | 8/11/2014 | D | X | Yes | 2014 |

2. **Overlapping Cases Example**

   The three cases below (one case per row) represent only **one** actual case with **33 days** detained, but have dates that overlap in the data file.

| ALIEN_NBR | IDNCASE | # Days Detained | Book-in Date | Book-out Date | Custody | I-862 | LOP | FY OF RECEIPT |
|---|---|---|---|---|---|---|---|---|
| 123456789 | 12345678 | 10 | 8/1/2014 | 8/11/2014 | D | X | Yes | 2014 |
| 123456789 | 12345678 | 33 | 8/1/2014 | 9/3/2014 | D | X | Yes | 2014 |
| 123456789 | 12345678 | 2 | 9/1/2014 | 9/3/2014 | D | X | Yes | 2014 |

---

[47] The ALIEN_NBR used in the examples is not an actual Alien Number, but a proxy used in the example.
[48] The IDNCASE number used in the examples is not an actual IDNCASE number, but a proxy used in the example.

Therefore, so that 45 days are not counted, the above overlapping cases become:

| ALIEN_NBR | IDNCASE | # Days Detained | Book-in Date | Book-out Date | Custody | I-862 | LOP | FY OF RECEIPT |
|-----------|---------|-----------------|--------------|---------------|---------|-------|-----|----------------|
| 123456789 | 12345678 | 33 | 8/1/2014 | 9/3/2014 | D | X | Yes | 2014 |

**3. Example of Subtotaling Cases**

The three cases below are for the same respondent across three fiscal years and the IDNCASE number is the same in two of them. Since the same respondent was detained on three separate dates, the number of days are subtotaled and reported in the fiscal year of the original EOIR fiscal year of receipt.

| ALIEN_NBR | IDNCASE | # Days Detained | Book-in Date | Book-out Date | Custody | I-862 | LOP | FY OF RECEIPT |
|-----------|---------|-----------------|--------------|---------------|---------|-------|-----|----------------|
| 123456789 | 12345678 | 14 | 6/1/2014 | 6/15/2014 | D | X | No | 2014 |
| 123456789 | 12345678 | 29 | 8/1/2015 | 8/30/2015 | D | X | No | 2015 |
| 123456789 | 12345689 | 7 | 5/1/2016 | 5/8/2016 | D | X | No | 2016 |

Therefore, the number of days detained were counted as:

| ALIEN_NBR | # Days Detained | Custody | I-862 | LOP | FY OF RECEIPT |
|-----------|-----------------|---------|-------|-----|----------------|
| 123456789 | 50 | D | X | No | 2014 |

**SM2. The Number and Proportion of all LOP and Non-LOP Respondents with Legal Representation at any Time During their Detention.**

Table 31. The Number of Respondents with Legal Representation at any Time During their Detention

| FY of Receipt | Number of Respondents with Legal Representation | | | |
|---------------|------------------------|--------------|------------------|--------------|
| | LOP | | Non-LOP | |
| | Detained | Released | Detained | Released |
| 2014 | 2,595 | 6,719 | 4,527 | 21,600 |
| 2015 | 2,889 | 8,160 | 4,292 | 17,063 |
| 2016 | 2,873 | 10,951 | 4,076 | 20,024 |
| 2017 | 4,317 | 9,920 | 6,425 | 22,121 |
| 2018 | 4,629 | 8,904 | 8,280 | 29,031 |
| 2019 | 3,741 | 7,870 | 8,777 | 28,975 |
| **Totals across FY** | **21,044** | **52,524** | **36,377** | **138,814** |

Table 32. The Proportion of Respondents with Legal Representation at any Time During their Detention

| FY of Receipt | Proportion of Respondents with Legal Representation | | | |
| | LOP | | Non-LOP | |
| | Detained | Released | Detained | Released |
|---|---|---|---|---|
| 2014 | 16.00% | 67.39% | 16.22% | 70.60% |
| 2015 | 19.34% | 73.69% | 20.63% | 73.80% |
| 2016 | 19.97% | 77.90% | 20.61% | 78.20% |
| 2017 | 21.83% | 76.92% | 21.87% | 76.88% |
| 2018 | 22.22% | 74.47% | 24.15% | 75.31% |
| 2019 | 21.89% | 56.42% | 21.83% | 65.07% |

Note that released respondents were 3.33 times more likely to have legal representation than detained respondents.

The likelihood of LOP and Non-LOP respondents who had legal representation is summarized below[49].

A. Regardless of LOP and custody status and across fiscal year, released respondents are 3.51 times more likely to have representation at some point in their case than detained respondents[50] across fiscal year when adjusting for proportions. See Figure 5.

B. Non-LOP respondents are 0.03 times more likely to have representation in their case than LOP respondents regardless of custody status and across fiscal year. See Figure 6.

C. Detained LOP respondents are 0.01 times more likely to have representation than detained LOP respondents. See Figure 5.

D. Released Non-LOP respondents are 0.04 times more likely to have representation than released LOP respondents. See Figure 6.

---

[49] Derived from Table 31 in SM1

*Figure 6.  Proportion of Respondents with Legal Representation by Custody Status across FY (Illustrating Point A Above*



*Figure 7.  Proportion of Respondents with Legal Representation by Custody Status and FY (Illustrating Points A-D Above)*



Note that the number of LOP and Non-LOP respondents with legal representation for both detained and released custody status are quite similar.

Admin. Rec. 315

## SM3. Median Days of Detention

## Statistical Assumptions

All statistical tools used to analyze differences, associations, and dependence of multiple groups include a set of assumptions regarding the distribution of these data. The most common assumptions of parametric statistics[51] are that the underlying distribution of data are normally distributed (symmetric), have similar variances across multiple groups (homogeneity), have a linear relationship (linearity), and are independent. In other words, when examining underlying data distributions, it is critical to look at the center, shape, and spread of the data.[52]

Skew and kurtosis were examined to determine the shape and spread of the current data. Acceptable values for skew in a normal distribution are +/- 2.0 and for kurtosis are +/-7.0. In Component I of the current study, the underlying distributions of data were highly positively skewed (non-normal with most values low) and present with an extremely high kurtosis (high peaks in the left tail),[53] lack homogeneity, linearity, and/or independence.

