# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| AMICA CENTER FOR IMMIGRANT RIGHTS, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) ) ) |
| Defendants. | ) ) |

_____

Civil Action No. 1:25-cv-298-RDM

## SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

ARGUMENT........................................................................................................................4

    I.     The Termination of the Operative Program Task Orders...............................5

    II.    The Termination of the Programs....................................................................6

    III.   The "Decision" To Replace the Programs with a Federalized Program.........12

CONCLUSION...................................................................................................................17

## TABLE OF AUTHORITIES

**CASES**

*AIDS Vaccine Advoc. Coal. v. Dep't of State*,
    --- F. Supp. 3d. ----, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ................................................. 9

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ........................................................................................ 16

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
    659 F.3d 13 (D.C. Cir. 2011) ........................................................................................... 11

*City of New York v. U.S. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) ........................................................................................... 10

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ........................................................................................................ 9

*Equal Rights Ctr. v. Post Props., Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011) ....................................................................................... 11

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................................................... 10, 11

*Greenlaw v. United States*,
    554 U.S. 237 (2008) ......................................................................................................... 13

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil., Recs.*,
    56 F.3d 279 (D.C. Cir. 1995) ............................................................................................ 9

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................................. 7, 9, 14

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................................... 15, 16

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ........................................................................................ 14

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................................................... 10, 15, 16

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) .......................................................................................... 5

*U.S. Conference of Catholic Bishops v. U.S. Dep't of State*,
   --- F. Supp. 3d ----, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ............................................ 9, 11

**STATUTES**

5 U.S.C. § 701(a)(2) ................................................................................................................ 7, 14

8 U.S.C § 1232 .................................................................................................................... 2, 7, 14

**OTHER AUTHORITIES**

Consolidated Appropriations Act, 2024,
   Pub. L. No. 188-42, 138 Stat. 25 .................................................................................................. 6

Pursuant to the Court's May 14, 2025 Order, Dkt. 75, Defendants respectfully submit this supplemental brief in support of their Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment and Request for Preliminary Injunctive Relief, Dkt. 70 ("Defs.' Summ. J. Br.").

## INTRODUCTION

This case started with a contract action. On January 22, 2025, the Executive Office for Immigration Review ("EOIR") directed a Department of Justice ("DOJ") contracting officer to issue a stop work order that suspended the delivery of services under four legal access programs administered by EOIR—the Legal Orientation Program ("LOP"), the Immigration Court Helpdesk ("ICH"), the Family Group Legal Orientation Program ("FGLOP"), and the Counsel for Children Initiative ("CCI"). That stop work order was issued pursuant to the express terms of the contract governing those programs ("the Acacia Contract"). The plaintiffs in this case—twelve nonprofit organizations that delivered services under the suspended programs as subcontractors to the prime contractor—nonetheless challenged the stop work order as unlawful under the Administrative Procedure Act ("APA"), *see* Dkt. 1 at 43-48 (¶¶ 133-57), and sought a preliminary injunction on the grounds that the "abrupt[] halt [in] funding for the Programs" would cause Plaintiffs "severe and irreparable harm." Dkt. 2-1 at 38; *see id.* at 3 ("Without . . . [program] funding, Plaintiffs cannot continue their critical missions to assist noncitizens by informing them of their legal rights and responsibilities during immigration proceedings.").

The operative task orders for LOP, ICH, FGLOP, CCI, and a fifth program, the Legal Orientation Program for Custodians of Unaccompanied Children ("LOPC"), were later terminated on April 16, 2025, for the convenience of the government ("Termination Decision")—an action that was also made pursuant to the express terms of the Acacia Contract. Plaintiffs once again moved for preliminary relief, claiming that the termination of the task orders was tantamount to a "termination" of the five Programs ("the Programs"), that such a termination was unlawful under the APA, and that the consequent loss of Program funding would cause Plaintiffs "imminent harm" that could not be "later remediated." Dkt. 53-1 at 4-5, 39-40; *see id.* at 40 ("Without the [Program]

funding . . . , Plaintiffs will be forced to reduce or eliminate services to *pro se* noncitizens."). After the Court denied Plaintiffs' motion, Plaintiffs filed an amended complaint, in which they alleged that the April 16, 2025 Termination Decision—which, according to Plaintiffs, "stopped funding [for] the Programs with no apparent plans to continue the Programs"—was arbitrary and capricious; not in accordance with the Appropriations Clause or the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), 8 U.S.C § 1232(c)(4); violative of the First Amendment and the separation of powers; and ultra vires. Dkt. 62 at 6-7, 54-62 (¶¶ 12, 158-98). Defendants moved to dismiss. Dkt. 64. The parties then cross-moved for summary judgment on Plaintiffs' claims. And Defendants argued in their summary judgment brief that they were entitled to summary judgment on those claims for various threshold and substantive reasons, irrespective of whether the claims were understood as contract-based claims for monetary relief against the federal government, or as a challenge to what Plaintiffs describe as "Defendants' wholesale . . . termination of the Programs" as previously structured, Dkt. 67-1 at 29. Defs.' Summ. J. Br. at 12, 34.

