# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMICA CENTER FOR IMMIGRANT
RIGHTS, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
JUSTICE, *et al.*,

Defendants.

Case No. 1:25-cv-00298-RDM

**PLAINTIFFS' SUPPLEMENTAL BRIEF
IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT AND
REQUEST FOR PRELIMINARY
INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 4

I.    The New Materials Defendants Submitted Are Not Properly Part of the
      Administrative Record and Should Not Be Considered at Summary Judgment. .......... 4

II.   Defendants' "Federalized Program" Is Tantamount to Terminating the
      Programs. ................................................................................................................ 9

III.  Any Decision to "Federalize" the Programs Would Be Subject to, and Would
      Not Satisfy, Arbitrary and Capricious Review. ......................................................... 14

      A.   Defendants' Termination of the Programs and Purported Shift to a
           "Federalized Program" Are Reviewable Final Agency Actions........................... 15

      B.   Defendants' Purported Decision to Move to a "Federalized Program" Is
           Arbitrary and Capricious.................................................................................. 18

IV.   Defendants' Actions Continue to Harm Plaintiffs. ...................................................... 24

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*AIDS Vaccine Advoc Coal. v. U.S. Dep't of Justice*,
    2025 WL 752378 (D.D.C. Mar. 10, 2025)......................................................................16, 17

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
    370 F. Supp. 3d 1 (D.D.C. 2019) ...............................................................................17, 18

*Am. First Legal Found. v. Cardona*,
    630 F. Supp. 3d 170 (D.D.C. 2022) ......................................................................................6

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
    72 F.4th 1324 (D.C. Cir. 2023)...............................................................................................6

*Am. Wildlands v. Kempthorne*,
    530 F.3d 991 (D.C. Cir. 2008) ...............................................................................................5

*Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*,
    269 F.3d 1112 (D.C. Cir. 2001) ..............................................................................................8

*AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*,
    810 F.2d 1233 (D.C. Cir. 1987) .............................................................................................9

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................................................15

*Biden v. Texas*,
    597 U.S. 785 (2022).........................................................................................................2, 5, 9

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017) ..................................................................................................16

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
    2025 WL 1393876 (9th Cir. May 14, 2025) ........................................................................14

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*,
    2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) ...............................................................16, 17

*Democracy Forward Found. v. Pompeo*,
    474 F.Supp.3d 138 (D.D.C. 2020) ........................................................................................22

*End Citizens United PAC v. FEC*,
    69 F.4th 916 (D.C. Cir. 2023)..................................................................................................6

*Env't Def. Fund v. U.S. Env't Prot. Agency*,
    124 F.4th 1 (D.C. Cir. 2024)..................................................................................................18

*Forest County Potawatomi Comm. v. United States*,
    270 F.Supp.3d 174 (D.D.C. 2017) ........................................................................................23

*Fund for Animals v. Williams*,
   246 F. Supp. 2d 27 (D.D.C. 2003) ........................................................................9

*GE v. Jackson*,
   595 F. Supp. 2d 8 (D.D.C. 2009) ..........................................................................8

*Hanly v. Mitchell*,
   460 F.2d 640 (2d Cir. 1972)................................................................................23

*Hill Dermaceuticals, Inc. v. FDA*,
   709 F.3d 44 (D.C. Cir. 2013) ...............................................................................5

*League of Women Voters of U.S. v. Harrington*,
   560 F. Supp. 3d 177 (D.D.C. 2021) ......................................................................6

*Nat'l Council for Adoption v. Blinken*,
   4 F.4th 106 (D.C. Cir. 2021) ..............................................................................16

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
   763 F. Supp. 3d 36 (D.D.C. 2025) ......................................................................16

*Nat'l Parks Conservation Ass'n v. Manson*,
   414 F.3d 1 (D.C. Cir. 2005) ...............................................................................16

*Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
   448 F. Supp. 2d 1 (D.D.C. 2006) .........................................................................8

*Quintero v. Garland*,
   998 F.3d 612 (4th Cir. 2021) .............................................................................10

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ...........................................................................14

*Tourus Recs., Inc. v. Drug Enf't Admin.*,
   259 F.3d 731 (D.C. Cir. 2001) ...........................................................................18

*Widakuswara v. Lake*,
   2025 WL 1521355 (D.C. Cir. May 28, 2025)......................................................14

## Statutes

5 U.S.C. § 704 ...........................................................................................................15

5 U.S.C. § 706 ...........................................................................................................15

Pub. L. No. 118-42, 138 Stat. 133 (2024)..................................................................13

## Other Authorities

170 Cong. Rec. S1405 ...............................................................................................13

EOIR, Explore Relief Options, ICOR, https://icor.eoir.justice.gov................................12

EOIR, Migrant Protection Protocols, ICOR, https://icor.eoir.justice.gov/en ................11

EOIR, U.S. Citizenship, ICOR, https://icor.eoir.justice.gov/en ...................................................12

H.R. Rep. 108-10 (2003)...............................................................................................................12

H.R. Rep. No. 116-455 (2020) ......................................................................................................11

Immigration Review, "FY 2014 to FY 2019 Legal Orientation Program Cost
    Evaluation" (May 7, 2021) ...................................................................................................4

Immigration Review, "LOP Cohort Analysis: Phase II" (January 29, 2019)................................4

Immigration Review, "LOP Cohort Analysis" (September 5, 2018) .............................................4

*Increase Deportations*, NPR (Apr. 22, 2025), https://www.npr.org/2025/04/22/nx-
    s1-5372681/trumpimmigration-judges-fired..........................................................................11

Acacia Center for Justice, *A Refutation of EOIR Analyses of the Legal Orientation
    Program for Detained Adults* (Mar. 21, 2025), https://acaciajustice.org/wp-
    _content/uploads/2025/05/LOP-Memo-Long-Versionfinal.pdf; ....................................20, 21, 22

S. Rep. No. 110-397 (2008) ..........................................................................................................13

S. Rep. No. 118-62 (2023) ......................................................................................................12, 13

S. Rep. No. 118-198 (2024) ..........................................................................................................17

Vera Institute of Justice, LOP Case Time Analysis for Performance Indicators
    (Sept. 14, 2018), https://perma.cc/F7TG-9BDL ....................................................................20

## INTRODUCTION

The administrative record Defendants filed on April 24, 2025 made clear they had no reasoned justification for terminating longstanding legal orientation and legal representation programs (the "Programs") and no plan for how to spend funds Congress appropriated for the Programs. In fact, Defendants conceded that "within the record itself there is not an articulated reason" for why Defendants terminated the Programs. Dkt. 77 at 38:20–39:3. As Plaintiffs explained in their motion for summary judgment and request for preliminary injunctive relief, this groundless termination is invalid and warrants immediate injunctive relief and entry of judgment in favor of Plaintiffs under the APA.