Figure 8 shows the distribution of data for LOP and Non-LOP respondents by custody status and across fiscal year. Figure 9 shows the Q-Q plots detailing the underlying distribution in each of the data sets in Figure 8.

---

51 Parametric statistics refer to a category of statistics which assumes data come from populations that can be adequately modeled by a probability distribution that has a fixed set of parameters. Vickers A. J. (2005). Parametric versus non-parametric statistics in the analysis of randomized trials with non-normally distributed data. BMC medical research methodology, 5, 35.

52 These assumptions require examination prior to any data analyses in order to determine the best statistical tools to use with the underlying distribution. Most parametric statistics are robust to some violations of these assumptions (General Linear Models such as Analysis of Variance (ANOVA), Regression, test of means and standard deviations (z and t-tests).

53 Skew for Detained LOP and Non-LOP respondents respectively is 6.049 and 3.864, and for released LOP and Non-LOP respondents is 4.980 and 4.297 respectively. Kurtosis for Detained LOP and Non-LOP respondents respectively 111.040 and 41.302, and for released LOP and Non-LOP respondents is 62.932 and 46.207 respectively, The skew and kurtosis show that these data are non-normal, highly positively skewed, which indicates many low values with some very large outliers pulling the data, and have very high peaks in the left tail.

---

Admin. Rec. 316

*Figure 8.  Distribution of LOP and Non-LOP Respondents by Custody and across FY*



Figure 8 shows that the underlying distributions of LOP and Non-LOP detained and released respondents is highly skewed (positive skew) and high kurtosis (shape is not flat and consistent but has peaks)

*Figure 9. Q-Q Plots to show Linearity and Outliers for LOP and Non-LOP Respondents by Custody Status and across FY[54]*



The Q-Q plots in Figure 9 above support the findings that these data have non-normal underlying distributions to include non-linearity and extreme outliers.

Using the median to estimate the number of days detained rather than the mean is appropriate for these data. Additionally, the median is less influenced by outliers than the mean. Nonparametric statistics, which are not based on assumptions of distribution, are presented here as a comparison to represent the center of these data.

The median is not used in the current cost analysis because in EOIR budgeting, the costs for Component I were calculated using the average (mean) number of days detained to provide useful budgeting parameters regardless of the underlying distribution of the number of days detained.

Table 33 provides the median days detained only as a comparison. In both the mean and median results, on average, LOP respondents are detained longer than Non-LOP respondents across custody status and FY.

---

[54] QQ plots (quantile-quantile) are probability plots where the observed value is mapped to the expected value. If the observed and expected values are similar, the shape of the line will be similar. Otherwise the two quantiles are not similar which provides a graphical view of location, scale, and skewness of each. QQ plots provide a visual "goodness of fit" of the observed data to the expected data. These QQ plots show the underlying observed distribution is non-normal.

Table 33. Median Number of Days Detained across Custody Status and Fiscal Year for Comparison Purposes Only

| FY of Receipt | Median Number of Days Detained | | | |
| --- | --- | --- | --- | --- |
| | LOP Respondents (#) | | Non-LOP Respondents (#) | |
| | Median Days (#) | | Median Days (#) | |
| | Detained | Released | Detained | Released |
| 2014 | 68 | 50 | 52 | 38 |
| 2015 | 82 | 55 | 60 | 44 |
| 2016 | 103 | 73 | 68 | 55 |
| 2017 | 101 | 62 | 64 | 41 |
| 2018 | 91 | 55 | 64 | 40 |
| 2019 | 103 | 69 | 71 | 50 |

Note that the differences between the LOP and Non-LOP median number of days detained are consistent with the differences between LOP and Non-LOP mean number of days detained reported in Tables 10 and 12 in Component I. In other words, both measures of central tendency (mean and median) show that LOP respondents stayed longer, on average, than Non-LOP respondents regardless of custody status or fiscal year.

## APPENDIX B-METHODOLOGICAL DETAILS

**Methodological Details Overview**

The steps taken and decisions made at each level of analysis are critical for any study. The strength of any study lies in the ability of researchers to reproduce the results using the same data and methods. In the current study, the methodological details are broken out step-by-step to elucidate decisions at every step of the analyses. For this FY 2014 through FY 2019 Cost Evaluation, EOIR employed a quasi-experimental method using archival data from DHS-ICE, VERA, and EOIR data.

Quasi-experimental studies encompass a broad range of non-randomized intervention studies. These designs are commonly used when it is not logistically feasible or not ethical to conduct a randomized, controlled trial—the "gold standard" of causal research design.[55] This quasi-experimental study is similar to an experimental study, except that respondents could not be randomly assigned to be in the LOP or Non-LOP groups as their assignment was pre-determined prior to this study.  Quasi-experimental studies are most often used to evaluate interventions, and in this study, the intervention is the LOP programs and services offered to respondents. As with any quasi-experimental design, there is a control group and a treatment group.

**Control and Treatment Groups (Non-Randomly Assigned)**

In the current study, the control group are those respondents who did not attend any LOP programs or receive any LOP services (Non-LOP) and the treatment group are those respondents who did attend LOP programs and/or receive services to assist them in navigating the immigration court system (LOP).

**Assumptions for the Current Study**

*Components I & II*

With any study, key assumptions about the data are made and in quasi-experimental designs, two important assumptions are *exogeneity* and *monotonicity*.[56] Exogeneity means that the independent variables (X) are not mutually exclusive and not dependent on the dependent variable (Y), although, they may influence the dependent variable. Monotonicity in the data means that the order of data does not affect the outcome.

Exogeneity Example: The independent variables (IVs) in this study are LOP status, custody status, and fiscal year. The dependent variable (DV) for component I is the length of stay in detention and the DVs in Component II  were the costs associated with the type of proceeding, hearing, schedule, or motion. The assumption for Component I was that were not dependent on length of stay in detention. This assumption has been met. The assumption for Component II was

---

[55] Millsao, R.E. and Maydeu-Olivares, A.  (2009). Quantitative Methods in Psychology. SAGE. Los Angeles, CA.

[56] Clapham, Christopher; Nicholson, James (2014). *Oxford Concise Dictionary of Mathematics* (5th ed.). Oxford University Press.

that LOP status (LOP or Non-LOP), custody status (detained or released) and fiscal year (2014 through 2019) were not dependent on the on-record costs. The data meet this assumption

<u>Monotonicity Example:</u> This assumption means that the way in which these data are ordered does not affect the outcome. The data meet this assumption.