In conjunction with their summary judgment brief, Defendants filed a declaration from EOIR's Acting Director stating that, "[n]otwithstanding the termination of the operative [Program] task orders" on April 16, 2025, "EOIR will satisfy its . . . obligation" to "disburse" a certain minimum amount of funding for "legal orientation" services, "as required by statutory appropriation," via "a consolidated federalized program" under which such services would be delivered using federal resources rather than outside contractors. Dkt. 70-1 at 3-4 (¶¶ 5, 9). Plaintiffs had an opportunity to respond to the assertions made in the declaration, and they did so by arguing that the declaration "d[id] not impact the outcome in this case." Dkt. 72 at 10; *see id.* at 10-15. At the May 14, 2025 hearing, both parties agreed that their cross-motions for summary judgment were ripe for resolution. In a post-hearing Order, however, the Court suggested that the "relevant agency action" at issue might instead be what the Court described as Defendants' "decision to replace the existing [P]rogram[s] with a 'federalized' program." Dkt. 75 at 3. The Court then ordered Defendants to produce a supplement to the administrative record containing

"materials relevant to Defendants' decision to 'federalize' . . . or alter the Programs" and granted Plaintiffs leave to amend their complaint in light of that supplement. Dkt. 75 at 3-4. Defendants have produced that Court-ordered supplement, *see* Dkt. 78, and Plaintiffs have filed another amended complaint, which includes a few paragraphs-worth of allegations regarding the "federalized program," *see* Dkt. 79 at 9-12, 50-54, 64 (¶¶ 21-24, 143-50, 182).

A crucial question, then, is whether Defendants' supplement to the administrative record and Plaintiffs' amended complaint materially affect how the Court should decide this case. They do not. Defendants are entitled to summary judgment on multiple, independent grounds that do not rise or fall based on the contents of the administrative record, whether supplemented or not. And in their newly amended complaint, Plaintiffs assert the same six claims and seek the same relief against the same agency action—namely, the "terminati[on] [of] the Programs . . . in their current form" as allegedly effectuated by the April 16, 2025 termination of the operative Program task orders. Dkt. 79 at 13 (¶ 31); *see id.* at 7 (¶ 12) (describing the April 16, 2025 Termination Decision as the action that "operatively . . . terminat[ed] funding for the Programs"); *id.* at 12 (¶ 25) ("Plaintiffs . . . seek to enjoin Defendants from illegally and arbitrarily ending the[e] Programs . . . ."); *id.* at 62 (¶ 174) ("Defendants' termination of funding for the Programs constitutes 'final agency action' reviewable under the APA . . . ."). *Compare* Dkt. 62 at 54-63 (¶¶ 158-98 and "Prayer for Relief"), *with* Dkt. 72 at 62-72 (¶¶ 175-216 and "Prayer for Relief").

Indeed, the April 16, 2025 Termination Decision was the discrete final agency action that ended the disbursement of funding to the contractor administering the Programs, and that termination of funding is the source of the injuries that Plaintiffs, as subcontractors, assert as a basis for their standing to sue in this case. *See, e.g.*, Dkt. 72 at 18 ("Defendants have terminated all funding for the Programs through which Plaintiffs fund and run their legal orientation activities . . . ."); Dkt. 79 at 18 (¶ 50) ("Defendants' decision to terminate funding for the Programs creates a substantial burden on the limited resources available to Plaintiffs to carry out their missions."). That Termination Decision is also the particular agency action that Plaintiffs continue to allege was arbitrary and capricious and not in accordance with the law. *See, e.g.*, Dkt. 79 at 65-

66 (¶¶ 185, 190). And although Plaintiffs now make additional allegations about the "federalized program" that will replace the contractor-based Programs, those allegations are seemingly meant to show only that the federalized program does not, in Plaintiffs' view, render the "[t]he decision to end the Programs" less arbitrary and capricious. *Id.* at 63 (¶ 178); *see id.* at 64 (¶ 182) (mentioning the "federalized program" as part of Plaintiffs' claim that the "abrupt termination of the Programs" was arbitrary and capricious); *see also id.* at 51 (¶ 144) (alleging that Defendants did not "consider[] a 'federalized program' as a basis for their decision to terminate the Programs"). Notably, Plaintiffs do not contend that the federalized program is an independent final agency action subject to review.