After Defendants tried to inject confusion into these issues by way of a May 7 declaration that provided a back-of-the-napkin plan for a "federalized program," Dkt. 70-1, this Court ordered Defendants to file a supplemental record including "all materials relevant to Defendants' decision to 'federalize' or otherwise terminate or alter the Programs, as well as their plan to administer the Programs and to spend the appropriated funds before the end of the fiscal year," Dkt. 75 at 4.

Defendants filed a supplemental record, but it features none of the information contemplated in this Court's order. Defendants provided no pre-decisional material (new or omitted) that illuminates their April decision to terminate the Programs. They offer no actual "plan to administer" their hypothetical federalized program, which, even taken at face value, would at most cover only two of the five Programs. And they do nothing to explain how their proposal for such a federalized program—which apparently consists of an evolving hodgepodge of preexisting materials and independent obligations—would spend congressionally mandated funds. Instead, all the supplemental record adds is another self-serving (and contradictory) declaration presenting material that post-dates the termination of the Programs, plus a handful of flawed memoranda and

studies that Defendants' previously-submitted administrative records show were not considered at any point in deciding to terminate the Programs.

None of these materials further explain or justify Defendants' April decision to terminate the Programs. Since April 16, Plaintiffs have continued to suffer irreparable harm, as their ability to access immigration courts and detention facilities have been increasingly restricted and they have been forced to lay off, furlough, or reallocate staff as they try to do more with less in order to continue fulfilling their missions. Plaintiffs re-urge the Court to grant their pending motion for summary judgment and request for preliminary injunctive relief, Dkt. 67, and submit this supplemental brief to make four additional points.

*First*, although the Court ordered Defendants to produce a supplemental administrative record, what Defendants produced merely confirms that they did not consider a consolidated federal program *at all* before terminating the Programs. Thus, Defendants' post-termination declarations and newly-submitted exhibits are not properly part of the administrative record and should not be considered at summary judgment. In assessing agency actions, courts are generally "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Biden v. Texas*, 597 U.S. 785, 811 (2022). The new materials Defendants seek to introduce through declarations and their "supplemental administrative record" either post-date their April termination decision or are otherwise shown by previously-produced materials to not have been considered as part of that hasty decision. The court should thus exclude them from consideration at summary judgment.

*Second*, even if the Court were to consider Defendants' post-termination declarations, they show only that the hypothetical "federalization" of the Programs is termination by another name. This supplemental record, contradicting Defendants' prior statements, indicates that the purported

federal program will ostensibly "replace" only the Legal Orientation Program ("LOP") and the Legal Orientation Program for Custodians ("LOPC"), and confirms that Defendants have completely terminated the Immigration Court Helpdesk ("ICH"), Family Group Legal Orientation Program ("FGLOP"), and Counsel for Children Initiative ("CCI") programs. Defendants provide only two concrete details about this purported federal program: (1) they will encourage immigration judges to explain to individuals their rights in proceedings (an obligation that already exists, and a feature they appear to drop in later descriptions of the program), and (2) they will furnish "self-help" materials (which already exist independent of the Programs). Defendants cannot fulfill their obligations to perform $28 million of congressionally mandated services with these illusory initiatives, meaning "federalization" would be *ultra vires*, violate the separation of powers, and contravene the APA.

*Third*, Defendants' purported decision to "federalize" the programs is independently unlawful as arbitrary and capricious under the APA. Defendants' declarations identified a narrow subset of flawed and outdated studies that they purport to rely on post-termination. Defendants did not engage with substantial documentation showing the effectiveness of the Programs as run by third-parties like Plaintiffs, nor did they cite any studies that assessed a potential "federalized" program. That is not the kind of reasoned decision-making required by the APA, and it provides no basis for Defendants to immediately terminate the existing Programs without replacing them with adequate substitutes—a reviewable final agency action.

*Fourth*, Defendants' unlawful actions continue to harm Plaintiffs and directly impede their shared mission to provide services to individuals in immigration proceedings. These issues have only worsened since Plaintiffs were last before the Court, escalating the need for relief.

Defendants admitted they did "not want to supplement the administrative record," Dkt. 77 at 81:25, and it is now clear why: there is simply nothing to justify Defendants' termination of the Programs. Instead, all they can offer are post-hoc justifications and hypothetical concepts of a plan to replace two of the Programs, all of which wither under scrutiny. This Court should enter summary judgment in Plaintiffs' favor.

## ARGUMENT

**I.    The New Materials Defendants Submitted Are Not Properly Part of the Administrative Record and Should Not Be Considered at Summary Judgment.**

Since filing their original administrative record on April 25, Defendants have submitted eight new documents:

- Declaration of Sirce E. Owen (May 7, 2025), SAR 206–10;

- Declaration of Stephanie E. Gorman (May 7, 2025), SAR 211–17;

- Declaration of Sirce E. Owen (May 21, 2025), SAR 218–25;

- Executive Office for Immigration Review, "LOP Cohort Analysis" (September 5, 2018), SAR 226–50;

- Executive Office for Immigration Review, "LOP Cohort Analysis: Phase II" (January 29, 2019), SAR 251–62;

- Executive Office for Immigration Review, "Addendum to LOP Cohort Analysis, Phase I: Detention Length with DHS Data" (January 29, 2019), SAR 263–65;

- Executive Office for Immigration Review, "FY 2014 to FY 2019 Legal Orientation Program Cost Evaluation" (May 7, 2021), SAR 266–335; and

- Executive Office for Immigration Review, Memorandum (PM 25-15), "Office of Legal Access Programs" (January 31, 2025), SAR 336–37.[1]

Plaintiffs agree with Defendants that none of these materials "materially affect how the Court should decide this case." Dkt. 80 at 7. Although the Court ordered Defendants to supplement the administrative record, the scarcity of Defendants' production (and its complete lack of contemporaneous materials) confirms that Defendants had not considered a consolidated federal program at all when terminating the Programs. As a result, none of these materials are properly part of the administrative record, and none should be considered at summary judgment.