**Research Questions for Component I**

1. Is there a difference in detention costs between LOP and Non-LOP respondents across FY?
   - **Results are in Tables 10 and 12**
2. Is there a difference in detention costs between LOP and Non-LOP respondents across custody status?
   - **Results are in Tables 10 and 12.**
3. Is there a difference in detention costs between LOP and Non-LOP respondents across location?
   - **Preliminary results are in Appendix C.**

To answer these questions, EOIR analyst adhered to the data characteristics in Table 1 to filter these data.  In all of Component I analysis, the following calculations were made in using these six steps:

1. *All average number of days detained were calculated by subtracting the book-out date from the book-in date from the DHS-ICE database.*

2. *All average number of days detained were rounded to the nearest whole day and all costs were rounded to nearest whole dollar amount for ease of presentation and interpretation*

3. *The number of days detained were compared across LOP status, custody status, and fiscal year. The differences were calculated by subtracting the average number of Non-LOP days from the average number of LOP days detained.*

4. *These differences were then multiplied by the daily cost of detention provided by the Department of Homeland Security U.S. Immigrations and Customs Enforcement Budget Overview from FY 2014 through FY 2019 to determine the average cost per adult respondent for one day of detention.*

5. *Once the average cost per adult respondent per one day of detention was calculated, the product was then multiplied by the number of adult respondents for each fiscal year.*

6. *The total LOP cost by fiscal year (and across all custody statuses) are a product of the final calculation made in step 5.*

**Research Questions for Component II**

1. What are the average number of Initial Master's, Individual Merits, Applications, Bonds, and Motions attended by LOP and Non-LOP respondents by Custody Status across FY?
   - **Results are in Tables 15 through 26**
2. What are the differences in the average amount of time in minutes between LOP and Non-LOP respondents by Custody Status and across FY for each type of proceeding?
   - **Results are in Tables 16 through 26**
3. Is there a difference in the average cost of Initial Master's, Individual Merits, Applications, Bonds, and Motions proceedings between LOP and Non-LOP respondents across Custody Status and FY?
   - **Results are in Tables 16 through 28 and summed in Table 29**

To answer these questions, the data from Component I were used. The following calculations were made using the five steps below.

1. *The average number of Initial Master's, Individual Merits, Applications, Bonds, and Motions were calculated for each proceeding by LOP and custody status and fiscal year.*

2. *The average time in minutes was calculated for each type of proceeding by LOP and custody status and fiscal year using the DAR data base.*

3. *The average court costs per minute were calculated using the weighted averages salaries of court staff (IJs, JLCs, LAs, DHS attorneys, and interpreters) over six fiscal years, across all pay grades and steps, and across all court locations based on the actual number of these staff at each location. Other court costs were not included in these analyses, which means that the per-minute court cost is underestimated but representative of what was included.*

4. *The average costs were calculated for each of the five proceeding types (Initial Master's, Individual Merits, Applications, Bonds, and Motions) by using the product of the number of proceedings and their corresponding average times in minutes by the average cost per minute by custody status and fiscal year.*

5. *Finally, the differences between the average costs of LOP and Non-LOP respondents were calculated over custody status and fiscal year and multiplied by the number of LOP respondents, resulting in the average costs reported in Tables 16 through 29.*

## APPENDIX C-BRIEF LOP LOCATIONS ANALYSIS

**A Brief Analysis Regarding LOP Locations**

In the previous FY 2013 to FY 2017 cohort study and the current FY 2014 through FY 2019 cohort study, the base city location of the proceeding and/or the detention were found to be a confounding variable. In other words, respondent's base city location influenced the number of days detained, regardless of custody or LOP status.

With this in mind, EOIR analysts examined base city locations found in the EOIR CASE files and compared all Non-LOP cases to matching LOP base city locations only. Base cities were selected over hearing locations since base cities have one or more hearing locations, capturing a larger area of analyses and allowing for a more broad view of these data. The results show that the data presented with 68 unique base city locations, and of those 68 locations, LOP matched to 55 of them and only 52 base cities had significant differences between LOP and Non-LOP respondents on the number of days detained.[57]

Two of the 52 base city locations LOP serves had shorter average number of days detained for LOP respondents when compared to Non-LOP respondents (Otero, NM (OTO) and LaSalle, LA (JNA)). Eighteen locations show higher than expected SEMs at the 99% confidence level ($\geq 2.58$), and 34 LOP matched locations are within the expected SEM indices and provide evidence of data precision and fidelity.

**LOP and Non-LOP Respondent Demographics**

Tables 34-37 provide more detail about the number of respondents in the current cost analysis across the 52 matching hearing LOP locations. Data were assembled from LOP data provided by VERA, EOIR, and DHS-ICE detention data across FYs 2014 through 2019 as found in Table 3 above. The total number of respondents across the 52 LOP matched locations, regardless of LOP, custody status, or FY, is 297,843. This represents 55.09% of all LOP and Non-LOP respondents in Table 3. Table 34 provides the percentage of respondents at LOP hearing locations matched to Non-LOP respondents by LOP status.[58]

Table 34. Number and Percent of Respondents by LOP Status for Matched LOP Locations

| LOP Status | In Matched Location Data | In Master File | Percent of Respondents by LOP Status (%) |
|---|---|---|---|
| LOP | 153,787 | 177,153 | 86.81% |
| Non-LOP | 317,883 | 363,522 | 87.45% |
| **Total Respondents** | **297,843** | **540,675** | 55.09% |

---

[57] An Analysis of Variance (ANOVA), showed with $\alpha = .01$, that out of 55 matched LOP locations, the number of days detained between LOP and Non-LOP respondents was significantly higher for LOP respondents ($p < 0.0001$) in all but Denver ($p = .158$), Oakland ($p = 0.188$), and Ulster Correctional Facility ($p = 0.151$).
[58] Not all LOP or Non-LOP respondents are accounted for since there were non-matching locations for each which were removed from these analyses.