Plaintiffs' second amended complaint, in short, does not allege any claims that were not already before the Court, and Defendants have already demonstrated why they are entitled to summary judgment on those claims. The Court should accordingly deny Plaintiffs' motion for summary judgment and grant summary judgment to Defendants.[1]

## ARGUMENT

No matter how the "relevant agency action" is characterized here, Dkt. 75 at 3-4—that is, whether it is (1) the termination of the operative Program task orders for the convenience of the government; (2) the "termination of the Programs" more broadly absent a final plan for "an adequate equivalent," as Plaintiffs frame it, Dkt. 72 at 10, 23; or (3) a "decision" by Defendants "to replace the existing program with a 'federalized' program," as the Court suggests, Dkt. 75 at 3—summary judgment should be granted in Defendants' favor. To the extent Plaintiffs seek a restoration of Program funding to them specifically—which could only be achieved by reinstating the now-terminated Program task orders—the Court lacks jurisdiction over such a contract-based claim for monetary relief against the federal government. Plaintiffs otherwise lack standing to

---

[1] Defendants believe that the pending cross-motions for summary judgment can be resolved based on the briefing and materials that have already been submitted to the Court. Should the Court wish to hold another hearing, however, due to preexisting travel commitments on the part of Defendants' counsel, Defendants respectfully request that any such hearing be scheduled before June 12, 2025.

seek other forms of relief—whether that be an order merely requiring Defendants to expend a certain minimum amount of appropriated funds, or an order vacating an unspecified choice Defendants have made regarding the structure of the federalized program—that would leave their funding-based injuries wholly unredressed.  And any claims Plaintiffs conceivably level against certain facets of the federalized program—including EOIR's choice to deliver legal orientation services using federal resources rather than outside contractors, or the specific structure and format of those services—amount to challenges against discretionary programmatic decisions that are unreviewable under the APA.

## I.      The Termination of the Operative Program Task Orders

As Defendants have argued since this case's inception, Plaintiffs' claims in this case are premised on a contract with the government and effectively challenge the government's exercise of an express contractual right (i.e., the termination of a contract for convenience).  *See* Defs.' Summ. J. Br. at 20.  Defendants have also made clear that the only relief that could conceivably redress the financial and "mission"-based injuries that Plaintiffs assert in their effort to establish standing and irreparable harm would be a restoration of Program funding to Plaintiffs specifically and, by extension, a reinstatement of the terminated Program task orders.  *See id.* at 21-23, 37-38; *see also* Dkt. 72 at 16 (asserting as an injury in fact "financial injuries resulting from the termination of the Programs"); Dkt. 79 at 64 (¶ 183) ("Here, *the loss of funds* will frustrate Plaintiffs' missions and force them to reduce staff and/or shift program[m]ing to serve fewer noncitizens.") (emphasis added)); Dkt. 67-1 at 50 (asserting that Plaintiffs will suffer irreparable harm absent preliminary relief because "Defendants' decision to terminate funding for the Programs has directly interfered with Plaintiffs' funding and ability to provide critical orientation services that are at the heart of Plaintiffs' activities").

Plaintiffs, in other words, are essentially (1) asserting a right to Program funding that can only be plausibly derived from the Acacia Contract and the related Program task orders and (2) seeking relief that is indistinguishable from "the classic contractual remedy of specific performance," *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).  Yet

as Defendants have briefed several times over, the Court lacks jurisdiction under the APA over such contract-based claims for monetary relief against the federal government, or to otherwise "enforce" Defendants' "contractual obligation[s] to pay money." Defs.' Summ. J. Br. at 17, 27 (quoting *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam)); *see* Dkt. 60 at 10-15; Dkt. 64-1 at 12-20. Summary judgment in Defendants' favor is thus warranted on that jurisdictional basis alone.

## II.    The Termination of the Programs

As the Court acknowledged in its May 14, 2025 Order, Plaintiffs have instead framed the "relevant agency action" in this case, Dkt. 75 at 1, 3-4, as the "termination of the Programs" more broadly, which Plaintiffs allege was effectuated when the operative Program task orders were terminated without a contemporaneous plan "to continue the Programs in any form," Dkt. 67-1 at 9, 11, or to expend all of the funds appropriated by Congress for the "Legal Orientation Program," *see* Consolidated Appropriations Act, 2024, Pub. L. No. 188-42, 138 Stat. 25, 133. *See, e.g.*, Dkt. 72 at 23 ("Plaintiffs challenge the lawfulness of Defendants' *decision* to terminate the *Programs* without providing an adequate equivalent, causing a gap in services . . . ."); Dkt. 67-1 at 34 ("Yet Defendants are not spending the appropriated funds on any Program services. That violates the APA."). And in their newly amended complaint, Plaintiffs once again allege that the "abrupt termination of the Programs" on April 16, 2025, was the particular agency action that they claim is arbitrary and capricious and not in accordance with the law, all in violation of the APA. *See* Dkt. 79 at 62-69 (¶¶ 175-207); *id.* at 62 (¶ 174) ("Defendants' termination of funding for the Programs constitutes 'final agency action' reviewable under the APA . . . .").[2]