It is "black-letter administrative law that in an APA case, a reviewing court 'should have before it neither more nor less information than did the agency when it made its decision.'" *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013). Materials in an administrative record are thus limited to what was "before the [agency] at the time [it] made [its] decision," and materials that "were written after the [agency] issued its [decision] . . . are therefore not part of the administrative record." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). Even when the government offers a "supplemental explanation" outside of the administrative record, that explanation must be "anchored to 'the grounds that the agency invoked when it took the action'" at issue. *Biden*, 597 U.S. at 811.

The new materials Defendants have submitted are not part of the administrative record because they (1) post-date the April termination of the programs and/or (2) were not considered by Defendants when they terminated the programs and not "anchored to 'the grounds that the agency invoked when it took the action.'" *Biden*, 597 U.S. at 811.

---

[1] Plaintiffs cite the administrative record filed on April 24 as "AR" and the supplemental material filed on May 21 as "SAR."

*First*, the three declarations Defendants submit—which were drafted between May 7 and May 21—all post-date Defendants' April termination decision and thus cannot be considered at summary judgment. When assessing administrative action, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1336 (D.C. Cir. 2023). Where the government provided no rationalization at the agency level, it is precluded from initially offering one on judicial review as a *post hoc* rationalization. *End Citizens United PAC v. FEC*, 69 F.4th 916, 922 (D.C. Cir. 2023).

Defendants' three "self-serving declaration[s]" that were "created and filed . . . several weeks after litigation ensued"—and after the administrative record was filed—amount to "little more than . . . post-hoc rationalization[s] of the type routinely rejected by courts in APA proceedings." *League of Women Voters of U.S. v. Harrington*, 560 F. Supp. 3d 177, 187–88 (D.D.C. 2021); *accord, e.g.*, *Am. First Legal Found. v. Cardona*, 630 F. Supp. 3d 170, 176 (D.D.C. 2022) (declining to rely on declaration made after administrative decision in question because it was "outside of the Administrative Record"). Because the May declarations necessarily could not have been considered by Defendants in April, they are not properly part of the record and are irrelevant to assessing Defendants' termination decision.

The declarations also advance "evidence" of a plan to federalize the Programs that is found nowhere else in the administrative record. In the declarations, Defendants state for the *first* time— months after the agency action under review—that they are creating "a consolidated federalized program" to replace the Programs. SAR 207–08, 218–25. Yet no such program is mentioned in the February or April administrative records, and there is no indication Defendants considered the creation of such a program *before* terminating the Programs, or even any time before Plaintiffs

filed their motion for summary judgment. Defendants conceded as much at the May 14 hearing, stating that "within the record itself there is not an articulated reason" for why Defendants terminated the programs. Dkt. 77 at 38:6–39:4. Defendant EOIR Acting Director Sirce Owen's declaration likewise *admits* that the purported plan to "federalize" the Programs was not in place at the time of the challenged termination of the Programs and remains undeveloped to this day. *See* SAR 223 ("At the time those task orders were terminated, however, alternative models for delivering 'Legal Orientation Program' services, including a federalized program, were still being developed and considered."). But her assertion that alternative models were under considerations is contradicted by the record: there is not a single email or other contemporaneous record suggesting Defendants ever considered a consolidated federal program before April 16.

The declarations also provide conflicting rationales for Defendants' termination decision. On May 7, Defendants declared (for the first time) that their rationale for terminating the Programs was that "EOIR will satisfy its legal orientation services' obligation by providing a consolidated federalized program." SAR 207–08. But on May 21, Defendants made an about face, claiming that the *real* reason for the termination of the Programs was that "EOIR's prior studies indicated that LOP was a wasteful program that should not continue in its current form." SAR 222. Between the May 7 and May 21 declarations, the scope of this federalized program apparently shrunk to exclude both ICH and the role of IJs.[2] The "federalized plan" is seemingly the shape of water, somehow fulfilling all the obligations that termination of the Programs creates, while simultaneously changing in scope, and being both the reason and not the reason why the Programs were terminated.

---

[2] In their supplemental brief filed on May 30, Defendants seem to suggest ICH is part of the Programs to be replaced by the purported federalized program, apparently conceding that failing to continue ICH is a violation of their duty under the statute. Dkt. 80 at 12–13.

*Second*, the new exhibits provided in the supplemental record were not considered in Defendants' decision-making process when terminating the Programs and, thus, are not properly part of the scope of the administrative record for the decision at issue. On April 15, this Court reminded Defendants that:

> if the administrative record or the relevant decision encompasses more than simply the decision to terminate the contract, I would expect that to be included. And if it is a decision with respect to how to proceed forward with respect to the LOP more generally, that should all be included in the administrative record.

Dkt. 63 at 69:5–16; *see also id.* at 69:25–70:8 (requiring Defendants to produce "any guidance whatsoever that the government provides to facilities about what to do . . . [about allowing people in or not] so we actually know if there is any guidance"). Obviously, Defendants did not include the five new exhibits when they compiled the original administrative record. *Compare* Dkt. 65, *with* Dkt. 78. And nothing in the record indicates that Defendants considered, when reaching their decision, any of the flawed studies now offered in the supplemental record before preparing that record. *Cf. Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) (courts must reject rationalizations developed for litigation).

These are improper submissions. "[T]he administrative record should not include materials that were not considered by agency decisionmakers." *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (cleaned up); *see also GE v. Jackson*, 595 F. Supp. 2d 8, 18 (D.D.C. 2009) ("[I]rrelevant documents should be excluded from the record."). Defendants have shown no indication that the five additional exhibits—which consist of years-old studies and memoranda, and which say nothing about federalizing the programs—were part of their decision-making process. And the record shows just the opposite: up to the last minute before termination, an employee from the DOJ's Justice Management Division ("JMD"), which oversees DOJ's contracts, asked, "why does EOIR want these task orders

terminated?  Please provide a memo in writing."  AR at 21.  No such memorandum ever materialized—much less one that reflects consideration of any of the five exhibits Defendants now offer.  Because there is no indication those exhibits (or anything else, really) was considered at the time the Programs were terminated, and because these exhibits are not "anchored to the grounds that [Defendants] invoked when" they terminated the Programs, the Court should not consider this extra-record evidence and any arguments relying on it.  *Biden*, 597 U.S. at 811; *see also, e.g.*, *Fund for Animals v. Williams*, 246 F. Supp. 2d 27, 48 (D.D.C. 2003), *rev'd on other grounds by Fund for Animals, Inc. v. Hogan*, 428 F.3d 1059 (D.C. Cir. 2005) (striking extra-record declarations); *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (refusing to consider post-hoc declarations in an APA case).