**Length of Stay and the Standard Error of the Mean**

To determine if any of the calculations for the average length of stay by LOP location were overestimated or underestimated, EOIR analysts computed the standard error of measurement (SEM) at a 99% confidence level ($\alpha$ =.01). As mentioned previously, other internal, external, and/or DHS-ICE-related factors may also contribute to detention length. Consequently, in this Appendix for FY 2014 through FY 2019, base city locations were accounted for with DHS-ICE detained and released respondent data by using the base city locations matching LOP program locations.

Tables 35 and 36 illustrate the means and SEMs for the average number of days detained by LOP status across locations. The tables are organized from largest LOP SEMs to smallest. The largest SEMs are in Table 34 and show that variance in these locations is high, indicating that the true population mean may not be accurately represented and/or a significant number of outliers exist. This result indicates that the base cities require further analysis to determine the reason(s) for such large variances in these 18 locations. The underlying reasons may have to do with their smaller respondent populations[59] and/or other unknown or unmeasured variables. The factors in play are beyond the scope of this study, but serve as a starting point for future analysis.

Table 35. LOP Matched Locations with Average (Mean) Number of Days Detained with LOP SEMs > 2.58 (High-SEM Data)

| Location Code | Base city | State/Territory | Mean LOP | SEM LOP | Mean Non-LOP | SEM Non-LOP |
|---|---|---|---|---|---|---|
| SAJ | San Juan | PR | 127.81 | *14.353 | 111.30 | *5.524 |
| DET | Detroit | MI | 114.86 | *7.72 | 62.71 | 1.063 |
| OTM | Otay Mesa | CA | 238.24 | *6.877 | 118.16 | *4.614 |
| TUC | Tucson | AZ | 105.61 | *6.543 | 95.60 | 2.383 |
| HON | Honolulu | HI | 77.75 | *6.511 | 61.30 | *2.967 |
| BTV | Batavia | NY | 152.38 | *6.285 | 130.65 | *3.200 |
| BLM | Bloomington | MN | 112.65 | *5.367 | 88.89 | 1.316 |
| KAN | Kansas City | MO | 94.67 | *4.849 | 55.68 | 0.881 |
| POO | Portland | OR | 85.61 | *4.336 | 36.57 | 1.223 |
| LOU | Louisville | KY | 91.28 | *4.173 | 50.64 | 1.100 |

---

[59] A correlation between the LOP SEMs and location populations showed a significant negative relationship between these variable. With $\alpha$ =.01, $r$ (1) = -0.619, p < .0001. These results indicate that as the number of respondents increase, the SEMs decrease significantly. This is intuitive since SEM is sample size dependent.

*Continued…*

| Location Code | Base city | State/Territory | Mean LOP | SEM LOP | Mean Non-LOP | SEM Non-LOP |
|---|---|---|---|---|---|---|
| CLE | Cleveland | OH | 103.69 | *4.124 | 66.93 | 1.020 |
| SND | San Diego | CA | 130.98 | *4.048 | 58.19 | 1.622 |
| ELZ | Elizabeth | NJ | 174.04 | *3.914 | 146.33 | *3.533 |
| LVG | Las Vegas | NV | 98.05 | *3.766 | 70.38 | 1.002 |
| OMA | Omaha | NE | 92.36 | *3.659 | 65.14 | 1.127 |
| HAR | Hartford | CT | 87.85 | *3.58 | 66.33 | 1.503 |
| SLC | Salt Lake City | UT | 69.14 | *3.023 | 49.62 | 1.135 |
| FLO | Florence | AZ | 133.81 | *2.844 | 77.14 | 2.029 |

*All SEMs > 2.58 are flagged*

Base city locations with low SEMs are in Table 35.

Table 36. LOP matched Locations with Average (Mean) Number of Days Detained with LOP SEMs < 2.58 (Low-SEM Data)

| Average (Mean) Days Detained with Standard Errors of Measurement (SEMs ) < 2.58 | | | | | | |
|---|---|---|---|---|---|---|
| Location Code | Base city | State/Territory | Mean LOP | SEM LOP | Mean Non-LOP | SEM Non-LOP |
| ADL | Adelanto | CA | 149.10 | 2.480 | 89.70 | 2.225 |
| YOR | York County | PA | 126.49 | 2.360 | 89.90 | 2.431 |
| PHO | Phoenix | AZ | 96.74 | 2.307 | 50.26 | 1.000 |
| ELO | ELOY | AZ | 146.94 | 2.264 | 82.22 | 1.535 |
| CHI | Chicago | IL | 112.80 | 2.243 | 73.12 | 0.712 |
| SEA | Seattle | WA | 88.07 | 2.160 | 62.99 | 1.326 |
| PSD | Pearsall | TX | 133.33 | 2.155 | 90.82 | 1.731 |
| EPD | El Paso SPC | TX | 128.47 | 2.087 | 97.03 | *2.751 |
| ORL | Orlando | FL | 91.37 | 2.086 | 67.73 | 0.796 |
| KRO | Krome North PC | FL | 134.92 | 2.035 | 89.27 | 0.980 |
| AUR | Aurora | CO | 112.94 | 1.960 | 89.52 | *4.231 |
| TAC | Tacoma | WA | 156.93 | 1.924 | 102.07 | 1.971 |
| PIS | Port Isabel | TX | 115.69 | 1.920 | 100.14 | 2.353 |
| BOS | Boston | MA | 90.05 | 1.913 | 80.03 | 0.878 |
| DAL | Dallas | TX | 100.61 | 1.866 | 54.20 | 0.460 |
| CHL | Charlotte | NC | 82.95 | 1.842 | 50.93 | 0.800 |