---

[2] Plaintiffs also reassert in their second amended complaint separation-of-powers and ultra vires claims, *see* Dkt. 79 at 70-70 (¶¶ 208-16). But as Defendants explained in their summary judgment brief, such claims should be dismissed as wholly duplicative of Plaintiffs' statutory claim that the Termination Decision amounted to an unlawful withholding of appropriated funds, *see* Defs.' Summ. J. Br. at 48-49, and the allegations in Plaintiffs' second amended complaint should have no bearing on that outcome.

Two points should be reiterated at the outset.  First, two of the Programs at issue here—FGLOP and CCI—are not prescribed by any federal statute or regulation and were discretionarily funded through lump-sum funding sources, a fact that Plaintiffs concede.  *See* Defs.' Summ. J. Br. at 31; *see also* Dkt. 79 at 34 (¶ 94) ("In 2021, EOIR added FGLOP and CCI as discretionarily funded programs.").  The Supreme Court has made clear that an agency's "allocation of funds from" such a "lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion" under 5 U.S.C. § 701(a)(2).  *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993).  Any decision by EOIR regarding how much funding to allocate to either FGLOP or CCI, or a "decision to discontinue" the two programs entirely, is "accordingly unreviewable" under the APA, *id.* at 193—a point that Plaintiffs did not meaningfully contest in their summary judgment briefing.  *See* Dkt. 72 at 38 (arguing that "[e]ven for those Programs that were run through lump-sum appropriations, the relevant statutes feature no language suggesting Defendants' decisions regarding the Programs should be exempted from" arbitrary-and-capricious review without addressing *Lincoln*'s clear holding).

Second, even for the other Programs that Plaintiffs contend are subject to certain "statutory requirements" and "mandates," Dkt. 72 at 13, 36, the only such *legally binding* requirements are (1) that "not less than" $28 million of the funds appropriated to EOIR in fiscal year 2024 "shall be made available for services and activities provided by the Legal Orientation Program," 138 Stat. at 133, and (2) that "custodians" of certain "unaccompanied alien children" receive "legal orientation presentations provided through the Legal Orientation Program administered by [EOIR]" in some form, 8 U.S.C. § 1232(c)(4), (g).  Any additional conditions concerning funding for or the structure of the "Legal Orientation Program" that might be found in congressional reports are, as Plaintiffs themselves acknowledge, merely "recommendations."  Dkt. 79 at 9 (¶ 18), 30 (¶ 88); *see Lincoln*, 508 U.S. at 192 (explaining that "indicia in committee reports and other legislative history as to how . . . funds should or are expected to be spent do not establish any legal requirements on" the receiving agency).

These two points thus narrow the relevant inquiry under Plaintiffs' framing of the case to whether the termination of the operative task orders for LOP, LOPC, and ICH (1) was tantamount to an unlawful withholding of funds appropriated for the "Legal Orientation Program," 138 Stat. at 133 (*i.e.*, the thrust of Plaintiffs' "Appropriations Clause" claim); (2) amounted to an unlawful termination of the "legal orientation presentations" described in the TVPRA; or (3) was otherwise arbitrary and capricious.  *See* Dkt. 79 at 62-67 (¶¶ 175-95).[3]

As Defendants explained in their summary judgment brief, however, Plaintiffs' "Appropriations Clause" and TVPRA claims—the former of which is really a statutory unlawful-withholding claim—hinge on Plaintiffs' contention that Defendants are "not spending" *any* "appropriated funds on *any* Program services" moving forward. Dkt. 67-1 at 24 (emphasis added); *see id.* at 34-35 (arguing that the termination of the Program task orders amounts to a "withhold[ing] of congressionally obligated funds").  Yet the record that is before the Court indicates that EOIR is committed to delivering legal orientation services through a federalized "Legal Orientation Program" and that EOIR "will also take appropriate steps to ensure that the minimum level of funding specifically appropriated by Congress for the 'Legal Orientation Program' is obligated and expended as required."  Dkt. 78-1 at 19-20 (¶ 18); *see* Dkt. 70-1 at 2-5 (¶¶ 5-12).  That record evidence alone should dispose of Plaintiffs' statutory unlawful-withholding and TVPRA claims.  *See* Defs.' Summ. J. Br. at 34.