## II.    Defendants' "Federalized Program" Is Tantamount to Terminating the Programs.

Even if this Court were to consider Defendants' post-hoc declarations describing their plan to "federalize" the Programs, that would not change the outcome.  Defendants' purported "federalized program" describes materials that already exist and services (such as the obligation of immigration judges to explain proceedings) that are already legally required, independent of the Programs.  Defendants could not possibly fulfill their statutory obligations or spend appropriated funds to provide services *via* a "federalized program" as outlined.  Rather, Defendants' declarations make clear that "replacing" LOP and LOPC with a "federalized" program is tantamount to terminating the Programs entirely.

In Defendants' May 7 declaration, where they first provided a barebones description of their purported plan, they said that the "federalized program" would rely on "Immigration Judges orienting [noncitizens] to their rights, obligations, and available legal options" and "hard copy and online legal tools," including some undefined set of "self-help legal materials" and "EOIR's Immigration Court Online Resource (ICOR)."  Dkt. 70-1 ¶ 7.  But these resources already exist

alongside the Programs long operated by Plaintiffs and other non-governmental organizations, and Defendants offer no explanation for how they can or will spend $28 million in congressionally appropriated funds on resources already provided and paid for. *See generally* Dkt. 72 at 13–15, 34–42. Defendants provided no information about, for example, additional staff that might be hired to run their purported "federalized program," training materials that were being developed, new materials that were being prepared, or any indication of when or where this supposedly new programming would occur.

Defendants' supplemental record adds no detail, and instead raises more questions about the purported "federalized" program. Director Owen's May 21 declaration asserts that the "federalized program" will now exclude ICH services, purportedly covering only LOP and LOPC. SAR 220, 224. And it no longer mentions "Immigration Judges orienting aliens to their rights, obligations, and available legal options." *Compare* Dkt. 70-1 ¶ 7, *with* SAR 222–25. Indeed, Defendants provide no explanation as to how they will possibly perform $28 million of services via the extremely limited resources described in the May 21 declaration.

The "federalized program" as described in the May 7 and May 21 declarations cannot meet Defendants' statutory and constitutional obligations. As Plaintiffs have explained, to the extent immigration judges are involved, they already "have an affirmative duty to assist and work with" individuals appearing before them. *Quintero v. Garland*, 998 F.3d 612, 626 (4th Cir. 2021). Congress created the Programs to supplement this duty, given that these judges already face an "overwhelming backlog" and "have limited time to engage in the intensive assistance required for pro se respondents," Amicus Brief of Former Immigration Judges and Former Members of the Board of Immigration Appeals, Dkt. 41-1 at 14. Making matters worse, immigration judges are being reduced in number. *See* Ximena Bustillo, *Trump Fires More Immigration Judges Even As*

10

*He Aims to Increase Deportations*, NPR (Apr. 22, 2025), https://www.npr.org/2025/04/22/nx-s1-5372681/trumpimmigration-judges-fired.  But even if Defendants used these funds to hire more immigration judges, that still is akin to terminating the Programs and contrary to the Programs' congressional mandate because immigration judges historically have been paid through different appropriations, and are officials whose independent duties are augmented by the more expansive Programs.  *See* Dkt. 72 at 41–42.

To the extent Defendants rely on online "self-help materials" for their "federalized program," that presents two major problems.

*First*, effectively utilizing such materials depends on noncitizens being able to access and read them—a barrier that is far from trivial, as LOP exclusively serves detained noncitizens, many of whom do not have technology or internet access, and many face vision, literacy, and language barriers with these materials.  Dkt. 67-14 ¶¶ 19–20.  The in-person, live group, and one-on-one services that Plaintiffs and other non-profits have historically provided (and that Defendants now abandon) help mitigate these challenges.  *Id.*  Indeed, Congress has warned Defendants that web-based, as opposed to in-person, programming is insufficient.  *See* H.R. Rep. No. 116-455, at 63 (2020) ("The Committee is concerned that plans for a web-based application will not adhere to congressional intent. . . . The Committee reminds EOIR that funding for this program, in its ongoing, in-person format, is mandated by law . . . ..").

*Second*, the information presented in these materials is incomplete and inaccurate.  ICE is informing noncitizens that the Programs, including LOP, no longer exist (not that they are being replaced), Dkt. 72-5, while still pointing them to the ICH—even though Director Owen's most recent declaration indicates that LOP is *not* terminated, but ICH *is* terminated, *see* EOIR, Migrant Protection Protocols, ICOR, https://icor.eoir.justice.gov/en (last visited May 30, 2025).  ICE is

11

scrubbing its website of references to asylum and how to obtain legal representation, Dkt. 72-2, and the ICOR website describes only relief available before the Immigration Court—not relief available via the United States Customs and Immigration Services ("USCIS"), including U visas, T visas, Special Immigrant Juvenile Status, family petitions, employment-based petitions, and citizenship or naturalization remedies, *see* EOIR, Explore Relief Options, ICOR, https://icor.eoir.justice.gov (last visited May 30, 2025) (listing voluntary departure, asylum, withholding of removal, convention against torture, cancellation of removal, and adjustment of status); EOIR, U.S. Citizenship, ICOR, https://icor.eoir.justice.gov/en (last visited May 30, 2025) (redirecting individuals to the difficult-to-navigate USCIS Citizenship Resource Center). ICOR also excludes any information pertaining to unaccompanied children or their custodians, which LOPC requires. Meanwhile, ICE is encouraging noncitizens to "self-deport." Dkt. 67-10. If these are the "self-help" materials Defendants have in mind, they certainly do not inform noncitizens about their "rights and responsibilities" as Congress envisioned, S. Rep. No. 118-62, at 84 (2023). Instead, they seek to keep noncitizens ignorant of their rights and responsibilities, like the right to affirmatively apply for asylum before USCIS.