*Continued…*

| Location Code | Base city | State/Territory | Mean LOP | SEM LOP | Mean Non-LOP | SEM Non-LOP |
|---|---|---|---|---|---|---|
| OTO | Otero | NM | 127.88 | 1.625 | 162.64 | 2.851 |
| HLG | Harlingen | TX | 54.43 | 1.592 | 41.58 | 0.817 |
| NOL | New Orleans | LA | 66.97 | 1.546 | 46.36 | 0.725 |
| SDC | Stewart D.C. | GA | 127.75 | 1.484 | 103.80 | 0.837 |
| PHI | Philadelphia | PA | 57.46 | 1.480 | 50.80 | 1.033 |
| MEM | Memphis | TN | 66.58 | 1.463 | 53.82 | 0.852 |
| BAL | Baltimore | MD | 95.13 | 1.442 | 64.29 | 0.714 |
| SNA | San Antonio | TX | 86.87 | 1.422 | 60.88 | 0.511 |
| WAS | Arlington | VA | 105.36 | 1.407 | 62.03 | 0.617 |
| ELP | El Paso | TX | 67.69 | 1.384 | 55.14 | 1.338 |
| ATL | Atlanta | GA | 69.87 | 1.336 | 46.63 | 0.609 |
| JNA | LaSalle | LA | 98.56 | 1.234 | 105.85 | 1.268 |
| NEW | Newark | NJ | 82.19 | 1.192 | 54.84 | 0.592 |
| SFR | San Francisco | CA | 86.48 | 1.065 | 72.32 | 0.156 |
| LOS | Los Angeles | CA | 83.52 | 1.019 | 62.10 | 0.579 |
| MIA | Miami | FL | 84.64 | 0.987 | 55.95 | 0.450 |
| NYC | New York City | NY | 85.55 | 0.764 | 69.23 | 0.335 |
| HOU | Houston | TX | 68.87 | 0.761 | 51.80 | 0.431 |

Table 37 below lists base city locations from the highest average number of LOP days detained to the lowest average number of LOP days detained. Note that in Otero, NM and LaSalle, LA, the number of Non-LOP days detained was **higher** than the LOP days detained.

Table 37. Average Number of Days Detained across Base-Cities from Highest to Lowest

| Location Code | Base city | Mean LOP Days (#) | Mean Non-LOP Days (#) | Difference in Average Days Detained (#) |
|---|---|---|---|---|
| OTM | Otay Mesa | 238.24 | 118.16 | 120.08 |
| ELZ | Elizabeth | 174.04 | 146.33 | 27.71 |
| TAC | Tacoma | 156.93 | 102.07 | 54.86 |
| BTV | Batavia | 152.38 | 130.65 | 21.73 |
| ADL | Adelanto | 149.10 | 89.70 | 59.40 |
| ELO | ELOY | 146.94 | 82.22 | 64.72 |
| KRO | Krome North PC | 134.92 | 89.27 | 45.65 |
| FLO | Florence | 133.81 | 77.14 | 56.67 |
| PSD | Pearsall | 133.33 | 90.82 | 42.51 |
| SND | San Diego | 130.98 | 58.19 | 72.79 |
| EPD | El Paso SPC | 128.47 | 97.03 | 31.44 |
| OTO* | Otero | 127.88 | 162.64 | -34.76 |
| SAJ | San Juan | 127.81 | 111.30 | 16.51 |
| SDC | Stewart D.C. | 127.75 | 103.80 | 23.95 |
| YOR | York County | 126.49 | 89.90 | 36.59 |
| PIS | Port Isabel | 115.69 | 100.14 | 15.55 |
| DET | Detroit | 114.86 | 62.71 | 52.15 |
| AUR | Aurora | 112.94 | 89.52 | 23.42 |
| CHI | Chicago | 112.80 | 73.12 | 39.68 |
| BLM | Bloomington | 112.65 | 88.89 | 23.76 |
| TUC | Tucson | 105.61 | 95.60 | 10.01 |
| WAS | Arlington | 105.36 | 62.03 | 43.33 |
| CLE | Cleveland | 103.69 | 66.93 | 36.76 |
| DAL | Dallas | 100.61 | 54.20 | 46.41 |
| JNA* | LaSalle | 98.56 | 105.85 | -7.29 |
| LVG | Las Vegas | 98.05 | 70.38 | 27.67 |
| PHO | Phoenix | 96.74 | 50.26 | 46.48 |
| BAL | Baltimore | 95.13 | 64.29 | 30.84 |
| KAN | Kansas City | 94.67 | 55.68 | 38.99 |
| OMA | Omaha | 92.36 | 65.14 | 27.22 |

*Indicates that Non-LOP respondents, on average, stayed longer than LOP respondents*

*Continued…*

| Location Code | Base city | Mean LOP Days (#) | Mean Non-LOP Days (#) | Difference in Average Days Detained (#) |
|---|---|---|---|---|
| ORL | Orlando | 91.37 | 67.73 | 23.64 |
| LOU | Louisville | 91.28 | 50.64 | 40.64 |
| BOS | Boston | 90.05 | 80.03 | 10.02 |
| SEA | Seattle | 88.07 | 62.99 | 25.08 |
| HAR | Hartford | 87.85 | 66.33 | 21.52 |
| SNA | San Antonio | 86.87 | 60.88 | 25.99 |
| SFR | San Francisco | 86.48 | 72.32 | 14.16 |
| POO | Portland | 85.61 | 36.57 | 49.04 |
| NYC | New York City | 85.55 | 69.23 | 16.32 |
| MIA | Miami | 84.64 | 55.95 | 28.69 |
| LOS | Los Angeles | 83.52 | 62.10 | 21.42 |
| CHL | Charlotte | 82.95 | 50.93 | 32.02 |
| NEW | Newark | 82.19 | 54.84 | 27.35 |
| HON | Honolulu | 77.75 | 61.30 | 16.45 |
| ATL | Atlanta | 69.87 | 46.63 | 23.24 |
| SLC | Salt Lake City | 69.14 | 49.62 | 19.52 |
| HOU | Houston | 68.87 | 51.80 | 17.07 |
| ELP | El Paso | 67.69 | 55.14 | 12.55 |
| NOL | New Orleans | 66.97 | 46.36 | 20.61 |
| MEM | Memphis | 66.58 | 53.82 | 12.76 |
| PHI | Philadelphia | 57.46 | 50.80 | 6.66 |
| HLG | Harlingen | 54.43 | 41.58 | 12.85 |

## APPENDIX D-RELEASED-PENDING DATA ANALYSIS

**Component II Released-Pending Data and Total Costs**

In the body of this report, only released respondents with an ICC date and judicial decision were included ($n = 90,801$). In this appendix, released-pending respondents (those without an ICC date or judicial decision) are presented ($n = 174,276$). Tables 37 through 46 represent released-pending respondent cases.

Table 38 shows the number of released-pending respondents in the current study pulled from the Master LOP and Non-LOP data file from Table 3.