Crucially, though, Defendants also argued in their summary judgment brief that "[e]ven taking" Plaintiffs' unlawful-withholding and TVPRA claims "at face value"—and accepting, by extension, Plaintiffs' corresponding framing of the relevant agency action as the "wholesale . . . termination" of the LOP, LOPC, and ICH programs that existed prior to the April 16, 2025 Termination Decision, Dkt. 67-1 at 29—those claims "still fail[] as a matter of law for various threshold reasons."  Defs.' Summ. J. Br. at 34 (emphasis added); *see id.* at 39-40.  For

---

[3] Regardless of how the relevant agency action in this case is framed, Plaintiffs' First Amendment claim, which Plaintiffs re-allege in their second amended complaint, *see* Dkt. 79 at 67-69 (¶¶ 196-207), fails on the merits for the reasons provided in Defendants' summary judgment brief.  *See* Defs.' Summ. J. Br. at 41-48.

instance, Defendants highlighted that the injuries in fact Plaintiffs have asserted for purposes of Article III standing all flow directly from the termination of Program funding to Plaintiffs specifically, and that the relief that would actually redress Plaintiffs' funding-related injuries would require a reinstatement of "Plaintiffs' own funding" pursuant to the Acacia contract and related subcontracts and task orders. *Id.* at 35 (quoting Dkt. 67-1 at 26). But by effectively asking the Court to reinstate the now-terminated Program task orders and "enforce" Defendants' "contractual obligation[s]" under those task orders "to pay [Plaintiffs] money," Plaintiffs' unlawful-withholding and TVPRA claims are, in essence, the same sort of contract-based claims for specific performance over which the Court lacks jurisdiction. *Id.* (quoting *Dep't of Educ.*, 145 S. Ct. at 968); *see Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995) ("[W]e have stated that jurisdiction under the Tucker Act cannot be avoided by disguising a money claim as a claim requesting a form of equitable relief." (cleaned up)).

Seemingly to avoid these jurisdictional consequences, Plaintiffs now purport to disclaim any interest in having the terminated task orders reinstated or their Program funding restored. *See* Dkt. 72 at 20 ("Plaintiffs do not request this Court to restore their subcontracts with Acacia as redress for their injuries."); *id.* at 26 (claiming that Plaintiffs can receive "the relief they desperately need" without "receiv[ing] a single cent of continued funding"); *id.* at 29 (asserting that Plaintiffs "do not seek an order to restore any contract"). And rightfully so, given that the Supreme Court and other courts in the D.C. Circuit have concluded that district courts lack jurisdiction under the APA "to order the payment of money" pursuant to a contract. *Dep't of Educ.*, 145 S. Ct. at 968; *see U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, -- F. Supp. 3d -- , 2025 WL 763738, at *6 (D.D.C. Mar. 11, 2025) ("[The plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do."); *cf. AIDS Vaccine Advoc. Coal. v. Dep't of State*, -- F. Supp. 3d. --, 2025 WL 752378, at *23 (D.D.C. Mar. 10, 2025) ("Plaintiffs' proposed relief is overbroad insofar as it would specifically order [the federal government] Defendants to continue to contract with them."). Consequently, Plaintiffs themselves appear to concede that their request

that the Court "set aside" Defendants' "unlawful termination of the Programs," Dkt. 72 at 10, cannot entail reinstating the terminated task orders or ordering that any Program funding be disbursed to Plaintiffs specifically.

Plaintiffs instead appear to demand that the Court simply order Defendants "to continue the Programs as mandated by Congress." *Id.* at 10; *see id.* at 20 (demanding an "order enjoining Defendants from 'terminat[ing]' their 'compliance with the mandate'" in the 2024 Consolidated Appropriations Act); *id.* at 23 ("An order enjoining Defendants from terminating the Programs will redress Plaintiffs' injuries, no matter how Defendants choose to comply."). As an initial matter, it is well settled that federal courts lack authority under the APA "to enter" such a generic order "compelling compliance with [a] broad statutory mandate[]." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). And that principle applies equally to the statutory "mandate" (using Plaintiffs' language) at issue here, which simply requires that "Legal Orientation Program" services be delivered in some form and that a certain minimum amount of appropriated funds be spent on those services. An order requiring general compliance with that broad mandate, the Supreme Court has warned, would effectively "inject[]" a federal judge "into day-to-day agency management" and "entangle[]" a court "in abstract policy disagreements which [it] lack[s] both expertise and information to resolve." *Id.* at 66-67. The nonmonetary relief Plaintiffs claim to seek here would thus require the Court "either to enter a disfavored 'obey the law' injunction or to engage in day-to-day oversight of the executive's administrative practices." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (citation omitted). Both options "are foreclosed by the APA, and rightly so." *Id.*