Additionally, Defendants' "federalized program" fails to comply with Congress's repeated statements that the Programs should be run by non-governmental entities and meaningfully implemented. In 2002, Congress clarified when providing for LOP that it was appropriating funds "for non-governmental agencies to provide 'live presentations' to persons in INS detention prior to their first hearing before an immigration judge." H.R. Rep. 108-10, at 626 (2003). "These presentations will provide immigration detainees with essential information about immigration court procedures and the availability of legal remedies to assist detainees in distinguishing between meritorious cases and frivolous cases." *Id.* In 2008, the Senate affirmed this understanding of the

role of LOP: "The LOP program informs detained aliens in immigration removal proceedings about the immigration court process, how to obtain legal representation or represent themselves and how to determine if they are eligible for any immigration relief or expedite the removal process." S. Rep. No. 110-397, at 45 (2008). The Senate Report for the 2024 appropriation confirms that Congress meant LOP to refer to the program "created in 2003" which "currently informs more than 50,000 detained non-citizens per year about their legal rights and responsibilities." S. Rep. No. 118-62, at 84 (2023). The congressional record affirmed that Congress "direct[ed] the Department to utilize all appropriated funds solely for legitimate program purposes." 170 Cong. Rec. S1405. Spending funds on different programs or other preexisting resources purportedly provided by federal employees plainly does not comply with these congressional directions.

The Programs provide numerous services which Defendants have no plan to replace and which have been fully terminated, contrary to Congress's directive to fund the "services and activities provided by the Legal Orientation Program." Pub. L. No. 118-42, 138 Stat. 133 (2024). This includes the "know your rights" group presentations and written materials discussed above; one-on-one consultations and intakes to provide limited legal advice on an individual basis, Dkt. 67-1 (Burrola Decl.) ¶ 5; referrals to non-profit organizations and pro bono legal representation from law firms, *id.* ¶ 11; assistance delivering immigration court filings and important documents to individuals in detention to ensure they receive them in a timely fashion, *id.* ¶ 10; assistance translating evidence from an individual's native language to English to ensure they can be understood by the immigration court, *id.* ¶ 10; Dkt. 67-14 (St. John Decl.) ¶ 19; and assistance filling out forms and applications for those who do not speak English, St. John Decl. ¶ 19. Congress expressly directed Defendants to spend the money on the "services and activities"

of the Programs; Defendants cannot provide the services and activities of the Programs by only spending the money in December or by providing some other (and demonstrably lesser and different) services and activities. *See* Dkt. 80 at 12.

Defendants are wrong to suggest that Congress has provided no guidance on the "contours" of the Programs it funded. SAR 219–20. Congress plainly intended for the Programs to provide real and effective services to individuals in removal proceedings and for these Programs to be carried out by qualified non-governmental providers, to ensure that individuals receive holistic information. Defendants' belated proposal for a "federalized" program—with self-deport posters and inaccurate advice to those in detention—in no way complies with Congress's mandate. It amounts to termination by another name, and thus is *ultra vires*, violates the separation of powers, and runs afoul of the APA. *See* Dkt. 67-1 at 26–41.[3]

## III. Any Decision to "Federalize" the Programs Would Be Subject to, and Would Not Satisfy, Arbitrary and Capricious Review.

Even if the Court were to consider Defendants' post-hoc declarations, and even if it determined that the "federalized plan" described in those declarations amounts to something other than termination, Plaintiffs would *still* be entitled to summary judgment because Defendants' purported shift to a "federalized" program would be arbitrary and capricious.

---

[3] As Plaintiffs have stressed throughout this litigation, they do not seek contractual relief (including specific performance) and this Court has jurisdiction over their claims. *See Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1393876, at *3 (9th Cir. May 14, 2025); *see also Widakuswara v. Lake*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (denying rehearing *en banc* and rejecting the government's Tucker Act claims). At the May 14 hearing, this Court asked for clarification as to whether the Court of Federal Claims can order specific performance of a government contract. Dkt. 77 at 68:4–24. A court "exercising Tucker Act jurisdiction ordinarily lacks authority to grant specific performance of contracts as well as other forms of equitable relief." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 n.7 (D.C. Cir. 1985). As a result, the Claims Court ordinarily cannot order specific performance—a remedy Plaintiffs do not seek, in any event.

**A.      Defendants' Termination of the Programs and Purported Shift to a "Federalized Program" Are Reviewable Final Agency Actions.**

Courts have power under the APA to review a "final agency action" and determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A).   An agency action is considered "final" if it (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Defendants' decision to terminate and cease all spending on the Programs was a final agency action; it marked the consummation of Defendants' "decisionmaking process"—if it could be called that—and created legal consequences for Plaintiffs and the individuals they serve.  Over months of briefing, Defendants have never denied as much.  *See, e.g.*, Dkt. 70 at 27–33 (raising other APA arguments at summary judgment without disputing final agency action); Dkt. 64 at 12–22 (same in motion to dismiss).  To the contrary, Defendants' late-filed declarations show they have no intent at all to revisit their decision to terminate the Programs.  This case is thus ripe for review right now based on Defendants' decision to terminate the Programs without any record evidence showing that they had any reasoned basis for doing so or were considering any alternative at the time of termination.  *See* SAR 223 (suggesting without any contemporaneous evidence that, at the time of termination, "alternative models . . . were still being developed and considered").

Defendants *already* terminated the Programs as they existed for more than two decades, but have not replaced them with any valid substitute.  That means individuals who previously would have received services through the Programs are going without while Defendants

15

purportedly consider whether and how to implement a federalized program.[4]  This shut-off in

funding, even if temporary, amounts to a final agency action because "temporary" funding pauses

have "legal consequences and constitute[] final agency action."  *Nat'l Council of Nonprofits v. Off.*

*of Mgmt. & Budget*, 763 F. Supp. 3d 36, 54 (D.D.C. 2025); *see also Clean Air Council v. Pruitt*,

862 F.3d 1, 6 (D.C. Cir. 2017) (an agency's "interim" action can constitute final agency action if

it "has an immediate and direct effect on the parties").  And it is this action that has already caused

"legal consequences" by directly impeding Plaintiffs' collective missions to provide services to

individuals in removal hearings.[5]

Defendants concede that the relevant decision is the April 16 termination, but confusingly

try to fault Plaintiffs for not evaluating the May 7 announcement of a federal program as the

relevant decision, which Plaintiffs had never heard of when filing the relevant motion.  Dkt. 80 at

12, 19–20.    Regardless, for either so-called "decision," Defendants' actions represent a

fundamental shift in Policy with regard to the Programs, constitute final agency action, and are

---

[4] To the extent Defendants are claiming the "federalized" program is already up and running, the result is the same because they are not providing any of the services required as part of Congress's mandate, meaning the program is merely termination by another name.  *Supra* § II.