Table 38. Number of Released-Pending Respondents across FY

| LOP and Non-LOP Released-Pending Respondents | | |
|---|---|---|
| **FY of Receipt** | **LOP Released-Pending (No ICC Date)** | **Non-LOP Released-Pending (No ICC Date)** | **Grand Total** |
| 2014 | 4,008 | 12,879 | 16,887 |
| 2015 | 5,607 | 11,948 | 17,555 |
| 2016 | 8,070 | 14,728 | 22,798 |
| 2017 | 8,208 | 18,372 | 26,580 |
| 2018 | 8,926 | 28,520 | 37,446 |
| 2019 | 12,764 | 40,246 | 53,010 |
| Totals | **47,583** | **126,693** | |
| | | | |
| **Grand Total** | | **174,276** | |

The proportion of released-pending LOP respondents out of all released-pending respondents is 27.30% and for released-pending Non-LOP respondents is 72.70%.

*Figure 10. Number of Released-Pending Respondents across LOP Status and FY*



Figure 10 demonstrates the trajectories of released and released-pending respondents across fiscal year, regardless of LOP status. As seen above, there were more released respondents than released-pending respondents in FY 2014, in FY 2015, the number of respondents was similar, and beginning in FY 2016, the number of respondents diverged, with the number of released respondents decreasing while the number of released-pending respondents increasing[60].

Figure 11 shows the number of LOP and Non-LOP released and released-pending respondents across fiscal year.

*Figure 11. Number of Released and Released-Pending Respondents by LOP Status across FY*



Figure 11 illustrates that the trajectories for released-pending respondents are similar by LOP status. The number of both LOP and Non-LOP released-pending respondents increased year over year.

Table 39 shows the number of proceedings attended by released-pending respondents; the 174,276 respondents attended 600,225 proceedings for an average of 3.44 proceedings per respondents.

---

[60] Equal variances are assumed. With $\alpha = .01$, $t(10) = 2.251$, $p = .048$. This result indicates no significant difference at the .01 level between the mean number of released respondents and released-pending respondents. With $\alpha = .05$, these results would be significant.

Table 39. Number of Proceedings Attended by Released-Pending Respondents

| Number of Times Respondents (PENDING) Attended Court Proceedings | | | |
|---|---|---|---|
| **Type of Court Proceeding** | **LOP Respondents (#)** | **Non-LOP Respondents (#)** | **Grand Total** |
| | **Released-Pending** | **Released-Pending** | |
| Masters | 49,990 | 126,693 | 176,683 |
| Merits | 36,078 | 89,225 | 125,303 |
| Application | 69,097 | 131,643 | 200,740 |
| Bond | 23,316 | 49,637 | 72,953 |
| Motion | 24,546 | 0 | 24,546 |
| **Totals** | **203,027** | **397,198** | **600,225** |

Tables 40 through 44 show the released-pending LOP costs, based on the average number and duration of the proceedings, beyond the Non-LOP costs by type of proceeding (initial master's, individual merits, applications, bonds, and motions).

Table 40. Total Number of Released-Pending Respondents Attending Initial Masters Hearings across Custody Status and FY

| Fiscal Year of Receipt | Average Initial Masters Hearing Duration (minutes) | | Average Number of Initial Masters Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released-Pending LOP Respondents (#) | Total Average Annual Cost Added by LOP Released-Pending Cases ($) |
|---|---|---|---|---|---|---|---|
| | **LOP** | **Non-LOP** | **LOP** | **Non-LOP** | | | |
| 2014 | 18.57 | 12.44 | 1.045 | 0.988 | $37.94 | 4,008 | $152,070 |
| 2015 | 20.19 | 15.45 | 1.014 | 0.984 | $28.06 | 5,607 | $157,345 |
| 2016 | 16.31 | 14.41 | 0.854 | 0.876 | $6.37 | 8,070 | $51,393 |
| 2017 | 14.57 | 13.47 | 0.985 | 0.940 | $8.02 | 8,208 | $65,810 |
| 2018 | 13.93 | 13.54 | 1.087 | 1.013 | $6.78 | 8,926 | $60,500 |
| 2019 | 11.60 | 12.48 | 1.210 | 1.091 | $2.08 | 12,764 | $26,540 |
| **Averages** | **15.86** | **13.63** | **1.03** | **0.98** | **$14.87** | **7,931** | **$85,610** |
| **Total Costs** | | | | | | | **$513,658** |

On average, and across fiscal year, LOP respondents spent 2.23 more minutes in initial master proceedings and attended 0.05 more proceedings than Non-LOP respondents.

Table 41. Total Number of Released-Pending Respondents Attending Individual Merits Hearings across and FY

| Fiscal Year of Receipt | Average Individual Merits Hearing Duration (minutes) | | Average Number of Individual Merits Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released-Pending LOP Respondents (#) | Total Average Annual Cost Added by LOP Released-Pending Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 59.62 | 57.47 | 0.810 | 0.792 | $14.89 | 4,008 | $59,683 |
| 2015 | 65.85 | 63.32 | 0.669 | 0.590 | $35.54 | 5,607 | $199,250 |
| 2016 | 68.39 | 64.04 | 1.172 | 1.105 | $45.82 | 8,070 | $369,798 |
| 2017 | 67.90 | 62.86 | 0.956 | 0.947 | $25.51 | 8,208 | $209,349 |
| 2018 | 64.68 | 59.03 | 0.825 | 0.763 | $39.64 | 8,926 | $353,799 |
| 2019 | 65.09 | 58.92 | 0.416 | 0.411 | $14.20 | 12,764 | $181,249 |
| **Averages** | **65.25** | **60.94** | **0.81** | **0.77** | **$29.27** | **7,931** | **$228,855** |
| **Total Costs** | | | | | | | **$1,373,129** |

On average, and across fiscal year, LOP respondents spent 4.31 more minutes in individual merits proceedings and attended 0.04 more proceedings than Non-LOP respondents.