More saliently, by disclaiming any interest in the restoration of their Program funding, Plaintiffs have created a fatal standing problem with respect to their unlawful-withholding, TVPRA, and arbitrary-and-capricious claims. Plaintiffs cannot, of course, base their standing on a general desire to have Defendants "act in accordance with law." Defs.' Summ. J. Br. at 36 (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). They instead must establish a "particularized" injury caused by the Termination Decision they challenge—that is, an injury

that "affect[s]" Plaintiffs "in a personal and individual way," rather than "a generalized grievance." *All. for Hippocratic Med.*, 602 U.S. at 381 (citation omitted). Plaintiffs accordingly assert that the termination of the operative Program task orders caused them to lose a considerable amount of Program funding, which affected "substantial portions" of their "overall budget[s]," required them "to reassign, furlough, or terminate staff," and left a "large gap in the services Plaintiffs are able to provide to noncitizens." Dkt. 72 at 18-19; *see* Dkt. 79 at 57 (¶ 158) ("Plaintiffs have lost access to necessary funding that allows them to share information with noncitizens and inform them about their rights and responsibilities in the immigration process."). But absent an order restoring Program funding to Plaintiffs specifically via a reinstatement of the terminated Program task orders—a remedy that Plaintiffs disclaim and the Court lacks jurisdiction to grant, *see U.S. Conference of Catholic Bishops*, 2025 WL 763738, at *6—such funding-related injuries would go wholly unredressed. *See* Defs.' Summ. J. Br. at 37-38.

Plaintiffs ostensibly try to evade this fatal deficiency by insisting that a court order requiring Defendants to "restore" certain services delivered under the Programs, or to spend a certain amount of appropriated funds on such services, would redress an array of "mission"-related injuries that purportedly do not depend on Plaintiffs receiving Program funding themselves. Dkt. 72 at 16-18, 20-22; *see id.* at 21 ("Acacia or another contractor could run materially similar Programs without Plaintiffs, and Plaintiffs' harms would be redressed."). Plaintiffs argue, for example, that their general mission to "ensure[] that immigrants . . . have access to counsel and know their rights" can be "fulfilled" so long as *someone* provides legal orientation services to those immigrants. *Id.* at 21. But "an organization's abstract interest in a problem"—the "problem" in Plaintiffs' case being the overall adequacy of the legal orientation services provided to noncitizens subject to removal proceedings—"is insufficient to establish standing." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011); *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (explaining that "a mere 'setback' to" an organization's "abstract social interests" is "not sufficient" to establish standing).

Furthermore, Plaintiffs make clear in their summary judgment briefing that "a core aspect of their missions" is that *they* "provide noncitizens with critical information regarding their rights and responsibilities in immigration proceedings." Dkt. 72 at 17; *see* Dkt. 79 at 18 (¶ 50) ("Defendants' actions impede Plaintiffs' respective missions to provide information, counseling, referrals, representation, and other services to noncitizens."). Plaintiffs allege in turn that the April 16, 2025 Termination Decision "create[d] a substantial burden on the limited resources available to carry out their missions" and that they "cannot continue their critical, mission-serving work if Defendants withdraw the previously allocated [Program] funding." Dkt. 79 at 18, 57 (¶ 50, 156). In other words, Plaintiffs allegedly cannot "conduct their missions" as "efficient[ly] and effective[ly]" as they would like, Dkt. 72 at 18, because they have lost a substantial amount of *Program funding* as a result of the Termination Decision. Plaintiffs' "mission"-related injuries are thus dependent on a restoration of Program funding as well, and those injuries likewise cannot be redressed by the particular relief Plaintiffs seek here.

At bottom, even accepting for the sake of argument Plaintiffs' framing of the relevant agency action in this case as the "termination of the Programs" more generally, that framing fails on its own terms. To the extent Plaintiffs seek a restoration of Program funding to them specifically pursuant to the now-terminated Program task orders, the Court lacks jurisdiction to grant such relief. And to the extent Plaintiffs seek other forms of relief unrelated to such funding, they lack standing to do so.

## III.    The "Decision" To Replace the Programs with a Federalized Program

In its May 14, 2025 Order, the Court suggested an alternative framing of the "relevant agency action" at issue in this case. Dkt. 75 at 3-4. After noting that Plaintiffs make clear in their summary judgment briefing that they are challenging what they repeatedly describe as Defendants' "decision" to "effectively terminate[] the Programs," the Court indicated that Plaintiffs should be given an opportunity to potentially challenge "the lawfulness of Defendants' decision to replace the existing [P]rogram[s] with a 'federalized' program" as well. *Id.* at 1-3.