[5] At the May 14 hearing, the Court asked about the lower standard of redressability for procedural claims.  Dkt. 77 at 7:16–8:2.  There is a lower standard that applies to such claims.  *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021).  But Plaintiffs are bringing substantive claims for violations of the APA, not procedural violations.  In any event, Plaintiffs meet the redressability requirement because they have shown there is a substantial likelihood that a favorable court order would redress their injuries.  *See Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 6–7 (D.C. Cir. 2005) (declining to decide whether a claim was substantive or procedural because the claims survived in either case).  As Plaintiffs explained in their motion, Dkt. 67-1 at 25–26, Dkt. 72 at 20–23, Plaintiffs' harms are redressable even if Defendants comply in a manner that does not reinstate Plaintiffs' contracts to provide the Programs.  So long as the Programs are actually reinstated and providing this critical legal information to individuals in removal proceedings, Plaintiffs' mission harms will be redressed and Plaintiffs' financial harms will be at least partially redressed as they will be able to reorganize and provide other resources more effectively.  *See, e.g.*, *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of Justice*, 2025 WL 752378, at *7 (D.D.C. Mar. 10, 2025); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 2025 WL 1233674, at *5 (N.D. Cal. Apr. 29, 2025).

reviewable under the APA as arbitrary and capricious. *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 32–33 (D.D.C. 2019); *see also AIDS Vaccine Advoc. Coal. v. U.S. Dep't of Justice*, 2025 WL 752378, at *7, *10 (D.D.C. Mar. 10, 2025) (finding the suspension of federal aid, motivated by a desire to review programs for efficiency or consistency, to be reviewable and likely arbitrary and capricious under the APA); *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 2025 WL 1233674, at *11 (N.D. Cal. Apr. 29, 2025) (finding that "terminat[ing] all funding" for legal services without "contemplat[ing] any alternatives to the existing policy" is reviewable and likely arbitrary and capricious under the APA).

Defendants' gesture to a supposed "federalized" program is an attempt to distract from the fact that they have already acted by terminating the Programs and cutting off services. RMIAN Decl. ¶¶ 4–5, 8–9 (detailing ongoing access issues); Amica Decl. ¶¶ 12–15, 18, 20 (similar). Nor can Defendants claim this is not final action merely because it is (or may be) part of EOIR's continuing operations—the final agency action is the reversal in policy, and that is reviewable by this Court. *Am. Bar Ass'n*, 370 F. Supp. 3d at 32–33.

Recognizing the harms that would result from a "pause" in funding the Programs pending any reorganizing or federalization, Congress expressly told Defendants to continue funding the Programs as-is in the event they were to consider any changes. Just last year, the Senate Appropriations Committee "direct[ed] the Department to continue all LOP services and activities, including that of the ICH, without interruption, including during any review of the program." S. Rep. No. 118-198, at 92 (2024). Defendants cannot dodge review by ignoring this instruction and describing their decision to "federalize" the program as non-final. Defendants' decision to cut off funding for the Programs without implementing any replacement for the services the Programs

provided is reviewable now as a final agency action subject to the arbitrary and capricious standards.

### B.    Defendants' Purported Decision to Move to a "Federalized Program" Is Arbitrary and Capricious.

To survive review under the arbitrary and capricious standard, agency actions must be "reasonable and reasonably explained." *Env't Def. Fund v. U.S. Env't Prot. Agency*, 124 F.4th 1, 11 (D.C. Cir. 2024). This "standard requires the agency to 'examine the relevant data and articulate a satisfactory explanation for its action.'" *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001). Particularly when, as here, an agency reverses longstanding policy, it must provide a reasoned basis for doing so. *See, e.g.*, *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 32–33 (D.D.C. 2019). This case presents the precise type of agency action that requires a reasoned justification.

As Defendants conceded at the May 14 hearing, "within the record itself there is not an articulated reason" for why Defendants terminated the Programs. Dkt. 77 at 38:6–39:4. Yet in their new filings, Defendants claim for the first time that "EOIR has had doubts . . . about the efficacy and efficiency of the prior 'Legal Orientation Program' model, under which services and resources were delivered by subcontractors," for "several years," citing studies performed by EOIR in 2018 and 2021. SAR 220–23. Defendants include these studies, together with follow-ups to the 2018 study published in 2019, in their supplemental record. SAR 226–335.

As an initial matter, Defendants do not explain why—given that these studies are several years old and have supposedly formed the basis of Defendants' "know[ledge]" that "LOP was a wasteful program that should not continue in its current form" since "at least 2018," SAR 222— Defendants failed to mention them until now. This is especially puzzling given that Plaintiffs referenced at least one of these studies in their original complaint filed in January, *see* Dkt. 1

¶ 101,[6] and that Defendants have had numerous opportunities to cite them, including when they previously produced administrative records on February 21 and April 24, and declarations on May 9. That they were not produced until now supports only one conclusion: Defendants did not consider them as part of their decision-making process in any way and, instead, offer them only as post-hoc, litigation justifications for cancelling the Programs under the guise of "federalization."

The administrative records show that Defendants never relied on these flawed studies and instead terminated the Programs despite a direct request asking for a memo (which never appeared) explaining "why . . . EOIR want[ed] these task orders terminated." AR 27. In fact, Acting EOIR Director Owen—upon whose declarations Defendants now rely to provide justification for the termination—admitted at the time that, while some unnamed person at JMD may "know[] the basis for the termination," Owen herself "was not privy to this conversation" and had no idea why the Programs were being terminated. AR 8. Over the course of this litigation, Defendants have provided shifting rationales for their decision to terminate the Programs, apparently in response to Plaintiffs' claims: first, they claimed it was to comply with the Protecting the American People Against Invasion Executive Order; second, Defendant Attorney General issued the Sanctuary Jurisdiction Directives memo ordering termination of services to noncitizens; third, they terminated the Programs for no reason other than the government's "convenience"; fourth, they purported to federalize the Programs; and, finally, they now claim to federalize in an attempt to reduce waste. SAC ¶ 24.