Table 42. Total Number of Released-Pending Respondents Attending Application Hearings across FY

| Fiscal Year of Receipt | Average Application Hearing Duration (minutes) | | Average Number of Applications per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released-Pending LOP Respondents (#) | Total Average Annual Cost Added by LOP Released-Pending Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 14.66 | 11.01 | 1.835 | 0.976 | $109.84 | 4,008 | $440,228 |
| 2015 | 12.30 | 8.77 | 1.620 | 1.049 | $66.15 | 5,607 | $370,895 |
| 2016 | 12.34 | 9.67 | 1.372 | 0.949 | $47.82 | 8,070 | $385,940 |
| 2017 | 13.68 | 9.92 | 1.634 | 1.042 | $70.21 | 8,208 | $576,311 |
| 2018 | 13.93 | 10.71 | 1.599 | 0.961 | $63.96 | 8,926 | $570,891 |
| 2019 | 13.26 | 9.96 | 1.089 | 1.143 | $9.82 | 12,764 | $125,376 |
| **Averages** | **13.36** | **10.01** | **1.52** | **1.02** | **$61.30** | **7,931** | **$411,607** |
| **Total Costs** | | | | | | | **$2,469,640** |

On average, and across fiscal year, LOP respondents spent 3.35 more minutes in application proceedings and attended 0.50 more proceedings than Non-LOP respondents.

Table 43. Total Number of Released-Pending Respondents Attending Bond Hearings across FY

| Fiscal Year of Receipt | Average Bond Hearing Duration (minutes) | | Average Number of Bond Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released-Pending LOP Respondents (#) | Total Average Annual Cost Added by LOP Released-Pending Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 15.07 | 12.32 | 0.452 | 0.297 | $16.79 | 4,008 | $67,291 |
| 2015 | 12.46 | 9.12 | 0.554 | 0.392 | $17.75 | 5,607 | $99,541 |
| 2016 | 13.31 | 9.81 | 0.483 | 0.332 | $15.52 | 8,070 | $125,250 |
| 2017 | 13.18 | 9.36 | 0.531 | 0.414 | $14.77 | 8,208 | $121,230 |
| 2018 | 13.47 | 10.17 | 0.508 | 0.415 | $12.49 | 8,926 | $111,529 |
| 2019 | 12.87 | 10.45 | 0.439 | 0.417 | $6.38 | 12,764 | $81,448 |
| Averages | 13.39 | 10.21 | 0.49 | 0.38 | $13.95 | 7,931 | $101,048 |
| Total Costs | | | | | | | $606,290 |

On average, and across fiscal year, LOP respondents spent 3.19 more minutes in bond proceedings and attended 0.12 more proceedings than Non-LOP respondents.

Table 44. Total Number of Released-Pending Respondents Attending Motion Hearings across FY

| Fiscal Year of Receipt | Average Motion Hearing Duration (minutes) | | Average Number of Motion Hearings per Case (#) | | Average Cost Added per LOP Case ($) | Number of Released-Pending LOP Respondents (#) | Total Average Annual Cost Added by LOP Released-Pending Cases ($) |
|---|---|---|---|---|---|---|---|
| | LOP | Non-LOP | LOP | Non-LOP | | | |
| 2014 | 14.51 | 0.00 | 0.463 | 0.000 | $35.83 | 4,008 | $143,597 |
| 2015 | 12.92 | 0.00 | 0.527 | 0.000 | $36.30 | 5,607 | $203,550 |
| 2016 | 13.65 | 0.00 | 0.531 | 0.000 | $35.43 | 8,070 | $285,937 |
| 2017 | 13.65 | 0.00 | 0.542 | 0.000 | $35.03 | 8,208 | $287,532 |
| 2018 | 14.71 | 0.00 | 0.509 | 0.000 | $35.64 | 8,926 | $318,126 |
| 2019 | 14.26 | 0.00 | 0.506 | 0.000 | $35.68 | 12,764 | $455,442 |
| Averages | 13.95 | 0.00 | 0.50 | 0.00 | $35.65 | $7,930.50 | $282,363.83 |
| Total Costs | | | | | | | $1,694,183 |

On average, and across fiscal year, LOP respondents spent 13.95 minutes in motion proceedings and attended 0.50 proceedings per respondent. Non-LOP respondents did not attend any motion proceedings.

Admin. Rec. 333

Table 45. Costs for Released-Pending Respondents Only

| Costs for Released-Pending Respondents Only | |
|---|---|
| Custody Status | Additional Average Costs across Fiscal Years Added by LOP Respondents ($) |
| Released-Pending | $6,656,900 |
| Total On-record Costs | $6,656,900 |
| Average of On-record Costs across 6 Fiscal Years | $2,218,966.76 |

The costs presented in Table 45 are in addition to the Component II costs.

## APPENDIX E-OTHER COMPARATIVE DATA

**Component II: Average Duration and Number of Proceedings for Component II Respondents**

The average duration and number of proceedings by LOP and custody status are presented in Tables 46 (detained) and 47 (released).

Table 46. Average Duration and Number of Proceedings for Detained Component II Respondents

| Detained | | | | | | |
|---|---|---|---|---|---|---|
| Type of Proceeding | Average Duration | | | Average Number of Procedings | | |
| | LOP | Non-LOP | Differences (LOP - Non-LOP) | LOP | Non-LOP | Differences (LOP - Non-LOP) |
| Masters | 18.37 | 16.71 | 1.66 | 0.91 | 0.74 | 0.17 |
| merits | 62.48 | 54.73 | 7.75 | 0.43 | 0.29 | 0.14 |
| Applications | 17.51 | 13.43 | 4.08 | 0.4 | 0.48 | -0.08 |
| Bonds | 17.07 | 13.03 | 4.04 | 0.44 | 0.41 | 0.08 |
| Motions | 17.16 | 13.86 | 3.31 | 0.23 | 0.15 | 0.07 |
| Averages | 26.52 | 22.35 | 4.17 | 0.48 | 0.41 | 0.08 |

Data for Table 46 show, on average, LOP detained respondents spend more time in proceedings than Non-LOP respondents ($\mu_{LOP}$ =26.52 minutes and $\mu_{Non-LOP}$ = 22.35 minutes) and attend more proceedings ($\mu_{LOP}$ = 0.48 proceedings and $\mu_{Non-LOP}$ = 0.41) across fiscal years.