Yet in their newly amended complaint, Plaintiffs still characterize the "final agency action" at issue here as the "termination of funding for the Programs," as allegedly effectuated by the April 16, 2025 termination of the operative Program task orders. Dkt. 79 at 62 (¶ 174); *see id.* at 64 (¶ 183) (alleging that "Defendants' unlawful actions" in this case include the issuance of the April 16, 2025 "Termination Order" and the termination of "funding for the Programs"). Plaintiffs have added new allegations about the "federalized program," *see id.* at 50-54 (¶¶ 143-50), but nothing in Plaintiffs' new complaint indicates that they are challenging the federalized program as an independent final agency action subject to review. Instead, those new allegations can only be fairly read to suggest that the federalized program does not, in Plaintiffs' view, defeat their claim that the April 16, 2025 "termination of the Programs" was arbitrary and capricious; Plaintiffs appear to simply allege that "Defendants' purported plan for a 'federalized program' to replace the Programs" does not cure the unlawfulness of the Termination Decision that Plaintiffs are ultimately challenging. Dkt. 79 at 64 (¶ 182); *see id.* at 10 (¶ 21) ("Defendants' filings in this action make clear that this 'replacement' is termination by another name."); *id.* at 51 (¶ 144) ("There is no evidence that Defendants considered a 'federalized program' as a basis for their decision to terminate the Programs . . . ."). And, crucially, Plaintiffs ask the Court to set aside or enjoin only Defendants' decision to terminate the Programs (as allegedly effectuated by the termination of the Program task orders). *See id.* at 13 (¶ 31) ("Plaintiffs respectfully ask this Court to . . . enjoin[] Defendants nationwide from terminating the Programs by withholding the funding Congress appropriated to maintain LOP, LOPC, FGLOP, CCI, and ICH in their current form."); *id.* at 79 (¶ 185) ("Because Defendants' termination of the Programs is arbitrary and capricious, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA."). They do not seek relief against any sort of programmatic "decision" to transition from a contractor-based model of delivering legal orientation services to a "federalized" one. In short, Plaintiffs continue to insist on framing the relevant agency action here as the "termination of the Programs," *id.* at 62 (¶ 177). *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (explaining that under the "principle of party presentation," courts "rely on the parties to frame the issues for decision" and noting that

13

"[o]ur adversary system is designed around the premise that the parties know what is best for them").

In any event, Plaintiffs' allegations about the "federalized program" do not make granting summary judgment in Defendants' favor any less warranted.  For one, Plaintiffs appear to suggest that the federalized program as described by the declarations in the record would fail to "fulfill Defendants' statutory and constitutional obligations" and to "provide the . . . services and programming" that are purportedly "required" by statute.  Dkt. 79 at 51, 54 (¶¶ 144, 149).  But again, the only legally binding requirements found in the statutes Plaintiffs rely on are (1) that EOIR "ma[ke] available" a minimum amount of appropriated funds for the "Legal Orientation Program," 138 Stat. at 133, and (2) that EOIR provide "legal orientation presentations" in some form to "custodians" of unaccompanied minors, 8 U.S.C. § 1232(c)(4).  Those statutes otherwise say nothing about the structure of the "Legal Orientation Program," who should deliver legal orientation services (*e.g.*, outside contractors versus the agency itself), the precise format of those services, the timing and frequency of such services, or the particular resources that should be provided to noncitizens.  *See, e.g.*, Dkt. 79 at 51 (¶ 146) ("Defendants provide no information about, for example, staff that may be hired to run [the federalized program], training materials that are being developed, new materials being prepared, or any indication of when/where this supposedly new programming will occur."); Dkt. 72 at 42 ("Defendants *cannot* fulfill their obligations under the appropriations statute using solely preexisting federal employees.  Instead, they must work with experienced non-profits to provide these legal services . . . .").  That statutory silence means in turn that any choices EOIR has made or will make about the structure of the federalized program are committed to its discretion and are thus unreviewable under the APA.  *See* 5 U.S.C. § 701(a)(2); *Lincoln*, 508 U.S. at 192-93; see *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (explaining that a funding decision was committed to agency discretion because the text of the applicable appropriation statute "left to the Secretary the decision about how" the funds should "best be distributed").  And such unreviewable discretionary choices include moving from a contractor-based model to one that relies on "federal agency resources,"

14

Dkt. 78-1 at 18 (¶ 14); altering the specific services and resources that are provided as part of the "Legal Orientation Program"; and transitioning to a new program structure gradually without disbursing funds to outside contractors in the meantime. Any "decision to 'federalize' or otherwise . . . alter" the "Legal Orientation Program," as the Court puts it, Dkt. 75 at 4, is thus not subject to arbitrary-and-capricious review.