---

[6] To the extent Defendants' argue that the 2021 study was "hidden" until January 2025, *see* SAR 222, this still does not explain their failure to cite these studies in any prior brief or include them in either of the previously produced records. It is no answer at all with respect to the 2018 and 2019 studies, which were never "hidden." And the Court's April orders to produce the administrative record post-date Defendants' awareness of the 2021 report by several months.

Nevertheless, even as post-hoc justifications, the studies do not provide a reasoned justification for "federalizing" the Programs for three reasons: (1) they do not support the proposition that the Programs are "wasteful"; (2) Defendants do not engage with multiple studies underlining the efficacy of the Programs; and (3) not one of the studies purported to compare the Programs as provided by non-profit providers like Plaintiffs and the federalized program Defendants now claim to be implementing.

### 1.    Defendants' Studies Do Not Find LOP Wasteful.

As a threshold matter, the studies Defendants cite suffer from demonstrated methodological problems, which mean they do not support even their own supposed findings and takeaways. *See generally* Acacia Center for Justice, *A Refutation of EOIR Analyses of the Legal Orientation Program for Detained Adults* (Mar. 21, 2025), https://acaciajustice.org/wp-content/uploads/2025/05/LOP-Memo-Long-Version_final.pdf; Vera Institute of Justice, LOP Case Time Analysis for Performance Indicators (Sept. 14, 2018), https://perma.cc/F7TG-9BDL (contradicting the findings of the 2018 EOIR study and pointing out its methodological flaws). For instance, the 2018 and 2021 EOIR studies did not control for intervening variables and did not account for the fact that LOP purposefully "serves larger detention facilities, that are in more remote locations, that are serviced by courts with the largest backlogs." Acacia Center for Justice, *A Refutation*, at 3–6, 9–10.

Even if the Court took EOIR's studies at face value, they support only the proposition that LOP is *correlated* with some costs. *See* SAR 229 (finding that LOP participants had longer detention stays, longer proceedings and cases, and slightly more hearings); *id.* at 254 (finding that LOP participants had marginally longer hearings, are more likely to file applications for relief or protection, and their merits hearings are slightly longer if they have filed at least one application); *id.* at 310 (calculating detention and proceeding costs per fiscal year associated with LOP). But

correlation is not causation. None of these studies even purport to claim that LOP is the *cause* of these costs; indeed, they disclaim that. *See id.* at 296 ("These costs are also not to be interpreted as causation. In other words, these costs do not mean that LOP programs *cause* higher costs since their programs are only one of many unmeasured/unknown variables impacting the length of detention."); *id.* at 311 ("EOIR has not assigned any causal behavior to the LOP. . . . There could be other causal factors. EOIR would need to conduct additional, rigorous analysis to draw definitive conclusions regarding any potential causal factors.").

These studies also consider only certain kinds of costs—those associated with the length of detention and proceedings—without weighing efficiency improvements, such as reductions in non-meritorious appeals and other countervailing benefits associated with LOP. *See* SAR 275 n.1 ("This evaluation does not include non-financial, non-monetary costs nor benefits in this study."); SAR 275 ("While other types of evaluations/analyses may be considered to assess the non-cost impacts and/or possible benefits of the LOP program, this evaluation focuses solely on government expenditures generated by the LOP program."); SAR 296 ("These costs do not reflect the human impact of the LOP program, which is beyond the scope of these analyses."); SAR 296 n.29 ("EOIR limited these analyses to quantifiable cost elements. Therefore, these analyses do not necessarily include all possible costs or cost savings. Further, EOIR recognizes that other governmental agencies and components incur additional costs and savings, which are beyond the scope of this evaluation."); SAR 311 ("EOIR focused only upon the tangible, primary financial costs EOIR identified. It did not attempt to identify any non-tangible costs that the LOP program may (or may not) provide.").

The EOIR studies, by their own words, do not support Defendants' claims that the Programs are "wasteful." SAR 222. Indeed, if "the increases in the length of hearings and the

numbers of motions and applications" is the result of LOP orientations "inform[ing] [noncitizen's] decision-making," or of "[noncitizens] exercising the options available to them within immigration proceedings," as one of the EOIR studies suggests, SAR 311, that would be evidence that the Programs are *working* exactly as intended, not that they are wasteful.  Defendants' interpretation of "efficiency" appears to be one in which the highest number of individuals are removed without any provision of due process or consideration of whether they are eligible for any relief.  But the Programs are intended to help the immigration system as a whole run efficiently, which must include allowing individuals to receive due process prior to removal.  Summary deportations for all do not achieve this goal.  Similarly, if LOP hearings or cases take longer because noncitizens who participate in LOP appear at their court-ordered hearings, as opposed to noncitizens who are ordered removed *in absentia*, that again is evidence that the Programs are *working*, not wasteful. *See* SAC ¶ 122; Acacia Center for Justice, *A Refutation*, at 8–9.

### 2.   Defendants Do Not Engage with Studies that Reach Results Different from Their Own Flawed Studies.

Numerous studies highlight the efficiency and efficacy of LOP and ICH.  *See, e.g.*, Dkt. 1 ¶¶ 10, 69, 116 (EOIR's 2012 study); 84, 101 (Booz Allen Hamilton's 2017 report); 101 (Vera Institute of Justice's 2018 study).  These studies—several of which did perform the analysis necessary to be able to make causal claims—found that LOP *saves* the government money.  *Id.* ¶¶ 62–69, 84–87.  But other than a brief remark suggesting some concerns with the 2012 study, SAR 221, 231, the supplemental record is devoid of evidence that EOIR considered any of these studies before choosing to terminate (or "federalize") the Programs.  None of these studies are included in the administrative record, which is supposed to include "*all* materials relevant to Defendants' decision to 'federalize' or otherwise terminate or alter the Programs"—not just those that cut Defendants' way.  Dkt. 75 at 4; *see also Democracy Forward Found. v. Pompeo*, 474

F.Supp.3d 138, 148 (D.D.C. 2020) ("The administrative record generally 'consists of all documents and materials directly or indirectly considered by agency decision-makers *and includes evidence contrary to the agency's position*.'" (emphasis added)); *Forest County Potawatomi Comm. v. United States*, 270 F.Supp.3d 174, 178 (D.D.C. 2017) ("Of course, an agency 'may not skew the record by excluding unfavorable information but must produce the full record.'"). That these studies were not included shows that they were not considered. The decision to terminate (or "federalize") the Programs thus fails arbitrary and capricious review. *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972) ("[I]t is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination.").