Table 47. Average Duration and Number of Proceedings for Released Component II Respondents

| Released ICC | | | | | | |
|---|---|---|---|---|---|---|
| Type of Proceeding | Average Duration | | | Average Number of Procedings | | |
| | LOP | Non-LOP | Differences (LOP - Non-LOP) | LOP | Non-LOP | Differences (LOP - Non-LOP) |
| Masters | 4.54 | 4.36 | 0.18 | 0.88 | 0.84 | 0.04 |
| Merits | 71.14 | 68.12 | 3.03 | 0.58 | 0.54 | 0.04 |
| Applications | 13.36 | 10.01 | 3.35 | 0.39 | 0.29 | 0.10 |
| Bonds | 13.10 | 9.58 | 3.52 | 0.45 | 0.32 | 0.50 |
| Motions | 13.64 | 0.00 | 13.64 | 0.5 | 0.00 | 0.16 |
| Averages | 23.16 | 18.41 | 4.74 | 0.56 | 0.40 | 0.16 |

Data for Table 47 show, on average, LOP released respondents spend more time in proceedings than Non-LOP respondents ($\mu_{LOP}$ =23.16 minutes and $\mu_{Non-LOP}$ = 18.41 minutes) and attend more proceedings ($\mu_{LOP}$ = 0.56 proceedings and $\mu_{Non-LOP}$ = 0.40) across fiscal year.



*This document is pre-decisional, privileged, confidential, and intended solely for the use and information of DOJ Executive Office of Immigration Review*



OOD
PM 25-15
Effective:  January 31, 2025

To:      All of EOIR
From:  Sirce E. Owen, Acting Director
Date:   January 31, 2025

SIRCE
OWEN

Digitally signed by
SIRCE OWEN
Date: 2025.01.31
15:43:27 -05'00'

## OFFICE OF LEGAL ACCESS PROGRAMS

| | |
|---|---|
| PURPOSE: | Clarify questions regarding EOIR's Office of Legal Access Programs |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | None |

Multiple questions about the status and function of EOIR's Office of Legal Access Programs (OLAP) have arisen in recent years. This Policy Memorandum (PM) addresses those questions.

Two of OLAP's principal functions, administering EOIR's various legal orientation programs and facilitating *pro bono* legal services, are assigned by regulation to the Office of Policy (OP). *See* 8 C.F.R. § 1003.0(e)(1). Its third principal function, administration of EOIR's recognition and accreditation (R&A) program is also assigned by regulation to OP. *See* 8 C.F.R. §§ 1292.11(a), 1292.12(a). In turn, OP delegated responsibility for these programs to OLAP after OLAP was placed under the auspices of OP in 2019. *See* Organization of the Executive Office for Immigration Review, 84 Fed. Reg. 44537 (Aug. 26, 2019).[1] Because OLAP was previously located within the EOIR Office of the Director (OOD), before making the change, EOIR complied with the procedures in 28 C.F.R. § 0.190(a) regarding changes to organizational units within the Department of Justice (DOJ).

In July 2021, all programs and staff in OLAP, except for those supporting the R&A program, were moved to OOD in contravention of 8 C.F.R. § 1003.0(e)(1). No rulemaking was undertaken to effectuate the move, and EOIR has no record that EOIR leadership at the time complied with the requirements of 28 C.F.R. § 0.190(a). Further, because authority cannot be delegated upward and OOD supervises OP, that move vitiated the delegations of authority from OP to OLAP.

In short, the move of most of OLAP to OOD in July 2021 appears to have been invalid, calling into serious question the validity of any subsequent action taken by OLAP until it was moved back to OP in February 2024. Consequently, if challenged, EOIR may not be able to recommend

---

[1] The interim final rule moving OLAP to OP was subsequently finalized on November 3, 2020. *See* Organization of the Executive Office for Immigration Review, 85 Fed. Reg. 69465 (Nov. 3, 2020).

1

Admin. Rec. 336

defending any action taken by OLAP while it resided in OOD between July 2021 and February 2024.[2]

Although OLAP administers multiple programs under the rubric of "legal orientation programs," the most salient one is commonly referred to as the general Legal Orientation Program (LOP). The general LOP provides information to detained aliens ostensibly to assist them in determining their options in immigration proceedings and is alleged to make those proceedings more efficient and to reduce detention time.

However, EOIR published a study in September 2018 showing that the general LOP does not make immigration proceedings more expeditious; to the contrary, it increases the length of proceedings and the length of time in detention, which, in turn, increases costs to the federal government.[3] Consequently, EOIR publicly classified the general LOP as a wasteful program in December 2020. *See* Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 82750, 82754 (Dec. 18, 2020); *accord* 5 C.F.R. § 2635.101(b)(11) (requiring federal employees to "disclose waste, fraud, abuse, and corruption"); 28 C.F.R. § 0.29b (requiring DOJ employees to disclose waste in government programs). EOIR also conducted a follow-up study of the general LOP in 2021 (2021 Study), which reaffirmed its previous review that the general LOP was a wasteful program because it lengthened detention times and increased net costs to the government by a considerable margin; however, the EOIR leadership at the time refused to publicly release that study and successfully hid it from relevant stakeholders. Subsequently, EOIR continued to seek additional funding for legal orientation programs and repeatedly failed to disclose to DOJ or to Congress that it knew that the general LOP was not an effective or economical program.

The behavior of EOIR regarding the 2021 Study was inappropriate and significantly undermined EOIR's credibility and integrity. EOIR is committed to transparency, scientifically-sound and data-based decision-making, and the reform or elimination of wasteful programs consistent with its ethical duties. EOIR, including OLAP, will do better.

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

---

[2] Because the R&A program remained in OP, consistent with applicable regulations, throughout this period, there is no question regarding the validity of any R&A decision, and if challenged, EOIR will defend any R&A decisions issued during this period if otherwise appropriate.

[3] *See* LOP Cohort Analysis, https://www.justice.gov/eoir/file/1091801/dl?inline=. The 2018 Study, which was quantitative, also largely debunked a previous 2017 Legal Case Study which addressed, *inter alia*, the general LOP from a qualitative analytic perspective. The 2017 Legal Case Study was methodologically flawed due to a selection bias issue regarding its interviews with EOIR personnel and a failure to control for the biases or valences of its non-EOIR subjects. In light of these flaws, EOIR cannot necessarily validate any of the conclusions of the 2017 Legal Case Study.

Admin. Rec. 337