Moreover, to the extent Plaintiffs challenge the "federalized program" as generally "inadequate," Dkt. 72 at 23, 40, the APA's "limitation to discrete agency action precludes th[at] kind of broad programmatic attack." *Norton*, 542 U.S. at 64. Put another way, Plaintiffs cannot "challenge the entirety" of the "federalized program" because that program is not a final agency action "within the meaning of" the APA, but rather "refer[s] to the continuing (and thus constantly changing) operations of" EOIR in delivering legal orientation services under the "Legal Orientation Program," 138 Stat. at 133. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990); *see also* Dkt. 78-1 at 19 (¶ 14) (explaining that "EOIR continues to implement th[e] federalized program and determine how to best utilize federal agency resources using an iterative approach"). Plaintiffs, for instance, appear to object to the "effective[ness]," "efficien[cy]," and "robust[ness]" of the services that will be delivered under the federalized program, and they question EOIR's plan to expend the funds appropriated for the "Legal Orientation Program." Dkt. 79 at 51, 53-54 (¶¶ 146, 148-49). But such alleged "flaws in the entire 'program' . . . cannot be laid before [a court] for wholesale correction under the APA." *Lujan*, 497 U.S. at 893; *see id.* at 891 ("[R]espondent cannot seek *wholesale* improvement of this program by court decree, rather than in the office of the Department or the halls of Congress, where programmatic improvements are normally made."). Rather, "[u]nder the terms of the APA," a party "must direct its attack against some particular 'agency action' that causes it harm." *Id.* at 891.

Plaintiffs have repeatedly made clear that the particular agency action they are challenging in this case is the April 16, 2025 "termination of the Programs" (as they call it) and the attendant "stop[]" in Program funding from which all of Plaintiffs' alleged injuries flow. Dkt. 79 at 7 (¶ 12). Yet such a challenge to the "termination of the Programs" cannot be construed to encompass every

single change to the "Legal Orientation Program," or any decision involving the contours of a federalized program that EOIR is still in the process of implementing. *See Lujan*, 497 U.S. at 899 (explaining that a "land withdrawal review program" was not "an identifiable action or event" that could be challenged under the APA). Indeed, concluding otherwise would effectively invite the Court to supervise EOIR's "day-to-day operations" in administering and implementing the "Legal Orientation Program"—an outcome that the Supreme Court has soundly rejected. *Lujan*, 497 U.S. at 899; *Norton*, 542 U.S. at 67 ("The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.").

Finally, Plaintiffs' remaining allegations about the federalized program—that the description of the program is "vague" and "barebones," that Defendants have failed to adequately explain their reasons for transitioning to a federalized model, that the precise details of the program were not finalized before the operative Program task orders were terminated, Dkt. 79 at 51-52 (¶¶ 144, 146)—are seemingly intended to bolster Plaintiffs' claim that the April 16, 2025 Termination Decision was arbitrary and capricious. Yet even assuming for the sake of argument that the "relevant agency action" here is Defendants' "decision" to transition from the contractor-based Programs to a consolidated program supported by federal resources, Dkt. 75 at 3-4, under D.C. Circuit precedent, "the normal remedy" for a successful APA claim is to "set aside" the agency action that is deemed arbitrary and capricious. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). And here, merely "set[ting] aside" a "decision to 'federalize,'" Dkt. 75 at 4, whether because of Defendants' allegedly inadequate explanation or for another reason, would not result in a restoration of Program funding to Plaintiffs specifically, meaning in turn that the various funding-related injuries Plaintiffs assert would go unredressed. Thus, as explained above and in Defendants' summary judgment brief, Plaintiffs have failed to establish their standing to bring their APA claims, regardless of the particular theories they advance as to why the April 16, 2025 Termination Decision was allegedly arbitrary and capricious.

16

## CONCLUSION

For the reasons set forth above and in Defendants' summary judgment brief, Dkt. 70, the Court should deny Plaintiffs' motion for summary judgment, grant Defendants' cross-motion for summary judgment, and enter judgment in Defendants' favor.


DATED: May 30, 2025                    Respectfully submitted,

                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General

                                       ANDREW I. WARDEN
                                       Assistant Director
                                       Federal Programs Branch

                                       */s/ Zachary W. Sherwood*
                                       ZACHARY W. SHERWOOD
                                       Indiana Bar No. 37147-49
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street NW
                                       Washington, DC 20005
                                       Phone: (202) 616-8467
                                       Fax: (202) 616-8470
                                       Email: zachary.w.sherwood@usdoj.gov

                                       *Counsel for Defendant*