### 3. Defendants' Studies Do Not Support a "Federalized Program."

None of the studies Defendants cite have any bearing on the comparative question whether running the Programs through non-profit organizations or through a "consolidated federalized program" is more efficient. Indeed, the studies expressly disclaim their ability to answer such a question. *See* SAR 231 ("This study does not address several LOP-related legal and policy issues that are beyond its scope, including whether the LOP should be continued in its present form, modified, or terminated. For example, this study does not assess whether LOP programs are most effective within EOIR or would be more effective within another federal agency or within another component of the Department of Justice. Additionally, it does not address any legal considerations associated with the LOP."); SAR 280 ("As in the prior studies, this study does not address several LOP-related legal and policy issues that are beyond its scope. For example, this study does not assess whether LOP programs are most effective within a particular EOIR program, as a standalone, or within another component of the Department of Justice.").

The studies thus provide absolutely no basis for a decision to "federalize" the Programs given that they did not (and were not designed to) evaluate that possibility. Because Defendants

provide no other evidence to support a "federalized program," their purported federalization scheme is arbitrary and capricious.

## IV.    Defendants' Actions Continue to Harm Plaintiffs.

Plaintiffs and the individuals they serve continue to suffer ongoing and irreparable harm as a result of Defendants' termination of the Programs.  These harms have only gotten worse since Plaintiffs were last before the Court.  Defendants' termination of funding has impacted Plaintiffs' overall organizational budgets and staffing, including forcing Plaintiffs to terminate large numbers of staff.  For instance, the Florence Project has had to lay off 47 individuals (approximately one-quarter of its staff) and anticipates the possibility of additional future lay-offs.  FIRRP Decl. ¶¶ 15–18.  This irreplaceable loss of institutional knowledge is exacerbated by several recent resignations as a result of the uncertainty and decreased morale.  *Id.*

Likewise, Plaintiffs continue to be denied access to detention facilities and immigration courts.  *See* RMIAN Decl. ¶¶ 4–5, 5–6 (RMIAN has not received authorization to provide group presentations at Aurora and its staff are frequently unable to reach anyone in the facility by phone); Amica Decl. ¶ 12 (two volunteers were turned away from a visit because Caroline detention facility staff stated—in an unexplained and unwarned reversal of prior practice—that there needed to be two weeks between a background check and the first visit); *id.* ¶¶ 13, 15, 18, 20 (Amica Center is no longer able to file documents on noncitizens' behalf or inquire about a hearing without an E-28 notice of appearance or E-61 notice of limited appearance submitted via ECAS, but it is impossible to submit an E-61 via ECAS).

Plaintiffs' ability to share information with noncitizens has also been hindered as a result of Defendants' action.  *See* FIRRP Decl. ¶¶ 8–10 (Florence Project staff frequently have to wait over an hour for guards to bring people to their presentations and meetings, guards frequently do not bring all the people on the participant list, and attendance at presentations is historically low);

RMIAN Decl. ¶¶ 6–7 (staff frequently have to wait hours to meet with pro se individuals and clients); Amica Decl. ¶¶ 6–11 (Amica Center has had lower attendance than normal during their "know your rights" visits and is no longer permitted to exchange documents with noncitizens detained at Caroline via email without a Form G-28 on file, and therefore has to resort to exchanging documents via the mail or in-person, both of which take much longer).

Finally, Defendants are cutting off the distribution of Plaintiffs' informational resources, infringing their First Amendment rights.  *See* RMIAN Decl. ¶ 13 (posters advising detained individuals of RMIAN's existence and how to contact them have been removed from the dorms at the Aurora facility).  In lieu of Plaintiffs' materials, Defendants are providing noncitizens with incomplete and inaccurate information that suggests their only option in immigration proceedings—even when they have already been granted relief—is to self-deport.  FIRRP Decl. ¶ 12; *see also* Amica Decl. ¶ 6.  As a result of all of this, hundreds, if not thousands, of noncitizens are being detained and removed without ever receiving the knowledge of all their rights and obligations that Congress intended to provide.  *See* RMIAN Decl. ¶ 10 (more than 600 individuals at the facility, hundreds with upcoming hearings, have not received orientation services).

In sum, Plaintiffs' shared mission to provide individuals in removal hearings with accurate information and important services continues to be frustrated by Defendants' unlawful actions, underlining the need for immediate relief.

## CONCLUSION

Defendants' continued—and continually shifting—post-hoc rationalizations for their decision to terminate the Programs do not justify that decision.  Defendants' actions are *ultra vires*, violate the separation of powers, and contravene the APA.  The Court should grant Plaintiffs' pending motion for summary judgment or, if further proceedings are necessary, grant Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

May 30, 2025

/s/ Adina Appelbaum                                    /s/ Laura Sturges

AMICA CENTER FOR IMMIGRANT              GIBSON DUNN & CRUTCHER
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)      Laura Sturges (C.O. Bar No. 36843)*
Samantha Hsieh (V.A. Bar No. 90800)*         1801 California Street, Suite 4200
Amelia Dagen (D.C. Bar No. 9004838)          Denver, CO 80202-2642
Amica Center for Immigrant Rights             (303) 298-5700
1025 Connecticut Avenue NW, Suite 701        lsturges@gibsondunn.com
Washington, DC 20036
(202) 331-3320                                Amer S. Ahmed (D.C. Bar No. 500630)
adina@amicacenter.org                        Richard W. Mark (D.D.C. Bar No. NY0378)
sam@amicacenter.org                          200 Park Avenue
amelia@amicacenter.org                       New York, NY 10166-0193
                                             (212) 351-4000
                                             rmark@gibsondunn.com
                                             aahmed@gibsondunn.com

                                             * admitted *pro hac vice*